McDERMOTT WILL & EMERY LLP
William P. Smith (WS-3210)
David D. Cleary (DC-9166)
227 West Monroe Street
Chicago, Illinois  60606
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700

*and*

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst (SS-6963)
James M. Sullivan (JS-2189)
50 Rockefeller Plaza
New York, New York  10020
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444

Proposed Attorneys for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.,*<br><br>　　　　　　　Debtors. | Chapter 11<br>Case No. 05 __ - _____<br><br>(Jointly Administered) |

**AFFIDAVIT OF TIMOTHY WEIS PURSUANT TO**
**LOCAL BANKRUPTCY RULE 1007-2 AND IN**
**SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**

STATE OF NEW YORK　　　)
　　　　　　　　　　　　)　　SS:
COUNTY OF NEW YORK　)

　　　Timothy Weis, being duly sworn, deposes and says:

　　　I am the Chief Financial Officer of Saint Vincent Catholic Medical Centers of New York

("**SVCMC**" or the "**System**"), and I am familiar with the business and affairs of its debtor-

affiliates, CMC Physician Services, P.C., CMC Radiological Services P.C., CMC Cardiology Services P.C., CMC Occupational Health Services P.C., Medical Service of St. Vincent's Hospital and Medical Center, P.C.,  and Surgical Service of St. Vincent's, P.C. (collectively, the "**Captive PCs,**" and together with the System, the "**Debtors**").

I submit this declaration (this "**Declaration**") pursuant to Rule 1007 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), filed on the date hereof, and the relief, in the form of motions and applications, that the Debtors' have requested of the Court (the "**First Day Motions and Applications**").   I believe that the relief sought in each of the First Day Motions and Applications (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption to their operations or loss of value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and creditors' interests.

Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtors' management or professionals, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  Unless otherwise indicated, all financial information contained herein is presented on a consolidated and unaudited basis.  I am authorized to submit this Declaration.

This Declaration is intended to provide a summary overview of the Debtors and the events leading to the commencement of the chapter 11 cases.  Part I provides an overview of the

CHI99 4478581-24.030067.0030

Debtors' business and the circumstances that compelled the filing of these chapter 11 cases. Part II sets forth the relevant facts in support of the First-Day Motions and Applications. Part III contains the information required by Local Bankruptcy Rule 1007-2.

## BUSINESS OF THE DEBTORS

1.     The System was formed in 2000 as a result of the merger of Catholic Medical Centers of Brooklyn and Queens under the auspices of the Diocese of Brooklyn, Saint Vincents Hospital and Medical Center under the auspices of the Archdiocese of New York and the Congregation of the Sisters of Charity, and Sisters of Charity Health Care on Staten Island under the auspices of the Congregation of the Sisters of Charity.

2.     The System is one of the New York metropolitan area's most comprehensive health care systems, serving more than 600,000 people annually. The System serves as the academic medical center of New York Medical College in New York City. In addition, the System is also one of New York metropolitan area's largest employers, employing approximately 12,500 full and part-time employees.

3.     The System includes seven hospitals: St. Vincent's Hospital Manhattan; Bayley Seton, Staten Island; Mary Immaculate, Queens; St. John's, Queens; St. Mary's, Brooklyn (which is scheduled to close in 2005); St. Vincent's Hospital, Staten Island; and St. Vincent's Hospital, Westchester. The System also operates numerous debtor and non-debtor affiliates, including four skilled nursing facilities, a hospice, a system-wide home health care agency, a hospice and over 60 off-site ambulatory care centers, which provide a broad array of medical, psychiatric and substance abuse services.

CHI99 4478581-24.030067.0030

4.      In 2004, the System recorded more than 600,000 outpatient visits, 640,000 home care visits and 92,000 inpatient discharges.  Its emergency rooms, which include three Level 1 trauma centers, received 255,000 visits in 2004.  The System is the largest provider of EMS services in the New York City Fire Department's 911 service.  More than 2,500 physicians are affiliated with the System, which includes comprehensive services for cardiovascular disease, cancer and HIV.

5.      The System's mission is combined with a system-wide emphasis on technology and quality.  The System is committed to reflecting God's love by advancing Christ's healing ministry, with Respect, Integrity, Compassion and Excellence to all who come to the System in need, especially the poor.  Its core values are:

- Respect: The basic dignity of the human person is the guiding principle in all of the System's interactions, policies and procedures.

- Integrity: Integrity is the consistency between the Catholic identity the System professes and the ways in which it acts.  It is that quality of truthfulness which fosters trust.

- Compassion: Compassion is the way the System shares deep concern, love and care toward each person.

- Excellence: Excellence is the System's way of demonstrating that it can always be more, always be better.

6.      In accordance with its mission, the System is a substantial provider of emergency and charitable care.  Because many of the primary treatment areas served by the System are in low-income neighborhoods, many of the residents in these communities lack health insurance and use the System's hospitals as primary health care providers.  During 2004, the System provided approximately $104 million in charity care to poor and uninsured patients.

CHI99 4478581-24.030067.0030

7.      In 2004, the System had total revenues (including gifts) of $1.557 billion and recorded a net operating loss of $143.4 million.  For the first four months of 2005, the System had total revenues of $496.5 million and recorded a net operating loss of $21.1 million.

## A.    <u>Hospitals</u>

8.      <u>St. Vincent's Hospital Manhattan</u>.  St. Vincent's Hospital Manhattan is a 758 bed hospital located at 170 West 12th Street in the Greenwich Village neighborhood of Manhattan.  It was founded in 1848 by four Sisters of Charity as a 30-bed hospital in a small brick house on 13th Street as one of the few charity hospitals in New York City at that time.  St. Vincent's Hospital Manhattan provides a wide array of hospital services, including behavioral health, cancer, cardiology, HIV treatment, orthopaedic surgery, obstetric/maternity, pediatrics, intensive care units, rehabilitation and child psychiatry.

9.      <u>Mary Immaculate Hospital</u>.  Mary Immaculate Hospital is a 261 bed hospital located at 152-11 89th Avenue, Jamaica, New York that was established in 1902 by the Roman Catholic Sisters of St. Dominic of Amityville, New York.  Mary Immaculate Hospital provides the following services: 24-hour emergency department and Level I trauma center; ambulatory surgery; behavioral health; cancer care; cardiovascular care; care for asthma, diabetes and other chronic illnesses; HIV treatment; and wound care.

10.     <u>St. John's Queens Hospital</u>.  St. John's Queens Hospital is a 358 bed hospital located at 90-02 Queens Blvd., in the Elmhurst neighborhood of Queens, New York that was established in 1891 by the Sisters of St. Joseph.  The original hospital was located at the intersection of Jackson Avenue and Twelfth Street (now called 45th Avenue), where the Citicorp tower stands.  In 1961 St. John's Long Island City moved to its current location on Queens

CHI99 4478581-24.030067.0030

Boulevard and was renamed St. John's Queens Hospital. St. John's Queens Hospital provides the following services: behavioral health; cancer care; cardiology and cardiovascular care; obstetrical/maternity; HIV care; 24-hour emergency department; critical care; residential mental health services and substance abuse services; osteoporosis care; rehabilitation care; renal dialysis; obesity surgery; and wound care.

11.   St. Vincent's Hospital Staten Island.   St. Vincent's Hospital Staten Island is a 440 bed hospital founded by the Sisters of Charity of New York in 1903. It began as a 74-bed facility on a former estate. St. Vincent's Hospital Staten Island provides the following services: ambulatory surgery; cancer care; reproductive medicine; cardiovascular care; HIV treatment; critical care; endoscopy; incontinence care; behavioral health; mental health services; obstetrics/maternity; pediatrics; seizure disorders; and speech and hearing services.

12.   Bayley Seton Hospital.   Bayley Seton Hospital is a 198 bed hospital located at 75 Vanderbilt Avenue, Staten Island, New York.   Bayley Seton takes its name from Dr. Richard Bayley, New York City's first Public Health Service Officer and St. Elizabeth Ann Seton, his daughter and foundress of the Sisters of Charity in America.   Originally established in the 1830s as a marine hospital for the care of merchant seamen, the facility was expanded in the early 1900s and became part of the United States Public Health Service System.   During this period, it served as the site for the founding research labs of the National Institutes of Health.   In 1981, when the federal government disbanded the Public Health Service System, the New York Sisters of Charity assumed the sponsorship of the facility and renamed it Bayley Seton.   Bayley Seton maintains a contract with the U.S. Department of Defense to provide health care to active military personnel, their dependents and retired military throughout the metropolitan area.   Key

- 6 -

services provided by Bayley Seton include: behavioral health, chemical and alcohol detox unit, HIV treatment, endoscopy, ambulatory care, rehabilitation services and vision care.

13.     <u>St. Vincent's Westchester</u>.  St. Vincent's Westchester is a 133 bed hospital with its main campus at 275 North Street, Harrison, New York. St. Vincent's Westchester was founded by the Sisters of Charity in 1879. For more than 120 years, St. Vincent's Westchester has maintained a commitment to provide care to all in need of mental health and substance abuse services. St. Vincent's Westchester offers a continuum of inpatient and outpatient services to treat individuals in all stages of illness and recovery. In addition to its main site in Harrison, St. Vincent's Westchester offers a variety of outpatient services at sites in the Bronx, Mamaroneck, Mount Kisco and Tuckahoe.

14.     <u>St. Mary's Hospital Brooklyn</u>.  St. Mary's Hospital Brooklyn is a 269 bed hospital located at 170 Buffalo Avenue, Brooklyn, New York that was founded in 1892 by the Sisters of Charity of St. Vincent de Paul to deliver health care to the poor and underserved of the neighborhood and surrounding areas.  The Franciscan Sisters of St. Joseph of Hamburg, New York have staffed the hospital since 1945.  St. Mary's Hospital Brooklyn provides the following services: ambulatory surgery; behavioral health; cancer care, cardiovascular care; HIV treatment; dental services; emergency department; geriatric care; pediatrics and pediatric orthopedic services; programs for the disabled; special programs for high-risk pregnancies; women's' health services; and wound care.  In June 2005, the System announced it intends to close St. Mary's Hospital Brooklyn due to the long history of losses the System has experienced at this facility. The System recently submitted a closure plan for St. Mary's Hospital Brooklyn to the New York Department of Health.  The System expects to complete the closure of  St. Mary's Hospital Brooklyn before the end of 2005.

CHI99 4478581-24.030067.0030

B.      **Nursing Homes**

15.      <u>Bishop Mugavero Center for Geriatric Care</u>.  Bishop Mugavero Center for Geriatric Care, located at 155 Dean Street, Brooklyn, New York, is a 288 bed long term care facility located in the Boerum Hill neighborhood of Brooklyn.  Bishop Mugavero Center for Geriatric Care is not a chapter 11 debtor.

16.      <u>Holy Family Home</u>.  Holy Family Home, located at 1740 84th Street, is a 200 bed long term care facility located in the Bensonhurst neighborhood of Brooklyn.  Holy Family Home is not a chapter 11 debtor.

17.      <u>Msgr. Fitzpatrick Skilled Nursing Pavilion</u>.  Msgr. Fitzpatrick Skilled Nursing Pavilion is a 115-bed long term care facility located on three floors of Mary Immaculate Hospital.

18.      <u>St. Elizabeth Ann's Health Care & Rehabilitation Center</u>.  St. Elizabeth Ann's Health Care & Rehabilitation Center is a 300 bed nursing and rehabilitation center located at 91 Tompkins Avenue in Staten Island, New York.  St. Elizabeth Ann's Health Care & Rehabilitation Center is not a chapter 11 debtor.

C.      **Home Health Care**

19.      SVCMC Home Health provides skilled nursing and rehabilitative services in their homes to residents of all five boroughs as well as Nassau and Suffolk counties. The Home Care division of SVCMC is responsible for over 700,000 visits annually. Its programs are licensed by the New York State Department of Health; accredited by the Joint Commission on Accreditation of Healthcare Organizations; and approved for participation in the Medicare and Medicaid Programs.

CHI99 4478581-24.030067.0030

## EVENTS LEADING TO CHAPTER 11

### A.    Health Care Environment in New York State

20.    Over the past several years the healthcare environment has become particularly challenging in New York for health care providers, and these changes have had a generally negative impact on the Debtors.  The delivery of health care is changing. More patients are receiving their care in ambulatory settings, while lengths of stay have been reduced. Both of these factors have led to declining inpatient volumes and a need to restructure the healthcare delivery system.

21.    Reimbursements from Medicare and Medicaid have remained flat or declined, while managed-care plans have used their leverage to keep reimbursement rates low – and caused SVCMC to experience increased levels of billing and payment denials due to increasing complex authorization and billing requirements.

22.    Overall medical costs are rising faster than inflation. Medical equipment and technology continue to advance – and grow more costly. SVCMC has made significant investments in some of the latest technology to meet the healthcare needs of its patients. In addition, medical malpractice insurance costs are a significant burden on the System.

23.    The growth of managed-care plans have also adversely affected revenues at New York hospitals, including SVCMC. Managed-care plans have dealt with healthcare costs at the expense of hospitals and other providers. The graph below shows that while net income for managed-care companies has steadily risen, hospitals have experienced a steady decline in net income. According to Weiss Ratings, in 2002 (the most recent year for which this information

was compiled), health plans in New York State recorded the highest amount of net profits, $1.15 billion, of those of any state in the country.

**NYS Private Health Plan and Hospital Net Income, 1999-2003**

**($ in millions)**



| | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Health Plans | $708 | $768 | $902 | $1,217 | $1,513 |
| Hospitals | ($366) | ($214) | ($347) | ($428) | NA |

Source:  NYS Hospital Institutional Cost Reports; NYS Insurance Department Health Plan Annual Financial Statements (NAIC Statements).  Excludes Pre-paid Health Services Plans.

24.    While SVCMC's problems are significant, SVCMC is not alone in finding itself in financial distress in New York.  According to a recent study, the financial condition of New York hospitals is among the worst in the United States. The chart below compares New York hospitals' ratios to the national average, and ranks the state in comparison to others. New York is among the worst in all of these critical financial measures.

| | U.S. | New York | NY Rank |
|---|---|---|---|
| **Profitability** | | | |
| Total Margin | 2.6% | –1.1% | 2d lowest |
| **Liquidity** | | | |
| Current ratio | 2.00 | 1.30 | 3d lowest |
| Days in average payment period | 55 | 77 | 2d lowest |
| **Capital structure** | | | |
| Equity financing ratio | 55% | 32% | 2d lowest |
| Debt service coverage ratio | 2.9 | 1.7 | 3d lowest |

Source: *Almanac of Hospital Financial and Operating Indicators*, *2004* (Salt Lake City: Ingenix, 2003).

- 10 -

25.    The medical malpractice crisis has also adversely affected SVCMC and other hospitals in New York. Medical malpractice insurance and large jury awards are a significant burden on SVCMC and all healthcare providers in New York. The graph below depicts the yearly increase in costs for malpractice premiums, and the cumulative effect that this has had on the overall cost of malpractice premiums since 1999.



**Annual and Cumulative % Change in Premiums**
(base year for cumulative change, 1999)

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Annual % Change | 35% | 7% | 21% | 23% | 51% |
| Cumulative % Change | 35% | 13% | 50% | 84% | 147% |

Source: Greater New York Hospital Association 2004 Medical Malpractice Survey. Note: Hospitals with self-funded plans may over-reserve in one year and then take money out the following year as a correction. One of the hospital respondents experienced a large correction in the 2000-2001 period.

**B.    SVCMC's 2005 Liquidity Crisis**

26.    SVCMC was formed in 2000 as a result of the merger of Catholic Medical Centers of Brooklyn and Queens, St. Vincent's Hospital and Medical Center and Sisters of Charity Health Care on Staten Island.   In an analysis conducted in 1998 by Ernst & Young, it was estimated that if each institution continued to operate independently, the three organizations would have a combined operating loss of approximately $100 million by 2002.   The same

CHI99 4478581-24.030067.0030

analysis predicted that a combined entity that took advantage of growth opportunities, as well as integration efficiencies, would have net income of $25 to $30 million for 2002. That analysis was the rationale for the merger.

27.    Following the merger, SVCMC's management adopted goals designed to reduce costs, increase revenues and enhance the overall competitiveness of SVCMC in the marketplace. As shown below, although revenues increased, management was not able to contain costs, and losses were not reduced over the period from 2000-2004. As discussed below, the 2004 losses included a $60 million write-off of accounts receivable booked in prior years.

| (In Billions) | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Revenue | $1.465 | $1.570 | $1.664 | $1.635 | $1.557 |
| Expenses | $1.532 | $1.628 | $1.687 | $1.717 | $1.770 |
| Operational Losses    ($ millions) | $ (66) | $ (58) | $(22) | $ (81) | $(143) |

28.    After the merger, SVCMC's management began to combine certain functions and disruptions were encountered. For example, SVCMC encountered some disruptions when it combined the business centers for the operating units in a central office; similarly, migrating to a single information technology platform led to initial integration difficulties. SVCMC also encountered resistance to renegotiating payor contracts to increase SVCMC's revenues and to restructuring fixed-compensation physician contracts. The Debtors also believe that negative publicity concerning their financial condition has eroded their traditional base of philanthropic support.

29.    By the end of 2003, the board of directors of SVCMC decided it was necessary to retain the services of a turnaround team that could bring to SVCMC the resources,

CHI99 4478581-24.030067.0030

expertise, and experience to address the growing financial crisis for the System. In April, 2004, the board of directors of SVCMC selected David Speltz as the System's new president and Chief Executive Officer, Tim Weis as Chief Financial Officer, and other principals of the turnaround firm Speltz & Weis LLC to manage the turnaround. (In May 2005, Speltz and Weis LLC was acquired by Huron Consulting Group, LLC.)

30.    Speltz & Weis LLC developed a turnaround plan, which was finalized in June 2004, and approved by the board of directors of SVCMC and by the United States Department of Housing and Urban Development ("**HUD**") and the Dormitory Authority of the State of New York ("**DASNY**"), SVCMC's two principal mortgage lenders. The turnaround plan projected more than $157 million in annual improvements by the end of 2006 through improvements in revenue recovery, managed care re-contracting, supply chain, labor and productivity improvements (including physician compensation), and the reconfiguration of acute care services.

31.    In late 2004, SVCMC's management became aware that the audited financial statements reflecting prior years' accounts receivables were overstated by $60 million, which was confirmed by KPMG, the Debtors' auditors, in connection with the 2004 audit. Because that fact came to light well after the turnaround plan had been prepared, it masked the magnitude of the revenue shortfall that the System faced.

32.    In addition, although the System's performance in the first quarter of 2005 generally tracked the turnaround plan, beginning in March 2005 SVCMC began to experience softness in patient volume. Since March 2005, in-patient discharges have run approximately 5% below the corresponding months in 2004. The Debtors have investigated the current weakness in

CHI99 4478581-24.030067.0030

patient volumes and believe they are likely to persist through the summer of 2005, but should begin to recover to normal levels by the fourth quarter of 2005.

33.    Thus, despite a $23 million improvement in operating results in the first quarter of 2005, compared to the first quarter of 2004, in Spring 2005, it became apparent to SVCMC's management that it would need to supplement the original turnaround plan.  In Spring 2005, SVCMC's management recommended a major restructuring of the System that included the closure of St. Mary's Hospital in Brooklyn, which was announced in June 2005, the conversion of acute care beds at Mary Immaculate Hospital in Queens to behavioral beds, the consolidation of certain ancillary services and the closure of certain economically marginal medical services.  The Debtors believe that the restructuring plan, which supplements the 2004 turnaround plan, should serve as the core for an eventual plan of reorganization of the Debtors.

34.    The unanticipated weakness in patient volume has also reduced the amount of free cash flow generated by the System, and the Debtors have continued to incur losses in 2005. For the first four months of 2005, they generated operating losses of approximately $21.3 million on revenues of approximately $496 million. These losses left the Debtors with extremely limited liquidity throughout 2005.

35.    The Debtors' high level of indebtedness has contributed to their liquidity crisis.  As of December 31, 2004, their total long-term debt and capital leases aggregated approximately  $423 million (including some debt of non-debtor affiliates and the working capital loan). In 2004, the Debtors paid approximately $70 million in principal and interest on their long-term debt.

36.    One consequence of the Debtors' lack of liquidity is that for some years they have been significantly in arrears to trade vendors, which has created both financial and

- 14 -

operational obstacles.  The Debtors owe approximately $240 million in respect of accounts payable and other current liabilities; the Debtors' accounts payable are, on average, more than 120 days outstanding.  These arrearages have led to lawsuits commenced by creditors to collect accounts due to them, some interruptions in the delivery of goods and services, and some trade creditors being unwilling to continue to do business with the Debtors except on a cash on delivery basis.  As a result of vendor pressures, from time to time the System's physicians were unable to schedule cases and procedures due to shortages in necessary equipment and supplies. The Debtors believe their inability to maintain supplies and properly working diagnostic equipment at levels sufficient to support their medical staff appropriately has contributed to the decrease in patient admissions in 2005.

37.    In addition to their cash flow from operations, the Debtors generated liquidity in 2005 from asset sales and the proceeds from real estate financing transactions. Through the Petition Date, these activities generated approximately $45 million in additional funds for the System.

38.    However, despite the  liquidity provided by real estate transactions, the Debtors faced increasing liquidity pressure throughout the second quarter of 2005. For the first six months of 2005, the Debtors have paid approximately $40 million for debt service, essential capital expenditure and repayments to third parties. The cash provided by real estate transactions was used to pay these nonoperating cash requirements. Also, during the second quarter of 2005, the Debtors' availability  under their working capital line of credit decreased by approximately $18 million. On or about June 1, 2005, HFG-Healthco IV LLC ("HFG"), the Debtors' working capital lender, declared an event of default under its working capital facility and on or about June 30, 2005, HFG terminated the working capital facility.

- 15 -

39.     Throughout the second quarter of 2005, the Debtors undertook a variety of efforts to increase liquidity, including accelerating sales or financings of real property, and seeking to obtain additional lending facilities to ameliorate their liquidity crisis.  The Debtors made the difficult decision to seek relief under chapter 11 when it became apparent that they would not be able to generate or obtain sufficient liquidity to continue their operations without a filing.

## CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

40.     The Debtors' indebtedness for borrowed money consists of mortgages on substantially all their principal operating facilities, a working capital borrowing facility secured by a first lien on accounts receivable, and several other borrowing facilities, all of which are described below.   As of the Petition Date, the Debtors' aggregate indebtedness for borrowed money was approximately $395 million, which includes approximately $275 million of mortgage debt.  The Debtors' principal mortgage creditors are the Dormitory Authority of the State of New York ("**DASNY**"), which is owed approximately $180 million as of the Petition Date and Sun Life Assurance Company of Canada ("**Sun Life**"), which is owed approximately $80 million as of the Petition Date.

A.     **Non-Mortgage Debt**

41.     HFG Prepetition Loan.  SVCMC owes approximately $30 million to HFG as of June 30, 2005, which loan (the "**HFG Prepetition Loan**") is secured by a first priority perfected lien on most of the System's accounts receivable generated by the Debtors' operations

(the "**HFG Prepetition Lien**"), subject to an Intercreditor Agreement dated May 21, 2004.[1]  The

HFG Prepetition Loan is evidenced by a Loan and Security Agreement dated as of May 21,

2004, as amended, among, inter alia, SVCMC, as borrower, the guarantors named therein and

signatories thereto, HFG, as the lender thereunder, and HFG as agent (the "**Loan and Security**

**Agreement**").    This indebtedness bears interest at the London Interbank Offered Rate

("**LIBOR**") plus 3.50% and has a maturity date of May 21, 2008.  As further described in the

Loan and Security Agreement, certain accounts receivable are excluded from the HFG

Prepetition Lien, such as: (a) the accounts receivable relating to the Professional Education Pools

and Indigent Care Pools, which are programs established by the State of New York pursuant to

Article 28 of the New York Public Health Law to reimburse health care providers for training

medical residents and interns and providing care for the indigent (together, the "Pools"), and (b)

the accounts receivable relating to the Comprehensive Cancer Corporation's operations.[2]

42.    <u>Commerce Bank Pools Loan</u>.  SVCMC owes approximately $20 million

to Commerce Bank (the "**Commerce Bank Pools Loan**") as of the Petition Date, which loan is

purportedly secured by a first priority perfected lien on SVCMC's entitlement to distributions

from the Pools (excluding amounts from such Pools related to the St. Dominic Family Health

Center).  The Commerce Bank Pools Loan is a revolving credit facility with an aggregate limit of

the lesser of $20 million or 80% of the combined entitlement to distribution under the Pools.

The Commerce Bank Pools Loan is evidenced by a $50 million Promissory Note and a Security

---

[1] Pursuant to this Intercreditor Agreement, HFG has agreed to remit the first $2.4 million receivables collection for the benefit of DASNY.

[2] The System entered into a Second Amended and Restated Consulting and Administrative Services Agreement dated April 11, 1996 with Comprehensive Cancer Corporation of New York, a New York corporation that develops, operates and manages comprehensive cancer detection, diagnostic and treatment centers throughout the country in affiliation with acute care hospitals.  Pursuant to such agreement, Comprehensive Cancer Corporation of New York provides administrative and consulting services in connection with the day-to-day operation of the System's oncology services.

Agreement each dated as of September 30, 2003.  This indebtedness bears interest at the prime rate of interest charged by Commerce Bank (the "**Commerce Prime Rate**") and has a maturity date of the earlier of September 30, 2005 or the expiration of the Pools.

43.    <u>Commerce Bank Pledged Securities Loan</u>.  SVCMC owes approximately $30 million as of the Petition Date to Commerce Bank (the "**Commerce Bank Pledged Securities Loan**"), which loan is purportedly secured by (a) a first priority perfected lien on a portfolio of pledged securities (the "**Securities Account**") at Bank of America (as the successor to Fleet Bank) (the "**Securities Intermediary**"), (b) any and all free credit balance or other money, now or hereafter credited to, or owing from the Securities Intermediary to SVCMC with respect to the Securities Account, (c) any and all money, securities (certificated or uncertificated), security entitlements, commodity contracts, instruments, documents, general intangibles, financial assets and/or other investment property, identified and/or associated with, and/or contained in and/or distributed from the Securities Account, (d) all books and records relating to any of the foregoing and/or the Securities Account, (e) all proceeds of the sale, exchange, redemption or exercise of any of the foregoing, including, but not limited to, any dividend, interest payment or other distribution of cash or property in respect thereof, and (f) any rights incidental to the ownership of any of the foregoing, such as voting, conversion and registration rights and rights of recovery for violations of applicable securities laws.  The Commerce Bank Pledged Securities Loan is evidenced by a $40 million Promissory Note and a Pledge Agreement each dated as of September 30, 2003.  This indebtedness bears interest at (a) LIBOR plus 2% for loans up to $30,000,000, and (b) at the Commerce Prime Rate for loans in excess of $30,000,000, and has a maturity date of September 30, 2005.

- 18 -

44.     <u>HSBC Letters of Credit</u>.  HSBC Bank USA has issued two letters of credit in the aggregate amount of $8,334,633 for the System (the "**Letters of Credit**").  The Letters of Credit are outstanding pursuant to a Continuing Credit Agreement dated as of January 27, 2003 (the "**Continuing Credit Agreement**").  One letter of credit is in the amount of $8,090,663 (the "**Bond LOC**"), for the benefit of DASNY, to secure the System's obligations with respect to the 1995 Bonds for Catholic Medical Center of Brooklyn and Queens, Inc. and St. Jerome's Health Services Corporation (both as further described below). The other letter of credit is in the amount of $254,000 (the "**DOE LOC**"), for the benefit of the United States Department of Education, to secure the System's obligations with respect to loans for student financial assistance to St. Anthony's Health Professions and Nursing Institute.  The System's obligations to HSBC Bank USA in respect of the Bond LOC is evidenced by two Letters of Credit and Reimbursement Agreement dated as of December 1, 1995 and the DOE LOC is evidenced by the Continuing Credit Agreement.

45.     In addition, as of the Petition Date, SVCMC has outstanding capital liens of approximately $38 million.

## B.     <u>Mortgage Debt</u>

46.     <u>St. Vincent's Hospital Manhattan</u>.  SVCMC owes approximately $56 million as of March 31, 2005 to DASNY in respect of St. Vincent's Hospital and Medical Center New York FHA-Insured Mortgage Revenue Bonds, Series 1991 (the "**1991 St. Vincent's Bonds**"), purportedly secured by a shared first mortgage and security interest on St. Vincent's Hospital Manhattan, (the "**Manhattan Property**").  The 1991 St. Vincent's Bonds share the purported first mortgage and security interest on the Manhattan Property with the 1995 St. Vincent's Bonds, which are described below.  The 1991 St. Vincent's Bonds are insured by the

CHI99 4478581-24.030067.0030

Department of Housing and Urban Development ("**HUD**") under its "242 Program," which was established pursuant to 12 U.S.C. §1715Z-7 and 24 C.F.R. §242 (the "**242 Program**"). This indebtedness bears interest of 7.50% per annum and has a final maturity date of May 1, 2015.

47.    SVCMC also owes DASNY approximately $27 million as of March 31, 2005 in respect of the St. Vincent's Hospital and Medical Center of New York FHA-Insured Mortgage Revenue Bonds, Series 1995 (the "**1995 St. Vincent's Bonds**"), which are purportedly secured by a purported shared first mortgage and security interest on the Manhattan Property. The 1995 St. Vincent's Bonds share the first mortgage and security interest on the facility with the 1991 St. Vincent's Bonds, which are described above. The 1995 St. Vincent's Bonds are insured by HUD under its 242 Program. This indebtedness bears interest at 5.98% per annum and has a final maturity date of May 1, 2015. In addition, the 1995 St. Vincent's Bonds are insured by Ambac Assurance Corporation.

48.    <u>Mary Immaculate Hospital and St. John's Hospital</u>. SVCMC owes $48 million as of March 31, 2005 to DASNY in respect of the Hospital and Nursing Home FHA-Insured Mortgage Revenue Bonds, 1981 Series A (the "**Mary Immaculate/St. John Bonds**"), which are purportedly secured by a first mortgage and security interest on (a) Mary Immaculate Hospital, a 261-bed acute care hospital in Queens, New York, and (b) St. John's Hospital,. This indebtedness (a) bears interest at 8.65%, (b) has a final maturity date of January 1, 2011, and (c) is insured by HUD under the 242 Program. In addition, this indebtedness is purportedly secured by a Collateral Mortgage on various other parcels of real property located in Queens County, New York.

49.    SVCMC also owes DASNY approximately $6 million as of March 31, 2005 in respect of the Municipal Health Facilities Improvement Program Lease Revenue Bonds

CHI99 4478581-24.030067.0030

(City of New York Issue), Series 1996A (the "**St. Dominic Bonds**").  This is a "lease-leaseback transaction", pursuant to which the amounts due by SVCMC under the operating lease are in an amount equal to the debt service on the bonds.  The operating lease is purportedly secured by a first mortgage on that portion of Mary Immaculate Hospital campus constituting the St. Dominic's Family Health Center, which is located in a stand-alone facility at 114-39 Sutphin Boulevard, Queens, New York, and a security interest on the tangible personal property relating to the St. Dominic facility.  This indebtedness (a) bears interest at 5.45%, and (b) has a maturity date of April 1, 2023.

50.    St. John's Hospital.  SVCMC owes DASNY approximately $4 million as of March 31, 2005 in respect of New York Hospital and Nursing Home Revenue Bonds (Letter of Credit Secured) 1995 Issue A (the "**St. John Bonds**"), which is purportedly secured by a Mortgage and Assignment of Gross Receipts in respect of the parking garage (the "**Parking Garage**") relating to St. John's Hospital.  Pursuant to a Subordination Agreement, HUD agreed to subordinate its first priority mortgage on the Parking Garage for this hospital.  This indebtedness is supported by a $8,090,663 letter of credit issued by HSBC (previously Republic National Bank).  The St. John Bonds (a) bear interest at rates ranging from 4.1% to 5.75%, and (b) has a maturity date of July 1, 2014.  The HSBC letter of credit is evidenced by a Letter of Credit and Reimbursement Agreement dated as of December 1, 1995 and is secured by a Mortgage and a Gross Receipts Security Agreement granted to DASNY.

51.    St. Vincent's Hospital Westchester.  SVCMC issued two promissory notes to Sun Life, which notes are purportedly secured by a first priority mortgage, security interest and an assignment of leases on the facilities that constitute St. Vincent's Hospital Westchester (the "**Westchester Notes**").  As of March 31, 2005, SVCMC owes approximately $22.5 million

with respect to first note ("**Note A**") and $7.5 million with respect to the second note ("**Note B**"). Note A bears interest at a rate of 5.79% with a maturity date of March 1, 2015 and Note B bears interest at a rate of 5.44% with a maturity date of March 1, 2010.

52.    <u>Bayley Seton Hospital</u>.    SVCMC owes DASNY approximately $20 million as of March 31, 2005 in respect of Sisters of Charity Health Care System Corporation FHA-Insured Mortgage Hospital Revenue Bonds, Series 1999 (the "**Bayley Seton Bonds**"), which bonds are purportedly secured by a first mortgage and a security interest in Bayley Seton Hospital.  This indebtedness (a) bears interest at 5.35%, (b) has a maturity date of August 1, 2038, and (c) is insured by HUD under the 242 Program.  In addition, there is a bond insurance policy issued by MBIA Insurance Corporation purportedly securing the payment of principal and interest under the Bayley Seton Bonds when due.

53.    <u>St. Vincent's Hospital Staten Island</u>.    SVCMC owes DASNY approximately $29 million as of March 31, 2005 in respect of the New York State Medical Lease Facilities and Finance Agency 1994 Series A Hospital and Nursing Home FHA – Insured Mortgage Revenue Bonds (the "**Staten Island Bonds**"), which are purportedly secured by a first mortgage on and security interest in St. Vincent's Hospital Staten Island.  This indebtedness (a) bears interest at 7.97%, (b) has a maturity date of February 15, 2027, and (c) is insured by HUD under the 242 Program.

54.    <u>St. Mary's Hospital of Brooklyn</u>.  SVCMC owed DASNY $0 as of March 31, 2005 in respect of borrowings under a certain FHA-Insured Mortgage dated as of July 30, 1976.  This indebtedness was purportedly secured by a first mortgage on and a security interest in St. Mary's Hospital of Brooklyn.  The indebtedness (a) bore interest at 8.75%, (b) had a maturity date of April 1, 2005, and (c) was insured by HUD under its "232 Program" which was

established pursuant to 12 U.S.C. §1715w and 24 CFR §232 (the "**232 Program**").  Although
this indebtedness has been paid off by SVCMC on March, 2005, it still serves as security to the
other outstanding bonds issued by DASNY since DASNY has not yet released its collateral
mortgage with respect to St. Mary Hospital of Brooklyn.

55.    O'Toole, Staff House and Martin Payne.  SVCMC issued three promissory
notes to Sun Life, which notes are purportedly secured by a first priority mortgage, a security
interest and an assignment of leases on the facilities with respect to which such notes relate.  As
of March 31, 2005, SVCMC owes (a) approximately $5 million with respect to the note relating
to O'Toole ("O'Toole Note"), $28 million with respect to the Staff House note ("**Staff House
Note**") and (c) $16 million with respect to the Martin Payne note ("**Martin Payne Note**" and
together with the O'Toole Note and the Staff House Note, the "**Sun Life Notes**").  Each of the
Sun Life Notes bears interest at a rate of 5.7% and has a maturity date of November 1, 2014.  In
addition, each Sun Life Note is cross-collateralized with the properties relating to the other two
Sun Life Notes.

56.    In addition, SVCMC, as of June 30, 2005, owed  RCG Longview II,
L.P.approximately $16 million.  Such indebtedness is comprised of two loans: one issued on
May 18, 2005 in the amount of approximately $10 million ("**Loan A**") and one issued on June
27, 2005 in the amount of approximately $6 million ("**Loan B**").  Loan A is secured by a third
priority mortgage on the Staff House property, O'Toole property, and Martin Payne property and
Loan B is secured by a fourth priority mortgage on the Staff House property, O'Toole property
and Martin Payne property.  The total value of the collateral in which RCG has a security interest
is $124 million, such, as of June 30, 2005, RCG was oversecured by approximately $60 million,
after factoring in prior liens.

- 23 -

57.     As additional security with respect to DASNY's outstanding debt relating

to the SVCMC facilities, (i) two collateral mortgages were granted to DASNY with respect to

each of the O'Toole property, Staff House property and Martin Payne property, (ii) a mortgage

reserve fund was established in an amount equal to the sum of six (6) months of payments due to

by SVCMC with respect to the Sun Life Notes and (iii) the parties established a Rent Account

for deposit of all rents relating to the properties securing the Sun Life Notes.

58.     As additional security with respect to each of the issues of bonds issued by

DASNY, SVCMC granted DASNY a mortgage on each facility subject to a HUD-insured

mortgage as security for the each issue of bonds.

## SUMMARY OF FIRST-DAY MOTIONS AND APPLICATIONS[3]

### A.      Administrative Motions

59.     The Debtors have filed a series of administrative motions in their First-

Day Motions and Applications.  These include:

a.      Joint Administration Motion -- By this Motion, the Debtors seek the entry
        of an Order, pursuant to Bankruptcy Rule 1015(b), authorizing the joint
        administration of their Cases for procedural purposes only.

b.      Motion For Establishing Procedures For Monthly Compensation And
        Reimbursement Of Professionals And Committee Members -- The
        requested procedures would require each professional to file with the
        Court and submit to the Debtors, the United States Trustee, the prepetition
        and postpetition secured creditors, and the Committee (once appointed) a
        detailed statement of services rendered and expenses incurred by the
        professional for the prior month.  If there is no timely objection, the
        Debtors would pay eighty percent (80%) of the amount of fees incurred
        for the month, with a twenty percent (20%) holdback, and one hundred
        percent (100%) of disbursements for the month.  These payments would

---

[3]     Capitalized terms used but not otherwise defined here shall have the meanings ascribed to them in the
relevant First-Day Motion or First-Day Application.

CHI99 4478581-24.030067.0030

be subject to the Court's subsequent approval as part of the normal interim fee application process, approximately every one-hundred and twenty (120) days.

c.    Motion For Order Establishing Certain Notice, Case Management And Administrative Procedures --The Debtors seek that the Court enter an Order, pursuant to sections 102(1) and 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(m) and 9007 and Local Rule 9013, establishing certain notice, case management and administrative procedures, including:

- Limiting the notice procedures in the Cases;

- Designating the parties upon whom notice must be served;

- Establishing filing and service requirements; and

- Directing that all matters be heard at omnibus hearings (the "Omnibus Hearings") to be scheduled in advance by the Court.

d.    Motion To Extend Time To File Schedules And Statements Of Financial Affairs --The Debtors seek that this Court extend the 15-day period under Section 521 of the Bankruptcy Code for an additional 45 days, to September 2, 2005, without prejudice to the Debtors' right to seek further extensions or a waiver of the requirement to file certain of the Schedules and Statements.

e.    Motion For Entry Of An Order Authorizing The Debtors To (I) Prepare A Consolidated List Of Creditors And A List Of Equity Security Holders In Lieu Of A Matrix, (II) Include Names And Addresses Of Certain Patients In The Consolidated Creditors List, (III)  File A Consolidated List Of The Thirty Largest General Unsecured Creditors, And (IV) Mail Initial Notices -- The Debtors request authority to prepare a consolidated list of creditors and a list of equity security holders in electronic format only, identifying their creditors in the format or formats currently maintained in the ordinary course of business in lieu of any required creditor matrix. The Debtors further seek the authority to disclose the names and addresses of certain patients to whom refunds are owed in the consolidated list of creditors.  The Debtors further seek authority not to file either list with the Court concurrently with the filing of their bankruptcy petitions, but instead to make such lists available only upon request.

60.    The Debtors seek authority to implement these administrative motions, which are designed to minimize the administrative burdens on the Debtors, the Court, and all

- 25 -

parties in conducting these proceedings.   The extension of time to file required information is especially important given the amount of work and attention required by the Debtors' employees, management, and professionals in filing a case of this magnitude and complexity.   I believe that the relief requested in these motions is important for the Debtors' smooth transition into Chapter 11.

**B.**      **Motion To Use Cash Collateral And For DIP Financing**

61.      The Debtors' liquidity crisis has left them with virtually no available cash to fund their ongoing operations.   The Debtors urgently need to use the Cash Collateral and to obtain new credit to purchase inventory, pay their employees, and continue their businesses and operations.   Without the immediate availability of the Cash Collateral and new credit, the Debtors' operations would be severely disrupted and they would be forced to cease or sharply curtail operations of some or all of their facilities, which in turn would limit or eliminate the Debtors' ability to generate operating revenue.   Put simply, the going concern value of the Debtors' businesses would be obliterated if this Court denies the relief sought in the DIP Motion.

62.      Given the Debtors' liquidity crisis, there is no reason to believe that the Debtors would be able, under Chapter 11 or otherwise, to operate solely in reliance on their cash-on-hand.

63.      The Debtors are unable to procure financing without the grant of liens on assets.   Accordingly, the Debtors, together with their attorneys and financial advisors, sought proposals for postpetition financing from HFG, as Postpetition Agent, as well as a number of other financial institutions.

- 26 -

64.    Because they have been unable to procure the necessary financing from any other source, the Debtors have determined to accept a financing proposal put forward by HFG, as Postpetition Agent.  The Debtors believe that the HFG financing proposal addresses the Debtors' working capital and liquidity needs.

65.    The Debtors and HFG engaged in good faith and extensive arm's length negotiations.  The terms and conditions of the proposed postpetition financing facility  are set forth in that certain Credit Agreement, dated as of July 5, 2005 among the Debtors, as Borrower, HFG, as Postpetition Agent, and the Postpetition Lenders as well as in the Interim Order.

66.    The availability of postpetition financing will provide more than just the necessary cash for the Debtors to operate their businesses.  Equally important is the sense of confidence that the financing will instill in the Debtors' suppliers, patients, and employees.  If the Debtors' suppliers failed to extend credit and services to the Debtors at this time, the loss of patients, and the impact on employee morale could have a profound negative impact on the Debtors' ability to reorganize and preserve value pending a reorganization of their businesses.

67.    In sum, without immediate access to Cash Collateral and to postpetition financing, the Debtors face a liquidity crisis that would threaten the viability of their businesses. If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of these cases, the Debtors will likely face a substantial if not devastating loss of revenue and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of employees and employee morale, and deteriorating relationships with suppliers and patients – all of which would adversely affect the value of the Debtors' businesses.  Thus, the ability of the Debtors to remain viable operating entities, reorganize under  Chapter 11 of the Bankruptcy Code, and preserve value pending a

CHI99 4478581-24.030067.0030

reorganization of their businesses, depends upon obtaining the interim and final relief requested in this Motion.

## C.    **Cash Management and Bank Accounts**

68.    Prior to the commencement of these Cases, in the ordinary course of business, the Debtors maintained a substantially integrated and complicated centralized cash management system consisting of various accounts.

69.    Pursuant to that certain Loan and Security Agreement, dated as of May 21, 2004, among Saint Vincents Catholic Medical Centers of New York as the Borrower, The Guarantors[4], The Lenders[5], and HFG Healthco-4 LLC as the Agent, SVCMC established various Borrower Lockbox Accounts and Lender Lockbox Accounts with certain banks.

70.    The Cash Management System is organized by region: Brooklyn/Queens, Manhattan, Staten Island, and Bayley Seton.    Each Region has a corresponding Borrower Lockbox Account held at Bank of America into which its government receivables (e.g. Medicare, Medicaid) are deposited.    Each Region also has a corresponding Lender Lockbox Account held at Bank of America into which its non-government (i.e. commercial) receivables are deposited. Pursuant to the Loan and Security Agreement, each day, the Lockbox Accounts are swept into a collection account held in the name of the Lender.

71.    The Collection Account is at the Bank of New York.    Each day, all funds in the Lockbox Accounts are swept into the Collection Account.    From the Collection Account, the funds are first applied to debt service under the Loan and Security Agreement.    The

---

[4] The Guarantors are CMC Cardiology Services, P.C., CMC Physician Services, P.C. and CMC Radiological Services, P.C
[5] The sole Lender is HFG Healthco-4 LLC.

CHI99 4478581-24.030067.0030

remainder of funds is then swept into the Concentration Account, held in the name of SVCMC which are then disbursed into the various Payroll Accounts, Accounts Payable Accounts and various Other Accounts through which the Debtors fund their operations. The Other Accounts include accounts at Bank of America held pursuant to a contract between SVCMC and the United States Department of Defense to provide healthcare for DOD members and accounts at Bank of America and Bank of New York that fund operations of St. Vincent's Hospital, Westchester. All of the Accounts are located at various banks including Amalgamated, JPMorgan Chase Bank, Citibank, Bank of America, HSBC, and Bank of New York.

72.    SVCMC also has various Lockbox Accounts with JPMorgan. JPMorgan controls the Lockbox Accounts into which some of the Captive PCs' receivables are deposited before they are swept into the Collection Account.

73.    In addition to the Lockbox Accounts that channel funds to the Collection Account, the Cash Management System also involves accounts that bypass the Collection Account but are supported and funded by the Concentration Account. These accounts include the Tax Account, which funds tax obligations, the TPA Account, which funds malpractice claims, the Registry Accounts, which are intercompany transfer accounts, the Msgr. Fitzpatrick Resident Fund Accounts, which are held for Msgr. Fitzpatrick residents, and the Pax Christi Accounts, which are held for the hospice.

74.    The Cash Management System also includes the Foundation Account which receives gifts and stands separately and distinctly from the Concentration Account.

75.    Outside of the Cash Management System described above, each of the Captive PCs maintains one or more separate accounts and its own cash management system. Below is a brief description of each of the Captive PC Cash Management Systems.

- 29 -

76.     CMC Physician Services, P.C. maintains accounts within as well as outside of the Cash Management System.  Physician Services' government and non-government receipts are channeled into their respective Lockbox Accounts held at JPMorgan.  Receipts in the Physician Services' Lockbox Accounts are swept daily into the Collection Account and applied in the same manner as described above.  SVCMC transfers funds from its Brooklyn-Queens Account Payables Account held at Bank of America to a separate account at JPMorgan from which Physician Services funds its operations.

77.     CMC Radiological Services P.C.'s cash management system is substantially similar to that maintained by Physician Services.  Radiological Services also maintains government and non-government Lockbox Accounts at JPMorgan from which funds are swept into the Collection Account.  SVCMC transfers funds from its Brooklyn-Queens Account Payables Account held at Bank of America to a separate account at JPMorgan from which Radiological Services funds its operations.

78.     CMC Cardiology Services P.C.'s cash management system is substantially similar to those maintained by Physician Services and Radiological Services.  Cardiology Services maintains government and non-government Lockbox Accounts at JPMorgan from which funds are swept into the Collection Account.  SVCMC transfers funds from its Brooklyn-Queens Account Payables Account held at Bank of America  to a separate account at JPMorgan from which Cardiology Services funds its operations.

79.     CMC Occupational Health Services P.C. maintains its accounts separately from the Cash Management System.  Occupational Health maintains four accounts at Citibank: 1) a general operating account (#000014811541), 2) a payroll account (#000014811533) and 3) a

- 30 -

general savings/operating money market account (#000027653722), and 4) a lockbox money market account (#000018842089).

80.     Medical Service of St. Vincent's Hospital and Medical Center, P.C. maintains its accounts separately from the Cash Management System.   Medical Service maintains two accounts at JPMorgan: 1) a checking account into which patient fees are deposited and from which stipends and operating expenses are funded and 2) a money market account which is an interest bearing account.

81.     Surgical Service of St. Vincent's, P.C.'s cash management system consists of one account at JPMorgan from which it funds its operational expenses, such as salaries, payroll expenses, disability insurance, workmen's compensation, accountants' fees, and billing fees.

82.     Continuation of the Cash Management System and the Captive PC Cash Management Systems with their complex structure of lockboxes and accounts is essential to maintaining the stability of the Debtors' financial structure while operating in Chapter 11.  By preserving business continuity and avoiding the operational and administrative paralysis that would accompany the closing of all accounts and the re-establishment of new ones, the relief requested herein is in the best interests of the Debtors' estates and all parties in interest.

83.     The Debtors likewise require continued use of their Cash Management System, Captive PC Cash Management Systems, and intercompany transfer system so that they may continue the operation of their businesses without disruption and unnecessary confusion.

84.     The Debtors derive most of their revenue from third party payors, including Medicare and Medicaid reimbursements. Cash inflow is also generated by commercial

payors (e.g. HMO, private health insurance), as well as from other sources.  Most receivables are deposited in the various Lockbox Accounts before they are swept into the Collection Account.

85.    Each day, the HFG Healthco-4 LLC as Agent applies the funds in the Collection Account in the following order: a) to pay fees, interest, and expenses; b) to pay any Borrower Base Deficiency (as defined in the Loan and Security Agreement); c) to reduce the principal amount of any Revolving Loan (as defined in the Loan and Security Agreement); d) to pay any debt owed by the Debtors to any of the Lenders (as defined in the Loan and Security Agreement), apart from the Revolving Loan; and e) to the Debtors by deposit in the Concentration Account.

86.    From the Concentration Account, funds are then disbursed to the various Payroll Accounts, Accounts Payable Accounts, and Other Accounts.  From these Accounts, SVCMC and its related entities fund their operations, including payroll, insurance, malpractice expenditures, building equipment and rentals, capital leases, capital expenditures, drugs and supplies, physician fees, contract labor, capitation payments, third party liability repayments, professional fees, accounts payable paydown, vendor settlements, and other expenses.

87.    Several other accounts operate outside of the main account infrastructure, bypassing the Collection Account, the Concentration Account or both. Those accounts or funds that bypass the Collection Account do so because they are not a part of the Lender's collateral. For example, the Registry Accounts are managed separately from the Collection Accounts, as are the Tax Account, TPA Account,  Msgr. Fitzpatrick Resident Fund Accounts,  and Pax Chrisit Accounts.  The Cash Management System also involves accounts that stand separate from the Concentration Account, such as the Foundation Account.  In such cases, funds are deposited directly into and withdrawn directly out of those respective accounts. Further, the

- 32 -

Comprehensive Cancer Center receivables are deposited into a Lockbox Account maintained by SVCMC's Manhattan Region and are swept into the Collection Account. However, from the Collection Account, the Comprehensive Cancer Center receivables are swept back out and returned to the Comprehensive Cancer Center without entering the Concentration Account.

88.     Lastly, the Captive PC Cash Management Systems involve accounts within the Cash Management System as well as separate accounts.

89.     The Cash Management System utilized by the Debtors is similar to those commonly employed by other diversified healthcare organizations and has been employed by the Debtors for many years. Because the aforementioned cash management procedures constitute the Debtors' usual, ordinary and essential business practices, the Debtors seek this Court's authorization to continue such practices during these Cases. If this relief is granted, the Debtors will maintain records of all postpetition intercompany transfers so that all transactions can be readily ascertained.

90.     The operation of the Debtors' businesses require that their Cash Management System and Captive PC Cash Management Systems remain in place during the pendency of these Cases. Requiring the Debtors to adopt a new, segregated cash management architecture at this early and critical stage of their Cases would be expensive, disruptive, and create unnecessary administrative difficulties. Any disruption in the Debtors' operations could have a severe adverse impact upon the Debtors' operations and prospects for a successful reorganization especially given the Debtors' acute liquidity problems. Accordingly, maintenance of the existing Cash Management System and Captive PC Cash Management Systems is not only essential, but is in the best interests of all creditors and parties in interest.

- 33 -

91.     The foregoing practices directly and indirectly help maintain and preserve the value of the Debtors' enterprise.  Indeed, the Debtors' operations and asset values depend on the continuation of these cash management practices.  Otherwise, the Debtors might not be able to trace their receipts and disbursements or efficiently manage their liquid assets.  As a result: (a) the Debtors would not be able to timely meet postpetition obligations; (b) interest on the Debtors' funds would be lost; (c) payroll for thousands of employees would be disrupted; and (d) the Debtors' ability to service their patients would be impeded.  Accordingly, absent the relief requested herein, the Debtors' businesses could be disrupted and their asset values irreparably harmed.

92.     The Lockbox Accounts are maintained as zero balance accounts and do not maintain balances over time.  Moreover, the Accounts that do maintain balances, such as the Debtors' Payroll Accounts, are held by Amalgamated, Bank of America, Bank of New York, Citibank, HSBC, and JPMorgan.  The Debtors believe that these banks are financially stable, and are otherwise FDIC or FSLIC insured.  For this reason, the Debtors' believe that the funds held in deposit are safe, and that any risks associated with such accounts are so *de minimus* that it would be a waste of estate resources to incur the cost required to close such accounts and establish entirely new ones.

**D.    Continuing Existing Insurance Programs**

93.     In connection with the operation of their businesses and management of their facilities, the Debtors maintain various workers' compensation programs, insurance policies and bonds through several different insurance carriers or bond carriers.  The Insurance Programs include coverage for workers' compensation claims, hospital professional, comprehensive general, excess, managed care error & omissions, individual physician for employed high risk

- 34 -

specialties, professional, malpractice, automobile claims, fiduciary liability claims, reinsurance, crime claims, directors' and officers' liability and securities claims, certain general liability claims, and various property related liabilities and various financial guarantee and performance bonds.

94.     Prior to the Petition Date, the Debtors entered into an insurance brokerage agreement with Willis Group Holdings for the administration of the majority of the Debtors' insurance policies.  With respect to certain of these policies, the Insurance Carriers charge the Broker directly for all premiums and other amounts due under such policies.  The Broker sends the Debtors a consolidated monthly statement for payment of amounts due on a forward basis, and, once paid by the Debtors, the Broker submits the payments to the Insurance Carriers.  For all other insurance policies, the premiums are either financed or paid in advance directly by the Debtors to the Insurance Carriers.  The Broker is paid a fee for administering certain of the insurance policies, including, but not limited to, the directors' and officers' liability policy, fiduciary liability policy, commercial general and professional liability policies, and property policies, which is paid partially out of commissions earned on insurance premiums.  The Debtors are responsible for payment of the broker fees not covered by commissions on insurance premiums.

95.     The Debtors also typically purchase their bonds through a broker Willis Holding Group.  The Debtors pay the Bond Broker directly for all premiums and other amounts due under such bonds.  The Bond Broker sends the Debtors a consolidated statement for payment on a monthly basis, and once paid by the Debtors, the Bond Broker submits the payments to the Bond Carriers.  The Bond Broker is paid a fee for placing the Debtors' bonds which is paid out of commissions earned on bond premiums.

- 35 -

96.    Under the laws of the State of New York, the Debtors are required to maintain workers' compensation policies and programs and to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. Pursuant to such state law requirements, the Debtors maintain Workers' Compensation Programs in New York through self-insured and third-party programs.

97.    The Debtors' affiliate, Queensbrook Offshore Insurance LLC, has issued a deductible reimbursement policy for Debtors' first $250,000 in coverage. Excess insurance above the Retention is provided in accordance with New York State statutory limits by New Hampshire Insurance Company, a division of AIG.

98.    Premiums for the current Workers' Compensation Programs are based on a fixed rate of estimated payroll and are paid quarterly. Following an annual audit of the Debtors' payroll, the Debtors either pay a retrospective premium owed or receive back overpayments that were made. On certain of the former insurance programs, there are annual retrospective audits and annual "true-ups" of the premiums owed.

99.    The Debtors also maintain many general liability and property insurance policies, which provide the Debtors with insurance coverage for claims relating to, among other things, commercial, general and professional malpractice liability, commercial umbrella liability, automobile liability, directors' and officers' liability, fiduciary liability, commercial crime, boiler and machinery, property (including business interruption), floods, earthquakes, and pollution. These policies are essential to the ongoing operating of the Debtors' business.

100.    Several of the liability, property, and workers' compensation policies and certain of the bonds expire during the period from the Petition Date through July 31, 2005. In order to pursue renewal of these policies, there will be requirements for collateral and potential

CHI99 4478581-24.030067.0030

premium payments and increases as yet unknown.  It is essential that all payment and collateral

obligations be met postpetition to achieve maximized cost limitations on the renewal programs.

Debtors' estimate of the amounts due during the period from the Petition Date through August

31, 2005 is $5,395,636.72.   Such estimate is based upon the premiums paid for the prior term of

insurance under these policies and bonds.

101.    The Debtors are required to pay premiums based upon a fixed rate

established and billed by each Insurance Carrier.  The premiums for most of these policies are

determined annually and are paid at policy inception either directly to the Insurance Carrier, or to

the Broker (who pays the Insurance Carrier), or are financed through A.I. Credit Corp. who pays

the premium to Insurance Carrier on behalf of Debtors.  With respect to the premiums on the

commercial, general and professional liability policies, and the directors' and officers' liability

policies, the premiums are financed through Financing Agent prepays the premiums to the

Insurance Carriers and then the Debtors make either monthly or quarterly payments in respect

thereof to Financing Agent.

102.    With respect to all policies of insurance, there are certain deductible or

self-insured retention amounts set forth in the policy language for each claim.   In the

commercial, general and professional malpractice liability policies and certain of the workers'

compensation policies, there are additionally set forth aggregate limits on the deductible or self-

insured retention amounts under each policy year.  Claim losses and expenses are paid by the

Insurance Carriers directly to claimants, attorneys, investigators, and health care providers as

incurred.  The Insurance Carriers then bill the Debtors quarterly for reimbursement of those

losses and expenses which fall under the deductible or self-insured retention amounts.

Deductibles under the property and automobile insurance policies are subtracted from the

amounts that the Insurance Carriers reimburse the Debtors after the Debtors have paid the claim losses.

103.    As of the Petition Date, the Debtors believe they were current on their prepetition premiums and deductible reimbursements with respect to the policies with such features.

## E.    Reclamation Claims

104.    The Debtors' continued operations rely on the uninterrupted services of thousands of vendors.  These vendors supply the Debtors with a variety of goods including over-the-counter and prescription medicines, medical supplies and equipment, food and beverage supplies and sanitary items.

105.    The Debtors anticipate receiving demands during the early days of the Cases from numerous vendors asserting such vendors' purported rights of reclamation.  The Reclamation Claims, if properly asserted, will request that the Debtors return certain goods identified in the Reclamation Claims, grant a lien against the Reclamation Goods or grant such creditor an administrative claim.  Establishing procedures will simplify the process of addressing such claims while adequately safeguarding the reclamation rights of the creditors asserting them.

106.    The Debtors' operations require the constant availability of a variety of goods, including over-the-counter and prescription medicines, medical supplies, equipment, food, and beverage supplies and sanitary items.  If the Debtors' suppliers are allowed to exercise their rights to reclamation, the Debtors' operations could be compromised and the Debtors' ability to successfully reorganize its operations could be significantly diminished.

107.    In anticipation of receiving the Reclamation Claims, the Debtors have established internal procedures for the handling of such claims and for bringing them to the attention of the Debtors' professionals.

**F.    Critical Vendors**

108.    The Debtors comprise one of the most comprehensive healthcare systems in the metropolitan New York area, serving thousands of patients and residents annually. The Debtors' viability as healthcare providers is dependant upon the Debtors' uninterrupted access to the goods and services provided by the Critical Vendors, as is the health and safety of the Debtors' patients and residents. The Critical Vendors include suppliers of over-the-counter and prescription medicines, medical supplies, and equipment, food and beverage supplies and sanitary items. Certain of the Debtors' Critical Vendors are either the sole source of critical supplies and medications, or even if alternative sources were available, the transition process to such alternate sources would likely result in a lengthy disruption of essential inventory. Any interruption in the goods and services provided by the Critical Vendors will have a detrimental effect on the Debtors' operations and potentially a devastating effect on the care and safety of the Debtors' Patients.

109.    The Debtors seek only to pay Critical Vendor Claims where nonpayment of such claims would lead to the interruption of the delivery of goods and services or would seriously disrupt the Debtors' operations.

110.    The Debtors estimate that the maximum amount needed to pay the prepetition Critical Vendor Claims is $16,200,000. Obtaining authority to pay the Critical Vendor Claims will not create an imbalance of its cash flows because the majority of these

CHI99 4478581-24.030067.0030

obligations have customary payment terms and will not be payable in a lump-sum. Cash maintained by the Debtors, together with cash generated in the ordinary course of the Debtors' business will provide more than sufficient liquidity for the payment of the Critical Vendor Claims in the ordinary course of business.

## G.    Payment of Prepetition Sales And Use Taxes

111.    The Debtors believe that they are current with respect to the payment of their Sales and Use Taxes and that only de minimus amounts of Sales and Use Taxes, if any, are owed on a prepetition basis to the Taxing Authorities.

112.    The Debtors, in the ordinary course of their business, incur various tax liabilities, including Sales and Use Taxes. Prior to the Petition Date, the Debtors paid the Sales and Use Taxes as they became due. On average, the Debtors' quarterly obligations for the Sales and Use Taxes, including for certain taxes and duties owed to certain Taxing Authorities, were approximately $6,000.

113.    Sales and Use Taxes accrue daily in the ordinary course of the Debtors' business, and are calculated based upon statutorily mandated percentages. On a periodic basis, typically quarterly or monthly, the Debtors remit the Sales and Uses Taxes collected during the preceding quarter or month to the Taxing Authorities.

114.    As described above, the Debtors pay Sales and Use Taxes to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers depending on the particular Taxing Authority. Prior to the Petition Date, certain Taxing Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions as of the Petition Date.

- 40 -

115.    The Debtors represent that each of the Checks or Electronic Transfers can be readily identified as relating directly to the authorized payment of prepetition Sales and Use Taxes.  Accordingly, the Debtors believe that Checks and Electronic Transfers other than those relating to authorized payments will not be honored inadvertently.

116.    Payment of the Sales and Use Taxes in full and on time to the Taxing Authorities is both necessary and in the estates' best interests.  Failure to timely pay, or precautionary withholding by Debtors of payment of, the Sales and Use Taxes likely would cause Taxing Authorities to take aggressive actions, such as the filing of multiple liens and a marked increase in audits which would unnecessarily divert the Debtors' attention from the reorganization process.  Prompt and regular payment of the Sales and Use Taxes would avoid any such unwarranted governmental action.  Also, because the Sales and Use Taxes constitute "trust fund" taxes, the Debtors' officers or directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of such Sales and Use Taxes.

117.    To the extent that the Debtors have collected Sales Taxes from their customers, such funds are held in trust by the Debtors for the benefit of the Taxing Authorities.

118.    The Debtors believe that sufficient assets exist to pay all priority Sales and Use Taxes in full under any plan of reorganization that may ultimately be proposed and confirmed by this Court.  Accordingly, the relief requested will only affect the timing of the payment of these priority Sale and Use Taxes and will not prejudice the rights of general unsecured creditors or other parties in interest.  Furthermore, in some cases, prepayment of such Sales and Use Taxes may actually reduce the amounts ultimately paid to the Taxing Authorities. The rights of other unsecured creditors and parties in interest consequently would not be prejudiced if the requested relief is granted.

CHI99 4478581-24.030067.0030

## H.   Payment For Goods In Transit

119.   In the ordinary operation of the Debtors' business, numerous vendors and suppliers provide the Debtors with thousands of dollars of goods necessary for the operation of the Debtors' business, such as over-the-counter and prescription medicines, medical supplies, equipment, food and beverage supplies and sanitary items.  As of the Petition Date, and in the ordinary course of their businesses, the Debtors had numerous prepetition purchase orders outstanding with various vendors and suppliers for such goods.   As a consequence of the commencement of these Chapter 11 cases, many of the Vendors are concerned or assume that delivery of goods subject to prepetition Outstanding Orders after the Petition Date will leave those Vendors, who make such shipments postpetition, general unsecured creditors of the Debtors' estates with respect to such shipments.  Accordingly, such Vendors may refuse to ship or deliver goods to the Debtors unless the Debtors issue substitute purchase orders or obtain an order of the Court providing that undisputed obligations of the Debtors arising from the postpetition delivery of merchandise subject to prepetition Outstanding Orders are afforded administrative expense priority.

120.   Additionally, certain amounts may be due for charges by common carriers related to the delivery of the Outstanding Orders.  The Debtors' failure to pay the Common Carrier Charges may give rise to claims secured by various liens, including liens on goods and supplies or possessory liens under state and other applicable law.   Depending on the circumstances of a particular case, these liens may give rise to claims that the Debtors' estates would be required to pay in full.  Accordingly, the immediate payment of certain Common Carrier Charges will affect only the timing of such payments and will not prejudice the rights of general unsecured creditors or other parties in interest.  In addition, these liens may entitle the

- 42 -

Common Carriers to refuse to release or deliver property which could impede the Debtors' ability to provide their customers the full range of goods and services necessary for Debtors' continued operations an uninterrupted supply of fresh, saleable inventory.  For example, the assertion of a possessory lien could prevent the Debtors from making prescription medicines available to their customers.  All of these scenarios, among others, would cause delay and disruption to the Debtors' business, to the detriment of all parties in interest.

121.    The Debtors believe that undisputed obligations to the Vendors arising from Outstanding Orders and Common Carrier Charges aggregates approximately $1,397,039.72 on a monthly basis.

122.    By requesting the Outstanding Orders, the Debtors have induced the Vendors and Common Carriers to perform under the Outstanding Orders.  The Debtors also submit that the transactions with the Vendors will "substantially benefit the estate."  The relief requested herein will ensure a continuous supply of goods indispensable to the operations of the Debtors' healthcare facilities.  Absent such relief, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide the Vendors with the assurance of such administrative priority.

## I.    Compensation, Payroll Taxes, Employee Benefits, and Related Employee Obligations

123.    The Debtors' workforce includes both union and non-union hourly and salaried employees and independent contractors who worked prepetition either full-time or part-time.  The Debtors' reorganization efforts require the continued and uninterrupted service of the Employees in order to support continuing operations and to maintain the consistent high-quality services necessary for the Debtors' patients and residents.

- 43 -

124.    The Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein.  Without the requested relief, the Debtors' stability would be undermined at the outset of these Cases.  Any delay in paying Prepetition Compensation, Benefits, Deductions or Prepetition Expenses would seriously harm the Debtors' relationship with their Employees and could irreparably impair employee morale at the very time the dedication, confidence, and cooperation of the Employees is most critical.  The Debtors face the imminent risk that their remaining operations may be severely impaired and the welfare of the Patients jeopardized if they are not immediately granted authority to make the payments described in the Motion.  Employee stability is particularly important to the Debtors because many Employees are directly responsible for the health and welfare of the Patients.  In other words, high employee turnover could jeopardize Patients' health and safety.  In addition, many of Debtors' healthcare workers would be very difficult to replace in today's competitive market for healthcare providers.

125.    The deductions and certain of the benefits represent funds that the Debtors ordinarily do not hold for any protracted period and for which the Employees themselves may have a direct claim against the Debtors for such funds.  Because it is likely that Employees will file claims against the Debtors equal to the amount of the Deductions, there is ample justification for the payment of the Deductions to or on behalf of the Employees in the ordinary course of the Debtors' business.

126.    There will be sufficient cash available to pay all Prepetition Compensation, Deductions, Benefits, Trust Fund Taxes and Prepetition Expenses, as such amounts become due in the ordinary course of their business.

CHI99 4478581-24.030067.0030

**(i)**      **Compensation and Deductions**

127.    As of the Petition Date, many Employees were owed or had accrued various sums for: wages, salaries, contractual compensation, sick pay, vacation pay (including "personal days"), holiday pay, bonuses, automobile allowances, and other accrued compensation.

128.    Vacation time is accrued by Employees over the course of each year. Accrued vacation time can be used by an Employee during the year, at which point it is paid. Employees who have accrued vacation time are not entitled to receive the cash value except that Employees generally are entitled to compensation for earned vacation time when such time is taken, and upon termination of employment, including upon retirement up to a maximum of one and one-half years of pay.  Additionally, the Debtors observe certain of the major holidays according to a pre-determined observance schedule, which provides for payment to salaried / non-salaried employees on such dates.

129.    Sick time is accrued by Employees over the course of each year.  Accrued sick time can be used by an Employee during the year, at which point it is paid.  Employees who have accrued sick time are not entitled to receive the cash value except that Employees generally are entitled to compensation for earned sick time when such time is taken and are entitled to convert unused sick time to vacation time, and upon termination of employment, including upon retirement up to a maximum of one and one-half years of pay.

130.    Personal time is accrued by Employees over the course of each year. Accrued personal time can be used by an Employee during the year, at which point it is paid. Employees who have accrued personal time are not entitled to receive the cash value.

- 45 -

131.    All of the Debtors' hourly and salaried Employees are paid bi-weekly on a rolling weekly basis.

132.    In addition, as of the Petition Date, Debtors have made deductions from Employees' paychecks to make payments on behalf of Employees for 401(k) savings programs, tax-deferred annuity plans (403(b)) and pension plans including a defined benefit and defined contribution components, medical, vision, life, flexible spending account, and dental benefit plans; short-term and long-term disability insurance and ancillary benefit programs for universal life, legal services, long-term care, and supplemental short-term disability; union dues, charitable contributions, qualified transportation expense plans, college savings plans, tuition assistance; garnishments, support payments, and other similar programs on account of which Debtors ordinarily deduct a sum of money from an Employee's paycheck and pay that amount to a third party.

133.    Prepetition Compensation and Deductions were due and owing as of the Petition Date because, among other things:

a.    The Debtors filed their Chapter 11 petitions in the midst of regular and customary salary, compensation, and hourly wage payroll periods;

b.    Many payroll and expense reimbursement checks issued to date have not yet been presented for payment or have not yet cleared the banking system and accordingly were not honored and paid as of the Petition Date;

c.    Employees have not yet been paid certain amounts of their salaries, contractual compensation and wages for services previously rendered to the Debtors; and

d.    certain other forms of compensation (including sick pay, vacation pay, bonuses, payments into employee benefit plans, and withholdings for benefit plan contributions) related to prepetition services have not yet been paid to or for the benefit of Employees because such benefits, although

- 46 -

accrued either in whole or in part prior to the Petition Date, were not payable at such time, but rather will become payable in the future in the ordinary course of Debtors' business.

134.    The Debtors estimate that, as of the Petition Date, an aggregate of approximately $12,930,529  in Prepetition Compensation and Deductions had accrued but remains unpaid, including estimated checks issued but not cashed as of the Petition Date.

### (ii)    Contributions to Benefit Plans

135.    The Debtors have a number of employee programs, including 401(k) savings programs, tax-deferred annuity plans 403(b) and pension plans with defined benefit and defined contribution components, senior executive retirement plans; medical, vision, life, flexible spending account, and dental benefit plans; short-term and long-term disability insurance and ancillary benefit programs for universal life, legal services, long-term care, and  supplemental short-term disability, qualified transportation expense plans, college savings plans, and tuition assistance.  As of the Petition Date, the Debtors were obligated to pay certain contributions to or benefits under such benefit plans.

136.    Some Benefits remained unpaid as of the Petition Date because certain of the Debtors' obligations under the applicable benefit plans accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of Debtors' business until a later date.   The Debtors estimate that the aggregate amount of accrued prepetition Benefits as of the Petition Date calculated on a weekly basis is approximately $1,957,540.

137.    Additionally, some Prepetition Compensation and Deductions remained unpaid as of the Petition Date because certain of the Debtors' obligations under the applicable

CHI99 4478581-24.030067.0030

benefit plans accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of Debtors' business until a later date. The Debtors estimate that the aggregate amount of such Prepetition Compensation and Deductions to Employees is approximately $2,725,000.

### (iii)    Withholding and Payroll-Related Taxes

138.    In the ordinary course of business, the Debtors withhold from Employees' paychecks various federal, state, and local income, FICA, and other taxes. Attendant to the payment of Employee wages, salaries, and expenses is the Debtors' obligation to pay federal, state, and city withholding taxes, including without limitation, Social Security taxes, Medicare taxes, and unemployment insurance taxes.

139.    Some Trust Fund Taxes remained unpaid as of the Petition Date because certain of the Debtors' obligations under the applicable benefit plans accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of Debtors' business until a later date. The Debtors estimate that the aggregate amount of such prepetition Trust Fund Taxes to Employees is approximately $4,150,267.

### (iv)    Prepetition Expenses

140.    In the ordinary course of business, the Debtors reimburse hourly and salaried employees for certain expenses. As of the Petition Date, many Employees were owed reimbursement of employee business expenses, including but not limited to travel, lodging, temporary corporate housing, moving and other relocation expenses. To enable the Employees to perform their jobs effectively, the Debtors must continue corporate policies of permitting certain Employees to incur business and travel-related expenses and thereafter seek

- 48 -

reimbursement by submitting appropriate invoices or vouchers evidencing such expenses. In the ordinary course of Debtors' business, Employees travel to meet with vendors, suppliers, and customers and are reimbursed for expenses incurred in connection therewith. The Employees may be unwilling or unable to continue this vital business practice if they are not reimbursed for Prepetition Expenses, thus irreparably injuring the Debtors' business.

141.    Some Prepetition Expenses remained unpaid as of the Petition Date because certain of the Debtors' obligations under the applicable benefit plans accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of Debtors' business until a later date.

### (v)    Independent Contractors

142.    Additionally, in the ordinary course of Debtors business, the Debtors utilize the services of approximately 635 independent contractors in the operation of Debtors' business.    The services provided include physician services, nursing services and other healthcare and miscellaneous staffing related expenses and obligations.    The Contractors are necessary to the successful operation of Debtors' business and perform services similar to Debtors' employees, including temporary and full-time staffing services as may be needed from time to time in connection with the Debtors healthcare operations.

Some Contractors remained unpaid as of the Petition Date because certain of the Debtors' obligations accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of Debtors' business until a later date.    The Debtors seek authority to pay, on the dates that Contractors would be due in the ordinary course, all amounts due to Contractors that accrued but remained unpaid as of the Petition Date.

CHI99 4478581-24.030067.0030

143.    The Debtors maintain a consolidated accounts payable system for reimbursement of Prepetition Expenses and payments to Contractors.  In the ordinary course of business, approximately $4,422,120 is paid for Prepetition Expenses and payments to Contractors on a monthly basis.  Debtors estimate, as of the Petition Date, that approximately $1,020,489 has accrued but remains unpaid for Prepetition Expenses and Payments to Contractors.

144.    All banks and other financial institutions need to be authorized and directed to receive, process, honor and pay any and all checks drawn on the Debtors' payroll and other disbursement accounts.  Such checks are drawn on identifiable payroll and disbursement accounts and can be readily identified as relating directly to the authorized payment of Prepetition Compensation, Deductions, Benefits, funds deducted from payroll including, without limitation, Trust Fund Taxes, or Prepetition Expenses and Payments to Contractors whether such checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.  Accordingly, checks other than those relating to authorized payments should not be honored inadvertently.

145.    The Employees and Contractors are essential to the continued operation of the Debtors' business and successful reorganization, and the Employees' morale directly affects their effectiveness and productivity.  Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  The Employees and Contractors are central to the Debtors' operations and are vital to this reorganization.  A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors, their Patients, and the value of their assets and businesses.  The total amount sought to be paid herein is relatively modest

compared with the size of the Debtors' overall business and the importance of the Employees and Contractors to the Debtors' reorganization efforts.

## J.   **Utilities Motion**

146.   Prior to the Petition Date, the Debtors received water, heat, natural gas, oil, electricity, trash removal, sewage, telephone, and other utility services from various utility companies.  Uninterrupted utility service is essential to the Debtors' ongoing operations.

147.   If the Utility Companies were permitted to terminate services twenty (20) days after the Petition Date, then the Debtors would be unable to operate and there would be potential life-threatening hazards for the Debtors' patients and employees.  To avert such harm, the Debtors would be required to pay potentially substantial sums demanded by the Utility Companies to avoid the cessation of necessary utility services.

148.   Although the Debtors may not have been current in their payments to certain Utility Companies prior to the Petition Date, the Debtors represent that they will pay their postpetition utility charges (as well as other postpetition obligations) as billed and when due. Further, the Debtors have filed a  motion seeking authority to enter into postpetition financing arrangements.  Together with the cash generated by operations, these financing arrangements will enable the Debtors to pay their postpetition debts as they become due.  In fact, the Debtors included charges for future utility service in the projected budgets prepared in connection with obtaining such financing arrangements.

149.   Requiring the Debtors to provide security deposits to each Utility Company would cause a cash drain that could impede the Debtors' ability to reorganize.

CHI99 4478581-24.030067.0030

Negotiations with each of the numerous Utility Companies would waste time and money better devoted to the Debtors' reorganization efforts.

**K.        License and Regulatory Agency Fees**

150.    Certain of the Debtors offer their patients and residents a comprehensive array of medical, residential and recreational services, many of which are subject to licensing arrangements and accompanying license and regulatory fees.

151.    In the ordinary course of business, the Debtors are regulated by various agencies in the states and counties in which the Debtors operate their facilities and other businesses.    Each year, the Debtors are required to pay (a) annual fees to the Regulatory Agencies in order to remain in good standing to operate their facilities and (b) license fees to the Regulatory Agencies for the licensing of their facilities and other operations.    In fiscal year 2004, the aggregate amount of Regulatory Fees paid to Regulatory Agencies was approximately $300,000.

152.    While the Debtors are not certain that they have any outstanding prepetition obligations to the Regulatory Agencies in respect of the Regulatory Fees, it is possible that the Debtors may be notified by such Regulatory Agencies in the future that they must satisfy such prepetition obligations.

153.    It is essential to the operation of the Debtors' facilities that the Debtors pay the Regulatory Fees imposed by the Regulatory Agencies.    Otherwise, the Debtors may not be able to maintain certain licenses that are critical to their continued operations.    It is essential to the operation of the Debtors' facilities that the Regulatory Agencies do not revoke or refuse to renew any of the Debtors' licenses.    Without such licenses, the Debtors would be  precluded

CHI99 4478581-24.030067.0030

from operating their business and caring for their thousands of residents and the Debtors' reorganization process may be irreparably harmed

**L.**     **Motion for Authority to Honor Prepetition Refunds Owed to Nursing Home Residents and to Maintain Resident Trust Fund Accounts and Policies**

154.    SVCMC provides inpatient skilled nursing care, rehabilitative services and other health-related care and residential services to the Residents of Monsignor J.H. Fitzpatrick Pavilion for Skilled Nursing Care.  The Nursing Facility is a 115-bed long-term care facility based within Mary Immaculate Hospital.  The Nursing Facility is a New York Certified Home Health Agency and Long-Term Home Health Care Program.  In addition, the Nursing Facility is an enrolled provider in the Medicare and Medicaid programs.

155.    In the ordinary course of operating the Nursing Facility, SVCMC is subject to certain federal and New York state statutes and regulations applicable to Residents' payments, refunds and deposits.  In accordance with these laws, SVCMC has adopted certain practices and policies that address (a) promptly refunding amounts owed to Residents and (b) holding certain funds in segregated accounts on behalf of Residents.  These practices and policies concern eligibility refunds under New York's Medicaid program, prepayment refunds, overpayment refunds, the use of security deposits and maintaining trust fund accounts.

156.    Residents occasionally are admitted to the Nursing Facility before the issuance of an eligibility determination NYSDH.  While awaiting NYSDH's determination, a process that typically takes 30 to 60 days (but may take up to 90 days), the Nursing Facility usually bills the Resident at private-payor rates for services rendered.  Bills issued during this gap period are usually paid from the Resident's private funds or some other source of private funding.  If the Resident is determined to be eligible for Medicaid coverage of his or her stay in the Nursing

- 53 -

Facility, then the private funds paid by or on behalf of the Resident, less any applicable spend-down or co-payment by the Resident, must be refunded pursuant to federal and state regulatory requirements.  In addition to complying with its regulatory obligations, SVCMC endeavors to make prompt payment of Medicaid Eligibility Refunds in order to maintain the goodwill of Residents and their families.

157.    In accordance with normal industry practices. SVCMC may require the Nursing Home's private-pay Residents to pay their monthly bill, and Medicaid Residents to pay their NAMI, in full in advance at the beginning of each month.  When a Resident is discharged from the Nursing Facility before month's end, the Nursing Facility is required by law to issue the Resident or his or her responsible party a pro-rated refund of the unearned portion of the monthly payment.

158.    Similarly, Residents occasionally overpay for items and care provided at the Nursing Facility, such as when the estimated cost of nursing care exceeds the actual cost of services rendered or a patient's Medicaid spend-down is decreased before the Nursing Home receives notice from NYSDH.  The Nursing Facility refunds such overpayments in accordance with its ordinary business practice and applicable law.

159.    In the ordinary course of its business, and as permitted by law, SVCMC may receive Security Deposits from private-pay Residents of the Nursing Facility.  When received, SVCMC either applies the Security Deposit to the Resident's outstanding obligations or returns the Security Deposit to the Resident or his or her responsible party, as appropriate.

160.    Upon written authorization of a Resident, the Nursing Facility must hold, safeguard, manage and account for the Resident's personal funds deposited with the Nursing Facility.  The Nursing Facility is required by law to deposit personal funds in excess of $50.00 in

a segregated interest-bearing account and ensure that the Resident's funds are not commingled with the Nursing Facility's other funds. Residents are able to access funds in the Resident Trust Fund Account during posted hours.

161.    SVCMC has established Resident Trust Fund Accounts for the Nursing Facility. Each Resident Trust Fund Account is segregated from SVCMC's other operating and trust accounts. SVCMC has also satisfied regulatory requirements to assure the security of all personal funds of Residents deposited with the Nursing Facility.

162.    Funds from Social Security, Supplemental Security Income, private pension funds and other sources that flow to SVCMC on account of Residents are deposited into the appropriate Resident Trust Fund Account. Residents' SSI checks are either (a) sent to the Resident or his or her responsible party and then endorsed for deposit into the Resident Trust Fund Account, (b) sent to the Nursing Facility in the name of the Resident and deposited into either the Resident's personal account or the Resident Trust Fund Account, or (c) sent to the Nursing Facility's administrator, who endorsed the check and deposits it into the Resident Trust Fund Account on behalf of the Resident. At the beginning of each month, the Nursing Facility's bookkeeper debits each Resident's personal funds in the applicable Resident Trust Fund Account in an amount necessary to satisfy expected personal charges for the coming month.

163.    SVCMC maintains the Resident Trust Fund Account procedures in the ordinary course of its business and pursuant to applicable law. These trust accounting procedures are also subject to audit by New York state regulatory officials. As of March 31, 2005, approximately $145,000 in the aggregate was held in the Resident Trust Fund Accounts.

CHI99 4478581-24.030067.0030

**M.**    **Motion to Pay Construction and Lien Claimants**

164.    The Debtors have a reputation for reliability and dependability among their customers.  This reputation depends in substantial part on the uninterrupted provision of services to the Debtors' customers and patients at facilities throughout the New York City region.  Along these lines, the Debtors rely heavily on third party contractors and vendors to construct, repair and maintain the Debtors' facilities at various locations.

165.    It is essential for the Debtors' businesses, and their efforts to maximize value for all creditors, that they maintain a reliable and efficient facility construction, repair and maintenance operation.  Because the Debtors are in many cases dependent on third parties, it is essential that their bankruptcy cases not be a reason or excuse for any third party to cease performing timely services or to retain products, goods or equipment required to construct, repair or maintain the facilities.

166.    As of the Petition Date, certain Lien Claimants may have outstanding invoices for work performed or goods that were delivered to the Debtors or the Debtors' customers prior to the Petition Date.  As a result, the Lien Claimants will likely argue that they are entitled to possessory liens for transportation and storage, as applicable, of the goods in their possession and may refuse to perform services or deliver or release such goods before their claims have been satisfied and their liens redeemed.

167.    The Debtors will only pay Lien Charges where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions.

CHI99 4478581-24.030067.0030

168.    The total amount to be paid to the Lien Claimants if the requested relief is granted is minimal compared to the importance and necessity of the uninterrupted receipt of services and the losses the Debtors may suffer if their operations are disrupted.  Moreover, the Debtors do not believe that there are viable timely alternatives to the Lien Claimants that they have used prior to the Petition Date.

169.    Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, a substantial number of the Lien Claimants may not have been paid for certain prepetition goods and services, which may result in many of the Lien Claimants having a right to assert, and perfect, construction, mechanics', or artisans' Liens against the Debtors' relevant plant locations or the Debtors' goods.

170.    As a result, certain Lien Claimants may refuse to perform their ongoing obligations under such agreements with the Debtors, including construction, installation, servicing and warranty obligations.  Additionally, the existence and perfection of these Liens could possibly place the Debtors out of compliance under their various leases.

**N.**    **Application to Retain McDermott Will & Emery LLP as Counsel for the Debtors**

171.    The Debtors have selected McDermott as their bankruptcy and general corporate counsel because McDermott has substantial experience and expertise in Chapter 11 cases involving business entities (including those operating in the healthcare industry), as well as in the practice areas of healthcare law, corporate law, litigation, employee benefits, real estate, secured lending, finance, taxation and other fields that may be required by the Debtors in these cases.  McDermott has the resources necessary to manage Chapter 11 cases of this size and scope.  McDermott has represented numerous debtors, creditors, purchasers, and other parties in

CHI99 4478581-24.030067.0030

interest before courts in the Second Circuit and in numerous other jurisdictions throughout the country.

172.    Moreover, McDermott is extremely familiar with the Debtors' businesses, financial affairs, and the circumstances surrounding the Debtors' Chapter 11 filings.  McDermott has long represented the Debtors, particularly in connection with legal and regulatory matters relating to the various healthcare services that the Debtors provide.  In June of 2004, attorneys from McDermott's bankruptcy and financial restructuring practice became extensively involved in the Debtors' representation and, recently, have advised the Debtors with respect to these Cases and assisted the Debtors in the preparation for their commencement.

## O.    Application to Retain Huron Consulting Services LLC As Financial Advisors

173.    The Debtors seek to retain Huron  Consulting Services LLC as financial advisors because of its extensive experience with the financial and reporting aspects of Chapter 11 proceedings.  The Debtors believe that Huron is both well qualified and able to assist them in these Chapter 11 proceedings in an efficient and timely manner.

174.    Prior to the Petition Date, on October 4, 2004, the Debtors engaged Huron to provide financial advisory services to the Debtors.  Since this time, Huron has developed a great deal of institutional knowledge regarding the Debtors' operations, finance and systems.  This experience and knowledge will be valuable to the Debtors in their efforts to reorganize. Accordingly, the Debtors wish to retain Huron to provide assistance during these Cases.

**P.** **Application to Retain Bankruptcy Services LLC as Claims, Noticing and Balloting Agent**

175.   The Debtors have identified in excess of 51,000 entities or persons to which notice must be given for various purposes.   Such a large number of parties makes utilization of an outside claims and noticing agent necessary and appropriate in these Cases.

176.   Moreover, the Debtors believe that the employment of Bankruptcy Services LLC as claims and noticing agent will (a) relieve the clerk's office of a significant administrative burden, (b) avoid delay in processing proofs of claim and interests, and (c) reduce legal fees that would be otherwise incurred in connection with the retrieval of proof of claim copies from the clerk's office and responding to numerous claim-related inquiries.   In addition, the Debtors' management and professionals will coordinate responsibilities with Bankruptcy Services LLC to ensure that no unnecessary duplication of services occurs.

177.   Bankruptcy Services LLC is well-qualified to perform claims processing and the various services set forth in the Agreement and has provided identical or substantially similar services to many other Chapter 11 debtors of similar sizes in this and other jurisdictions.

**Q.** **Application to Retain Garfunkel, Wild & Travis, P.C. As Special Health Care, Corporate And Financing Counsel For The Debtors**

178.   The Debtors have selected Garfunkel as their special health care, corporate and financing counsel because Garfunkel has substantial experience and expertise in healthcare , corporate and financing matters.   Garfunkel's proposed retention is for only these discrete matters and services and Garfunkel will work with the Debtors' other counsel to ensure that there will be no duplication of legal services provided to the Debtors.

CHI99 4478581-24.030067.0030

179.    Moreover, Garfunkel is extremely familiar with the Debtors' businesses, financial affairs, and the circumstances surrounding the Debtors' Chapter 11 filings.  Garfunkel has represented the Debtors to varying degrees over the past 20 years on a generally continual basis, particularly in connection with Debtors' efforts preceding these cases to restructure their finances.  For these reasons, the Debtors believe that Garfunkel possesses the requisite expertise to serve as special finance and debt counsel in these Cases, and can do so in an efficient and cost-effective manner.

**R.    Application to Retain Dechert As Conflicts Counsel To The Debtors**

180.    The Debtors seek to retain Dechert LLP as conflicts counsel, because Dechert is particularly well-suited to serve as special conflicts counsel in these cases.  Dechert is a full-service international law firm with offices.

181.    The Debtors have employed Dechert in the past to provide advice to, and conducted investigations for, the Debtors on certain discrete matters where the criminal justice process was implicated.  None of those matters are currently pending.

182.    The Debtors have selected Dechert as counsel in these cases because of its knowledge of the Debtors from prior representation and because of its considerable experience in, among other areas, bankruptcy restructuring, tax, real estate, employment, environmental, litigation, mergers and acquisitions, and general corporate matters.

- 60 -

**S.      Motion Approving A Management Agreement With Speltz & Weis LLC For Restructuring Services**

183.    On April 13, 2004, the Debtors engaged SWLLC to provide certain management advisory services in connection with the Debtors' financial restructuring pursuant to the terms of the Management Agreement.

184.    SWLLC has developed a great deal of institutional knowledge regarding the Debtors' operations, finance and systems.  This experience and knowledge will be valuable to the Debtors in their efforts to reorganize.   Accordingly, the Debtors wish to continue to employ SWLLC to provide assistance during these Cases under the same terms and in the same manner as existed on a prepetition basis.  Further, SWLLC has stated its desire and willingness to render the necessary services to the Debtors.

185.    SWLLC is one of the country's leading healthcare advisory, interim management, and restructuring organizations, with a team of over thirty healthcare and management consultants.  SWLLC specializes in working with companies, creditors, investors and others in out-of-court workouts and Chapter 11 proceedings.  SWLLC has served as interim managers and advisors in financially complex bankruptcies and workouts involving billions of dollars in debt.  SWLLC has experience in virtually all aspects of the health care industry, as well as experience with large multinational companies.

**ADDITIONAL INFORMATION REQUIRED BY LOCAL RULE 1007-2**

186.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.  To the best of my knowledge, information and belief, no committees of creditors of the Debtors were organized prior to the Commencement Date.

CHI99 4478581-24.030067.0030

187.    Pursuant to Fed. R. Bankr. P. 1007(d) and Local Bankruptcy Rule 1007-2(a)(4), set forth on **Schedule 1(a-g)** hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the 30 largest unsecured claims (excluding insiders and employees) of each of the Debtors.[6]  Such lists include the amount of the claim, the nature of the claim, and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 1 regarding, among other things, the actual validity of any such claims.[7]

188.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), set forth on **Schedule 2 (a-g)** hereto is the following information with respect to each of the holders of the five largest secured claims against any of the Debtors: the creditor's name and address; the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and, whether the claim or lien is disputed.

189.    Pursuant to Local Bankruptcy Rule 1007(a)(6), **Schedule 3** hereto provides the preliminary unaudited consolidating balance sheet of the System as of April 30, 2005.

190.    Pursuant to Local Bankruptcy Rule 1007(a)(7), the Debtors have not issued securities that are publicly held.[8]

191.    Pursuant to Local Bankruptcy Rule 1007(a)(8), the Debtors represent on **Schedule 4** that to the best of their knowledge none of the Debtors' property is in the possession

---

[6]    Some of the Debtors do not have 30 unsecured claims.  As a result, Schedule 1 lists <u>all</u> of the general unsecured claims against such Debtors.

[7]    As the Debtors have not had sufficient time to review their various leasing agreements, the Debtors reserve their right to assert that any such lease(s) are disguised financing transactions.

[8]    However, DASNY has issued numerous series of bonds to the public that are effectively secured by mortgages on the Debtors' properties.

CHI99 4478581-24.030067.0030

or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

192.    Pursuant to Local Bankruptcy Rule 1007(a)(9), set forth on **Schedule 5** hereto is a list of the premises owned, leased, or held under other arrangement, from which the Debtors operate their business.

193.    Pursuant to Local Bankruptcy Rule 1007(a)(10), to the best of my knowledge, the Debtors do not have any assets outside the territorial limits of the United States.

194.    Pursuant to Local Bankruptcy Rule 1007(a)(11), set forth on **Schedule 6** hereto is a list of the significant litigation commenced against the Debtors. Where a judgment against the Debtors or a seizure of any of their property is imminent.

195.    Pursuant to Local Bankruptcy Rule 1007(a)(12), set forth on **Schedule 7 (a-g)** hereto are the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

196.    Each of the Debtors intends to continue to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), set forth on **Schedule 8** hereto is the estimated amount of the payroll to employees of such Debtors and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the commencement of the Debtors' Chapter 11 cases.

CHI99 4478581-24.030067.0030

197.    Pursuant to Local Bankruptcy Rule 1007-2(b)(3), set forth on **Schedule 9**

hereto are the estimated consolidated cash receipts and disbursements and net cash gain or loss

for the 30-day period following the commencement of the Debtors' Chapter 11 cases.

CHI99 4478581-24.030067.0030

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on this 5th day of July, 2005 at New York, New York.

/s/ Timothy Weis

Timothy Weis
Authorized Person on behalf
of Saint Vincents Catholic Medical Centers
of New York d/b/a
Saint Vincent Catholic Medical Centers,
CMC Physician Services, P.C.,
CMC Radiological Services P.C.,
CMC Cardiology Services P.C., CMC
Occupational Health Services P.C.,
Medical Service of St. Vincent's Hospital
  and Medical Center, P.C., and
Surgical Service of St. Vincent's, P.C.

Sworn to and subscribed before me a Notary Public for the State of New York, New York County, this 5th day of July, 2005.

/s/ Gary O. Ravert

Notary Public, State of New York
02RA6062205
Certificate Filed Kings County
Commission Expires July 30, 2005

CHI99 4478581-24.030067.0030

## Schedule 1(a)

### 30 Largest Unsecured Claims (Excluding Insiders) for
### Saint Vincents Catholic Medical Centers of New York

    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the thirty largest unsecured claims, excluding claims of insiders as defined in 11 U.S.C. §101, for Saint Vincents Catholic Medical Centers of New York:[9]

| *(1)*<br><br>*Name of creditor and complete mailing address including zip code* | *(2)*<br><br>*Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *(3)*<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | *(4)*<br><br>*Indicate if claim is contingent, unliquidated, disputed or subject to set off[10]* | *(5)*<br><br>*Amount of claim [if secured also state value of security]* |
|---|---|---|---|---|
| COMPUTER SCIENCES CORP | Technology Mgmt Group East 95-25 Queens Blvd Rego Park, NY 11374<br><br>and<br><br>PO Box 22040 Albany, NY 12201-2040<br><br>Contact: Mark Greaker Tel: (800-343-9000) Fax: (518-257-4280) | Trade | N/A | 12,070,208.20 |
| AMERISOURCE BERGEN RECEIVABLES | 100 Friars Blvd. Thorofare, NJ 08086<br><br>and<br><br>PO Box 8500-41950 Account # 564476 Community Med. Philadelphia, PA 19178-4873<br><br>Contact: Debbie Wertz Tel: (800-562-2526) Fax: (856-848-7529) | Trade | N/A | 6,777,304.57 |
| NEW YORK CITY WATER BOARD | Finance Authority 75 Park Pl., 6th Fl. New York, NY 10007<br><br>and<br><br>PO Box 410 Church Street Station New York, NY 10008-0410<br><br>Contact: Denise Richardson | Trade | N/A | 5,685,363.14 |

---

[9]    The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

[10] The Debtor reserves its rights to object to claims or assert that they are contingent, unliquidated and/or disputed.

CHI99 4478581-24.030067.0030

| | Tel: (718-595-7000)<br>Fax: (718-760-7621) | | | |
|---|---|---|---|---|
| 1199 SEIU Benefits Fund | 330 West 42nd Street<br>New York, NY  10036-6977<br>Contact:  Bridget Crichlow<br>Tel:  (646-473-9200)<br>Fax:  (646-473-6279) | Trade | N/A | 3,996,217.25 |
| AMERISOURCE /<br>BERGEN (HIV) | PO Box 8500-41950<br>Philadelphia, PA  19178<br><br>Tel: (800-562-2526)<br>Fax: (856-848-7529)<br>Contact: Debbie Wertz | Trade | N/A | 3,860,511.77 |
| SAINT VINCENT'S<br>COMPREHENSIVE | Cancer Center<br>111 Eighth Avenue<br>New York, NY  10011<br><br>Contact:  Bernadette Bianco<br>Tel: (212-367-1732)<br>Fax: (212-367-1707) | Trade | N/A | 3,854,471.00 |
| SPECIAL TOUCH<br>HOME CARE<br>SERVICE | 2091 Coney Island Avenue<br>Brooklyn, NY  11223<br><br>Tel: (718-627-1122)<br>Fax: (718-258-2379)<br>Contact: Steve Ostrovsky | Trade | N/A | 2,881,426.71 |
| AI CREDIT CORP | c/o Bettie Evans<br>1001 Winstead Dr. Ste 500<br>Cary, NC  27513<br><br>and<br><br>Box 9045 GPO<br>New York 10087-9045<br><br>Tel: (212-458-3250)<br>Fax:  (919-234-2712) | Trade | N/A | 2,818,947.14 |
| GE MEDICAL<br>SYSTEMS | C/O Accounts Receivable<br>5517 Collection Center Dr.<br>Chicago IL  60693<br><br>PO Box 640944<br>Pittsburg, PA  15264-0944 | Trade | N/A | 2,726,745.94 |
| NURSING<br>PERSONNEL<br>HOMECARE INC | 175 South 9 Street<br>Brooklyn, NY  11211<br>Contact: Moses Schlesinger<br><br>Tel: (917-674-0003))<br>Fax: (718-599-2227) | Trade | N/A | 2,387,368.92 |
| ARAMARK<br>CORPORATION | Nations Bank, Lockbox 651009<br>101 North Tryon Street<br>Charlotte, NC  28256<br><br>Contact: Jim Toban<br>Tel: (704-375-1705)<br>Fax: (704-375-0942)<br><br>St. John's University<br>8000 Utopia Parkway | Trade | N/A | 2,300,492.41 |

CHI99 4478581-24.030067.0030

|  | Jamaica, NY  14439<br>Contact:  Dave Feldman<br>Tel: (973-202-3602)<br><br>St. Elizabeth Anne's<br>HC & Rehab Center<br>91 Tompkins Avenue<br>Staten Island, NY  10304<br>Contact:  Dave Feldman<br>Tel: (973-202-3602)<br><br>153 West 11th Street<br>New York, NY  10011<br>Contact: Tommy Nge<br><br>1011 Market Street<br>Philadelphia, PA 19107-2988<br>Contact:  Dave Feldman<br>Tel: (973-202-3602) |  |  |  |
|---|---|---|---|---|
| METRO BLOOD SERVICE | 1150 Yonkers Avenue<br>Yonkers, NY  10704<br><br>Contact:  Laura Petitti<br>Tel: (914-237-0000)<br>Fax: (914-237-1662) | Trade | N/A | 2,231,812.00 |
| SIEMENS MEDICAL SOLUTIONS USA | 51 Valley Stream Pkwy<br>Malvern, PA  19355<br>Tel: (800-888-7436)<br>Fax: (501-643-7439)<br>Contact:  Jeff Cargaris<br><br>and<br><br>PO Box 7777 W3580<br>Philadelphia, PA  19175<br>Tel: (800-888-7436)<br>Fax: (501-643-7439)<br>Contact:  Jeff Cargaris | Trade | N/A | 2,171,591.60 |
| SODEXHO MARRIOTT SERVICES INC | 100 Avon Meadow<br>Avon, CT  03001<br><br>and<br><br>PO Box 905374<br>Charlotte, NC  28290-5374<br><br>Tel: (860-678-1023)<br>Fax: (860-678-1058)<br>Fax: (704-364-2403)<br><br>Contact: Liz Lamertti<br>Tel: 516-794-9150 x 113 | Trade | N/A | 2,148,387.88 |
| ACCESS NURSING SERVICES | 411 Manville Road<br>Pleasantville, NY  10570<br><br>Contact: John<br>Tel: (212-754-4333)<br>Fax: (212-754-5898) | Trade | N/A | 2,006,209.72 |
| CARDINAL HEALTH | C/O Customer Service And | Trade | N/A | 1,792,993.50 |

CHI99 4478581-24.030067.0030

| | Legal Dept.<br>401 Mason Road<br>La Vergne, TN 37086<br>Tel: (800-878-3837)<br>Fax: (888-206-3157)<br><br>22456 Network Place<br>Chicago, IL 60673-1224<br>Tel: (858-480-6000)<br>Fax: (858-480-6329) | | | |
|---|---|---|---|---|
| CRITICARE LLC | 573 Valley Road, Suite 1<br>Wayne, NJ 07470<br><br>Contact: Jackie Morgensten<br>Tel: (888-337-9975)<br>Fax: (888-220-8875) | Trade | N/A | 1,470,601.94 |
| AMERISOURCE CORP | 100 Friars Blvd.<br>Thorofare, NJ 08086<br><br>Contact: Debbie Wertz<br>Tel: (800-562-2526)<br>Fax: (856-848-7529) | Trade | N/A | 1,248,104.01 |
| ARAMARK SERVICE MASTER | 1011 Market Street<br>Philadelphia, PA 19107-2988<br>Contact: Jim Toban<br>Tel: (215-238-4001)<br>Fax: (215-238-6175)<br><br>and<br><br>Management Services<br>PO Box 33170<br>Newark, NJ 07188-0170 | Trade | N/A | 1,222,361.44 |
| COUNTY GRAPHICS FORMS MGMT | 2 Stercho Road<br>Linden, NJ 07036<br>Contact: Bob Gaudiosi<br><br>Tel: (908-474-9797)<br>Fax: (908-474-5232) | Trade | N/A | 1,202,394.91 |
| 1199 SEIU PENSION FUND | 330 West 42nd Street<br>New York, NY 10036-6977<br>Contact: Bridget Crichlow<br>Tel: (646-473-9200)<br>Fax: (646-473-6279) | Trade | N/A | 1,169,390.48 |
| JOHNSON & JOHNSON HEALTH CARE | 5972 Collections Center Drive<br>Chicago, IL 60693<br>Tel: (513-786-7000)<br>Fax: (513-786-7000)<br>Contact: Matt Henderson<br><br>Contact: Danielle<br>Tel: (800-255-2500)<br>Fax: (800-255-2500)) | Trade | N/A | 1,072,737.81 |
| BAXTER HEALTHCARE CORP | Lockbox #33037 3rd Fl.<br>First Chicago Nat'l Bank<br>Processing<br>300 Harmon Meadow Blvd<br>Secaucus, NJ 07094 | Trade | N/A | 1,061,899.62 |

CHI99 4478581-24.030067.0030

| | | | | |
|---|---|---|---|---|
| | and<br><br>PO Box 33037<br>Newark, NJ  07188<br><br>Contact:  Mark Lemay<br>Direct: 847-940-5321<br>Tel: (888-229-0001)<br>Fax: (847-948-4602) | | | |
| MEDTRONIC USA INC | c/o Jan Larsen/Bank of America<br>Medtronic Lockbox Services<br>4642 Collection Center Dr.<br>Chicago, IL 60693<br><br>and<br><br>PO Box 751056<br>Charlotte, NC  28275<br>Contact:  Jan Larsen<br>Tel: (800-328-1357)<br>Fax: (800-826-0790) | Trade | N/A | 1,019,193.14 |
| BOSTON SCIENTIFIC SCIMED | One Boston Scientific Place<br>Nadick, MA  01760-1537<br><br>Contact:  Customer Service<br>Tel: (800-832-7822)<br>Fax: (800-782-1357) | Trade | N/A | 867,095.11 |
| CONSTELLATION NEWENERGY INC | Lockbox #642399 c/o Payment Center<br>500 First Ave.<br>Pittsburg, PA  15219<br>Contact: Carrie<br>Tel: (212-885-6448)<br>Fax: (212-885-6445)<br><br>Payment Center<br>PO Box 642399<br>Pittsburgh, PA  15264-2399<br>Contact:  Carrie<br>Tel: (212-885-6448)<br>Fax: (212-885-6445) | Trade | N/A | 852,944.60 |
| SIEMENS ENTERPRISE NETWORK | 900 Broken Sound Parkway<br>Boca Raton, FL  33487<br>Contact:  Jacob Rice<br>Tel: (561-923-8347)<br>Fax: (858-337-7900)<br><br>PO Box 99076<br>Chicago, IL  60693 9076 | Trade | N/A | 784,818.60 |
| PRICE WATERHOUSE COOPERS LLP | 125 High Street<br>Boston, MA  02110<br><br>Tel: (617-530-5000)<br>Fax:  (617-530-5001)<br><br>PO Box 3026<br>Boston, MA  02241 | Trade | N/A | 770,285.16 |
| IMMEDIATE HOME CARE INC | 204 Broadway<br>Brooklyn, NY  11211 | Trade | N/A | 724,970.76 |

CHI99 4478581-24.030067.0030

|  | Contact:  Shandy<br>Tel: (718-302-1000)<br>Fax: (718-384-3178) |  |  |  |
|---|---|---|---|---|
| JSK<br>CONSTRUCTION<br>CORP. | c/o John Sucich<br>438 Fifth Avenue<br>Pelham NY 10803<br>Contact:  John Sucich<br>Tel:  (914-738-6770)<br>Fax: (914-738-6770) | Trade | N/A | 707,077.00 |

CHI99 4478581-24.030067.0030

## Schedule 1(b)

**Unsecured Claims (Excluding Insiders) for**
**CMC Physician Services, P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the thirty largest unsecured claims, excluding claims of insiders as defined in 11 U.S.C. §101, for CMC Physician Services, P.C.:[11]

| (1)<br><br>Name of creditor and complete mailing address including zip code | (2)<br><br>Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3)<br><br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed or subject to set off | (5)<br><br>Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| ING | 1895 Walt Whitman Rd.<br>Melville, NY 11747<br><br>Tony Izzo<br>Tel: (631-991-6050)<br>Fax: (631-454-6423) | Trade | N/A | $29,504.56 |
| Nationwide | 200 Summit Lake Dr.<br>Valhalla, NY 10595<br>Contact = Tom Massan<br>Tel: (614-435-6671)<br>Fax: (614-435-6677)<br>Contact:  Peter Ryan<br>Tel: (800-433-9832) | Trade | N/A | $25,716.18 |
| JP Morgan Chase | 1166 Ave. of the America<br>New York, NY 10036<br>Contact:  Jeffrey Glazer,<br>Service Officer, Middle Market<br>Group<br>Tel:  (212-899-2874)<br>Fax: (212-899-2874) | Trade | N/A | $118.83 |

---

[11]     The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

**Schedule 1(c)**

**Unsecured Claims (Excluding Insiders) for
CMC Radiological Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the thirty largest unsecured claims, excluding claims of insiders as defined in 11 U.S.C. §101, for CMC Radiological Services P.C.:[12]

| *(1)* Name of creditor and complete mailing address including zip code | *(2)* Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | *(3)* Nature of claim (trade debt, bank loan, government contract, etc.) | *(4)* Indicate if claim is contingent, unliquidated, disputed or subject to set off | *(5)* Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| Nationwide | 200 Summit Lake Dr. Valhalla, NY 10595<br><br>Contact: Tom Massan<br>Tel: (614-435-6671)<br>Fax: (614-435-6677)<br>Contact: Peter Ryan<br>Tel:  (800-433-9832) | Trade | N/A | $33,875.39 |
| ING | 1895 Walt Whitman Rd. Melville, NY  11747<br><br>Tony Izzo<br>Tel:  (631-991-6050)<br>Fax:  (631-454-6423) | Trade | N/A | $10,093.24 |
| ADP | One Penn Plz., 23rd Fl. New York, NY  10119<br><br>Andrew Trager<br>Tel:  (212-631-3137)<br>Fax:  (212-631-3145) | Trade | N/A | $53.10 |

---

[12]    The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

### Schedule 1(d)

**Unsecured Claims (Excluding Insiders) for
CMC Cardiology Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the thirty largest unsecured claims, excluding claims of insiders as defined in 11 U.S.C. §101, for CMC Cardiology Services P.C.:[13]

| (1)<br><br>Name of creditor and complete mailing address including zip code | (2)<br><br>Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3)<br><br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed or subject to set off | (5)<br><br>Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| ING | 1895 Walt Whitman Rd.<br>Melville, NY 11747<br>Tony Izzo<br>Tel: (631-991-6050)<br>Fax: (631-454-6423) | Trade | N/A | $9,477.16 |
| ADP | One Penn Plz., 23rd Fl.<br>New York, NY 10119<br>Andrew Trager<br>Tel: (212-631-3137)<br>Fax: (212-631-3145) | Trade | N/A | $35.40 |

---

[13]     The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

## Schedule 1(e)

### 30 Largest Unsecured Claims (Excluding Insiders) for
### CMC Occupational Health Services P.C.

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the thirty largest unsecured claims, excluding claims of insiders as defined in 11 U.S.C. §101, for CMC Occupational Health Services P.C.:[14]

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to set off* | *Amount of claim [if secured also state value of security]* |
| Port Authority of NY and NJ | P.O. Box 95000-1517 Philadelphia, PA 19195-1517 Kathy Massad Tel: (212-435-2690) Fax: (718-244-3639) | Utilities | N/A | 28,473.13 |
| Quest Diagnostics Inc. | 7402 Collection Center Drive Chicago, IL 60693 Irlanda Tel: (800-227-3887 x5856)) Fax: 201-462-6760) | Laboratory Company | N/A | 26,491.01 |
| Caligor Physicians | P.O. Box 382023 Pittsburgh, PA 15250-8023 Mary Kae Tel: (800-225-9906 x7270) Fax: (914-738-9200) | Medical Supplies | N/A | 16,591.94 |
| Aventis Pasteur | 12458 Collections Center Drive Chicago, IL 60693 Lucie Kothitz Tel: (800-822-2463) Fax: (570-839-5002) | Immunization Supplies | N/A | 14,072.30 |
| Aetna | Attention; ALIC P.O. Box 88860 Chicago, IL 60695-1860 Russ Keil Tel: (516-938-9595 Fax: (516-908-4323 | Employee Health Insurance | N/A | 12,038.43 |
| American Express | P.O. Box 2855 New York, NY 10116-2855 Jon Franco Tel: (800-492-3344) Fax: (516-228-0101) | Credit Card | N/A | 10,429.24 |

---

[14]     The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

| | | | | |
|---|---|---|---|---|
| Medcomp Systems, Ltd. | 991 Main Street Holbrook, NY 11741 Roger Tel: (631-467-5401) Fax: (631-467-6105) | Billing Computer Company | N/A | 8,150.00 |
| Laboratory Corp. Of America Holdings | P.O. Box 12190 Burlington, NC 27216-2190 Janice Watson Tel: (800-833-3984) Fax: (919-572-7489) | Laboratory Services | N/A | 7,542.50 |
| Steven C. Garner, MD, P.C. | BLDG 198 JFK Airport Jamaica, NY 11430 Steven Garner Tel: (718-656-5344) Fax: (718-917-8860) | Radiology Services | N/A | 5,311.27 |
| D'Ambrozio & Co., LLP | 246 Saw Mill River Road Hawthorne, NY 10532 Chris D'Ambrozio Tel: (914-773-1700) Fax: (914-773-0518) | Accounting Services | N/A | 5,100.00 |
| Airway Maintenance Corp. | JFK International Airport Building 67, Room 3216 Jamaica, NY 11430 Tel: (718-656-8090)  15 Clinton Avenue Rockville Centre, NY 11750 Romona Tel: (516-594-4944) Fax: (516-594-4902) | Building Maintenance | N/A | 4,980.59 |
| Niftus, LLC | 225 N. 11th Street P.O. Box 1505 Wytheville, VA 24382 Freda Tel: (718-480-5212) Fax: (800-480-5213) | Immunization Supplies | N/A | 4,659.35 |
| BridgeCom International Inc. | General Post Office P.O. Box 9632 Uniondale, NY 11555-9632 Steve Tel: (877-963-1200) Fax: (914-742-5812) | Telephone Service | N/A | 4,280.95 |
| Gerald Bryant, PhD | 141 East 55th Street NewYork, NY 10022 Gerald Bryant Tel: (212-644-5889) Fax: (917-917-8860) | Psychology | N/A | 4,250.00 |
| NEO Medtech, Inc. | 44 West 36 Street 2nd Floor New York, NY 10018 Bob Pardasani Tel: (212-290-8383) Fax: (212-594-1028) | Data Processing | N/A | 3,933.86 |
| R.L. Burtis Enterprises, Inc. | P.O. Box 485 Lynbrook, NY 11563-0485 Ralph Tel: (516-872-3887) Fax: (516-908-4224) | Plumbing and HVAC services | N/A | 3,182.95 |

CHI99 4478581-24.030067.0030

| | | | | |
|---|---|---|---|---|
| VTA Management Services, Inc. | PO Box 1901 Emmons Ave. Suite 200 Brooklyn, NY 11235 Dawn Tel: (718-615-0049) Fax: (718-615-1972) | Physical therapy services | N/A | 2,673.00 |
| Airport Press | P.O. Box 300879 JFK Station Jamaica, NY 11430 Nicole Tel: (718-244-6788) Fax: (718-995-3432) | Advertising | N/A | 2,650.00 |
| Henry Schein Inc. | 135 Duryea Road Mellville, NY 11747 Customer Service Rep Tel: (800-472-4346 x6146) Fax: (800-972-2611) | Medical Supplies | N/A | 2,596.90 |
| St Johns Hospital | PO Box 32405 Hartford, CT 06150 Eddie Antoine Tel: (800-558-1000) Fax: (718-558-1878) | Medical office | N/A | 2,147.00 |
| Robert Lautin, MC | 425 East 58th Street New York, NY 10022 Robert Lautin Tel: (212-759-7680) Fax: (718-283-8366) | Radiology Services | N/A | 2,025.00 |
| High Rise Fire Protection Corp. | 144 21st Street Brooklyn, NY 11232 Samanatha Peters Tel: (718-369-3434) Fax: (718-369-0375) | Fire Alarm System | N/A | 1,998.15 |
| United States Postal Service | CMRS-POC PO Box7247 Philadelphia, PA 19170 Customer Services Tel: (800-867-3738) Fax: (972-243-8389) | Postage | N/A | $1,800.00 |
| Ocean Side Inst. Ind., Inc. | 2525 Long Beach Road Oceanside, NY 11572 Sheila Tel: (516-766-1461) Fax: (516-678-0980) | Laundry Cleaning | N/A | 1,679.92 |
| MedTox Laboratories, Inc. | NW 8939 P.O. Box 1450 Minneapolis, MN 55485-8939 Michelle Tel: (877-409-7269) Fax: (651-628-6192) | Laboratory Company | N/A | 1,492.15 |
| Industrial Distributors Inc. | 151 East 2nd Street Huntington Station, NY 11746 Edith Tel: (631-421-4182) Fax: (631-421-4179) | Building Cleaning Supply` | N/A | 1,326.70 |

CHI99 4478581-24.030067.0030

| | | | | |
|---|---|---|---|---|
| Long Island Processors | 33 Frong Street<br>East Rockaway, NY 11518<br>Customer Service Rep<br>Tel:  (516-887-1600)<br>Fax: (516-887-1601) | X-ray service | N/A | 1,264.38 |
| Deer Park Spring Water | P.O. Box 52271<br>Phoenix, AZ 85072-2271<br>Customer Service<br>Tel:  (800-325-3337)<br>Fax: (508-977-8508) | Bottle Water Supply | N/A | 1,246.39 |
| Canon Business Solutions – NE | P.O. Box 7247-0322<br>Philadelphia, PA 19170-0322<br>Patrick O Neil<br>Tel:  (877-898-2600 x5063)<br>Fax: (660-263-8717) | Equipment Leasing | N/A | 1,147.53 |
| Royal Waste Services Inc. | 187-40 Hollis Avenue<br>Hollis, NY 11423<br>Jesus<br>Tel:  (212-533-5100)<br>Fax: (718-906-6085) | Waste Management | N/A | 1,107.56 |

CHI99 4478581-24.030067.0030

**Schedule 1(f)**

**Unsecured Claims (Excluding Insiders) for**
**Medical Service of St. Vincent's Hospital and Medical Center, P.C.**

Based on the books and records of Medical Service of St. Vincent's Hospital and Medical Center, P.C., there are no general, unsecured claims against Medical Service of St. Vincent's Hospital and Medical Center, P.C. as of July 5, 2005.:[15]

---

[15]    The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

## Schedule 1(g)

**Unsecured Claims (Excluding Insiders) for
Surgical Service of St. Vincent's, P.C.**

Based on the books and records of Surgical Service of St. Vincent's, P.C., there are no general, unsecured claims against Surgical Service of St. Vincent's, P.C. as of July 5, 2005.:[16]

---

[16]     The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

CHI99 4478581-24.030067.0030

**Schedule 2(a)**
**Five Largest Secured Creditors for**
**Saint Vincents Catholic Medical Centers of New York**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists five largest secured claims for Saint Vincents Catholic Medical Centers of New York.[17]

| Creditor | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| Dormitory Authority of the State of New York | Corporate Office 515 Broadway Albany, New York 12207-2964 518-257-3000 Fax: 518-257-3100 New York City Office One Penn Plaza, 52nd Floor New York, New York 10119-0098 212-273-5000 Fax: 212-273-5121 | $192,594,590 | Real and Personal Property and a lien on certain Gross Revenues | Unknown | No |
| Sun Life Assurance Company of Canada | c/o Sun life of Canada One Sun Life Executive Park Wellesley Hills, MA 02481 Attention: Mortgage Investment Group | $78,927,967 | Real Property relating to Staff House, O'Toole and Martin Payne | $172,700,000 | No |
| HFG HealthCo-4 LLC | c/o Healthcare Finance Group, Inc. 110 Wall Street New York, NY 10005 Tel: 212-785-9212 Fax: 212-785-9211 | $50,843,249 (as of 8/31/04) | Accounts Receivable | Unknown | No |
| Commerce Bank | 475 Park Avenue South New York, NY 10016 Tel: 212-918-4163 Fax: 212-918-4111 | $34,400,354 | Pledged Securities and Interest in Indigent Care Pool and Professional Education Pool | Unknown | No |
| RCG Longview II, L.P. | Seven Penn Plaza Suite 512 New York, NY 10001 | $10,000,000 (to be increased to $16,000,000 | Subordinate interest in Real Property relating to Staff House, O'Toole and Martin Payne | $123,600,000 | No |

---

[17]    Certain of the Debtors have less than five secured claims against them.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

**<u>Schedule 2(b)</u>**
**Largest Secured Creditor for**
**CMC Physician Services, P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the largest secured claim for CMC Physician Services, P.C..[18]

| Creditor | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| HFG HealthCo-4 LLC | c/o Healthcare Finance Group, Inc. 110 Wall Street New York, NY 10005 Tel: 212-785-9212 Fax: 212-785-9211 | $45,000,000 (as of 4/30/05) | Accounts Receivable | Unknown | No |

---

[18]    Certain of the Debtors have less than five secured claims against them.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

## Schedule 2(c)
## Largest Secured Creditor for
## CMC Radiological Services P.C.

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the largest secured claim for CMC Radiological Services P.C..[19]

| Creditor | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| HFG HealthCo -4 LLC | c/o Healthcare Finance Group, Inc. 110 Wall Street New York, NY 10005 Tel: 212-785-9212 Fax: 212-785-9211 | $45,000,000 (as of 4/30/05) | Accounts Receivable | Unknown | No |

---

[19]    Certain of the Debtors have less than five secured claims against them.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

**Schedule 2(d)**
**Largest Secured Creditor for**
**CMC Cardiology Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the largest secured claim for CMC Cardiology Services P.C..[20]

| Creditor | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| HFG HealthCo -4 LLC | c/o Healthcare Finance Group, Inc. 110 Wall Street New York, NY 10005 Tel: 212-785-9212 Fax: 212-785-9211 | $45,000,000 (as of 4/30/05) | Accounts Receivable | Unknown | No |

---

[20] Certain of the Debtors have less than five secured claims against them. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

**Schedule 2(e)**
**Five Largest Secured Creditors for**
**CMC Occupational Health Services P.C.**

Based on the books and records of CMC Occupational Health Services P.C., there are no secured claims against CMC Occupational Health Services P.C. as of July 5, 2005.[21]

---

[21] The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

**Schedule 2(f)**
**Five Largest Secured Creditors for**
**Medical Service of St. Vincent's Hospital and Medical Center, P.C.**

      Based on the books and records of Medical Service of St. Vincent's Hospital and Medical Center, P.C., there are no secured claims against Medical Service of St. Vincent's Hospital and Medical Center, P.C. as of July 5, 2005.[22]

---

[22] The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

- 86 -

**Schedule 2(g)**
**Five Largest Secured Creditors for**
**Surgical Service of St. Vincent's, P.C.**

Based on the books and records of Medical Surgical Service of St. Vincent's, P.C., there are no secured claims against Surgical Service of St. Vincent's, P.C. as of July 5, 2005.[23]

---

[23] The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. In addition to the agreements giving rise to the security interests of the secured parties described above, the Debtors are subject to other arrangements that potentially give rise to security interests by third parties in the Debtors' property.

CHI99 4478581-24.030067.0030

**Schedule 3**
**Unaudited Consolidated Balance Sheets**
**As of April 30, 2005**

SAINT VINCENTS CATHOLIC MEDICAL CENTERS
OF NEW YORK

Combined Balance Sheets
April 30, 2005
With Comparative Figures at December 31, 2004

| Assets | | April 2005 | March 2005 | Change Month | December 2004 | Change YTD |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 4,655,000 | 12,467,000 | (7,812,000) | 28,874,000 | (24,219,000) |
| Investments | | 9,431,000 | 9,296,000 | 135,000 | 9,687,000 | (256,000) |
| Assets designated for self-insurance funds - short-term investments at market | | 30,640,000 | 30,640,000 | — | 30,640,000 | — |
| Assets whose use is limited - collateralized assets | | 37,162,000 | 37,162,000 | | 37,162,000 | |
| Patients accounts receivable, less allowance for doubtful accounts | | 257,900,000 | 247,688,000 | 10,212,000 | 224,807,000 | 33,093,000 |
| Accounts receivable other | | 45,986,000 | 44,112,000 | 1,874,000 | 48,843,000 | (2,857,000) |
| Other current assets | | 35,887,000 | 37,420,000 | (1,533,000) | 31,793,000 | 4,094,000 |
| **Total current assets** | | 421,661,000 | 418,785,000 | 2,876,000 | 411,806,000 | 9,855,000 |
| Other: | | | | | | |
| Depreciation reserve funds and collateralized assets | | 117,166,000 | 118,396,000 | (1,230,000) | 126,241,000 | (9,075,000) |
| Assets designated for self-insurance -investments at market | | 36,675,000 | 36,114,000 | 561,000 | 34,922,000 | 1,753,000 |
| Assets whose use is limited - investments at market | | 42,408,000 | 41,790,000 | 618,000 | 41,711,000 | 697,000 |
| Other non-current assets | | 12,499,000 | 12,530,000 | (31,000) | 11,794,000 | 705,000 |
| Land, buildings and equipment net of accumulated depreciation | | 341,522,000 | 343,331,000 | (1,809,000) | 360,217,000 | (18,695,000) |
| **Total assets** | $ | 971,931,000 | 970,946,000 | 985,000 | 986,691,000 | (14,760,000) |
| **Liabilities and Net Assets** | | | | | | |
| Current: | | | | | | |
| Current installments of long term debt | $ | 330,080,000 | 330,080,000 | — | 330,080,000 | — |
| Loan Payable - Pool Securitization | | — | — | | — | — |
| HFG Loan | | 45,301,000 | 41,076,000 | 4,225,000 | 54,165,000 | (8,864,000) |
| Repurchase agreement | | — | — | | — | — |
| Accrued salaries and payroll taxes withheld | | 69,063,000 | 72,100,000 | (3,037,000) | 67,484,000 | 1,579,000 |
| Current estimated liability for self insurance | | 30,640,000 | 30,640,000 | — | 30,640,000 | — |
| Accounts payable and accrued | | 229,422,000 | 219,251,000 | 10,171,000 | 228,795,000 | 627,000 |

- 88 -

| Assets | April 2005 | March 2005 | Change Month | December 2004 | Change YTD |
|---|---|---|---|---|---|
| expenses | | | | | |
| Estimated retroactive payables to third parties, net | 97,824,000 | 96,334,000 | 1,490,000 | 93,614,000 | 4,210,000 |
| **Total current Liabilities** | 802,330,000 | 789,481,000 | 12,849,000 | 804,778,000 | (2,448,000) |
| Other: | | | | | |
| Long-term debt, excluding current installments | 46,147,000 | 48,641,000 | (2,494,000) | 39,488,000 | 6,659,000 |
| Estimated liability for self insurance | 140,080,000 | 138,641,000 | 1,439,000 | 136,029,000 | 4,051,000 |
| Other non-current liabilities | 113,718,000 | 115,515,000 | (1,797,000) | 112,812,000 | 906,000 |
| | 299,945,000 | 302,797,000 | (2,852,000) | 288,329,000 | 11,616,000 |
| Net assets: | | | | | |
| Unrestricted | (185,226,000) | (174,570,000) | (10,656,000) | (158,967,000) | (26,259,000) |
| Temporarily Restricted | 30,531,000 | 28,887,000 | 1,644,000 | 28,200,000 | 2,331,000 |
| Permanently Restricted | 24,351,000 | 24,351,000 | — | 24,351,000 | — |
| **Total net assets** | (130,344,000) | (121,332,000) | (9,012,000) | (106,416,000) | (23,928,000) |
| **Total liabilities and net assets** $ | 971,931,000 | 970,946,000 | 985,000 | 986,691,000 | (14,760,000) |

CHI99 4478581-24.030067.0030

**Schedule 4**

**Debtors' Property Not in Debtors' Possession**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the Debtors represent that to the best of their knowledge as of July 5, 2005 none of the Debtors' property is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

**Schedule 5**

**Debtor's Property**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

## A.    Commercial Properties

| Owner | Location of Property |
|---|---|
| SVCMC | 95-25 Queens Blvd., Queens, NY |
| SVCMC | 90-02 Queens Blvd., Queens, NY |
| SVCMC | 88-25 153rd Street, Brooklyn, NY, 1st Floor |
| SVCMC | 170 Buffalo Avenue, Brooklyn, NY, 2nd, 3rd & 5th |
| Narrows Medical Building Associates | 9920 4th Ave., Ste 101-102, Brooklyn, NY |
| Maverick Management | 1110 Eastern Parkway, Brooklyn, NY |
| CBC Realty | 1199-1221 Sutter Avenue, Brooklyn, NY |
| 331 Knickerbocker | 333 Knickerbocker Avenue, Brooklyn, NY |
| Unknown | 342 Kingsboro Third Walk, Brooklyn, NY |
| BBC Realty | 1061 Liberty Avenue, Brooklyn, NY |
| Shiloh Realty Corp. | 639 Classon Avenue, Brooklyn, NY |
| RJ Archer | 147-18 Archer Avenue, Jamaica, NY |
| Emilia Realty | 147-20 Archer Avenue, Jamaica, NY |
| SVCMC-Sublandlord | Bldg. # 198, JFK Int'l Airport, Jamaica, NY |
| Cavaliere Group | 66-17 Grand Avenue, Maspeth, NY |
| Queens Office Tower | 95-25 Queens Blvd., Rego Park, NY |
| Rywa Wilner | 70-08 Cooper Cooper, Glendale, NY |
| Unknown | 161-10 Union Turnpike, Flushing, NY |
| Turnpike Gardens | 175-05 Horace Harding Expressway, Fresh Meadows, NY |
| Park Plaza 7 Co. LLC | 1707-32 Vets Memorial Highway, Islandia, NY |
| SVCMC | 1 Seventh Avenue, New York, NY |
| SVCMC | 130 West 12th Street, New York, NY |
| SVCMC | 133 West 11th Street, New York, NY |
| SVCMC | 143 West 11th Street, New York, NY |
| SVCMC | 148 West 12th Street, New York, NY |
| SVCMC | 153 West 11th Street, New York, NY |
| SVCMC | 20 Seventh Avenue, New York, NY |
| SVCMC | 135 Spring Street, New York, NY, West Side, East Side |
| Spring Street Associates | 135 Spring Street, New York, NY, Soho Practice |
| Thomas F. Campenni Co. | 95 University Place, New York, NY, 9th Floor |
| DeSales Associated Living Operating Corporation | 1261 5th Avenue, New York, NY |
| Greenhorn Dev. Co JR Equities | 144 West 23 Street, New York, NY |
| 15-17 Park Avenue, LLC | 15-17 Park Avenue, New York, NY |

CHI99 4478581-24.030067.0030

| Owner | Location of Property |
|---|---|
| AMG Realty Partners, LP | 170 Broadway, New York, NY, Suite 1208 |
| BCC Realty, Inc. | 221-227 Canal Street, New York, NY |
| Royal Realty c/o Sackman Enterprises | 222 West 14th Street, New York, NY |
| DG Hart | 25 Elizabeth Street aka 168 Canal Street, New York, NY |
| Seward Park Housing c/o Cooper Square Realty | 260 East Broadway, #1, New York, NY |
| Mutual Redevelopment | 275-277 8th Avenue, New York, NY |
| Comprehensive Cancer Corporation of New York | 111 8th Avenue, New York, NY |
| Mutual Redevelopment Houses | 365 West 25th Street, New York, NY |
| 450 Partners LLC | 450 West 33 Street, New York, NY |
| St. Margaret's House | 49 Fulton Street, New York, NY |
| Milford Mgmt. | 30 Lincoln Plaza aka 1886-96 Broadway aka 30 W.63rd, New York, NY |
| SVCMC | 384 Bard Avenue, Staten Island, NY |
| Prime Source, LLC | 1975 Hylan Blvd., Staten Island, NY |
| Vornado Realty Trust | 2040 Forest Avenue, Staten Island, NY |
| Robb Décor | 235-237 Port Richmond Ave, Staten Island, NY |
| West End Management Co. | 800 Castleton Avenue, Staten Island, NY |
| Commanding Officer, USCG Civil Engineering Unit Providence | Ft Wadsworth, Staten Island, NY |
| B.M.N. | 2025 Richmond Avenue, Staten Island, NY |
| Seaview Hospital and Home | 450-460 Brielle Avenue, Staten Island, NY |
| Baywood, LLC | 110 Henderson Avenue, Staten Island, NY |
| Block 1030 LLC | 1490 Castleton Avenue, Staten Island, NY |
| AMG Realty Partners, LP | Echo Hills, Dobbs Ferry, NY |
| Coastal Electric | 92 Yonkers Avenue, Tuckahoe, NY |
| 199 Main Street Realty | 199 Main Street, White Plains, NY |
| Village of Port Chester | 350 North Main Street, Port Chester, NY |
| Ambulatory Care | Building #9, West Road, Nassau |
| SVCMC | 735 Castleton Avenue, Staten Island, NY |
| SVCMC | 739-741 Castleton Avenue, Staten Island, NY |

CHI99 4478581-24.030067.0030

## B.  Residential Properties

| Owner | Location of Property |
| --- | --- |
| Compass Forwarding | 1000 Clove Road (R. Shelala), Staten Island, NY  10301, Apt 3K |
| SVCMC affiliate- Immaculata Hall Supportive Housing Development Fund Corporation | 90-10 150th Street, Jamaica, NY  11435 |
| SVCMC affiliate- St. Mary's Supportive Housing Development Fund Corporation | 1534 Prospect Place, Brooklyn, NY  11213 |
| J.R. Equities, Inc | 144 West 23rd Street, New York, NY  10011 |
| SVCMC | 130 West 12th Street, New York, NY  10011 |
| SVCMC | 101 West 15th Street, New York, NY  10011 |
| Joseph Beignano | 542 Greeley Avenue, Staten Island, New York,  10306, 1st Floor |
| Jennifer Merel | 165 Regis Drive, Staten Island, New York,  10314, 2nd Floor |
| Richard Zawisny | 166 Charles Ave., Staten Island, New York,  10302, 1st Floor |
| Forest Manor Mgmt. | 1356 Bay Street, Staten Island, New York,  10305, 2nd Floor |
| Doris Cosme | 149 Regis Drive, Staten Island, New York,  10314, 1st Floor & Side |
| SVCMC | 690 Castleton, Staten Island, NY, 10310 |
| SVCMC | 288 kissell Avenue, Staten Island, NY, 10310, 1A |
| Jennifer Merel | 165 Regis Drive, Staten Island, New York,  10314, 1st Floor |
| Jennifer Merel | 196 Regis Drive, Staten Island, New York,  10314, 2nd Floor |
| SVCMC | 700 Bay Street, Staten Island, New York,  10304, 2A |
| Baldwin Bernard Jr. | 2246 Quimby Avenue, Bronx, New York,  10473, 1st & 2nd Fl. |
| CEKA Realty | 286 Myrtle Avenue, Staten Island, New York,  10310, 3H |
| CEKA Realty | 290 Myrtle Avenue, Staten Island, New York,  10310 |
| Unknown | 49 Clinton Avenue, Staten Island, New York,  10301 |
| Jennifer Merel | 53 Richard Lane, Staten Island, New York,  10314, |
| Joseph Larubbio | 255 Ada Drive, Staten Island, New York, 13014, 1st Floor |
| Daut Ibroceiu | 37 Oxford Place, Staten Island, New York,  10301, 1st Floor, Rear |

CHI99 4478581-24.030067.0030

| Owner | Location of Property |
|---|---|
| Richmond County Construction | 446 Travis Avenue, Staten Island, New York,  10314, |
| Richard Zawisny | 155 Charles Ave., Staten Island, New York,  10302, 2nd Floor |
| Richard Zawisny | 221 Nicholas Ave., Staten Island, New York,  10302 |
| Dorothy Nelson | 130 Nicholas Ave., Staten Island, New York,  10302, 2ndFloor |
| Vance/Phillis Horne | 108 Nicholas Avenue, Staten Island, New York,  10302, |
| Bosede Amenra | 10 Spartan Avenue, Staten Island, New York,  10303, 2nd Floor |
| Ben Ojeh | 50 Birch Road, Staten Island, New York,  10303, 2nd Floor |
| Carmen Quinones | 253 Sumner Place, Staten Island, New York,  10301, |
| Babalola Adeleke | 104 Spartan Avenue, Staten Island, New York,  10303, 2nd Floor |
| Our Lady of Good Counsel | 20 Austin Place, Staten Island, New York,  10301, |
| Joseph Beignano | 542 Greeley Avenue, Staten Island, New York,  10306, 2nd Floor |
| George K. Wonica | 29 Eldridge, Staten Island, New York,  10302, |
| George K. Wonica | 27 Eldridge, Staten Island, New York,  10302, 1st Floor |
| Giovanucci Prop. Mgmt. | 4 Michelle Ct., Staten Island, New York,  10303, 2nd Floor |
| Giovanucci Prop. Mgmt. | 4B Michelle Ct., Staten Island, New York,  10303, |
| Giovanucci Prop. Mgmt. | 6B Michelle Ct., Staten Island, New York,  10303, |
| Giovanucci Prop. Mgmt. | 6A Michelle Ct., Staten Island, New York,  10303, 1st Floor |
| Giovanucci Prop. Mgmt. | 8 Michelle Ct., Staten Island, New York,  10303, 2nd Floor |
| Giovanucci Prop. Mgmt. | 10 Michelle Ct., Staten Island, New York,  10303, |
| Giovanucci Prop. Mgmt. | 12 Michelle Ct., Staten Island, New York,  10303, |
| Forest Manor Mgmt. | 1354 Bay Street  , Staten Island, New York,  10305, 1st & 2nd Floors |
| Forest Manor Mgmt. | 809 Delafield Avenue, Staten Island, New York,  10310, 1st floor |

CHI99 4478581-24.030067.0030

| Owner | Location of Property |
|---|---|
| EV Fleischman | 180 Titus Ave., Staten Island, New York,  10306, 2ndFloor |
| Alan Portiz | 636 Castleton Avenue, Staten Island, New York,  10310, 1st & 2nd Floors |
| Alan Portiz | 638 Castleton Avenue, Staten Island, New York,  10310, 1st Floor |
| J Helm Properties | 98 Davis Avenue, Staten Island, New York,  10310, |
| Salmon Brothers, LLC | 1857 Victory Blvd., Staten Island, New York,  10314, |
| Forest Manor Mgmt. | 809 Delafield Avenue, Staten Island, New York,  10310, 2nd Floor |
| SVCMC | 75 Vanderbilt Avenue, Staten Island, New York,  10304 |
| SVCMC | 382 Westervelt Avenue, Staten Island, New York,  10301, |
| SVCMC | 1150 Castleton Avenue, Staten Island, New York,  10310, |
| 440 East 182nd St. HDFC | 440 East 182nd Street, Bronx, New York,  10458 |
| 1329 College Ave. HDFC | 1329 College Ave., Bronx, New York,  10456 |
| 2216 Adams Pl. HDFC | 2216 Adams Place, Bronx, New York,  10457, 3D |
| 2428 Beaumont Ave. HDFC | 2428 Beaumont Ave., Bronx, New York,  10458, 4 |
| 2425 Lorillard Pl. Realty | 2426 Lorillard Pl, # 14, Bronx, New York,  10458, 14 |
| 660 Crescent Ave. HDFC | 660 Crescent Avenue, Bronx, New York,  10458, 22 |
| Pinnacle Bronx East LLC | 1710 Popham Avenue, Bronx, New York,  10453, 1A |
| Pinnacle Bronx East LLC | 1730 Popham Avenue, Bronx, New York,  10453, 2D |
| Pinnacle Bronx East LLC | 2474 Valentine Avenue, Bronx, New York,  10458, C2 |
| Pinnacle Bronx East LLC | 1121 Morrison Avenue, Bronx, New York,  10472, 2G |
| Pinnacle Bronx East LLC | 1145 Morrison Avenue, Bronx, New York,  10472, 2K |
| Pinnacle Bronx East LLC | 1155 Morrison Avenue, Bronx, New York,  10472, 1F |
| Pinnacle Bronx East LLC | 1171 Morrison Avenue, Bronx, New York,  10472, 2E |

CHI99 4478581-24.030067.0030

| Owner | Location of Property |
|---|---|
| Prime Residential c/o R & R IV, LLC | 735 Walton Avenue, Bronx, New York,  10472, C7 |
| AV 243 LLC | 740 East 243rd Street, Bronx, New York,  10470 |
| Unknown | 708-10 East 243rd Street, Bronx, New York,  10470, 1C |
| Angela Baldera | 395 Westchester Avenue, Port Chester, New York, 10573, |
| Unknown | 76 Hamilton Avenue, Yonkers, New York,  10705, 1 |
| B.I.L.of Westchester | 27 Runyon Avenue, Westchester, New York,  10710, #4 |
| DilaRe, Inc | 411 Warburton Avenue, Westchester, New York,  10701, 3D |
| Jose and Cheila Fortes | 11 Valerie Drive, Westchester, New York,  10703, 1st Fl |
| Prospect Rochelle Realty LLC | 5 Prospect Street, Westchester, New York,  10705, 3M |
| Whitney Young Manor | 354 Nepperhan Aveneue, Westchester, New York,  10701 |
| Wolf Creek Realty Corp. | 366 Warburton Avenue, Westchester, New York,  10701 |
| Baldwin Bernard Jr. | 2246 Quimby Ave., 1st Fl., Bronx, New York,  10473 |

CHI99 4478581-24.030067.0030

## Schedule 6

### Significant Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.[24]

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| Evans-McCord v. St. Mary's Hospital; Case No. 91-4038 pending in the Kings County Supreme Court for the State of New York | Medical malpractice claim against St. Mary's Hospital | The case was tried and the Jury returned a verdict against St. Mary's Hospital in the amount of $114,869,495. By order dated July 16, 2002, the trial judge vacated the verdict and reduced the verdict to $7,032,560. Plaintiff appealed and the Debtors cross-appealed. By Order dated November 3, 2003, the Appellate Court (a) denied the plaintiff's appeal; and (b) denied the Debtors' cross-appeal. The parties are relitigating the issue of damages. A pretrial on damages has been set for June 23, 2005. Trial is currently set for early August 2005. |

---

[24]    The Debtors do not believe that any judgment against them is warranted or imminent. However, out of an abundance of caution, the Debtors have listed herein all actions and proceedings against them where a judgment has been entered but not satisfied, and/or where a trial has been scheduled within 30 days of the date hereof.

CHI99 4478581-24.030067.0030

**Schedule 7(a)**

**Senior Management for**
**Saint Vincents Medical Center of New York**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Saint Vincents Medical Center of New York existing senior management, their tenure with the Saint Vincents Medical Center of New York, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience/Responsibilities |
|---|---|
| David Speltz<br>President and Chief Executive Officer | Mr. Speltz has been with the Debtors since 2004. Mr. Speltz was retained by the Debtors as their head turnaround management consultant and has been in charge of the Debtors' turnaround process since his retention. |
| Timothy Weis<br>Chief Financial Officer | Mr. Weis has been with the Debtors since 2004. Mr. Weis is in charge of understanding and providing clear, accurate and timely financial information to the Board, the CEO, and management. Mr. Weis leads the finance staff at the Debtors. |
| Robert Fanning<br>Senior Vice President, Chief Operating Officer | Mr. Fanning has been with the Debtors for over 20 years. Mr. Fanning is in charge of developing goals and objectives that result in the expansion of business growth, customer service initiatives, and quality patient care. |
| Miriam Kevin Phillips<br>Senior Vice President, Chief Mission Officer | Ms. Phillips has been with the Debtors since 1966. As chief mission officer, Ms. Phillips is in charge of developing and maintaining a culture at the Debtors that is reflective of the values and the mission of the Debtors. |
| William G. Bithony, MD<br>Physician in Chief | Dr. Bithony has been with the Debtors since 2005. Dr. Bithony provides overall direction and management of medical staff aspects of the system operations. |
| Elizabeth St. Clair, Esq.<br>Senior Vice President, Legal Counsel | Ms. St. Clair has been with the Debtors since 2001. Ms. St. Clair provides legal counsel, assistance and representation to all business units and corporate departments of SVCMC, and focuses on avoiding liability. |

CHI99 4478581-24.030067.0030

| Name/Position | Experience/Responsibilities |
|---|---|
| Bernadette Kingham-Bez<br>Senior Vice President, Communications & Business Development | Ms. Bez has been with the Debtors since 1993. Ms. Bez serves as the media spokesperson and oversees the development of media policies and provides leadership to the development and implementation of all communications and marketing initiatives. |
| James Woods<br>Senior Vice President, Corporate Real Estate Services | Mr. Woods has been with the Debtors since 2004. Mr. Woods provides leadership and direction to the departments of planning, design, and construction with respect to the facilities of the Debtors. |
| Mark G. Ackerman<br>Senior Vice President, Development and Government Relations, Chief Corporate Services Officer | Mr. Ackerman has been with the Debtors since 1983. Mr. Ackerman coordinates all corporate matters of the Debtors and is directly responsible for the Board of Directors and all board committees as well as matters relating to the Debtors' membership corporation and subsidiary corporation. Mr. Ackerman also oversees government affairs, community affairs, day-to-day operations of the Office of the President, and system-wide disaster preparedness. |
| Peter Garrison<br>Senior Vice President, Chief Information Officer | Mr. Garrison has been with the Debtors since 2004. He provides leadership, direction and administration on all aspects of the Information Services division for the Debtors. |
| Michele Napier<br>Senior Vice President, Delivery System/Payor Relations | Ms. Napier has been with the Debtors since 2001. Ms. Napier is responsible for managing the Debtors' health plan operations, including negotiating and managing health care contracts and building relationships with managed care payors. |
| Michael Calder<br>Senior Vice President, Patient Financial Services | Mr. Calder has been with the Debtors since 2005. Mr. Calder is responsible for the day-to-day operations for all functions of the Patient Financial Services department. |
| M. Anthony Napoli<br>Senior Vice President, Human Resources | Mr. Napoli has been with the Debtors since 2001. Mr. Napoli is responsible for the strategic planning and leadership for all human resource functions including policy development, employee & labor relations, organizational development and learning, staff compensation, employee benefits and recruitment.. |
| Virginia Sweeny<br>Senior Vice President, Chief Nursing Officer | Ms. Sweeny has been with the Debtors since 1982. Ms. Napier provides leadership and direction to the nursing service in the Brooklyn, Queens and Manhattan regions. She is responsible for developing and implementing nursing standards of |

| Name/Position | Experience/Responsibilities |
|---|---|
| | care to ensure the maintenance of one standard of nursing care across the system. |

CHI99 4478581-24.030067.0030

**Schedule 7(b)**
**Senior Management for**
**CMC Physician Services, P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the CMC Physician Services, P.C. existing senior management, their tenure with the CMC Physician Services, P.C., and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience/Responsibilities |
|---|---|
| Jorge Farrat, M.D.<br>Sole Officer, Director and Shareholder,<br>CMC Physician Services, P.C. | Dr. Farrat has been with the Debtors since 1984. Dr. Farrat is in charge of the operations of CMC Physician Services, P.C. |

CHI99 4478581-24.030067.0030

**Schedule 7(c)**
**Senior Management for**
**CMC Radiological Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the CMC Radiological Services P.C. existing senior management, their tenure with the CMC Radiological Services P.C., and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience/Responsibilities |
|---|---|
| Steven Garner, M.D.<br>Sole Officer, Director and Shareholder,<br>CMC Radiological Services P.C. | Dr. Garner has been with the Debtors since 1988. Dr. Garner is in charge of the operations of CMC Radiological Services P.C., which performs 300,000 cases per year and has 25 full time radiologists. Mr. Garner is also in charge of the operations of CMC Occupational Health Services P.C. |

CHI99 4478581-24.030067.0030

**Schedule 7(d)**
**Senior Management for**
**CMC Cardiology Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the CMC Cardiology Services P.C. existing senior management, their tenure with the CMC Cardiology Services P.C., and a brief summary of their relevant responsibilities and experience

| Name/Position | Experience/Responsibilities |
| --- | --- |
| Alexander Kintzoglou, M.D.<br>Sole Officer, Director and Shareholder,<br>CMC Cardiology Services P.C. | Dr. Kintzoglou has been with the Debtors since 1987. Dr. Kintzglou is in charge of the operations of CMC Cardiology Services P.C. |

CHI99 4478581-24.030067.0030

**Schedule 7(e)**
**Senior Management for**
**CMC Occupational Health Services P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the CMC Occupational Health Services P.C. existing senior management, their tenure with the CMC Occupational Health Services P.C., and a brief summary of their relevant responsibilities and experience

| Name/Position | Experience/Responsibilities |
|---|---|
| Steven Garner, M.D.<br>Sole Officer, Director and Shareholder,<br>CMC Occupational Health Services P.C. | Dr. Garner has been with the Debtors since 1988.<br>Dr. Garner is in charge of the operations of CMC Occupational Health Services P.C. |

CHI99 4478581-24.030067.0030

**Schedule 7(f)**
**Senior Management for**
**Medical Service of St. Vincent's Hospital and Medical Center, P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Medical Service of St. Vincent's Hospital and Medical Center, P.C. existing senior management, their tenure with the Medical Service of St. Vincent's Hospital and Medical Center, P.C., and a brief summary of their relevant responsibilities and experience

| Name/Position | Experience/Responsibilities |
|---|---|
| Dennis Greenbaum, M.D.<br>Sole Officer, Director and Shareholder, Medical Service of St. Vincent's Hospital and Medical Center, P.C. | Dr. Greenbaum has been with the Debtors since 1968. Dr. Greenbaum is in charge of the operations of Medical Service of St. Vincent's Hospital and Medical Center, P.C. |

CHI99 4478581-24.030067.0030

**Schedule 7(g)**
**Senior Management for**
**Surgical Service of St. Vincent's, P.C.**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Surgical Service of St. Vincent's, P.C. existing senior management, their tenure with the Surgical Service of St. Vincent's, P.C., and a brief summary of their relevant responsibilities and experience

| Name/Position | Experience/Responsibilities |
| --- | --- |
| Marc Wallack, M.D. Sole Officer, Director and Shareholder, Surgical Service of St. Vincent's, P.C. | Dr. Wallack has been with the Debtors since 1991. Dr. Wallack is in charge of the operations of Surgical Service of St. Vincent's, P.C. |

- 106 -

**Schedule 8**

**Payroll**

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the thirty (30) day period following the filing of the Chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees** | $14,806,200 on a bi-weekly basis, totaling $55,474,705 monthly |
| **Payments to Officers and Directors** | $938,892 |
| **Payments to Financial and Business Consultants** | $1,311,900 |

CHI99 4478581-24.030067.0030

**Schedule 9**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides for the thirty (30) day period following the filing of the Debtors' Chapter 11 petitions, the estimated aggregate cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professionals fees.

| | |
|---|---|
| **Cash Receipts** | $112 million |
| **Cash Disbursements** | $140 million |
| **Net Cash Loss** | $28 million |
| **Unpaid Obligations (Net)** | $30 million[25] |
| **Uncollected Receivables (Net)** | $93 million[26] |

---

[25]    The Debtors have projected this number based on their June 2005 accounts payable aging information. This number will likely not reflect all invoices that come due during that period.

[26]    The Debtors have projected this number based on their March 2005 billed gross accounts receivable aging information.  Estimated collections on this amount, while unknown, are expected to be substantially lower than this amount.

- 108 -

CHI99 4478581-24.030067.0030