UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
:
In re:                                                           :
                                                                 :      Chapter 11
SAINT VINCENTS CATHOLIC MEDICAL         :      Case No. 05-14945 (PCB)
CENTERS OF NEW YORK d/b/a SAINT VINCENT :
CATHOLIC MEDICAL CENTERS, *et al.*,           :      (Jointly Administered)
                                                                 :
                Debtors.                                  :
------------------------------------------------------------------ X

**SUPPLEMENTAL DECLARATION OF THOMAS M. BARRY IN SUPPORT
OF DEBTORS' MOTION FOR AUTHORITY TO CLOSE
ST. MARY'S HOSPITAL IN BROOKLYN, NEW YORK PURSUANT
TO THE DIRECTIVES OF THE NEW YORK STATE DEPARTMENT OF
HEALTH AND OTHER APPLICABLE GOVERNMENTAL AGENCIES AND TO
REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

I, Thomas M. Barry, hereby declare, pursuant to section 1746 of title 28 of

the United States Code, that the following is true to the best of my knowledge,

information and belief:

1.      On September 19, 2005, I executed a declaration in support of the

Debtors' motion for authority to close St. Mary's Hospital (the "Declaration"). In the

Declaration, I reported that a meeting was scheduled with representatives of the Brooklyn

Safety Network ("BSN") for the evening of September 19, 2005, to review its most

recent proposal to acquire St. Mary's Hospital ("St. Mary's") as contained in a September

14, 2005 letter to the Court. The purpose of this supplemental declaration (the

"Supplemental Declaration") is to report on that meeting which in fact did take place. To

the extent necessary to give context to this Supplemental Declaration and to provide

information about my background and involvement in these cases, I refer to my

Declaration, which I incorporate here by reference.

2.      The meeting started around 7:30 p.m. and continued until approximately 10:45 p.m. Dr. Brendan O'Neill and Mr. Rodney Cooper attended in person on behalf BSN. On behalf of the Debtors, the following people attended this meeting in person: in addition to myself, Todd Rudsenske and Nicholas Estrada from Cain Brothers & Company, LLC ("Cain Brothers"), Steven Korf from Huron Consulting Group LLC and Andrew M. Troop from Weil, Gotshal & Manges, LLP. The Official Committee of Unsecured Creditors (the "Committee") also was represented at this meeting. Committee counsel Craig E. Freeman attended the meeting in person, and the Committee's financial consultant, Reid Snellenbarger from Houlihan Lokey, attended the meeting by phone.

3.      The purpose of the meeting was to confirm the estate and Committee's representatives' understanding of BSN's most recent proposal, and to share with BSN the continuing concerns, if any, with respect to that proposal. In my opinion, the meeting was very productive. I believe that the representatives of the estate and the Committee came away with a clear understanding of BSN's current proposal, and I also believe that the representatives of BSN came away with a clear understanding of (a) the predicted maximum value to estate to be derived from BSN's proposal and the predicted minimum value to the estate to be derived from the closure of St. Mary's and the subsequent sale of its property and (b) the risks associated with the BSN proposal from the perspective of these estates.

**The Competing Proposals Before Adjusting BSN's Proposal For Risk and Delay**

4.      At this meeting, both we and the Committee confirmed and reached a common understanding with BSN about the maximum amount that the estates

would realize if one assumed that the BSN proposal contained no execution risk and no delay in proposed payment. This effort effectively confirmed the pre-meeting analysis of BSN's proposal as contained in my Declaration. In summary, if all that BSN proposes occurs and is assumed to occur immediately, the estates would realize gross proceeds from the BSN proposal of $27 million, consisting of (a) $2 million in proceeds loaned to BSN from doctors and others associated with St. Mary's, (b) $10 million in proceeds from a working capital loan that initially would be collateralized by $20 million of Debtors' accounts receivable, and (c) $15 million in proceeds from the collection of those accounts receivable over time after the $10 million borrowed through BSN's working capital line was repaid (or substantially repaid) from the sale of three-quarters of the St. Mary's campus, which BSN believes is not necessary for the continued operation of the hospital. At the meeting, we also agreed that to obtain an initial "net" number for the estate from the proposed BSN transaction, it would be appropriate to deduct the approximately $5 million in current post-petition payables projected to be due at the time of any potential transaction with BSN, leaving an initial net number to the estates of $22 million, before any deductions for execution risk associated with the BSN proposal, the time delay in being able to close any transaction, and the time delay in actual proposed payments from BSN to the estates.

5.      We and the Committee also confirmed and reached a common understanding with BSN of the base economic benefits to the estates from proceeding with the proposed closure of St. Mary's and the sale of its campus. We confirmed with BSN that the base, that is minimum, economic benefit to these estates from proceeding as the Debtors propose results in gross proceeds of approximately $65 million, consisting of

(a) $25 million from the sale of the St. Mary's campus based upon current negotiations with a financially capable developer, (b) $25 million in present value based upon the $3 million per year income stream to be received by St. Vincents Catholic Medical Centers ("SVCMC") from the behavioral health outpatient clinics to be retained and operated by SVCMC after the closure of St. Mary's, and (c) $15 million in realizable value from the $20 million in accounts receivable that will be retained and not pledged to support a working capital loan to BSN. We also agreed that to obtain a initial "net" number for the estate from the pursuing the closure of St. Mary's and the sale of its campus, it would be appropriate to deduct the approximately $5 million in current post-petition payables projected to be due at the time of closure (the same deduction from BSN's gross proceeds) and approximately an additional estimated maximum of $18 million for other closing costs (including severance and other employee obligations), leaving an initial net number to the estates of $42 million. On behalf of the estate, we noted that the actual price to be obtained on the sale of the St. Mary's campus may be higher as the offer would be subject to higher and better counteroffers.

6.      Before the representatives of BSN left the meeting, we committed the above analysis to writing and made a copy for everyone. A copy of this writing is attached as Exhibit A. Everyone in the room confirmed that the writing accurately reflected the analysis undertaken during the meeting and was accurate. In sum, the analysis demonstrates that pursuing the closure of St. Mary's and sale of its campus conservatively provides approximately $20 million in additional value to this estates. As noted above, this additional benefit is calculated before reducing BSN's proposal for

execution risk or discounting the proposal for delay in payment. For ease of review and reference, the writing is reproduced below:

|  | BSN | SVCMC | |
|---|---|---|---|
| | (millions) | | |
| Cash at closing | 2.0 | | |
| Real Estate Sale | 10.0 | 25.0 | |
| Accounts Receivable | 15.0 | 15.0 | |
| Accounts Payable | (5.0) | (5.0) | |
| Closing Obligations | | (18.0)[1] | |
| Behavioral Health | _____ | 25.0 _____ | |
| [total/difference] | 22.0 | 42.0 | 20.0 |

7.      After we went through the analysis of the basic economics of the BSN proposal and pursuing the closure of St. Mary's and sale of its campus and distributed Exhibit A, we also agreed that it would be appropriate to further reduce the "net" proceeds to the estates from the BSN proposal by an additional $1 million. This further reduction reflects the fact that BSN acknowledged that, even if it could close on its proposal, the earliest it would be able to do so would be October 18, 2005 – two weeks after the contemplated closure of St. Mary's. Accordingly, pursuing the BSN proposal would require these estates to cover the weekly cash burn at St. Mary's for at least two more weeks.

---

[1] Again, this is an estimated maximum amount.

8.      When this additional reduction is factored into the analysis, pursuing the closure of St. Mary's and sale of its campus, rather than the BSN proposal, is predicted to benefit the estate by at least $21 million before one considers any discount to be applied to the BSN proposal or any increase in proceeds to be realized through a competitive bidding process for the St. Mary's campus.

### Execution and Delay Risk

9.      I and the other professionals at this meeting also explained to BSN that a fair evaluation of its proposal and making a recommendation about that proposal to the Debtors and the Committee required that the proposal be discounted to reflect execution risk and delay in payment.

10.     The execution of BSN's proposal requires, among other things, that it obtain $2 million in loans from individuals to make a payment to the Debtors, obtain a working capital loan in the estimated amount of $20 million to make a $10 million payment to the Debtors and have some working capital, be able to subdivide and sell a portion of the St. Mary's campus so that the working capital loan could be paid down and the $20 million of pledged St. Mary's accounts receivable could be released so those receivables could be collected for the benefit of the Debtors and their estates, and execute on a business plan that contemplates a turnaround at St. Mary's.

11.     The following risks to execution of these components of BSN's proposal were identified at the meeting on September 19, 2005.

12.     Incomplete and Inaccurate Financial Projections. BSN's financial projections as provided to the Debtors and the Committee are incomplete and inaccurate. For example, the financial projections project that the ratio of salaries and benefits to

projected revenues at BSN's St. Mary's would be approximately 56%. Historically that ratio has been approximately 75%. In addition, the projections calculate employee costs at approximately $50,000 per full time equivalent ("FTE"). Historically employee costs are closer to $62,000 per FTE at St. Mary's. Furthermore, because the projections calculate employee benefits as a percentage of employee costs, they too understate employee benefit expense.

13.     BSN's financial projections also fail to provide for capital expenditures at St. Mary's. The need for capital expenditures at St. Mary's if it is to continue to operate (even assuming BSN were to operate it differently than it is currently operated) is clear.

14.     When one adjusts BSN's financial projections only for employee costs and benefits and minimal capital expenditures, St. Mary's operates at a loss under BSN's financial projections.

15.     Furthermore, BSN's financial projections contemplate that it will have $10 million of available working capital and $10 million in proceeds to make a payment to the Debtors from a third-party lender at closing based upon the $20 million in St. Mary's accounts receivable that BSN proposes be used to collateralize that loan. Based on St. Mary's current lending relationship, $20 million of accounts receivable results in borrowing availability of only about $7 million, and as noted above, the receivables themselves are only likely to collect out at about $15 million. When likely borrowing capacity is applied to the financial projections, the projections reflect a working capital deficiency for the hospital. (I also note that, as a result of sharing this analysis of borrowing availability with BSN, Dr. O'Neill indicated that BSN would have

to rethink whether it could, in fact, pay $10 million to the Debtors at closing or whether it would have to retain more of any available proceeds from borrowing for the hospital's own working capital needs. If so, the proposed payment to the Debtors either would decrease or a greater amount of it would have to be deferred). In any event, a lack of working capital availability would put the continued operations of the hospital and patients at risk, and likely would cause the hospital and community to face even greater challenges if the hospital were forced to close at a later date.

16.     The financial projections also lack the detail and supporting documentation routinely provided to, and required by, prospective working capital lenders.

17.     Based on my experience as a investment banker in the health care field, these deficiencies in BSN's financial projections would make it extremely difficult for BSN to obtain third party financing for its acquisition and operation of St. Mary's. Accordingly, the BSN proposal needs to be discounted for the risk that it cannot obtain financing.

18.     No Financing Commitment. As noted, BSN contemplates at closing that it would pay the estates $12 million, consisting of the proceeds of (a) a $2 million loan from individuals associated with St. Mary's and BSN and of (b) a $20 million loan from a third party. BSN does not contemplate that any of its financing for this transaction will be other than debt financing.

19.     For the reasons set forth above, I think it would be very difficult for BSN to obtain its contemplated third party financing. And, in fact, BSN has not produced any documentation supporting access to third party financing. It has not

produced, and it confirmed that it does not have, a lending commitment for its acquisition and operation of St. Mary's.

20.     In addition, although BSN has represented that it has "pledges" for at least $2 million in loans from individuals associated with St. Mary's and BSN (the exact amount reported at our meeting was $2.2 million in pledges), payment on those pledges has not yet been made.  The pledges have neither been converted to cash nor supported by any form of credit enhancement, like an irrevocable letter of credit.  In addition, if the "pledges" become cash, they will be loaned to BSN increasing the amount of leverage on its balance sheet.

21.     Accordingly, there is no assurance that BSN has access to third party financing or the "pledges."  The BSN proposal would be properly discounted for this risk.

22.     <u>Lack of Regulatory Approval</u>.  To effectuate a transfer of St. Mary's to BSN, the Department of Health ("<u>DOH</u>") will have to approve the acquisition of the hospital by BSN and issue a Certificate of Need ("<u>CON</u>").  BSN represented at the meeting that (a) it has not yet hired a regulatory lawyer to assist it in obtaining a CON, and (b) it has not begun on its own the process of applying for a CON.

23.     Although BSN acknowledges that its purchase of St. Mary's requires DOH approval and the issuance of a CON, it believes that either it can obtain the required approvals and CON in short order or if it cannot do so quickly, it can take over the operation of the hospital from SVCMC under a management agreement until such time as approvals are obtained.

24.   Based on my experience in the State of New York, I think that it would take several months, in fact perhaps up to six months, for an established, well-financed and experienced healthcare operator to obtain DOH approval to acquire a financially healthy and stable hospital. For a start-up entity to acquire St. Mary's, with its history of financial losses and need for capital improvements, it likely would take longer than six months, if approval could be obtained at all.

25.   Accordingly, I think it highly unlikely that BSN can obtain regulatory approval for the transfer of St. Mary's to it by October 4, 2005, the projected closing date for the hospital, or even by October 18, 2005, the date on which BSN has represented it could assume management of the hospital, assuming again that approval could be obtained at all.

26.   The delay between the time that BSN would propose taking over management of the hospital and the time it might obtain regulatory approval (if evebr) increases the risk of the proposed BSN transaction to these estates. Because SVCMC would continue to own St. Mary's until such time as BSN receives regulatory approval, SVCMC would continue to have potential liability for matters involving St. Mary's even if BSN indemnified against any such liability. And of course, the strength of any indemnity is questionable. It would be called into play only when BSN has failed to operate profitably or a cash-flow positive basis. Moreover, there is the indisputable risk that approval may never be obtained.

27.   The lack of regulatory approval, thus, also requires that BSN's proposal be discounted.

28.    <u>Unproven Turnaround</u>. BSN's projections effectively assume the immediate success of its turnaround of the hospital and that new (but unidentified) management will be in place by October 18, 2005. For the reasons set forth above, the underpinnings for BSN's financial projections are suspect. Furthermore, based on my own experience, it seems highly unlikely that the historical losses at St. Mary's will completely evaporate overnight, even if one were to assume that BSN could turn the hospital around. There is unquestionably risk in executing a turnaround at St. Mary's and it takes time. These factors would, in my opinion, individually and in combination require a discount to the BSN proposal.

29.    <u>No Zoning or Subdivision Approval</u>. A cornerstone to BSN's proposal is its assumption that it will be able to sell a portion of the St. Mary's campus consisting of approximately three-quarters of the total campus and located between two structures which BSN intends to retain as part of the hospital. One structure is the hospital itself located on one side of the square city block on which the St. Mary's campus is located. The second structure is Shevlin Hall, located on the other side of the square city block. The sale of this property would be needed, under BSN's proposal, to obtain a release of $20 million in accounts receivable from BSN's working capital lender to be collected for the benefit of these estates.

30.    The ability to sell this property, if at all, requires that the St. Mary's campus be subdivided. Until subdivided, there is no way for BSN to sell the property it would hope to sell. BSN acknowledges that the property is not subdivided and to do so would take time.

31.    Although BSN believes that it could obtain authority to subdivide the property, there is no guarantee that it can do so.  In fact, in my opinion, and based on my own experience and discussions with the Debtors' in-house real estate manager, I think that it may not be possible to subdivide this property as contemplated by BSN. First, a substantial portion of the property that BSN would propose to sell currently serves as a parking lot for the hospital and Shevlin Hall.  In my experience, most cities want hospitals to provide parking.  Second, the Debtors in fact explored a separate sale of Shevlin Hall and learned that it would have to provide parking with that structure if it were to be able to subdivide it from the rest of the campus.  Third, both the hospital and Shevlin Hall do not comply with current zoning codes in Brooklyn.  They continue to exist in their current state because they are "grandfathered."  As I understand it, subdividing the property and obtaining new zoning for the portion of the property to be sold would require that the hospital and Shevlin Hall be brought into compliance with current zoning laws.  The benefits of having been "grandfathered" would be lost.

32.    The lack of existing zoning and subdivision approvals and uncertainty of getting those approvals means that there is a risk that BSN will be unable to execute on a significant portion of its plan to be able to pay SVCMC.  The BSN proposal should be discounted appropriately.

33.    <u>Operational Questions</u>.  In addition to the foregoing, I learned the following from BSN during the course of our meeting.  It has not secured malpractice insurance.  It has not even secured a firm quote for cost of malpractice insurance. Although it has had preliminary discussions with a third-party about billing and collections for the hospital, it does not have a firm quote for that service or contract for

that service. It does not have information technology or a plan for information technology or funds to acquire and install required information technology. Separately and in combination, these issues add risk to the smooth operation of the hospital and to payment as contemplated by the BSN proposal.

34. <u>Payment is delayed</u>. Although in the first part of this Supplemental Declaration I reported that as a group we assumed immediate payment by BSN to the Debtors of all consideration, in fact, BSN's proposal does not provide for immediate payment. The payment of the initial $10 million (assuming it is $10 million – see paragraph 15 above) is conditioned on the closing of BSN's working capital financing, which is not in place. The release back to SVCMC of its pledged accounts receivable will not take place even under BSN's projections for several months. Both payments, therefore, share the risk inherent in delay. In addition, the fact that in four months SVCMC will be relegated to collecting receivables generated by BSN makes collection more risky.

35. <u>The Discount</u>. Although each of these risk factors was identified, none of the Debtors' professionals or the Committee's professionals applied a specific discount to the gross or net proceeds that might be generated from the BSN proposal. It seemed unnecessary to do so where, as here, the undiscounted value of the BSN proposal is more than $20 million less than the value anticipated from pursuing the closure of the hospital and the sale of the St. Mary's campus.

### Conclusion and Next Steps

36. Having listened to our analysis and the Committee's analysis of the difference in value between BSN's proposal and the current course of action, Dr. O'Neill

acknowledged that in constructing its proposal BSN failed to appreciate that the behavioral health clinics would continue to produce value for SVCMC and its estate even after the closure of St. Mary's and the sale of the St. Mary's campus. From my own review of BSN's projections, BSN clearly understands the value inherent in this behavioral health practice. It makes up a meaningful portion of its own projected revenues and the service is scheduled to be expanded in BSN's financial projections. And it is highly questionable whether, without behavioral health, BSN could operate at all.

37.    We ended the meeting by asking Dr. O'Neill and Mr. Cooper to review the substance of our meeting with the proposed "investors" in BSN. BSN was asked to consider the down-side not only to the estate but to other employees of the hospital if the hospital's closure was delayed and the job opportunities provided by the League of Hospital's Agreement with Local 1199 was not fully utilized. BSN also was asked to consider these issues carefully, particularly in light of the disparity in value between its proposal and SVCMC's proposed course of action. BSN was asked to contact the Debtors' representative if, after reflection, they conclude that the analysis of comparative values is not correct. And BSN was asked to advise the Debtors if, after considering all of the foregoing, BSN concluded that it should not pursue its proposal so the Court could be advised.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

September 19, 2005.

/s/ Thomas M. Barry
Thomas M. Barry

## Exhibit A

|  | BSN | SVCMC |
|---|---|---|
|  | (millions) | |
| Cash at Closing | 2.0 | |
| Real Estate Sale | 10.0 | 25.0 |
| Accounts Receivable | 15.0 | 15.0 |
| Accounts Payable | (5.0) | (5.0) |
| Closing Obligation | | (18.0) |
| Behavioral Health | | $25.0 |
|  | 22.0 | 42.0 |