UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.,*<br><br>Debtors. | Chapter 11<br><br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

# CHAPTER 11 PLAN OF REORGANIZATION OF SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION OF MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.

**WEIL, GOTSHAL & MANGES LLP**
**767 Fifth Avenue**
**New York, New York  10153**
**(212) 310-8000**

**Attorneys for the Debtors and**
**Debtors in Possession**

**Dated:  New York, New York**
**        February 9, 2007**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

**CHAPTER 11 PLAN OF REORGANIZATION OF SAINT
VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK
D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS,
and CHAPTER 11 PLANS OF LIQUIDATION OF MEDICAL
SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL
CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S,
P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN
SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.**

**Introduction**

Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent
Catholic Medical Centers, Medical Service of St. Vincent's Hospital and Medical Center,
P.C., Surgical Service of St. Vincent's, P.C., CMC Cardiology Services P.C., CMC
Physician Services, P.C., and CMC Radiological Services P.C., as debtors and debtors in
possession, propose the following chapter 11 plans of reorganization and liquidation,
pursuant to section 1121(a) of the United States Bankruptcy Code.  All capitalized terms
used in the Plan are defined in either section 101 of the Bankruptcy Code or Article I
below.

Briefly stated, but subject to more specific details provided herein, the Plan
provides for the reorganization of SVCMC and the liquidation of SVCMC's five
affiliated Debtors (the operating assets of three of which were sold or will be sold during
the Chapter 11 Cases).  The Plan also provides for the preservation of SVCMC's mission,
which is reflecting God's love by advancing Christ's healing ministry, with respect,
integrity, compassion, and excellence to all who come to its system in need, especially
the poor.  Although the Debtors' cases have been jointly administered, the Debtors and
their estates have not been substantively consolidated.  Accordingly, the Plan is really six
distinct plans, one for each of the Debtors. The sections of the Plan generally apply to all
of the Debtors, except where otherwise indicated.

# Article I.

## DEFINITIONS

Definitions.  As used in the Plan, the following terms shall have the respective meanings specified below:

1.1     50% Milestone means the date upon which fifty percent (50%) or more of the number of MedMal Claims existing on the Effective Date have been resolved.

1.2     75% Milestone means the date upon which seventy-five percent (75%) or more of the number of MedMal Claims existing on the Effective Date have been resolved.

1.3     Additional Funding Schedule means the additional payments described in Section 6.6(n) of the Plan below.

1.4     Ad Hoc Committee means the unofficial committee formed by Stonehill Capital Management LLC, CarVal Investors, LLC, and Davidson Kempner Capital Management LLC or entities affiliated with such parties, as purchasers of General Unsecured Claims against SVCMC.

1.5     Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, other than the DIP Claim, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 328, 330 and/or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date.

1.6     Allocation Method means the method of allocating certain costs among the Debtors or Post-Effective Date Debtors and reimbursing SVCMC or Reorganized SVCMC for payments made by SVCMC or Reorganized SVCMC under the Plan on behalf of another Debtor or Post-Effective Date Debtor, pursuant to Section 6.12 of the Plan.

1.7     Allowed means, with reference to any Claim, (a) any Claim allowed pursuant to the Plan, (b) any Claim that is not Disputed, (c) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court, or (d) any Claim that, if Disputed, has been allowed by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder; provided further, however, that a MedMal Claim shall only become an

Allowed Claim after the MedMal Claim has been determined by Final Order of a court of competent jurisdiction or by settlement. In determining such MedMal Claim, nothing contained in the Plan or in any of the supporting documentation, shall be deemed to limit, modify or otherwise impair the rights of the parties under applicable state law with respect to the prosecution and/or defense of such MedMal Claim. Unless otherwise specified herein or by order of the Bankruptcy Court, an "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.8     __Aptium__ means Aptium W. New York, Inc. f/k/a Comprehensive Cancer Centers of New York.

1.9     __Aptium Agreement__ means that certain Second Amended and Restated Consulting and Administrative Services Agreement, dated as of April 11, 1996, between SVCMC and Aptium and any amendments thereto, as modified by the Stipulation and Order Confirming the Validity of Pre-Petition Liens and Security Interests Held by Aptium W. New York, Inc. f/k/a Comprehensive Cancer Corporation of New York, entered August 28, 2006.

1.10     __Aptium Secured Claim__ means all Secured Claims of Aptium for obligations of SVCMC arising out of the Aptium Agreement.

1.11     __Available Cash__ means all Cash (other than Restricted Cash) of Reorganized SVCMC available on the Effective Date, minus: (i) fifteen million dollars ($15 million) for operations, (ii) payments required to be made under the Plan on the Effective Date (including, without limitation, $1.25 million to be given and/or loaned to the Litigation Trust) other than payments to holders of General Unsecured Claims against SVCMC, and (iii) professional or other administrative costs and expenses accrued as of the Effective Date.

1.12     __Bankruptcy Code__ means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, as in effect on the Confirmation Date; provided, however, only those sections of the BAPCPA which were applicable to cases filed on the Commencement Date shall apply to the Debtors' Chapter 11 Cases and, unless otherwise noted, all references to the Bankruptcy Code shall be to sections in effect prior to the enactment of the BAPCPA.

1.13     __Bankruptcy Court__ means the District Court and, to the extent of any reference under section 157 of title 28 of the United States Code, the bankruptcy unit of such District Court under section 151 of title 28 of the United States Code.

1.14     __Bankruptcy Rules__ means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Rules of the Bankruptcy Court.

1.15     __BAPCPA__ means the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005).

1.16    Brooklyn/Queens Hospitals means hospitals formerly owned and operated by SVCMC in Brooklyn, New York and Queens, New York.

1.17    Brooklyn/Queens Seller Notes means that certain note entitled "Form of Seller Financing Note" and that certain note entitled "Additional Note," each issued by Caritas Health Care Planning, Inc. to SVCMC as part of the consideration paid pursuant to that certain Asset Purchase Agreement dated May 9, 2006, by and among certain of the Debtors and Caritas Health Care Planning, Inc., which notes are secured by the real property at Mary Immaculate Hospital, Queens and St. John's Queens Hospital.

1.18    Business Day means any day other than (a) a Saturday, (b) a Sunday, (c) any day on which commercial banks in New York, New York are required or authorized to close by law or executive order, and (d) the Friday after Thanksgiving Day.

1.19    Caronia Report means that certain report prepared by Caronia Corporation and dated February __, 2007, estimating the likely amount of Allowed MedMal Claims after giving effect to MedMal Self-Insurance Trust Funds.

1.20    Cash means legal tender of the United States of America.

1.21    Change of Control means any moment in time in which the selection of at least fifty percent (50%) of the Board of Directors of Reorganized SVCMC is not within the control of one or more of the following:  the holders of Membership Interests in Reorganized SVCMC as of the Effective Date and any other New York based Catholic institution.

1.22    Chapter 11 Cases means the following cases commenced by the Debtors pursuant to chapter 11 of the Bankruptcy Code, and jointly administered under the caption In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., Chapter 11 Case No. 05-14945 (ASH) (jointly administered):  (i) In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, Chapter 11 Case No. 05-14945; (ii) In re CMC Physician Services, P.C., Chapter 11 Case No. 05-14951; (iii) In re CMC Radiological Services P.C., Chapter 11 Case No. 05-14949; (iv) In re CMC Cardiology Services P.C., Chapter 11 Case No. 05-14948; (v) In re Medical Service of St. Vincent's Hospital and Medical Center, P.C., Chapter 11 Case No. 05-14947; and (vi) In re Surgical Service of St. Vincent's, P.C., Chapter 11 Case No. 05-14946.

1.23    Claim has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.24    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan, classified by the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

1.25    CMC-CS means CMC Cardiology Services P.C.

1.26    CMC-PS means CMC Physician Services, P.C.

1.27    <u>CMC-RS</u> means CMC Radiological Services P.C.

1.28    <u>Collateral</u> means any property or interest in property of the estate of the Debtors subject to a lien to secure the payment or performance of a Claim, which lien is valid, perfected and enforceable under applicable law, and is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.29    <u>Commencement Date</u> means July 5, 2005, the date on which the Debtors commenced the Chapter 11 Cases.

1.30    <u>Commerce Loan Agreement</u> means the Loan and Security Agreement by and between SVCMC and Commerce Bank, dated August __, 2005, and approved by the Bankruptcy Court on November 7, 2005.

1.31    <u>Commerce Secured Claim</u> means the Secured Claim of Commerce Bank arising out of the Commerce Loan Agreement.

1.32    <u>Committees</u> means the Creditors' Committee and the Tort Claimants' Committee.

1.33    <u>Confirmation Date</u> means the date upon which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.34    <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.35    <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.36    <u>Creditors' Committee</u> means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases on July 18, 2005 pursuant to section 1102 of the Bankruptcy Code.

1.37    <u>Cure Amount</u> means all amounts required to be paid to a counterparty to an executory contract or unexpired lease to assume such contract or lease pursuant to section 365 of the Bankruptcy Code.

1.38    <u>DASNY Subordinated Claims</u> means the Claims to which the Dormitory Authority for the State of New York is entitled pursuant to that certain stipulation between the Dormitory Authority for the State of New York and the Creditors' Committee, so ordered by the Court on December 29, 2005.

1.39    <u>Debtors</u> mean, collectively, SVCMC, CMC-CS, CMC-PS, CMC-RS, MS-SVH, and SSSV, including, where applicable, such entities in their capacity as debtors in

possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.40    DIP Agreement means that certain secured credit facility, dated December 30, 2005, between the Debtors and the DIP Lender, together with the terms of the order of the Bankruptcy Court, dated December 23, 2005, approving such agreement.

1.41    DIP Claim means all Claims of the DIP Lender or any additional lenders arising under the DIP Agreement.

1.42    DIP Lender means General Electric Capital Corporation.

1.43    Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.44    Disputed means, with reference to any Claim, (i) any Claim, proof of which was timely and properly filed, and in such case or in the case of an Administrative Expense Claim, any Administrative Expense Claim or Claim, which is disputed under the Plan, or as to which the Debtors, the Post-Effective Date Debtors, either of the Committees, or one of the MedMal Trustees have interposed, will interpose or have determined to interpose a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (ii) any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was filed but was not timely or properly filed, and (iii) any Claim that is disallowed pursuant to section 502(d) of the Bankruptcy Code.  A Claim that is Disputed as to its amount shall not be Allowed in any amount until it is no longer a Disputed Claim.

1.45    Distributable Cash means the Cash available in a particular MedMal Trust for distribution to holders of MedMal Claims after the MedMal Trustee has reserved sufficient Cash to pay all expected expenses, costs, taxes, and fees of the MedMal Trust that it is obligated to pay hereunder.

1.46    District Court means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.47    Effective Date means the first Business Day on which the conditions specified in Section 9.1 of the Plan have been satisfied or waived.

1.48    Effective Date Anniversary means an anniversary of the Effective Date; provided, however, that if the anniversary of the Effective Date in any year is not a Business Day, then the Effective Date Anniversary shall be the first Business Day after the anniversary of the Effective Date in such year.

1.49    Effective Date Cash Distribution means (i) Available Cash in an aggregate amount not less than 80% multiplied by Total Trade Claims minus (ii) 50% of any Available Cash in excess of 85% multiplied by Total Trade Claims; provided, however, that the Effective Date Cash Distribution shall not exceed 93% multiplied by Total Trade Claims.

1.50    Equity Interest means any share of common or preferred stock or other instrument evidencing an ownership interest in the Other Debtors, whether or not transferable, and any option warrant or right, contractual or otherwise, to acquire any such interest.  Solely for the sake of clarity, SVCMC has no Equity Interests.

1.51    ERISA means Title IV of the Employee Retirement Income Security Act of 1974, as amended, codified as 29 U.S.C. §§ 1301-1461.

1.52    Excess Cash means any Cash (after taking into account current capital expenditure reserves, deferred capital expenditure reserves, payments required to be made or accrued under the Plan, reserves required by an exit lender and emergency capital expenditures) of Reorganized SVCMC greater than $10 million more than projected in the business plan filed with the Disclosure Statement, as of December 31 of any year based upon Reorganized SVCMC's audited financial statements for such fiscal year.

1.53    Excess Monitor Fees means reasonable fees and expenses of the MedMal Trust Monitor, including the reasonable fees and expenses of counsel to the MedMal Trust Monitor, in excess of $75,000 a year.

1.54    Exit Facility means a credit facility determined by SVCMC to be sufficient to meet its Plan obligations and working capital needs as of the Effective Date.

1.55    Final Order means an order of the Bankruptcy Court or District Court (or, in the case of MedMal Claims only, another court of appropriate jurisdiction) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, or move to reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or District Court shall have been upheld by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, the possibility that a timely motion under Bankruptcy Rules 9023 or 9024 or any applicable analogous rule may be filed with respect to such order shall not prevent such order from being a Final Order.

1.56    General Unsecured Claim means any Claim that is not a Secured Claim, Administrative Expense Claim (including fees and costs for professional compensation

and reimbursement), Priority Non-Tax Claim, Priority Tax Claim, MedMal Claim, PBGC Claim, or Intercompany Claim.

1.57    GUC Litigation Trust Interest means a beneficial interest in the Litigation Trust entitling the holders of such interest to receive up to seven percent (7%) of the Allowed amount of their General Unsecured Claims plus an annual accretion on any unpaid portion thereof at a rate of eight percent (8%) compounding annually, from Litigation Trust Assets paid in accordance with the Litigation Distribution Schedule; provided, however, holders of the GUC Litigation Trust Interest shall not have recourse against Reorganized SVCMC on account of the GUC Litigation Trust Interest.

1.58    Intercompany Claim means any Claim against SVCMC by an entity of which SVCMC is a direct or indirect member.

1.59    Liquidity Event Distribution Schedule means,

(a)    In the event that and to the extent that, at the time that Reorganized SVCMC receives proceeds (i) in excess of $400 million from the sale or other disposition of the Manhattan Hospital Real Estate or (ii) in excess of $175 million from the sale or other disposition of the O'Toole Real Estate, the Unsecured Obligation remains outstanding and/or the GUC Litigation Trust Interest remains outstanding, then such excess proceeds shall be distributed in the following manner, in each case within thirty (30) days of the receipt by Reorganized SVCMC thereof:

- first, to the MedMal Trusts until such time as (i) the aggregate amount contributed to the MedMal Trusts (including Initial Trust Assets) divided by the aggregate estimated amount of Allowed MedMal Claims equals or exceeds (ii) the aggregate amount distributed to holders of General Unsecured Claims against SVCMC divided by the sum of Allowed and estimated Allowed General Unsecured Claims against SVCMC;

- second, (x) 45% to the MedMal Trusts in accordance with their Pro Rata Share, (y) 27.5% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 27.5% to holders of Allowed General Unsecured Claims against SVCMC or to the Litigation Trust.

Amounts distributed on account of (z) in the preceding sentence upon a Manhattan Real Estate Liquidity Event will be applied first to the remaining balance (if any) of the Secured Obligation (principal first and then interest), second to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest), and third as a transfer to the Litigation Trust, but in no event shall the contribution to the Litigation Trust on account of a Manhattan Liquidity Event exceed 1/7 of that GUC Litigation Trust Interest as of the Effective Date plus accrued accretions thereon; provided, however, that Reorganized SVCMC's obligations to make any payments on account of a Manhattan Real Estate Liquidity Event shall cease when the Unsecured Obligation has been paid in full and either (i) the GUC Litigation Trust Interest has been paid in full or (ii) 2/7 of the

GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 have been paid transferred by SVCMC to the Litigation Trust as a result of the occurrence of a Litigation Trust Contribution Event.

(b)     In the event that and to the extent that the Unsecured Obligation remains outstanding, if there is Excess Cash, it will be distributed (x) 45% to the MedMal Trusts in accordance with their Pro Rata Share, (y) 27.5% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 27.5% to holders of Allowed General Unsecured Claims against SVCMC and applied only to the Secured Obligation (principal first and then interest) and then to the Unsecured Obligation (principal first and then interest) until paid in full; provided, however, that Reorganized SVCMC shall not be obligated to distribute Excess Cash in accordance with the Liquidity Event Distribution Schedule if Reorganized SVCMC has not received the consent of the lenders for Reorganized SVCMC's Exit Facility or any successor thereof to distribute such Excess Cash; provided further, however, that Reorganized SVCMC's obligation to make any payments on account of Excess Cash shall cease when the Unsecured Obligation has been paid in full.

1.60     Litigation Claims means all claims, rights (including rights of setoff and/or recoupment) and causes of action, including claims, rights, or causes of action arising out of or under chapter 5 of the Bankruptcy Code, that could have been brought or raised by or on behalf of the Debtors arising before, on, or after the Commencement Date, whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law, against any of the Litigation Parties.

1.61     Litigation Claims Costs means any and all costs, including reasonable professionals' fees, incurred by the Litigation Trust, of prosecuting the Litigation Claims, enforcing any judgment on the Litigation Claims, and recovering proceeds on account of the Litigation Claims.

1.62     Litigation Claims Proceeds means the actual gross cash payments, if any, received by the Litigation Trust as a result of any judgment, settlement, or compromise of any of the Litigation Claims.

1.63     Litigation Distribution Schedule means the distribution of Litigation Claims Proceeds and other Litigation Trust Assets by the Litigation Trust in the following manner and order:

- first, to pay Litigation Claims Costs;

- second, to Reorganized SVCMC to pay back the Litigation Trust Loan (principal first and then interest);

- third, to pay down the remaining principal portion of the GUC Litigation Trust Interest;

- fourth, to pay down the accreted portion of the GUC Litigation Trust Interest;

- fifth, after the GUC Litigation Trust Interest is satisfied in full and until the Secured Obligation is paid in full, fifty percent (50%) to pay down the Secured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Share, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- sixth, after the Secured Obligation (both interest and principal) is paid in full and until the Unsecured Obligation is paid in full, fifty percent (50%) to pay down the Unsecured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Share, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- seventh, to the MedMal Trusts until Reorganized SVCMC's payments under the MedMal Trust Funding Schedule shall have been fully paid or the obligation to make such payments shall have ceased;

- eighth, any remaining balance to the Pension Plan.

1.64    Litigation Parties means McDermott, Will & Emery LLP (except to the extent claims against McDermott, Will & Emery LLP relating to services provided after the Commencement Date have been resolved by Final Order or settlement on or prior to the Effective Date); other parties to be named later; affiliates of the foregoing Persons; and any individual who is or was a member of, a managing director of, or a partner in, or held a similar position in, any of the foregoing Persons, including in such individual's capacity as an officer or director of the foregoing Persons; provided, however, the Debtors are not Litigation Parties.

1.65    Litigation Trust means the liquidating trust as established under Section 6.5 of the Plan and the Litigation Trust Agreement.

1.66    Litigation Trust Agreement means the agreement establishing and delineating the terms and conditions of the Litigation Trust, substantially in the form set forth in the Plan Supplement.

1.67    Litigation Trust Assets means (i) Litigation Claims, (ii) $1 million, (iii) the proceeds of the Litigation Trust Loan, (iv) transfers made to the Litigation Trust as a result of a Litigation Trust Contribution Event having occurred, and (v) any proceeds, including interest, of the assets described in (i), (ii), and (iv) above.

1.68    Litigation Trust Contribution Event means the occurrence of one of the following conditions, in which case Reorganized SVCMC shall have additional payment obligations to the Litigation Trust to the extent of, but only to the extent of, in the

aggregate, an amount no greater than 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7:

(a)     In the event, either (i) (x) all holders of Allowed MedMal Claims have received the full Allowed amount of their Claims (including MedMal Interest, where applicable), (y) there remain five or fewer Disputed MedMal Claims, and (z) there is sufficient Cash in each of the MedMal Trusts to pay at least one hundred and fifty percent (150%) of the aggregate amount in which the Disputed MedMal Claims are estimated to be Allowed for each MedMal Trust, respectively, pursuant to a formal estimate performed at the request of Reorganized SVCMC or as otherwise agreed to by the MedMal Monitor, or (ii) (y) all holders of Allowed MedMal Claims have received the full Allowed amount of their Allowed MedMal Claims and (z) there do not remain any Disputed MedMal Claims, then Reorganized SVCMC shall make payments to the Litigation Trust in twelve (12) equal monthly installments of principal plus accrued accretions, up to (but in no event exceeding), in the aggregate, the lesser of (i) the difference between 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 minus amounts (if any) received on account of the GUC Litigation Trust Interest as a result of the condition set forth in Section 1.68(b) hereof having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid under the Litigation Distribution Schedule.  The amount of each monthly installment shall be recalculated in the event distributions are made on account of Section 1.68(b) hereof after the first distribution is made on account of this Section 1.68(a).

(b)     In the event that Reorganized SVCMC is required to make a payment to the Litigation Trust under the Liquidity Event Distribution Schedule, Reorganized SVCMC shall make that payment in an amount not to exceed the lesser of (i) the difference between (y) 1/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 1/7 minus (z) amounts in excess of 1/7 of the GUC Litigation Trust Interest plus accrued accretions received by the Litigation Trust as a result of the condition set forth in Section 1.68(a) hereof having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid out under the Litigation Distribution Schedule.

1.69     <u>Litigation Trust Loan</u> means Cash in the amount of $250,000 to be loaned to the Litigation Trust by Reorganized SVCMC to fund the fees, expenses, and costs of the Litigation Trust.

1.70     <u>Litigation Trustee</u> means the Person or Persons appointed in accordance with the Litigation Trust Agreement, and identified in the Plan Supplement, to administer the Litigation Trust.

1.71     <u>LT Disputed Claims Reserve</u> means the assets of the Litigation Trust allocable to, or retained on account of, Disputed General Unsecured Claims against SVCMC, as determined from time to time, which assets shall (to the extent possible) be held separately from other assets of the Litigation Trust, but shall be subject to an allocable share of all expenses and obligations of the Litigation Trust.

1.72    Manhattan Hospital means St. Vincent's Hospital and Medical Center of New York in Manhattan, New York.

1.73    Manhattan Hospital Real Estate means the real estate currently occupied by the Manhattan Hospital, located on 12th Street east of Seventh Avenue in New York, New York, other than the Martin Payne Building located at 130 West 12th Street.

1.74    Manhattan Real Estate Liquidity Event means the occurrence of either of the following events:  (i) if Reorganized SVCMC shall receive proceeds greater than $400 million from the sale or other disposition of the Manhattan Hospital Real Estate or (ii) if Reorganized SVCMC shall receive proceeds greater than $175 million from the sale or other disposition of the O'Toole Real Estate.

1.75    Manhattan Real Estate Process means the proposal for development/renovation of the Manhattan Hospital and related real estate, described in more detail in the Disclosure Statement.

1.76    MedMal Claim means any prepetition Claim relating to medical malpractice (i) asserted or which can be asserted against SVCMC and/or SVCMC's insurers or (ii) asserted or which can be asserted against any physician or employee of SVCMC to the extent such physician or employee has a right of indemnification against or from SVCMC with respect to claims of alleged medical malpractice, in each case net of third party insurance available to pay such Claim.

1.77    MedMal Collateral means Staff House and the Westchester Land.

1.78    MedMal Defense Costs means all costs, fees, and expenses incurred by Reorganized SVCMC associated with resolving (including defending, settling or otherwise compromising) the respective MedMal Claims.

1.79    MedMal Interest means interest on the unpaid portion of any MedMal Claim from the date that the MedMal Claim becomes Allowed until it is paid in full, which interest shall accrue at the judgment rate prevailing in New York State on the Effective Date.

1.80    MedMal Lien means a second priority lien granted by SVCMC to each MedMal Trust on the MedMal Collateral to secure all obligations of Reorganized SVCMC to the MedMal Trust under the Plan.

1.81    MedMal Self-Insurance Trust Funds means the MedMal-BQ Self-Insurance Trust Funds, the MedMal-MW Self-Insurance Trust Funds, and the MedMal-SI Self Insurance Trust Funds.

1.82    MedMal Trust Agreements means the MedMal-MW Trust Agreement, the MedMal-SI Trust Agreement, and the MedMal-BQ Trust Agreement.

1.83     MedMal Trust Assets means the MedMal-MW Trust Assets, the MedMal-SI Trust Assets, and the MedMal-BQ Trust Assets.

1.84     MedMal Trust Funding Schedule means, for each MedMal Trust, its Pro Rata Share of the amounts set forth below:

| Effective Date Anniversary | Funding Amount |
|---|---|
| First (1st) | $10 million |
| Second (2nd) | $10 million |
| Third (3rd) | $10 million |
| Fourth (4th) | $15 million |
| Fifth (5th) | $15 million |
| Sixth (6th) | $15 million |
| Seventh (7th) | $15 million |
| Eighth (8th) | $15 million |
| Ninth (9th) | $18 million |

1.85     MedMal Trust Initial Assets means the MedMal-MW Trust Initial Assets, the MedMal-SI Trust Initial Assets, and the MedMal-BQ Trust Initial Assets.

1.86     MedMal Trust Monitor means the Person or Persons selected by the Tort Claimants' Committee, and reasonably acceptable to SVCMC, to monitor the operations of the MedMal Trusts and contributions from Reorganized SVCMC, answer questions from holders of MedMal Claims, enforce the payment obligations of Reorganized SVCMC to the MedMal Trusts, enforce the MedMal Lien, oversee the refinancing or other disposition of the collateral securing the MedMal Lien, enforce the cap on MedMal Defense Costs to be paid by the MedMal Trusts, and perform other duties as set forth herein.

1.87     MedMal Trust Policies means the MedMal-BQ Trust Policy, the MedMal-MW Trust Policy, and the MedMal-SI Trust Policy.

1.88     MedMal Trustees means the MedMal-MW Trustee, the MedMal-SI Trustee, and the MedMal-BQ Trustee.

1.89     MedMal Trusts means the MedMal-MW Trust, the MedMal-SI Trust, and the MedMal-BQ Trust.

1.90     MedMal-BQ Claim means a MedMal Claim other than a MedMal-MW Claim and a MedMal-SI Claim.

1.91     MedMal-BQ Self-Insurance Trust Funds means all funds in the consolidated trust established pursuant to section 2162.7B of the Medicare Provider Reimbursement Manual to (i) support a program of risk management and self-insurance

against malpractice claims and losses arising in connection with the charitable operations of SVCMC at the Brooklyn/Queens Hospitals and certain related facilities (above and beyond the coverage afforded SVCMC by its third-party commercial primary insurance providers (if any)), and (ii) be used exclusively for the payment of all or part of claims, settlements, judgments and judicial or administrative awards asserted against, entered into on behalf of, or entered against SVCMC as a result of alleged acts of medical or nursing malpractice at the Brooklyn/Queens Hospitals and certain related facilities, or any person or entity at the Brooklyn/Queens Hospitals and certain related facilities for which SVCMC is legally responsible or obligated to indemnify.

1.92    MedMal-BQ Trust means the trust described in Section 6.6 of the Plan and the MedMal-BQ Trust Agreement.

1.93    MedMal-BQ Trust Agreement means the agreement establishing and delineating the terms and conditions of the MedMal-BQ Trust, substantially in the form set forth in the Plan Supplement.

1.94    MedMal-BQ Trust Assets means (i) the MedMal-BQ Trust Initial Assets, (ii) the amounts paid by Reorganized SVCMC to the MedMal-BQ Trust after the Effective Date after such amounts are transferred to the MedMal-BQ Trust, and (iii) any proceeds, including interest, of the assets described in (i) and (ii) above.

1.95    MedMal-BQ Trust Initial Assets means (i) the MedMal-BQ Self-Insurance Trust Funds, (ii) the MedMal-BQ Trust's Pro Rata Share of the sum of (x) $5 million, plus (y) 50% of any Available Cash in excess of 85% multiplied by Total Trade Claims up to the Available Cash necessary to make the Effective Date Cash Contribution equal 93% multiplied by Total Trade Claims plus (z) 100% of any Available Cash in excess of the Available Cash necessary to make the Effective Date Contribution equal 93% multiplied by Total Trade Claims, (iii) the rights, titles and interests afforded to the MedMal-BQ Trust pursuant to the MedMal-BQ Trust Agreement and the Plan, (iv) the MedMal-BQ Trust Policy, and (v) any proceeds, including interest, of the assets described in (i) through (iv) above.

1.96    MedMal-BQ Trust Policy means an insurance policy or other financial instrument established or purchased on behalf the MedMal-BQ Trust, substantially in the form set forth in the Plan Supplement, that will underwrite a portion of amounts due on MedMal-BQ Claims in excess of funds in the MedMal-BQ Trust.

1.97    MedMal-BQ Trustee means the Person or Persons appointed in accordance with the MedMal-BQ Trust Agreement, and identified in the Plan Supplement, to administer the MedMal-BQ Trust.

1.98    MedMal-MW Claim means a MedMal Claim relating to an incident that allegedly occurred at the Manhattan Hospital or the Westchester Hospital.

1.99    MedMal-MW Self-Insurance Trust Funds means all funds in the trust established by SVCMC pursuant to section 2162.7B of the Medicare Provider

Reimbursement Manual to (i) support a program of risk management and self-insurance against malpractice, claims and losses arising in connection with the charitable operations of SVCMC at St. Vincent's Manhattan (above and beyond the coverage afforded SVCMC by its third-party commercial primary insurance providers) and (ii) pay for claims, settlements, judgments and judicial or administrative awards asserted against, entered into on behalf of or entered against SVCMC as a result of alleged acts of medical or nursing malpractice at the Manhattan Hospital or certain related facilities, or any person or entity at the Manhattan Hospital or certain related facilities for which SVCMC is legally responsible or obligated to indemnify.

1.100    MedMal-MW Trust means the trust described in Section 6.6 of the Plan and the MedMal-MW Trust Agreement.

1.101    MedMal-MW Trust Agreement means the agreement establishing and delineating the terms and conditions of the MedMal-MW Trust, substantially in the form set forth in the Plan Supplement.

1.102    MedMal-MW Trust Assets means (i) the MedMal-MW Trust Initial Assets, (ii) the amounts paid by Reorganized SVCMC to the MedMal-MW Trust after the Effective Date after such amounts are transferred to the MedMal-MW Trust, and (iii) any proceeds, including interest, of the assets described in (i) and (ii) above.

1.103    MedMal-MW Trust Initial Assets means (i) the MedMal-MW Self-Insurance Trust Funds, (ii) the MedMal-MW Trust's Pro Rata Share of the sum of (x) $5 million, plus (y) 50% of any Available Cash in excess of 85% multiplied by Total Trade Claims up to the Available Cash necessary to make the Effective Date Cash Contribution equal 93% multiplied by Total Trade Claims plus (z) 100% of any Available Cash in excess of the Available Cash necessary to make the Effective Date Contribution equal 93% multiplied by Total Trade Claims, (iii) the rights, titles and interests afforded to the MedMal-MW Trust pursuant to the MedMal-MW Trust Agreement and the Plan, (iv) the MedMal-MW Trust Policy, and (v) any proceeds, including interest, of the assets described in (i) through (iv) above.

1.104    MedMal-MW Trust Policy means an insurance policy or other financial instrument established or purchased on behalf the MedMal-MW Trust, substantially in the form set forth in the Plan Supplement, that will underwrite a portion of amounts due on MedMal-MW Claims in excess of funds in the MedMal-MW Trust.

1.105    MedMal-MW Trustee means the Person or Persons appointed in accordance with the MedMal-MW Trust Agreement, and identified in the Plan Supplement, to administer the MedMal-MW Trust.

1.106    MedMal-SI Claim means a MedMal Claim relating to an incident that allegedly occurred at one of the Staten Island Hospitals or certain related facilities.

1.107    MedMal-SI Self-Insurance Trust Funds means all funds in the consolidated trust established pursuant to section 2162.7B of the Medicare Provider

Reimbursement Manual to (i) support a program of risk management and self-insurance against malpractice, claims and losses arising in connection with the charitable operations of SVCMC at the Staten Island Hospitals and certain related facilities (above and beyond the coverage afforded SVCMC by its third-party commercial primary insurance providers) and (ii) be used exclusively for the payment of all or part of claims, settlements, judgments and judicial or administrative awards asserted against, entered into on behalf of, or entered against SVCMC as a result of alleged acts of medical or nursing malpractice at the Staten Island Hospitals and certain related facilities, or any person or entity at the Staten Island Hospitals and certain related facilities for which SVCMC is legally responsible or obligated to indemnify.

1.108  <u>MedMal-SI Trust</u> means the trust described in Section 6.6 of the Plan and the MedMal-SI Trust Agreement.

1.109  <u>MedMal-SI Trust Agreement</u> means the agreement establishing and delineating the terms and conditions of the MedMal-SI Trust, substantially in the form set forth in the Plan Supplement.

1.110  <u>MedMal-SI Trust Assets</u> means (i) the MedMal-SI Trust Initial Assets, (ii) the amounts paid by Reorganized SVCMC to the MedMal-SI Trust after the Effective Date after such amounts are transferred to the MedMal-SI Trust, and (iii) any proceeds, including interest, of the assets described in (i) and (ii) above.

1.111  <u>MedMal-SI Trust Initial Assets</u> means (i) the MedMal-SI Self-Insurance Trust Funds, (ii) the MedMal-SI Trust's Pro Rata Share the sum of (x) $5 million, (y) 50% of any Available Cash in excess of 85% multiplied by Total Trade Claims up to the Available Cash necessary to make the Effective Date Cash Contribution equal 93% multiplied by Total Trade Claims plus (z) 100% of any Available Cash in excess of the Available Cash necessary to make the Effective Date Contribution equal 93% multiplied by Total Trade Claims, (iii) the rights, titles and interests afforded to the MedMal-SI Trust pursuant to the MedMal-SI Trust Agreement and the Plan, (iv) the MedMal-SI Trust Policy, and (v) any proceeds, including interest, of the assets described in (i) through (iv) above.

1.112  <u>MedMal-SI Trust Policy</u> means an insurance policy or other financial instrument established or purchased on behalf the MedMal-SI Trust, substantially in the form set forth in the Plan Supplement, that will underwrite a portion of amounts due on MedMal-SI Claims in excess of funds in the MedMal-SI Trust.

1.113  <u>MedMal-SI Trustee</u> means the Person or Persons appointed in accordance with the MedMal-SI Trust Agreement, and identified in the Plan Supplement, to administer the MedMal-SI Trust.

1.114  <u>Membership Interests</u> means the interests in SVCMC held as of the Commencement Date by the President of the religious congregation of The Sisters of Charity of St. Vincent de Paul of New York (or a designee thereof who is a member of

such congregation) in her individual ex officio capacity and the Most Reverend Bishop of the Diocese of Brooklyn, New York (or a designee of such person who is a member of such Diocese) in his individual ex officio capacity.

1.115   Mercer Report means that certain actuarial report prepared by Mercer Oliver Wyman and dated February __, 2007, estimating the likely amount of Allowed MedMal Claims after giving effect to MedMal Self-Insurance Trust Funds.

1.116   Miscellaneous Non-Operating Real Property shall mean the following parcels of real property:  1496-1540 & 1482 Prospect Place (Brooklyn, New York); 690 Castleton Avenue (Staten Island, New York); 731 Castleton Avenue (Staten Island, New York); 360 Bard Avenue (Staten Island, New York); 154 St. Austin (Staten Island, New York); 155 Vanderbilt (Staten Island, New York); 427 Forest Avenue (Staten Island, New York); 376 Jersey Street (Staten Island, New York); and 90 Hill Street (Brooklyn, New York).

1.117   MS-SVH means Medical Service of St. Vincent's Hospital and Medical Center, P.C.

1.118   O'Toole Real Estate means the real estate currently occupied by the O'Toole building at 36 7th Avenue in New York, New York.

1.119   Other Debtors means all Debtors other than SVCMC.

1.120   Other Secured Claim means any Secured Claim other than a DIP Claim, the Aptium Secured Claim, the Commerce Secured Claim, the RCG Secured Claim, and the Sun Life Secured Claim.

1.121   PBGC means the Pension Benefit Guaranty Corporation, a wholly owned United States Corporation that administers the defined benefit pension plan termination insurance under ERISA.

1.122   PBGC Claim means the Allowed Claim of the PBGC arising out of the Pension Plan and the PBGC Penalties Claim.

1.123   PBGC Penalties Claim means the claims, fines or assessments, if any, of the PBGC or Internal Revenue Service arising out of SVCMC's failure to timely make the filings required under section 4010 of ERISA for Pension Plan years 2001, 2002, 2003, 2004, and 2005.

1.124   Pension Plan means the Saint Vincents Catholic Medical Centers Retirement Plan, the tax qualified defined benefit pension plans covered by ERISA, sponsored and maintained by SVCMC.

1.125   Person means an individual, partnership, corporation, limited liability company, business trust, joint stock company trust, unincorporated association, joint venture, governmental authority, governmental unit or other entity of whatever nature.

1.126   Plan means this chapter 11 plan, including all exhibits and schedules annexed hereto, either in its present form or as it may be altered, amended or modified from time to time, and the Plan Supplement.

1.127   Plan Administration Account means a separate bank account established in the name of each Other Debtor to pay all expenses of administration of such Other Debtor's Plan and to make all distributions required by each Other Debtor under the Plan.

1.128   Plan Supplement means the compilation of documents and forms of documents specified in the Plan that will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan, and will be a part of the Plan.

1.129   Post-Effective Date Debtors means Reorganized SVCMC and the Other Debtors after the Effective Date.

1.130   Priority Non-Tax Claim means any Claim entitled to priority in payment, as specified in sections 507(a)(2)-(7) and (9) of the Bankruptcy Code, other than a Priority Tax Claim.

1.131   Priority Tax Claim means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.132   Pro Rata means the proportion that the amount of any Claim in a particular Class bears to the aggregate amount of all Claims in such Class, including the estimated Allowed amount of any Disputed Claims in such Class.

1.133   Pro Rata Share means, with respect to the MedMal Trusts, an allocation among the MedMal Trusts equal to the proportion to the total estimated Allowed MedMal Claims, as of the Effective Date, for which a particular MedMal Trust is responsible, after giving effect to the MedMal Self-Insurance Trust Funds; provided, however, that if at the 50% Milestone, the 75% Milestone, or otherwise, an official estimation of the MedMal Claims is performed, then after such estimation, the Pro Rata Share shall mean an allocation among the MedMal Trusts equal to the proportion to the total estimated unpaid Allowed MedMal Claims, as of the date of the estimation, for which a particular MedMal Trust is responsible, after giving effect to any funds remaining in the MedMal Trusts as of the date of such estimation.

1.134   RCG means RCG Longview II, L.P. or its successors and assigns.

1.135   RCG Secured Claim means the Secured Claim of RCG, which is Allowed in the amount of $3 million, that arises out of the Subordinate Promissory Note, dated May 18, 2005, in the principal amount of $10 million, made by SVCMC to the order of RCG and the Subordinate Promissory Note, dated June 27, 2005, in the principal amount of $6 million, made by SVCMC to the order of RCG.

1.136    Record Date means the date of the order approving the Disclosure Statement.

1.137    Reimbursable Costs means Defense Costs, premiums on the MedMal Trust Policies, Excess Monitor Fees, MedMal Interest accrued or paid by any MedMal Trust, fees and expenses of the MedMal Trustees, taxes (if any), and all other reasonable fees and expenses of the MedMal Trust other than non-MedMal Interest payments made to holders of Allowed MedMal Claims on account of such Claims.

1.138    Released Parties means any current or former agent, representative, director, officer, member, sponsor, manager, attorney, accountant, financial advisor, or other professional of the Debtors, the Committees, the Ad Hoc Committee, or the DIP Lender, but only to the extent, in each case, such party served in such capacity on or after the Commencement Date; provided, however, notwithstanding anything herein to the contrary, none of the Litigation Parties shall be Released Parties.

1.139    Reorganized Articles of Incorporation means the articles of incorporation or similar corporate organizational document of Reorganized SVCMC, as amended and restated, substantially in the forms to be filed with the Plan Supplement.  The Reorganized Articles of Incorporation of Reorganized SVCMC shall, among other things, prohibit the issuance of nonvoting equity securities, subject to further amendment of such Reorganized Articles of Incorporation as permitted by applicable law.

1.140    Reorganized By-laws means the by-laws or similar corporate organizational document, to the extent applicable, of Reorganized SVCMC, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

1.141    Reorganized SVCMC means SVCMC on and after the Effective Date.

1.142    Restricted Assets means all cash, cash equivalents, or other assets of the Debtors as of the Effective Date, the use of which is restricted by New York Not-For-Profit Law to the furtherance of a particular purpose or purposes in accordance with the expressed or implied intent of the party that transferred the asset to the Debtors.

1.143    Schedules means the schedules of assets and liabilities and the statements of financial affairs filed by each of the Debtors on October 3, 2005 as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.144    Secured Claim means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order).  The defined term Secured Claim includes any Claim that is:  (i) subject to an

offset right under applicable law, and (ii) a secured claim against a Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.145    Secured Obligation means a debt payment obligation by Reorganized SVCMC to each holder of an Allowed General Unsecured Claim, the principal amount of which obligation shall be equal to an amount, if greater than zero, which shall provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 85% of the Allowed Amount of its General Unsecured Claim  after payment of the Effective Date Cash Distribution, but prior to payment of the Unsecured Obligation or the distribution of the GUC Litigation Trust Interest, as set forth in Section 6.3 of the Plan.

1.146    Shortfall Payment means a payment made in respect of the obligation of Reorganized SVCMC to make payments to the MedMal Trusts under certain circumstances as specifically set forth in the Plan in the event funds in the MedMal Trust are insufficient to pay holders of Allowed MedMal Claims or Reimbursable Costs.

1.147    SSSV means Surgical Service of St. Vincent's, P.C.

1.148    Staff House means the Debtors' real property located at 555 6th Avenue, New York, New York 10011 (mailing address) / 101 W 15th Street, New York, New York 10011 (deed).

1.149    Staten Island Hospitals means SVCMC's Bayley Seton Hospital and St. Vincent's Medical Center of Richmond.

1.150    Sun Life Notes  means (i) the Promissory Note, dated February 11, 2005, in the principal amount of $22.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate, (ii) the Promissory Note, dated February 11, 2005, in the principal amount of $7.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate, (iii) the Promissory Note, dated October 18, 2004, in the principal amount of $5 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's O'Toole building, (iv) the Promissory Note, dated October 18, 2004, in the principal amount of $28 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Staff House property, and (v) the Promissory Note, dated October 18, 2004, in the principal amount of $16 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Martin Payne property.

1.151    Sun Life Secured Claim means the Secured Claim of Sun Life Assurance Company of Canada or any of its affiliates, arising out of the Sun Life Notes.

1.152    SVCMC means Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers.

1.153    Tort Claimants' Committee means the statutory committee of tort claimants appointed in the Chapter 11 Cases on May 17, 2006 pursuant to section 1102 of the Bankruptcy Code.

1.154   <u>Total Trade Claims</u> means an amount equal to the sum of (x) the amount of General Unsecured Claims that have been Allowed (or for which proofs of claim have been filed to which the Debtors do not object) and (y) the amount of Disputed General Unsecured Claims the Debtors estimate, as of the Effective Date, will ultimately be Allowed, which estimate must be either (i) approved by Final Order or (ii) reasonably acceptable to the Creditors' Committee and the Ad Hoc Committee.

1.155   <u>Unsecured Obligation</u> means an unsecured debt payment obligation by Reorganized SVCMC to each holder of an Allowed General Unsecured Claim, the principal amount of which obligation shall be equal to the amount, if greater than zero, which shall provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 93% of the Allowed amount of its General Unsecured Claim after payment of the Effective Date Cash Distribution and the Secured Obligation, but prior to the distribution of the GUC Litigation Trust Interest, as described in Section 6.4 of the Plan.  For the avoidance of doubt, the principal amount of the Unsecured Obligation shall not exceed an amount sufficient to provide each holder with an Allowed General Unsecured Claim against SVCMC a recovery greater than 8% of the Allowed amount of its Claim on account of the Unsecured Obligation.

1.156   <u>Westchester Hospital</u> means Saint Vincent's Hospital, Westchester.

1.157   <u>Westchester Land</u> means the land owned by SVCMC adjacent to Westchester Hospital.

## Construction of Certain Terms

The words "<u>herein</u>," "<u>hereof</u>," "<u>hereto</u>," "<u>hereunder</u>," and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

If a Claim is to be "<u>reinstated</u>" under the terms of the Plan, it shall mean that such claim shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding that the holder of such Claim shall not have any right to enforce, with regard to any default occurring prior to the Effective Date, any contractual provision or applicable nonbankruptcy law that entitles the holder of such Claim to demand or receive payment of such Claim prior to its stated maturity date from and after the occurrence of a default, and (i) the holder of the Claim shall retain all of its legal rights respecting the Claim, (ii) Reorganized SVCMC shall remain liable for the Claim, and (iii) Reorganized SVCMC shall retain any and all defenses respecting the Claim.

Any term used in the Plan that is not defined shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

**Article II.**

**TREATMENT AND PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

2.1     Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided in section 2.2 or 2.3 below, SVCMC or the applicable Post-Effective Date Debtor, as appropriate, shall pay to each holder of an Allowed Administrative Expense Claim against such Debtor an amount in Cash equal to the Allowed amount of such Claim on the later to occur of (a) the Effective Date or (b) the date such Administrative Expense Claim otherwise would become due in the ordinary course of business.

2.2     Professional Compensation and Reimbursement Claims.

(a)     All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for expenses incurred through and including the Effective Date under section 503(b) of the Bankruptcy Code shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed from Reorganized SVCMC (with the Other Debtors reimbursing Reorganized SVCMC pursuant to the Allocation Method), (i) on the date the order granting such award is a Final Order, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon by the relevant professional and Reorganized SVCMC; provided, however, that Alvarez & Marsal, LLC shall be entitled to its full Incentive Fee (as defined in the Final Order approving the Debtors' agreement with Alvarez & Marsal, LLC, dated December 14, 2005) regardless of whether the Creditors' Committee supports the Plan or the Plan is confirmed under section 1129(a) or 1129(b) of the Bankruptcy Code.

(b)     SVCMC shall support any application, pursuant to section 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for "substantial contribution" to the Chapter 11 Cases filed by (i) the Ad Hoc Committee for up to $350,000 in actual and reasonable fees and expenses incurred by the Ad Hoc Committee and (ii) holders of MedMal Claims for up to $150,000 in actual and reasonable legal fees and expenses of Cooley Godward Kronish LLP incurred by holders of MedMal Claims.  The payment of any such fees and expenses shall be subject to the independent approval of the Bankruptcy Court and shall not be deemed approved merely by entry of the Confirmation Order.

(c)     Notwithstanding any of the foregoing, Reorganized SVCMC shall assume all postpetition liabilities, fees and expenses for and make payment in the ordinary course to those professionals retained by SVCMC as ordinary course

professionals pursuant to that certain order of the Bankruptcy Court, entered September 9, 2005.

2.3     DIP Claims.  Except to the extent that a holder of a DIP Claim agrees to a different treatment, SVCMC and the Other Debtors shall pay each holder of a DIP Claim, on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim.

2.4     Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Debtor, from such Debtor (i) on the Effective Date, Cash equal to the Allowed amount of such Claim or (ii) equal annual Cash payments on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to 7% or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the applicable Debtor as such obligations become due.

## Article III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1     Classification under SVCMC Plan.  Claims against SVCMC, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting (unless otherwise specified), confirmation, and distribution pursuant to the Plan, as follows:

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 1 – Priority Non-Tax Claims against SVCMC | Unimpaired | No (deemed to accept) |
| Class 2-1 – Other Secured Claims against SVCMC | Unimpaired | No (deemed to accept) |
| Class 2-2 – Aptium Secured Claim | Impaired | Yes |
| Class 2-3 – Commerce Secured Claim | Unimpaired | No (deemed to accept) |
| Class 2-4 – RCG Secured Claim | Unimpaired | No (deemed to accept) |
| Class 2-5 – Sun Life Secured Claim | Unimpaired | No (deemed to accept) |

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 3 – General Unsecured Claims against SVCMC | Impaired | Yes |
| Class 4 – MedMal-BQ Claims | Impaired | Yes |
| Class 5 – MedMal-MW Claims | Impaired | Yes |
| Class 6 – MedMal-SI Claims | Impaired | Yes |
| Class 7 – PBGC Claim | Unimpaired | No (deemed to accept) |
| Class 8 – Intercompany Claims | Impaired | Yes |
| Class 9 – DASNY Subordinated Claims | Impaired | Yes |

3.2    Classification under Other Debtors' Plans.  Claims against and Interests in the Other Debtors, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting (unless otherwise specified), confirmation, and distribution pursuant to the Plan, as follows:

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class A1 – Priority Non-Tax Claims against MS-SVH | Unimpaired | No (deemed to accept) |
| Class A2 – Other Secured Claims against MS-SVH | Unimpaired | No (deemed to accept) |
| Class A3 – General Unsecured Claims against MS-SVH | Impaired | Yes |
| Class A4 – Equity Interest in MS-SVH | Impaired | Yes |
| Class B1 – Priority Non-Tax Claims against SSSV | Unimpaired | No (deemed to accept) |
| Class B2 – Other Secured Claims against SSSV | Unimpaired | No (deemed to accept) |
| Class B3 – General Unsecured Claims against SSSV | Impaired | Yes |
| Class B4 – Equity Interest in SSSV | Impaired | Yes |

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class C1 – Priority Non-Tax Claims against CMC-CS | Unimpaired | No (deemed to accept) |
| Class C2 – Other Secured Claims against CMC-CS | Unimpaired | No (deemed to accept) |
| Class C3 – General Unsecured Claims against CMC-CS | Impaired | Yes |
| Class C4 – Equity Interest in CMC-CS | Impaired | Yes |
| Class D1 – Priority Non-Tax Claims against CMC-PS | Unimpaired | No (deemed to accept) |
| Class D2 – Other Secured Claims against CMC-PS | Unimpaired | No (deemed to accept) |
| Class D3 – General Unsecured Claims against CMC-PS | Impaired | Yes |
| Class D4 – Equity Interest in CMC-PS | Impaired | Yes |
| Class E1 – Priority Non-Tax Claims against CMC-RS | Unimpaired | No (deemed to accept) |
| Class E2 – Other Secured Claims against CMC-RS | Unimpaired | No (deemed to accept) |
| Class E3 – General Unsecured Claims against CMC-RS | Impaired | Yes |
| Class E4 – Equity Interest in CMC-RS | Impaired | Yes |

**Article IV.**

**TREATMENT OF CLAIMS AND EQUITY INTERESTS**

4.1    Class 1 - Priority Non-Tax Claims against SVCMC.

(a)    Impairment and Voting. Class 1 consists of Priority Non-Tax Claims against SVCMC. Class 1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against SVCMC conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against SVCMC, each holder of an Allowed Priority Non-Tax Claim against SVCMC shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by SVCMC prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.2    Class 2-1 - Other Secured Claims against SVCMC.

(a)    Impairment and Voting. Class 2-1 consists of the Other Secured Claims against SVCMC. Each Allowed Other Secured Claim in Class 2-1 shall be considered to be a separate subclass within Class 2-1, and each such subclass shall be deemed to be a separate class for purposes of the Plan. To the extent an Other Secured Claim is undersecured, such Claim shall be classified as a General Unsecured Claim. Class 2-1 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the holder of an Other Secured Claim agrees to less favorable treatment, each Other Secured Claim against SVCMC shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Other Secured Claims against SVCMC that are not due and payable on or before the Effective Date shall, at SVCMC's option, be paid (i) in the ordinary course of business in accordance with the course of practice between SVCMC and such holder with respect to such Claim, or (ii) by transfer of the Collateral to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.3     Class 2-2 – Aptium Secured Claim.

(a)     Impairment and Voting.  Class 2-2 consists of the Aptium Secured Claim.  Class 2-2 is impaired by the Plan.  The holder of the Aptium Secured Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, the holder of the Aptium Secured Claim shall be treated in accordance with a separate agreement to be approved by the Bankruptcy Court.

4.4     Class 2-3 – Commerce Secured Claim.

(a)     Impairment and Voting.  Class 2-3 consists of the Commerce Secured Claim.  Class 2-3 is unimpaired by the Plan.  The holder of the Commerce Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, SVCMC shall reinstate the Commerce Secured Claim.

4.5     Class 2-4 – RCG Secured Claim.

(a)     Impairment and Voting.  Class 2-4 consists of the RCG Secured Claim.  Class 2-4 is unimpaired by the Plan.  The holder of the RCG Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, at SVCMC's sole and absolute discretion, either (i) SVCMC shall reinstate the RCG Secured Claim, or (ii) the holder of the RCG Secured Claim shall receive Cash equal to the Allowed amount of the RCG Secured Claim in full and complete satisfaction, settlement and release of and in exchange for the RCG Secured Claim.

4.6     Class 2-5 – Sun Life Secured Claim.

(a)     Impairment and Voting.  Class 2-5 consists of the Sun Life Secured Claim.  Class 2-5 is unimpaired by the Plan.  The holder of the Sun Life Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, at SVCMC's sole and absolute discretion, either (i) SVCMC shall reinstate the Sun Life Secured Claim, (ii) the holder of the Sun Life Secured Claim shall receive Cash equal to the Allowed amount of the Sun Life Secured Claim in full and complete satisfaction, settlement and release of and in exchange for the Sun Life Secured Claim, or (iii) SVCMC and Sun Life shall reach an agreement with respect to treatment of the Sun Life Secured Claim.

4.7     Class 3 – General Unsecured Claims against SVCMC.

(a)     Impairment and Voting.  Class 3 consists of General Unsecured Claims against SVCMC.  Class 3 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against SVCMC is entitled to vote to accept or reject the Plan.

(b)     Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SVCMC, each holder of an Allowed General Unsecured Claim against SVCMC shall receive the following distributions on the Effective Date or as soon thereafter as is reasonably practicable:

(i)     a Pro Rata share of the Effective Date Cash Distribution, which will yield at least an 80% distribution, after SVCMC has deducted and reserved a portion of the Effective Date Cash Distribution sufficient to provide the same Pro Rata recovery being received by holders of Allowed General Unsecured Claims to holders of Disputed General Unsecured Claims that SVCMC estimates will become Allowed General Unsecured Claims (in the amount that SVCMC estimates such Disputed General Unsecured Claims will be Allowed), which estimate must be either (i) approved by Final Order or (ii) reasonably acceptable to the Creditors' Committee and the Ad Hoc Committee,

(ii)     a Pro Rata share of the Secured Obligation;

(iii)     a Pro Rata share of the Unsecured Obligation;

(iv)     a Pro Rata share of the GUC Litigation Trust Interest; provided, however, that the GUC Litigation Trust Interest shall be satisfied solely out of Litigation Trust Assets, and holders of Allowed General Unsecured Claims against SVCMC shall not have recourse to Reorganized SVCMC for unpaid portions of the GUC Litigation Trust Interest.

4.8     Class 4 – MedMal-BQ Claims.

(a)     Impairment and Voting.  Class 4 consists of MedMal-BQ Claims. Class 4 is impaired by the Plan.  Each holder of an Allowed MedMal-BQ Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed MedMal-BQ Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-BQ Claim, (i) on the later of the Effective Date and the date that a MedMal-BQ Claim becomes an Allowed Claim, Cash up to the amount of its Allowed MedMal-BQ Claim to the extent there remains Distributable Cash in the MedMal-BQ Trust on such date, such Cash being distributed to all Allowed MedMal-BQ Claims existing on such date in proportion to the unpaid portion of each Allowed MedMal-BQ

Claim (including accrued MedMal Interest, if any) existing as of that date, (ii) on each date thereafter that the MedMal-BQ Trust receives a payment from Reorganized SVCMC or the MedMal-BQ Trust Policy such that there is Distributable Cash in the MedMal-BQ Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-BQ Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-BQ Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-BQ Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-BQ Trust. Holders of MedMal-BQ Claims that did not timely file proofs of claim or have their MedMal-BQ Claims deemed to be Allowed MedMal-BQ Claims by Final Order of the Bankruptcy Court shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of Allowed MedMal-BQ Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-BQ Claims.

4.9     Class 5 – MedMal-MW Claims.

(a)     Impairment and Voting. Class 5 consists of MedMal-MW Claims. Class 5 is impaired by the Plan. Each holder of an Allowed MedMal- MW Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions. Each holder of an Allowed MedMal-MW Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-MW Claim, (i) on the later of the Effective Date and the date that a MedMal-MW Claim becomes an Allowed Claim, Cash up to the amount of its Allowed MedMal-MW Claim to the extent there remains Distributable Cash in the MedMal-MW Trust on such date, such Cash being distributed to all Allowed MedMal-MW Claims existing on such date in proportion to the unpaid portion of each Allowed MedMal-MW Claim (including accrued MedMal Interest, if any) existing as of that date, (ii) on each date thereafter that the MedMal-MW Trust receives a payment from Reorganized SVCMC or the MedMal-MW Trust Policy such that there is Distributable Cash in the MedMal-MW Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-MW Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-MW Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-MW Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-MW Trust. Holders of MedMal-MW Claims that did not timely file proofs of claim or have their MedMal-MW Claims deemed to be Allowed MedMal-MW Claims by Final Order of the Bankruptcy Court shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of Allowed MedMal-MW Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-MW Claims.

4.10    Class 6 – MedMal-SI Claims.

(a)    Impairment and Voting. Class 6 consists of MedMal-SI Claims. Class 6 is impaired by the Plan. Each holder of an Allowed MedMal-SI Claim is entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed MedMal-SI Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-SI Claim, (i) on the later of the Effective Date and the date that a MedMal-SI Claim becomes an Allowed Claim, Cash up to the amount of its Allowed MedMal-SI Claim to the extent there remains Distributable Cash in the MedMal-SI Trust on such date, such Cash being distributed to all Allowed MedMal-SI Claims existing on such date in proportion to the unpaid portion of each Allowed MedMal-SI Claim (including accrued MedMal Interest, if any) existing as of that date, (ii) on each date thereafter that the MedMal-SI Trust receives a payment from Reorganized SVCMC or the MedMal-SI Trust Policy such that there is Distributable Cash in the MedMal-SI Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-SI Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-SI Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-SI Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-SI Trust. Holders of MedMal-SI Claims that did not timely file proofs of claim or have their MedMal-SI Claims deemed to be Allowed MedMal-SI Claims by Final Order of the Bankruptcy Court shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of Allowed MedMal-SI Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-SI Claims.

4.11    Class 7 – PBGC Claim.

(a)    Impairment and Voting. Class 7 consists of the PBGC Claim. Class 7 is unimpaired by the Plan. The PBGC, on account of its Allowed PBGC Claim, is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the PBGC's Allowed PBGC Claim, SVCMC shall make the payments to the Pension Plan set forth herein.

4.12    Class 8 – Intercompany Claims.

(a)    Impairment and Voting. Class 8 consists of Intercompany Claims. Class 8 is impaired by the Plan. Each holder of an Allowed Intercompany Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  After (i) all General Unsecured Claims against SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims against SVCMC, Allowed MedMal Claims and the Allowed PBGC Claim have received (unless they have agreed otherwise) 100% of the Allowed amount of their Claims in Cash plus interest, each holder of an Intercompany Claim shall be entitled to receive payment from Reorganized SVCMC pursuant to terms to be mutually agreed upon between Reorganized SVCMC and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

4.13     Class 9 – DASNY Subordinated Claims.

(a)     Impairment and Voting.  Class 9 consists of the DASNY Subordinated Claims.  Class 9 is impaired by the Plan.  Each holder of an Allowed DASNY Subordinated Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  After (i) all General Unsecured Claims against SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims against SVCMC, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have received 100% of the distributions to which they are entitled under the Plan in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $2,865,721.47.  After (i) all General Unsecured Claims against SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) the holders of all Allowed General Unsecured Claims against SVCMC, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have been paid in full (i.e., received 100% of the Allowed amount of their Claims plus interest) in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $3.9 million.    If, at any time, it becomes evident that the holders of all Allowed General Unsecured Claims against SVCMC, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim shall not be paid in full (i.e., shall not receive 100% of the Allowed amount of their Claims plus interest), then the right of each holder of a DASNY Subordinated Claim to receive its Pro Rata share of $3.9 million as set forth in the immediately preceding sentence shall cease, and DASNY's claim for such amount automatically shall be disallowed and expunged without further action of the Bankruptcy Court or any other court.

4.14     Class A1 - Priority Non-Tax Claims against MS-SVH.

(a)     Impairment and Voting.  Class A1 consists of Priority Non-Tax Claims against MS-SVH.  Class A1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim against MS-SVH conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against MS-SVH, each holder

of an Allowed Priority Non-Tax Claim against MS-SVH shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.15 __Class A2 - Other Secured Claims against MS-SVH__.

(a) __Impairment and Voting__. Class A2 consists of the Other Secured Claims against MS-SVH. Class A2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against MS-SVH conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) __Distributions__. On the Effective Date, except to the extent that the holder of an Other Secured Claim against MS-SVH agrees to less favorable treatment, each holder of an Other Secured Claim against MS-SVH shall receive, at MS-SVH's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.16 __Class A3 – General Unsecured Claims against MS-SVH__.

(a) __Impairment and Voting__. Class A3 consists of General Unsecured Claims against MS-SVH. Class A3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim against MS-SVH is entitled to vote to accept or reject the Plan.

(b) __Distributions__. In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against MS-SVH, each holder of an Allowed General Unsecured Claim against MS-SVH shall receive, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of MS-SVH (net of the distributions to which Priority Non-Tax Claims against MS-SVH and Other Secured Claims against MS-SVH are entitled under the Plan, and the costs of administering the Plan of MS-SVH); __provided__, __however__, that no holder of an Allowed General Unsecured Claim against MS-SVH shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against MS-SVH.

4.17 __Class A4 – Equity Interest in MS-SVH__.

(a) __Impairment and Voting__. Class A4 consists of the Equity Interest in MS-SVH. Class A4 is impaired by the Plan. The holder of the Allowed Equity Interest in MS-SVH is entitled to vote to accept or reject the Plan.

(b) __Distributions__. In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in MS-SVH, the holder of the Allowed Equity Interest in MS-SVH shall receive the remaining assets of MS-SVH (net of the

costs of administering the Plan of MS-SVH), as soon as reasonably practicable after all assets of MS-SVH have been liquidated and all Claims against MS-SVH have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in MS-SVH to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in MS-SVH under the Plan.

4.18    Class B1 - Priority Non-Tax Claims against SSSV.

(a)    Impairment and Voting. Class B1 consists of Priority Non-Tax Claims against SSSV. Class B1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against SSSV conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against SSSV, each holder of an Allowed Priority Non-Tax Claim against SSSV shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.19    Class B2 - Other Secured Claims against SSSV.

(a)    Impairment and Voting. Class B2 consists of the Other Secured Claims against SSSV. Class B2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against SSSV conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the holder of an Other Secured Claim against SSSV agrees to less favorable treatment, each holder of an Other Secured Claim against SSSV shall receive, at SSSV's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.20    Class B3 – General Unsecured Claims against SSSV.

(a)    Impairment and Voting. Class B3 consists of General Unsecured Claims against SSSV. Class B3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim against SSSV is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SSSV, each holder of an Allowed General Unsecured Claim against SSSV shall receive, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion

of the assets of SSSV (net of the distribution to which Priority Non-Tax Claims against SSSV and Other Secured Claims against SSSV are entitled under the Plan, and the costs of administering the Plan of SSSV); provided, however, that no holder of an Allowed General Unsecured Claim against SSSV shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against SSSV.

4.21    Class B4 – Equity Interest in SSSV.

(a)    Impairment and Voting.  Class B4 consists of the Equity Interest in SSSV.  Class B4 is impaired by the Plan.  The holder of the Allowed Equity Interest in SSSV is entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in SSSV, the holder of the Allowed Equity Interest in SSSV shall receive the remaining assets of SSSV (net of the costs of administering the Plan of SSSV), as soon as reasonably practicable after all assets of SSSV have been liquidated and all Claims against SSSV have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in SSSV to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in SSSV under the Plan.

4.22    Class C1 - Priority Non-Tax Claims against CMC-CS.

(a)    Impairment and Voting.  Class C1 consists of Priority Non-Tax Claims against CMC-CS.  Class C1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim against CMC-CS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-CS, each holder of an Allowed Priority Non-Tax Claim against CMC-CS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.23    Class C2 - Other Secured Claims against CMC-CS.

(a)    Impairment and Voting.  Class C2 consists of the Other Secured Claims against CMC-CS.  Class C2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim against CMC-CS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-CS agrees to less favorable treatment, each Other Secured Claim against CMC-CS shall receive, at CMC-CS's option, (i) Cash,

on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.24    Class C3 – General Unsecured Claims against CMC-CS.

(a)    Impairment and Voting.  Class C3 consists of General Unsecured Claims against CMC-CS.  Class C3 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against SVCMC is entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-CS, each holder of an Allowed General Unsecured Claim against CMC-CS shall receive, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of CMC-CS (net of the distribution to which Priority Non-Tax Claims against CMC-CS and Other Secured Claims against CMC-CS are entitled under the Plan, and the costs of administering the Plan of CMC-CS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-CS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-CS.

4.25    Class C4 – Equity Interest in CMC-CS.

(a)    Impairment and Voting.  Class C4 consists of the Equity Interest in CMC-CS.  Class C4 is impaired by the Plan.  The holder of the Allowed Equity Interest in CMC-CS is entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-CS, the holder of the Allowed Equity Interest in CMC-CS shall receive the remaining assets of CMC-CS (net of the costs of administering the Plan of CMC-CS), as soon as reasonably practicable after all assets of CMC-CS have been liquidated and all Claims against CMC-CS have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in CMC-CS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-CS under the Plan.

4.26    Class D1 - Priority Non-Tax Claims against CMC-PS.

(a)    Impairment and Voting.  Class D1 consists of Priority Non-Tax Claims against CMC-PS.  Class D1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim against CMC-PS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-PS, each holder of an Allowed Priority Non-Tax Claim against CMC-PS shall receive, except to the

extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.27    Class D2 - Other Secured Claims against CMC-PS.

(a)     Impairment and Voting.  Class D2 consists of the Other Secured Claims against CMC-PS.  Class D2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim against CMC-PS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-PS agrees to less favorable treatment, each Other Secured Claim against CMC-PS shall receive, at CMC-PS's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.28    Class D3 – General Unsecured Claims against CMC-PS.

(a)     Impairment and Voting.  Class D3 consists of General Unsecured Claims against CMC-PS.  Class D3 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against CMC-PS is entitled to vote to accept or reject the Plan.

(b)     Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-PS, each holder of an Allowed General Unsecured Claim against CMC-PS shall receive, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of CMC-PS (net of the distribution to which Priority Non-Tax Claims against CMC-PS and Other Secured Claims against CMC-PS are entitled under the Plan, and the costs of administering the Plan of CMC-PS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-PS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-PS.

4.29    Class D4 – Equity Interest in CMC-PS.

(a)     Impairment and Voting.  Class D4 consists of the Equity Interest in CMC-PS.  Class D4 is impaired by the Plan.  Each holder of the Allowed Equity Interest in CMC-PS is entitled to vote to accept or reject the Plan.

(b)     Distributions.  In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-PS, the holder of the Allowed Equity Interest in CMC-PS shall receive the remaining assets of CMC-PS (net of the costs of administering the Plan of CMC-PS) as soon as reasonably practicable after all

assets of CMC-PS have been liquidated and all Claims against CMC-PS have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in CMC-PS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-PS under the Plan.

4.30    Class E1 - Priority Non-Tax Claims against CMC-RS.

(a)    Impairment and Voting. Class E1 consists of Priority Non-Tax Claims against CMC-RS. Class E1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against CMC-RS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-RS, each holder of an Allowed Priority Non-Tax Claim against CMC-RS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.31    Class E2 - Other Secured Claims against CMC-RS.

(a)    Impairment and Voting. Class E2 consists of the Other Secured Claims against CMC-RS. Class E2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against CMC-RS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-RS agrees to less favorable treatment, each Other Secured Claim against CMC-RS shall at CMC-RS's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.32    Class E3 – General Unsecured Claims against CMC-RS.

(a)    Impairment and Voting. Class E3 consists of General Unsecured Claims against CMC-RS. Class E3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim against CMC-RS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-RS, each holder of an Allowed General Unsecured Claim against CMC-RS shall receive, on the later of the Effective Date and the date that such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion

of the assets of CMC-RS (net of the distribution to which Priority Non-Tax Claims against CMC-RS and Other Secured Claims against CMC-RS are entitled under the Plan, and the costs of administering the Plan of CMC-RS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-RS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-RS.

4.33    Class E4 – Equity Interest in CMC-RS.

(a)    Impairment and Voting. Class E4 consists of the Equity Interest in CMC-RS. Class E4 is impaired by the Plan. The holder of the Allowed Equity Interest in CMC-RS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-RS, the holder of the Allowed Equity Interest in CMC-RS shall receive the remaining assets of CMC-RS (net of the costs of administering the Plan of CMC-RS) as soon as reasonably practicable after all assets of CMC-RS have been liquidated and all Claims against CMC-RS have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in CMC-RS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-RS under the Plan.

**Article V.**

**PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN**

5.1    Voting of Claims. Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article IV of the Plan, or the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a), shall be entitled to vote separately to accept or reject the Plan.

5.2    Nonconsensual Confirmation. If any impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

5.3    Method of Distributions Under the Plan.

(a)    Distributions Generally—SVCMC.

(i)    Reorganized SVCMC shall make all distributions required by the Plan other than those to be made by the MedMal Trustees or the Litigation Trustee.

(ii)     Reorganized SVCMC shall make the $1 million contribution and the Litigation Trust Loan described in the Plan to the Litigation Trust.  The Litigation Trustee shall make distributions in accordance with the Litigation Distribution Schedule.

(iii)     Reorganized SVCMC shall make the distributions described in the Plan to the respective MedMal Trusts on and after the Effective Date.  The respective MedMal Trustees, when and as directed by Reorganized SVCMC, shall make all distributions to holders of Allowed MedMal Claims in accordance with the Plan and the respective MedMal Trust Agreements.

(b)     <u>Distribution Generally—Other Debtors.</u>

(i)     On the Effective Date, Reorganized SVCMC shall place all Cash of each of the Other Debtors into a Plan Administration Account. Reorganized SVCMC shall deposit the proceeds of any assets of an Other Debtor liquidated after the Effective Date into the applicable Plan Administration Account.  Reorganized SVCMC shall pay all costs of administering the Other Debtors' Plans and make all distributions required to be made by the Other Debtors out of their respective Plan Administration Accounts.

(ii)     Reorganized SVCMC shall make periodic payments Pro Rata to holders of General Unsecured Claims against each of the Other Debtors out of their respective Plan Administration Accounts; <u>provided</u>, <u>however</u>, that Reorganized SVCMC shall maintain, in each Plan Administration Account, sufficient Cash (and/or appropriate assets) as reasonably necessary for each Other Debtor to (a) meet the reasonable necessary administrative expenses of the Other Debtor after the Effective Date, including contingent liabilities, (b) pay reasonable administrative expenses of the Other Debtor's estate that have not been paid (including the Other Debtor's professional fees and expenses) or have not been Allowed as of the Effective Date but which are subsequently Allowed, (c) pay holders of Disputed General Unsecured Claims against the Other Debtor the amount such holders would be entitled to receive under the Plan if all such Claims were to become Allowed Claims, (d) satisfy other liabilities incurred by the Other Debtor permitted in accordance with the Plan, and (e) otherwise perform the functions and take the actions provided for or permitted herein.

(iii)     If (a) all holders of Allowed General Unsecured Claims against an Other Debtor have not received payment in full on account of their Claims after the resolution of all Disputed Claims against the Other Debtor, (b) the Other Debtor's Plan Administration Account does not hold sufficient Cash or other assets to pay all holders of General Unsecured

Claims against the Other Debtor the full Allowed amount of their Claims, and (c) all assets of the Other Debtor have been liquidated, then (y) Reorganized SVCMC shall make a final Pro Rata distribution of all remaining Cash in the Other Debtor's Plan Administration Account (other than the amount of Cash necessary to wind up the Other Debtor) to holders of Allowed General Unsecured Claims against the Other Debtor and (z) the holders of Equity Interests against the Other Debtor shall not receive a distribution on account of their Equity Interests.

(iv)     As soon as reasonably practical after (a) the payment in full of all Allowed Claims against an Other Debtor, (b) the resolution of all Disputed Claims against the Other Debtor, and (c) the liquidation of all the assets of the Other Debtor, Reorganized SVCMC shall make a final Pro Rata distribution of all remaining Cash in the Other Debtor's Plan Administration Account (other than the amount of Cash necessary to complete all requirements for and wind up the Other Debtor) to the holder of the Equity Interest in the Other Debtor.

(v)     Reorganized SVCMC shall close each Other Debtor's Plan Administration Account after there remains no Cash in such Plan Administration Account, all the assets of the Other Debtor have been liquidated, and all payments required to be made under the Other Debtor's Plan have been made.

(c)     Distributions of Cash.  Any payment of Cash made by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

(d)     Distributions Free and Clear.  Except as otherwise provided herein, any distributions or transfers by or on behalf of any Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

(e)     Timing of Distributions.  Unless otherwise provided herein, any distribution to be made by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be made to the extent and at the time provided in Article IV of the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(f)     Delivery of Distributions.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and

records of the Debtors or their agents unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. The holder must notify Reorganized SVCMC in writing of a change of address pursuant to the notice requirements set forth in Section 12.17 of the Plan. None of Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein.

(g)     Distributions to Holders as of Record Date. As of the close of business on the Record Date, the claims register, for each Debtor, shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim. Neither Reorganized SVCMC, the Other Debtors, the Litigation Trustee nor the MedMal Trustees shall have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized SVCMC, the Other Debtors, the Litigation Trustee, and the MedMal Trustees shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

(h)     Undeliverable and Unclaimed Distributions. If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall be made as soon as is practicable to such holder, without interest, except as provided in the last sentence of this paragraph. Checks issued by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check shall be made in accordance with the notice provisions of Section 12.17 of the Plan to Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks shall be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of Reorganized SVCMC, or the appropriate MedMal Trust, as the case may be. The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code shall not be entitled to any other or further distribution under the Plan on account of such Claim.

(i)     Setoffs. Reorganized SVCMC or a MedMal Trustee as the case may be, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any

nature that the Debtors have asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or a MedMal Trustee of any such claims, rights and causes of action that the Debtors may possess against such holder; and provided further, however, that at the Debtors' discretion, any claims of the Debtors arising before the Commencement Date may be set off against Claims against the Debtors arising after the Commencement Date and any claims of the Debtors arising after the Commencement Date may be set off against Claims against the Debtors arising before the Commencement Date.

(j)     Application of Distributions.  Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any.

(k)     Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Other Debtors, the Litigation Trustee, the MedMal Trustees, or any other paying agent, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## Article VI.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLANS

6.1     Reorganized SVCMC.

(a)     Reorganized Articles of Incorporation and Reorganized By-laws. Reorganized SVCMC shall adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date.  The Reorganized Articles of Incorporation and Reorganized By-laws of Reorganized SVCMC shall preserve the power of the holders of the Membership Interests to appoint and remove members of Reorganized SVCMC's Board of Directors and approve substantial asset sales and substantial capital projects.

(b)　　Boards of Directors and Officers.  The initial Board of Directors and officers of Reorganized SVCMC shall be disclosed in the Plan Supplement and shall be in effect as of the Effective Date.

(c)　　SVCMC Membership Interests.  The prepetition Membership Interests in SVCMC shall remain unchanged.

(d)　　Restructuring Transactions.  On or after the Effective Date, and in SVCMC's discretion, certain transactions that will be listed in a schedule to the Plan Supplement shall be effectuated.

6.2　　Other Debtors.

(a)　　Reorganized SVCMC as Plan Administrator.  Reorganized SVCMC shall be the administrator for the Plans of each of the Other Debtors.  In such capacity, the powers of Reorganized SVCMC shall include any and all powers necessary to implement the Plan and to administer and liquidate the assets and wind up the business and affairs of the Other Debtors, including, but not limited to resolving claims, liquidating assets, abandoning assets, pursuing causes of action, retaining professionals, maintaining books and records, entering into agreements, investing cash, administering and paying taxes, and paying any and all reasonable fees and expenses of the Other Debtors.

(b)　　Liquidation of Assets of SSSV and MS-SVH.  SSSV and/or MS-SVH may, on or around the Effective Date, sell any of their assets and/or assume and assign their contracts to a new entity created by SVCMC to carry on a similar or expanded function to SSSV or MS-SVH.

(c)　　Expenses of Liquidation.  Reorganized SVCMC shall pay the expenses of liquidation of each Other Debtor out of such Other Debtor's Plan Administration Account; provided, however, that Reorganized SVCMC shall be entitled to reimbursement from each Other Debtor for all fees and expenses incurred and paid by Reorganized SVCMC on or after the Effective Date in connection with administering the Plan for such Other Debtor.

(d)　　Termination.  Each Other Debtor will terminate after the conclusion of the liquidation, administration, and distribution of its assets in accordance with the Plan and its material completion of all duties and functions set forth in the Plan, but in no event later than three (3) years after the Effective Date, unless extended by Court order upon the request of Reorganized SVCMC.  Upon such termination, the Equity Interests in the Other Debtor shall be extinguished and the legal existence of the Other Debtors shall terminate without further action of the Bankruptcy Court or any other Court, administrative body or other agency.  Reorganized SVCMC may cause to be filed with the State of New York and any other governmental authority such certificate of dissolution or cancellation and other certificates and documents as may be or become necessary to reflect the termination of the legal existence of each Other Debtor.  No

further or other court order or regulatory approval shall be necessary to effectuate the termination of the legal existence of each Other Debtor.

6.3     Secured Obligation.  The terms of the Secured Obligation, if any, shall be as follows:

(a)     The Secured Obligation and accrued and unpaid interest thereon shall be paid in full on or before the earlier of (i) the fifth (5th) Effective Date Anniversary and (ii) a Change of Control.

(b)     Interest shall accrue on the Secured Obligation at the rate calculated from time to time using the interest rate formula for the term loan portion of the Exit Facility, compounding annually.  Interest shall be paid in full on or before the fifth (5th) Effective Date Anniversary.

(c)     The Secured Obligation shall be secured by the Brooklyn/Queens Seller Notes and the Miscellaneous Non-Operating Real Property.

(d)     There shall be no mandatory prepayments on the Secured Obligation and accrued and unpaid interest thereon other than (i) upon the sale of the Miscellaneous Non-Operating Real Property, in which case the net proceeds of such sale shall be applied to any unpaid portion of the Secured Obligation, (ii) upon receipt by Reorganized SVCMC of proceeds from the Brooklyn/Queens Seller Notes, in which case proceeds received by Reorganized SVCMC from the Brooklyn/Queens Seller Notes shall be applied to any unpaid portion of the Secured Obligation, (iii) in accordance with the Litigation Distribution Schedule, or (iv) in accordance with the Liquidity Event Distribution Schedule.

(e)     There shall be no penalty for prepayment of the Secured Obligation.

(f)     Any payments on the Secured Obligation shall be applied first to principal and then to interest due thereunder.

6.4     Unsecured Obligation.  The terms of the Unsecured Obligation, if any, shall be as follows:

(a)     The Unsecured Obligation and accrued and unpaid interest thereon shall be paid in full on or before the earlier of (i) the seventh (7th) Effective Date Anniversary and (ii) a Change of Control.

(b)     Interest shall accrue on the Unsecured Obligation at the rate of 8% annually, non-compounding.  Interest shall be paid in full on or before the seventh (7th) Effective Date Anniversary.

(c)     There shall be no mandatory prepayments on the Unsecured Obligation and accrued and unpaid interest thereon other than (i) in accordance with the

Litigation Distribution Schedule or (ii) in accordance with the Liquidity Event Distribution Schedule. Other than the mandatory prepayments, Reorganized SVCMC shall not, without the written consent of the MedMal Trust Monitor which shall not be unreasonably withheld or delayed, make any payments on account of the Unsecured Obligation before the seventh (7th) Effective Date Anniversary.

(d) There shall be no penalty for prepayment of the Unsecured Obligation.

(e) Any payments on the Unsecured Obligation shall be applied first to principal and then to interest due thereunder.

6.5 <u>Litigation Trust</u>.

(a) <u>General</u>. On or before the Effective Date, the Litigation Trust Agreement, in a form reasonably acceptable to SVCMC, the Creditors' Committee and the Ad Hoc Committee, shall be executed, and all other necessary steps shall be taken to establish the Litigation Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and Reorganized SVCMC. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern. Such Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims against SVCMC.

(b) <u>Purpose of Litigation Trust</u>. The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c) <u>Fees and Expenses of Litigation Trust</u>. Other than the $1 million grant on the Effective Date, all fees, expenses, and costs of the Litigation Trust (including Litigation Trust Loan interest) shall be paid by the Litigation Trust, and the Reorganized Debtors shall not be responsible for any fees, expenses and costs of the Litigation Trust.

(d) <u>Litigation Trust Loan</u>.

(i) On the Effective Date, SVCMC shall transfer Cash in the amount of the Litigation Trust Loan to the Litigation Trust.

(ii) The Litigation Trust Loan shall be evidenced by a note payable by the Litigation Trust to Reorganized SVCMC and such other appropriate documentation to evidence the Litigation Trust Loan, the forms of which shall be included in the Plan Supplement and reasonably

acceptable in form and substance to SVCMC, the Creditors' Committee, and the Ad Hoc Committee.  In the event of any inconsistency between the terms of the Plan and the terms of such documentation, the terms of such documentation shall control.

(iii)     The Litigation Trust Loan shall accrue interest at the rate of 8% compounded annually.  The Litigation Trust Loan and accrued interest on that loan shall be paid in accordance with the Litigation Distribution Schedule.

(e)     <u>Litigation Trust Assets</u>.  As of the Effective Date, SVCMC shall assign and transfer to the Litigation Trust all of its rights, title and interests in and to the Litigation Trust Assets for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and shall be free and clear of any liens, claims and encumbrances, and no other entity, including the Debtors or the Reorganized Debtors (other than Reorganized SVCMC with respect to the Litigation Trust Loan), shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Trust Assets upon their assignment and transfer to the Litigation Trust (other than as provided herein or in the Litigation Trust Agreement).

(f)     <u>Governance of Litigation Trust</u>.  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee.

(g)     <u>Appointment of a Litigation Trustee</u>.  Prior to the Effective Date, the Creditors' Committee and the Ad Hoc Committee shall jointly select the Litigation Trustee; <u>provided</u>, <u>however</u>, if the Creditors' Committee and the Ad Hoc Committee cannot agree on the Litigation Trustee, the Litigation Trustee will be proposed by the U.S. Trustee and confirmed by the Bankruptcy Court at the Confirmation Hearing.  The identity of and contact information for the Litigation Trustee (or proposed Litigation Trustee, if applicable) shall be set forth in the Plan Supplement.  In the event the Litigation Trustee dies, is terminated, or resigns for any reason, the Trust Governing Board shall designate a successor.

(h)     <u>The Trust Governing Board</u>.  The Litigation Trustee shall take direction from a "Trust Governing Board" that shall initially consist of three (3) independent directors jointly selected by the Creditors' Committee and the Ad Hoc Committee; <u>provided</u>, <u>however</u>, that if the Creditors' Committee and the Ad Hoc Committee cannot agree on three (3) independent directors, then these directors will be nominated by the United States Trustee and confirmed by the Bankruptcy Court at the Confirmation Hearing.  The identity of the individuals serving (or if applicable to be nominated to serve) on the Trust Governing Board shall be set forth in the Plan Supplement.  In the event one of the Trust Governing Board directors dies, is terminated, or resigns for any reason, the remaining Trust Governing Board directors shall designate a successor.

(i)    Role of the Litigation Trustee.  In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee shall (i) hold the Litigation Trust Assets for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, (ii) make distributions of Litigation Claim Proceeds pursuant to the Litigation Distribution Schedule as provided herein, and (iii) have the power and authority to prosecute and resolve, in the name of SVCMC, Reorganized SVCMC and/or the Litigation Trustee, any Litigation Claims.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets.  In all circumstances, the Litigation Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

(j)    GUC Litigation Trust Interests.  The GUC Litigation Trust Interests shall not be certificated and are not transferable.

(k)    Cash.  The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(l)    Retention of Professionals by the Litigation Trustee.  The Litigation Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate, without Bankruptcy Court approval, subject to the prior approval of the Trust Governing Board.

(m)    Compensation of the Litigation Trustee.  The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation (which compensation shall be negotiated by the Litigation Trustee), to the extent not set forth in the Plan, shall be set forth in the Litigation Trust Agreement.  The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(n)    Cooperation of Reorganized SVCMC.  Reorganized SVCMC shall be required to provide information to the Litigation Trustee regarding the status of General Unsecured Claims against SVCMC sufficient to enable the Litigation Trustee to perform its duties hereunder.  Reorganized SVCMC shall cooperate with the Litigation Trust in the administration of the Litigation Trust, including, without limitation, in providing documentation, witness testimony, and other evidence in support of the prosecution of the Litigation Claims, at no cost or expense of the Litigation Trust other than out of pocket expenses for copying, overtime to comply with requests from the Litigation Trust, or similar expenses.

(o)     Distribution of Litigation Trust Assets.

(i)     The Litigation Trustee shall distribute, in all events at least annually, but also within thirty (30) days of the Litigation Trust having indefeasibly received $500,000 in Litigation Claims Proceeds (whether on or after the Effective Date), and at periodic intervals thereafter as Cash becomes available, in accordance with the Litigation Distribution Schedule and in accordance with the Litigation Trust Agreement, all Cash on hand (including any Cash received from SVCMC on the Effective Date, and treating as Cash for purposes of this Section any permitted investments under Section 6.5(k) hereof), except such amounts (i) as would be distributable to a holder of a Disputed General Unsecured Claim against SVCMC (as of the time of such distribution) if such Disputed Claim had been Allowed in the full amount asserted by the holder of such Claim prior to the time of such distribution (but only until such Claim is resolved), which amounts shall be held in the LT Disputed Claims Reserve, (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust during liquidation, (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets, including any taxes in respect of LT Disputed Claims Reserve), and (iv) to satisfy other liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.

(ii)     Any payments to the Litigation Trust as a result of a Litigation Trust Contribution Event having occurred shall be remitted by the Litigation Trust in accordance with the Litigation Distribution Schedule within thirty (30) days of receipt thereof by the Litigation Trust, except such amounts as would be distributable to a holder of a Disputed General Unsecured Claim against SVCMC (as of the time of such distribution) if such Disputed Claim had been Allowed in the full amount asserted by the holder of such Claim prior to the time of such distribution (but only until such Claim is resolved), which amounts shall be held in the LT Disputed Claims Reserve.

(iii)     The Litigation Trustee shall remove funds from the LT Disputed Claims Reserve as the value of the General Unsecured Claims against SVCMC that are Disputed decreases.

(p)     Federal Income Tax Treatment of Litigation Trust.

(i)     Litigation Trust Assets Treated as Owned by Creditors. For all federal income tax purposes, all parties (including, without limitation, SVCMC, Reorganized SVCMC, the Litigation Trustee, and the holders of Allowed General Unsecured Claims against SVCMC) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust

including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) for the benefit of Reorganized SVCMC and the holders of General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, as (A) a transfer of the Litigation Trust Assets directly to the holders of Allowed General Unsecured Claims against SVCMC, followed by (B) the transfer by such persons and Reorganized SVCMC to the Litigation Trust of such Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, the holders of such Claims and Reorganized SVCMC shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

  (ii) <u>Tax Reporting</u>.

    (A) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties shall treat the Litigation Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which Reorganized SVCMC and the holders of Allowed General Unsecured Claims against SVCMC are the grantors and beneficiaries. In the event an alternative treatment of the Liquidating Trust is required for federal income tax purposes, the Liquidating Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Liquidating Trust, including Reorganized SVCMC, and anyone who subsequently becomes a holder, of such alternative treatment. The Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 6.4(p). The Litigation Trustee also shall annually send to Reorganized SVCMC and to each record holder of a beneficial interest in the Litigation Trust a separate statement setting forth Reorganized SVCMC's and the holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income

tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Litigation Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any governmental unit. Subject to Section 6.5(p)(ii)(C), the Litigation Trust's taxable income, gain, loss, deduction or credit shall be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Litigation Trust Agreement, up to the tax book value of the Litigation Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims and Reorganized SVCMC, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(B)     As soon as possible after the Effective Date, the Litigation Trustee shall make a good faith valuation of the value of the Litigation Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(C)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Disputed Claims Reserve

as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the LT Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Litigation Trust that would have been allocated to the holders of Disputed General Unsecured Claim against SVCMC had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the LT Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the LT Disputed Claims Reserve), and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). Reorganized SVCMC and all holders of General Unsecured Claims against SVCMC shall report, for tax purposes, consistent with the foregoing.

(D)    The Litigation Trustee shall be responsible for payments, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the LT Disputed Claims Reserve.

(E)    The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including the LT Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust (including LT Disputed Claims Reserve).

(q)    <u>Dissolution of Litigation Trust</u>. The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Litigation Trustee determines that the pursuit of additional Litigation Claims is not likely to yield sufficient additional Litigation Claims Proceeds to justify further pursuit of such claims and (ii) all distributions of Litigation Claims Proceeds required to be made by the Litigation Trustee under the Plan have been made, but in no event shall the Litigation Trust be dissolved later than seven (7) years from the Effective Date unless the

Bankruptcy Court, upon motion made within the six (6) month period prior to such seventh (7th) anniversary (and, in the event for further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets. Upon dissolution of the Litigation Trust, any remaining Litigation Trust Proceeds shall be distributed to all holders of beneficial interests in the Litigation Trust in accordance with their relative beneficial interests and in accordance with the Litigation Trust Agreement.

6.6    MedMal Trusts.

(a)    General. On or before the Effective Date, the MedMal Trust Agreements, in a form reasonably acceptable to SVCMC and the Tort Claimants' Committee, shall be executed, and all other necessary steps shall be taken to establish the MedMal Trusts. This Section 6.6 sets forth certain of the rights, duties, and obligations of the MedMal Trustees. In the event of any conflict between the terms of the Plan and the terms of the MedMal Trust Agreements, the terms of the MedMal Trust Agreements shall govern. The MedMal Trust Agreements may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of each of the MedMal Trusts as a grantor trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed MedMal Claims.

(b)    Purpose of MedMal Trusts. Each MedMal Trust shall be established for the sole purpose of holding the MedMal Trust Assets to be distributed to holders of the applicable Allowed MedMal Claims, with no objective to continue or engage in the conduct of a trade or business.

(c)    MedMal Trust Assets. The MedMal Trusts shall consist of all respective MedMal Trust Assets and the proceeds therefrom. As of the Effective Date, SVCMC shall assign and transfer to the MedMal Trusts all of their rights, title and interests in and to the MedMal Trust Initial Assets. SVCMC or such other Persons that may have possession or control of such MedMal Trust Initial Assets shall transfer possession or control of such property to the respective MedMal Trusts prior to or as of the Effective Date and shall execute the documents or instruments necessary to effectuate such transfers. Reorganized SVCMC shall make additional contributions to the MedMal Trusts in accordance with each MedMal Trust's Pro Rata Share of the amounts set forth on the MedMal Trust Funding Schedules and as otherwise set forth herein. Except as otherwise provided herein, all transfers by or obligations of SVCMC or Reorganized SVCMC to the MedMal Trusts shall be in accordance with each MedMal Trust's Pro Rata Share. All transfers to the MedMal Trusts shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax as discussed in Section 12.6 below, and shall be free and clear of any liens, claims and encumbrances,

and no other entity, including the Debtors or the Post-Effective Date Debtors shall have any interest, legal, beneficial, or otherwise, in the MedMal Trusts or the assets of the MedMal Trusts upon their assignment and transfer to the MedMal Trusts; provided, however, that all such assets will be transferred to the MedMal Trusts subject only to the obligation of the MedMal Trusts to pay (i) respective Allowed MedMal Claims, (ii) Reimbursable Costs, subject to the obligation of Reorganized SVCMC to make Shortfall Payments under certain circumstances as described herein, (iii) after payment of the foregoing, the balance (if any) to the other MedMal Trusts, and (iv) and after payment of the foregoing, the balance (if any) to Reorganized SVCMC.

(d)     Governance of MedMal Trusts.  The MedMal Trusts shall be governed by the respective MedMal Trust Agreements and administered by the respective MedMal Trustees.

(e)     Appointment of the MedMal Trustee.  Prior to the Effective Date, SVCMC, after consultation with the Tort Claimants' Committee, shall appoint the MedMal Trustees for each of the MedMal Trusts.  The identity of and contact information for the MedMal Trustees shall be described in the Plan Supplement.

(f)     Role of the MedMal Trustee.  In furtherance of and consistent with the purpose of the MedMal Trusts and the Plan, each of the MedMal Trustees shall, as instructed by Reorganized SVCMC, (i) hold, manage, sell, or invest, as appropriate, the MedMal Trust Assets, (ii) hold the MedMal Trust Assets for the benefit of the holders of the Allowed MedMal Claims, (iii) hold, manage, sell, invest and distribute Cash or non-Cash MedMal Trust Assets, and (iv) perform such other functions as are provided in the Plan.

(g)     The MedMal Trust Monitor.

(i)     Prior to the Effective Date, the Tort Claimants' Committee, with the reasonable consent of SVCMC, shall appoint the MedMal Trust Monitor.  The identity of and contact information for the MedMal Trust Monitor shall be set forth in the Plan Supplement.  If the MedMal Trust Monitor is terminated, resigns, or is unavailable to serve for any reason, then (i) if any members of the Tort Claimants' Committee have not been paid the full Allowed amount of their respective Claims or have not had their Claims disallowed by Final Order, counsel to the MedMal Trust Monitor shall contact such members and the MedMal Trust Monitor shall be selected based on the majority vote of such members, with the reasonable consent of Reorganized SVCMC (with any tie to be broken by counsel to the MedMal Trust Monitor, with the reasonable consent of Reorganized SVCMC), or (ii) if all members of the Tort Claimants' Committee have been paid the full Allowed amount of their respective Claims and/or have had their Claims disallowed by Final Order, counsel to the MedMal Trust Monitor and Reorganized SVCMC shall jointly select the MedMal Trust Monitor.

(ii)     Counsel to the MedMal Trust Monitor shall initially be counsel to the Tort Claimants' Committee.  Any replacement counsel for the MedMal Trust Monitor must be reasonably acceptable to Reorganized SVCMC.

(iii)     Reorganized SVCMC shall pay the reasonable fees and expenses of the MedMal Trust Monitor up to $75,000 per year until the dissolution of all MedMal Trusts.  The Excess Monitor Fees shall be paid by the respective MedMal Trusts in accordance with their Pro Rata Share, subject to Reorganized SVCMC's obligations to make Shortfall Payments.

(h)     <u>Nontransferability of MedMal Trust Interests</u>.  The beneficial interests in each of the MedMal Trusts shall not be certificated and are not transferable (except as otherwise provided in the MedMal Trust Agreements).

(i)     <u>Cash</u>.  The MedMal Trustees may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code.

(j)     <u>MedMal Defense Costs</u>.  The MedMal Defense Costs of each MedMal Trust up to its Pro Rata Share of $3 million per year shall be paid by the respective MedMal Trusts, subject to Reorganized SVCMC's obligations to make Shortfall Payments.  Any MedMal Defense Costs incurred by a MedMal Trust in excess of its Pro Rata Share of $3 million per year shall be paid directly by Reorganized SVCMC.

(k)     <u>Other Costs and Expenses of the MedMal Trustees</u>.  All reasonable fees, costs, and expenses of the MedMal Trusts, including the fees, expenses, bonding and insurance of the respective MedMal Trustees and their retained professionals, other than (i) the reasonable fees and expenses of the MedMal Trust Monitor up to $75,000 a year and (ii) the MedMal Defense Costs in excess of $3 million a year, each of which shall be paid as otherwise set forth herein, shall be paid out of the respective MedMal Trust Assets (including the proceeds, if any, of the MedMal Trust Policies) and shall constitute Reimbursable Costs, subject to Reorganized SVCMC's obligations to make Shortfall Payments; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, payments made to holders of Allowed MedMal Claims on account of such Claims, other than payments on account of MedMal Interest, shall not constitute Reimbursable Costs.

(l)     <u>Retention of Professionals by the MedMal Trustees</u>.  The MedMal Trustees may retain and reasonably compensate counsel and other professionals to assist in their duties as MedMal Trustees on such terms as the MedMal Trustees deem appropriate, without Bankruptcy Court approval.

(m)     <u>Compensation of the MedMal Trustees</u>.  The MedMal Trustees shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(n)     MedMal Trust Policies.  Prior to the Effective Date SVCMC and the Tort Claimants' Committee, or after the Effective Date Reorganized SVCMC and the MedMal Trust Monitor, shall cooperate reasonably and in good faith to cause the procurement of MedMal Trust Policies reasonably acceptable to SVCMC and the Tort Claimants' Committee or Reorganized SVCMC and the MedMal Trust Monitor, as applicable, in an amount equal to at least 25% of the greater of the estimated Allowed amount of the MedMal Claims as set forth in the Caronia Report and as set forth in the Mercer Report.  If procurement of the MedMal Trusts Policies is, in SVCMC's or Reorganized SVCMC's discretion, impossible or financially unreasonable, Reorganized SVCMC shall pay each MedMal Trust its Pro Rata Share of an amount equal to at least 25% of the greater of the estimated Allowed amount of the MedMal Claims as set forth in the Caronia report and as set forth in the Mercer report, to be paid in five (5) equal annual installments commencing on the tenth (10th) Effective Date Anniversary and continuing through and including the fourteenth (14th) Effective Date Anniversary (the "Additional Funding Schedule").  The premiums on the MedMal Trust Policies, if any, shall be paid by the respective MedMal Trusts, subject to Reorganized SVCMC's obligations to make Shortfall Payments.

(o)     Relief from MedMal Trust Funding Schedule.  Reorganized SVCMC's obligation to make the MedMal Trust Funding Schedule payments shall be satisfied by (i) payments, if any, made to the MedMal Trusts on account of Available Cash on the Effective Date exceeding an amount equal to 85% multiplied by Total Trade Claims, (ii) payments made to the MedMal Trusts pursuant to the Litigation Distribution Schedule, (iii) payments made to the MedMal Trusts pursuant to the Liquidity Event Distribution Schedule, (iv) payments made to the MedMal Trusts on account of monetization of the MedMal Collateral, and (v) Shortfall Payments made to the MedMal Trusts for amounts other than Reimbursable Costs.  Until the aggregate of Shortfall Payments exceeds $25 million, Shortfall Payments shall be presumed to have been for other than Reimbursable Costs.   Such payments shall reduce or satisfy the payments called for by the MedMal Trust Funding Schedule in inverse order of those payments maturity dates.

(p)     Reimbursement Obligations/Shortfall Payments.

(i)     If at any point in time, the funds in a MedMal Trust from any source, including proceeds recoverable on account of the MedMal Trust Policies or a MedMal Loan, shall be insufficient to pay all unpaid Allowed MedMal Claims and all accrued Reimbursable Costs, SVCMC shall, within thirty (30) days of receiving a written notice signed by the applicable MedMal Trustee, remit to such MedMal Trust a Shortfall Payment as necessary to cure such deficiency; provided, however, that Reorganized SVCMC's obligations to make Shortfall Payments shall not, in the aggregate, exceed the sum of (i) the MedMal Trust's Pro Rata Share of $25 million plus (ii) any accrued or paid Reimbursable Costs for that MedMal Trust; and provided further, however that Reorganized SVCMC's obligations to make Shortfall Payments for all MedMal Trusts

shall not, in the aggregate, exceed the sum of (i) $25 million plus (ii) the aggregate of any accrued or paid Reimbursable Costs for all MedMal Trusts.

(ii) The obligations of the MedMal Trusts to advance the Reimbursable Costs on behalf of Reorganized SVCMC shall be a financial accommodation as such term is used in section 365(c)(2) of the Bankruptcy Code. In the event of a subsequent bankruptcy or other insolvency event of Reorganized SVCMC, (i) the MedMal Trusts shall have no further obligation to fund any Reimbursable Cost, and neither Reorganized SVCMC nor any party claiming to be a beneficiary of Reorganized SVCMC, the MedMal Trusts and/or the transactions contemplated hereby shall have any claim for or any interest in any Reimbursable Costs, (ii) the Reimbursable Costs and all other funds in the MedMal Trusts, shall be for the exclusive benefit of the holders of the MedMal Claims, (iii) Reorganized SVCMC shall reimburse the MedMal Trusts for all costs and expenses, including attorneys' fees, incurred in defending against claims for the Reimbursable Costs, and (iv) Reorganized SVCMC shall indemnify and hold harmless the MedMal Trusts against any claims for Reimbursable Costs. For the avoidance of doubt, in the event of a subsequent bankruptcy or other insolvency event of Reorganized SVCMC, nothing herein shall preclude the MedMal Trusts from interposing one or more claims against Reorganized SVCMC for reimbursement of Reimbursable Costs.

(iii) To the extent and only to the extent a holder of an Allowed MedMal Claim is not paid in full within thirty (30) days of its MedMal Claim becoming an Allowed Claim, then such holder shall be entitled to receive MedMal Interest on the unpaid portion of its Allowed MedMal Claim from the date the Claim is Allowed until the full principal amount of its Allowed MedMal Mal Claim is paid. The MedMal Trustee shall give notice to any holder of an Allowed MedMal Claim that is entitled to MedMal Interest that it is being provided with MedMal Interest until its Allowed MedMal Claim is paid in full.

(q) Milestones. Following (i) the 50% Milestone and (ii) the 75% Milestone, Reorganized SVCMC may, at its sole discretion and expense, cause the estimation of the Claims remaining in all the MedMal Trusts. If (i) following the 50% Milestone, the funds remaining in any MedMal Trust after payment of all unpaid Allowed MedMal Claims and all accrued Reimbursable Costs as of that date exceed 125% of the estimate of all remaining unpaid Allowed MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such MedMal Trust or (ii) following the 75% Milestone, the funds remaining in any MedMal Trust after payment of all unpaid Allowed MedMal Claims and all accrued Reimbursable Costs as of that date exceed 115% of the estimate of all remaining unpaid Allowed MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such Claims,

Reorganized SVCMC may, in its sole discretion, either discontinue payment of such MedMal Trust's Pro Rata Share of the periodic payments it is obligated to make pursuant to the MedMal Trust Funding Schedule and/or Additional Funding Schedule (as applicable) or receive a payment from such MedMal Trust equal to the amount of such excess; provided, however, that prior to Reorganized SVCMC receiving payment from any MedMal Trust on account of such excess, the funds in the MedMal Trust shall be rebalanced in a manner that provides each MedMal Trust with sufficient funds to pay 125% at the 50% Milestone and 115% at the 75% Milestone of all remaining MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such Claims.

(r)     MedMal Collateral/MedMal Liens.

(i)     Each of the MedMal Trusts shall be granted the MedMal Lien to secure all obligations of Reorganized SVCMC to the MedMal Trusts under the Plan payable following the Effective Date, including, without limitation:  (i) payments under the MedMal Trust Funding Schedules, (ii) payments under the Additional Funding Schedule in the event SVCMC or Reorganized SVCMC does not obtain the MedMal Trust Policies, and (iii) Shortfall Payments.  Each MedMal Trust shall be entitled to enforce its MedMal Lien or its rights to payment from Reorganized SVCMC under the Plan if after the MedMal Trustee has provided Reorganized SVCMC with one hundred and twenty (120) days' written notice of the failure of Reorganized SVCMC to make a payment required under the Plan, Reorganized SVCMC has failed to satisfy the obligation.

(ii)     Reorganized SVCMC may monetize the MedMal Collateral at any time provided that Reorganized SVCMC pays to the MedMal Trusts in accordance with each MedMal Trust's Pro Rata Share all net proceeds (after satisfaction of senior liens and transaction costs) from the MedMal Collateral, minus any Shortfall Payments in excess of Reimbursable Costs made by Reorganized SVCMC to the MedMal Trusts. The MedMal Trustee shall not withhold its consent to such a monetization, if and to the extent such consent is required.

(s)     Cooperation with Reorganized SVCMC.  Each MedMal Trustee shall provide Reorganized SVCMC with access to its books and records and be available to answer Reorganized SVCMC's questions relating to MedMal Claims and the finances of the MedMal Trusts.  Reorganized SVCMC shall provide the MedMal Trustees with information necessary to enable the MedMal Trustees to object to MedMal Claims and provide recoveries to holders of Allowed MedMal Claims.

(t)     Distribution of MedMal Trust Assets.

(i)     On the Effective Date and as soon as reasonably practicable after Reorganized SVCMC transfers Cash to a MedMal Trust, the MedMal Trustee shall pay to each holder of an applicable unpaid Allowed MedMal Claim the lesser of (A) an amount of Cash sufficient to pay its Allowed MedMal Claim and any MedMal Interest accrued thereon and (B) its Pro Rata share of Distributable Cash remaining in the MedMal Trust.

(ii)     As soon as reasonably practicable after a MedMal Claim becomes an Allowed Claim, the MedMal Trustee shall pay to the holder of such Claim the lesser of (A) an amount of Cash sufficient to pay its Allowed MedMal Claim and any MedMal Claim Interest accrued thereon and (B) its Pro Rata share of Distributable Cash remaining in the MedMal Trust.

(iii)     If the MedMal Trust Policies have been obtained and at any time after the ninth (9th) Effective Date Anniversary, any MedMal Trust does not possess sufficient Distributable Cash to pay all holders of Allowed MedMal Claims the full Allowed amount of their Claim, the applicable MedMal Trustee shall exercise all of the powers available in its reasonable discretion, to collect from the respective MedMal Trust Policies and, as soon as reasonably practicable after receipt of proceeds from the MedMal Trust Policies, the applicable MedMal Trustee shall transfer to each holder of an unpaid Allowed MedMal Claims the lesser of (A) an amount of Cash sufficient to pay its Allowed MedMal Claim and any MedMal Claim Interest accrued thereon and (B) its Pro Rata portion of Distributable Cash remaining in the MedMal Trust.

(iv)     When all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved and all Allowed MedMal Claims relating to the MedMal Trust have been paid in full, (A) Reorganized SVCMC's obligations to make additional payments to the MedMal Trust shall cease and (B) the applicable MedMal Trustee shall make a final distribution of all remaining assets in the MedMal Trust as described in Section 6.6(t)(v) of the Plan.

(v)     When a MedMal Trust is making a final distribution of the MedMal Trust assets (pursuant to Section 6.6(t)(iv) of the Plan or upon dissolution), the MedMal Trustee shall, after reserving a sufficient amount of Cash to cover the wind-down expenses of the MedMal Trust (including any taxes due thereon), make a distribution of all assets in the MedMal Trust to the remaining MedMal Trusts, if any, in proportion to the estimated unpaid Allowed MedMal Claims of each such MedMal Trust pursuant to the last estimate thereof.  In the event there are no remaining

MedMal Trusts, or if after an estimation paid for by Reorganized SVCMC in its sole discretion it is determined that funds in the remaining MedMal Trusts exceeds 115% of the all remaining MedMal Claims subject to each such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time, then any excess funds in the dissolving MedMal Trust shall be remitted to Reorganized SVCMC, after reserving a sufficient amount of Cash to cover the wind-down expenses of the MedMal Trusts (including any taxes due thereon).

(u)     Any MedMal Trust shall have the ability, but not the obligation, to loan funds to another MedMal Trust up to the amount due from Reorganized SVCMC to the borrower MedMal Trust under the MedMal Trust Funding Schedule on the next Effective Date Anniversary if the lending MedMal Trustee, in it sole discretion, reasonably believes that it has sufficient funds in its MedMal Trust to pay all MedMal Claims of its MedMal Trust that it estimates will be Allowed prior to the next Effective Date Anniversary plus all costs for which such MedMal Trust will be responsible prior to the next Effective Date Anniversary.  The borrower MedMal Trust shall repay, on or prior to the next Effective Date Anniversary, any amounts borrowed from another MedMal Trust.  Additional terms of any such loan shall be negotiated between the respective MedMal Trustees.

(v)     Federal Income Tax Treatment of MedMal Trusts.

(i)     MedMal Trust Assets Treated as Owned by SVCMC.

(A)     Each of the MedMal Trusts is intended to constitute a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

(B)     SVCMC or Reorganized SVCMC shall timely prepare and execute a "grantor trust election" statement for each of the MedMal Trusts pursuant to Treasury Regulation section 1.468B-1(k) to treat each such trust as a trust all of which is owned by SVCMC for applicable federal income tax purposes, and shall, to the extent permitted by applicable law, report consistently therewith for state and local tax purposes (including making any appropriate elections).  Each of the MedMal Trustees in respect of the MedMal Trusts or Reorganized SVCMC, as applicable in accordance with the foregoing Treasury Regulation, shall attach such grantor trust election statement to its timely filed income tax return for the taxable year in which the trust is established.  If the election statement is required to be attached to the trust's tax return,

Reorganized SVCMC shall timely deliver to the respective MedMal Trustee the original executed election statement with respect to such trust.

(ii)    <u>Tax Reporting</u>.

(A)    Each MedMal Trustee shall timely prepare and file all federal, state, local and foreign tax returns and other tax related statements for its respective MedMal Trust treating such trust as a grantor trust in accordance with Treasury Regulation section 1.468B-1(k) and this Section 6.6(v). Before filing any MedMal Trust tax return or statement, the MedMal Trustee shall timely provide copies of such return or statement to Reorganized SVCMC for review and approval.

(B)    The MedMal Trustees shall cooperate with Reorganized SVCMC and any affiliate (including any successor in interest) with respect to the preparation and filing of any tax returns or statements of such person for which information relating to the MedMal Trusts is necessary or appropriate.

(C)    Each MedMal Trustee shall be responsible for payment, out of its respective MedMal Trust Assets, of any taxes imposed on such assets or its respective MedMal Trust.

(D)    Each MedMal Trustee may request an expedited determination of taxes in respect of its respective MedMal Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, such trust for all taxable periods through the dissolution of such trust.

(w)    <u>Dissolution</u>. The respective MedMal Trustees and the MedMal Trusts shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved, and (ii) all distributions required to be made by the MedMal Trustee under the Plan have been made, but in no event shall the MedMal Trusts be dissolved later than the fourteenth (14th) Effective Date Anniversary unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fourteen (14th) Effective Date Anniversary, determines that a fixed period extension is necessary to facilitate or complete the payments to holders

of Allowed MedMal Claims.  Upon dissolution, any remaining assets in a MedMal Trust shall be distributed in accordance with Section 6.6(t)(v) of the Plan.

6.7    Non-Transferability of Rights of Holders of Allowed Claims.  The rights of holders of Allowed Claims to receive payments under the Plan after the Effective Date, including but not limited to on account of the Secured Obligation, the Unsecured Obligation, the GUC Litigation Trust Interest, or from the MedMal Trusts shall not be certificated and are not transferable, except by the laws of descent or distribution or otherwise by operation of law or as part of the sale of substantially all the assets of the holder thereof.

6.8    Pension Plan/PBGC.

(a)    On the Effective Date, the Pension Plan shall be assumed.

(b)    On or before the Effective Date, SVCMC shall make payments totaling $60 million into the Pension Plan or into an escrow account established in cooperation with the PBGC, allocated between the Pension Plan and the escrow account as agreed by SVCMC and the PBGC.  This Effective Date payment shall be attributable to Pension Plan year 2006.

(c)    After the Effective Date, Reorganized SVCMC shall make at least all payments required to be paid to the Pension Plan under ERISA and other applicable law.

(d)    Reorganized SVCMC shall make additional payments to the Pension Plan in accordance with the Litigation Trust Distribution Schedule and/or the Liquidity Event Distribution Schedule, as applicable.

(e)    The PBGC Penalties Claim shall be unimpaired, and the PBGC and SVCMC (and Reorganized SVCMC) reserve all rights with respect to assessing and objecting to the PBGC Penalties Claim.  The PBGC and SVCMC (or Reorganized SVCMC) may enter into an agreement, which shall not be subject to Bankruptcy Court approval if it occurs after the Effective Date, with respect to the PBGC Penalties Claim.  SVCMC and Reorganized SVCMC reserve all rights to pursue claims against and/or seek a recovery from third parties, including the auditors for the Pension Plan, with respect to the PBGC Penalites Claim.

(f)    Except as it relates to the PBGC Penalties Claim, the PBGC Claim shall be disallowed and expunged.

6.9    Intercompany Claims.  All Intercompany Claims are subordinated to payment in full of General Unsecured Claims, the MedMal Claims, and the PBGC Claim.

6.10    DASNY Subordinated Claims.  All DASNY Subordinated Claims are subordinated to General Unsecured Claims, the MedMal Claims, and the PBGC Claim, as provided herein.

6.11     Exit Facility.  On or before the Effective Date, SVCMC or Reorganized SVCMC shall enter into the Exit Facility.  The Exit Facility shall be on terms and conditions substantially similar to the commitment letter that will be filed with the Plan Supplement and approved by the Bankruptcy Court.

6.12     Allocation Method.  On the Effective Date, each of the Other Debtors shall pay Reorganized SVCMC $1 as reimbursement for all costs incurred by SVCMC during the Chapter 11 Cases in respect of all the Other Debtors (including professionals' fees).

6.13     Restricted Assets.  Notwithstanding anything to the contrary herein, the Restricted Assets are not property of the Debtors' estates, shall not be applied to satisfy any Allowed Claim or distribution under the Plan, and shall only be used in furtherance of the use to which they are restricted.

6.14     Closing of the Chapter 11 Cases.  When all Disputed Claims, other than MedMal Claims, against any Debtor have become Allowed or have been disallowed by Final Order, and no controverted matter remains outstanding, Reorganized SVCMC shall seek authority from the Bankruptcy Court to close the applicable Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

6.15     Early Payment.  Nothing herein shall prevent any of the Debtors or Post-Effective Date Debtors from making any payments prior to the date provided for in the Plan, and neither the Debtors nor the Post-Effective Date Debtors shall suffer any penalty or prejudice from making any such payments.

## Article VII.

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

7.1     No Distributions Pending Allowance.  Notwithstanding any other provision herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed.

7.2     Resolution of Disputed Claims.

(a)     Resolution of Disputed Claims other than MedMal Claims. Reorganized SVCMC shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims.  Reorganized SVCMC shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court.  The Bankruptcy Court, for cause, may extend the deadline on the ex parte request of Reorganized SVCMC.  All objections shall

be litigated to a Final Order except to the extent that Reorganized SVCMC elects to withdraw such objection, or Reorganized SVCMC and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

(b)     <u>Resolution of Disputed MedMal Claims</u>.  All MedMal Claims shall be Disputed as of the Effective Date such that no objection to a MedMal Claim is required to be filed.  Reorganized SVCMC shall have the right to the exclusion of all others to make, file, and prosecute objections to MedMal Claims in a forum of appropriate jurisdiction.  All MedMal Claims shall be litigated to a Final Order except to the extent that Reorganized SVCMC and the holder of the Disputed MedMal Claim compromise, settle or otherwise resolve the MedMal Claim, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court or any other court.

(c)     <u>Reserve Accounts for Disputed Claims</u>.

(i)     None of the Post-Effective Date Debtors shall be required to maintain segregated reserve accounts for Disputed Claims; <u>provided</u>, <u>however</u>, that Reorganized SVCMC shall be required to reserve (but not in a formal, segregated account) sufficient Cash for Disputed General Unsecured Claims as set forth in the Plan and the Litigation Trustee shall be required to establish the LT Disputed Claims Reserve.

(ii)     None of the MedMal Trustees shall be required to maintain segregated reserve accounts for Disputed MedMal Claims; however, such MedMal Trustees must reserve sufficient Cash as set forth in the Plan.

7.3     <u>Estimation of Claims</u>.  The Debtors or the Post-Effective Date Debtors may, at any time, request the Bankruptcy Court to estimate any Claim, other than MedMal Claims, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously have objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, other than a MedMal Claim, at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the applicable Post-Effective Date Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

7.4     <u>Allowance of Disputed Claims</u>.  If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, Reorganized SVCMC, the applicable

MedMal Trustee, or the Litigation Trustee shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided herein, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.

7.5     No Distribution in Respect of Disallowed Claims.  To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed.

7.6     Late-Filed Claims.  Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.

## Article VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1     Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtor that is the counterparty thereto, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date and is pending as of the Effective Date, (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.1(A) (executory contracts) or Schedule 8.1(B) (unexpired leases), which Schedules shall be contained in the Plan Supplement, or (iv) that is an executory contract or unexpired lease as to which an Other Debtor, but not SVCMC, is a party; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.1(A) and 8.1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected.  The Debtors shall provide notice of any amendments to Schedules 8.1(A) and 8.1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 8.1(A) or 8.1(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.2     Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which

the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

8.3     Inclusiveness.  Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

8.4     Cure of Defaults.

(a)     Schedule 8.4, which Schedule shall be contained in the Plan Supplement, lists certain executory contracts and unexpired leases the Debtors are intending to assume pursuant to section 365 of the Bankruptcy Code and the Debtors' proposed Cure Amounts for each such lease or contract; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.4 to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, or to amend the Cure Amount listed for any executory contract or unexpired lease.  The Debtors shall provide notice of any amendments to Schedule 8.4 to the parties to the executory contracts and unexpired leases affected thereby.

(b)     With the exception of the executory contracts and unexpired leases listed on Schedule 8.4, the Debtors are not required to make any payment or take any other action in order to satisfy the requirements of section 365(b) of the Bankruptcy Code with regard to all executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan.  The Cure Amounts of any executory contracts or unexpired leases not listed on Schedule 8.1(A), 8.1(B), or 8.4 shall be deemed to be zero, and the exclusion of an executory contract or unexpired lease from Schedule 8.4 shall not affect the status of such executory contract or unexpired lease under Section 8.1 of the Plan.

(c)     The Post-Effective Date Debtors shall pay all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the later to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

(d)     If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtors and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of

the Court or, at the Debtors' sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

(e)     Notwithstanding the above, the Debtors may, at their sole and absolute discretion, determine to reject any executory contract or unexpired lease at any time prior to the later of (i) thirty (30) days after the Effective Date and (ii) thirty (30) days after the entry of a Final Order determining the proper Cure Amount for that contract or lease.  The effective date of a rejection effected pursuant to the preceding sentence shall be the Confirmation Date regardless of the date on which the Debtors give notice of such rejection.

8.5     <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Sections 8.1 or 8.4 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, Reorganized SVCMC, no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, (iii) notice of an amendment to Schedule 8.1(A) or 8.1(B) that results in the rejection of such executory contract or unexpired lease, and (iv) notice of rejection of such executory contract or unexpired lease pursuant to Section 8.4(f) of the Plan.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Post-Effective Date Debtors and their property.

8.6     <u>Insurance Policies</u>.  All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan.  Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

8.7     <u>Compensation and Benefit Programs</u>.  Except as provided in Section 8.1 of the Plan, all savings plans, retirement plans, health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, and other insurance plans are reinstated as of the Effective Date; <u>provided</u>, <u>however</u>, the Pension Plan shall be treated in accordance with the Plan.

8.8     <u>Retiree Benefits</u>.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized SVCMC shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits.

# Article IX.

## EFFECTIVE DATE

9.1 <u>Conditions Precedent to the Effective Date</u>. The following are conditions precedent to the Effective Date of the Plan:

(a) The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth herein, which shall be in form and substance satisfactory to the Debtors;

(b) No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in this Section 9.1 are satisfied or waived;

(c) All documents, instruments and agreements, in form and substance satisfactory to the Debtors, provided for under or necessary to implement the Plan, including but not limited to the MedMal Trust Agreements and the Litigation Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

(d) The Reorganized Articles of Incorporation and Reorganized By-laws shall have been adopted by SVCMC or Reorganized SVCMC;

(e) All of the payments to be made by SVCMC by or on the Effective Date shall have been made or will be made on the Effective Date;

(f) SVCMC shall have sufficient Available Cash such that the Effective Date Cash Distribution is no less than the sum of (x) 80% multiplied by Total Trade Claims plus (y) proceeds, if any, received by the Debtors prior to the Effective Date on account of the sale or other disposition of Miscellaneous Non-Operating Real Property or the Brooklyn/Queens Seller Notes;

(g) SVCMC shall have entered into an Exit Facility providing for a term loan of at least $250 million and an accounts receivable credit line of at least $50 million, and all conditions precedent to funding under the Exit Facility shall have been satisfied; and

(h) SVCMC shall have obtained all governmental and other regulatory approvals or rulings that SVCMC believes, in its reasonable discretion, are necessary for confirmation of the Plan.

9.2 <u>Waiver of Conditions</u>. The Debtors may waive one or more of the conditions precedent to the Effective Date of the Plan set forth in Section 9.1 of the Plan. The Debtors may only waive condition 9.1(f) with the consent of the Creditors' Committee and the Ad Hoc Committee.

9.3     <u>Effect of Failure of Conditions</u>.  In the event that one or more of the conditions specified in Section 9.1 of the Plan have not occurred and have not been waived pursuant to Section 9.2, on or before the date that is 180 days after the Confirmation Date, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the <u>status</u> <u>quo</u> <u>ante</u> as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, and (e) the Debtors' exclusive right to propose a plan of reorganization and solicit votes on that plan of reorganization shall be deemed to have been extended uninterrupted and shall be further extended for an additional 120 days and 180 days respectively from the date the Confirmation Order is vacated pursuant to (a) above.

**Article X.**

**<u>RETENTION OF JURISDICTION</u>**

The Bankruptcy Court shall retain jurisdiction over all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

     (a)     To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

     (b)     To determine any and all adversary proceedings, applications, and contested matters that have been or may be commenced;

     (c)     To hear and determine any objections to or requests to estimate any Claims;

     (d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

     (e)     To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

     (f)     To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(i)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(j)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(k)     To hear any other matter consistent with the provisions of the Bankruptcy Code;

(l)     To hear any matter concerning the Manhattan Real Estate Process;

(m)     To resolve all issues concerning Litigation Claims and Disputed Claims (other than MedMal Claims); and

(n)     To enter a final decree closing these Chapter 11 Cases.

## Article XI.

## EFFECT OF CONFIRMATION OF PLAN

11.1    <u>Vesting of Assets</u>.

(a) As of the Effective Date, the property of each Debtor's estate, including all claims and causes of action against third parties that arose prior to or after the Commencement Date, shall vest in the applicable the Post-Effective Date Debtor or such other entity as provided in the Plan.

(b) From and after the Effective Date, each Post-Effective Date Debtor, each MedMal Trust, and the Litigation Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

(c) As of the Effective Date, all assets of the Post-Effective Debtors shall be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

11.2    <u>Binding Effect</u>.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Equity Interest in the Debtors and their respective

successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

11.3    Discharge. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors and the Post-Effective Date Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Equity Interest in any Debtor or the Post-Effective Date Debtor.

11.4    **Exculpation. The Debtors, the Committees, the DIP Lender, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any person for any act taken or omission, after the Commencement Date, in connection with or related to the Chapter 11 Cases or the operations of the Debtors' businesses during the Chapter 11 Cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

11.5    **Releases.**

(a)    **As of the Effective Date, the Released Parties shall be released by the Debtors and any successors-in-interest of the Debtors from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that any of the Debtors would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim, Equity Interest, Membership Interest, or other person or entity would have been legally entitled to assert on behalf of any of the Debtors or any of their estates, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date, except for acts constituting willful**

misconduct, gross negligence, or bad faith and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Without limiting the generality of the foregoing, to the extent permitted by law, the Debtors and any successors-in-interest of the Debtors shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

(b)      Nothing herein shall be interpreted as in any way compromising the effect or scope of releases under applicable New York State law with respect to MedMal Claims, and all such releases shall be enforceable to the fullest extent of New York State law.

(c)      No provision of the  Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will discharge, release, or relieve any other party, in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The PBGC shall not be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims.

11.6    <u>Injunction</u>.

(a)      All persons or entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against and Equity Interests in the Debtors from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Effective Date Debtors, the Released Parties, or against the property or interests in property of the foregoing, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Post-Effective Date Debtors, the Released Parties, or any of their property, except as contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

**(b)** All Persons are permanently enjoined, on and after the Effective Date, from asserting any Claim (x) which is released by such Person under the Plan or (y) for which the party against whom the Claim is being asserted has received exculpation under the Plan, including: **(i)** commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of such Claim, **(ii)** enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of such Claim, **(iii)** creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of such Claim, **(iv)** asserting any right of setoff, directly or indirectly, against any obligation on account of such claim, **(v)** acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, **(vi)** commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and **(vii)** taking any actions to interfere with the implementation or consummation of the Plan.

**(c)** The automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Sections 11.6(a) and (b) of the Plan shall not apply after the Effective Date to acts by holders of timely filed MedMal Claims to seek payment from the Debtors' insurance companies for or to liquidate the amount of their Claims against the Debtors in a court or administrative body of appropriate jurisdiction, except to the extent that it is determined by a Final Order that the MedMal Claim shall not be Allowed. Notwithstanding the forgoing sentence, holders of MedMal Claims may only be paid on account of their Claims as provided for, and from assets specifically designated for payment of such Claims, under the Plan. Nothing in the Plan shall limit, modify or otherwise impair the rights of holders of timely filed Claims alleged to be for medical malpractice to seek payment for such Claims from the Debtors' insurance policies which cover such Claims, it being the intent of the Plan to leave such timely filed Claims alleged to be for medical malpractice unimpaired unless such Claims become MedMal Claims as defined by the Plan.

11.7    <u>Term of Injunctions or Stays</u>.  Unless otherwise provided, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing of these Chapter 11 Cases.

11.8    <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements

provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

11.9    Retention of Causes of Action/Reservation of Rights.

(a)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Post-Effective Date Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code and (iii) the turnover of any property of the Debtors' estates.

(b)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Debtors and the Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such Claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Post-Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)    Except as expressly provided in the Plan, each of the Post-Effective Date Debtors shall, after the Effective Date, retain the rights to bring any causes of action that could have been brought by the respective Debtors at any time, including, without limitation, any Litigation Claims, provided that the Litigation Claims shall be prosecuted as set forth in the Plan.

(d)    Notwithstanding anything to the contrary contained in this Article XI, none of its exculpation, release or injunctive provisions shall apply or provide any benefit to the Litigation Parties.

11.10    Section 506(c) Reservation.  The Debtors and the Post-Effective Date Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

11.11   Chapter 5 Reservation.  Without limiting Section 11.9 above, the Debtors and the Post-Effective Date Debtors reserve all rights under chapter 5 of the Bankruptcy Code.

## Article XII.

## MISCELLANEOUS PROVISIONS

12.1   Effectuating Documents and Further Transactions.  Upon entry of the Confirmation Order, each of the Debtors, the Post-Effective Date Debtors, and the MedMal Trustees shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.2   Payment of Statutory Fees.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Reorganized SVCMC.  Any such fees accruing after the Confirmation Date also shall be paid by Reorganized SVCMC.

12.3   Modification of Plan.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

12.4   Withdrawal or Revocation.  The Debtors may withdraw or revoke the Plan as to any Debtor at any time prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

12.5   Dissolution of the Committees.  On the Effective Date, the Committees shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Committees' attorneys, accountants, and other agents shall terminate.

12.6    Exemption from Transfer Taxes.  Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any disposition of assets contemplated by the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

12.7    Severability.  In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Committees, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

12.8    Governing Law.  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

12.9    Courts of Competent Jurisdiction.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

12.10    Plan Supplement.  The documents comprising the Plan Supplement shall be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' bankruptcy counsel or on the website of the Debtors' claims agent (www.bsillc.com).

12.11    Headings.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

12.12  Exhibits/Schedules.  All Exhibits and Schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

12.13  Plan Controls Disclosure Statement; Confirmation Order Controls Plan. To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling.  To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order shall be controlling.

12.14  Filing of Additional Documents.  On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.15  Successors and Assigns.  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of the heirs, executors, administrators, successors, and/or assigns of such person.

12.16  Tax-Exempt Status.  Nothing in the Plan shall adversely affect, or be interpreted to be inconsistent with, the tax-exempt status of SVCMC.

12.17  Notices.  Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A
SAINT VINCENT CATHOLIC MEDICAL CENTERS
130 W. 12th Street
Martin Payne, 1G
New York, New York  10011
(212) 604-2300
Attn:   Chief Executive Officer and General Counsel

*with copies to the Debtors' bankruptcy counsel*:

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
Attn:   Deryck A. Palmer, Esq. and John J. Rapisardi, Esq.

100 Federal Street, 34th Floor
Boston, Massachusetts 02110

(617) 772-8300
Attn:  Andrew M. Troop, Esq.

*with copies to the MedMal Trustees:*

MedMal-BQ Trustee
(Name and Address
 to be included in
 Plan Supplement)

MedMal-MW Trustee
(Name and Address
 to be included in
 Plan Supplement)

MedMal-SI Trustee
(Name and Address
 to be included in
 Plan Supplement)

*with copies to the MedMal Trust Monitor:*

MedMal Trust Monitor
(Name and Address
 to be included in
 Plan Supplement)

*with copies to the Litigation Trustee:*

Litigation Trustee
(Name and Address
  to be included in
  Plan Supplement)

Dated: New York, New York
       February 9, 2007

                    SAINT VINCENTS CATHOLIC MEDICAL
                       CENTERS OF NEW YORK D/B/A SAINT
                       VINCENT CATHOLIC MEDICAL CENTERS
                    CMC PHYSICIAN SERVICES, P.C.
                    CMC RADIOLOGICAL SERVICES P.C.
                    CMC CARDIOLOGY SERVICES P.C.
                    MEDICAL SERVICE OF ST. VINCENTS
                       HOSPITAL AND MEDICAL CENTER, P.C.
                    SURGICAL SERVICE OF ST. VINCENTS, P.C.

                  By:     /s/ Guy Sansone
                         Guy Sansone
                         Chief Executive Officer