**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT PURSUANT TO**
**SECTION 1125 OF THE BANKRUPTCY CODE FOR FIRST AMENDED CHAPTER 11**
**PLAN OF REORGANIZATION FOR SAINT VINCENTS CATHOLIC MEDICAL**
**CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL**
**CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION FOR MEDICAL SERVICE**
**OF ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, P.C., SURGICAL**
**SERVICE OF ST. VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC**
**PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.**

Note:
THE DEBTORS AND THE TORT CLAIMANTS' COMMITTEE BELIEVE THAT ACCEPTANCE OF THE PLANS OF REORGANIZATION AND LIQUIDATION DESCRIBED IN THIS DOCUMENT ARE IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, THEIR CREDITORS AND ALL OTHER PARTIES IN INTEREST. ACCORDINGLY, THE DEBTORS RECOMMEND AND URGE THAT YOU **VOTE** **IN** **FAVOR** OF THOSE PLANS.

**Cadwalader, Wickersham & Taft LLP**
**One World Financial Center**
**New York, New York 10281**
**(212) 504-6000**
**Attorneys for the Debtors and**
**Debtors in Possession**

Dated:  June 5, 2007

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**
**ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A**
**DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY**
**COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR**
**APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS, AND CHAPTER 11 PLANS OF LIQUIDATION FOR MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C. (COLLECTIVELY, THE "PLAN").  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ ALL OF THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  A COPY OF THE PLAN IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT (AS DEFINED BELOW).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

## I.    INTRODUCTION

### A.    Narrative Summary of SVCMC's Plan of Reorganization and of the Other Debtors' Plans of Liquidation

Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers ("SVCMC"), Medical Service of St. Vincent's Hospital and Medical Center, P.C. ("MS-SVH"), Surgical Service of St. Vincent's, P.C. ("SSSV"), CMC Cardiology Services P.C. ("CMC-CS"), CMC Physician Services P.C. ("CMC-PS"), and CMC Radiology Services P.C. ("CMC-RS," and with SVCMC, MS-SVH, SSSV, CMC-CS, CMC-PS, and CMC-RS, the "Debtors") each submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against all of the Debtors, to holders of Equity Interests in the Debtors other than SVCMC and to the sponsors of SVCMC.[1]  The Debtors have prepared this Disclosure Statement to be able to solicit votes with respect to the chapter 11 plan of reorganization of SVCMC, and the chapter 11 plans of liquidation of MS-SVH, SSSV, CMC-CS, CMC-PS, and CMC-RS (collectively, the "Plan"), they originally filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on February 9, 2007 and amended on June 1, 2007.  For the reasons described in greater detail below, the Debtors filed petitions under chapter 11 of the Bankruptcy Code on July 5, 2005 (the "Commencement Date").

**UNLESS OTHERWISE DEFINED, ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

Generally, the Plan provides for (a) the reorganization of SVCMC and (b) the liquidation of the five other debtors (the "Other Debtors") in these jointly-administered cases. The operating assets of three of the Other Debtors were sold during the cases.[2]  Although the Debtors' cases have been jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective estates.  Thus, the Plan is really six distinct chapter 11 plans, one for each of the Debtors.  However, because some of the procedural provisions of the Plan are the same for each Debtor, and to save the Debtors' estates the costs of the duplicative efforts that would be involved in drafting and soliciting approval of six separate chapter 11 plans and disclosure statements, the Debtors are submitting a

---

[1] As described below in Section II, there are no holders of Equity Interests in SVCMC for bankruptcy purposes. SVCMC is a nonprofit, charitable corporation organized under the laws of the State of New York, and no one owns its residual economic interest above liabilities, if any.  Instead, SVCMC has "sponsors," who have retained certain powers over the governance of SVCMC in accordance with state law.  New York Not For Profit Corporation Law § 601.

[2] The Court entered an order on December 21, 2006, dismissing the chapter 11 case of CMC Occupational Health Services P.C. ("CMC-OHS"), conditioned upon the assumption by SVCMC and assignment to Caritas Health Care, Inc. ("Caritas") of an agreement (the "Shareholder Agreement") between SVCMC and Dr. Neil Mandava, the sole shareholder of CMC-OHS, pursuant to which SVCMC controlled CMC-OHS.  See Chapter 11 Case No. 05-14950 (ASH), Docket No. 6.  The assumption by SVCMC and assignment to Caritas of the Shareholder Agreement was effectuated on January 1, 2007, and as a result, the chapter 11 case of CMC-OHS has been dismissed.

single Plan and Disclosure Statement for all Debtors.  Accordingly, the Plan generally applies to all of the Debtors, except where otherwise indicated.

1. *The SVCMC Plan of Reorganization*

The Plan provides for the reorganization of SVCMC and its successful emergence from chapter 11.  The Plan provides for the payment in full over time of all allowed claims against SVCMC if various assets are liquidated successfully and certain assumptions about, among other things, the amount of allowed claims prove to be accurate.  Under the Plan, the President of the congregation of the Sisters of Charity, ex officio, and the Most Reverend Bishop of the Diocese of Brooklyn, ex officio, will remain Reorganized SVCMC's members.

The following summarizes the Plan's major features and key assumptions for SVCMC's various creditor groups:

Medical Malpractice Claims

During its chapter 11 case, SVCMC obtained various outside professional estimates of its potential liability for prepetition medical malpractice claims, net of available third-party commercial insurance for those claims.[3]  These estimates suggest that SVCMC's liability for timely filed medical malpractice claims is between approximately $77 million and $116 million. In light of these estimates, the Plan contemplates the payment in full of all timely filed proofs of claim asserting medical malpractice liability for which SVCMC is liable either directly or vicariously based on medical malpractice committed by its employees or other healthcare professionals, as and when each such medical malpractice claim becomes an allowed claim.  The Plan further contemplates that if a medical malpractice claim cannot be paid in full within 30 days of when it becomes an allowed claim, it will accrue interest until paid in full.

The Plan provides that, subject to a more favorable resolution of medical malpractice claims than contemplated by the estimates of SVCMC's liability which could reduce or limit its funding obligations, Reorganized SVCMC will fund an aggregate of approximately $173 million in cash into three separate trusts (the MedMal Trusts) to cover its estimated liability for medical malpractice claims, as well as to cover the costs associated with liquidating those claims in an amount of up to $3 million annually (to the extent those costs are not otherwise covered by third-party commercial insurance).  The MedMal Trusts correspond to the three regions in which SVCMC operated prior to the commencement of its chapter 11 case:  Manhattan/Westchester, Brooklyn/Queens and Staten Island.

---

[3] As discussed below in more detail, over two hundred parties filed motions seeking relief from or modification of the automatic stay to proceed with the prosecution of their medical malpractice claims in state court.  With limited exceptions, the Debtors objected to each of these motions in favor of a more systematic approach to these claims. The Debtors, in consultation with the Tort Claimants' Committee, agreed on a systematic approach whereby holders of medical malpractice claims who both filed requests for stay relief and timely filed proofs of claim could liquidate their claims in state court, but not collect on those claims, once liquidated, from any source absent further Bankruptcy Court order.  The order that confirms the Plan, once entered, will act as the order that authorizes holders of medical malpractice claims to liquidate, collect on account of, or otherwise resolve such claims in accordance with the Plan.

Initially, each region's MedMal Trust will be funded from the prepetition self-insurance trust that SVCMC had maintained for operations within that or otherwise associated with that region, from a pro rata share of a $5 million cash contribution by SVCMC that will be allocated among the MedMal Trusts based on the estimated aggregate liability of SVCMC for medical malpractice claims in each region, and from potential amounts of Available Cash on the Effective Date in excess of benchmark distributions to General Unsecured Creditors under the Plan.  As a result, approximately $50 million of the $173 million in cash to be contributed in the aggregate to all of the MedMal Trusts will be funded on the Effective Date of the Plan.  The balance will be funded over no more than the next 9 years in accordance with the following funding schedule (the Funding Schedule):

| Effective Date Anniversary | Funding Amount |
| --- | --- |
| First (1st) | $10 million |
| Second (2nd) | $10 million |
| Third (3rd) | $10 million |
| Fourth (4th) | $15 million |
| Fifth (5th) | $15 million |
| Sixth (6th) | $15 million |
| Seventh (7th) | $15 million |
| Eighth (8th) | $15 million |
| Ninth (9th) | $18 million |

The Funding Schedule can be accelerated under certain circumstances.  First, if certain targets for payments to general unsecured creditors as described below are exceeded, then additional payments will be made to the MedMal Trusts that will be applied to reduce the then-last-due of the future payments under the Funding Schedule.  Second, if the assets in the MedMal Trusts are insufficient to pay then-allowed medical malpractice claims in full, Reorganized SVCMC must make accelerated cash payments to the MedMal Trusts in an aggregate amount not to exceed $25 million to cover those allowed claims.  Third, if after the accelerated payment of this $25 million the assets in the MedMal Trusts are still insufficient to pay then-allowed medical malpractice claims in full, Reorganized SVCMC will be required to make payments to the MedMal Trusts but only to the extent that the MedMal Trusts have accrued and paid (a) the costs of defending medical malpractice claims, (b) interest paid on allowed medical malpractice claims, (c) insurance premiums for MedMal Trust Policies as defined below, and (d) reasonable fees and expenses of the MedMal Trusts and of the trustees of the MedMal Trusts.

Furthermore, if at the end of the 9-year Funding Schedule, medical malpractice claims have not been paid in full and certain threshold amounts are not in the MedMal Trusts to cover SVCMC's potential liability for those claims, Reorganized SVCMC will contribute approximately another $25 million to the MedMal Trusts over five years (the Supplemental Funding Schedule).  Payments under the Supplemental Funding Schedule will be made from Reorganized SVCMC's operations or through the purchase of insurance or another financial instrument (the MedMal Trust Policies) if the cost of doing so is reasonable in the opinion of SVCMC.

One or more MedMal Trust Monitors, selected by the Tort Claimants' Committee and reasonably acceptable to SVCMC, will monitor the operations of the MedMal Trusts. The MedMal Trust Monitor(s) will, among other things, monitor the contributions from Reorganized SVCMC, be available to answer questions from holders of MedMal Claims, enforce the payment obligations of Reorganized SVCMC to the MedMal Trusts, enforce the MedMal Lien, oversee the refinancing or other disposition of the MedMal Collateral, enforce the cap on the MedMal Defense Costs and perform other duties as set forth in the Plan.

Each MedMal Trust will be responsible only for medical malpractice claims arising from its corresponding region, and no holder of a medical malpractice claim will be able to collect on its claim other than from the assets contributed to, or otherwise required to be contributed to, that MedMal Trust under the Plan. Holders of medical malpractice claims will not be entitled under any event to recover on such claims from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal Trusts. The payment of medical malpractice claims will occur as such claims are allowed, subject to availability of sufficient funds provided by Reorganized SVCMC under the Plan. Consequently, if medical malpractice claims ultimately are allowed in aggregate amounts that exceed all of the funding promised by Reorganized SVCMC, there may not be sufficient funds to pay all medical malpractice claims, in whole or in part, which are allowed later in time. For the reasons set forth above, however, SVCMC anticipates that the MedMal Trusts will have sufficient assets ultimately to pay all allowed medical malpractice claims. Reorganized SVCMC's obligations to make payments to the MedMal Trusts will be secured by second liens on certain real property in Westchester County and its "Staff House" in Manhattan.

The allowed amount of a medical malpractice claim will be fixed either by agreement of the claimant and Reorganized SVCMC or through the litigation process most likely in state court (but in no event in the Bankruptcy Court).

SVCMC intends through the Plan to leave unaffected the availability of third-party commercial insurance to satisfy timely filed medical malpractice proofs of claim and for the payments from the MedMal Trusts to be applied against any deductible, self-insured retention, self-insured layer of insurance, interaggregate deductible or the like in order to satisfy any such payment prerequisite by SVCMC so as to make such third-party commercial insurance available to holders of allowed MedMal Claims in accordance with its terms.

<u>General Unsecured Claims</u>

Holders of general unsecured claims (other than medical malpractice claims) will receive up to 100% of the allowed amount of their claims from potentially five sources: 1) the Effective Date Cash Distribution; 2) the Secured Obligation; 3) the Unsecured Obligation; 4) the proceeds from the Litigation Trust; and 5) the Liquidity Events.  SVCMC estimates that General Unsecured Claims ultimately will be allowed in the amount of approximately $190 million. [4]

*The Effective Date Cash Distribution*

First, holders of allowed General Unsecured Claims will receive a distribution based on "Available Cash" calculated as of the Effective Date of the Plan and recalculated under certain circumstances as of the first anniversary of the Effective Date (the "Effective Date Cash Distribution").  The Effective Date Cash Distribution as of the Effective Date must be equal to at least (a) 80% (and can be as great as 93%) of the estimated allowed amount of General Unsecured Claims for SVCMC if the Effective Date is on or before August 29, 2007 or (b) 75% (and can be as great as 93%) of the estimated allowed amount of General Unsecured Claims for SVCMC if the Effective Date is after August 29, 2007 to emerge from chapter 11 (although this condition can be waived by the Creditors' Committee and the Ad Hoc Committee) based on the amount of Available Cash actually available as of the Effective Date.  In the event that the Effective Date Cash Distribution does not produce at least an 80% distribution based on the estimated amount of allowed General Unsecured Claims, Reorganized SVCMC must pay the holders of allowed General Unsecured Claims the difference (the Deferred Effective Date Payment) by December 15, 2007.  The Deferred Effective Date Payment will be funded from one of two sources: (i) Reorganized SVCMC's operating cash or (ii) the proceeds of the sale by Reorganized SVCMC of Bayley Seton.  To the extent that Available Cash on the Effective Date would produce a distribution in excess of 85% for holders of allowed General Unsecured Claims, half of that excess will be paid as an advanced payment under the Funding Schedule for the MedMal Trusts and the remaining half will paid to holders of allowed General Unsecured Claims.

Available Cash is all of SVCMC's cash as of the Effective Date other than (a) restricted grants and gifts, (b) $15 million for operations, (c) amounts required to be paid on the Effective Date pursuant to the Plan, including $5 million for contribution to the MedMal Trusts, $1 million to be given to the Litigation Trust, and $250,000 to be loaned to the Litigation Trust, and (d) reserves for accrued and unpaid administrative costs and expenses.  The supplement to Available Cash on the first Effective Date Anniversary addresses potential fluctuations to Available Cash had, for example, all claims been resolved on the Effective Date or had the liquidation of all of the Other Debtors been completed on the Effective Date.  At SVCMC's discretion, amounts available under its contemplated revolving line of credit can be used to supplement Available Cash and other payments required on the Effective Date, though it is not currently SVCMC's intent to exercise that discretion.

---

[4] A Trade Claims Monitor will be selected to monitor or enforce the payment obligations on behalf of Reorganized SVCMC with respect to and on behalf of all holders of the Secured Obligation (including the Deferred Effective Date Payment, if any) and the Unsecured Obligation.

*The Secured Obligation*

Second, to the extent that the Effective Date Cash Distribution does not produce at least an 85% distribution based on the estimated amount of allowed General Unsecured Claims, Reorganized SVCMC will pay the holders of allowed General Unsecured Claims the difference, plus interest from the Effective Date at a rate equal to Reorganized SVCMC's costs of funds under its contemplated post-Effective Date term loan compounded annually, within five years (the Secured Obligation). The Secured Obligation will include the Deferred Effective Date Payment, if any. SVCMC's obligations under the Secured Obligation will be secured by a limited number of assets (the Secured Obligation Collateral), the value of which may or may not equal or exceed the amount of the Secured Obligation. These assets include (a) the Bayley Seton Campus, (b) various other pieces of real property in Staten Island and Brooklyn which SVCMC previously has identified as being up for sale, (c) accounts receivable relating to services provided by the hospitals in Queens and Staten Island that were sold during the chapter 11 case but which accounts receivable were not transferred to the purchasers of those hospitals, to the extent collected after the Effective Date, (d) the purchase money notes issued by the purchaser of the hospitals in Queens and other security provided by that purchaser to secure various obligations to SVCMC, (e) SVCMC's interest, if any, in a joint escrow account established with the Dormitory Authority of the State of New York pending the resolution of certain disputes, (f) cash reimbursements, if any, owed to SVCMC as of the Effective Date, by certain non-debtor affiliates of SVCMC (i.e., Bishop Mugavero, Holy Family and Saint Elizabeth Ann's) and (g) the pool of bad debt receivables sold pursuant to a transaction approved during the chapter 11 case that may be reversed pending a secondary sale, but only to the extent reversed prior to the Effective Date, and not re-consummated prior to the Effective Date. Reorganized SVCMC is required to make certain prepayments on the Secured Obligation when and if (i) items included in the Secured Obligation Collateral are liquidated, (ii) Reorganized SVCMC is relieved of certain indemnity obligations owed to the purchaser of the Queens hospitals, (iii) any of the "Liquidity Events" described below occurs, (iv) allowed medical malpractice claims are paid in full before all payments are made under the Funding Schedule, or (v) a Change of Control. In addition, the Litigation Trust shall make payments on the Secured Obligation in accordance with the Litigation Distribution Schedule.

*The Unsecured Obligation*

Third, to the extent that the aggregate estimated distribution based on the Effective Date Cash Distribution and the Secured Obligation is less than 93%, Reorganized SVCMC will pay the holders of allowed General Unsecured Claims the difference, plus interest from the Effective Date at a rate equal to 8% annually, within seven years (the Unsecured Obligation). Reorganized SVCMC is required to make certain prepayments on the Unsecured Obligation when and if (a) there are certain recoveries on litigation claims as described below, (b) either of the "Liquidity Events" described below occurs, or (c) allowed medical malpractice claims are paid in full before all payments are made under the Funding Schedule. In addition, (a) the Litigation Trust shall make payments on the Unsecured Obligation in accordance with the Litigation Distribution Schedule and (b) the distribution of the Post-Effective Date Available Cash Reconciliation Account may result in payments on the Unsecured Obligation.

*The Litigation Claims*

Fourth, each holder of an allowed General Unsecured Claim will receive a beneficial interest (the GUC Litigation Trust Interest) in a Litigation Trust to fund payment of the final 7% of each allowed General Unsecured Claim, plus interest on that amount at the rate of 8% compounded annually.  The GUC Litigation Trust Interest will be paid (a) from recoveries on certain litigation claims (the Litigation Claims) that will be brought against certain of SVCMC's prepetition and post-petition advisors and professionals (the Litigation Parties) but only to the extent those recoveries exceed the cost and expense of pursuing those Litigation Claims not covered by an initial grant from Reorganized SVCMC of $1 million and a $250,000 loan from Reorganized SVCMC that will accrue interest at the rate of 8% compounded annually, and (b) to a limited extent from certain other sources as described below.  The Litigation Parties include McDermott Will & Emery LLP, the Debtors' original counsel in these chapter 11 cases; Huron Consulting Services LLC (one of the Debtors' financial advisors) and Huron Consulting Group LLC and their successors in interest (collectively, "Huron LLC") and certain of their affiliates, including, but not limited to, Huron Consulting Group Inc. ("Huron Inc."); Speltz & Weis LLC, the Debtors' former turnaround consultants; various individuals associated with each of the forgoing; David Speltz, SVCMC's former chief executive officer and a director; and Tim Weis, SVCMC's former chief financial officer.  The Litigation Claims will be pursued by the Litigation Trust.  The Litigation Trust will be run by a Litigation Trustee under the supervision of a governing board of three representatives of holders of General Unsecured Claims.

If the recoveries on Litigation Claims exceed the amount required to pay the cost and expense of pursuing those Litigation Claims not covered by the Reorganized SVCMC's grant of $1 million and to repay the $250,000 loan (plus interest), and are sufficient to pay the remaining unpaid amount of the GUC Litigation Trust Interest, then the balance will be applied as follows: first, half to pay down the Secured Obligation until paid in full and half to pay down in advance the then-last-due of the future payments due under the Funding Schedule; second, half to pay down the Unsecured Obligation until paid in full and half to pay down in advance the remaining then-last-due of the future payments due under the Funding Schedule; third, to pay amounts due under the Funding Schedule until paid in full (or the obligation to fund ceases); and fourth, to SVCMC's ERISA-qualified pension plan.

Although as a general matter, the GUC Litigation Trust Interest will be satisfied from recoveries on Litigation Claims, under certain limited circumstances the holders of Allowed General Unsecured Claims will be able to recover the greater of, but not both of (a) up to 2/7 of the GUC Litigation Trust Interest directly from Reorganized SVCMC if (i) all allowed medical malpractice claims have been paid in full, (ii) there remain only a very limited number of disputed medical malpractice claims and (iii) there are more than sufficient assets in the MedMal Trusts to address that limited number of disputed medical malpractice claims, and (b) up to 1/7 of the GUC Litigation Trust Interest from an extraordinary result obtained upon the sale of certain of SVCMC's real estate in Manhattan as discussed in the "Liquidity Events" summary below.

*The Liquidity Events*

Fifth, in the circumstances described below, Reorganized SVCMC will make accelerated payments to various creditors based upon achieving better than expected results under its business plan.

A.    Manhattan Real Estate

If Reorganized SVCMC is able to realize more than either (a) $400 million in gross proceeds on the disposition of its real property east of 7th Avenue on West 12th Street in Manhattan (other than the Martin Payne Building located at 130 West 12th Street) or (b) $175 million in gross proceeds on the disposition of its real property west of 7th Avenue on West 12th Street in Manhattan, then Reorganized SVCMC will distribute any such excess as follows so long as there are amounts outstanding with respect to either the Unsecured Obligation or the GUC Litigation Trust Interest (unless 2/7 of the GUC Litigation Trust Interest has been paid as described above):

- first, to the MedMal Trusts until the funded amount to the MedMal Trusts as compared to the aggregate of allowed and estimated amounts of allowed medical malpractice claims expressed as a percentage equals or exceeds the amount paid to the holders of General Unsecured Claims as compared to the allowed or estimated allowed amount of General Unsecured Claims expressed as a percentage; and

- second, (x) 45% to the MedMal Trusts, (y) 27.5% to the Pension Plan for current and then future year funding requirements and (z) 27.5% to (i) the Litigation Trust until such time as 1/7 of the GUC Litigation Trust Interest shall have been paid and thereafter (ii) to holders of Allowed General Unsecured Claims in satisfaction of the Secured Obligation and thereafter (iii) to holders of Allowed General Unsecured Claims in satisfaction of the Unsecured Obligation.

B.    Sale of All or Substantially All of Reorganized SVCMC's Assets That is Not a Manhattan Real Estate Liquidity Event

If Reorganized SVCMC sells all or substantially all of its assets (through a transaction or series of transactions that does not constitute a Manhattan Real Estate Liquidity Event), then it will distribute the net proceeds from such transaction (an Acceleration Event) as follows, so long as there are amounts outstanding with respect to the Unsecured Obligation:

- first, to the MedMal Trusts until the funded amount to the MedMal Trusts as compared to the estimated amount of allowed medical malpractice claims expressed as a percentage equals or exceeds the amount paid to the holders of General Unsecured Claims as compared to the allowed or estimated allowed amount of General Unsecured Claims expressed as a percentage; and

- second, (x) 45% to the MedMal Trusts, (y) 27.5% to the Pension Plan for current and then future year funding requirements and (z) 27.5% to (i) holders of Allowed

General Unsecured Claims in satisfaction of the Secured Obligation and thereafter (iii) to holders of Allowed General Unsecured Claims in satisfaction of the Unsecured Obligation.

C.     Excess Cash

Provided that its post-petition exit lender (or subsequent senior lender) does not object, Reorganized SVCMC will distribute "Excess Cash" (w) 50% to the post-petition exit lender (or subsequent senior lender) as a prepayment under the Exit Facility, (x) 22.5% to the MedMal Trusts in accordance with respective their Pro Rata Shares, (y) 13.75% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 13.75% to holders of Allowed General Unsecured Claims against SVCMC and applied only to the Secured Obligation (principal first and then interest) and then to the Unsecured Obligation (principal first and then interest) until paid in full.  Excess Cash is the cash, if any, that exceeds by more than $15 million post-Effective Date projections attached to the Disclosure Statement for Reorganized SVCMC's "free cash" after debt service, expenses and capital expenditures and reserves, measured at the end of each year on audited basis.  So, by way of example only, if Reorganized SVCMC's free cash at the end of year one was predicted to be $2 million in the projections, but in fact, based on a year-end audit, it turned out to be $20 million, then $3 million would qualify as Excess Cash, provided, however, that if the amount owing to its post-petition exit lender (or subsequent senior lender) is not less than four times Reorganized SVCMC's EBIDA as reflected in the audited financial statements for the fiscal year, Excess Cash will equal $0.

Pension Plan

The Pension Plan will be assumed and benefits under the Pension Plan are anticipated to continue uninterrupted.  Reorganized SVCMC will make certain predetermined payments to the Pension Plan, which payments will be increased to cover any minimum funding requirements under ERISA.  In 2007, SVCMC and/or Reorganized SVCMC will pay approximately $75 million to the Pension Plan which payment will be credited against future minimum funding requirements for the Pension Plan.

Union Contracts

As a general matter, during the course of the Chapter 11 Case, SVCMC has renegotiated most if not all of its collective bargaining agreements.  SVCMC intends to assume these collective bargaining agreements as renegotiated on the Effective Date of the Plan.

Insurance Policies

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

The Debtors will be assuming their hospital professional liability (or medical malpractice) insurance policies under the Plan as necessary to make those policies and the proceeds thereof available to holders of timely filed Claims alleging medical malpractice to the extent such insurance policy otherwise covers a timely filed Claim alleging medical malpractice.

Other Executory Contracts

Under the Plan, unless an executory contract or unexpired lease is scheduled to be rejected, or is subject to a separate motion for rejection under section 365 of the Bankruptcy Code, that executory contract or unexpired lease shall be deemed to be assumed upon the Effective Date of the Plan subject to the fixing of any monetary "cure" payment in an amount acceptable to Reorganized SVCMC.

Secured Claims

If SVCMC and/or Reorganized SVCMC does not satisfy a secured claim on the Effective Date, then under the Plan that secured claim will be reinstated or satisfied through the return of collateral at SVCMC's option. Certain holders of secured claims or asserted secured claims and SVCMC have reached agreement with respect to their secured claims. These agreements either are embodied in the Plan or are or will be the subject of separate motions and/or stipulations before the Bankruptcy Court.

Releases

But for the Litigation Claims against the Litigation Parties, the Plan provides that any and all claims which could be brought against officers or directors of SVCMC and others involved in the reorganization process, by, through or related to SVCMC and the other Debtors, are to be released.

2.    *The Other Debtors' Liquidating Plans*

Each of the Other Debtors will be liquidated. Reorganized SVCMC will administer the liquidation of the Other Debtors and oversee the distribution of their assets to their respective creditors in the order of the priority of their claims as set forth in the Bankruptcy Code. To the extent that the liquidated value of any of the Other Debtors exceeds the amount required to pay its creditors in full, that excess will be paid over to Reorganized SVCMC, as any distribution that the holder of an Equity Interest in an Other Debtor might otherwise have received will be paid over to Reorganized SVCMC in accordance with existing agreements between SVCMC and holders of those Equity Interests. Upon the completion of the liquidation process, each Other Debtor will be dissolved.

**B.    Purpose, Limitations and Structure of this Disclosure Statement**

The purpose of this Disclosure Statement is to provide the holders of Claims against all Debtors and the holders of Equity Interests in the Other Debtors with adequate information to make an informed decision as to whether to accept or reject the Plan.  This

Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any other case or any bankruptcy or non-bankruptcy proceeding involving any of the Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On [June 5], 2007, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in this Disclosure Statement generally are made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement after that date does not mean that the information set forth in this Disclosure Statement remains unchanged since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement. The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information available to them. No audit of the financial information contained in this Disclosure Statement has been conducted. Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward-looking statements will turn out to be true.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The Plan is a legally binding arrangement and should be read in its entirety. No one should rely on a summary of the Plan in determining whether to accept or reject the Plan. Each holder of an impaired Claim or Equity Interest should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

The Disclosure Statement describes:

- background information on the Debtors, their prepetition businesses and finances, and the events leading to these cases (Section II);

- significant developments during these cases (Section III);

- the Debtors' proposed Plan (Section IV);

- the procedures and requirements for confirming the Plan (Section V);

- certain federal income tax consequences of the Plan (Section VI);

- certain risk factors to consider before voting on the Plan (<u>Section VII</u>);

- alternatives to confirmation and consummation of the Plan (<u>Section VIII</u>); and

- the Debtors' recommendation that holders of impaired Claims and Equity Interests vote to accept the Plan (<u>Section IX</u>).

In addition, attached as Exhibits 1 through 6 to this Disclosure Statement are copies of the following documents:

| | |
|---|---|
| Exhibit "1" | The Plan |
| Exhibit "2" | Claims Summary |
| Exhibit "3" | Debtors' Liquidation Analysis |
| Exhibit "4" | Debtors' Projected Financial Information |
| Exhibit "5" | GE Commitment Letter |
| Exhibit "6" | Professional Fees and Expenses |

All of the exhibits listed should be attached to this Disclosure Statement and should have been served on you with this Disclosure Statement.  In addition, there are certain documents and other materials identified in this Disclosure Statement and/or the Plan that are not attached to the Disclosure Statement or the Plan.  These documents or other materials will be contained in the Plan Supplement.  The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by reviewing the website of the Debtors' claims agent (www.bsillc.com) or by sending a written request to the Debtors at the following address:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
(212) 504-6000
Attorneys for the Debtors and
Debtors in Possession
Attn: Andrew M. Troop, Esq.
Admitted *pro hac vice* in these cases

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorney listed above by mail or by phone.

C.    **Voting on the Plan**

The Disclosure Statement Order also approved procedures governing the solicitation of votes on the Plan by holders of Claims against the Debtors, and Equity Interests in the Debtors other than SVCMC.[5]

1.    *Classes Entitled to Vote*

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Equity Interests that are members of a Class that is (a) impaired under section 1124 of the Bankruptcy Code (an "Impaired Class") and (b) not deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject the Plan. Classes of Claims or Equity Interests that are unimpaired under section 1124 of the Bankruptcy Code are deemed to have accepted the Plan and are not entitled to vote. Classes of Claims or Equity Interests in which the holders of Claims or Equity Interests will receive no recovery under the Plan are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Under the Plan, Classes 2-2, 3, 4, 5, 6, 8, A3-4, B3-4, C3-4, D3-4, and E3-4 are impaired and, to the extent Claims and Equity Interests in those Classes are Allowed, the holders of those Claims or Equity Interests will receive distributions under the Plan. As a result, holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan. In contrast, Classes 1, 2-1, 2-3, 2-4, 2-5, 7, 9, A1-2, B1-2, C1-2, D1-2, and E1-2 of the Plan are unimpaired. Consequently, holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Only holders of record of Claims or Equity Interests as of [June 5, 2007], the date of the entry of the order approving this Disclosure Statement, that otherwise are entitled to vote under the Plan, will receive a Ballot and may vote on the Plan.

A Ballot which may be used to vote for the acceptance or rejection of the Plan has been sent to the holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan with this Disclosure Statement.

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and you did not receive a Ballot with this Disclosure Statement, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Bankruptcy Services LLC at (888)-498-7764 (Toll Free).

---

[5] From this point forward in the Disclosure Statement, the phrase "holders of Claims" or "Allowed Claims" shall refer to holder of Claims or Allowed Claims against any or all of the Debtors. The phrase "holders of Equity Interests," however, shall mean only the holders of Equity Interests in the Debtors other than SVCMC. As noted in footnote 1 above, no one holds Equity Interests in SVCMC.

2.      *Tabulation of Votes*

Pursuant to the Bankruptcy Code, a class of claims will be deemed to have accepted a plan of reorganization if, of the class members that <u>actually</u> <u>vote</u> on the plan, at least two-thirds in amount, and more than one-half in number, vote to accept it.  Thus, Classes 2-2, 3, 4, 5, 6, 8, A3, B3, C3, D3, and E3 will be deemed to have accepted the Plan if the members of each Class that vote to accept the Plan hold more than one-half of the total number, and more than two-thirds of the total dollar amount, of all Claims in that Class for which a Ballot was properly submitted.  A class of interests will be deemed to have accepted a plan of reorganization if, of the class members that <u>actually</u> <u>vote</u> on the plan , at least two-thirds in amount voted to accept it.  Thus, Classes A4, B4, C4, D4, and E4 will be deemed to have accepted the Plan if members of each class that vote to accept the Plan hold more than two-thirds of the total amount of Equity Interests in that Class for which a Ballot was properly submitted.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  If a Claim or Equity Interest Holder does not properly submit a Ballot, or that holder's vote is disregarded in accordance with the previous sentence, the number and amount of that holder's Claim or Equity Interest will not be included in deciding whether Class members voted to accept or reject the Plan.  See Section V for a more detailed description of the requirements for confirmation of the Plan.

If one or more of the Classes of Claims or Equity Interests entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, without further notice to you.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  Holders of Claims and Equity Interests should assume that, if one or more of the Classes of Claims or Equity Interests entitled to vote on the Plan reject the Plan, the Debtors will amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, at the currently scheduled Confirmation Hearing.  Any such amendment could include cancellation of Equity Interests.  See Section V for a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes.

3.      *Voting Instructions*

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims and Equity Interests in more than one Class, you will receive separate Ballots for each Claim or Equity Interest, which must be used for each separate Class of Claims and Equity Interests.  Please refer to the Disclosure Statement Order, which is enclosed with this Disclosure Statement if you are entitled to vote, for more specific instructions on voting on the Plan.

Please vote and return your Ballot(s) to:

**First Class Mail or USPS Express Mail**

Saint Vincents Ballot Processing Center
c/o Bankruptcy Services LLC
FDR Station
P.O. Box 5014
New York, NY 10150-5014

**Overnight and Hand Delivery**

Saint Vincents Ballot Processing Center
c/o Bankruptcy Services LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

FACSIMILE BALLOTS WILL NOT BE ACCEPTED.

DO NOT RETURN ANY NOTES OR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M., NEW YORK CITY TIME, ON JULY 18, 2007.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, SHALL BE DEEMED TO ACCEPT THE PLAN.

The Debtors recommend that you vote in favor of confirmation of the Plan.

**D.    Tabular Summary of Treatment Including, When Applicable, Classification Under the Plan**

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.  Section IV of the Disclosure Statement should be consulted for a fuller description of the classification and treatment of Claims and Equity Interests under the Plan.  The following table includes descriptions of Claims even if they are not separately classified under the Plan for the purpose of providing a full picture of the Debtors' obligations with respect to payments in connection with confirmation of the Plan.

General for Both SVCMC's Plan and Other Debtors' Plans[6]

| Class | Description | Treatment Under The Plan | Estimated Aggregate Recovery | Status |
|---|---|---|---|---|

---

[6] None of the holders of Claims or expenses in this first "General" Category are entitled to be classified under, or to vote on, the Plan.  See section 1123(a)(1) of the Bankruptcy Code.  Thus, they are designated as neither impaired nor unimpaired for purposes of the Plan.

| Class | Description | Treatment Under The Plan | Estimated Aggregate Recovery | Status |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided below, SVCMC or the applicable Post-Effective Date Debtor, as applicable, shall pay to each holder of an Allowed Administrative Expense Claim against such Debtor an amount in Cash equal to the Allowed amount of such Claim on the later to occur of (a) the Effective Date or (b) the date such Administrative Expense Claim otherwise would become due in the ordinary course of business. | 100% | N/A |
| -- | DIP Claim | Except to the extent that a holder of a DIP Claim agrees to a different treatment, SVCMC and the Other Debtors shall pay each holder of a DIP Claim, on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim. | 100% | N/A |
| -- | Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Debtor, from such Debtor (i) on the Effective Date, Cash equal to the Allowed amount of such Claim or (ii) equal annual Cash payments on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at a fixed annual rate equal to 7% or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the applicable Debtor as such obligations become due. | 100% | N/A |
| -- | United States Trustee Quarterly Fees and Other Statutory Fees | All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Reorganized SVCMC. Any such fees accruing after the Confirmation Date also shall be paid by Reorganized SVCMC. | 100% | N/A |

Classification under SVCMC Plan

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 1 | Priority Non-Tax Claims against SVCMC | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against SVCMC, each holder of an Allowed Priority Non-Tax Claim against SVCMC shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by SVCMC prior to the Effective Date and except to the extent such holder agrees to a less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |
| 2-1 | Other Secured Claims against SVCMC | On the Effective Date, except to the extent that the holder of an Other Secured Claim agrees to less favorable treatment, each Other Secured Claim against SVCMC shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  All Other Secured Claims against SVCMC that are not due and payable on or before the Effective Date shall, at SVCMC's option, be paid (i) in the ordinary course of business in accordance with the course of practice between SVCMC and such holder with respect to such Claim, or (ii) by transfer of the Collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 2-2 | Aptium Secured Claim | On the Effective Date, the holder of the Aptium Secured Claim shall be treated in accordance with a settlement agreement filed with the Bankruptcy Court on May 11, 2007 (Docket No. 3104) which, among other things, provides for the payment of the Aptium Secured Claim by the first Effective Date Anniversary. It is anticipated that this agreement will be approved by the Bankruptcy Court prior to the Confirmation Date. In the event that the agreement is not approved by the Bankruptcy Court prior to the Confirmation Date, it will be deemed approved upon entry of the Confirmation Order. By agreement with the Creditors' Committee, and notwithstanding anything to the contrary contained in the settlement agreement with Aptium or any order entered approving the settlement agreement with Aptium, SVCMC will not fund or pay more than 50% of the Aptium Secured Claim on the Effective Date. | 100% of compromise amount | Impaired |
| 2-3 | Commerce Secured Claim | On the Effective Date, SVCMC shall reinstate the Commerce Claim. | 100% | Unimpaired/ Deemed to Accept |
| 2-4 | RCG Secured Claim | On the Effective Date, at SVCMC's sole and absolute discretion, either (i) SVCMC shall reinstate the RCG Secured Claim, or (ii) the holder of the RCG Secured Claim shall receive Cash equal to the Allowed amount of the RCG Secured Claim in full and complete satisfaction, settlement and release of and in exchange for the RCG Secured Claim. | 100% | Unimpaired/ Deemed to Accept |
| 2-5(a) | Sun Life Westchester Secured Claim | On the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for the Sun Life Secured Claims, Reorganized SVCMC and Sun Life will enter into a refinancing agreement for the Sun Life Westchester Secured Claim, on substantially the terms set forth in the term sheet attached to the Plan as Exhibit "4.6(b)." Among other things, these terms contemplate that the Sun Life Westchester Collateral and the Staff House will be transferred to special purpose entities, provided, however, that the assets transferred to these special purpose entities will be subject to the MedMal Liens, which shall be subordinate to SunLife's liens on these properties. Reorganized SVCMC shall not, without the consent of the MedMal Trust Monitor, increase the principal amount owed to Sun Life secured by the collateral for the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 2-5(b) | Sun Life Manhattan Secured Claim | On the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for the Sun Life Secured Claims, Reorganized SVCMC and Sun Life will enter into a refinancing agreement for the Sun Life Manhattan Secured Claim, on substantially the terms set forth in the term sheet attached to the Plan as Exhibit "4.6(b)." Among other things, these terms contemplate that the Sun Life Westchester Collateral and the Staff House will be transferred to special purpose entities, provided, however, that the assets transferred to these special purpose entities will be subject to the MedMal Liens, which shall be subordinate to SunLife's liens on these properties. Reorganized SVCMC shall not, without the consent of the MedMal Trust Monitor, increase the principal amount owed to Sun Life secured by the collateral for the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 3 | General Unsecured Claims against SVCMC (excluding MedMal Claims) | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SVCMC, each holder of an Allowed General Unsecured Claim against SVCMC, except to the extent such holder agrees to a less favorable treatment, shall receive the following distributions on the Effective Date or as soon thereafter as is reasonably practicable:<br><br>(i)      a Pro Rata share of the Effective Date Cash Distribution after SVCMC has deducted and reserved a portion of the Effective Date Cash Distribution sufficient to provide the same Pro Rata recovery being received by holders of Allowed General Unsecured Claims against SVCMC to holders of Disputed General Unsecured Claims against SVCMC based on the GUC Estimate, provided, however, that in the event a Disputed General Unsecured Claim against SVCMC is Allowed in an amount greater than the GUC Estimate, distributions on such Allowed Claim will be made based on the Allowed Amount, not the estimated amount, and Reorganized SVCMC shall fund the additional Cash necessary to make such distributions.<br><br>(ii)      a Pro Rata share of the Secured Obligation, which will yield a cumulative 85% distribution plus interest on or before the Fifth (5th) Effective Date Anniversary;<br><br>(iii)      a Pro Rata share of the Unsecured Obligation, which will yield a cumulative 93% distribution plus interest on or before the Seventh (7th) Effective Date Anniversary; and<br><br>(iv)      a Pro Rata share of the GUC Litigation Trust Interest (an interest in the Litigation Trust that will pursue the Litigation Claims), which could yield a cumulative 100% distribution plus interest; provided, however, that the GUC Litigation Trust Interest shall be satisfied solely out of Litigation Trust Assets, and holders of Allowed General Unsecured Claims against SVCMC shall not have recourse to Reorganized SVCMC for unpaid portions of the GUC Litigation Trust Interest, except as specifically set forth in the Plan. | 100% (plus interest from the date the Claim is Allowed) | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 4 | MedMal-BQ Claims | Each holder of an Allowed MedMal-BQ Claim shall receive a Cash payment from the MedMal-BQ Trust that is expected to equal 100% of the Allowed amount of the Claim within 30 days of the date the Claim becomes an Allowed Claim (or, if not paid within 30 days of becoming an Allowed Claim, MedMal Interest from the date the Claim becomes an Allowed Claim to the date the Claim is paid).<br><br>Specifically, each holder of an Allowed MedMal-BQ Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-BQ Claim, except to the extent that such holder agrees to less favorable treatment, (i) (A) if such MedMal-BQ Claim is Allowed on the Effective Date, as soon as practicable after the Effective Date, or (B) if such MedMal-BQ Claim is not Allowed on the Effective Date, as soon as practicable after the date such MedMal-BQ Claim becomes Allowed, Cash up to the amount of its Allowed MedMal-BQ Claim to the extent there remains Distributable Cash in the MedMal-BQ Trust on such date, such Cash to be distributed to all Allowed MedMal-BQ Claims in proportion to the unpaid portion of each Allowed MedMal-BQ Claim (including accrued MedMal Interest, if any), and (ii) within 30 days after each date that the MedMal-BQ Trust receives a payment from Reorganized SVCMC, the Litigation Trust or the MedMal-BQ Trust Policy such that there is Distributable Cash in the MedMal-BQ Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-BQ Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-BQ Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-BQ Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-BQ Trust (which, for the avoidance of doubt, shall not preclude any holder of an Allowed MedMal-BQ Claim from recovering proceeds from any of SVCMC's third party insurance policies otherwise available for MedMal-BQ Claims although there are no such policies). Holders of MedMal-BQ Claims that did not timely file proofs of claim (other than those whose MedMal-BQ Claims are deemed to be Allowed MedMal-BQ Claims pursuant to a Final Order of the Bankruptcy Court) shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of MedMal-BQ Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-BQ Claims. | 100% (plus interest from the date the Claim is Allowed) | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 5 | MedMal-MW Claims | Each holder of an Allowed MedMal-MW Claim shall receive a Cash payment from the MedMal-MW Trust that is expected to equal 100% of the Allowed amount of the Claim within 30 days of the date the Claim becomes an Allowed Claim (or, if not paid within 30 days of becoming an Allowed Claim, MedMal Interest from the date the Claim becomes an Allowed Claim to the date the Claim is paid).

Specifically, each holder of an Allowed MedMal-MW Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-MW Claim, except to the extent such holder agrees to less favorable treatment, (i) (A) if such MedMal-MW Claim is Allowed on the Effective Date, as soon as practicable after the Effective Date, or (B) if such MedMal-MW Claim is not Allowed on the Effective Date, as soon as practicable after the date such MedMal-MW Claim Allowed, Cash up to the amount of its Allowed MedMal-MW Claim to the extent there remains Distributable Cash in the MedMal-MW Trust on such date, such Cash to be distributed to all Allowed MedMal-MW Claims in proportion to the unpaid portion of each Allowed MedMal-MW Claim (including accrued MedMal Interest, if any), and (ii) within 30 days after each date that the MedMal-MW Trust receives a payment from Reorganized SVCMC, the Litigation Trust or the MedMal-MW Trust Policy such that there is Distributable Cash in the MedMal-MW Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-MW Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-MW Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-MW Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-MW Trust (which, for the avoidance of doubt, shall not preclude any holder of an Allowed MedMal-MW Claim from recovering proceeds from any of SVCMC's third party insurance policies otherwise available for MedMal-MW Claims). Holders of MedMal-MW Claims that did not timely file proofs of claim (other than those whose MedMal-MW Claims are deemed to be Allowed MedMal-MW Claims pursuant to a Final Order of the Bankruptcy Court) shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of MedMal-MW Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-MW Claims. | 100% (plus interest from the date the Claim is Allowed) | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 6 | MedMal-SI Claims | Each holder of an Allowed MedMal-SI Claim shall receive a Cash payment from the MedMal-SI Trust that is expected to equal 100% of the Allowed amount of the Claim within 30 days of the date the Claim becomes an Allowed Claim (or, if not paid within 30 days of becoming an Allowed Claim, MedMal Interest from the date the Claim becomes an Allowed Claim to the date the Claim is paid).

Specifically, each holder of an Allowed MedMal-SI Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-SI Claim, except to the extent such holder agrees to less favorable treatment, (i) (A) if such MedMal-SI Claim is Allowed on the Effective Date, as soon as practicable after the Effective Date, or (B) if such MedMal-SI Claim is not Allowed on the Effective Date, as soon as practicable after the date such MedMal-SI Claim becomes Allowed, Cash up to the amount of its Allowed MedMal-SI Claim to the extent there remains Distributable Cash in the MedMal-SI Trust on such date, such Cash being distributed to all Allowed MedMal-SI Claims in proportion to the unpaid portion of each Allowed MedMal-SI Claim (including accrued MedMal Interest, if any), and (ii) within 30 days after each date that the MedMal-SI Trust receives a payment from Reorganized SVCMC, the Litigation Trust or the MedMal-SI Trust Policy such that there is Distributable Cash in the MedMal-SI Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-SI Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-SI Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal-SI Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-SI Trust (which, for the avoidance of doubt, shall not preclude any holder of an Allowed MedMal-SI Claim from recovering proceeds from any of SVCMC's third party insurance policies otherwise available for MedMal-SI Claims).  Holders of MedMal-SI Claims that did not timely file proofs of claim (other than those whose MedMal-SI Claims are deemed to be Allowed MedMal-SI Claims pursuant to a Final Order of the Bankruptcy Court) shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers.  Holders of MedMal-SI Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-SI Claims. | 100% (plus interest from the date the Claim is Allowed) | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 7 | PBGC Claim | The PBGC Claim is a contingent claim for underfunding of the Pension Plan if the Pension Plan is terminated. In addition to payments to the Pension Plan required by ERISA, Reorganized SVCMC will be required to make contributions to the Pension Plan as set forth in the chapter 11 Plan. On the Effective Date, Reorganized SVCMC shall assume the Pension Plan and the obligations of contributing plan sponsor unless the Pension Plan has been terminated in accordance with Title IV of ERISA. In full and complete satisfaction, settlement and release of and in exchange for the PBGC's Allowed PBGC Claim, SVCMC shall make the payments to the Pension Plan set forth in the Plan.<br><br>The PBGC Penalties Claim (if any) is unimpaired. | Full funding over time of Pension Plan and 100% of the Allowed amount of the PBGC Penalties Claim, if any. | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 8 | Intercompany Claims | After (i) all General Unsecured Claims against SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims against SVCMC, Allowed MedMal Claims and the Allowed PBGC Claim have received (unless they have agreed otherwise, <u>provided</u>, <u>however</u>, that the treatments provided pursuant to this Plan shall not be considered such agreement) a cash recovery of 100% of the Allowed amount of their Claims in Cash plus interest (including all accrued MedMal Interest), each holder of an Intercompany Claim shall be entitled to receive payment from Reorganized SVCMC pursuant to terms to be mutually agreed upon between Reorganized SVCMC and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim. | 100% | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 9 | DASNY Subordinated Claims | Unless SVCMC and DASNY shall reach an alternative agreement with respect to the treatment of the DASNY Subordinated Claims that shall be separately approved by the Bankruptcy Court, and which alternative agreement will be subject to the reasonable satisfaction of the Tort Claimants' Committee, after (i) all General Unsecured Claims and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have received 100% of the distributions to which they are entitled under the Plan in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $2,865,721.47.  The payment of such amount shall not be considered a payment required to be made under the Plan as contemplated in the definition of Available Cash and shall not reduce the amount of the Effective Date Cash Distribution.  After (i) all General Unsecured Claims and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) the holders of all Allowed General Unsecured Claim, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have been paid in full (i.e., received 100% of the Allowed amount of their Claims plus interest) in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $3.9 million.  If, at any time, it becomes evident that the holders of all Allowed General Unsecured Claims, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim shall not be paid in full (i.e., shall not receive 100% of the Allowed amount of their Claims plus interest), then the right of each holder of a DASNY Subordinated Claim to receive its Pro Rata share of $3.9 million as set forth in the immediately preceding sentence shall cease, and DASNY's claim for such amount automatically shall be disallowed and expunged and any security therefore shall be avoided and released without further action of the Bankruptcy Court or any other court. | The entire benefit of a court-approved settlement fixing the amount of and sub-ordination of DASNY's claims | Unimpaired/ Deemed to Accept[7] |

---

[7] DASNY contends that its claim is impaired under the Plan because its treatment under the Plan is inconsistent with the stipulation entered into by DASNY, the Debtors and the Committee, "so ordered" by the Court on December 29, 2005.  The Debtors disagree with DASNY's contention and believe that DASNY's treatment under the Plan is consistent with the stipulation, as described in more detail below.

Classification under Other Debtors' Plans

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| A1 | Priority Non-Tax Claims against MS-SVH | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against MS-SVH, each holder of an Allowed Priority Non-Tax Claim against MS-SVH shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |
| A2 | Other Secured Claims against MS-SVH | On the Effective Date, except to the extent that the holder of an Other Secured Claim against MS-SVH agrees to less favorable treatment, each holder of an Other Secured Claim against MS-SVH shall receive, at MS-SVH's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |
| A3 | General Unsecured Claims against MS-SVH | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against MS-SVH, each holder of an Allowed General Unsecured Claim against MS-SVH shall receive, except to the extent such holder agrees to less favorable treatment, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of MS-SVH (net of the distributions to which Priority Non-Tax Claims against MS-SVH and Other Secured Claims against MS-SVH are entitled under the Plan, and the costs of administering the Plan of MS-SVH); provided, however, that no holder of an Allowed General Unsecured Claim against MS-SVH shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against MS-SVH. | 100% | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| A4 | Equity Interests in MS-SVH | In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in MS-SVH, the holder of the Allowed Equity Interest in MS-SVH shall receive the remaining assets of MS-SVH (net of the costs of administering the Plan of MS-SVH), as soon as reasonably practicable after all assets of MS-SVH have been liquidated and all Claims against MS-SVH have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in MS-SVH to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in MS-SVH under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution. | $20,000.00 | Impaired |
| B1 | Priority Non-Tax Claims against SSSV | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against SSSV, each holder of an Allowed Priority Non-Tax Claim against SSSV shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |
| B2 | Other Secured Claims against SSSV | On the Effective Date, except to the extent that the holder of an Other Secured Claim against SSSV agrees to less favorable treatment, each holder of an Other Secured Claim against SSSV shall, at SSSV's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| B3 | General Unsecured Claims against SSSV | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SSSV, each holder of an Allowed General Unsecured Claim against SSSV shall receive, except to the extent such holder agrees to less favorable treatment, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata share of the assets of SSSV (net of the distributions to which Priority Non-Tax Claims against SSSV and Other Secured Claims against SSSV are entitled under the Plan, and the costs of administering the Plan of SSSV); provided, however, that no holder of an Allowed General Unsecured Claim against SSSV shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against SSSV. | Nominal | Impaired |
| B4 | Equity Interest in SSSV | In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in SSSV, the holder of the Allowed Equity Interest in SSSV shall receive the remaining assets of SSSV (net of the costs of administering the Plan of SSSV), as soon as reasonably practicable after all assets of SSSV have been liquidated and all Claims against SSSV have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in SSSV to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in SSSV under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution. | $0.00 | Impaired |
| C1 | Priority Non-Tax Claims against CMC-CS | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-CS, each holder of an Allowed Priority Non-Tax Claim against CMC-CS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date, and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| C2 | Other Secured Claims against CMC-CS | On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-CS agrees to less favorable treatment, each holder of an Other Secured Claim against CMC-CS shall, at CMC-CS's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |
| C3 | General Unsecured Claims against CMC-CS | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-CS, each holder of an Allowed General Unsecured Claim against CMC-CS shall receive, except to the extent such holder agrees to a less favorable treatment, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata share of the assets of CMC-CS (net of the distributions to which Priority Non-Tax Claims against CMC-CS and Other Secured Claims against CMC-CS are entitled under the Plan, and the costs of administering the Plan of CMC-CS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-CS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-CS. | 100% | Impaired |
| C4 | Equity Interest in CMC-CS | In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-CS, the holder of the Allowed Equity Interest in CMC-CS shall receive the remaining assets of CMC-CS (net of the costs of administering the Plan of CMC-CS), as soon as reasonably practicable after all assets of CMC-CS have been liquidated and all Claims against CMC-CS have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in CMC-CS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-CS under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution | $400,000.00 | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| D1 | Priority Non-Tax Claims against CMC-PS | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-PS, each holder of an Allowed Priority Non-Tax Claim against CMC-PS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |
| D2 | Other Secured Claims against CMC-PS | On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-PS agrees to less favorable treatment, each holder of an Other Secured Claim against CMC-PS shall at CMC-PS's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |
| D3 | General Unsecured Claims against CMC-PS | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-PS, each holder of an Allowed General Unsecured Claim against CMC-PS shall receive, except to the extent such holder agrees to less favorable treatment, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata share of the assets of CMC-PS (net of the distributions to which Priority Non-Tax Claims against CMC-PS and Other Secured Claims against CMC-PS are entitled under the Plan, and the costs of administering the Plan of CMC-PS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-PS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-PS. | Nominal | Impaired |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| D4 | Equity Interest in CMC-PS | In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-PS, the holder of the Allowed Equity Interest in CMC-PS shall receive the remaining assets of CMC-PS (net of the costs of administering the Plan of CMC-PS) as soon as reasonably practicable after all assets of CMC-PS have been liquidated and all Claims against CMC-PS have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in CMC-PS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-PS under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution. | $0.00 | Impaired |
| E1 | Priority Non-Tax Claims against CMC-RS | In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-RS, each holder of an Allowed Priority Non-Tax Claim against CMC-RS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | 100% | Unimpaired/ Deemed to Accept |
| E2 | Other Secured Claims against CMC-RS | On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-RS agrees to less favorable treatment, each holder of an Other Secured Claim against CMC-RS shall at CMC-RS's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim. | 100% | Unimpaired/ Deemed to Accept |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| E3 | General Unsecured Claims against CMC-RS | In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against CMC-RS, each holder of an Allowed General Unsecured Claim against CMC-RS shall receive, except to the extent such holder agrees to less favorable treatment, on the later of the Effective Date and the date that such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata share of the assets of CMC-RS (net of the distributions to which Priority Non-Tax Claims against CMC-RS and Other Secured Claims against CMC-RS are entitled under the Plan, and the costs of administering the Plan of CMC-RS); provided, however, that no holder of an Allowed General Unsecured Claim against CMC-RS shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against CMC-RS. | Nominal | Impaired |
| E4 | Equity Interest in CMC-RS | In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-RS, the holder of the Allowed Equity Interest in CMC-RS shall receive the remaining assets of CMC-RS (net of the costs of administering the Plan of CMC-RS) as soon as reasonably practicable after all assets of CMC-RS have been liquidated and all Claims against CMC-RS have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in CMC-RS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-RS under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution. | $0.00 | Impaired |

Notwithstanding the treatment set forth above, the holder of any Allowed Claim may elect to receive lesser and different treatment if so agreed with the Debtors.

### E.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on July 27, 2007, beginning at 9:30 a.m. (New York City Time), before the Honorable Adlai S. Hardin, Jr., United States Bankruptcy Judge, in Room 520 of the Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are

received on or before July 20, 2007, at 4:00 p.m. (New York City Time), in the manner described below in Section V of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    GENERAL INFORMATION ABOUT THE DEBTORS

### A.    Description and History of Debtors' Business

#### 1.    _Background_

SVCMC was formed in 2000 as a result of the merger of Catholic Medical Centers of Brooklyn and Queens under the auspices of the Diocese of Brooklyn, Saint Vincents Hospital and Medical Center under the auspices of the Archdiocese of New York and the Congregation of the Sisters of Charity, and Sisters of Charity Health Care on Staten Island under the auspices of the Congregation of the Sisters of Charity. SVCMC is a nonprofit corporation organized under the Not-for-Profit Corporation Law of the State of New York. SVCMC is also listed in the official Catholic Directory and is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code.

Since the merger, the two members (sponsors) of SVCMC are (i) the President of the religious congregation of The Sisters of Charity of St. Vincent de Paul of New York in her individual ex officio capacity (or her designee who is a member of such congregation) and (ii) the Most Reverend Bishop of the Diocese of Brooklyn, New York in his individual ex officio capacity (or his designee who is a member of such Diocese). Under New York and general nonprofit law, the members do not hold an economic interest in SVCMC.

SVCMC's mission is to reflect God's love by advancing Christ's healing ministry, with respect, integrity, compassion, and excellence to all who come to its health care system in need, especially the poor.

SVCMC was and remains a comprehensive healthcare system. As of the Commencement Date, over 2,500 physicians were on the medical staff of one or more of the hospitals, and the system was the largest private provider of EMS services in the New York City Fire Department's 911 service. In 2004, the last full calendar year prior to the Commencement Date, SVCMC and its affiliated debtors were recording more than 600,000 outpatient visits, 640,000 home care visits and 92,000 inpatient discharges per year.

#### 2.    _SVCMC's Hospitals_

As of the Commencement Date, the Debtors operated seven hospitals located in four boroughs of New York City and in Westchester County, New York: St. Vincent's Hospital, Manhattan ("SV Manhattan"), Mary Immaculate Hospital, Queens ("Mary Immaculate"), St. John's Queens Hospital ("St. John's"), St. Vincent's Hospital, Staten Island ("SV Staten Island"), Bayley Seton Hospital, Staten Island ("Bayley Seton"), St. Vincent's Hospital,

Westchester ("SV Westchester"), and St. Mary's Hospital, Brooklyn ("St. Mary's").[8]  As described in Section III, during these cases: SVCMC closed St. Mary's and sold the St. Mary's real estate; closed, sold, or transferred most of the programs that had been operating at Bayley Seton[9] and began negotiating a transaction to sell the Bayley Seton real estate; and sold and transferred Mary Immaculate, St. John's, and SV Staten Island to entities that had agreed to continue to operate those facilities as acute care hospitals.  The hospital sales are described below in more detail.

The Debtors' remaining hospitals are SV Manhattan and SV Westchester.  Brief descriptions of these facilities follow:

St. Vincent's Hospital, Manhattan.  SV Manhattan is a 758 bed hospital located at 170 West 12th Street in the Greenwich Village neighborhood of Manhattan.  It was founded in 1848 by four Sisters of Charity as a 30 bed hospital in a small brick house on 13th Street, and was one of the few charity hospitals in New York City at that time.  SV Manhattan provides services in a wide array of specialties.

St. Vincent's Hospital, Westchester.  SV Westchester is a 133 bed hospital with its main campus at 275 North Street, Harrison, New York.  SV Westchester was founded by the Sisters of Charity in 1879.  For more than 120 years, SV Westchester has maintained a commitment to provide care to all in need of mental health and substance abuse services.  SV Westchester offers a continuum of inpatient and outpatient services to treat individuals in all stages of behavioral illness and recovery.  In addition to its main site in Harrison, SV Westchester offers a variety of outpatient services at sites in the Bronx, Mamaroneck, Mount Kisco and Tuckahoe.

3.       *SVCMC'S Other Businesses*

SVCMC also operates three non-debtor nursing homes, a non-debtor hospice, a home health business operated as a division of the debtor SVCMC, a health maintenance organization for certain members of federal uniformed services and their families operated as a division of the debtor SVCMC, and two captive, non-debtor insurance companies.  The non-debtors are registered as separate, corporations or limited liability entities under New York State or other applicable law.  To the extent the non-debtors are non-profit entities, their membership interests are held by SVCMC, and to the extent that they are for-profit entities, their equity is held by SVCMC.

---

[8] Prior to the Commencement Date, the Debtors also operated St. Joseph's Hospital in Queens.  This hospital was closed in May, 2005, due to substantial and continuing operating losses generated by that hospital, the high cost of renovating and modernizing that facility, and the lack of any other entity willing to purchase, or even take transfer of, and continue operating St. Joseph's.

[9] Bayley Seton's operations as an acute care hospital ceased prior to the Commencement Date.

(a)    Nursing Homes

(i)    *Bishop Mugavero Center for Geriatric Care:* Bishop Mugavero Center for Geriatric Care, located at 155 Dean Street, Brooklyn, New York, is a 288 bed long-term care facility in the Boerum Hill neighborhood of Brooklyn.  Bishop Mugavero Center for Geriatric Care is a separate entity from SVCMC and it is not a chapter 11 debtor.

(ii)    *Holy Family Home:* Holy Family Home, located at 1740 84th Street, is a 200 bed long-term care facility in the Bensonhurst neighborhood of Brooklyn.  Holy Family Home is a separate entity from SVCMC and it is not a chapter 11 debtor.

(iii)    *St. Elizabeth Ann's Health Care & Rehabilitation Center:* St. Elizabeth Ann's Health Care & Rehabilitation Center is a 300 bed nursing and rehabilitation center located at 91 Tompkins Avenue in Staten Island, New York.  St. Elizabeth Ann's Health Care & Rehabilitation Center is a separate entity from SVCMC and it is not a chapter 11 debtor.[10]

(b)    SVCMC Home Health.  SVCMC Home Health, a business division of SVCMC, provides in-home skilled nursing and rehabilitative services to residents of all five boroughs of New York City, as well as Nassau and Suffolk counties.  The Home Health division of SVCMC is responsible for over 700,000 visits annually.  Its programs are licensed by the New York State Department of Health; accredited by the Joint Commission on Accreditation of Healthcare Organizations; and approved for participation in the Medicare and Medicaid Programs.

(c)    Uniformed Services Family Health Plan.  SVCMC, itself or through its predecessors, has been an administrator of a Uniformed Services Family Health Plan ("USFHP") program since 1994.  USFHP is a program available to selected beneficiaries in the military health care system under an HMO-like program known as TRICARE Prime.  USFHP is not a separate subsidiary, but rather a program administered by SVCMC pursuant to a contract with the United States Department of Defense.  Under the program, SVCMC offers eligible beneficiaries comprehensive healthcare services and associated support services, excluding family planning and those services that would not be permitted under the Ethical and Religious Directives for Catholic Health Care Facilities, a document issued by the Committee on Doctrine of the National Conference of Catholic Bishops.

(d)    Pax Christi Hospice.  Pax Christi Hospice provides care to terminally ill patients and their families.  This care is designed to meet the special needs arising out of physical, psychological, spiritual, social and economic stresses often experienced during

---

[10] As of the Commencement Date, the Debtors also operated Msgr. Fitzpatrick Skilled Nursing Pavilion, a 115 bed long-term care facility operated as part of Mary Immaculate.  The Debtors sold Msgr. Fitzpatrick Skilled Nursing Pavilion in connection with the sale of Mary Immaculate, described below in Section III.

the final stages of illness and during dying and bereavement.  Services are frequently provided in the patient's home to provide maximum comfort to the terminally ill patient.  Pax Christi Hospice is located at 355 Bard Avenue, Staten Island, New York, and it is <u>not</u> a chapter 11 debtor.

4.      *Relationship of SVCMC to the Other Debtors*

SVCMC's chapter 11 case has not been consolidated with those of the Other Debtors.  The Other Debtors are professional corporations established by SVCMC's predecessors in interest to manage specific medical practices and provide specific physician services at SVCMC's hospitals.  Each Other Debtor is a New York professional corporation, and is a so-called captive professional corporation of SVCMC because (a) each Other Debtor has only one shareholder, who is a physician employee-at-will of SVCMC, and (b) that sole shareholder is contractually obligated to transfer his or her shares in the applicable Other Debtor to another at-will employee designated by SVCMC upon termination of the shareholder's employment by SVCMC.  In this manner, SVCMC maintains effective control of the Other Debtors.

Although the Plan provides for the liquidation of all of the Other Debtors, to the extent that the Debtors conclude that there will be business reasons for the use of professional corporations in the future, the Debtors may set up new professional corporations to carry on the functions of MS-SVH and SSSV (and, accordingly, the Plan provides that MS-SVH and SSSV may sell assets to these new corporations or assume and assign contracts to such new corporations).  These business reasons may include being able to account more easily for reimbursements for certain physician services, when billed and collected separately from SVCMC.   In contrast, because all or substantially all of the assets of CMC-RS, CMC-CS, and CMC-PS are being or have been sold in connection with the Debtors' sale of Mary Immaculate and St. John's, discussed below, the Debtors are dissolving those Other Debtors through the Plan, and will not set up new corporations to continue their historic functions.

B.      **The Debtors' Prepetition Financing Arrangements**

As of the Commencement Date, the Debtors' aggregate indebtedness from borrowed money (net of reserve funds established to pay such debt) was approximately $264.26 million.  This indebtedness primarily consisted of (i) mortgages on substantially all of their principal operating facilities; (ii) a working capital borrowing facility secured by a first lien on accounts receivable; and (iii) a revolving credit facility secured by certain receivables from New York State.

1.      *Mortgage Debt*

The Debtors' total mortgage indebtedness (net of reserve funds established to pay such debt) was approximately $216.66 million as of the Commencement Date.  The principal mortgage creditors were:

(i)    the Dormitory Authority of the State of New York ("DASNY"), which was owed approximately $126.83 million as of June 30, 2005;

(ii)    Sun Life Assurance Company of Canada and its affiliates ("Sun Life"), which was owed approximately $77.8 million as of June 30, 2005; and

(iii)    RCG Longview II, L.P ("RCG"), which was owed approximately $15.15 million as of June 30, 2005.

Substantially all of the DASNY mortgages were insured by the federal Department of Housing and Urban Development ("HUD"). Following the 2000 merger that created SVCMC, as additional security for the DASNY mortgage loans, SVCMC cross-collateralized its obligations to DASNY by granting DASNY a mortgage on each facility as security for each HUD-insured loan. As explained below in more detail, the majority of the DASNY mortgage debt was paid down, retired, or settled during these cases with the proceeds of the DIP Agreement, and based on certain challenges raised by the Creditors' Committee with respect to various aspects of the DASNY mortgage loans and a post-petition loan to the Debtors, the balance was compromised in part as to amount and in part as to priority of payment.

The Sun Life mortgage debt arose out of the Sun Life Notes, which include:

(i)    the Promissory Note, dated February 11, 2005, in the principal amount of $22.5 million, made by SVCMC to the order of Sun Life Canada, secured by SVCMC's Westchester real estate,

(ii)    the Promissory Note, dated February 11, 2005, in the principal amount of $7.5 million, made by SVCMC to the order of Sun Life Canada, secured by SVCMC's Westchester real estate,

(iii)    the Promissory Note, dated October 18, 2004, in the principal amount of $5 million, made by SVCMC to the order of Sun Life U.S., secured by SVCMC's O'Toole building,

(iv)    the Promissory Note, dated October 18, 2004, in the principal amount of $28 million, made by SVCMC to the order of Sun Life U.S., secured by SVCMC's Staff House property, and

(v)    the Promissory Note, dated October 18, 2004, in the principal amount of $16 million, made by SVCMC to the order of Sun Life U.S., secured by SVCMC's Martin Payne property.

The RCG mortgage debt arose out of (i) the Subordinate Promissory Note, dated May 18, 2005, in the principal amount of $10 million, made by SVCMC to the order of RCG and (ii) the Subordinate Promissory Note, dated June 27, 2005, in the principal amount of $6 million, made by SVCMC to the order of RCG. Repayment of both notes was secured by separate mortgages on the Debtors' property at (i) 555 Sixth Avenue, New York, New York (Block 791,

Lot 36); (ii) 122-132 West 12th Street, New York, New York (Block 607, Lot 27); and (iii) 203 West 12th Street, New York, New York (Block 617, Lot 55), and was further secured by the subordinate assignment of any and all leases relating to those properties (collectively, the "RCG Collateral").  As described below, based on assertions that the mortgages securing these two Subordinate Promissory Notes were not timely perfected, the amount of RCG's Secured Claim was reduced and certain of its mortgages were avoided.

As of June 30, 2005, the value of the collateral securing SVCMC mortgage debt was in excess of the Debtors' obligations owing to DASNY, Sun Life and RCG.

2.    _Working Capital Facility_

On May 21, 2004, SVCMC entered into a Loan and Security Agreement with HFG HealthCo-4 LLC ("HFG"), pursuant to which HFG agreed to extend up to $100 million to SVCMC in exchange for a first priority security interest in all of SVCMC's receivables, subject to certain exceptions and other permitted liens.  As of the Commencement Date, the outstanding amount owed to HFG under this facility was approximately $28.7 million.

3.    _Commerce Bank Pool Loans_

Prior to the Commencement Date, the Debtors entered into a revolving credit facility with Commerce Bank, secured by a lien on their accounts receivable (the "Pool Reimbursements") relating to the Professional Education Pools and Indigent Care Pools, which are programs established by the State of New York pursuant to Article 28 of the New York Public Health Law to reimburse health care providers for training medical residents and interns and providing care for the indigent.  As of June 30, 2005, the Debtors owed Commerce Bank approximately $20 million under this facility.

In addition, SVCMC owed Commerce Bank approximately $30 million as of the Commencement Date pursuant to a loan secured by a first priority lien on a portfolio of pledged securities at Bank of America.

4.    _Other Indebtedness_

On or about April 11, 1996, Aptium and SVCMC entered into the Aptium Agreement, pursuant to which Aptium provides development, consulting, administrative and other services to SVCMC with respect to the operation of SVCMC's outpatient cancer center. To secure the payment of fees due to Aptium under the Aptium Agreement, SVCMC granted Aptium a security interest in the following collateral (collectively, the "Aptium Cash Collateral"): (i) all Program Revenue (as defined in the Aptium Agreement); (ii) all accounts receivable, contract rights, rights to receive payment, claims, entitlements and other rights which are a part of, which arise out of, or which result from the Program Revenue; and (iii) all proceeds

of any of the foregoing.[11]  Aptium alleges that the value of the Aptium Cash Collateral as of the Commencement Date was approximately $25 million.

SVCMC also had outstanding capital leases of approximately $13.64 million as of the Commencement Date.

### C.    Events Leading to Commencement of Chapter 11 Cases

1.    _The Healthcare Environment in New York_

For a number of years, New York's hospitals have ranked among the lowest in the country in almost all indicators of financial health, including profitability, liquidity, and debt load.  At the same time, these hospitals have faced high and rising costs, particularly with respect to malpractice claims and insurance.  This condition has been precipitated by a convergence of trends that have placed extreme financial pressure on the viability of New York's not-for-profit hospitals.  SVCMC has not been immune from these general market conditions.

For example, hospitals generally have been unable to cover the rising cost of providing healthcare due to federal cost cutting efforts in the Medicare and Medicaid programs, and the growth of managed care plans.  Reimbursements from Medicare and Medicaid are not negotiable, and have remained overall flat over recent years.  Although private managed care plans are required to negotiate with hospitals over reimbursement rates, their size and bargaining strength relative to individual hospital groups has allowed managed care plans to require hospitals and other healthcare providers to bear the brunt of increased healthcare costs.

At the same time, the rate of billing and payment denials from both Medicare and Medicaid programs, as well as from private managed care plans, has increased due to the increasingly complex authorization and billing requirements imposed by private insurance providers and the federal agencies that administer the Medicare and Medicaid programs.

Furthermore, hospitals in New York generally suffer because, in the aggregate, they have more capacity (beds) than there is demand (patients).  Capacity outstrips supply in part because advances in healthcare have reduced the length of stay in hospitals for many patients, and eliminated the need to stay in a hospital at all in other cases.  Hospitals were generally built, and their infrastructures designed, to support more (rather than fewer) inpatients.

2.    _The Berger Commission_

In July, 2005, the financial problems faced by New York's hospitals led then-New York State Governor George Pataki and the New York Legislature to establish the Commission

---

[11] Aptium and HFG were parties to a prepetition intercreditor agreement pursuant to which HFG agreed that Aptium's interest in the Aptium Cash Collateral shall be first, prior and senior to the liens of HFG in the Aptium Cash Collateral, and HFG stipulated to the extent, validity and priority of Aptium's liens in the Aptium Cash Collateral, and acknowledged that Aptium held a valid lien prior to HFG's lien in the Aptium Cash Collateral.

on Health Care Facilities in the 21st Century, headed by Stephen Berger (commonly referred to as the "<u>Berger Commission</u>").

The Berger Commission – a non-governmental panel created to undertake an independent review of healthcare capacity and resources in New York State – was charged with assessing the supply of regional and local hospital and nursing home facilities to respond to community needs while achieving efficiencies in service delivery.

In late November, 2006, the Berger Commission announced its final recommendations for reconfiguring the capacity of New York State's hospitals and nursing homes. The Commission recommended that nine (9) acute care hospitals close, and that another forty-eight (48) implement reconfiguration, affiliation, or conversion schemes. The Commission further recommended the elimination of approximately 3,000 nursing home beds, or 2.6% of the State's total supply. Despite the recommendation of the Commission's regional advisory committee that St. Vincent's Midtown provided necessary capacity that should be strengthened and reconfigured, one of the Commission's findings and proposed configurations was that St. Vincent's Midtown should close. The Berger Commission recommended that St. Vincent's Midtown's psychiatric beds and ambulatory services be transferred to and operated by SV Manhattan or other sponsors.

St. Vincent's Midtown is <u>not</u> a debtor in these Chapter 11 Cases or any other chapter 11 case. St. Vincent's Midtown is a separate non-profit entity whose sole member is SVCMC Health Services, Inc. The members of SVCMC Health Services, Inc. are the same as the members of SVCMC. Certain board members of SVCMC also are board members of SVCMC Health Services, Inc. In 2002, SVCMC and St. Vincent's Midtown considered a formal affiliation that would have been structured with SVCMC Health Services, Inc. becoming the member of both SVCMC and St. Vincent's Midtown. (In fact, SVCMC Health Services, Inc. was formed at that time.) This affiliation was never consummated, however, in part due to the failure to receive full regulatory approval for the change in SVCMC's members. Although this corporate affiliation never happened, St. Vincent's Midtown did refer patients to SVCMC for tertiary care and other specialty services. SVCMC and St. Vincent's Midtown executed an Administrative and Consulting Services Agreement in April, 2002, under which SVCMC provided and was paid for certain consulting services to St. Vincent's Midtown.

3.    *Operating Losses at the Debtors' Hospitals*

Following the merger that created SVCMC in 2000, SVCMC's management adopted strategies designed to reduce costs, increase revenues and enhance the overall competitiveness of SVCMC in the healthcare marketplace. Although SVCMC was successful in increasing its revenues, it was unable to realize many of the anticipated benefits from the merger, including: consolidated and reduced expense for overhead and shared services among the hospitals; greater purchasing power that would reduce cost of goods and increase reimbursement rates from private insurance companies and payors; and greater flexibility in negotiating competitive compensation packages with physicians. As a result, SVCMC sustained continuing losses after the merger, and the negative publicity surrounding these losses eroded philanthropic support for the hospitals, support upon which these hospitals heavily rely.

The following chart indicates revenues, expenses, and operating losses for the five years following the merger that created SVCMC.

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Revenue (in Billions) | $1.465 | $1.570 | $1.664 | $1.635 | $1.557 |
| Expenses (in Billions) | $1.532 | $1.628 | $1.687 | $1.717 | $1.770 |
| Operating Losses (in Millions) | $(66) | $(58) | $(22) | $(81) | $(143) |

4.    *Speltz & Weis and the Debtors' Turnaround Plans*

As noted above, SVCMC's financial condition continued to deteriorate in the years following the merger.  By the end of 2003, the board of directors (the "Board") of SVCMC had determined that SVCMC required the assistance of a turnaround team to address the system's continuing and expanding financial crisis.  In April 2004, the Board retained the services of the turnaround firm Speltz & Weis LLC ("Speltz & Weis"), and appointed David Speltz as SVCMC's new President and Chief Executive Officer, and Timothy Weis as its new Chief Financial Officer.  The Board was led to believe that Speltz & Weis had the experience, resources and expertise to effectuate SVCMC's turnaround.

Between April and June 2004, Speltz & Weis developed various restructuring plans (the "Turnaround Plans") for SVCMC designed to generate over $150 million in EBIDA improvements on an annualized basis by the end of 2006 through improvements in revenue recovery, supply chain efficiency, labor costs and productivity, and renegotiation of certain managed care contracts.

5.    *Acquisition of Speltz & Weis by Huron Consulting Services LLC[12]*

On or about May 5, 2005, Huron Inc. acquired Speltz & Weis.  Huron LLC had provided financial restructuring advice to the Debtors since on or about October 4, 2004.  The financial terms of the relevant acquisition documents provided for upfront payments to the principals of Speltz & Weis (David Speltz and Tim Weis), as well as certain incentive compensation payments, the amount of which turned, among other things, on billings by Speltz & Weis and Huron LLC to SVCMC.  After the acquisition of Speltz & Weis by Huron Inc., serious ethical issues were brought to the attention of SVCMC concerning the terms and conditions surrounding Huron Inc.'s acquisition of Speltz & Weis and the pre-closing disclosures made to SVCMC.  SVCMC hired special outside counsel to conduct an investigation and to prepare a report for the Board as to the conduct of all professionals involved in the Huron

---

[12] This section I.C.5 of the Disclosure Statement was drafted in part by the Creditors' Committee.

acquisition of Speltz & Weis, and as to whether any of SVCMC's ethical rules and procedures, as well as any fiduciary obligations, were breached or violated.  Current chapter 11 counsel to the Debtors have conducted a preliminary review of facts and circumstances surrounding the conduct of all parties involved with Huron Inc.'s acquisition of Speltz & Weis, as well as the pre-petition management services provided and the fees and expenses incurred by Speltz & Weis and related parties, the conduct of and advice provided by said parties concerning the advisability and timing of a chapter 11 filing and the advice concerning and pursuit of the post-petition dual retention of Speltz & Weis and Huron LLC by SVCMC.  Based on their common interests, this review has been shared informally with counsel to the Creditors' Committee.  Based upon the Debtors' chapter 11 counsel's preliminary review, however, there exist claims and causes of action for, among other things, breach of contract, inducement of breach of contract, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, breach of New York not-for-profit corporation law, and fraudulent transfer law.  These claims and causes of action will be transferred to the Litigation Trust, and will be pursued by the Litigation Trust.  The Creditors' Committee asserts that there are claims and causes of actions against, among others, Speltz & Weis, David Speltz, Tim Weis, Huron Inc., and/or Huron LLC for, among other things, breach of fiduciary duty, breach of New York Not-for-Profit Corporation law, negligence, breach of contract, promissory estoppel, unjust enrichment, tortious interference, aiding and abetting breach of fiduciary duty, avoidable transfers under section 547 of the Bankruptcy Code and/or fraudulent transfers under the Bankruptcy Code and New York Debtor & Creditor law.  These claims and causes of action will be transferred to the Litigation Trust and will be pursued by the Litigation Trust.

6.      _Decision to Commence the Chapter 11 Cases_

Notwithstanding the development and partial implementation of aspects of certain of the Turnaround Plans, SVCMC was forced to seek chapter 11 protection on July 5, 2005, when it experienced a severe reduction in available liquidity.[13]

7.      _Claims Against Litigation Parties_

There exist claims and causes of action against certain of the Debtors' professionals that emanate out of advice given to the Board in connection with the development and implementation of the Turnaround Plans, as well as advice given with respect to the timing of the chapter 11 filing and anticipated creditor recoveries, that will be transferred to the Litigation Trust and will be pursued by the Litigation Trust.  There are also claims and causes of action related to excessive fees and expenses incurred by Speltz & Weis and related parties, including fees incurred by certain independent contractors retained by SVCMC at the behest of

---

[13] Because certain current management and counsel were engaged months after the Commencement Date, this Disclosure Statement does not attempt to provide a detailed explanation of the circumstances that actually gave rise to the chapter 11 filing.   Moreover, current management and counsel expressly disclaim any such explanation that was provided in any prior pleading filed in this Court by prior counsel and/or under the direction of prior management.  As noted below, the Litigation Trust will be pursuing claims with respect to the advice provided by certain of the professionals concerning the timing of chapter 11 filing and the extent of creditors' recoveries in a chapter 11 case.

Speltz & Weis, that also will be transferred to the Litigation Trust and will be pursued by the Litigation Trust.

## III.   THE DEBTORS' CHAPTER 11 CASES

### A.   Filing and First Day Orders

On the Commencement Date, SVCMC and the Other Debtors filed their petitions under chapter 11 of the Bankruptcy Code.  The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

1.   *Certain First Day Orders*

Early in these cases, the Court entered a number of orders requested by the Debtors that were designed to minimize disruption to the Debtors' business operations as a result of the chapter 11 filings.  Among other things, these orders authorized the Debtors (i) to maintain their existing bank accounts and cash management systems and (ii) to pay prepetition wages and certain other prepetition claims (including critical vendors and construction and other lien creditors, described below).  The Court also entered an order deeming utility companies adequately assured of future performance such that SVCMC generally was not required to post deposits or other security for continued utility service.

The Court also entered orders intended to facilitate the administration of these cases.  Among other things, these orders (i) authorized the joint administration of the Debtors' cases; (ii) authorized specific notice and case management procedures; (iii) authorized the Debtors to file a consolidated list of creditors and equity holders; (iv) extended the time for the Debtors to file schedules and statements of financial affairs; (v) established procedures for treatment of valid reclamation claims; and (vi) established procedures for compensation and reimbursement of professionals and committee members.

2.   *Critical Vendor Order*

On July 11, 2005, the Court entered an order (the "Critical Vendor Order") authorizing the Debtors to pay up to $16,200,000 in prepetition claims of vendors the Debtors determined to be indispensable to their ongoing operations and reorganization efforts (the "Critical Vendors").  Shortly after the Creditors' Committee (as defined herein) was appointed, the Creditors' Committee filed a motion to reconsider the Critical Vendor Order.  Prior to the hearing on such motion, the Debtors agreed not to make any payments pursuant to the Critical Vendor Order without the Creditors' Committee's prior consent.  Since that time, with the Creditors' Committee's consent, the Debtors have made three payments pursuant to the Critical Vendor Order totaling $1,391,850.  No additional payments have been made under the Critical Vendor Order.

3.   *Construction/Lien Order*

On August 25, 2005, the Court entered an order authorizing the Debtors to pay the prepetition claims of construction and other lien creditors that perfected liens before the

Commencement Date or were capable of perfecting liens securing their claims against the Debtors in an aggregate amount not to exceed $2 million. The Debtors were required to provide the Creditors' Committee with seven days advance written notice of the payment and were authorized to make the payment if the Creditors' Committee did not object during the seven day period to any such payment.

As of the date of this Disclosure Statement, the Debtors have made the following payments pursuant to the Construction/Lien Order:

| Creditor | Project | Date Authorized | Amount |
|----------|---------|-----------------|--------|
| G Builders I LLC | SV Manhattan Operating Room Renovation | November 19, 2005 | $283,401.26 |
| G Builders I LLC | SV Manhattan Operating Room Renovation | December 23, 2005 | $25,566.76 |
| DavEd Fire Systems, Inc. | Bayley Seton Fire System Repair | January 25, 2006 | $120,000.00 |
| Karlsberger Architecture, P.C. | SV Manhattan Emergency Department Renovation | June 30, 2006 | $346,825.73 |

4.    *Retention of Debtors' Professionals*

Throughout these cases, the Debtors have sought authority to retain certain professionals in connection with their reorganization as appropriate for required tasks. The retention of the Debtors' professionals is discussed in more detail in Section III.F, below.

**B.    The Creditors' Committee**

1.    *Appointment of the Creditors' Committee*

On July 18, 2005, the United States Trustee appointed a seven-member committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Creditors' Committee"). The persons or entities initially appointed to the Creditors' Committee were as set forth below:

**Creditors' Committee Members**

Computer Science Corporation
3170 Fairview Park Drive MC 244
Church Falls, VA  22042

Special Touch Home Care Services, Inc.
2091 Coney Island Avenue
Brooklyn, NY  11223

Siemens Medical Solutions USA, Inc.
51 Valley Stream Parkway
Malvern, PA  19355

Aramark Corp., *et al.*
1101 Market Street
Philadelphia, PA  19107

Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

1199SEIU National Benefit & Pension Funds
310 West 43rd Street
New York, NY  10036-6407

American Express Travel Related Services
Company, Inc.
c/o Jason Halpern, Esq.
200 Vesey Street
New York, NY  10285

Two members (Aramark Corp. and American Express Travel Related Services) have since resigned from the Creditors' Committee.

Since the Creditors' Committee's formation, the Debtors have consulted with the Creditors' Committee concerning the administration of these cases.  The Debtors have kept the Creditors' Committee informed with respect to their operations and have sought the concurrence of the Creditors' Committee for actions and transactions outside the ordinary course of the Debtors' business, including, without limitation, authorization to use cash collateral, procurement of debtor-in-possession financing, and the sales of several of the Debtors' hospitals. The Debtors also have engaged the Creditors' Committee in negotiations about the terms and conditions of the Plan.

## 2.     *Purchases and Sales of General Unsecured Claims*

During the course of these cases, a number of general unsecured creditors have sold their claims to third parties ("Secondary Purchasers").  As of the date of this Disclosure Statement, the Debtors believe that of an estimated total of approximately $190 million in valid, general unsecured trade debt against SVCMC, nearly $95 million have been purchased by Secondary Purchasers, and three such entities that have formed a committee (the "Ad Hoc Committee") own or control nearly 40% of all general unsecured trade debt.  As a result, and together with the Creditors' Committee, the Debtors sought to have one of the members of the Ad Hoc Committee appointed as an official member of the Creditors' Committee.  When that effort failed to obtain the support of the United States Trustee, the Debtors entered into confidentiality agreements with the members of the Ad Hoc Committee to permit discussions with them about the Plan within the limitations on solicitation with respect to a reorganization plan prior to approval of a disclosure statement, in accordance with section 1125 of the Bankruptcy Code.  In exchange, one of the members of the Ad Hoc Committee agreed not to purchase or sell the Debtors' claims until January 31, 2007.  Although this member of the Ad Hoc Committee informed the Debtor of its intent to make public on or after February 9, 2007, certain information that it believes to be material non-public information, to the Debtors' knowledge, no such information was made public by such member.  Two of the other members of the Ad Hoc Committee have agreed not to purchase or sell the Debtors' claims until the earlier of (a) June 30, 2007 or (b) the effective date of a plan of reorganization.  These two members

and counsel to the Ad Hoc Committee have participated directly and substantially in the
negotiation of the Plan.

### 3. *Creditors' Committee's Professionals*

In connection with these cases, the Creditors' Committee retained Thelen Reid &
Priest LLP as its legal counsel, and Houlihan Lokey Howard & Zukin Capital, Inc. as its
financial advisors. On June 21, 2006, the Court authorized the retention of Alston & Bird LLP
as substitute counsel to the Creditors' Committee, effective as of March 16, 2006.

## C. The Tort Claimants' Committee

### 1. *Appointment of the Tort Claimants' Committee*

On April 23, 2006, a group of ten law firms representing holders of alleged
MedMal Claims filed a motion seeking appointment of an official committee to represent the
interests of MedMal Claimants. The motion was granted, and on May 17, 2006, the United
States Trustee appointed a five-member committee (the "Tort Claimants' Committee" and
together with the Creditors' Committee, the "Committees") pursuant to section 1102(a) and
1102(b) of the Bankruptcy Code. By order dated July 25, 2006 (the "Tort Committee Retention
Order"), the Tort Claimants' Committee was given the following limited responsibilities:

1.  Investigate, monitor, negotiate and assist in resolving MedMal Claims;

2.  Investigate, monitor, negotiate and assist in resolving requests by holders
    of MedMal Claims for relief from the automatic stay;

3.  Investigate, monitor, negotiate and assist the holders of MedMal Claims
    with respect to the Debtors' various insurance policies;

4.  Investigate, monitor, negotiate and assist holders of MedMal Claims with
    respect to procedures for pooling of insurance proceeds and the treatment
    of the Debtors' current or former employees in the context of commencing
    or continuing a proceeding related to a MedMal Claim;

5.  Monitor the disposition of otherwise unencumbered assets of the Debtors'
    estates which might be available for distribution to holders of MedMal
    Claims;

6.  Communicate with holders of MedMal Claims regarding the cases
    generally or the treatment of MedMal Claims; and

7.  Participate in the formation of any plan of reorganization or liquidation,
    but only to the extent of (a) reviewing and negotiating the classification of
    MedMal Claims in such plan; (b) reviewing whether a plan that separately
    classifies the holders of MedMal Claims discriminates unfairly or is fair
    and equitable with respect to such a class; and (c) advising holders of

MedMal Claims of the Tort Claimants' Committee's determination as to such a plan.

The following persons were appointed to the Tort Claimants' Committee:

### Tort Claimants' Committee Members

Ms. Elizabeth Evans and Mr. Mark McCord,
co-guardians ad litem for Michelle McCord
c/o Annemarie Bondi-Stoddard, Esq.
Pagalis & Erickson, LLC
1 Hollow Lane, Suite 107
Lake Success, New York 11042

Ms. Barbara Vaccaro
c/o Charles H. Burger, Esq.
32 Court Street, Suite 1407
Brooklyn, New York 11201

Resham Singh
c/o Joan Lieberman, Esq.
The Jacob Fuchsberg Law Firm, LLP
500 Fifth Avenue
New York, New York 10110

Mr. Alberto Cruz
c/o Trolman, Glaser & Lichtman, P.C.
777 Third Avenue
New York, New York 10017
Attn: Jeffrey A. Lichtman, Esq.

Ms. Edeline Dodard
c/o Ellen Werther, Esq.
Ressler & Ressler, Attorneys at Law
48 Wall Street
New York, New York 10005

Since the formation of the Tort Claimants' Committee, the Debtors have consulted with the Tort Claimants' Committee concerning the administration of these cases and the Plan. As contemplated by the Tort Committee Retention Order, the Debtors have kept the Tort Claimants' Committee informed with respect to their operations and have sought the Tort Claimants' Committee's input with respect to issues related to the automatic stay, the Plan, the treatment of MedMal Claimants, and, as discussed below, a process to estimate the aggregate amount of to-be Allowed MedMal Claims to assist in the negotiation and confirmation of the Plan.

2.    *The Tort Claimants' Committee's Professionals*

In connection with these cases, the Tort Claimants' Committee retained Kronish Lieb Weiner & Hellman LLP n/k/a Cooley Godward Kronish LLP ("CGK") as its counsel and Gilbert Heintz & Randolph LLP ("GH&R") as its special insurance consultant.

CGK's fees were limited by order of the Bankruptcy Court at a monthly cap of $100,000 for the compensation period starting on July 1, 2006. Fees for GH&R were limited to $175,000 for its engagement. By order dated February 21, 2007, the monthly cap for CGK was modified to permit a limited rollover of "unused" amounts to succeeding months.

3.    *Retention of Caronia Corp.*

On September 21, 2006, the Debtors, the Creditors' Committee and the Tort Claimants' Committee filed a joint application seeking authority to retain Caronia Corporation ("Caronia") as estimation consultant in connection with the estimation of MedMal Claims asserted against the Debtors.  The purpose of the retention is to create a process to deal with the difficult issue of negotiating and confirming a plan of reorganization where a large number and amount of filed proofs of claims in these cases relate to disputed, contingent and unliquidated MedMal Claims,[14] where the Bankruptcy Court lacks jurisdiction to fix the amount of those Claims, see 28 U.S.C. § 157(b)(5), and where, as described below, there is no medical malpractice insurance for some of these Claims.  Pursuant to this process, Caronia has been retained by the Debtors and both Committees and has been provided with access to information from both the Debtors and medical malpractice plaintiffs so that its expert estimation of the Debtors' potential liability for MedMal Claims can be the most precise under the circumstances, while at the same time preserving privileged communications and work product by the Debtors or plaintiffs.  Pursuant to its engagement, Caronia was to submit a single estimate for the Debtors' estimated liability, net of available insurance, for MedMal Claims for each of the Debtors' medical malpractice regions (as described below), to be used by the parties, subject to the limitations set forth in the Court's Order approving the Caronia retention, entered on November 3, 2006, to, among other things, assist in determining the feasibility of the Plan and assist in formulating and implementing the Plan.  The Caronia Estimate, which embodies this estimate, was submitted to the Debtors and the Committees at the end of March 2007, and was filed with the Court on June 1, 2007.  See also Subsection K below.

**D.    Use of Cash Collateral and Debtor-In-Possession Financing**

1.    *Initial DIP Financing*

On the Commencement Date, the Debtors filed a motion (the "Initial DIP Financing Motion") seeking, among other things, authorization to use the cash collateral of their secured creditors, and interim and final orders approving certain postpetition financing with HFG, among others.  On July 6, 2005, the Court entered an emergency order which, among other things: (i) authorized the Debtors to use cash collateral; (ii) granted adequate protection to their secured creditors; and (iii) authorized postpetition secured financing on an interim basis.  The Court entered a final order on September 9, 2005 granting the Initial DIP Financing Motion and approving up to $100 million in a revolving credit facility with HFG secured by receivables (the "HFG DIP Facility").

Pursuant to interim and final orders dated August 5, 2005 and September 8, 2005, respectively, the Court also authorized SVCMC to enter into a postpetition secured term loan agreement with DASNY in the approximate amount of $6,766,000 (the "DASNY DIP Loan").

---

[14] As of the Commencement Date, the Debtors were a named defendant in approximately 700 lawsuits based on claims of alleged medical malpractice and had identified approximately 1,000 instances that could give rise to additional MedMal Claims against the Debtors.  After accounting for duplicate proofs of claim, there are approximately 567 timely proofs of claim in this case asserting MedMal Claims in the billions of dollars.

The purpose of the DASNY DIP Loan was to fund, with HUD, the monthly debt service payments on the DASNY mortgage notes through January 1, 2006, in order to permit the Debtors time to seek and obtain additional DIP funding sufficient to satisfy DASNY's mortgage notes and redeem or defease the DASNY bonds.

2.      *Replacement DIP Financing*

Because the HFG DIP Facility was insufficient to support their liquidity needs under their long-term business plan, the Debtors sought a larger DIP facility that would allow them to implement a business plan and deliver first-rate patient care without interruption through the chapter 11 reorganization process. In addition to obtaining liquidity, the Debtors also sought lower interest rates and the flexibility to operate their business without the many regulatory constraints imposed by DASNY and HUD under the DASNY secured financing.

Although the process of finding a new DIP Lender started early in the case, it was pursued most vigorously and to conclusion only after the Debtors chose a Chief Executive Officer/Chief Restructuring Officer ("CEO/CRO") as described below. Thus, after a thorough marketing and negotiating process with several prospective lenders, including HFG, the Debtors (with guidance from their CEO/CRO and input from the Creditors' Committee) selected General Electric Capital Corporation ("GE Capital") as the new DIP lender to provide a $350 million secured credit facility, consisting of a term loan of up to $275 million (the "Term Loan"), and a $75 million revolving credit facility (the "Revolving Credit Facility," and together with the Term Loan, the "GE Capital DIP Facility"). The Debtors' obligations under the GE Capital DIP Facility are secured by a first lien on substantially all of the Debtors' assets, with certain limited exceptions. The Court approved the GE Capital DIP Facility on December 23, 2005, and the facility closed on December 30, 2005. The proceeds of the borrowings under the GE Capital DIP Facility were used to repay the HFG DIP Facility and DASNY's prepetition secured debt (other than that securing the St. Dominic's facility in Queens). See Section II(C)(3) below. The balance of the GE Capital DIP Facility has been available, *inter alia,* to fund ongoing working capital and general corporate needs during the cases; fund operating losses, including the costs attendant to transitioning certain operations; pay the fees, costs, expenses, and disbursements of professionals retained by the Debtors and the Committees; and pay the fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to GE Capital.

3.      *DASNY*

As noted above, a portion of the borrowings under the GE Capital DIP Facility was intended to be used to retire the HUD-insured DASNY loan. The Creditors' Committee, however, challenged the validity, enforceability, priority and/or perfection of a portion of DASNY's liens. To resolve this dispute, DASNY, the Debtors and the Committee entered into a stipulation, "so ordered" by the Court on December 29, 2005, pursuant to which DASNY agreed to (i) waive a $2 million unsecured prepetition claim against the Debtors; (ii) receive payment of $2,865,721.47 of the DASNY DIP Loan Claim only upon confirmation of a chapter 11 plan and payment of all distributions to general unsecured creditors under the plan; and (iii) subordinate $3.9 million of the DASNY DIP Loan Claim to the claims of general unsecured creditors until those creditors are paid in full, with interest. This stipulation provides the basis for the DASNY Subordinated Claims and it is the Debtors' intent that the treatment of the DASNY Subordinated

Claims under the Plan is consistent with this stipulation. DASNY believes that the Plan does not adhere to the stipulation. If DASNY is correct, DASNY believes that the Plan in its current form cannot be confirmed by the Bankruptcy Court because DASNY will be entitled to receive $2.8 million on the effective date of the Plan and the balance of its claim ($3.9 million) after Class 3 is paid in full, but before any payment is made to MedMal Claims, the PBGC or Intercompany Claims. If the Plan is ultimately modified to comport with DASNY's interpretation of the stipulation, recoveries to unsecured creditors may be less than what is proposed in the current version of the Plan. As noted above, neither the Debtors nor the Creditors' Committee believe that DASNY's interpretation of the stipulation is correct. As discussed below, the resolution of this dispute must be reasonably satisfactory to the Tort Claimants' Committee.

### 4.    *Commerce Bank DIP Financing*

On or about August 26, 2005, the Debtors filed a motion seeking approval of a DIP financing arrangement with Commerce Bank (the "Commerce DIP Facility"), to be secured by the 2006 Pool Reimbursements. The Commerce DIP Facility provided for an assumption of the prepetition Commerce Bank Pool Loans, and additional financing of up to approximately $16 million. The Court entered an interim order approving the Commerce DIP Facility on September 8, 2005, and a final order on November 4, 2005.

### 5.    *Cash Collateral Stipulations*

The Court entered an order on September 9, 2005 (the "Final Cash Collateral Order"), pursuant to which the Debtors were authorized to use the cash collateral of their prepetition secured lenders, including Aptium, Primary Care Development Corporation, Sun Life and RCG. The Debtors entered into separate stipulations with Aptium, Sun Life and RCG, which were "so ordered" by the Court, which provide for the consensual use of cash collateral in which they each claim an interest. The Aptium and Sun Life cash collateral stipulations have been extended periodically during the case.

The Final Cash Collateral Order contained a reservation of rights for the Creditors' Committee to object to or challenge the validity, extent, perfection or priority of the liens and security interests asserted by RCG. The Creditors' Committee filed an adversary proceeding (the "RCG Adversary Proceeding") seeking to avoid RCG's liens pursuant to section 544 and/or section 547 of the Bankruptcy Code and to declare such liens void as being in violation of section 362 of the Bankruptcy Code. First American Title Insurance Company ("First American"), which had issued a title insurance policy for the benefit of RCG in connection with both of these mortgages, assumed defense of RCG Adversary Proceeding and was substituted for RCG both as a defendant in the RCG Adversary Proceeding and as the holder of RCG's claims asserted against the Debtors. After some discovery, the Creditors' Committee and First American entered into a stipulation (the "RCG Stipulation"), "so ordered" by the Bankruptcy Court on June 27, 2006, resolving the RCG Adversary Proceeding. Pursuant to the RCG Stipulation, (i) First American was Allowed a General Unsecured Claim in the amount of $6 million on account of the $6 million Subordinate Promissory Note and the mortgage securing the $6 million Subordinate Promissory Note was deemed avoided, (ii) First American was Allowed (x) a General Unsecured Claim in the amount of $7 million and (y) a Secured Claim in the amount of $3 million, secured by a valid, perfected and enforceable prepetition lien on the

RCG Collateral, and otherwise the mortgage securing the $10 million Subordinate Promissory Note was deemed avoided.

### E.    Extensions of Exclusivity

Pursuant to a series of orders entered by the Bankruptcy Court, the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances with respect to a plan of reorganization under section 1121 of the Bankruptcy Code have been maintained uninterrupted during the course of these cases.  The Plan associated with this Disclosure Statement was filed within the Debtors' exclusive period to file a plan of reorganization.  On March 22, 2007, the Debtors' exclusive period to solicit votes on the Plan (and amendments to the Plan) was extended to July 15, 2007.

### F.    Appointment of the Debtors' Professionals and Chief Restructuring Officer

#### 1.    *Initial Applications and Retentions*

On or about the Commencement Date, the Debtors sought authority to retain McDermott Will & Emery LLP ("MWE") as bankruptcy counsel and Garfunkel, Wild & Travis, P.C. as health care, corporate and financing counsel.  Final orders approving these retentions were entered on August 5, 2005, although as described below, MWE's services as bankruptcy counsel were subsequently terminated.  The Debtors also obtained a final order authorizing the employment of Bankruptcy Services LLC as claims, noticing and balloting agent on July 28, 2005, and obtained a final order authorizing the retention of professionals utilized in the ordinary course of business on September 9, 2005.

#### 2.    *Initial Attempts to Retain Speltz & Weis and Huron Consulting Services LLC*

Also on the Commencement Date, the Debtors filed requests (i) to continue to employ Speltz & Weis as interim management for the Debtors in accordance with its then-existing management agreement (the "July Speltz & Weis Motion"), pursuant to section 363 of the Bankruptcy Code, and (ii) to retain Huron as financial advisors to the Debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code (the "July Huron Application").

Almost immediately upon the filing of the July Speltz & Weis Motion and the July Huron Application, the U.S. Trustee, the Creditors' Committee, and other parties raised serious questions about the Debtors' ability to employ Speltz & Weis and Huron consistent with the requirements of the Bankruptcy Code.  These objections included the following: (i) an objection that the July Huron Application failed to comply with the so-called "Jay Alix Protocol," pursuant to which crisis managers in the Southern District of New York must be retained under section 363(b) of the Bankruptcy Code, because, among other reasons, at the Commencement Date, Huron Inc. owned Speltz & Weis yet pursuant to the management agreement Speltz & Weis would be supervising (and reviewing the fees of) Huron LLC; (ii) an objection that Huron LLC was not "disinterested," under section 101(14) of the Bankruptcy Code and as required of professionals under section 327(a) of the Bankruptcy Code, in light of, among other things, Huron Inc.'s prepetition acquisition of Speltz & Weis without proper disclosure to SVCMC and the terms of that acquisition which appeared to increase the

compensation paid to Messrs. Speltz and Weis based on Huron LLC's fees as financial advisor to SVCMC; (iii) an objection that Huron LLC and Speltz & Weis failed to adequately disclose relevant data involving Huron Inc.'s acquisition of Speltz & Weis as part of the bankruptcy retention process; and (iv) an objection to the presence of over fifty individuals associated with Huron LLC and/or Speltz & Weis in various positions at SVCMC.  In response to these objections, the Debtors withdrew the July Huron Application and adjourned the hearing on the July Speltz & Weis Motion.

Efforts to resolve the disputes over the Debtors' ability to retain Huron LLC and Speltz & Weis proved not only unsuccessful, but all-consuming.  The relationship between the Debtors, on the one hand, and U.S. Trustee, the Creditors' Committee, other parties and the Court (Beatty, J.), deteriorated beyond adversarial to simply contentious.  Matters that should have been resolved consensually were not.  And the Debtors found that their efforts to reorganize were being stymied.  Thus, in late August of 2005, Messrs. Speltz & Weis resigned from their management positions at SVCMC.  The Board appointed Richard Boyle, who was then serving as Chairman of the Board, as interim CEO, Tom Allison of Huron LLC as interim Chief Financial Officer, and Dawn Gideon of Speltz & Weis as interim Chief Restructuring Officer.  Mr. Boyle took on the responsibility of interim CEO for no compensation.  The U.S. Trustee voiced concern over the Board's appointment of the interim chief executive officer and chief financial officer and attempted to engage MWE in a dialogue concerning the development of a protocol for the appointment of a chief restructuring officer.  Upon the replacement of MWE as counsel to the Debtors, it became apparent to the Board that it was necessary to pursue dialogue with the U.S. Trustee's office in developing a protocol for the appointment of a new chief restructuring officer and chief financial officer.  As described in more detail below, that process began with the retention of new chapter 11 counsel in the Debtors' chapter 11 cases.

3.    *Retention of Weil, Gotshal & Manges LLP, and Togut, Segal & Segal LLP*

MWE, as the Debtors' counsel and public face, was at the center of the acrimony with the major constituencies in these cases, particularly the U.S. Trustee, and the Creditors' Committee.

The Debtors relied on MWE for guidance as to how best to overcome the obstacles facing them as debtors in possession under chapter 11.  By mid-September 2005, however, it had become clear to the Debtors' management and the Board that MWE had lost the confidence of not only parties critical to a successful reorganization, but of the Court as well, and that it could no longer represent the Debtors.  Accordingly, on September 20, 2005, the Board filed an application pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 to replace MWE and to employ Weil, Gotshal & Manges LLP ("WG&M") as lead attorneys for the Debtors, *nunc pro tunc* to September 12, 2005.  On September 30, 2005, the Court entered an interim order granting the application, and a final order was entered on November 7, 2005.

On October 6, 2005, the Debtors also filed an application to employ and retain Togut, Segal & Segal LLP ("Togut") as conflicts counsel for the Debtors, *nunc pro tunc* to September 14, 2005.  On October 19, 2005, the Court entered a final order approving the Togut retention.

Once WG&M and Togut were retained, the role of MWE was limited. MWE was retained as "special counsel" to the Debtors under section 327(e) of the Bankruptcy Code for the limited purposes of being available to assist in the transition to WG&M and to provide such other services as the Debtors and WG&M specifically requested.

4.    _Retention of Cadwalader, Wickersham & Taft LLP_

On April 19, 2007, the Debtors filed a motion to substitute Cadwalader, Wickersham & Taft LLP ("CWT") for WG&M as their general chapter 11 counsel. The Court entered a final order approving this substitution of counsel on April 25, 2007. WG&M continues to be retained as "special counsel" under section 327(e) of the Bankruptcy Code for limited transition matters.

5.    _Collaborative Process to Select a CEO/CRO and CFO_

After replacing their lead counsel, the Debtors turned their attention to the critical task of repairing relations with the Creditors' Committee and the U.S. Trustee, while at the same time restoring longer-term leadership focused on restructuring operations and emerging from chapter 11. Thus, immediately upon retaining replacement counsel in September 2005, the Debtors commenced discussions with the U.S. Trustee and the Creditors' Committee about finding a CEO/CRO and CFO to replace the interim holders of those positions, Mr. Boyle (CEO), Ms. Gideon (CRO) and Mr. Allison (CFO). The process to select these officers (the "Selection Process") was a collaborative one. First, the Debtors and the Creditors' Committee independently compiled a list of potential CEO/CRO candidates. Second, the Debtors, the Creditors' Committee, the U.S. Trustee, DASNY, HUD, and others met to discuss the CEO/CRO job description, the Selection Process procedure, and the lists of potential candidates compiled by the Debtors and the Creditors' Committee. From these discussions, the role of the CEO/CRO was defined to include, among other things, overseeing the Debtors' operations and restructuring efforts during their chapter 11 cases consistent with direction from and authority conferred by the Board; acting as an officer of SVCMC who would report directly to the Board, with all senior management reporting to the CEO/CRO; and assessing the need for and performance of the Speltz & Weis and Huron LLC personnel still employed by the Debtors, while ensuring a smooth transition and as little disruption to the Debtors' operations as possible. Third, a group consisting of representatives of the Debtors and the Creditors' Committee screened and interviewed candidates, making recommendations to the Board, which in turn considered candidates as well.

At the conclusion of this process, on October 14, 2005, the Board decided to employ Guy Sansone and Martin McGahan, both of Alvarez & Marsal LLC ("A&M"), as CEO/CRO and CFO, respectively. Interim orders authorizing the retention of Messrs. Sansone and McGahan were entered on October 28 and November 4, 2005. A final order authorizing this retention was entered on December 14, 2005. The final order provided for a fixed monthly payment to A&M for the services of Messrs. Sansone and McGahan, hourly compensation (subject to monthly caps) for other A&M personnel who work on the case, and a lump sum fee, upon the effective date of a plan of reorganization that is supported by the Debtors' Board and the Creditors' Committee, plus additional amounts to be paid if certain Board-approved performance objectives are achieved in these cases, provided that such objectives are not based

upon gross revenues or net income and are subject to approval by the New York State Department of Health. Such incentive fee is subject to Bankruptcy Court approval at the conclusion of the cases on a "reasonableness" standard. The Board has determined that Messrs. Sansone and McGahan have performed sufficiently to warrant the payment of the lump sum fee and the additional amounts described above, and has determined, provided that the Plan is confirmed and subject to Bankruptcy Court approval, to the extent required, to pay the lump sum fee and the additional amounts.

### 6. *Other Debtor Professionals*

With new counsel, the CEO/CRO and the CFO in place, the Debtors turned to the task of analyzing their other professional relationships. Given the number of Huron LLC and Speltz & Weis (now Huron LLC) employees filling key middle management roles at the Debtors, it was clear that, for the benefit of these estates, these Huron LLC employees needed to remain involved until permanent employees could be recruited and retained. Similarly, the Debtors' new management concluded that they needed to continue employing the services of an investment banker to assist in the marketing and sale of their hospitals in Queens and Staten Island, which, because they were sustaining continuing losses, needed to be divested as part of any successful reorganization. Accordingly, on October 21, 2005, the Debtors filed motions seeking (i) an order authorizing the retention of Huron LLC as restructuring and management consultants (the "October Huron Application") and (ii) an order authorizing the employment and retention of Cain Brothers & Company LLC as investment bankers (the "Cain Application").

(a)     The October Huron Application

Notwithstanding the Debtors' decision that it was in the best interests of their estates to retain Huron, the U.S. Trustee and the Creditors' Committee continued to oppose Huron's retention for the reasons raised in connection with the July Huron Application. Ultimately, a compromise was reached that provided for Huron's retention to provide restructuring and management services to the Debtors subject to the following conditions, among others: Huron LLC was required to limit compensation for Speltz & Weis employees – who were to be "seconded" to Huron LLC – to actual cost; Huron LLC was required to compensate the estates for certain costs and expenses incurred in investigating the prepetition relationship between Huron LLC and/or Huron Inc. and Speltz & Weis; Huron LLC was required to discount or otherwise limit its compensation from the early months of the case; Huron LLC would produce certain documents, and make certain employees available, to SVCMC, the Creditors' Committee, and the U.S. Trustee in connection with a review of Huron Inc.'s acquisition of Speltz & Weis and the prepetition services performed by Huron LLC and Speltz & Weis; and Huron LLC and Speltz & Weis would remain subject to any and all claims based on their acts or omissions. The October Huron Application was allowed on an interim basis on October 28, 2005, and on a final basis on December 22, 2005.

(b)     The Cain Application

The Cain Application requested authority to retain Cain Brothers & Company LLC ("Cain Brothers") as the Debtors' investment bankers pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, *nunc pro tunc* to July 5, 2005. No objections were received, and

the Cain Application was granted on an interim basis on October 28, 2005, and on a final basis on December 22, 2005.

### 7.   *Objections to Fees Charged by MWE*

On January 31, 2006, MWE filed an application for compensation and reimbursement of expenses for the period from June 5, 2005 through September 30, 2005 (the "MWE Fee Application"), in the aggregate amount of $2,332,293.78.  Objections were filed by the Creditors' Committee on March 3, 2006, and by the U.S. Trustee on March 7, 2006 effectively seeking to disallow all or a substantial portion of MWE's requested compensation.  On April 27, 2006, the Court entered an order referring the dispute to mediation, where the parties were unable to resolve the matter.  On June 14, 2006, the Debtors were ordered by the Court to make an interim payment of $1,200,000 to MWE, which is subject to disgorgement and will be accounted for in the disposition of the MWE Fee Application.  On July 31, 2006 the Debtors filed an objection to the MWE Fee Application.

An evidentiary hearing on the MWE Fee Application was held from October 23, 2006 through October 25, 2006.  At the conclusion of the hearing, MWE was directed to submit a post-trial brief in support of its fee application and specifically to address issues and concerns raised by the Bankruptcy Court.  The Bankruptcy Court requested that the objectors submit a statement of economic consequences to the Debtors' estates arising from MWE's services.  Those submissions were made on November 3, 2006 and the replies were submitted on November 22, 2006.  The Bankruptcy Court has not yet ruled on the MWE Fee Application.

### G.   **The Debtors' Relationships with their Unions**

As of the Commencement Date, the Debtors were parties to collective bargaining agreements (the "CBAs") with nine (9) unions covering approximately 8,813 employees.  As of the Commencement Date, the Debtors owed amounts under certain of the CBAs.  Because the Debtors value their relationships with unionized employees who are important to the Debtors' operations, the Debtors have endeavored to maintain positive relations with their unions through periodic consultations throughout these cases.

Because they have limited durations, certain CBAs have expired during the course of these cases.  The Debtors have tried, as much as possible, to maintain normal, ordinary course relations with the employees covered by these CBAs.  As such, they have entered into numerous memoranda of understanding, agreements, or similar arrangements with certain of their unions to continue to apply the same terms as the relevant CBA, or slightly amended terms, to the parties' relationship until the final status of the CBA is resolved.

In situations where the Debtors entered into agreements to transfer their hospitals, the Debtors, the purchasers, and the affected unions generally have worked out arrangements whereby the CBAs covering those hospitals were assumed by the Debtors and transferred to the Purchasers.

Subject to any negotiated compromise of claims related to CBAs which will be disclosed in the Plan Supplement or approved by separate motion to be filed prior to the Confirmation Hearing, the Debtors presently intend to assume the CBAs, to the extent not

previously assumed, relating to their continuing hospitals (*i.e.* SV Manhattan and SV Westchester) as amended by any such compromise.

## H.    The Debtors' Pension Plan

SVCMC sponsors the Saint Vincents Catholic Medical Centers Retirement Plan (the "Pension Plan").  The Debtors intend, and the Plan contemplates, that Reorganized SVCMC will continue to be the contributing sponsor of the Pension Plan, which is a defined benefit pension plan insured by the PBGC under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461, et seq.  The Pension Plan is subject to minimum funding requirements of ERISA and § 412 of the Internal Revenue Code.

PBGC believes that the Pension Plan is underfunded on a termination basis in an amount it estimates to be $219,100,000.  The Debtors disagree with such estimate.  The Debtors believe that the Pension Plan is underfunded on a termination basis in an amount estimated to be $152,500,000.  An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA.  PBGC has filed contingent claims in this bankruptcy for the unfunded benefit liabilities of the Pension Plan, and for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed PBGC.  It asserts portions of those claims would be entitled to priority treatment.  No provision of the Debtors' Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will discharge, release, or relieve any other party, in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The PBGC shall not be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims.  Further, all rights of the Debtors with respect to the Pension Plan are reserved, including, but not limited to, all rights of the Debtors with respect to professionals engaged in connection with the Pension Plan.

The Debtors do not necessarily agree with the PBGC's assertions, and as set forth herein, the Debtors intend to continue the Pension Plan and continue to make required payments to the Pension Plan.  Accordingly, the Debtors do not believe that the PBGC has a cognizable claim in these Chapter 11 Cases.

## I.    Uniformed Services Family Health Plan

The USFHP is a profitable business that the Debtors plan to retain upon emergence from chapter 11, subject to an ongoing review of each of the contracts relating to the program.  Accordingly, pursuant to the Plan, the Debtors will assume SVCMC's contract with DOD for USFHP and will assume all or substantially all contracts with its providers under USFHP (for example, doctors in the program) unless a contract is specifically identified in the Plan Supplement as a contract to be rejected.  Except as otherwise agreed pursuant to a separate agreement approved by the Bankruptcy Court, assumed USFHP contracts will be subject to the same procedure for assuming other executory contracts and fixing any required cure payments under section 365(b) of the Bankruptcy Code as described in section IV.D, below.

**J.    Closure or Sale of SVCMC's Brooklyn, Queens and Staten Island Hospitals**

Several of SVCMC's hospitals have been unprofitable for many years, both prior and subsequent to the merger that created SVCMC.  Specifically, Bayley Seton, Mary Immaculate, St. John's, St. Mary's, and SV Staten Island each have sustained significant operating losses over the past several years.  Despite a large investment of resources in each of these facilities, SVCMC was unable to operate them profitably.  Further, the Debtors lacked the financial wherewithal to return these hospitals to financial stability or continue to absorb the significant operating losses generated by these hospitals, or to fund the capital investments required to maintain the standard of care provided at these hospitals.

Because the Debtors could not afford to continue to operate Bayley Seton, Mary Immaculate, St. John's, St. Mary's and SV Staten Island, were unable to improve significantly the operating performance of these hospitals, and did not have the financial resources to fund the required capital improvements at these hospitals, the Debtors determined that they needed to divest themselves of these hospitals in order to reorganize successfully and continue as a going concern.  Given the importance of the hospitals to the communities they serve, the Debtors' mission, and their employees, the Debtors desired to transfer these hospitals to entities that would continue to operate them as hospitals, rather than converting or closing these facilities.  Unfortunately, the Debtors were unsuccessful in their attempts to transfer St. Mary's and Bayley Seton as going concerns.  As a result, the operations of Bayley Seton were substantially reduced before the Commencement Date.  Its acute care facilities were closed, and its operations were limited to various behavioral health and other clinic services.[15]  The Debtors also closed St. Mary's as discussed below.  The Debtors, however, were able to transfer Mary Immaculate, St. John's and SV Staten Island during the course of the Chapter 11 Cases.[16]

1.    _Closure of St. Mary's Hospital and Subsequent Sale of Campus_

St. Mary's Hospital Brooklyn: St. Mary's was a 269 bed hospital located at 170 Buffalo Avenue, Brooklyn, New York which was founded in 1892 by the Sisters of Charity of St. Vincent de Paul to deliver health care to the poor and underserved of the neighborhood and surrounding areas.  In June 2005, SVCMC announced that it would close St. Mary's due to the long history of losses the system had experienced at this facility, and SVCMC submitted a closure plan to DOH for approval.  At the time, St. Mary's was losing $500,000 per week, and efforts to sell St. Mary's, or even to give St. Mary's away, had failed.  The lone interested acquirer withdrew its stated interest in St. Mary's when the State of New York refused to provide $40 million for needed capital improvements to the facility.  Accordingly, on August 18, 2005, the Debtors filed a motion seeking authority to close St. Mary's.  Over the objection of numerous

---

[15] These programs were effectively transferred to the purchaser of SV Staten Island or other SVCMC hospitals during the Chapter 11 Cases.

[16] After the decision was made to sell SV Staten Island, financial performance improved at that hospital.  The Debtors nonetheless believe that it was in the best interest of these estates to sell SV Staten Island.  Substantial capital investment would have been required to sustain SV Staten Island in the long term, and SVCMC lacks the ability to make that investment in that hospital.

parties, including employees, physicians, and members of the community served by St. Mary's, the Court authorized the closure on September 20, 2005. And in accordance with the closure plan approved by DOH, St. Mary's closed most of its remaining operations on October 4, 2005, and transferred six of its outpatient centers to Kingsbrook Jewish Medical Center ("Kingsbrook"), a neighboring hospital. Kingsbrook continues to manage five of these centers in the same locations in which St. Mary's had operated them.

    With St. Mary's no longer operating as a hospital, the Debtors marketed and conducted a public auction for much of the real estate on which St. Mary's had operated (the "St. Mary's Campus") based on a stalking horse bid that had been received, pursuant to bidding procedures approved by the Court on June 2, 2006. Four bidders participated in the auction on July 11, 2006. The Backer Group LLC submitted the highest bid of $21.2 million, which after payment of the break-up fee to the stalking horse resulted in upwards of $20,000,000 for SVCMC's estate. On July 18, 2006, this Court entered an order approving the sale of the St. Mary's Campus to The Backer Group LLC, and the sale closed on December 29, 2006.

### 2.   _Sale of SVCMC's Queens Hospitals_

    As of the Commencement Date, the Debtors operated two hospitals in Queens, New York (the "Queens Hospitals"): Mary Immaculate, a 261 bed hospital located at 152-11 89th Avenue, Jamaica, New York which was established in 1902 by the Roman Catholic Sisters of St. Dominic of Amityville, New York; and St. John's Queens Hospital, a 358 bed hospital located at 90-02 Queens Blvd., in the Elmhurst neighborhood of Queens, New York which was established in 1891 by the Sisters of St. Joseph. Both hospitals were losing substantial amounts of money, at a combined rate of more than $3 million per month. In addition, both Queens Hospitals require substantial capital investment if they are to be competitive in the future.

    Accordingly, with the assistance of Cain Brothers, the Debtors embarked on a focused effort to sell the Queens Hospitals as going concerns. Cain Brothers contacted approximately sixty-five (65) potential purchasers of the Queens Hospitals, including New York, New Jersey, and national not-for-profit and for-profit organizations. Of those parties contacted, eight (8) signed nondisclosure agreements and proceeded with due diligence on one or both of the Queens Hospitals. Seven (7) of the potential purchasers conducted site visits to one or both of the Queens Hospitals, and/or attended presentations regarding the management, operation and financial condition of those hospitals.

    Despite the initial interest shown in the Queens Hospitals, the Debtors only received one (1) binding bid for the Queens Hospitals, from Wyckoff Heights Medical Center ("Wyckoff") for aggregate consideration totaling $40 million (subject to certain adjustments), mainly in the form of assumed liabilities.[17] The Debtors therefore proceeded to negotiate and execute an asset purchase agreement (the "Queens Purchase Agreement") with Caritas Health

---

[17] The only other serious proposal received for either of the Queens Hospitals was received from Medisys. The proposal was limited to Mary Immaculate. Among other things, the proposal did not provide these estates with any additional consideration beyond eliminating continuing exposure for losses at Mary Immaculate, and there were substantial questions about whether Medisys intended to continue to operate Mary Immaculate.

Care Planning, Inc. ("Caritas"),[18] an affiliate of Wyckoff, for the Queens Hospitals and related assets.  The Queens Purchase Agreement became the stalking horse agreement for a competitive bidding process approved by the Court on May 17, 2006.  When no competing bids were received, the Court approved the sale of the Queens Hospitals and related transactions contemplated by the Queens Purchase Agreement on June 28, 2006.  The sale of the Queens Hospitals and related transactions contemplated by the Queens Purchase Agreement were consummated on January 1, 2007.  These related transactions included providing, among other things, information technology services and access to SVCMC's  nurses registry to Caritas, and through a wholly-owned, insurance subsidiary, medical malpractice insurance for approximately 200 doctors.

The assets sold to Caritas along with the Queens Hospitals included Parsons Manor.  Parsons Manor is a six-story apartment building located next to Mary Immaculate. Parsons Manor has historically provided office space for certain department chairs and other employees of SVCMC, as well as for regional and system-wide corporate departments.[19]

After the Court authorized the Queens Purchase Agreement in June 2006, the Debtors, Caritas and Wyckoff subsequently agreed to two (2) amendments to the Queens Purchase Agreement (the Court approved an amendment to the Queens Purchase Agreement along with the agreement itself, in June 2006).  The first amendment provided, among other things, that Caritas would assume SVCMC's obligation to make installment payments to the Fire Department for the City of New York for automated vehicle locator equipment installed in certain of the ambulances being transferred to Caritas as part of the sale of the Queens Hospitals. The second amendment, among other things, modified the form of consideration to be paid to the Debtors under the Queens Purchase Agreement to allow Caritas to make a portion of the cash payment due under the Queens Purchase Agreement by issuing to the Debtors a $5 million, fully secured, interest-bearing note.  The Court approved these amendments to the Queens Purchase Agreement on December 20, 2006.[20]

Further, pursuant to an order entered in September 2006, the Debtors entered into an agreement with Wyckoff to permit it to manage on an interim basis the Queens Hospitals. Wyckoff requested this ability to begin its efforts to manage these hospitals more efficiently and in accordance with its own management goals.  Accordingly, by the time that Caritas in fact took

---

[18] Caritas has since changed its name to Caritas Health Care, Inc.

[19] Because Parsons Manor was largely vacant, and its apartment building-style layout was ill-suited for office space, the Debtors had marketed Parsons Manor as a stand alone property separate from Mary Immaculate.  In August 2005, the Debtors entered into an agreement for the sale of Parsons Manor for $12.5 million.  In response to concerns raised by an unofficial committee of Mary Immaculate physicians that selling Parsons Manor separately from Mary Immaculate might negatively impact the Debtors' ability to sell the latter, the Debtors did not close on this $12.5 million agreement and instead marketed Parsons Manor concurrently with Mary Immaculate.  The Debtors' agreement to sell Parsons Manor separately from Mary Immaculate has expired by its terms.

[20] In connection with the sale of the Queens Hospitals, SVCMC transferred its affiliation with CMC-OHS to Caritas. As a result, the Debtors filed a motion seeking to dismiss the chapter 11 case of CMC-OHS, and the relief requested was granted by the Court on December 21, 2006.  See also footnote 2.

title to the Queens Hospitals, it had at least three months to address various operational issues at those hospitals.

3.    *Sale of SVCMC's Staten Island Hospitals*

As of the Commencement Date, the Debtors owned and operated two hospitals on Staten Island: SV Staten Island, a 440 bed hospital founded by the Sisters of Charity of New York in 1903, and Bayley Seton, a 198 bed hospital located at 75 Vanderbilt Avenue, Staten Island, New York.

(a)    St. Vincent's Hospital, Staten Island.  Concurrently with their efforts to sell the Queens Hospitals, the Debtors, through Cain Brothers, also marketed SV Staten Island for sale as a going concern.  Again, only one (1) entity submitted a binding bid for SV Staten Island, Bayonne Medical Center ("Bayonne").  The Debtors therefore negotiated and executed an asset purchase agreement (the "Staten Island Purchase Agreement") pursuant to which the Debtors agreed to sell SV Staten Island and certain related assets to Castleton Acquisition Corporation ("Castleton"),[21] an affiliate of Bayonne, for aggregate consideration totaling $27.5 million (subject to certain adjustments), mainly in the form of assumed liabilities.  On June 2, 2006, the Court entered an order approving certain bidding procedures for the sale of SV Staten Island using the Staten Island Purchase Agreement as a stalking horse.  Those procedures set June 30, 2006 as the deadline for the submission of competing bids.  No competing bids were received by this deadline.  Staten Island University Hospital ("SIUH"), however, objected to the proposed sale of SV Staten Island to Castleton because it included SVCMC's interest in The Heart Institute, a joint venture between SIUH and SVCMC relating to the provision of advanced cardiac care services to the citizens of Staten Island.  SIUH contended that SVCMC's interest in The Heart Institute could not be assigned to Castleton without SIUH's consent, which SIUH refused to give.  The parties ultimately resolved their disputes on terms which included some modifications to the joint venture agreement for The Heart Institute, SIUH's consent to the assignment to Castleton, and a compromise of amounts due to SVCMC related to The Heart Institute.  Based on this resolution, the Court approved the sale of SV Staten Island and related transactions contemplated by the Staten Island Purchase Agreement on July 24, 2006.  The sale of SV Staten Island and related transactions contemplated by the Staten Island Purchase Agreement were consummated on January 1, 2007.  These related transactions included, among others, informational technology services.

After Court approval of the Staten Island Purchase Agreement, the Debtors, Castleton and Bayonne have entered into an amendment of that purchase agreement, which provided, among other things, that Castleton would assume, as of the closing date of the sale of SV Staten Island, the obligation for making installment payments to the Fire Department for the City of New York related to automated vehicle locator equipment installed in certain of the ambulances being transferred to Castleton in connection with the sale of SV Staten Island.  The Court approved this amendment on December 21, 2006.

---

[21] Castleton has since changed its name to Richmond Medical Center d/b/a Richmond University Medical Center.

(b)      Bayley Seton Hospital, Staten Island.  Bayley Seton takes its name from Dr. Richard Bayley, New York City's first Public Health Service Officer, and St. Elizabeth Ann Seton, his daughter and foundress of the Sisters of Charity in America.  Originally established in the 1830s as a marine hospital for the care of merchant seamen, the facility was expanded in the early 1900s and became part of the United States Public Health Service System. During this period, it served as the site for the founding research labs of the National Institutes of Health.  In 1981, when the federal government disbanded the Public Health Service System, the New York Sisters of Charity assumed the sponsorship of the facility and renamed it Bayley Seton.  SVCMC ceased providing medical acute care inpatient services at Bayley Seton in 1999. Key services still provided at Bayley Seton as of the Commencement Date included behavioral health care; chemical and alcohol detox treatment; HIV treatment; endoscopy services; ambulatory care; rehabilitation services; and vision care.  The majority of these programs were sold to Castleton in connection with the sale of SV Staten Island, and are being transferred from Bayley Seton to Castleton's facilities.  This transition may take as long as three (3) years.

The cessation of acute care facilities at Bayley Seton and the consolidation of other services formerly provided at Bayley Seton with related programs at SV Staten Island have left the Bayley Seton campus largely unused.  The sale of SV Staten Island to Castleton has resulted in a transfer of Bayley Seton's behavioral health, endoscopy, HIV treatment, detoxification treatment, and certain other programs to SV Staten Island or other facilities owned by Castleton or Bayonne, further obviating the Debtors' need for the expansive Bayley Seton campus.  At the same time the cost of maintaining that campus, which has historically exceeded the net revenues generated by the programs housed there even when Bayley Seton was a fully operational acute care facility, is increasing as the campus's infrastructure, much of it nearly a century old, continues to age.

The Debtors have therefore determined to sell the Bayley Seton campus, and have engaged in negotiations for parts of the campus with each of The Salvation Army, St. Elizabeth Ann's Health Care & Rehabilitation Center, and an alcohol rehabilitation facility on the premises, Chait House.  The net proceeds of the potential sale, if successfully negotiated to conclusion, documented and closed, cannot be reliably estimated because the Debtors have been advised of potential hazardous waste remediation measures that may be required to be able to consummate a sale.  The Debtors are in the process of analyzing the extent and cost of any remediation.  Once terms for a transaction are finalized, the Debtors will seek Bankruptcy Court approval for the sale of the Bayley Seton campus.  Parties in interest are urged to review the Debtors' filings with the Court to obtain more detailed information about any Bayley Seton transaction(s).

4.      *Sale of Allied Schools*

As of the Commencement Date, the Debtors operated the School of Allied Health Professions (the "Allied Schools") at 175-05 Horace Harding Expressway, Fresh Meadows, New York (the "Allied Schools Premises"), which included the following programs: (i) a Physician's Assistant program; (ii) a Medical Technology program; (iii) a Radiography program; (iv) a Pathology Assistant program; and (v) an EMS Institute program.  As they have developed their vision for their post-reorganization operations, the Debtors have concluded that, while the Allied Schools provide important learning opportunities for much-needed skills in the medical

professions, they are not sufficiently related to or supportive of the Debtors' core healthcare services to warrant continued management effort on the part of SVCMC, particularly since the Debtors have divested themselves of their hospitals in Queens. Accordingly, the Debtors decided to sell the "business" of the Allied Schools and the Allied Schools Premises to St. John's University, New York ("SJU") for $7.7 million, pursuant to Court authority granted on September 8, 2006 (the "Allied Schools Transaction").

As noted, part of the sale of the Allied Schools to SJU included selling the Allied Schools Premises to SJU. As of the Commencement Date, however, the Debtors did not own the Allied Schools Premises, notwithstanding that they had exercised an option to purchase the Allied School Premises for $4.2 million provided by the lease between the Debtors and Turnpike Gardens, Inc., a New York corporation ("Turnpike Gardens"). Turnpike Gardens had not performed as required under the option contained in the lease. The Debtors, therefore, commenced an adversary proceeding, docketed in the Bankruptcy Court as adversary proceeding number 06-01460 (ASH), seeking, among other things, to compel Turnpike Gardens to transfer the Allied Schools Premises to the Debtors in exchange for payment of the option price in connection with the Allied Schools sale to SJU. On September 28, 2006, simultaneously with the approval of the sale to SJU, the Bankruptcy Court entered a stipulation and order between the Debtors and Turnpike Gardens resolving the adversary proceeding and providing for, among other things, the purchase of the Allied Schools Premises by the Debtors no later than the end of 2006 (the "Turnpike Gardens Settlement").

In connection with the Allied Schools Transaction, SJU sought confirmation from the United States Department of Education that the Allied Schools could be transferred to SJU. In order to provide more time for SJU to obtain this confirmation, as well as to facilitate the purchase of the Allied Schools Premises under the Turnpike Gardens Settlement, SJU and the Debtors entered into an amendment of the Allied Schools Transaction, which was approved by the Court on December 19, 2006. As a result of the amendment, on December 27, 2006, SJU acquired the Allied Schools Premises from Turnpike Gardens for approximately $4.2 million (less the deposit already paid to Turnpike Gardens by the Debtors), and escrowed the balance of approximately $3.5 million due for the sale of the Allied Schools. Under the amendment, if SJU obtained the needed confirmation from the federal Department of Education within ninety (90) days of the purchase of the Allied Schools Premises, the balance would be released from escrow to the Debtors and the complete Allied Schools Transaction would close. If, however, that confirmation was not obtained, then at SJU's option either (a) the balance would be released from escrow to the Debtors as the purchase price for the Allied Schools Premises only, and the Debtors would retain ownership of the Allied Schools, or (b) the Debtors would reimburse SJU for the funds it paid to acquire the Allied Schools Premises, the escrowed funds would be returned to SJU, and the Debtors would retain ownership of both the Allied Schools and the Allied Schools Premises. In the latter event, the Debtors anticipated that they would proceed to solicit new offers for either of the Allied Schools Premises and/or the Allied Schools.

In late January 2007, the Debtors received confirmation from the Department of Education that the Allied Schools would remain eligible to participate in various student loan programs following its acquisition by SJU. The Allied Schools Transaction closed on March 1, 2007, and the funds in escrow were released to the Debtors.

5.    *Sale of Nursing Schools*

As of the Commencement Date, the Debtors also operated two schools of nursing, one on Staten Island and one in Queens (the "Nursing Schools").  Like the Allied Schools, the Nursing Schools provide training to future healthcare professionals – in this case nurses – that were integral to the Debtors' operations.  However, as a result of (i) annual operating losses of approximately $850,000, (ii) the low number of graduates of the Nursing Schools who have historically gone on to work at SVCMC's facilities, and (iii) the closure or sales of the Debtors' hospitals near the Nursing Schools, the Debtors decided to sell or transfer the Nursing Schools, if possible as going concerns.

Any sale or transfer of the Nursing Schools is subject to a lengthy and complex regulatory process.  Accordingly, in an effort to minimize losses to the Debtors' estates from the continued operation of the Nursing Schools during this regulatory process, the Debtors constructed a structure whereby a buyer would both (i) purchase an option to purchase the Nursing Schools upon receiving the requisite approvals, pursuant to an option agreement (the "Option Agreement"), and (ii) manage the Nursing Schools under SVCMC's supervision and be responsible for operating losses, pursuant to a management agreement (the "Management Agreement," and, together with the Option Agreement, the "Preliminary Agreements"), pending the receipt of required regulatory approvals.  On October 3, 2006, the Debtors filed a motion seeking approval of bidding procedures for interested parties to bid to become counterparties to the Preliminary Agreements, and the Bankruptcy Court approved the bidding procedures on October 11, 2006.  After extending the time for potential bidders to submit a bid for entry into the Preliminary Agreements by one day, the Debtors received three (3) bids before the bid deadline.

After consulting with the Creditors' Committee and its professionals, the Debtors concluded that only the bid submitted by Education Affiliates NY, Inc. ("EA") constituted a qualified bid pursuant to the bidding procedures.  The Debtors, therefore, cancelled the proposed auction, and designated EA as the successful bidder.  Thereafter, on November 10, 2006, the New York State Education Department (the "SED") filed an objection to the transaction on the basis that (i) the Management Agreement conferred too much authority over the Nursing Schools to EA and (ii) EA (a) had not filed an application with the New York Department of State to do business in New York and (b) is not registered as a provider of any degree-granting program.

Notwithstanding that the Debtors disagreed with SED's objections to the Preliminary Agreements, the Debtors chose to address SED's concerns by working with EA to revise the Preliminary Agreements to SED's satisfaction.  Accordingly, on November 15, 2006, the Debtors filed two new documents, an administrative services agreement (in place of the Management Agreement) (the "Administrative Services Agreement"), and a revised Option Agreement (the "Revised Option Agreement," and together with the Administrative Services Agreement, the "Revised Agreements"), whereby, among other things, it was made more clear that the Debtors would maintain management control over the Nursing Schools and EA would acquire that control only after it obtained regulatory authority to grant degrees from the State of New York.  Specifically, under the Administrative Services Agreement, EA shall only assist the Debtors in supervising, conducting and administering the day-to-day operations of the Nursing Schools, subject to the approval of, and supervision by, the Debtors.  The Debtors retain overall

authority and all management control over the Nursing Schools. Finally, the Debtors will transfer the Nursing Schools (and related assets) to EA under the Revised Option Agreement only upon EA's receipt of regulatory approval and degree-granting authority from SED.

After further discussions with SED and further revisions to the Revised Agreements to address SED's remaining concerns about the transaction, SED withdrew its objection to the sale of the Nursing Schools to EA and the Court entered an order authorizing the Debtors to enter into the Revised Agreements.

6. _Sale of Other Assets and Massey Knakal Realty Services Retention_

The Debtors have also sold, or are in the process of selling, other parcels of real property that will not be a part of their reorganized structure. To maximize the value from the sale of these assets, pursuant to an order dated September 27, 2006, the Debtors retained Massey Knakal Realty Services ("MKRS") as real estate brokers. Depending on the value of the property being sold and whether MKRS is the sole broker, MKRS receives commissions from 3% to 5% on each sale.

To date, MKRS has brokered the sale of eight parcels of nonresidential real property. Each of the properties listed below were sold free and clear of all liens, claims and encumbrances and were approved by the Bankruptcy Court.[22]

- The former St. Mary's Campus, approved by the Bankruptcy Court pursuant to an order dated July 18, 2006, and discussed above in Section III(J)(1).
- 160-24 79th Avenue in Flushing, New York, approved by the Bankruptcy Court pursuant to an order dated July 25, 2006.
- 177 Buffalo Avenue in Brooklyn, New York, approved by the Bankruptcy Court pursuant to an order dated July 25, 2006.
- 1482 Prospect Place, Brooklyn, New York, approved by the Bankruptcy Court pursuant to an order dated February 5, 2007
- 1496-1522 Prospect Place, Brooklyn, New York, approved by the Bankruptcy Court pursuant to an order dated February 5, 2007.
- 376 Jersey Street, Staten Island, New York, approved by the Bankruptcy Court pursuant to an order dated April 25, 2007.
- 155 Vanderbilt Avenue, Staten Island, New York approved by the Bankruptcy Court pursuant to an order dated May 16, 2007.
- 427 Forest Avenue, Staten Island, New York, approved by the Bankruptcy Court pursuant to an order dated May 16, 2007.

The MKRS retention also authorizes the Debtors to engage MKRS for the sale of the following properties: (i) 690 Castleton Avenue, Staten Island, New York; (ii) 90 Hill Street,

---

[22] MKRS's retention agreement also included Parsons Manor, unless Persons Manor was sold to Caritas. Because Parsons Manor was sold to Caritas, no fee is due to MKRS in respect of Parsons Manor.

Brooklyn, New York; (iii) 731 Castleton Avenue, Staten Island, New York; (iv) 360 Bard Avenue, Staten Island, New York; and (v) 154 St. Austin's Place, Staten Island, New York.  On February 5, 2007, the Bankruptcy Court granted the Debtors' motion seeking (i) approval of standardized bidding procedures related to the foregoing properties, as well as certain properties in the preceding list that had not been sold as of that date, (ii), the authority to set a reasonable break-up fee in connection with the negotiation of a contract of sale for each of the properties, and (iii) approval of the manner of providing notice of the auction and sale hearing for each property.  The Debtors have filed motions for the approval of the sale of each of the foregoing properties (with the exception of 90 Hill Street, Brooklyn, New York, for which the Debtors filed a notice of intended sale pursuant to the *de minimis* asset sales procedure described immediately below), which are scheduled for hearing on June 5, 2007.

During the course of these cases, the Debtors have disposed of certain other assets pursuant to Court authority.  Some of these assets have been sold pursuant to an order entered by the Bankruptcy Court on March 13, 2006, governing *de minimis* sales of assets that for the most part are no longer needed in the Debtors' operations.  This order authorized the Debtors to dispose of assets under $200,000 in value without further Bankruptcy Court authorization, free and clear of all liens, claims and encumbrances, subject to certain notice procedures and an aggregate cap on all such sales of $1,000,000.  As of April 30, 2007, the Debtors had conducted several sales of *de minimis* assets pursuant to the De Minimis Asset Sale Order, for a total sale price of $139,156.50.

K.      **The Debtors' Operating Performance During the Pendency of the Chapter 11 Cases**

Through December 31, 2006, the Debtors continued to experience operating losses of approximately $4,500,000 per month on an un-audited basis, and experienced an annualized operating loss of $55,000,000 in 2006.  Following the successful divestiture of certain of the Debtors' non-performing hospitals and various other assets, as discussed above, the Debtors have operated on a positive basis, excluding extraordinary charges and other restructuring costs, as reflected in their monthly operating reports.  During the course of these Chapter 11 Cases, the Debtors have filed monthly operating reports, identifying among other things their revenue and expenses, with the Bankruptcy Court.  These monthly operating reports are available through the Bankruptcy Court's electronic docketing system, as well as on the website maintained by the Debtors' Claims Agent (www.bsillc.com).

L.      **Medical Malpractice Claims**

1.      *The Debtors' Medical Malpractice Insurance*

As of the Commencement Date, one or more of the Debtors' hospitals were named defendants in approximately 700 lawsuits based on claims of alleged medical malpractice, in addition to other incidents and circumstances that could give rise to litigation. For purposes of understanding the hospital professional liability insurance (if any) available for these medical malpractice claims, the Debtors' business is generally divided among the following "regions:" (i) Manhattan and Westchester; (ii) Staten Island; and (iii) Brooklyn and Queens.

The insurance structures covering hospital professional liability for the Debtors' Manhattan, Westchester, and Staten Island hospitals are substantially similar in that each is made up of three tiers of insurance: (i) "claims made" third-party commercial primary insurance; (ii) self-insurance (partially backed by self-insurance trusts); and (iii) excess insurance.  Based on the Caronia Estimate and the funds in the self-insurance trusts as of April 30, 2007, the self-insurance trust in Manhattan held funds sufficient to cover approximately 86.6% of the total value of MedMal Claims estimated by Caronia to be SVCMC's liability above the primary insurance in that region, [23] and the self-insurance trust in Staten Island has funds effectively equal to the total value of MedMal Mal Claims estimated by Caronia to be SVCMC's liability above the primary insurance for that region. [24]

In contrast, the Debtors have no commercial hospital professional liability insurance for their Brooklyn and Queens hospital region.  Rather, those hospitals are self-insured, and based on the Caronia estimate, that region has funds in the Brooklyn and Queens self-insurance trusts sufficient to cover only 35%, approximately, of the total value of MedMal Mal Claims estimated by Caronia to be SVCMC's liability above the primary insurance for that region. [25]

To provide parties in interest, including holders of MedMal Claims, with information pertaining to the Debtors' hospital professional liability insurance and other insurance programs, the Debtors filed a comprehensive report with the Bankruptcy Court on November 2, 2005, which was supplemented on March 24, 2006.  This report, as supplemented, is incorporated into this Disclosure Statement by reference.

2.    *Lift Stay Motions and the Debtors' Responses*

As of January 31, 2007, over two hundred parties had filed motions seeking relief from or modification of the automatic stay to proceed with the prosecution of their MedMal Claims in state court.  With limited exceptions (where extenuating circumstances existed), the Debtors objected to each of the motions in favor of a systematic approach to these Claims.  Ultimately, the Debtors and the Tort Claimants' Committee agreed on the following systematic approach: the automatic stay could be modified to permit holders of MedMal Claims who both file requests for stay relief and have timely filed proofs of claim to liquidate their claims in state court but not collect on those claims – once liquidated –  from any source absent further Bankruptcy Court order, provided that claims made against certain professional clinical staff

---

[23] According to the Caronia Estimate, SVCMC's estimated aggregate liability on timely-filed MedMal Claims  in Manhattan and Westchester is approximately $20,534,000, and as of April 30, 2007, the balance in the self-insurance trust for these regions held approximately $17,787,000.

[24] According to the Caronia Estimate, SVCMC's estimated aggregate liability on timely-filed MedMal Claims in Staten Island is approximately $9,308,000, and as of April 30, 2007, the balance in the self-insurance trust for Staten Island  held approximately $9,648,000.

[25] According to the Caronia Estimate, SVCMC's estimated aggregate liability on timely-filed MedMal Claims  in Brooklyn and Queens is approximately $51,227,000, and as of April 30, 2007, the balance in the self-insurance trust for these regions held approximately $18,298,000.

(employees of the Debtors who have been indemnified by the Debtors or are covered by the Debtors' hospital professional liability insurance) also can only be liquidated and not collected.[26] As of April 30, 2007, the Court had entered orders on August 18, 2006, October 12, 2006, November 21, 2006, December 20, 2006, January 24, 2007, February 21, 2007, March 23, 2007 and April 25, 2007 granting stay relief for the limited purpose of liquidating and not collecting on MedMal Claims.  The Debtors anticipate that additional similar orders will be entered as and if additional requests for stay relief are filed by holders of timely filed MedMal Claims.

### M.    Treatment of the Debtors' Grants and Restricted Contributions

1.    *The Foundation Report*

To assist the Court and other parties in interest in understanding the mechanisms through which the Debtors solicit, receive, manage, and use charitable contributions, as well as the amount and types of charitable contributions the Debtors currently possess, the Debtors filed a report (the "Foundation Report") on October 27, 2005.  The Foundation Report details the history of charitable giving to the Debtors and their predecessors, the types of contributions that the Debtors receive, the accounting and fiscal methodologies employed by the Debtors to ensure that charitable funds are used for their intended purposes, and the type and amount of charitable contributions held by the Debtors as of the date of the Foundation Report.

The Foundation Report also describes the Debtors' relationship to the Saint Vincents Catholic Medical Centers Foundation, Inc. (the "Foundation"), a non-debtor affiliate of SVCMC that was founded in 2002 to centralize the fundraising activities historically performed by various elements within SVCMC.  The Foundation's principal purpose is to solicit, accept and distribute contributions for the SVCMC system of health care facilities.  However, due to certain legal and other restraints, the Foundation never fully took over all fundraising activities for SVCMC.  As such, the interplay between the non-debtor Foundation and the Debtors, and the impact this relationship had on the Debtors' use of certain charitable contributions, required the Debtors to distinguish between contributions, as further described below.

2.    *Motion to Use Grants*

The Debtors regularly apply for, and receive, grants from various federal and state agencies.  These grants are awarded to the Debtors to accomplish specific objectives, and are distributed to the Debtors to pay expenses incurred by the Debtors that are related to the particular purpose of each grant.  On January 19, 2006, the Debtors filed a motion seeking authority to pay, in full and prior to confirmation of any plan of reorganization, certain prepetition claims for which grant money had been received but not distributed by the Debtors to the appropriate vendors.  Specifically, the Debtors sought authority to pay approximately $308,944 in claims for which grant money was received prepetition but not distributed to the appropriate vendors as payment for prepetition goods or services, and approximately $142,886 in claims for which grant money was received postpetition but not distributed to the appropriate

---

[26] The order that confirms the Plan, once entered, will act as the order that authorizes holders of medical malpractice claims to liquidate, collect on account of, or otherwise resolve such claims in accordance with the Plan.

vendors as payment for prepetition goods or services.  The Debtors also sought authority to pay, if and when the appropriate grant money was received, approximately $93,856 in unpaid prepetition claims for which the Debtors had the right to receive grant money, but had not yet received such payments.  A supplemental motion, dated February 3, 2006, identified and requested authority to pay an additional $34,500 in prepetition claims for which the Debtors had received grant money postpetition.  The Court entered an order granting the relief requested on February 8, 2006.

3.    _Disposition of Restricted Contributions_

Under the Plan, all restrictions that attached to contributions and grants will remain valid and will be honored by Reorganized SVCMC as and to the extent required by applicable New York and other applicable nonbankruptcy law.

**N.    Litigation Claims**

The Debtors believe that these estates have substantial claims against the Litigation Parties.  As noted above, current chapter 11 counsel to the Debtors has conducted a preliminary review of facts and circumstances surrounding the conduct of all parties involved with Huron Inc.'s acquisition of Speltz & Weis, as well as the conduct of and advice provided by the Debtors' professionals to the Debtors concerning the timing of the chapter 11 filing and the anticipated creditor recoveries in a chapter 11 case.  Based upon the Debtors' chapter 11 counsel's preliminary review, there exist claims or causes of action which include (but are not limited to) breach of contract, inducement of breach of contract, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, breach of New York not-for-profit corporation law, and fraudulent transfer law.  Because there is a common interest, the Debtors' chapter 11 counsel has informally shared that review with counsel to the Creditors' Committee in connection with discussions over the potential structure of, and returns to creditors under, the Plan.  The Creditors' Committee asserts that there are claims and causes of actions against, among others, Speltz & Weis, David Speltz, Tim Weis, Huron Inc., and/or Huron LLC for, among other things, breach of fiduciary duty, breach of New York Not-for-Profit Corporation law, negligence, breach of contract, promissory estoppel, unjust enrichment, tortious interference, aiding and abetting breach of fiduciary duty and avoidable transfers under section 547 of the Bankruptcy Code and/or fraudulent transfers under the Bankruptcy Code and New York Debtor & Creditor law.  These claims and causes of action will be transferred to the Litigation Trust and will be pursued by the Litigation Trust.

As also noted above, certain claims related to these cases against MWE already have been asserted in the context of MWE's request for allowance of compensation.  The Debtors believe these estates may have additional claims against MWE relating to the prepetition period, including potentially claims relating to the advice provided to the Debtors prior to the chapter 11 filing, to certain acts and actions taken by MWE with respect to the retention of Huron and with respect to Huron's acquisition of Speltz & Weis, and to the advice provided to the Debtors' Board (or the lack thereof) with respect to the disclosure of that acquisition.  The facts and circumstances surrounding some of these potential claims are more fully set forth in the objections to the MWE Fee Application.  Again, given these joint interests and the formal proceedings surrounding the MWE Fee Application, the Debtors' chapter 11 counsel has

consulted with counsel to the Creditors' Committee, as well as counsel to the United States Trustee, in evaluating potential claims.

**O.    Bar Date and Summary of Claims**

1.    *Schedules and Statements*

On October 3, 2005, the Debtors filed their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "Schedules").

2.    *Bar Date*

Pursuant to Bankruptcy Rule 3003(c)(3), by order dated January 26, 2006 (the "Bar Date Order"), the Bankruptcy Court fixed March 30, 2006 at 4:00 p.m. (the "Bar Date"), as the date and time by which proofs of claim by all claimants were required to be filed. Unless exempted by the Bar Date Order,[27] potential creditors were required to file proofs of claim notwithstanding Bankruptcy Code section 1111(a) and Bankruptcy Rule 3003(c)(2) which generally require that only creditors who assert claims against any of the Debtors that arose prior to the Commencement Date, and whose claims are not scheduled in the Debtors' Schedules or whose claim is listed on the Schedules as disputed, contingent or unliquidated, must file a proof of claim. Notice of the Bar Date and a proof of claim form were mailed to all creditors listed on the Debtors' Schedules, all holders of asserted or potential MedMal Claims, the members of the Creditors' Committee and all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order. The Court-approved notice of the Bar Date was also published in *The New York Times*, *The Daily News* and the *Staten Island Advance* on March 9, 2006 and in *The Journal News* on March 10, 2006. The Debtors intend to request that the Court set an administrative bar date for medical malpractice claims at its divested facilities, but have not done so as of the date of this Disclosure Statement.

3.    *Summary of Claims*

As of January 31, 2007, over 2,850 proofs of claim had been filed in these cases. To date, the Debtors have filed six omnibus objections seeking to disallow and expunge amended or superseded, duplicate and late-filed claims. The Debtors are continuing the process of reviewing the proofs of claim and comparing them to their books and records and will

---

[27] Pursuant to the Bar Date Order, the following parties were exempted from filing a proof of claim by the Bar Date: (i) any person or entity that had already properly filed, with the Clerk of the United States Bankruptcy Court for the Southern District of New York, a proof of claim against the applicable Debtor or Debtors utilizing a claim form which substantially conformed to Official Form No. 10; (ii) any person or entity with a Claim under sections 503(b) or 507(a) of the Bankruptcy Code as an administrative expense of the Debtors' chapter 11 cases; (iii) any person or entity whose Claim was paid in full by any of the Debtors; (iv) any Debtor in these cases with a Claim against another Debtor; (v) any person or entity with a Claim that was allowed by an order of this Court entered on or before the Bar Date; (vi) any person or entity with a Claim solely against any of the Debtors' non-debtor affiliates; and (vii) any current director, officer or employee of any of the Debtors with a Claim against any of the Debtors for indemnification, contribution, subrogation or reimbursement.

continue to object to proofs of claim when appropriate.[28]  The Debtors' Claims Agent maintains a claims register indicating the proofs of claims as filed, as well as the existing status of each Claim based on orders of the Bankruptcy Court.

Attached as Exhibit 2 is a chart that summarizes the Debtors' current understanding of the claims filed against them.  This chart provides information for Claims against the Debtor, by class.  It contains three columns, indicating (i) the total dollar amount of Claims filed by Class; (ii) the total dollar amount of Claims on the Debtors' claims register by Class as of January 30, 2007, adjusted for those Claims which were disallowed, expunged, reduced, or classified by order of the Court; and (iii) the total dollar amount of Claims that the Debtors estimate will become Allowed Claims once the claims resolution process has concluded and all Claims have been liquidated.

As shown by Exhibit 2, Class 3 (General Unsecured Claims against SVCMC) and Classes 4-6 (MedMal Claims) are the largest classes (by dollar amount).  The Debtors believe that as of the date of this Disclosure Statement, approximately $395,706,035 in General Unsecured Claims against SVCMC have been filed and not disallowed or expunged pursuant to Court orders.  In addition, the Debtors believe that approximately $3,036,702,367.19 in MedMal Claims have been filed and not subsequently disallowed or expunged.  The Debtors believe that only a portion of these Claims will ultimately become Allowed Claims.  The Debtors' estimates are provided in the final column of each chart.

Creditors should be aware, however, that the disparity between the amount of Claims that currently exist in the claims registry and the amount of Claims that the Debtors believe will ultimately be allowed is a significant risk.  To the extent the Debtors have overestimated the degree to which Claims will be disallowed or expunged, the Debtors and Reorganized SVCMC may be unable to meet their obligations under the Plan.

4.    *Intercompany Claims*

As explained above, SVCMC is the member of several non-Debtor entities.  Prior to the Commencement Date, cash was transferred from those entities to SVCMC, resulting in intercompany payables from SVCMC to those entities.  As a result, those entities held Intercompany Claims against SVCMC in the following amounts as of the Commencement Date:[29]

- Bishop Mugavero Center for Geriatric Care: $13,853,854.00

- Holy Family Home: $11,500,000.00

---

[28]  Under the Plan, the Debtors will continue to have the ability to object to claims for up to one (1) year following the Effective Date, although this deadline can be extended by the Court on request of the Post-Effective Date Debtors.

[29] Although the claims summary attached as Exhibit 2 indicates over $75 million in Intercompany Claims have been filed, the Debtors believe the discrepancy between that number and the amounts listed below are due to the filing of duplicative claims.  The Debtors reserve all rights to object to such claims on any basis.

- St. Elizabeth Ann's Health Care & Rehabilitation Center: $11,323,962.36

- Pax Christi Hospice: $1,297,956.00

Pursuant to the Plan, these Intercompany Claims are fully subordinated to all other unsecured Claims against SVCMC (other than the DASNY Subordinated Claim). Thus, as discussed below in more detail, the holders of the Intercompany Claims will receive no recovery under the Plan unless all other General Unsecured Claims, MedMal Claims and the Allowed PBGC Claim receive payment in full, with interest. If all other General Unsecured Claims, MedMal Claims and the Allowed PBGC Claim receive payment in full with interest, Reorganized SVCMC will enter into an agreement with the holders of the Intercompany Claims regarding the payment of these intercompany claims (unless otherwise agreed at that time).

**P.     Search for New Management**

As SVCMC's current CEO/CRO is an interim manager, SVCMC requires a qualified permanent executive to run its businesses after it emerges from chapter 11. Consequently, on November 27, 2006, the Debtors filed a motion to retain Korn/Ferry International as their executive search consultant for the purpose of identifying potential candidates to be SVCMC's next chief executive officer. The Debtors hope to have SVCMC's new CEO take over management of Reorganized SVCMC on or prior to the Effective Date.

**Q.     CIT and the Manhattan Real Estate Process**

During these cases, the Debtors, in consultation with the Creditors' Committee and the Tort Claimants' Committee, commenced a strategic analysis of their real estate assets, businesses and operations on their Manhattan campus (the "Manhattan Campus") to achieve their dual goals of enhancing the return to creditors and improving on their ability to provide critical health care services to Manhattan residents. The Debtors decided to explore a variety of restructuring and/or financing options intended to (i) maximize value for SVCMC's estate, (ii) allow for the development of a consensual plan of reorganization, (iii) ensure the continuation of an acute-care hospital on the Manhattan Campus, (iv) support efficient use of real estate assets and needed facility investments to meet today's healthcare needs, and (v) address adequately the concerns of SVCMC's various constituents including, but not limited to, SVCMC's creditors, employees and patients.

In order to perform a high-quality, effective analysis of the Manhattan Campus real estate assets and implement the restructuring options that may result from such an analysis, the Debtors and the Committees agreed that SVCMC required the assistance of an experienced real estate advisor. To that end, SVCMC, after undertaking a collaborative and extensive search process with the Committees in the spring of 2006 that involved interviewing numerous real estate advisory firms, decided to retain CIT Capital USA Inc. ("CIT") as their real estate advisor with respect to their Manhattan Campus. On October 11, 2006, the Bankruptcy Court entered a final order approving the retention of CIT.

Since it began working in July, 2006, CIT has undertaken an extensive analysis of the Manhattan Campus and has determined that SVCMC may be able to maximize value by

selling certain buildings in their Manhattan Campus and building a new state-of-the art hospital on the property currently occupied by the O'Toole Building (on the west side of Seventh Avenue). The Debtors (and the Committees) have been advised that accomplishing such a reconfiguration of the SVCMC's real estate is dependent on numerous levels of regulatory approval, including zoning approvals, that could take three (3) to five (5) years, and actually completing the sale of certain buildings and the construction of a new hospital on the O'Toole Building location could take several more years after regulatory approvals are received. Furthermore, SVCMC understands that the success of this alternative requires not only finding an appropriate development partner but also substantial philanthropy. Given the length of time that this effort would require, the Plan is not based on this effort or its ultimate success. Success in this effort, however, would greatly enhance SVCMC's ability to perform in the future in accordance with the Plan. And if the effort is not successful, SVCMC will be required to expend substantial funds to rehabilitate the current Manhattan Campus to address identified deferred maintenance and capital improvements. The projections included with this Disclosure Statement do not include the expected cost and expense likely to be incurred in connection with the process of obtaining various regulatory approvals, including various architectural and design costs, or if that is unsuccessful in making the required deferred maintenance and capital improvements, nor do the projections include the corresponding improvements in financial performance that would thereafter be expected. SVCMC anticipates that the cost and expense of the regulatory process and associated costs for design will be borne by the developer chosen for the Manhattan Campus, and that if extensive deferred maintenance and capital improvements become required, these costs will be paid from operations, philanthropy and the future sale of assets.

Simultaneously with the process led by CIT for choosing developers for the Manhattan Campus, SVCMC also explored other options for maximizing value for its assets while maintaining a healthcare focus. Accordingly, with guidance and assistance from Cain Brothers, it solicited interest from other hospital systems, both in New York and elsewhere, to determine whether a partnership, affiliation, or acquisition that would provide a return to creditors could be negotiated within a reasonable amount of time. Four hospital systems in New York pursued discussions with SVCMC. None presented a practical proposal that would have provided a solution that approximated the returns for creditors contemplated in connection with the Plan.

Through the efforts managed by CIT, SVCMC identified a development partner for the Manhattan Campus with, among other things, the financial wherewithal to undertake this project and the corporate reputation to do so in a way consistent with SVCMC's mission and commitment to its Greenwich Village neighbors. Consequently, on May 16, 2007, the Debtors filed a motion seeking approval to enter into a memorandum of understanding and related other agreements with Rudin Development LLC ("Rudin") regarding the development of the Manhattan Campus. As set forth in more detail in that motion, the memorandum of understanding (the "MOU") provides for the construction of a new hospital on the west side of 7th Avenue; the eventual sale to Rudin of substantially all of the Manhattan Campus on the east side of 7th Avenue; and the funding by Rudin of up to $5,000,0000 for the expenses for the architectural design and regulatory review process necessary for the construction of the new hospital. The motion to authorize the Debtors' entry into the MOU is scheduled for hearing on June 4, 2007. Parties should review the motion and the MOU for additional details regarding the Debtors' proposed transactions with Rudin, as well as the process that lead to the decision to

construct the new hospital and the selection of Rudin as the Debtors' development partner. These documents are available on the Court's electronic docket. In addition, parties are encouraged to review the Court's electronic document to learn the disposition of the motion.

### R.    The Debtors' Exit Financing

One of the conditions to effectiveness of the Plan is that SVCMC have obtained exit financing to supplement the Debtors' ability to pay Plan obligations, including administrative expenses and outstanding debtor-in-possession financing, and to fund Reorganized SVCMC's general corporate and working capital expenditures. Accordingly, the Debtors filed a motion on February 22, 2007 seeking approval of a commitment letter with GE Capital (the "GE Commitment Letter"), annexed hereto as Exhibit "5," for a $300 million exit financing facility (the "Exit Facility") and authorizing the payment of fees, reimbursement of expenses and indemnification in accordance with the terms of a related fee letter agreement. The Bankruptcy Court entered an order approving the GE Commitment Letter and authorizing the payment of related fees and expenses and indemnification on March 18, 2007. The Exit Facility, as set forth in the GE Commitment Letter, currently consists of a $50 million revolving line of credit and a $250 million term loan, unless other financing arrangements are approved by the Bankruptcy Court. SVCMC anticipates that the Exit Facility will be modified to consist of a $50 million revolving line of credit and a $270 million term loan. In the event that such modification is necessary, SVCMC will seek Bankruptcy Court approval of the modified Exit Facility.

## IV.    THE PLAN

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.[30] In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. In cases where a debtor sells most of its operating assets during the chapter 11 case, such that all that remains is the distribution of the proceeds of the sale of such assets, the debtor may liquidate any remaining assets in an orderly manner and distribute the proceeds of that liquidation pursuant to a chapter 11 plan of liquidation. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a

---

[30] As noted elsewhere in this Disclosure Statement, SVCMC does not have any equity interest holders. Thus, although the pre-Commencement Date sponsors of SVCMC will remain Reorganized SVCMC's sponsors, the Debtors believe that those provisions of the Bankruptcy Code that impact equity interest holders are not applicable to SVCMC's sponsors but they are applicable to equity interest holders of the Other Debtors.

chapter 11 plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor whether or not such creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

The Debtors believe that implementation of the Plan will provide holders of Allowed Claims and Equity Interests a greater distribution than they would receive if these cases were converted to cases under chapter 7 of the Bankruptcy Code. The Plan is annexed as Exhibit 1 and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan. Unless otherwise provided, the holders of Allowed Secured Claims shall receive a General Unsecured Claim to the extent of any deficiency.

### A.   Classification and Treatment of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must provide certain treatment for Administrative Expense and Priority Tax Claims and otherwise classify claims and equity interests and provide for their treatment. As a result, the Plan (a) describes the treatment to be afforded to Administrative Expense Claims (which includes claims of compensation by professionals and the DIP Claim) and Priority Tax Claims and United States Trustee Quarterly Fees and Other Statutory Fees and (b) classifies Claims and Equity Interests in separate Classes and provides different treatment for different Classes of Claims and Equity Interests. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration, thereby giving effect to the different rights of holders of Claims and Equity Interests in each Class.

1.   *Administrative Expense Claims*

Administrative expenses are the actual and necessary costs and expenses of administering these cases. Those expenses include, but are not limited to, postpetition salaries and other benefits for employees, amounts owed to vendors providing goods and services during the cases, tax obligations incurred after the Commencement Date, allowed bankers' fees, allowed reclamation claims, management costs, and certain statutory fees and expenses. Other administrative expenses include the actual, reasonable, necessary, and unpaid fees and expenses of the professionals retained by the Debtors and the Committees.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided in Section 2.2 or 2.3 of the Plan, SVCMC or the applicable Post-Effective Date Debtor, as appropriate, shall pay to each holder of an Allowed Administrative Expense Claim against such Debtor an amount in Cash equal to the Allowed amount of such Claim on the later to occur of (a) the Effective Date or (b) the date such Administrative Expense Claim otherwise would become due in the ordinary course of business.

The Debtors estimate that approximately $10,700,000 of Administrative Expense Claims, excluding unpaid fees and expenses of the professionals retained by the Debtors and the Committees, will be payable on the Effective Date, as set forth in Exhibit 2 of the Disclosure Statement.

2.    *Professional Compensation and Reimbursement Claims*

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses incurred through and including the Effective Date under section 503(b) of the Bankruptcy Code shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed from Reorganized SVCMC (with the Other Debtors reimbursing Reorganized SVCMC pursuant to the Allocation Method), (i) on the date the order granting such award is a Final Order, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon by the relevant professional and Reorganized SVCMC.

SVCMC shall support any application, pursuant to section 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for "substantial contribution" to the Chapter 11 Cases filed by (i) the Ad Hoc Committee for up to $350,000 in actual and reasonable fees and expenses incurred by the Ad Hoc Committee and (ii) holders of MedMal Claims for up to $150,000 in actual and reasonable legal fees and expenses of Kronish Lieb Weiner & Hellman LLP n/k/a Cooley Godward Kronish LLP, incurred by holders of MedMal Claims.  The payment of any such fees and expenses shall be subject to the independent approval of the Bankruptcy Court and shall not be deemed approved merely by entry of the Confirmation Order.

Notwithstanding any of the foregoing, Reorganized SVCMC shall assume all postpetition liabilities, fees and expenses for and make payment in the ordinary course to those professionals retained by SVCMC as ordinary course professionals pursuant to that certain order of the Bankruptcy Court, entered September 9, 2005.

Attached as Exhibit 6 to the Disclosure Statement is a chart summarizing fees and expenses requested by the professionals employed by the Debtors and the Committees through March 31, 2007.

3.    *DIP Claims*

Except to the extent that a holder of a DIP Claim agrees to a different treatment, SVCMC and the Other Debtors shall pay each holder of a DIP Claim, on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim.

The Debtors estimate that, as of the Effective Date, the DIP Claim will be approximately $60 million.

4.    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Debtor, from such Debtor (i) on the Effective Date, Cash equal to the Allowed amount of such Claim or (ii) equal annual Cash payments on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at a fixed annual rate equal to 7% or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the applicable Debtor as such obligations become due.

5.    *United States Trustee Quarterly Fees and Other Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by the Debtors.  Any Statutory Fees accruing after the Confirmation Date also shall be paid by the Debtors.

6.    *Classes 1, A1, B1, C1, D1, & E1: Priority Non-Tax Claims*

The Claims in Classes 1, A1, B1, C1, D1, and E1 are the types of Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).  For the Debtors, these Claims related primarily to prepetition wages and employee benefit plan contributions that had not yet been paid as of the Commencement Date.  The Debtors believe that a substantial number of these Claims have already been paid pursuant to an order entered by the Bankruptcy Court at the beginning of these cases.  On the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each holder of an allowed Priority Non-Tax Claim in Classes 1 and A1, B1, C1, D1, & E1 shall receive, in full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid prior to the Effective Date, and except to the extent that such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim.

7.    *Classes 2-1, 2-2, 2-3, 2-4, 2-5, A2, B2, C3, D2, & E2: Secured Claims*

(a)    Other Secured Claims.  The Claims in Classes 2-1, A2, B2, C2, D2, & E2 are Other Secured Claims, as defined in the Plan.  Other Secured Claims are secured by the respective Debtor's collateral, but only to the extent of the value of the collateral, as set forth in the Plan, agreed to by the holder of such Claim, or as determined by Final Order.  An estimate of the aggregate amount of these claims is set forth in Exhibit 2.

On the Effective Date, except to the extent that the holder of an Other Secured Claim agrees to less favorable treatment, Other Secured Claims against SVCMC shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code,

notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  All Other Secured Claims against SVCMC that are not due and payable on or before the Effective Date shall, at SVCMC's option, be paid (i) in the ordinary course of business in accordance with the course of practice between SVCMC and such holder with respect to such Claim, or (ii) by transfer of the Collateral securing such claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

On the Effective Date, except to the extent that a holder of Other Secured Claims against the Other Debtors (Classes A2, B2, C2, D2, & E2) has agreed to less favorable treatment, each holder of an Other Secured Claim against the Other Debtors shall receive, at the applicable Other Debtor's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

(b)    Class 2-2 – Aptium Secured Claim.  Class 2-2 consists of the Aptium Secured Claim, which is all Secured Claims of Aptium for obligations of SVCMC arising out of the Aptium Agreement, as further described above in Section II.  On the Effective Date, the holder of the Aptium Secured Claim shall be treated in accordance with a settlement agreement filed with the Bankruptcy Court on May 11, 2007 (Docket No. 3104) which, among other things, provides for the payment of the Aptium Secured Claim by the first Effective Date Anniversary.  It is anticipated that this agreement will be approved by the Bankruptcy Court prior to the Confirmation Date.  In the event that the agreement is not approved by the Bankruptcy Court prior to the Confirmation Date, it will be deemed approved upon entry of the Confirmation Order.  An estimate of the amount of this claim is set forth in Exhibit 2.  By agreement with the Creditors' Committee, and notwithstanding anything to the contrary contained in the settlement agreement with Aptium or any order entered approving the settlement agreement with Aptium, SVCMC will not fund or pay more than 50% of the Aptium Secured Claim on the Effective Date.

(c)    Class 2-3 – Commerce Secured Claim.  Class 2-3 consists of the Commerce Secured Claim, which is the Secured Claim of Commerce Bank arising out of the Commerce Loan Agreement, as further described above in Section III.  On the Effective Date, SVCMC shall reinstate the Commerce Secured Claim.  An estimate of the amount of this claim is set forth in Exhibit 2.

(d)    Class 2-4 – RCG Secured Claim.  Class 2-4 consists of the RCG Secured Claim, which is the Secured Claim of RCG, which is Allowed in the amount of $3 million, pursuant to the RCG Stipulation, as further described above in Section III.  On the Effective Date, at SVCMC's sole and absolute discretion, either (i) SVCMC shall reinstate the RCG Secured Claim, or (ii) the holder of the RCG Secured Claim shall receive Cash equal to the Allowed amount of the RCG Secured Claim in full and complete satisfaction, settlement and release of and in exchange for the RCG Secured Claim.  An estimate of the amount of this claim is set forth in Exhibit 2.

(e)    Class 2-5 – Sun Life Secured Claims.  Class 2-5 consists of two separate subclasses:  Subclass 2-5(a), comprised of the Sun Life Westchester Secured Claim and Subclass 2-5(b), comprised of the Sun Life Manhattan Secured Claim.  Subclasses 2-5(a) and 2-5(b) are unimpaired by the Plan.  The holder of the Sun Life Secured Claims conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.  On the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for the Sun Life Secured Claims, Reorganized SVCMC and Sun Life will enter into a refinancing agreement for each of the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim, on substantially the terms set forth in the term sheets attached to the Plan collectively as Exhibit "4.6(b)."  Among other things, these terms contemplate that the Sun Life Westchester Collateral and the Staff House will be transferred to special purpose entities, provided, however, that the assets transferred to these special purpose entities will be subject to the MedMal Liens, which shall be subordinate to Sun Life's liens on these properties.  Reorganized SVCMC shall not, without the consent of the MedMal Trust Monitor, increase the principal amount owed to Sun Life secured by the collateral for the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim.  An estimate of the amount of these claims is set forth in Exhibit 2.

8.    *Classes 3, A3, B3, C3, D3, & E3  – General Unsecured Claims*

General Unsecured Claims are Claims against SVCMC or Other Debtors other than a Secured Claim, Administrative Expense Claim (including fees and costs for professional compensation and reimbursement), Priority Non-Tax Claim, Priority Tax Claim, MedMal Claim, PBGC Claim, or Intercompany Claim.

(a)    Class 3 – SVCMC.  In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SVCMC, each holder of an Allowed General Unsecured Claim against SVCMC shall receive, except to the extent such holder agrees to less favorable treatment, the following distributions on the Effective Date or as soon thereafter as is reasonably practicable:

     (i)        a Pro Rata share of the Effective Date Cash Distribution,[31] which, after SVCMC has deducted and reserved a portion of the Effective Date Cash Distribution sufficient to provide the same Pro Rata recovery being received by holders of Allowed General Unsecured Claims against SVCMC to holders of Disputed General Unsecured Claims against SVCMC based on the GUC Estimate, provided, however, that in the event a Disputed General Unsecured Claim against SVCMC is Allowed in an amount greater than the GUC Estimate, distributions on such Allowed Claim will be made based on the Allowed amount, not the estimated amount, and Reorganized SVCMC shall fund the additional Cash necessary to make such distributions;

     (ii)       a Pro Rata share of the Secured Obligation,[32] equal to an amount, if greater than zero, sufficient to provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 85% of the Allowed Amount of its General Unsecured Claim against SVCMC after payment of the Effective Date Cash Distribution, but prior to payment of the Unsecured Obligation or the distribution of the GUC Litigation Trust Interest.[33]  The terms of the Secured Obligation, if one exists, shall be as follows:

---

[31] The Effective Date Cash Distribution is defined as (i) Available Cash in an amount not less than 80% if the Effective Date is on or before August 29, 2007, and 75% if the Effective Date is after August 29, 2007 of the Total Trade Claims minus (ii) 50% of any Available Cash in excess of 85% of the Total Trade Claims; provided, however, that the Effective Date Cash Distribution shall not exceed 93% of the Total Trade Claims.  The Available Cash is all Cash (other than Restricted Assets) of Reorganized SVCMC available on the Effective Date, minus: (i) fifteen million dollars ($15 million) for operations, (ii) payments required to be made under the Plan on the Effective Date (including, without limitation, $1 million to be given to the Litigation Trust and the Litigation Trust Loan) other than (a) payments to holders of General Unsecured Claims against SVCMC (including based upon the GUC Estimate), and (b) payments to the MedMal Trusts in the aggregate in excess of $5 million, and (iii) professional or other administrative costs and expenses accrued as of the Effective Date; provided, however, in the event that, prior to the Effective Date, (x) the aggregate amount of fees and expenses Allowed by Final Order for a Non-Litigation Party Professional is less than the amount accrued by SVCMC or Reorganized SVCMC on account of the amount requested by such Non-Litigation Party Professional, (y) SVCMC or Reorganized SVCMC is otherwise released of an obligation to pay any portion of the aggregate amount of fees and expenses requested by a Non-Litigation Party Professional, or (z) any Non-Litigation Party Professional is required to disgorge any amounts previously paid to such Non-Litigation Party Professional by SVCMC or Reorganized SVCMC, the amount so reduced, released, or disgorged, as applicable, shall be considered Available Cash.  In general, this means that on the Effective Date, SVCMC will distribute all of its extra cash to holders of General Unsecured Claims against SVCMC up to an amount that would provide such holders with an 85% distribution.  Any cash in excess of that amount but less than the amount necessary to pay such holders a 93% distribution will be divided 50% to the MedMal Trusts and 50% to holders of Allowed General Unsecured Claims against SVCMC.  The Plan provides that the Available Cash must be sufficient to make a payment of at least 75% to holders of estimated Allowed General Unsecured Claims against SVCMC.

[32] The Secured Obligation shall include the Deferred Effective Date Payment, if any.

[33] The Secured Obligation is designed to provide holders of Allowed General Unsecured Claims against SVCMC with security to the extent Available Cash is not sufficient to provide such holders with an Effective Date Cash Contribution equal to at least an 85% distribution on the Effective Date.  If Available Cash is sufficient to provide such holders with at least an 85% distribution on the Effective Date, then there will not be a Secured Obligation.

(A)     The Secured Obligation and accrued and unpaid interest thereon shall be paid in full on or before the earlier of (i) the fifth (5th) Effective Date Anniversary and (ii) a Change of Control.

(B)     Interest shall accrue on the Secured Obligation at the rate calculated from time to time using the interest formula for the term loan portion of the Exit Facility, compounding annually; provided, however, that with respect to any default by Reorganized SVCMC under the Secured Obligation that is not cured by Reorganized SVCMC upon receipt by Reorganized SVCMC of 90 days' written notice of such default from the Trade Claims Monitor, interest shall accrue on such defaulted obligation for such time as the default continues at the above-referenced rate plus 2.00%.  Interest shall be paid in full on or before the fifth (5th) Effective Date Anniversary.

(C)     The Secured Obligation shall be secured by the Secured Obligation Liens.  On and after the Effective Date, the Secured Obligation Liens shall be valid, fully perfected first priority liens on, and security interests in, the Secured Obligation Collateral, without the necessity of the execution, delivery and/or filing of any security agreement, pledge agreement, financing statement or other document; provided, however, that the Secured Obligation Liens shall not attach to any proceeds of the Secured Obligation Collateral, to the extent such proceeds, if any, are realized by the Debtors prior to the Effective Date.[34]  The Secured Obligation Collateral shall consist of (i) the Miscellaneous Non-Operating Real Property,[35] (ii) the Brooklyn/Queens Seller Notes,[36] (iii) any

---

[34] On and after the Effective Date, the Secured Obligation Liens shall be valid, fully perfected first priority liens on, and security interests in, the Secured Obligation Collateral, without the necessity of the execution, delivery and/or filing of any security agreement, pledge agreement, financing statement or other document; provided, however, that the Secured Obligation Liens shall not attach to any proceeds of the Secured Obligation Collateral, to the extent such proceeds, if any, are realized by the Debtors prior to the Effective Date.  The Plan is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any and all of the collateral subject to the Secured Obligation Liens.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments Reorganized SVCMC deems necessary and appropriate to file, including without limitation a copy of the Confirmation Order, so as to provide notice of the Secured Obligation Liens to third parties.

[35] The Miscellaneous Non-Operating Real Property consists of the following parcels of real property: 690 Castleton Avenue (Staten Island, New York); 731 Castleton Avenue (Staten Island, New York); 360 Bard Avenue (Staten Island, New York); 154 St. Austin Place (Staten Island, New York); 155 Vanderbilt Avenue (Staten Island, New

security interest granted to SVCMC by Caritas, pursuant to the Caritas Settlement Agreement,[37] (iv) the amount, if any, contained in the DASNY Arbitrage Rebate Accounts[38] subject to the prior claims of DASNY, if any, to such amount, (v) any cash reimbursements owing to the Debtors from Bishop Mugavero Center for Geriatric Care, Holy Family Home and St. Elizabeth Ann's Health Care & Rehabilitation Center as of the Effective Date, (vi) accounts receivable associated with the Divested Facilities, to the extent collected after the Effective Date, and (vii) the pool of bad debt receivables sold pursuant to a transaction approved during the chapter 11 case that may be reversed pending a secondary sale, but only to the extent reversed prior to the Effective Date, and not re-consummated prior to the Effective Date. There is no guaranty that the realizable value of the Secured Obligation Collateral will equal or exceed the amount of the Secured Obligation outstanding from time to time.

(D)     Reorganized SVCMC shall reasonably cooperate with the Trade Claims Monitor to provide such reasonable documentation, make such reasonable public filings, in the real estate records and otherwise, and do such other acts as reasonably requested by the Trade Claims Monitor to (i) evidence the security interest of each holder of the Secured Obligation in the Secured Obligation Collateral, (ii) perfect the Secured Obligation Liens of the holders of the Secured Obligation, and (iii) delineate the events of default, remedies of the holders of the Secured Obligation and the opportunities for Reorganized SVCMC to cure with respect to the Secured Obligation Liens and the obligations they secure. Without limiting the generality of the foregoing, Reorganized SVCMC and

---

York); 427 Forest Avenue (Staten Island, New York); 376 Jersey Street (Staten Island, New York); 90 Hill Street (Brooklyn, New York); and Bayley Seton.

[36] The Brooklyn/Queens Seller Notes are (i) that certain note entitled "Form of Seller Financing Note" and (ii) that certain note entitled "Additional Note," each issued by Caritas to SVCMC as part of the consideration paid pursuant to that certain Asset Purchase Agreement dated May 9, 2006, by and among certain of the Debtors and Caritas, which notes (i) were approved by the Order Approving Two Amendments to the Queens Purchase Agreement, entered December 20, 2006 (Docket Number 2557 in the Chapter 11 Cases), and (ii) are secured by the real property at Mary Immaculate Hospital, Queens and St. John's Queens Hospital.

[37] The Caritas Settlement Agreement is that certain Settlement dated as of May 4, 2007 and approved by the Bankruptcy Court on such date, by and among SVCMC, Caritas Health Care, Inc. f/k/a Caritas Health Care Planning, Inc., and Healthcare Finance Group, HFG Healthco-4 and HFG Healthco-5.

[38] DASNY Arbitrage Rebate Account means that certain investment account held by DASNY for the purpose of making any arbitrage rebate payments that may be required to be made by SVCMC to the Internal Revenue Service in order to preserve the tax-exempt status of bonds issued by DASNY or the New York State Medical Care Facilities Finance Agency on behalf of SVCMC

the Trade Claims Monitor shall cooperate in causing the execution and delivery of such loan, security and intercreditor agreements as the Trade Claims Monitor shall reasonably request to accomplish the objective specified in the immediately preceding sentence.

(E)     There shall be no mandatory prepayments on the Secured Obligation and accrued and unpaid interest thereon other than immediately (i) upon the sale or collection of proceeds from the Secured Obligation Collateral, provided, however, that in the event Caritas elects to effectuate an offset against its payment obligations under the Brooklyn/Queens Seller Notes in accordance with paragraph 25 of the Caritas Settlement Agreement, the amount so offset shall be considered proceeds of the Brooklyn/Queens Seller Notes received by Reorganized SVCMC, (ii) in accordance with the Liquidity Event Distribution Schedule or (iii) upon disbursement of the proceeds of the Post-Effective Date Cash Reconciliation Account.  Mandatory prepayments on the Secured Obligation will be distributed as and when proceeds are received, provided, however, that with respect to the collection of accounts receivable relating to the Divested Facilities, such mandatory prepayments on the Secured Obligation will be made on December 31, 2007 and provided further, however, that after December 31, 2007 all mandatory prepayments relating to the collection of accounts receivable related to the Divested Facilities shall be made on the last business day of each calendar quarter thereafter.  Notwithstanding the foregoing, Reorganized SVCMC shall not be required to distribute any mandatory prepayments on the Secured Obligation pursuant to Section 6.3(e) of the Plan unless the aggregate amount to be distributed on the basis of any of the foregoing is equal to or greater than $500,000.  In addition, (a) the Litigation Trust shall make payments on the Secured Obligation in accordance with the Litigation Distribution Schedule, and (b) Reorganized SVCMC shall make the payments on the Secured Obligation otherwise provided for in Section 6.3 of the Plan.

(F)     There shall be no penalty for prepayment of the Secured Obligation.

(G)     Any payments on the Secured Obligation shall be applied first to principal and then to interest due thereunder; provided, however, that amounts disbursed from the Post-Effective Date Cash Reconciliation Account shall be applied solely to outstanding principal under the Secured Obligation, and not to interest.

(H)     In the event that, as of the first Effective Date Anniversary, the Secured Obligation has not been paid in full by Reorganized SVCMC, the aggregate amount, if any, contained at such time in

the Post-Effective Date Available Cash Reconciliation Account, shall be distributed by Reorganized SVCMC as if such amounts had been Available Cash on the Effective Date.

(I)    With respect to any alleged default under the Secured Obligation that is not cured by Reorganized SVCMC within 90 days following receipt by Reorganized SVCMC of written notice of any such alleged default from the Trade Claims Monitor, provided that if, as of the expiration of such 90-day notice period, all Allowed MedMal Claims have been paid in full as provided in the Plan and no Disputed MedMal Claims remain outstanding, the Trade Claims Monitor may elect to accelerate the balance due under the Secured Obligation on behalf of all holders of Allowed General Unsecured Claims against SVCMC and may commence litigation in the Bankruptcy Court to seek to recover any and all amounts then due from Reorganized SVCMC under the Secured Obligation.  In the event that the Chapter 11 Cases are closed as of such time that the Trade Claims Monitor seeks to initiate any such litigation, the Trade Claims Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such lawsuit before the Bankruptcy Court, and Reorganized SVCMC and the MedMal Trust Monitor shall not be, and are hereby deemed to have agreed that they shall not be, entitled to object to any such motion.

(J)    Upon payment in full by Reorganized SVCMC of all Allowed MedMal Claims, provided that no Disputed MedMal Claims remain outstanding, 50% of the two subsequent payments to be made by Reorganized SVCMC to the MedMal Trusts pursuant to the MedMal Trust Funding Schedule will instead be payable by Reorganized SVCMC against the then-outstanding amount, if any, of the Secured Obligation; provided, however, that if the Secured Obligation is then paid in full, the remaining balance of such payments shall be applied against the then-outstanding amount, if any, of the Unsecured Obligation.

(K)    The Brooklyn/Queens Seller Notes may not be modified by Reorganized SVCMC subsequent to the Effective Date without the prior consent of the Trade Claims Monitor; provided, however, that in the event the Trade Claims Monitor refuses or otherwise fails to consent to any such proposed modification, Reorganized SVCMC shall have the right to request that the Bankruptcy Court approve any such modification, notwithstanding the refusal or failure of the Trade Claims Monitor to consent.

(L)     Notwithstanding anything in the Plan to the contrary, if the Secured Obligation includes a Deferred Effective Date Payment, the following provisions shall apply:

(1)     Reorganized SVCMC shall pay the Deferred Effective Date Payment on or before December 15, 2007.  Such payment shall be solely from (a) the net proceeds collected by Reorganized SVCMC from the sale of Bayley Seton and as necessary at such time (b) Reorganized SVCMC's operating cash flow.

(2)     If the Deferred Effective Date Payment is paid by Reorganized SVCMC from the net proceeds collected by Reorganized SVCMC from the sale of Bayley Seton, the provisions of Section 6.3(e) of the Plan regarding mandatory prepayments of the Secured Obligation relating to Bayley Seton proceeds shall apply only to the net proceeds of Bayley Seton, if any, remaining after payment of the Deferred Effective Date Payment.

(3)     If the Deferred Effective Date Payment is paid by Reorganized SVCMC out of operating cash flow, then, upon any subsequent sale of Bayley Seton, Reorganized SVCMC shall be entitled to retain from the proceeds thereof the amount paid on account of the Deferred Effective Date Payment, and the provisions of Section 6.3(e) of the Plan regarding mandatory prepayments of the Secured Obligation shall apply only to the net proceeds of Bayley Seton, if any, remaining after such amount is retained by Reorganized SVCMC.

(4)     The Deferred Effective Date Payment shall accrue interest as with the Secured Obligation generally.  If the Deferred Effective Date Payment is not paid on or before December 15, 2007, Reorganized SVCMC shall have fourteen (14) days after December 15, 2007 to make such payment.  If the Deferred Effective Date Payment has not been paid on or before January 14, 2008, then (a) on January 15, 2008, the interest rate on the Deferred Effective Date Payment shall increase by 1.00% and (b) every 60 (sixty) days thereafter, the interest rate on the Deferred Effective Date Payment shall increase by an additional 1.00% until the Deferred Effective Date Payment and interest accrued thereon is paid in full.

(iii)     a Pro Rata share of the Unsecured Obligation, which is an unsecured debt payment obligation by Reorganized SVCMC and its successors, if

any, to each holder of an Allowed General Unsecured Claim against SVCMC equal to an amount, if greater than zero, sufficient to provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 93% of the Allowed amount of its General Unsecured Claim against SVCMC after accounting for payment of the Effective Date Cash Distribution and the Secured Obligation, but prior to the distribution of the GUC Litigation Trust Interest.[39] The terms of the Unsecured Obligation, if one exists, shall be as follows:

(A)     The Unsecured Obligation and accrued and unpaid interest thereon shall be paid in full on or before the earlier of (i) the seventh (7th) Effective Date Anniversary and (ii) a Change of Control.

(B)     Interest shall accrue on the Unsecured Obligation at the rate of 8% annually, non-compounding; provided, however, that with respect to any default by Reorganized SVCMC under the Unsecured Obligation that is not cured by Reorganized SVCMC upon receipt by Reorganized SVCMC of 90 days' written notice of such default from the Trade Claims Monitor, interest shall accrue on such defaulted obligation for such time as such default continues at the above-referenced rate plus 2.00%. Interest shall be paid in full on or before the seventh (7th) Effective Date Anniversary.

(C)     There shall be no mandatory prepayments on the Unsecured Obligation or payments of accrued and unpaid interest thereon other than in accordance with the Liquidity Event Distribution Schedule or as otherwise set forth herein. Other than the mandatory prepayments, and prior to the time that at least one of the conditions described in the second sentence of Section 6.6(q) of the Plan shall be satisfied, Reorganized SVCMC shall not, without the written consent of the MedMal Trust Monitor which shall not be unreasonably withheld or delayed, make any payments on account of the Unsecured Obligation before the seventh (7th) Effective Date Anniversary. Mandatory prepayments on the Unsecured Obligation will be distributed on a quarterly basis, commencing December 31, 2007; provided, however, Reorganized SVCMC shall not be required to distribute any mandatory prepayments on the Unsecured Obligation pursuant to Section 6.4(c) of the Plan unless the aggregate amount to be distributed on the basis of any of the foregoing is equal to or greater than $500,000, and if the available amount to be distributed at any point in time when a mandatory prepayment would otherwise be

---

[39] In general, holders of Allowed General Unsecured Claims will receive up to, but no more than, 8% of the Allowed amount of their Claims, plus interest accruing from the Effective Date, on account of the Unsecured Obligation. If Available Cash is sufficient to provide such holders with a 93% distribution on the Effective Date, which SVCMC believes is unlikely, then there will not be an Unsecured Obligation.

required is less than $500,000, Reorganized SVCMC will distribute such amounts as and when the aggregate value thereof is equal to at least $500,000. In addition, the Litigation Trust shall make payments on the Unsecured Obligation in accordance with the Litigation Distribution Schedule.

(D)     There shall be no penalty for prepayment of the Unsecured Obligation.

(E)     Any payments on the Unsecured Obligation shall be applied first to principal and then to interest due thereunder.

(F)     In the event that, as of the first Effective Date Anniversary, the Unsecured Obligation has not been paid in full by Reorganized SVCMC, the aggregate amount, if any, contained at such time in the Post-Effective Date Available Cash Reconciliation Account shall be distributed by Reorganized SVCMC as if such amounts had been Available Cash on the Effective Date. For the avoidance of doubt, the distribution of the Post-Effective Date Available Cash Reconciliation Account may result in a mandatory pre-payment of the Unsecured Obligation if the distribution results in the complete reduction of the outstanding principal amount of the Secured Obligation.

(G)     With respect to any alleged default under the Unsecured Obligation that is not cured by Reorganized SVCMC within 90 days following receipt by Reorganized SVCMC of written notice of any such alleged default from the Trade Claims Monitor, provided that if, as of the expiration of such 120-day notice period, all Allowed MedMal Claims have been paid in full as provided in the Plan and no Disputed MedMal Claims remain outstanding, the Trade Claims Monitor may elect to accelerate the balance due under the Unsecured Obligation on behalf of all holders of Allowed General Unsecured Claims against SVCMC and may commence litigation to recover any and all amounts then due from Reorganized SVCMC under the Unsecured Obligation. In the event that the Chapter 11 Cases are closed as of such time that the Trade Claims Monitor seeks to initiate any such litigation, the Trade Claims Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such lawsuit before the Bankruptcy Court, and Reorganized SVCMC and the MedMal Trust Monitor shall not be, and are hereby deemed to have agreed that they shall not be, entitled to object to any such motion.

(iv)        a Pro Rata share of the GUC Litigation Trust Interest;[40] provided, however, that the GUC Litigation Trust Interest shall be satisfied solely out of Litigation Trust Assets, and holders of Allowed General Unsecured Claims against SVCMC shall not have recourse to Reorganized SVCMC for unpaid portions of the GUC Litigation Trust Interest.

(b)        Classes A3, B3, C3, D3, & E3 – Other Debtors.  In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against an Other Debtor (Classes A3, B3, C3, D3, and E3), each holder of an Allowed General Unsecured Claim against an Other Debtor shall receive, except to the extent such holder agrees to less favorable treatment,  on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable, its Pro Rata share of the assets of the Other Debtor (net of the distributions to which Priority Non-Tax Claims against the Other Debtor and Other Secured Claims against the Other Debtor are entitled under the Plan, and the costs of administering the Plan of the Other Debtor); provided, however, that no holder of an Allowed General Unsecured Claim against an Other Debtor shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against such Reorganized Other Debtor.

9.        *Classes 4, 5, & 6 – MedMal Claims*

A MedMal Claim is any prepetition Claim relating to medical malpractice (i) asserted or which can be asserted against SVCMC and/or SVCMC's insurers on account of or related to SVCMC's purported liability for an alleged act of medial malpractice or (ii) asserted or which can be asserted against any Covered Person[41] with respect to or related to claims of alleged medical malpractice, in each case net of the proceeds of SVCMC's third party insurance available to pay the holder of such Claim.  The MedMal Claims are divided into three Classes: (i) MedMal-BQ Claims (Class 4), which are generally MedMal Claims relating to an incident that allegedly occurred at one of the Brooklyn/Queens Hospitals, (ii) MedMal-MW Claims (Class 5), which are MedMal Claims relating to an incident that allegedly occurred at the Manhattan Hospital or the Westchester Hospital, and (ii) MedMal-SI Claims (Class 6), which are

---

[40] The GUC Litigation Trust Interest is a beneficial interest in the Litigation Trust entitling the holders of such interest to receive up to seven percent (7%) of the Allowed amount of their General Unsecured Claims against SVCMC plus an annual accretion on any unpaid portion thereof at a rate of eight percent (8%) compounding annually, from Litigation Trust Assets paid in accordance with the Litigation Distribution Schedule; provided, however, holders of the GUC Litigation Trust Interest shall not have recourse against Reorganized SVCMC on account of the GUC Litigation Trust Interest.  The Litigation Trust is discussed in more detail in Section IV.C.3. below and Section 6.5 of the Plan.  Although SVCMC cannot determine with accuracy the amount of net proceeds that will be earned by the Litigation Trust from the pursuit of Litigation Claims, it is possible that the Litigation Claims will yield sufficient proceeds to provide holders of Allowed General Unsecured Claims against SVCMC with a distribution (together with the other distributions provided to them under the Plan) equal to 100% of the Allowed amount of their Claims plus interest accruing from the Effective Date.

[41] A Covered Person is any physician or employee of SVCMC to the extent that such physician or employee has a right of indemnification against or from SVCMC with respect to claims of alleged medical malpractice.  See Plan, § 1.42.

MedMal Claims relating to an incident that allegedly occurred at one of the Staten Island Hospitals or certain related facilities.  Under the Plan, a MedMal Trust will be set up with respect to each Class of MedMal Claims.

The MedMal Claims will be paid out of the MedMal Trusts, which are described in more detail in Section IV.C.4. below and Section 6.6 of the Plan.  Each holder of an Allowed MedMal Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal Claim, except to the extent such holder agrees to less favorable treatment, (i) (A) if such MedMal Claim is Allowed on the Effective Date, as soon as practicable after the Effective Date, or (B) if such MedMal Claim is not Allowed on the Effective Date, as soon as practicable after the date such MedMal Claim becomes Allowed, Cash up to the amount of its Allowed MedMal Claim to the extent there remains Distributable Cash in the MedMal Trust on such date, such Cash to be distributed to all Allowed MedMal Claims in proportion to the unpaid portion of each Allowed MedMal Claim (including accrued MedMal Interest, if any), and (ii) within 30 days after each date that the MedMal Trust receives a payment from Reorganized SVCMC, the Litigation Trust or the MedMal Trust Policy such that there is Distributable Cash in the MedMal Trust, Cash equal to its proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); provided, however, that in no event shall the holder of a MedMal Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal Trust.  Holders of MedMal Claims that did not timely file proofs of claim (other than those whose MedMal Claims are deemed to be Allowed MedMal Claims pursuant to a Final Order) shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers.  Holders of MedMal Claims shall not have recourse against Reorganized SVCMC on account of their MedMal Claims.

10.    *Class 7 – PBGC Claim*

The PBGC Claim is a contingent claim for underfunding of the Pension Plan if the Pension Plan is terminated.  In addition to payments to the Pension Plan required by ERISA, Reorganized SVCMC will be required to make contributions to the Pension Plan as set forth in the chapter 11 Plan.  On the Effective Date, Reorganized SVCMC shall assume the Pension Plan and the obligations of contributing plan sponsor unless the Pension Plan has been terminated in accordance with Title IV of ERISA.  In full and complete satisfaction, settlement and release of and in exchange for the PBGC's Allowed PBGC Claim, SVCMC shall make the payments to the Pension Plan set forth in the Plan.

11.    *Class 8 – Intercompany Claims*

The Intercompany Claims are Claims against SVCMC by an entity of which SVCMC is a direct or indirect member or shareholder.  The Intercompany Claims are fully subordinated to all other Claims against SVCMC (other than the DASNY Subordinated Claim).  After (i) all General Unsecured Claims against SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims

against SVCMC, Allowed MedMal Claims and the Allowed PBGC Claim have received (unless they have agreed otherwise, provided, however, that the treatments provided pursuant to the Plan shall not be considered such agreement) a cash recovery of 100% of the Allowed amount of their Claims in Cash plus interest (including all accrued MedMal Interest), each holder of an Intercompany Claim shall be entitled to receive payment from Reorganized SVCMC pursuant to terms not set forth in this Plan, but rather to be mutually agreed upon between Reorganized SVCMC and each holder of an Intercompany Claim, after the satisfaction of (i) and (ii) above, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

12.    *Class 9 – DASNY Subordinated Claims*

The DASNY Subordinated Claims are the Claims to which DASNY is entitled pursuant to that certain stipulation between DASNY and the Creditors' Committee, so ordered by the Court on December 29, 2005.  The Debtors believe that the treatment of DASNY's claims as set forth in the Plan are consistent with that stipulation.  Subject to continuing discussions with DASNY and the reasonable satisfaction of the Tort Claimants' Committee with respect to any alternative agreement that may be reached with respect to the DASNY Subordinated Claims, the Plan provides that after (i) all General Unsecured Claims and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have received 100% of the distributions to which they are entitled under the Plan in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $2,865,721.47.  The payment of such amount shall not be considered a payment required to be made under the Plan as contemplated in the definition of Available Cash and shall not reduce the amount of the Effective Date Cash Distribution.  After (i) all General Unsecured Claims and MedMal Claims have been either Allowed, disallowed, or withdrawn and (ii) the holders of all Allowed General Unsecured Claim, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have been paid in full (i.e., received 100% of the Allowed amount of their Claims plus interest) in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata share of $3.9 million.  If, at any time, it becomes evident that the holders of all Allowed General Unsecured Claims, Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim shall not be paid in full (i.e., shall not receive 100% of the Allowed amount of their Claims plus interest), then the right of each holder of a DASNY Subordinated Claim to receive its Pro Rata share of $3.9 million as set forth in the immediately preceding sentence shall cease, and DASNY's claim for such amount automatically shall be disallowed and expunged and any security therefore shall be avoided and released without further action of the Bankruptcy Court or any other court.

DASNY believes that the Plan does not adhere to the stipulation. If DASNY is correct, DASNY believes that the Plan in its current form cannot be confirmed by the Bankruptcy Court because DASNY will be entitled to receive $2.8 million on the effective date of the Plan and the balance of its claim ($3.9 million) after Class 3 is paid in full, but before any payment is made to MedMal Claims, the PBGC or Intercompany Claims. If the Plan is ultimately modified to comport with DASNY's interpretation of the stipulation, recoveries to unsecured creditors may be less than what is proposed in the current version of the Plan.  As

noted above, neither the Debtors nor the Creditors' Committee believe that DASNY's interpretation of the stipulation is correct.

Because resolution of this disagreement could affect the liens being granted under the Plan to secure certain obligations to the MedMal Trusts, SVCMC has agreed that any resolution of this disagreement must be reasonably satisfactory to the Tort Claimants' Committee.

13.    *Classes A4, B4, C4, D4, & E4 – Equity Interests in the Other Debtors*

In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in an Other Debtor, the holder of the Allowed Equity Interest in an Other Debtor (Classes A4, B4, C4, D4, and E4) shall receive the remaining assets of the Other Debtor (net of the costs of administering the Plan of the Other Debtor), as soon as reasonably practicable after all assets of the Other Debtor have been liquidated and all Claims against the Other Debtor have been paid in full.  On account of the contractual obligation of the holder of the Equity Interest in each Other Debtor to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of an Equity Interest in any Other Debtor under the Plan and to the extent that such payments are remitted to SVCMC on the Effective date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution.  As noted, SVCMC does not have any Equity Interests.

**B.    Methods of Distributions Under the Plan**

1.    *SVCMC's Plan*

Reorganized SVCMC shall make all distributions required by the Plan other than those to be made by the MedMal Trustees or the Litigation Trustee.  Reorganized SVCMC shall make the $1 million contribution and the Litigation Trust Loan described in the Plan to the Litigation Trust on the Effective Date.  The Litigation Trustee shall make distributions in accordance with the Litigation Distribution Schedule.  Reorganized SVCMC shall make the distributions described in the Plan to the respective MedMal Trusts on and after the Effective Date.  The respective MedMal Trustees, when and as directed by Reorganized SVCMC, shall make all distributions to holders of Allowed MedMal Claims in accordance with the Plan and the respective MedMal Trust Agreements.

2.    *Other Debtors' Plans*

On the Effective Date, Reorganized SVCMC shall place all Cash of each of the Other Debtors into a Plan Administration Account.  Reorganized SVCMC shall deposit the proceeds of any assets of an Other Debtor liquidated after the Effective Date into the applicable Plan Administration Account.  Reorganized SVCMC shall pay all costs of administering the Other Debtors' Plans and make all distributions required to be made by the Other Debtors out of their respective Plan Administration Accounts.

Reorganized SVCMC shall make periodic payments Pro Rata to holders of General Unsecured Claims against each of the Other Debtors out of their respective Plan Administration Accounts; provided, however, that, from the funds deposited in the Plan

Administration Accounts pursuant to section 5.3(b)(1) of the Plan, Reorganized SVCMC shall reserve, in each Plan Administration Account, sufficient Cash (and/or appropriate assets) as reasonably necessary for each Other Debtor to (A) meet the reasonable necessary administrative expenses of the Other Debtor after the Effective Date, including contingent liabilities, (B) pay reasonable administrative expenses of the Other Debtor's estate that have not been paid (including the Other Debtor's professional fees and expenses) or have not been Allowed as of the Effective Date but which are subsequently Allowed), (C) pay holders of Disputed General Unsecured Claims against the Other Debtor the amount such holders would be entitled to receive under the Plan if all such Claims were to become Allowed Claims, (D) satisfy other liabilities incurred by the Other Debtor permitted in accordance with the Plan, and (E) otherwise perform the functions and take the actions provided for or permitted in the Plan.

If (A) all holders of Allowed General Unsecured Claims against an Other Debtor have not received payment in full on account of their Claims after the resolution of all Disputed Claims against the Other Debtor, (B) the Other Debtor's Plan Administration Account does not hold sufficient Cash or other assets to pay all holders of General Unsecured Claims against the Other Debtor the full Allowed amount of their Claims, and (C) all assets of the Other Debtor have been liquidated, then (Y) Reorganized SVCMC shall make a final Pro Rata distribution of all remaining Cash in the Other Debtor's Plan Administration Account (other than the amount of Cash necessary to wind up the Other Debtor) to holders of Allowed General Unsecured Claims against the Other Debtor and (Z) the holders of Equity Interests in the Other Debtor shall not receive a distribution on account of their Equity Interests.

As soon as reasonably practical after (A) the payment in full of all Allowed Claims against an Other Debtor, (B) the resolution of all Disputed Claims against the Other Debtor, and (C) the liquidation of all the assets of the Other Debtor, Reorganized SVCMC shall be deemed to have made a final Pro Rata distribution of all remaining Cash in the Other Debtor's Plan Administration Account (other than the amount of Cash necessary to complete all requirements for and wind up the Other Debtor) to the holder of the Equity Interest in the Other Debtor; provided, however, that the final Pro Rata distribution shall in fact be retained by, and transferred to, and/or otherwise deemed transferred to, Reorganized SVCMC in accordance with Section 4.17(b), 4.21(b), 4.25(b), 4.29(b) or 4.33(b) of the Plan, as applicable.

Reorganized SVCMC shall close each Other Debtor's Plan Administration Account after there remains no Cash in such Plan Administration Account, all the assets of the Other Debtor have been liquidated, and all payments required to be made under the Other Debtor's Plan have been made.

3.    *Distributions of Cash*

Any payment of Cash made by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

4.      *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of any Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear  of any liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

5.      *Timing of Distributions*

Unless otherwise provided in the Plan, any distribution to be made by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be made to the extent and at the time provided in Article IV of the Plan, and, to the extent applicable, Sections 6.3(d) and 6.4(c) of the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.      *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents. The holder must notify Reorganized SVCMC in writing of a change of address pursuant to the notice requirements set forth in Section 12.18 of the Plan or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules.  None of Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein or in the Plan.

7.      *Distributions to Holders as of Record Date*

As of the close of business on the Record Date, the claims register, for each Debtor, shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim.  Neither Reorganized SVCMC, the Other Debtors, the Litigation Trustee nor the MedMal Trustees shall have any obligation to recognize any transfer of any Claim occurring after the Record Date, provided, however, that Reorganized SVCMC, the Other Debtors, the Litigation Trustee and the MedMal Trustees will recognize transfers of Claims made after the entry of an order approving the Disclosure Statement but before the Confirmation Date for distribution purposes.  Except as set forth in the prior sentence, Reorganized SVCMC, the Other Debtors, the Litigation Trustee, and the MedMal Trustees shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

8.    *Undeliverable and Unclaimed Distributions*

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, in writing, of such holder's then-current address, at which time all missed distributions shall be made, subject to the final sentence of this paragraph, as soon as is practicable to such holder, without interest. Checks issued by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check shall be made in accordance with the notice provisions of Section 12.18 of the Plan to Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks shall be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of Reorganized SVCMC (provided, however, that prior to the First Effective Date Anniversary, any such undeliverable or unclaimed distribution shall be deposited by Reorganized SVCMC into the Post-Effective Date Available Cash Reconciliation Account), the Litigation Trust or the appropriate MedMal Trust, as the case may be. The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code shall not be entitled to any other or further distribution under the Plan on account of such Claim.

9.    *Setoffs*

To the extent permitted under applicable law, Reorganized SVCMC may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that the Debtors have asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code and in the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from the Debtors, it will be conclusively presumed that the requirements for disallowance of a claim under section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have been satisfied. If the holder of such Allowed Claim does timely respond to the written assertion by the Debtors that setoff or recoupment against such holder of an Allowed Claim is appropriate, the party asserting such right to setoff or recoupment must seek an order of the Bankruptcy Court allowing for such setoff or recoupment; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, rights and causes of action that the Debtors may possess against such holder.

10.    *Application of Distributions*

Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any.

11.     _Withholding and Reporting Requirements_

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Other Debtors, the Litigation Trustee, the MedMal Trustees, or any other paying agent, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions. Any party issuing any instrument or making an in-kind (non-Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## C.     **Implementation of the Plan**

1.     _Reorganized SVCMC_

(a)     Reorganized Articles of Incorporation and Reorganized By-laws. Reorganized SVCMC shall adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which shall be included in the Plan Supplement. The Reorganized Articles of Incorporation and Reorganized By-laws of Reorganized SVCMC shall preserve the power of the holders of the Membership Interests to appoint and remove members of Reorganized SVCMC's Board of Directors and approve substantial asset sales and substantial capital projects. Prior to the closing of SVCMC's Chapter 11 case, any amendments to Reorganized SVCMC's Articles of Incorporation and Reorganized By-laws shall be filed with the Bankruptcy Court.

(b)     Boards of Directors and Officers. The initial Board of Directors and officers of Reorganized SVCMC shall be disclosed in the Plan Supplement and shall be in effect as of the Effective Date.

(c)     SVCMC Membership Interests. The prepetition Membership Interests in SVCMC shall remain unchanged.

(d)     Restructuring Transactions. On or after the Effective Date, and in SVCMC's discretion, certain transactions that will be listed in a schedule to the Plan Supplement shall be effectuated, provided, however, that these transactions shall in no way disadvantage the MedMal Trusts, payments to the Pension Plan or distributions or payments to holders of Allowed General Unsecured Claims pursuant to the Plan. These transactions may include the creation of non-profit or for-profit entities.

(e)     Change of Control. Until the Secured Obligation and the Unsecured Obligation have been paid in full, Reorganized SVCMC shall promptly provide notice to the Trade Claims Monitor and the MedMal Trust Monitor of any Change of Control.

(f)      <u>Liability of Affiliates</u>.  Any entity created by Reorganized SVCMC on or after the Effective Date as described above (other than any entity created for the purpose of a sale or financing of the Martin Payne building located at 130 West 12th Street in New York New York) into which assets of SVCMC immediately prior to the Effective Date are transferred or contributed, but not affiliates of Reorganized SVCMC existing prior to the Effective Date, shall be co-liable with Reorganized SVCMC on all of Reorganized SVCMC's obligations under the Plan.

2.      *Other Debtors*

(a)      <u>Reorganized SVCMC as Plan Administrator</u>.  Reorganized SVCMC shall be the administrator for the Plans of each of the Other Debtors.  In such capacity, the powers of Reorganized SVCMC shall include any and all powers necessary to implement the Plan with respect to the Other Debtors and to administer and liquidate the assets and wind up the business and affairs of the Other Debtors, including, but not limited to resolving claims, liquidating assets, abandoning assets, pursuing causes of action, retaining professionals, maintaining books and records, entering into agreements, investing cash, administering and paying taxes, and paying any and all reasonable fees and expenses of the Other Debtors.

(b)      <u>Liquidation of Assets of SSSV and MS-SVH</u>.  SSSV and/or MS-SVH may, on or around the Effective Date, sell any of their assets and/or assume and assign their contracts to a new entity created by SVCMC to carry on a similar or expanded function to SSSV or MS-SVH.

(c)      <u>Expenses of Liquidation</u>.  Reorganized SVCMC shall pay the expenses of liquidation of each Other Debtor out of such Other Debtor's Plan Administration Account; <u>provided</u>, <u>however</u>, that Reorganized SVCMC shall be entitled to reimbursement from each Other Debtor for all fees and expenses incurred and paid by Reorganized SVCMC on or after the Effective Date in connection with administering the Plan for such Other Debtor.

(d)      <u>Termination</u>.  Each Other Debtor will terminate after the conclusion of the liquidation, administration, and distribution of its assets in accordance with the Plan and its material completion of all duties and functions set forth in the Plan, but in no event later than three (3) years after the Effective Date, unless extended by Court order upon the request of Reorganized SVCMC.  Upon such termination, the Equity Interests in the Other Debtor shall be extinguished and the legal existence of the Other Debtors shall terminate without further action of the Bankruptcy Court, or any other Court, administrative body or other agency. Reorganized SVCMC may cause to be filed with the State of New York and any other governmental authority such certificate of dissolution or cancellation and other certificates and documents as may be or become necessary to reflect the termination of the legal existence of each Other Debtor.  No further or other court order or regulatory approval shall be necessary to effectuate the termination of the legal existence of each Other Debtor.

3.      *Litigation Trust*

(a)      <u>General</u>.  On or before the Effective Date, the Litigation Trust Agreement, in a form reasonably acceptable to SVCMC, the Creditors' Committee and the Ad

Hoc Committee, shall be executed, and all other necessary steps shall be taken to establish the Litigation Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern. Such Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims and MedMal Claims against SVCMC.

(b)  Purpose of Litigation Trust.  The Litigation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)  Fees and Expenses of Litigation Trust.  Other than the $1 million grant on the Effective Date, all fees, expenses, and costs of the Litigation Trust (including Litigation Trust Loan interest) shall be paid by the Litigation Trust, and Reorganized SVCMC shall not be responsible for any fees, expenses, and costs of the Litigation Trust.

(d)  Litigation Trust Loan.

(i)  On the Effective Date, SVCMC shall transfer Cash in the amount of the proceeds of the Litigation Trust Loan to the Litigation Trust.

(ii)  The Litigation Trust Loan shall be evidenced by a note payable by the Litigation Trust to Reorganized SVCMC and such other appropriate documentation to evidence the Litigation Trust Loan, the forms of which shall be included in the Plan Supplement and reasonably acceptable in form and substance to SVCMC, the Creditors' Committee, and the Ad Hoc Committee.  In the event of any inconsistency between the terms of the Plan and the terms of such documentation, the terms of such documentation shall control.

(iii)  The Litigation Trust Loan shall accrue simple interest at the rate of 8% annually.  The Litigation Trust Loan and accrued interest on that loan shall be paid in accordance with the Litigation Distribution Schedule.

(e)  Litigation Trust Initial Assets.  As of the Effective Date, SVCMC and the Creditors' Committee shall assign and transfer to the Litigation Trust all of their rights, title and interest in and to the Litigation Trust Initial Assets for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule.  Such

98

transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and shall be free and clear of any liens, claims and encumbrances, and no other entity, including the Debtors or Reorganized SVCMC (other than Reorganized SVCMC with respect to the Litigation Trust Loan), shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Trust Assets upon their assignment and transfer to the Litigation Trust (other than as provided herein or in the Litigation Trust Agreement); provided, however, that such assets shall be transferred to the Litigation Trust subject only to the obligation of the Litigation Trust to make distributions under the Litigation Distribution Schedule pursuant to Section 6.5(o) of the Plan.

(f)    Litigation Trust Contribution Event.

(i)    Under certain circumstances set forth below, Reorganized SVCMC may have additional payment obligations to the Litigation Trust to the extent of, and only to the extent of, in the aggregate, an amount no greater than 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued interest on such amount.

(ii)    Specifically, in the event, either (i) (x) all holders of Allowed MedMal Claims have received the full Allowed amount of their Claims (including MedMal Interest, where applicable), (y) there remain five or fewer Disputed MedMal Claims, and (z) there is sufficient Distributable Cash in each of the MedMal Trusts to pay at least one hundred and fifty percent (150%) of the aggregate amount in which the Disputed MedMal Claims are estimated to be Allowed for each MedMal Trust, respectively, pursuant to a formal estimate performed at the request of Reorganized SVCMC made at any time (at its sole expense), or at the reasonable request of the Trade Claims Monitor (but at Reorganized SVCMC's expense), provided that the Trade Claims Monitor may not cause such an estimation more than twice and no such estimate shall be performed within three months of another, or as otherwise agreed to by the MedMal Trust Monitor, or (ii) (y) all holders of Allowed MedMal Claims have received the full Allowed amount of their Allowed MedMal Claims and (z) there do not remain any Disputed MedMal Claims, then Reorganized SVCMC shall make payments to the Litigation Trust in twelve (12) equal monthly installments of principal plus the accrued accretions on each installment of principal paid, up to (but in no event exceeding), in the aggregate, the lesser of (i) an amount equal to (z) 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 minus (y) amounts (if any) received on account of the GUC Litigation Trust Interest as a result of the condition set forth in Section 1.84(b) of the Plan having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid under the Litigation Distribution Schedule.  The amount of each monthly installment shall be recalculated in the event distributions are made on account of Section 1.84(b) of the Plan after the first distribution is made on account of Section 1.84(a) of the Plan.

(iii)        In the event that Reorganized SVCMC is required to make a payment to the Litigation Trust under the Liquidity Event Distribution Schedule (as described below), Reorganized SVCMC shall make that payment in an amount not to exceed the lesser of (i) an amount equal to (y) 1/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 1/7 minus (z) amounts in excess of 1/7 of the GUC Litigation Trust Interest plus accrued accretions received by the Litigation Trust as a result of the condition set forth in Section 1.81(a) of the Plan having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid out under the Litigation Distribution Schedule.

(g)        <u>Litigation Distribution Schedule.</u>  The Plan places control over the Litigation Claims in the Litigation Trust.  Under the Plan, the Litigation Trust Assets are paid out as follows:

- first, to pay Litigation Claims Costs;

- second, to Reorganized SVCMC to pay back the Litigation Trust Loan (principal first and then interest);

- third, to pay down the remaining principal portion of the GUC Litigation Trust Interest;

- fourth, to pay down the accreted portion of the GUC Litigation Trust Interest;

- fifth, after the GUC Litigation Trust Interest is satisfied in full and until the Secured Obligation is paid in full, fifty percent (50%) to pay down the Secured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Shares, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- sixth, after the Secured Obligation (both interest and principal) is paid in full and until the Unsecured Obligation is paid in full, fifty percent (50%) to pay down the Unsecured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Shares, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- seventh, to the MedMal Trusts until Reorganized SVCMC's payments under the MedMal Trust Funding Schedule shall have been fully paid or the obligation to make such payments shall have ceased and all required Shortfall Payments due, outstanding, and unpaid at the time of distribution shall have been paid in full; and

- eighth, any remaining balance to the Pension Plan.

(h)    <u>Governance of Litigation Trust.</u>  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee.

(i)    <u>Appointment of a Litigation Trustee.</u>  Prior to the Effective Date, the Creditors' Committee and the Ad Hoc Committee shall jointly select the Litigation Trustee; provided, however, if the Creditors' Committee and the Ad Hoc Committee cannot agree on the Litigation Trustee, the Litigation Trustee will be proposed by the U.S. Trustee and confirmed by the Bankruptcy Court at the Confirmation Hearing.  The identity of and contact information for the Litigation Trustee (or proposed Litigation Trustee, if applicable) shall be set forth in the Plan Supplement.  In the event the Litigation Trustee dies, is terminated, or resigns for any reason, the Trust Governing Board shall designate a successor.

(j)    <u>The Trust Governing Board.</u>

(i) The Litigation Trustee shall take direction from a "Trust Governing Board" that shall initially consist of three (3) directors jointly selected by the Creditors'

Committee and the Ad Hoc Committee; provided, however, that if the Creditors' Committee and the Ad Hoc Committee cannot agree on three (3) directors, then these directors will be nominated by the United States Trustee and confirmed by the Bankruptcy Court at the Confirmation Hearing; provided further, however, the Litigation Trustee cannot settle any Litigation Claims unless the Bankruptcy Court enters an order approving such settlement pursuant to Rule 9019 of the Bankruptcy Rules. The identity of the individuals serving (or if applicable to be nominated to serve) on the Trust Governing Board shall be set forth in the Plan Supplement. In the event one of the Trust Governing Board directors dies, is terminated, or resigns for any reason, the remaining Trust Governing Board directors shall designate a successor.

(ii) Any fees and expenses of individuals serving on the Trust Governing Board shall be Litigation Claims Costs.

(iii) In all circumstances, the Trust Governing Board shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

(k)    Role of the Litigation Trustee. In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee shall (i) hold the Litigation Trust Assets for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, and such other beneficiaries as described in the Litigation Distribution Schedule, (ii) make distributions of Litigation Claim Proceeds pursuant to the Litigation Distribution Schedule as provided in the Plan, (iii) have the power and authority to prosecute and resolve any Litigation Claims, and (iv) litigate objections to Litigation Parties' professional fees, including any appeals with respect thereto. To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Claims prior to the Effective Date by the Debtors and/or the Creditor' Committee, the Litigation Trustee shall be substituted for the Debtors and/or the Creditors' Committee in connection therewith. The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. In all circumstances, the Litigation Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust. In addition, the Litigation Trustee shall provide to the MedMal Trust Monitor such information and other data about the Litigation Trust as the MedMal Trust Monitor shall reasonably request.

(l)    GUC Litigation Trust Interests. The GUC Litigation Trust Interests shall not be certificated and are not transferable.

(m)    Cash. The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(n)    Retention of Professionals by the Litigation Trustee. The Litigation Trustee may retain and reasonably compensate counsel and other professionals, as

applicable, to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate, without Bankruptcy Court approval, subject to the prior approval of the Trust Governing Board.

(o)    Compensation of the Litigation Trustee.  The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation (which compensation shall be negotiated by the Litigation Trustee), to the extent not set forth in the Plan, shall be set forth in the Litigation Trust Agreement.  The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(p)    Cooperation of Reorganized SVCMC.  Reorganized SVCMC, upon reasonable notice, shall be required to provide information, to the extent Reorganized SVCMC has such information, to the Litigation Trustee against SVCMC sufficient to enable the Litigation Trustee to perform its duties hereunder.  Reorganized SVCMC shall cooperate with the Litigation Trustee in the administration of the Litigation Trust, including, without limitation, in providing documentation, witness testimony, and other evidence in support of the prosecution of the Litigation Claims, at no cost or expense of the Litigation Trust other than out of pocket expenses for copying or similar expenses.

(q)    Distribution of Litigation Trust Assets.

(i)    As soon as reasonably practicable in the reasonable discretion of the Litigation Trustee, the Litigation Trustee shall distribute all Cash on hand (including any Cash received from SVCMC on the Effective Date or any Cash received as a result of a Litigation Trust Contribution Event having occurred, and treating as Cash for purposes of Section 6.5(o)(1) of the Plan any permitted investments under Section 6.5(k) of the Plan, except such amounts (A) as would be distributable to a holder of a Disputed General Unsecured Claim against SVCMC (as of the time of such distribution) if such Disputed Claim had been Allowed in the full amount asserted by the holder of such Claim prior to the time of such distribution (but only until such Claim is resolved), which amounts shall be held in the LT Disputed Claims Reserve, (B) as are reasonably necessary, in the sole discretion of the Litigation Trustee, to meet contingent liabilities and to maintain the value of the Litigation Trust during liquidation, (C) to pay reasonable expenses in the sole discretion of the Litigation Trustee (including, but not limited to, any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets, including any taxes in respect of LT Disputed Claims Reserve), and (D) to satisfy other liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.  The Litigation Trustee shall distribute Cash in accordance with the Litigation Distribution Schedule.

(ii)    The Litigation Trustee shall remove funds from the LT Disputed Claims Reserve as the General Unsecured Claims against

SVCMC are resolved, which funds shall be distributed in the manner provided for in Section 6.5(o)(i) of the Plan.

(r)    Federal Income Tax Treatment of Litigation Trust.

(i)    For all federal income tax purposes, all parties (including, without limitation, SVCMC, Reorganized SVCMC, the Litigation Trustee, and the holders of Allowed General Unsecured Claims against SVCMC) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule as (A) a transfer of the Litigation Trust Assets, for all purposes of the Internal Revenue Code of 1986, as amended (including sections 61(a)(12), 483, 1001, 1012, and 1274) directly to the beneficiaries of the Litigation Trust, followed by (B) the transfer by such persons to the Litigation Trust of such Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

(ii)    Tax Reporting:

(A)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties shall treat the Litigation Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule, are the grantors and beneficiaries. In the event an alternative treatment of the Litigation Trust is required for federal income tax purposes, the Litigation Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Litigation Trust, and anyone who subsequently becomes a holder, of such alternative treatment. The

Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 6.5(p) of the Plan. The Litigation Trustee also shall annually send to each record holder of a beneficial interest in the Litigation Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Litigation Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any governmental unit. Subject to Section 6.5(p)(ii)(C) of the Plan, the Litigation Trust's taxable income, gain, loss, deduction or credit shall be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Litigation Trust Agreement, up to the tax book value of the Litigation Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(B)     As soon as possible after the Effective Date, the Litigation Trustee shall make a good faith valuation of the value of the Litigation Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(C)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation

Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the LT Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Litigation Trust that would have been allocated to the holders of Disputed General Unsecured Claims against SVCMC had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the LT Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the LT Disputed Claims Reserve), and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections).  The holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule shall report, for tax purposes, consistent with the foregoing.

(D)     The Litigation Trustee shall be responsible for payments, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the LT Disputed Claims Reserve.

(E)     The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including the LT Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust (including LT Disputed Claims Reserve).

(s)     Dissolution of Litigation Trust.  The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Litigation Trustee determines that the pursuit of additional Litigation Claims is not likely to yield sufficient additional Litigation Claims Proceeds to justify further pursuit of such claims and (ii) all distributions of Litigation Claims Proceeds required to be made by the Litigation Trustee

under the Plan have been made, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period prior to such fifth (5th) anniversary (and, in the event for further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets. Upon dissolution of the Litigation Trust, any remaining Litigation Trust Proceeds shall be distributed to all holders of beneficial interests in the Litigation Trust in accordance with their relative beneficial interests and in accordance with the Litigation Trust Agreement (which shall include the Litigation Distribution Schedule).

4.    *MedMal Trusts*

(a)    General.  On or before the Effective Date, the MedMal Trust Agreements, in a form reasonably acceptable to SVCMC and the Tort Claimants' Committee, shall be executed, and all other necessary steps shall be taken to establish the MedMal Trusts. Section 6.6 of the Plan sets forth certain of the rights, duties, and obligations of the MedMal Trustees.  In the event of any conflict between the terms of the Plan and the terms of the MedMal Trust Agreements, the terms of the MedMal Trust Agreements shall govern.  The MedMal Trust Agreements may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties and authorities do not affect the status of each of the MedMal Trusts as a grantor trust for United States federal income tax purposes, or otherwise have a material adverse effect on the recovery of holders of Allowed MedMal Claims.

(a)    Purpose of MedMal Trusts.  Each MedMal Trust shall be established for the sole purpose of holding the MedMal Trust Assets, distributing such assets to holders of the applicable Allowed MedMal Claims, and otherwise acting in accordance with the Provisions of the Plan, with no objective to continue or engage in the conduct of a trade or business.

(b)    MedMal Trust Assets.  As of the Effective Date, SVCMC shall assign and transfer to the MedMal-MW Trust, the MedMal-SI Trust and the MedMal-BQ Trust all of SVCMC's right, title and interest in and to the MedMal-MW Trust Initial Assets, the MedMal-SI Trust Initial Assets, and the MedMal-BQ Trust Initial Assets, respectively.  SVCMC or such other Persons that may have possession or control of such MedMal Trust Initial Assets shall transfer possession or control of such property to the respective MedMal Trusts prior to or as of the Effective Date and shall execute the documents or instruments necessary to effectuate such transfers.  Reorganized SVCMC shall make additional contributions to the MedMal Trusts (i) in accordance with each MedMal Trust's Pro Rata Share[42] of the amounts set forth on the

---

[42] Pursuant to the Plan, each MedMal Trust's Pro Rata Share is calculated by comparing the projected liability for each MedMal Trust for MedMal Claims based on the region it represents as set forth in the Caronia Estimate after giving effect to the self-insurance funds available for that region.  Accordingly, until there is a further estimation of MedMal Claims upon the occurrence of the 50% Milestone Triggering Event or a 75% Milestone Triggering Event, and based on the funds in each existing Self-Insurance Trust as of April 30, 2007,  the Pro Rata Share for MedMal-

MedMal Trust Funding Schedule[43], (ii) to the extent necessary, to satisfy all of Reorganized SVCMC's obligations to make Shortfall Payments and payments under the Additional Funding Schedule, (iii) on the first Effective Date Anniversary in an amount equal to the amount that would have been paid to each MedMal Trust, if any, as if the amounts in the Post-Effective Date Available Cash Reconciliation Account had been included in the calculation of Available Cash on the Effective Date, provided, however, that Reorganized SVCMC shall be obligated to contribute such amount to the MedMal Trusts only if the aggregate amount of the Secured Obligation has been paid in full by Reorganized SVCMC as of such date and net of any amounts to be split as prepayments of the Unsecured Obligation, and (iv) as otherwise required under the Plan.  Except as otherwise provided herein, all transfers by or obligations of SVCMC or Reorganized SVCMC to the MedMal Trusts shall be in accordance with each MedMal Trust's Pro Rata Share.  All transfers to the MedMal Trusts shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax as discussed in Section 12.6 of the Plan, and shall be free and clear of any liens, claims and encumbrances, and no other entity, including the Debtors or the Post-Effective Date Debtors shall have any interest, legal, beneficial, or otherwise, in the MedMal Trusts or the assets of the MedMal Trusts upon their assignment and transfer to the MedMal Trusts; provided, however, that all such assets will be transferred to the MedMal Trusts subject only to the obligation of the MedMal Trusts to pay their

---

MW Trust will be 7%; the Pro Rata Share for MedMal-SI Trust will be 0%; and the MedMal-BQ Trust will be 93%. These Pro Rata Shares were calculated using the following data and comparing, as a percentage, the amount of the "Net Projected Liability By Region for Estimated Allowed MedMal Claims":

|  | Caronia Estimate of MedMal Claims by region | Available Self-Insurance Trust Funds as of April 30, 2007 | Net Projected Liability by Region for Estimated Allowed MedMal Claims |
| --- | --- | --- | --- |
| MedMal-MW Trust | $20,534,000 | $17,787,000 | $2,747,000 |
| MedMal-SI Trust | $9,308,000 | $9,647,738 | $0.00 |
| MedMal-BQ Trust | $51,227,000 | $18,298,000 | $32,676,000 |

[43] The MedMal Trust Funding Schedule, which is subject to reduction as set forth in the Plan, is as follows:

| Effective Date Anniversary | Funding Amount |
| --- | --- |
| First (1st) | $10 million |
| Second (2nd) | $10 million |
| Third (3rd) | $10 million |
| Fourth (4th) | $15 million |
| Fifth (5th) | $15 million |
| Sixth (6th) | $15 million |
| Seventh (7th) | $15 million |
| Eighth (8th) | $15 million |
| Ninth (9th) | $18 million |

respective (i) Allowed MedMal Claims, (ii) Reimbursable Costs, subject to the obligation of Reorganized SVCMC to make Shortfall Payments under certain circumstances as described herein, and (iii) final distributions pursuant to Section 6.6(t)(iv) of the Plan.

(c)    <u>Governance of MedMal Trusts.</u>  The MedMal Trusts shall be governed by the respective MedMal Trust Agreements and administered by the respective MedMal Trustees.

(d)    <u>Appointment of the MedMal Trustee.</u>  Prior to the Effective Date, SVCMC, after consultation with the Tort Claimants' Committee, shall appoint the MedMal Trustees for each of the MedMal Trusts.  The same Person may serve as the MedMal Trustee for two or more MedMal Trusts with the consent of the Tort Claimants' Committee.  The identity of and contact information for the MedMal Trustees shall be described in the Plan Supplement.  In the event a MedMal Trustee shall resign or otherwise cease serving in such capacity, a successor MedMal Trustee shall be appointed as provided for in the applicable MedMal Trust Agreement.

(e)    <u>Role of the MedMal Trustees.</u>  In furtherance of and consistent with the purpose of the MedMal Trusts and the Plan, each of the MedMal Trustees shall, as instructed by Reorganized SVCMC, (i) hold, manage, sell, or invest, as appropriate, the MedMal Trust Assets, (ii) hold the MedMal Trust Assets for the benefit of the holders of the Allowed MedMal Claims, (iii) hold, manage, sell, invest and distribute (in the manner specified in Sections 4.8, 4.9, and 4.10 of the Plan, as applicable) Cash or non-Cash MedMal Trust Assets, and (iv) perform such other functions as are provided in the Plan and the applicable MedMal Trust Agreement.  To the extent that Reorganized SVCMC refuses to instruct any MedMal Trustee to make any distribution otherwise provided under the Plan, Reorganized SVCMC must also seek an order of the Bankruptcy Court directing a MedMal Trustee to refrain from making that distribution within twenty (20) days of giving that instruction to the MedMal Trustee, unless the MedMal Trust Monitor shall have consented to a longer period of time in which to make such a request.  The MedMal Trust Monitor shall have standing to object to any such request for relief by Reorganized SVCMC.  In the event such relief is sought, the MedMal Trustee shall refrain from making the distribution at issue until the request for relief is withdrawn by Reorganized SVCMC or a Final Order has been entered permitting the MedMal Trustee to make the payment.  If no such request is timely filed, the MedMal Trustee may make the distribution otherwise provided by the Plan without any liability to Reorganized SVCMC to the extent the distribution in fact was provided by the Plan and in the amount provided by the Plan.

(f)    <u>The MedMal Trust Monitor.</u>

(i)    Prior to the Effective Date, the Tort Claimants' Committee, with the reasonable consent of SVCMC, shall appoint the MedMal Trust Monitor.  The identity of and contact information for the MedMal Trust Monitor shall be set forth in the Plan Supplement.  If the MedMal Trust Monitor is terminated, resigns, or is unavailable to serve for any reason, then (i) if any members of the Tort Claimants' Committee have not been paid the full Allowed amount of their respective Claims or have not had their Claims disallowed by Final Order, counsel to the MedMal Trust Monitor shall contact such members and the successor MedMal Trust

Monitor shall be selected based on the majority vote of such members, with the reasonable consent of Reorganized SVCMC (with any tie to be broken by counsel to the MedMal Trust Monitor, with the reasonable consent of Reorganized SVCMC), or (ii) if all members of the Tort Claimants' Committee have been paid the full Allowed amount of their respective Claims and/or have had their Claims disallowed by Final Order, counsel to the MedMal Trust Monitor and Reorganized SVCMC shall jointly select the MedMal Trust Monitor.

(ii)     Counsel to the MedMal Trust Monitor shall initially be counsel to the Tort Claimants' Committee.  Any replacement counsel for the MedMal Trust Monitor must be reasonably acceptable to Reorganized SVCMC.

(iii)     Reorganized SVCMC shall be obligated under the Plan, and shall promptly pay the reasonable fees and expenses of the MedMal Trust Monitor (including the fees and expenses of its legal counsel) up to $75,000 per year until the dissolution of all MedMal Trusts.  The Excess Monitor Fees shall be paid by the respective MedMal Trusts in accordance with their Pro Rata Share, subject to Reorganized SVCMC's obligations to make Shortfall Payments.

(iv)     Reorganized SVCMC shall provide to the MedMal Trust Monitor and to the Trade Claims Monitor quarterly reports with respect to the MedMal Trusts within 30 days after the close of each quarter.  These reports will include information on MedMal Trust Assets; distributions out of the MedMal Trusts on account of MedMal Claims or otherwise; and a summary of which Disputed MedMal Claims, if any, have become Allowed MedMal Claims during the quarter that is the subject of the report.

(v)     In addition to any other rights and duties of the MedMal Trust Monitor under the Plan, the MedMal Trust Monitor shall respond to inquiries from holders of MedMal Claims regarding the Plan and treatment of their claims thereunder.

(g)     Nontransferability of MedMal Trust Interests.  The beneficial interests in each of the MedMal Trusts shall not be certificated and are not transferable (except as otherwise provided in the MedMal Trust Agreements).

(h)     Cash.  The MedMal Trustees may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code.

(i)     MedMal Defense Costs.  The MedMal Defense Costs of each MedMal Trust up to its Pro Rata Share of $3 million per year shall be paid by the respective MedMal Trusts, subject to Reorganized SVCMC's obligations to make Shortfall Payments.  The MedMal Trusts shall have no obligation to pay any MedMal Defense Costs in excess of $3 million per year in the aggregate.  Any MedMal Defense Costs incurred by a MedMal Trust in

excess of its Pro Rata Share of $3 million per year shall be an obligation of Reorganized SVCMC under the Plan and shall be timely paid directly by Reorganized SVCMC.  To the extent that Reorganized SVCMC objects to a MedMal Claim in the Court on the basis that such a claim was not timely filed, or as a matter of bankruptcy law (unrelated to the question of whether medical malpractice occurred) cannot be allowed, the costs incurred in connection with the prosecution of such an objection does not constitute MedMal Defense Costs.

(j)    Other Costs and Expenses of the MedMal Trustees.  All reasonable fees, costs, and expenses of the MedMal Trusts, including the fees, expenses, bonding and insurance of the respective MedMal Trustees and their retained professionals, shall be paid out of the respective MedMal Trust Assets (including the proceeds, if any, of the MedMal Trust Policies) and shall constitute Reimbursable Costs, subject to Reorganized SVCMC's obligations to make Shortfall Payments, other than (i) the reasonable fees and expenses of the MedMal Trust Monitor up to an aggregate of  $75,000 a year and (ii) the MedMal Defense Costs in excess of $3 million a year, each of which shall be paid directly by Reorganized SVCMC as set forth herein; provided, however, that for the avoidance of doubt, payments made to holders of Allowed MedMal Claims on account of such Claims, other than payments on account of MedMal Interest, shall not constitute Reimbursable Costs.

(k)    Retention of Professionals by the MedMal Trustees.  The MedMal Trustees may retain and reasonably compensate counsel and other professionals to assist in their duties as MedMal Trustees on such terms as the MedMal Trustees deem appropriate without Bankruptcy Court approval.

(l)    Compensation of the MedMal Trustees.  The MedMal Trustees shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(m)    MedMal Trust Policies.  Prior to the Effective Date, SVCMC and the Tort Claimants' Committee, or after the Effective Date, Reorganized SVCMC and the MedMal Trust Monitor, may cooperate reasonably and in good faith to cause the procurement of MedMal Trust Policies reasonably acceptable to SVCMC and the Tort Claimants' Committee or Reorganized SVCMC and the MedMal Trust Monitor, as applicable.  At SVCMC or Reorganized SVCMC's sole discretion, in consultation with the Tort Claimants' Committee or the MedMal Trust Monitor, as applicable, SVCMC or Reorganized SVCMC will (i) acquire MedMal Trust Policies for each of the MedMal-BQ Trust, the Med-Mal-MW Trust and the MedMal-SI Trust, each with a coverage limit equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate for the MedMal-BQ Trust, the MedMal-MW Trust or the MedMal-SI Trust, as applicable, (ii) acquire a single MedMal Policy in an amount equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate, or (iii) elect not to procure a MedMal Policy, in which case Reorganized SVCMC shall make payments pursuant to the Additional Funding Schedule; provided however that SVCMC or Reorganized SVCMC may only elect not to procure a MedMal Policy or MedMal Policies if procurement of such policy or policies is, in SVCMC's or Reorganized SVCMC's discretion, after consultation with the Tort Claimants' Committee, impossible or financially unreasonable.  The premiums on the MedMal Trust Policies, if any, shall be paid by the respective MedMal Trusts and constitute Reimbursable Costs, subject to Reorganized SVCMC's obligations to make Shortfall Payments.

(n)     Application of Certain Payments in Satisfaction of Obligations under the MedMal Trust Funding Schedule.   All (i) payments, if any, made to the MedMal Trusts on account of Available Cash on the Effective Date or from the Post-Effective Date Available Cash Reconciliation Account on the First Effective Date Anniversary as if such amounts were Available Cash on the Effective Date after payment to General Unsecured Claims of an amount equal to 85% of the Total Trade Claims, (ii) payments made to the MedMal Trusts pursuant to the Litigation Distribution Schedule, (iii) payments made to the MedMal Trusts pursuant to the Liquidity Event Distribution Schedule, (iv) payments made to the MedMal Trusts on account of monetization of the MedMal Collateral, and (v) Shortfall Payments made to the MedMal Trusts for amounts other than Reimbursable Costs shall be applied, in inverse order of maturity, to the payments called for in the MedMal Trust Funding Schedule and shall reduce, dollar-for-dollar, Reorganized SVCMC's obligations to make the payments called for in the MedMal Trust Funding Schedule.  Until the aggregate of Shortfall Payments exceeds $25 million, Shortfall Payments shall be presumed to have been for other than Reimbursable Costs. Shortfall payments in excess of $25 million shall be allocated between Reimbursable Costs and an insufficiency to pay Allowed MedMal Claims to reflect the actual cause of the shortfall.  Such payments shall reduce or satisfy the payments called for by the MedMal Trust Funding Schedule in inverse order of those payments maturity dates.

(o)     Shortfall Payments; Reimbursable Costs; MedMal Interest.

(i)     Subject to Section 6.6(q) of the Plan, if at any point in time, the funds in a MedMal Trust from any source, including proceeds recoverable on account of the MedMal Trust Policies or a MedMal Loan, shall be insufficient to pay all unpaid Allowed MedMal Claims and all unpaid Reimbursable Costs, Reorganized SVCMC shall, within thirty (30) days of receiving a written notice signed by the applicable MedMal Trustee, remit to such MedMal Trust a Shortfall Payment as necessary to cure such deficiency unless a MedMal Trustee shall have made a MedMal Loan to cover such deficiency; provided, however, that Reorganized SVCMC's obligations to make Shortfall Payments shall not, in the aggregate, exceed the sum of (A) such MedMal Trust's Pro Rata Share of $25 million plus (B) any accrued or paid Reimbursable Costs for such MedMal Trust; and provided further, however that Reorganized SVCMC's obligations to make Shortfall Payments for all MedMal Trusts shall not, in the aggregate, exceed the sum of (Z) $25 million plus (Y) the aggregate of any accrued or paid Reimbursable Costs for all MedMal Trusts.  For the avoidance of doubt, nothing herein shall obligate any MedMal Trust to fund or obtain a MedMal Loan at any time.

(ii)     The obligations of the MedMal Trusts to advance the Reimbursable Costs on behalf of Reorganized SVCMC shall be a financial accommodation as such term is used in section 365(c)(2) of the Bankruptcy Code.  In the event of a subsequent bankruptcy or other insolvency event of Reorganized SVCMC, (A) the MedMal Trusts shall have no further obligation to fund any Reimbursable Cost, and neither Reorganized SVCMC nor any party claiming to be a beneficiary of

Reorganized SVCMC, the MedMal Trusts and/or the transactions contemplated hereby shall have any claim for or any interest in any Reimbursable Costs, (B) all funds in the MedMal Trusts, shall be for the exclusive benefit of the holders of the MedMal Claims, (C) Reorganized SVCMC shall reimburse the MedMal Trusts for all costs and expenses, including attorneys' fees, incurred in defending against claims for the Reimbursable Costs, and (D) Reorganized SVCMC shall indemnify and hold harmless the MedMal Trusts against any claims for Reimbursable Costs.  For the avoidance of doubt, in the event of a subsequent bankruptcy or other insolvency event of Reorganized SVCMC, nothing in the Plan shall preclude the MedMal Trusts from interposing one or more claims against Reorganized SVCMC for reimbursement of Reimbursable Costs.

(iii)    To the extent and only to the extent a holder of an Allowed MedMal Claim is not paid in full within thirty (30) days of its MedMal Claim becoming an Allowed Claim, then such holder shall be entitled to receive MedMal Interest on the unpaid portion of its Allowed MedMal Claim from the date that the MedMal Claim is Allowed until the full principal amount of its Allowed MedMal Mal Claim is paid. The MedMal Trustee shall give notice to any holder of an Allowed MedMal Claim that is entitled to MedMal Interest that it is being provided with MedMal Interest until its Allowed MedMal Claim is paid in full.

(p)    Milestones.  Following (i) the 50% Milestone Triggering Event and (ii) the 75% Milestone Triggering Event,[44] Reorganized SVCMC may, at its sole discretion and expense, cause an additional estimation of the Claims remaining in all the MedMal Trusts. If (A) following the 50% Milestone Triggering Event, such additional estimation determines that the 50% Milestone has occurred or (B) following the 75% Milestone Triggering Event, such additional estimation determines that the 75% Milestone has occurred, Reorganized SVCMC may, in its sole discretion, either suspend payment of such MedMal Trust's Pro Rata Share of the periodic payments it is obligated to make pursuant to the MedMal Trust Funding Schedule and/or Additional Funding Schedule (as applicable) or receive a payment from such MedMal Trust equal to the amount of such excess; provided, however, that prior to Reorganized SVCMC receiving payment from any MedMal Trust on account of such excess, the funds in the MedMal Trust shall be rebalanced in a manner that provides each MedMal Trust with sufficient funds to pay 125% upon the 50% Milestone and 115% upon the 75% Milestone of all remaining MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such

---

[44] The 50% Milestone Triggering Event means the occurrence of either of the following (a) 50% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 50% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.  The 75% Milestone Triggering Event means the occurrence of either of the following (a) 75% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 75% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.  See Plan, §§ 1.2, 1.4.

Claims; and underlined provided, underlined further, however, that, if at any time, and from time to time prior to the termination or dissolution of a MedMal Trust, after the 50% Milestone or the 75% Milestone, a MedMal Trust shall have insufficient funds to pay all unpaid Allowed MedMal Claims and unpaid Reimbursable Costs of that MedMal Trust, Reorganized SVCMC shall, prior to making any Shortfall Payment on account of that deficiency, pay to that MedMal Trust (A) if Reorganized SVCMC elected to suspend making periodic payments to that MedMal Trust pursuant to the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable), an amount equal to the lesser of (i) the amount of such deficiency and (ii) the amount equal to that MedMal Trust's Pro Rata Share of the periodic payments under the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable) that in fact were suspended (and not contributed to another MedMal Trust) less all amounts previously paid to that MedMal Trust under this *proviso*; or (B) if Reorganized SVCMC elected to receive a payment of excess funding of a MedMal Trust as set forth above, an amount equal to the lesser of (i) the amount of such deficiency and (ii) the amount of excess funding actually paid over to Reorganized SVCMC from that MedMal Trust (and not used to rebalance the level of funding of a different MedMal Trust) less all amounts paid to that MedMal Trust under this *proviso*.  For the avoidance of doubt, (x) no payment required to be made under any of the circumstances described in the last *proviso* of the immediately preceding sentence shall be treated as a Shortfall Payment or be subject to the limitations on Shortfall Payments; (y) to the extent that any portion of such deficiency remains following the payment made under any of the circumstances described in the last *proviso* of the immediately preceding sentence, Reorganized SVCMC shall make a Shortfall Payment to that MedMal Trust as and to the extent otherwise required under the Plan; and (z) nothing in Section 6.6(q) of the Plan shall relieve Reorganized SVCMC from paying to each MedMal Trust (i) its Pro Rata Share of the full amount of the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable) to the extent necessary to pay an Allowed MedMal Claim for the appropriate MedMal Trust and (ii) all Shortfall Payments required hereunder, provided that in no instance shall Reorganized SVCMC be required to pay more than the aggregate of the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable), plus any payment required to be made by Reorganized SVCMC from the Post-Effective Date Available Cash Reconciliation Account on account of Allowed MedMal Claims for all MedMal Trusts on a combined basis.

(q)    MedMal Collateral/MedMal Liens.

(i)    Each of the MedMal Trusts shall be granted the MedMal Lien to secure all obligations of Reorganized SVCMC to the MedMal Trusts under the Plan payable on or after the Effective Date, including, without limitation:  (A) payments under the MedMal Trust Funding Schedules, (B) payments under the Additional Funding Schedule in the event SVCMC or Reorganized SVCMC does not obtain the MedMal Trust Policies, and (C) Shortfall Payments.  The MedMal Liens on the MedMal Collateral shall be junior only to the liens securing the Sun Life Staff House Secured Claim and the Sun Life Westchester Secured Claim, and shall otherwise be senior to any and all liens or encumbrances of any kind whatsoever on the MedMal Collateral.  Without limiting the generality of the immediately preceding sentence, the MedMal liens shall be senior to any lien granted in the MedMal Collateral to secure the Exit Facility.  The

MedMal Trust Monitor shall be entitled to enforce on behalf of each MedMal Trust its MedMal Lien if, after the MedMal Trust Monitor has provided Reorganized SVCMC with one hundred and twenty (120) days' written notice of the failure of Reorganized SVCMC to make a payment required under the Plan, Reorganized SVCMC has failed to satisfy the obligation.

(ii)    Reorganized SVCMC may sell or refinance the MedMal Collateral at any time provided that Reorganized SVCMC promptly pays to the MedMal Trusts in accordance with each MedMal Trust's Pro Rata Share all net proceeds (after satisfaction of the Sun Life Staff House Secured Claim and the Sun Life Westchester Secured Claim and transaction costs) from the MedMal Collateral, minus any Shortfall Payments that were not made on account of Reimbursable Costs funded by Reorganized SVCMC to the MedMal Trusts.  Notwithstanding anything to the contrary contained in the Plan, the MedMal Trust Monitor shall instruct the MedMal Trusts whether to consent to such same or refinancing, if and to the extent consent is required, and such shall not be unreasonably withheld.

(iii)    On and after the Effective Date, each MedMal Lien shall be a valid, fully perfected lien on, and security interest in, the MedMal Collateral without the necessity of the execution, delivery and/or filing of any security agreement, pledge agreement, financing statement or other document.  The Plan is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the MedMal Collateral.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments the MedMal Trustees deems necessary and appropriate to file, including without limitation a copy of the Confirmation Order, so as to provide notice of the MedMal Lien to third parties.

(iv)    Reorganized SVCMC shall reasonably cooperate with the MedMal Trust Monitor to provide such reasonable documentation, make such reasonable public filings, in the real estate records and otherwise, and do such other acts as reasonably requested by the MedMal Trust Monitor to (i) evidence the security interest of each MedMal Trust in the MedMal Collateral, (ii) perfect the respective MedMal Liens of the MedMal Trusts in the MedMal Collateral, and (iii) delineate the events of default,

remedies of the respective MedMal Trusts and the opportunities for Reorganized SVCMC and the holder of the Sun Life Staff House Secured Claim and the Sun Life Westchester Secured Claim to cure with respect to the MedMal Liens and the obligations they secure. Without limiting the generality of the foregoing, Reorganized SVCMC and the MedMal Trust Monitor shall cooperate in causing the execution and delivery of such loan, security and intercreditor agreements as the MedMal Trust Monitor shall reasonably request to accomplish the objective specified in the immediately preceding sentence.

(r)    <u>Cooperation with Reorganized SVCMC.</u>  Each MedMal Trustee shall provide Reorganized SVCMC with reasonable access to its books and records and be available during regular business hours, upon reasonable advance notice, to answer Reorganized SVCMC's questions relating to MedMal Claims and the finances of the MedMal Trusts. Reorganized SVCMC shall provide the MedMal Trustees with all information reasonably requested by the MedMal Trustees or the MedMal Trust Monitor to enable each to carry out their respective duties hereunder and under the respective MedMal Trust Agreements and the Plan.

(s)    <u>Distribution of MedMal Trust Assets; Proceeds of MedMal Trust Policies; Final Distributions; Excess Insurance</u>.

(i)    MedMal Trust Assets shall be distributed to holders of Allowed MedMal Claims in accordance with Sections 4.8, 4.9, and 4.10 of the Plan.  Notwithstanding anything to the contrary herein or in the Plan, Reorganized SVCMC or the MedMal Trust Monitor shall reasonably cooperate to ensure that if the threshold trigger for receipt of payment from the Excess Insurance is met at any point for any insurance year that the medical malpractice claims of holders of Allowed MedMal Claims shall be paid from proceeds of the Excess Insurance to the extent available rather than from MedMal Trust Assets.  Further distributions to holders of Allowed MedMal Claims in accordance with Sections 4.8, 4.9 and 4.10 of the Plan are and shall be deemed to be payments by SVCMC or Reorganized SVCMC, as appropriate, against any self-insured retention, inter-aggregate buffer, or similar payment with respect to, and as required by, any third-party insurance that might be available for an Allowed MedMal Claim, including Excess Insurance, as and to the extent made.

(ii)    If the MedMal Trust Policies have been obtained and at any time after the ninth (9th) Effective Date Anniversary, any MedMal Trust does not possess sufficient Distributable Cash to pay all holders of Allowed MedMal Claims the full Allowed amount of their Claim, the MedMal Trust Monitor or Reorganized SVCMC, acting on behalf of the applicable MedMal Trustee, shall exercise all of the powers available in its reasonable discretion, to collect from the respective MedMal Trust Policies and, as soon as reasonably practicable after receipt of proceeds from the MedMal Trust Policies, the applicable MedMal Trustee shall transfer to each holder of an unpaid Allowed MedMal Claims the lesser of

(A) an amount of Cash sufficient to pay its Allowed MedMal Claim and any MedMal Claim Interest accrued thereon and (B) its Pro Rata portion of Distributable Cash remaining in the MedMal Trust.

(iii)    When all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved and all Allowed MedMal Claims relating to the MedMal Trust have been paid in full, (A) Reorganized SVCMC's obligations to make additional payments to the MedMal Trust shall cease and (B) the applicable MedMal Trustee shall make a final distribution of all remaining assets in the MedMal Trust, as described in Section 6.6(t)(iv) of the Plan.

(iv)    When a MedMal Trust is making a final distribution of the assets of a MedMal Trust (pursuant to Section 6.6(t)(iii) of the Plan or upon dissolution), the MedMal Trustee shall, after causing the repayment of any outstanding MedMal Loans and reserving a sufficient amount of Cash to cover the wind-down expenses of such MedMal Trust (including any taxes due thereon), make a distribution of all assets in the MedMal Trust to the remaining MedMal Trusts, if any, in proportion to the estimated unpaid Allowed MedMal Claims of each such MedMal Trust pursuant to the last estimate thereof.  In the event there are no remaining MedMal Trusts, or if Reorganized SVCMC elects to cause an additional estimation, in its sole discretion and at its sole expense, of the Claims remaining in each of the remaining MedMal Trusts, and in such estimation, it is determined that the funds in each remaining MedMal Trust exceed 125%, if such estimation occurs prior to the 75% Milestone Triggering Event, or 115%, if such estimation occurs subsequent to the 50% Milestone Triggering Event, of all then remaining MedMal Claims subject to each such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time, then any excess funds in the dissolving MedMal Trust shall be remitted to Reorganized SVCMC.

(t)    MedMal Loans.  Any MedMal Trust shall have the ability, but not the obligation, to make a MedMal Loan to another MedMal Trust up to the amount due from Reorganized SVCMC to the borrower MedMal Trust under the MedMal Trust Funding Schedule on the next Effective Date Anniversary if the lending MedMal Trustee, in it sole discretion, reasonably believes that it has sufficient funds in its MedMal Trust to pay all MedMal Claims of its MedMal Trust that it estimates will be Allowed prior to the next Effective Date Anniversary plus all accrued and unpaid MedMal Interest and any other costs for which such MedMal Trust will be responsible prior to the next Effective Date Anniversary.  The borrower MedMal Trust shall repay, on or prior to the next Effective Date Anniversary, any amounts borrowed under a MedMal Loan.  Additional terms of any MedMal Loan shall be negotiated between the respective MedMal Trustees.

(u)    Federal Income Tax Treatment of MedMal Trusts.

(i)    MedMal Trust Assets Treated as Owned by SVCMC.

(A)    Each of the MedMal Trusts is intended to constitute a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

(B)    SVCMC or Reorganized SVCMC shall timely prepare and execute a "grantor trust election" statement for each of the MedMal Trusts pursuant to Treasury Regulation section 1.468B-1(k) to treat each such trust as a trust all of which is owned by SVCMC for applicable federal income tax purposes, and shall, to the extent permitted by applicable law, report consistently therewith for state and local tax purposes (including making any appropriate elections). Each of the MedMal Trustees in respect of the MedMal Trusts or Reorganized SVCMC, as applicable in accordance with the foregoing Treasury Regulation, shall attach such grantor trust election statement to its timely filed income tax return for the taxable year in which the trust is established. If the election statement is required to be attached to the trust's tax return, Reorganized SVCMC shall timely deliver to the respective MedMal Trustee the original executed election statement with respect to such trust.

(ii)    Tax Reporting.

(A)    Each MedMal Trustee shall timely prepare and file all federal, state, local and foreign tax returns and other tax related statements for its respective MedMal Trust treating such trust as a grantor trust in accordance with Treasury Regulation section 1.468B-1(k) and Section 6.6(v) of the Plan. Before filing any MedMal Trust tax return or statement, the MedMal Trustee shall timely provide copies of such return or statement to Reorganized SVCMC for review and approval.

(B)    The MedMal Trustees shall cooperate with Reorganized SVCMC and any affiliate (including any successor in interest) with respect to the preparation and filing of any tax returns or statements of such person for which information relating to the MedMal Trusts is necessary or appropriate.

(C)    Each MedMal Trustee shall be responsible for payment, out of its respective MedMal Trust Assets, of any taxes imposed on such assets or its respective MedMal Trust.

(D)    Each MedMal Trustee may request an expedited determination of taxes in respect of its respective MedMal Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, such trust for all taxable periods through the dissolution of such trust.

(v)    <u>Litigation</u>.  In the event of an alleged default by Reorganized SVCMC with respect to any of its obligations under the Plan related to the treatment of Allowed MedMal Claims, any and all litigation arising out of or relating to such alleged default shall be brought by the MedMal Trust Monitor before the Bankruptcy Court.  In the event that the Chapter 11 Cases are closed as of such time that the MedMal Trust Monitor seeks to initiate any such litigation, the MedMal Trust Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such litigation before the Bankruptcy Court, and Reorganized SVCMC and the Litigation Trustee shall not be, and are hereby deemed to have agreed that they shall not be, entitled to object to any such motion.

(w)    <u>Dissolution.</u>  The respective MedMal Trustees and the MedMal Trusts shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved, and (ii) all distributions required to be made by the MedMal Trustee under the Plan have been made, <u>provided, however</u>, that if the foregoing conditions have not been met by the fourteenth (14th) Effective Date Anniversary, Reorganized SVCMC or the MedMal Trust Monitor shall, within the six (6) month period prior to the fourteenth (14th) Effective Date Anniversary, file a motion with the Bankruptcy Court for authorization to extend the duration of the applicable MedMal Trust for a fixed period so as to facilitate or complete the payments to holders of Allowed MedMal Claims.  In the event the foregoing motion is not timely filed or if timely filed the motion is denied, the appropriate MedMal Trust shall be dissolved.  Upon dissolution, any remaining assets in a MedMal Trust shall be distributed in accordance with Section 6.6(t)(v) of the Plan.

5.    <u>*Non-Transferability of Rights of Holders of Allowed General Unsecured Claims*</u>

The rights of holders of Allowed Claims to receive payments under the Plan after the Effective Date, including but not limited to on account of the Secured Obligation, the Unsecured Obligation, the GUC Litigation Trust Interest, or from the MedMal Trusts shall not be certificated and are not transferable, except by the laws of descent or distribution or otherwise by operation of law or as part of the sale of substantially all the assets of the holder thereof.

6.    <u>*Liquidity Event Distribution Schedule*</u>

The Plan provides that in the event that and to the extent that, at the time a Manhattan Real Estate Liquidity Event or an Acceleration Event occurs, any portion of the Unsecured Obligation remains outstanding and/or any portion of the GUC Litigation Trust Interest remains outstanding, then such excess proceeds (in the event of a Manhattan Real Estate Liquidity Event) or net proceeds (in the event of an Acceleration Event) shall be distributed in

the following manner, in each case within three (3) business days of the receipt by Reorganized SVCMC thereof:

- first, to the MedMal Trusts until such time as (i) the aggregate amount contributed to the MedMal Trusts (including the MedMal Trust Initial Assets, amounts funded pursuant to the MedMal Funding Schedule and Shortfall Payments, but not including any amounts funded on account of Reimbursable Costs) divided by the aggregate estimated amount at which Disputed MedMal Claims will be Allowed (as and to the extent modified based on a new estimate performed after a 50% Milestone Triggering Event or a 75% Milestone Triggering Event) plus, without duplication, the actual amount of Allowed MedMal Claims (without regard to whether such Allowed MedMal Claims have been paid in whole or in part) equals or exceeds (ii) the aggregate amount distributed in Cash to holders of General Unsecured Claims against SVCMC divided by the aggregate estimated amount of Allowed General Unsecured Claims against SVCMC;

- thereafter, (x) 45% to the MedMal Trusts in accordance with their respective Pro Rata Shares, (y) 27.5% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 27.5% to holders of Allowed General Unsecured Claims against SVCMC or to the Litigation Trust.

Amounts distributed on account of (z) in the preceding sentence shall be distributed as follows: A) upon a Manhattan Real Estate Liquidity Event, these amounts will be applied first, to amounts due, if any, to the Litigation Trust on account of the GUC Litigation Trust Interest, but in no event shall the contribution to the Litigation Trust on account of a Manhattan Real Estate Liquidity Event exceed 1/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions thereon, second, to the remaining balance (if any) of the Secured Obligation (principal first and then interest), and third to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest); provided, however, that Reorganized SVCMC's obligations to make any payments on account of a Manhattan Real Estate Liquidity Event shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full and either (i) the GUC Litigation Trust Interest has been paid in full or (ii) 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 shall have been realized by the Litigation Trust as a result of the occurrence of a Litigation Trust Contribution Event; and (B) upon an Acceleration Event these amounts will be applied first to the remaining balance (if any) of the Secured Obligation (principal first and then interest), and second to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest); provided, however, that Reorganized SVCMC's obligations to make any payments on account of an Acceleration Event shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full.

Amounts distributed on account of (z) in the preceding sentence upon an Acceleration Event will be applied first to the remaining balance (if any) of the Secured Obligation (principal first and then interest), and second to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest); provided, however, that Reorganized SVCMC's obligations to make any payments on account of an Acceleration Event shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full.

In the event that and to the extent that the Unsecured Obligation remains outstanding, if there is Excess Cash, it will be distributed (w) 50% to the lenders for Reorganized SVCMC's Exit Facility or any successor thereof as a prepayment thereunder, (x) 22.5% to the MedMal Trusts in accordance with respective their Pro Rata Shares, (y) 13.75% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 13.75% to holders of Allowed General Unsecured Claims against SVCMC and applied first to the Secured Obligation (principal first and then interest) and then to the Unsecured Obligation (principal first and then interest) until paid in full; provided, however, that Reorganized SVCMC shall not be obligated to distribute Excess Cash in accordance with the Liquidity Event Distribution Schedule if Reorganized SVCMC has not received the consent of the lenders for Reorganized SVCMC's Exit Facility or any successor thereof to distribute such Excess Cash; provided further, however, that Reorganized SVCMC's obligation to make any payments on account of Excess Cash shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full.

7.    *Pension Plan/PBGC*

(a)    On the Effective Date, Reorganized SVCMC shall assume the Pension Plan and the obligations of contributing plan sponsor under ERISA.

(b)    On the Effective Date, Reorganized SVCMC shall make payments totaling $60 million into the Pension Plan, provided the Effective Date is on or before July 15, 2007.  Regardless of when the Effective Date occurs and the Effective Date contribution is paid, SVCMC will contribute no less than $75 million to the Pension Plan in calendar year 2007.  The Effective Date payment will be attributable to plan year ending December 31, 2006.

(c)    Reorganized SVCMC shall make aggregate Pension Plan payments of $13.5 million in each of calendar years 2008, 2009, 2010, 2011, and 2012, provided, however, that such payments shall be subject to adjustment in the event that, with respect to any particular calendar year identified above, (i) SVCMC is legally required under ERISA funding rules, after taking into account any credit balance SVCMC is able to utilize, to contribute to the Pension Plan an amount in excess of $13.5 million to satisfy minimum funding requirements, or (ii) SVCMC is legally required under ERISA funding rules, without taking into account any credit balance SVCMC otherwise would be able to utilize, to contribute to the Pension Plan an amount less than $13.5 million to satisfy minimum funding requirements.

(d)    In the event that, with respect to any particular payment obligation of Reorganized SVCMC subject to Section 7(c) above, such payment obligation is not satisfied by Reorganized SVCMC in its entirety, the PBGC shall be entitled to seek to recover from Reorganized SVCMC the difference between the requisite payment obligation and the amount contributed to the Pension Plan by Reorganized SVCMC.

(e)    The PBGC Penalties Claim shall be unimpaired, and the PBGC and SVCMC (and Reorganized SVCMC) reserve all rights with respect to assessing and objecting to the PBGC Penalties Claim and raising any and all defenses in connection therewith. The PBGC and SVCMC (or Reorganized SVCMC) may enter into an agreement, which shall not be subject to Bankruptcy Court approval if such agreement occurs after the Effective Date, with

respect to the PBGC Penalties Claim.  SVCMC and Reorganized SVCMC reserve all rights to pursue claims against and/or seek a recovery from any and all third parties with respect to the PBGC Penalties Claim.  "PBGC Penalties Claim" refers to a contingent claim (or claims) arising under ERISA Section 4071, 29 U.S.C. § 1371, retained by PBGC, but not yet asserted, for a failure (or failures) to provide any notice or other material information under Title IV of ERISA, including notices and information obligations under Sections 4010 and 4043 of ERISA, 29 U.S.C. §§ 1310 & 1343.

(f)     Except as it relates to the PBGC Penalties Claim, the PBGC Claim shall be deemed withdrawn on the Effective Date.

(g)     Reorganized SVCMC and the PBGC shall enter into a separate agreement, to be included within the Plan Supplement, which agreement shall reflect the terms and conditions of the agreement between Reorganized SVCMC and the PBGC, as set forth in Sections 7(a) – 7(f), above.

8.     *Intercompany Claims*

All Intercompany Claims are subordinated to payment in full of General Unsecured Claims, the MedMal Claims, and the PBGC Claim.

9.     *DASNY Subordinated Claims*

All DASNY Subordinated Claims are subordinated to General Unsecured Claims, the MedMal Claims, Intercompany Claims and the PBGC Claim.

10.     *Exit Facility*

On or before the Effective Date, SVCMC or Reorganized SVCMC shall enter into the Exit Facility.  The Exit Facility shall be on terms and conditions substantially similar to the commitment letter that will be filed with the Plan Supplement and approved by the Bankruptcy Court.

11.     *Allocation Method*

On the Effective Date, each of the Other Debtors shall pay Reorganized SVCMC $1 as reimbursement for all costs incurred by SVCMC during the Chapter 11 Cases in respect of all the Other Debtors (including professionals' fees).

12.     *Restricted Assets*

Notwithstanding anything to the contrary herein or in the Plan, the Restricted Assets are not property of the Debtors' estates, shall not be applied to satisfy any Allowed Claim or distribution under the Plan, and shall only be used in furtherance of the use to which they are restricted.  These assets are the result of gifts made to SVCMC where the use of either the principal portion of the gift, the interest or other income earned on the gift or both has been specified by the person or entity that gave the gift.  SVCMC currently reports that it has in excess of $55 million in assets the use of which has been restricted by the donor.

13.     *Closing of the Chapter 11 Cases*

When all Disputed Claims, other than MedMal Claims, against any Debtor have become Allowed or have been disallowed by Final Order, and no controverted matter remains outstanding, Reorganized SVCMC shall seek authority from the Bankruptcy Court to close the applicable Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

14.     *Early Payment*

Nothing herein or in the Plan shall prevent any of the Debtors or Post-Effective Date Debtors from making any payments prior to the date provided for in the Plan, and neither the Debtors nor the Post-Effective Date Debtors shall suffer any penalty or prejudice from making any such payments; provided, however, that prepayments of the Unsecured Obligation shall only be made as provided for in Section 6.4 of the Plan.

15.     *Section 1123(b)(3)*

To the extent, but only to the extent, required, the Litigation Trustee, the Trade Claims Monitor, the MedMal Trust Monitor, and Reorganized SVCMC are each qualified as provided for in section 1123(b)(3) of the Bankruptcy Code.

**D.     Executory Contracts and Unexpired Leases**

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the counterparty to such contract or lease agreement may file a claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, damage claims are subject to certain limitations imposed by the Bankruptcy Code.  To assume an executory contract or unexpired lease, the debtor must cure all defaults and provide adequate assurance of future performance.

The Plan provides that all executory contracts and unexpired leases that exist between the Debtors and any person will be deemed assumed by the applicable Debtor, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, (iii) that is set forth in Schedule 8.1(A) (executory contracts) or Schedule 8.1(B) (unexpired leases), which schedules shall be contained in the Plan Supplement, or (iv) that is an executory contract or unexpired lease as to which an Other Debtor, but not SVCMC, is a party.  The Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.1(A) or 8.1(B) to add or delete any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, assumed or rejected.  The Debtors will provide notice of any amendments to Schedules 8.1(A) or 8.1(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.1(A) or 8.1(B) will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Pursuant to the Plan, unless otherwise specified on Schedules 8.1(A) or 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) or 8.1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) or 8.1(B).

Schedule 8.4, which the Debtors will file with the Plan Supplement, will list certain executory contracts and unexpired leases the Debtors are intending to assume and the Debtors' proposed Cure Amounts for each such lease or contract. The Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.4 to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, or to amend the Cure Amount listed for any executory contract or unexpired lease. The Debtors will provide notice of any amendments to Schedule 8.4 to the parties to the executory contracts and unexpired leases affected thereby. With the exception of the executory contracts and unexpired leases assumed pursuant to section 8.1 of the Plan, the Debtors are not required to make any payment or take any other action in order to satisfy the requirements of section 365(b) of the Bankruptcy Code with regard to all executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan. The Cure Amounts of any executory contracts or unexpired leases not listed on Schedule 8.1(A), 8.1(B), or 8.4 shall be deemed to be zero unless otherwise agreed by the Debtors and the applicable non-Debtor party to the executory contract or unexpired lease or as determined by the Bankruptcy Court upon a motion by the applicable non-Debtor party to an executory contract or unexpired lease filed on or before the first Effective Date Anniversary, and the exclusion of an executory contract or unexpired lease from Schedule 8.4 shall not affect the status of such executory contract or unexpired lease under Section 8.1 of the Plan.

The Post-Effective Date Debtors shall pay all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the later to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties. If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtors and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtors' sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount. Notwithstanding the above, the Debtors may, in their sole and absolute discretion, determine to reject, as of the Confirmation Date, any executory contract or unexpired lease at any time prior to the later of (i) thirty (30) days after the Effective Date and (ii) thirty (30) days after the entry of a Final Order determining the proper Cure Amount for that contract or lease.

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Sections 8.1 or 8.4 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, Reorganized SVCMC, no later than thirty (30) days after the later of (i) the date notice of entry of an order is mailed approving the rejection of such executory contract or unexpired lease, (ii) the date notice of entry of the Confirmation Order is mailed, (iii) the date notice of an amendment to Schedule 8.1(A) or 8.1(B)

that results in the rejection of such executory contract or unexpired lease is mailed, and (iv) the date notice of rejection of such executory contract or unexpired lease pursuant to Section 8.4(f) of the Plan is mailed.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Post-Effective Date Debtors and their property.

Pursuant to the Plan, all of the Debtors' insurance policies and any related agreements, documents or instruments are treated as executory contracts under the Plan.  The treatment of the Debtors' insurance policies and any related agreements, documents or instruments as executory contracts under the Plan will not constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance. For the avoidance of doubt, the Debtors' hospital professional liability (or medical malpractice) insurance policies and the proceeds thereof shall be available to holders of timely filed Claims alleging medical malpractice to the extent such insurance policies cover such Claims, and sole as necessary to make these insurance policies available to holders of timely filed claims alleging medical malpractice to the extent such insurance covers such claims, those insurance policies are hereby assumed.

### E.     Provisions for Treatment of Disputed Claims

If any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of that Claim unless and until, and only to the extent, such Claim becomes Allowed.  At the time that a Disputed Claim becomes an Allowed Claim, the holder of that General Unsecured Claim will be entitled to receive from Reorganized SVCMC a distribution on its Allowed General Unsecured Claim equal in percentage to the distributions made to date on previously-allowed Allowed General Unsecured Claims.

### 1.     *Resolution of Disputed Claims other than MedMal Claims*

Subject to the more specific provisions of Section 7.2(b) of the Plan relating to MedMal Claims, Reorganized SVCMC shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims. Reorganized SVCMC shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court. The Bankruptcy Court, for cause, may extend the deadline on the request of Reorganized SVCMC, on notice to the Trade Claims Monitor.  All objections shall be litigated to a Final Order except to the extent that Reorganized SVCMC elects to withdraw such objection, or Reorganized SVCMC and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

2.    *Resolution of Disputed MedMal Claims*

Except to the extent Allowed pursuant to a Final Order of the Bankruptcy Court prior to the Effective Date, all MedMal Claims shall be Disputed as of the Effective Date such that no objection to a MedMal Claim is required to be filed.  Pursuant to section 157(b) of title 28 of the United States Code, the Bankruptcy Court may not liquidate, adjudicate, fix or estimate for distribution purposes the amount of a contingent or unliquidated personal injury tort or wrongful death claim against the Debtors based on the substantive merits of any such claim. After the Effective Date, Reorganized SVCMC shall have the right to the exclusion of all others to make, file, and prosecute objections to MedMal Claims in a forum of appropriate jurisdiction; provided, however, that the Bankruptcy Court shall only have jurisdiction to hear objections to MedMal Claims based on timeliness of the proof of claim or other non-merit based objections, but shall not have jurisdiction to determine the underlying merits of a MedMal Claim.  All costs of objecting to Disputed MedMal Claims before the Bankruptcy Court shall be paid by SVCMC or Reorganized SVCMC, as appropriate, and shall not constitute MedMal Defense Costs.  All MedMal Claims shall be litigated to a Final Order except to the extent that Reorganized SVCMC and the holder of the Disputed MedMal Claim compromise, settle or otherwise resolve the MedMal Claim, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

3.    *Reserve Accounts for Disputed Claims*

None of the Post-Effective Date Debtors shall be required to maintain segregated reserve accounts for Disputed Claims; provided, however, that Reorganized SVCMC shall be required to reserve (but not in a formal, segregated account) sufficient Cash for Disputed General Unsecured Claims as set forth in the Plan, and the Litigation Trustee shall be required to establish the LT Disputed Claims Reserve.  None of the MedMal Trustees shall be required to maintain segregated reserve accounts for Disputed MedMal Claims; provided, however, such MedMal Trustees must reserve Cash to the extent required in Sections 4.8, 4.9 and 4.10 of the Plan.

4.    *Estimation of Claims*

The Debtors or the Post-Effective Date Debtors may, at any time, request the Bankruptcy Court to estimate any Claim, other than MedMal Claims, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously have objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, other than a MedMal Claim, at any time, including during litigation concerning any objection to such Claim. For the avoidance of doubt, in no event shall any MedMal Claim be subject to estimation by the Bankruptcy Court or the District Court.[45]  In the event the Bankruptcy Court estimates any

---

[45] These limitations on estimation of MedMal Claims are contained in the Plan and thus will be effective after the Effective Date.  Please note that in connection with the establishment of procedures for voting on the Plan, the Debtors obtained an order estimating all MedMal Claims at $1 each solely for purposes of voting on the Plan.  The limitations on estimation are not intended to, and do not, affect the validity of this prior estimation for voting purposes.

Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the applicable Post-Effective Date Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

5.     *Other Provisions Relating to Disputed Claims*

If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, Reorganized SVCMC, the applicable MedMal Trustee or the Litigation Trustee shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon (other than MedMal Interest if, and to the extent, due), that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.

F.     **Summary of Other Provisions of the Plan**

The following subsections summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.[46]

1.     ***Releases and Exculpations[47]***

**As of the Effective Date, the Released Parties shall be released by the Debtors and any successors-in-interest of the Debtors from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that any of the Debtors would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim, Equity Interest, Membership Interest, or other person or entity would have been legally entitled to assert on behalf of any of the Debtors or any of their estates, based in whole or in part upon any act or omission, transaction, agreement, event, or other**

---

[46] All governmental entities with a potential interest in the Debtors' chapter 11 cases were served with the Plan and Disclosure Statement.

[47] By agreement, the Office of the United States Trustee has reserved its right to object to the Plan's exculpation and injunction provisions prior to the Confirmation Hearing.

occurrence taking place before or on the Effective Date, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the chapter 11 cases and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Without limiting the generality of the foregoing, to the extent permitted by law, the Debtors and any successors-in-interest of the Debtors shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

The Debtors, the Committees, the DIP Lender, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person for any act taken or omission, after the Commencement Date, in connection with or related to these cases or the operations of the Debtors' businesses during the cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Chapter 11 Cases, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Nothing herein or in the Plan shall be interpreted as in any way compromising the effect or scope of releases under applicable New York State law with respect to MedMal Claims, and all such releases shall be enforceable to the fullest extent of the New York State law.

No provision of the  Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will discharge, release, or relieve any other party, in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The PBGC shall not be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims.

2.    *__Injunction__*

Subject to 11.6(c) of the Plan, all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against and Equity Interests in the Debtors from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Post-Effective Date Debtors, the Released Parties,

or their property, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Effective Date Debtors, the Released Parties, or against the property or interests in property of the foregoing, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Post-Effective Date Debtors, the Released Parties, or any of their property, except as contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

All Persons are permanently enjoined, on and after the Effective Date, from asserting any Claim (x) which is released by such Person under the Plan or (y) for which the party against whom the Claim is being asserted has received exculpation under the Plan, including: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of such Claim, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of such Claim, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of such Claim, (iv) asserting any right of setoff, directly or indirectly, against any obligation on account of such claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

The automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Sections 11.6(a) and (b) of the Plan shall not apply after the Effective Date to acts by holders of timely filed Claims alleging medical malpractice to seek payment from the Debtors' insurance companies for or to liquidate the amount of such Claims against the Debtors in a court or administrative body of appropriate jurisdiction, except to the extent that it is determined by a Final Order either that such Claim was not timely filed or that the MedMal Claim shall not be Allowed.  Notwithstanding the forgoing sentence, holders of MedMal Claims may only be paid on account of their MedMal Claims as provided for, and from assets specifically designated for payment of such MedMal Claims, under the Plan.  Nothing in the Plan shall limit, modify or otherwise impair the rights of holders of timely filed Claims alleged to be for medical malpractice to seek payment for such Claims from the Debtors' insurance policies and/or from insurance policies for the benefit of a Covered Person which cover such Claims, it being the intent of the Plan to leave such timely filed Claims alleged to be for medical malpractice unimpaired except to the extent such Claims are MedMal Claims as defined by the Plan.

If, notwithstanding the injunction contained in Section 11.6 of the Plan, any holder of a MedMal Claim shall assert such claim against a Covered Person, the injunction

**shall not preclude such Covered Person from asserting his or her right to indemnification against SVCMC (nor shall SVCMC be prevented from asserting all defenses, if any, to such asserted right to indemnification). Any indemnification amount owed to a Covered Person by SVCMC on account of a MedMal Claim shall be paid from the appropriate MedMal Trust; however, nothing in Section 11.6(d) of the Plan shall be deemed to supersede an obligation, if any, of SVCMC to provide legal representation for a Covered Person in the defense of a MedMal Claim.**

**Unless otherwise provided, all injunctions or stays provided for in these cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing these Chapter 11 cases.**

3.    *Modification of the Plan*

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

4.    *Withdrawal or Revocation of the Plan*

The Debtors may withdraw or revoke the Plan as to any Debtor at any time prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan or Disclosure Statement shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

5.    *Effectuating Documents and Further Transactions*

Upon entry of the Confirmation Order, each of the Debtors, the Post-Effective Date Debtors, and the MedMal Trustees shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

6.    *Dissolution of the Committees*

Except as otherwise set forth in Section 12.5 of the Plan, on the Effective Date, the Committees shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from

and in connection with the Chapter 11 Cases, and the retention and employment of the Committees' attorneys, accountants, and other agents shall terminate. The Committees shall continue in existence after the Effective Date solely for the purpose of reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code. With respect only to the foregoing, Reorganized SVCMC shall pay the reasonable fees and expenses of counsel for the Committees. The members of the Tort Claimants' Committee shall thereafter retain the right, in accordance with Section 6.6(g)(i) of the Plan, to select one or more successor MedMal Trust Monitors, and in the discharge of that function, the members of the Tort Claimants' Committee shall enjoy the full benefit of all applicable exculpation and indemnity provisions set forth herein, but shall not be entitled to any reimbursement or payment for costs and expenses in exercising the rights in Section 6.6(g)(i) of the Plan.

7.    *Exemption from Transfer Taxes*

Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any disposition of assets contemplated by the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. Without limiting the generality of the foregoing, it is expressly the intent of the Plan that this exemption from stamp, real estate transfer, mortgage recording, sales, use or other similar taxes shall apply to any post-Effective Date assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the development of the Manhattan Hospital as generally described in the Disclosure Statement, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection therewith.

8.    *Expedited Determination of Postpetition Taxes*

SVCMC and Reorganized SVCMC are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all tax returns filed for taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

9.    *Severability*

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted

in accordance with the foregoing, is valid and enforceable pursuant to its terms. Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

10. *Governing Law*

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the State of New York, without giving effect to New York's principles of conflicts of law.

11. *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Equity Interest in the Debtors and their respective successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the term of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

12. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by the Debtors. Any Statutory Fees accruing after the Confirmation Date also shall be paid by the Debtors.

13. *Discharge*

The rights and treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Commencement Date, against any of the Debtors or their estates, assets, properties or interests in property. Reorganized SVCMC shall not be responsible for any obligations of the Debtors or their estates except those expressly assumed in accordance with the terms of the Plan.

14. *Retention of Causes of Action/Reservation of Rights*

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Post-Effective Date Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for

setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code and (iii) the turnover of any property of the Debtors' estates.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Debtors and the Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such Claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the cases had not been commenced, and all of the Debtors' and the Post-Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the cases had not been commenced.

Except for the Litigation Claims, which are being assigned and transferred to the Litigation Trust pursuant to the Plan and will be prosecuted by the Litigation Trustee, each of the Post-Effective Date Debtors shall, after the Effective Date, retain the rights to bring any causes of action that could have been brought by the respective Debtors at any time.

None of the Plan's exculpation, release or injunctive provisions shall apply or provide any benefit to the Litigation Parties.

15.     *Section 506(c) Reservation*

The Debtors and the Post-Effective Date Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

16.     *Chapter 5 Reservation*

Without limiting the reservation of rights described in subsection (14) above, the Debtors and the Post-Effective Date Debtors reserve all rights under chapter 5 of the Bankruptcy Code.

17.     *Plan Supplement*

The documents comprising the Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' bankruptcy counsel or on the website of the Debtors' claims agent (www.bsillc.com). The Debtors intend to draft the documents to be contained in the Plan Supplement. Although the Debtors may consult with either or both of the Committees during the drafting process, the Debtors are not obligated to do so.

## V.    CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Voting Procedures and Solicitation of Votes

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Disclosure Statement Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing on the Plan has been scheduled for July 27, 2007, commencing at 9:30 a.m. (New York City Time), before the Honorable Adlai S. Hardin Jr., United States Bankruptcy Judge, in Room 520 of the Bankruptcy Court, 300 Quarropas Street, White Plains, New York  10601.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before July 20, 2007, at 4:00 p.m. (New York City Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest of the Debtors held by the objector.  Objections must be timely served upon the following parties:

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> (212) 504-6000
> Attn:   Deryck A. Palmer, Esq.
>          John J. Rapisardi, Esq.
>          Andrew M. Troop, Esq.
>
> Office of the United States Trustee
> 33 Whitehall Street
> 21st Floor
> New York, NY  10004
> Attn: Tracy H. Davis, Assistant United States Trustee
>
> Alston & Bird LLP
> Attorneys for the Creditors' Committee
> 90 Park Avenue
> New York, NY  10016
> Attn: Martin G. Bunin, Esq.

Cooley Godward Kronish LLP
Attorneys for the Tort Claimants' Committee
1114 Avenue of the Americas
46th Floor
New York, NY 10036
Attn: Richard Kanowitz, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The debtors have complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a person acquiring property under the plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the plan is reasonable or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of Reorganized SVCMC, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy, and SVCMC has disclosed the identity of any insider that will be employed or retained by Reorganized SVCMC, and the nature of any compensation for such insider.

- With respect to each class of claims or equity interests, each holder of an impaired claim or equity interest has either accepted the plan or will receive or retain under the plan on account of such holder's claim or equity interest, property of a value, as of the effective

date, that is not less than the amount such holder would receive or retain if the debtors were liquidated on the effective date under Chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below, and the Debtors' liquidation analysis in Exhibit 3.

- Each class of claims or equity interests has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to different favorable treatment of such claim, the plan provides that administrative expense claims, priority tax claims and priority non-tax claims will be paid in full as required by the Bankruptcy Code.

- At least one class of impaired claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtors or any successor to the debtors under the plan, unless such liquidation or reorganization is proposed in the plan.  See discussion of "Feasibility," below, and the debtors' financial projections in Exhibit 4.

- The plan provides for the continuation after the effective date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period the debtors have obligated themselves to provide such benefits.

1.    *Acceptance*

Classes 2-2, 3, 4, 5, 6, 8, A3, B3, C3, D3, E3, A4, B4, C4, D4, and E4 of the Plan are impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 1, 2-1, 2-3, 2-4, 2-5, 7, 9, A1, B1, C1, D1, E1, A2, B2, C2, D2, and E2 of the Plan are unimpaired and, therefore, conclusively are presumed to have voted to accept the Plan.

2.    *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the plan is feasible.[48]  A feasible plan is one

---

[48] By agreement, the Office of the United States Trustee has reserved its right to object to the Plan on the grounds that it is not feasible prior to the Confirmation Hearing.

that will not lead to a need for further reorganization or liquidation of the debtor, unless such reorganization or liquidation is proposed in the plan.  The Debtors believe that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code, as described in more detail in the Debtors' projected financial information contained in Exhibit 4.

        3.     *Best Interests Test*

        With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement often is referred to as the "best interests" test.

        The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation.  These proceeds must then be reduced by the costs of such liquidation, including costs incurred during the chapter 11 cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a trustee's fees, and the fees and expenses of professionals retained by a trustee.  The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7.  In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors.  The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery provided for in the Plan for that Class.  The Debtors' preliminary liquidation analysis is annexed as Exhibit 3.  As set forth in that analysis, although on liquidation, Administrative, Priority, and Secured Claims likely would be paid in full, unsecured creditors (including holders of General Unsecured Claims and MedMal Claim and the PBGC) likely would receive approximately between 0% and 23.8% on their claims in contrast to the 100% to be received under the Plan.  The Debtors, therefore, submit that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of each Debtor under chapter 7 of the Bankruptcy Code.

        4.     *Cramdown*

        The Debtors will seek to confirm the Plan notwithstanding the rejection by any of Classes 2-2, 3, 4, 5, 6, 8, A3, B3, C3, D3, E3, A4, B4, C4, D4, and E4.  To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

        (a)     Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the

proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)    Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.  (This provision is often referred to as the "absolute priority" rule.)

(c)    Equity Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

A plan does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.  Exact parity is not required.  And the Debtors believe that any discrepancy in treatment or potential distributions to otherwise unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their claims, the time that will be required to liquidate their claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their claims.

Furthermore, although SVCMC's sponsors will retain their Membership Interests in SVCMC while unsecured creditors may receive less than full payment under the Plan, retention of these sponsorship interests does not implicate the "fair and equitable" or so-called "absolute priority" test detailed above.  Courts have consistently held that the absence of the right to reap the profits or economic value of a nonprofit enterprise precludes a finding that members or sponsors hold "interests in the debtors."  *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1318 (7th Cir. 1996) ("Control alone, divorced from any right to share in corporate profits or assets, does not amount to an equity interest."); *In re Whittaker Mem'l Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bankr. E.D. Va. 1993) ("The present group retaining control over the debtor entity does not give them anything, certainly not a favored position over [the dissenting creditor] . . . .  Clearly there is no distribution to this group and nothing beyond control that passes to it.").  Accordingly, the requirements of section 1129(b)(2)(B)(ii) of the Bankruptcy Code that a plan is fair and equitable vis-à-vis non-consenting classes of unsecured claims that are not paid in full only if junior claims or interests do not receive any distribution "on account of such junior claim or interest," is not applicable to a nonprofit case like this one.  As a consequence, the Debtors believe the Plan could be confirmed over the objections of a non-consenting class of unsecured creditors that are not paid in full pursuant to section 1129(b) of the Bankruptcy Code as matter of law, even though SVCMC's pre-Commencement Date sponsors will remain its post-reorganization sponsors.

D.     **Consummation**

The Plan will be consummated on the Effective Date.  The following are conditions precedent to the Effective Date of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth therein, which shall be in form and substance satisfactory to the Debtors;

(b)     No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 of the Plan are satisfied or waived;

(c)     All documents, instruments and agreements, in form and substance satisfactory to the Debtors, provided for under or necessary to implement the Plan, including but not limited to the MedMal Trust Agreements and the Litigation Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

(d)     The Reorganized Articles of Incorporation and Reorganized By-laws shall have been adopted by SVCMC or Reorganized SVCMC;

(e)     All of the payments to be made by SVCMC by or on the Effective Date shall have been made or will be made on the Effective Date;

(f)     SVCMC shall have sufficient Available Cash such that the Effective Date Cash Distribution is no less than (a) 80% multiplied by Total Trade Claims if the Effective Date is on or before August 29, 2007, or (b) 75% multiplied by Total Trade Claims if the Effective Date is after August 29, 2007;

(g)     SVCMC shall have entered into an Exit Facility providing for a term loan of at least $250 million and an accounts receivable credit line of at least $50 million, and all conditions precedent to funding under the Exit Facility shall have been satisfied; and

(h)     SVCMC shall have obtained all governmental and other regulatory approvals or rulings that SVCMC believes, in its reasonable discretion, are necessary for confirmation of the Plan.

(i)     The treatment of the Sun Life Secured Claims and the DASNY Subordinated Claim shall be reasonably satisfactory to the Tort Claimants' Committee in respect of the mortgages being granted to secure the MedMal Trusts.

(j)     SVCMC shall have received all amounts owed from its non-debtor affiliate, St. Elizabeth Ann's Health Care & Rehabilitation Center, totaling

$9,523,263.00, on account of a certain deferred land not and a certain land acquisition user premium.

The Debtors may waive one or more of the conditions precedent to the Effective Date of the Plan set forth in Section 9.1 of the Plan. However, the Debtors may only waive the conditions set forth in (e), (f) and (j) above (which are Sections 9.1(e), (f) and (j) of the Plan) with the consent of the Creditors' Committee and the Ad Hoc Committee, which consent may not be unreasonably withheld, and may only waive the condition set forth in (i) above (which Section 9.9(i) of the Plan) with the consent of the Torts Claimants' Committee, which consent may not be unreasonably withheld.

In the event that one or more of the conditions specified in Article IX of the Plan have not occurred and have not been waived pursuant to that Article, on or before the date that is 180 days after the Confirmation Date, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the <u>status quo ante</u> as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## VI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Equity Interests. The following summary does not address the federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expense Claims, Priority Non-Tax Claims, and Secured Claims) and DASNY.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), existing and proposed Treasury regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "<u>IRS</u>"), all as in effect on the date hereof. Changes or new interpretations of these rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the Plan. In addition, the Debtors have not requested a ruling from the IRS concerning the federal income tax consequences of the Plan, and the consummation of the Plan is not conditioned upon the issuance of any such ruling. Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt.

This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign persons, broker-dealers, banks, mutual

funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt entities other than SVCMC and SSSV, persons holding Equity Interests of any of the Other Debtors as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investments, traders in securities that elect to use a mark-to-market method of accounting for their security holding, certain expatriates or former long term residents of the United States, persons who received Equity Interests of any of the Other Debtors as compensation, pass-through entities or investors in pass-through entities).

This summary also assumes that the various third-party debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form, and that Claims and Equity Interests are held as capital assets.

*Accordingly, the following summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to a holder of a Claim or Equity Interest.*

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **Consequences to the Debtors**

1.      *SVCMC*

SVCMC is a not-for-profit corporation that is exempt from federal income taxation under section 501(c)(3) of the Tax Code. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of SVCMC, and the Plan so provides. Accordingly, SVCMC does not expect the implementation of the Plan to have any adverse federal income tax consequences to it, including, without limitation, in connection with (i) the discharge of debt pursuant to the Plan, (ii) distributions received in respect of Intercompany Claims, and (iii) the establishment of the Litigation Trust. *See also* "– Tax Treatment of MedMal Trusts", below.

2.      *Other Debtors*

Each of the Other Debtors (other than SSSV, which is exempt from federal income taxation under section 501(c)(3) of the Tax Code) reports as a taxable corporation for federal income tax purposes, and utilizes the cash method of accounting. None of the Other Debtors (other than CMC-CS) had net operating loss ("NOL") carryforwards as of December 31,

2005 nor expects to incur significant losses.  The principal assets of the Other Debtors are accounts receivable.  Because the Other Debtors are cash basis taxpayers, each of the Other Debtors (other than SSSV) expects to recognize taxable income for federal income tax purposes in connection with the collection and/or liquidation of its receivables (which, in the case of CMC-CS, may be offset by available NOL carryforwards, but subject to possible federal alternative minimum tax).

As a result of the implementation of the Plan, it is likely that there will be some amount of cancellation of debt ("COD") resulting in taxable income for each of the Other Debtors (other than SSSV) for federal income tax purposes.  COD is the amount by which the debt cancelled (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction).  In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets – by the amount of any COD.  This reduction in tax attributes occurs only after the determination of tax for the taxable year in which the COD occurs (which, in the case of the Other Debtors, is not expected to occur until after all distributions have occurred as a result of liquidation of such Other Debtors).  In general, to the extent the amount of excluded COD income exceeds the tax attributes available for reduction, the excess amount is excluded from gross income without any further current or future tax cost to the debtor.  Accordingly, the Other Debtors (due, among other things, to (i) the timing of the COD event, (ii) the absence or relatively small amount of NOLs and asset tax basis, and (iii) the tax exempt status of SSSV) do not expect to incur any material adverse federal income tax consequences in respect of any COD arising pursuant to the Plan.

3.      *Tax Treatment of MedMal Trusts*

It is intended that each of the MedMal Trusts will be treated as a "grantor trust" for federal income tax purposes, of which SVCMC is the sole grantor.  Accordingly, it is anticipated that the MedMal Trusts will not be separate taxable entities for federal income tax purposes, that the income and operations of the MedMal Trusts will be treated for federal income tax purposes as the income and operations of SVCMC, and, because SVCMC is itself a tax-exempt entity, that none of the earnings of the trusts will be subject to federal income taxation.

Treasury Regulations promulgated under section 468B of Tax Code provide that a sole transferor to a fund, account or trust that otherwise constitutes a "qualified settlement fund" can elect to treat such account as a grantor trust for federal income tax purposes.  In general, a qualified settlement fund is a fund, account or trust (i) that has been established pursuant to an order of (or approved by) a government authority (including a court) solely to resolve or satisfy certain types of claims such as tort claims, (ii) that is subject to the continuing jurisdiction of that government authority, and (iii) whose assets are segregated from the other assets of the transferor.  Each of the MedMal Trusts is intended to satisfy the requirements for qualified settlement fund status.  In addition, the Plan provides that SVCMC or Reorganized SVCMC will execute a "grantor trust election" for each of the MedMal Trusts in accordance with the applicable Treasury Regulations.  Accordingly, pursuant to the Plan, the MedMal Trustee will treat the MedMal Trusts as grantor trusts for federal income tax purposes, and SVCMC will

report all income and expenses of the trusts as its own income and expenses for federal income tax purposes. Also, consistent with such treatment, distributions from the MedMal Trusts to holders of MedMal Claims will be treated for federal income tax purposes as if made by Reorganized SVCMC.

**B.    Consequences to the Holders of Certain Claims and Equity Interests**

Pursuant to the Plan, holders of Allowed General Unsecured Claims against SVCMC will receive (i) an initial distribution of Cash equal to at least 80% if the Effective date is on or before August 29, 2007 and 75% if the Effective Date is after August 29, 2007 of the Allowed Amount of such Claims (not to exceed in the aggregate 93% of the Allowed Amount of such Claims), (ii) the Secured Obligation, in the event and to the extent the initial Cash distribution is less than 85% of the Allowed Amount of such Claims, (iii) the Unsecured Obligation, in the event and to the extent the sum of the initial Cash distribution and Cash distribution under the Secured Obligation is less than 93% of the Allowed Amount of such Claims, (together with the Secured Obligation, the "Class 3 debt obligations"), and (iv) the GUC Litigation Trust Interests.

Holders of Allowed General Unsecured Claims against Other Debtors will receive either a share of the assets of such Debtors or Cash over time as assets are liquidated, not to exceed the Allowed Amount of such Claims.

Holders of Allowed MedMal Claims will receive Cash distributions, as soon as practicable after the Effective Date, and periodically thereafter as provided in the Plan, payable out of the applicable MedMal Trust, not to exceed in the aggregate the Allowed Amount of such Claims.

*The following discussion does not necessarily apply to holders who have Claims in more than one class relating to the same underlying obligation (such as where the underlying obligation serves as the basis for a primary Claim against one Debtor and a secondary liability or guarantee claim against another Debtor). Such holders should consult their tax advisors regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.*

1.    *Holders of General Unsecured Claims Against SVCMC*

(a)    Gain or Loss

In general, each holder of a General Unsecured Claim against SVCMC will recognize gain or loss equal to the difference, if any, between (i) the "amount realized" by such holder in satisfaction of its Claim (other than amounts, if any, paid in respect of any Claim for accrued but unpaid interest and other than any amounts treated as imputed interest as further described below) and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). A holder's "amount realized" generally will equal the sum of (i) the amount of Cash, (ii) the issue price or fair market value of the Class 3 debt obligations received by such holder (*see* "–Ownership and Disposition of Class 3 debt obligations", below), and (iii) the fair market value of the undivided interest in the Litigation Trust Assets received by

such holder.  For a discussion of the federal income tax consequences to holders of any Claim for accrued but unpaid interest, see below.

As discussed below (*see* "–Tax Treatment of Litigation Trust and Holders of Beneficial Interests"), the Litigation Trust is intended to be treated as a "grantor trust" for federal income tax purposes, of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule are the grantors.  Accordingly, each holder of an Allowed General Unsecured Claim against SVCMC is intended to be treated and, pursuant to the Plan, is required to report for federal income tax purposes, as directly receiving, and as a direct owner, of its respective share of the Litigation Trust Assets, except as otherwise discussed below (*see* "Tax Treatment of Litigation Trust and Holders of Beneficial Interests").  Pursuant to the Plan, the Trustee will make a good faith valuation of the Litigation Trust Assets, and all parties (including the Litigation Trustee, Reorganized SVCMC and the holders of General Unsecured Claim against SVCMC) must consistently use such valuation for all federal income tax purposes.

It is possible that a holder of an Allowed Claim may be treated for tax purposes as receiving additional distributions subsequent to the Effective Date as a result of additional contributions made by Reorganized SVCMC to the Litigation Trust or any subsequently disallowed Disputed Claims or unclaimed distributions.  In that event, the holder may be treated as having received additional amounts in respect of its Allowed Claim, and the imputed interest provisions of the Tax Code may apply to treat a portion of such later distributions to a holder as imputed interest.  In addition, it is possible (although not believed likely) that any loss realized by a holder in satisfaction of an Allowed Claim may be deferred until all subsequent distributions are determinable.

After the Effective Date, any amount a holder of a General Unsecured Claim against SVCMC receives as a distribution from the Litigation Trust in respect of its beneficial interest in the Litigation Trust should *not* be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim since such holder would already be regarded for federal income tax purposes as owning the underlying assets (and would already have realized any associated income).  *See* "–Tax Treatment of Litigation Trust and Holders of Beneficial Interests" below.

Where gain or loss is recognized by a holder in respect of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.  A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

A holder's tax basis in its Class 3 debt obligations for federal income tax purposes will equal the amount taken into account in respect of such obligation in determining the holder's amount realized.  A holder's holding period in such obligation generally will begin the day following the Effective Date.

(b)      Distributions in Discharge of Accrued Interest or OID

Pursuant to the Plan, all distributions in respect of any Claim (other than distributions after the Effective Date from the MedMal Trusts) will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any.  However, there is no assurance that such allocation will be respected by the IRS or a court of law for federal income tax purposes.

In general, to the extent that any distribution to a holder of a Claim is received in satisfaction of interest or original issue discount ("OID") accrued or amortized during the time such holder held the Claim, such amount will be taxable to such holder as interest income (if not previously included in such holder's gross income).  Conversely, a holder will generally recognize a deductible ordinary loss to the extent of any Claim for accrued interest that previously was included in its gross income and that is not paid in full.  However, the treatment of unpaid OID that was previously included in income is less clear.  The IRS has privately ruled that a holder of a debt obligation in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID.  Accordingly, it is possible that, by analogy, a holder of a Claim in a taxable exchange would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full.  *Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for federal income tax purposes.*

(c)      Ownership and Disposition of Class 3 Debt Obligation

All amounts payable under the Class 3 debt obligations (whether denominated as principal or interest) are payable at maturity, subject to certain mandatory prepayments.  Although the Claim 3 debt obligations nominally bear a stated rate of interest, the amount and accrual of such interest for federal income tax purposes will be governed by the OID provisions of the Tax Code, described below.  In general, OID is the excess of the "stated redemption price at maturity" of a debt obligation over its "issue price"; however, the determination of the issue price and stated redemption price at maturity is subject to complex regulations and legal and interpretational issues, particularly in the case of contingent obligations.

In addition, the federal income tax treatment of a Class 3 debt obligation will depend, in part, upon whether such Class 3 debt obligation is considered to be traded on an "established securities market" (a determination which is made based on the trading in the Class 3 debt obligation during the sixty day period ending thirty days after the Effective Date).  Pursuant to applicable Treasury Regulations, a debt instrument is traded on an "established securities market" if, among other things, (i) such instrument appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent

price quotations or actual prices of recent sales transactions, or (ii) price quotations for such instrument are readily available from dealers, brokers or traders.

*The tax treatment of the Class 3 debt obligations is unclear. Each holder of an Allowed General Unsecured Claim is urged to consult its tax advisors regarding the tax consequences of the ownership and disposition of the Class 3 debt obligations.*

### Unsecured Obligation

Because (i) the timing of the required payments with respect to the Unsecured Obligation is, in part, contingent upon certain future events and (ii) the yield-to-maturity of the Unsecured Obligation will vary depending on when the obligation is paid, it is likely, and the following discussion assumes, that the Unsecured Obligation will be treated as a "contingent payment debt instrument" under section 1275 of the Tax Code and the applicable Treasury Regulations governing the treatment of OID and related items. However, different contingent payment debt instrument rules generally should apply depending upon whether the Unsecured Obligation is traded on an established securities market.

***If Not Traded on an Established Securities Market.*** If, as is anticipated, the Unsecured Obligation is *not* traded on an established securities market, the contingent payment debt instrument rules generally should treat the contingent and noncontingent portions of the Unsecured Obligation separately for OID purposes, as discussed below. For purposes of determining a holder's gain or loss in respect of its Allowed General Unsecured Claim, a holder should include in its "amount realized" the issue price of any noncontingent portion and the fair market value of any contingent portion. Because the timing of the payments under the Unsecured Obligation is initially contingent upon certain future events, even though a fixed amount is due no later than the seventh anniversary of the Effective Date, the entirety of the Unsecured Obligation is expected to be treated as contingent absent a prior satisfaction of all of the contingencies.

In the event that there is any noncontingent portion of the Unsecured Obligation, such noncontingent portion should be treated as having an "issue price" equal to the lesser of (i) the noncontingent principal payments and (ii) the sum of the present values of all noncontingent payments (including interest payments), discounted at the lowest applicable federal rate in effect for obligations of similar term during the 3-month periods ending with the Confirmation Date or the Effective Date. The applicable federal rate is set monthly by the IRS in accordance with section 1274(d) of the Tax Code. The resulting OID (equal to the amount by which the noncontingent payments have been discounted) generally should be required to be accrued and included in the holder's gross income as interest over the term of such non-contingent portion based on the constant yield method, regardless of such holder's method of accounting. Accordingly, each holder generally should be required to include amounts in gross income in advance of the payment of Cash in respect of such income.

The contingent portion of the Unsecured Obligation also should have an OID component; however, the amount treated as OID is not determinable until all of the contingencies either occur or are no longer possible. At any time when the obligation to make an additional distribution to a holder of an Allowed General Unsecured Claim becomes fixed and is

no longer subject to any of the contingencies, a portion of the Unsecured Obligation should either be actually paid in Cash or, under the Treasury Regulations, be deemed paid with a note maturing upon the date the fixed payment is due. In the case of an actual Cash payment, the amount of OID is computed as the difference between the amount of the payment (whether in form denominated as principal or interest) and the present value of such payment, determined by discounting the payment back to the issue date, using the applicable federal rate that would have been in effect for debt instruments of similar term on the Effective Date. The amount of such OID should be includable at the time of such payment as interest in the holder's gross income. The principal portion of the payment should be applied to reduce the holder's tax basis in the contingent portion of such holder's share of the Unsecured Obligation (which initially should be the fair market value of the contingent payments as of the Effective Date), with any excess treated as gain from the sale or exchange of the obligation.

To the extent that the contingent portion of the Unsecured Obligation is deemed paid with a note, the deemed note should have an issue price determined by taking the amount payable under the note and discounting it back to the date the payment became fixed, using the lowest applicable federal rate in effect for obligations of similar term during the 3-month period ending with the month the payment became fixed. The issue price should then be treated, for purposes of computing the amount of includable OID for the preceding periods, in the same manner as an actual Cash payment. In addition, the note should be treated as having been issued with OID – which generally is required to be accrued and included in the holder's gross income as interest over the term of the note – equal to the difference between the issue price and the amount payable under the note.

Upon the sale or exchange of the Unsecured Obligation, the amount received by such holder should be allocated first to the noncontingent portion of the Unsecured Obligation (if any) to the extent of such holder's then-adjusted issue price in such obligation, and then to any contingent payments that have become fixed and treated as paid with a separate note. The remainder of the amount received, if any, should be treated as payment of the contingent portion and characterized as interest and principal in the same manner as an actual Cash payment.

***If Traded on an Established Securities Market.*** In general, if the Unsecured Obligation is traded on an established securities market, the "issue price" of such obligation should be its fair market value as of the Effective Date. In such event, the amount of OID (*i.e.*, the difference between all amounts payable under the Unsecured Obligation, whether in form denominated as principal or interest, and such obligation's issue price) generally should accrue and be includable in the holders' gross income based on the yield at which comparable fixed rate debt would be issued by Reorganized SVCMC and regardless of when the stated interest is actually paid to the holders (without adjustment for the riskiness of the contingencies in such obligation or the liquidity of such obligation), but not less than the applicable federal rate based upon the overall maturity of the obligation, as reasonably determined by Reorganized SVCMC. Thus, interest income may be recognized by a holder in advance of Cash payments.

In addition, under the contingent payment debt instrument rules, Reorganized SVCMC generally would be required to construct a payment schedule reflecting the amount and timing of all expected contingent payments adjusted to reflect the derived yield, and provide such schedule to holders of the Unsecured Obligation. If the amount of the actual payments

received by a holder for any period is less than the projected payments for such period, the shortfall generally should be treated as an adjustment to the amount received in subsequent periods or upon maturity. In contrast, in the event actual payments for any period exceed the projected payments for such period, the excess amount generally should be compared to the present value of the projected payments which (as reflected by the excess payment) were paid earlier than expected, and this net amount generally should be treated as additional interest income.

In general, any gain realized by a holder upon the sale or exchange of such holder's portion of the Unsecured Obligation governed by the foregoing provisions for debt traded on an established securities market should be treated as ordinary interest income, whereas any loss generally should be treated as ordinary loss only to the extent such loss does not exceed the net amount the holder previously included as interest income, and thereafter as capital loss.

Special rules potentially apply in the event a projected payment becomes fixed in amount but is not payable for more than six months, or all payments become fixed prior to their projected due date.

### Secured Obligation

Because interest compounds under the Secured Obligation, such obligation should potentially be treated as a contingent payment debt instrument only if it is traded on an established securities market, which SVCMC does not expect to occur.

***If Not Traded on an Established Securities Market.*** If, as is anticipated, the Secured Obligation is *not* traded on an established securities market, and the proposed Exit Facility (upon which the interest rate on the Secured Obligation is based) is approved, the "issue price" of the Secured Obligation should be its stated principal amount, and the Secured Obligation should be considered to be issued with OID in an amount equal to the interest payable over the term of the obligation. In such event, regardless of a holder's normal method of accounting, each holder should be required to accrue the OID in respect of its portion of the Secured Obligation, and to include such amount in its gross income as interest, over the term of the obligation based on the constant yield method. This should be equivalent to accruing interest at the Secured Obligation's stated rate of interest. Under the Plan, the interest rate on the Secured Obligation will increase if Reorganized SVCMC does not cure a default under the Secured Obligation within 90 days of receiving written notice of such default from the Trade Claims Monitor. However, because SVCMC believes that the possibility of any such default by Reorganized SVCMC is remote, the potential payment of additional interest by Reorganized SVCMC should be disregarded in determining whether the Secured Obligation has a constant yield under the OID regulations and, therefore, should not affect the above discussion regarding the federal income tax treatment of the Secured Obligation.

The "issue price" for the portion of the Secured Obligation received by a holder of an Allowed General Unsecured Claim will be used to determine the holder's "amount realized" for gain or loss purposes, and will be the holder's initial tax basis in the obligation. The holder's tax basis will thereafter be increased by the amount of any OID included in income from time to time, and reduced by subsequent Cash payments with respect to the obligation.

***If Traded on an Established Securities Market.*** If the Secured Obligation is traded on an established securities market, and the issue price of such obligation is equal to its stated principal amount, the determination and inclusion of OID should be the same as for a Secured Obligation that is not traded on an established securities market. If, however, the issue price of the Secured Obligation is less than its stated principal amount, it is likely that the Secured Obligation (like the Unsecured Obligation) will be treated as a contingent payment debt instrument. In such event, the federal income tax consequences with respect to the ownership and disposition of the Secured Obligation generally should be the same as the consequences that would apply to the Unsecured Obligation if such obligation were traded on an established market (*see* "Unsecured Obligation – If Traded on an Established Securities Market" above).

(d)    Tax Treatment of Litigation Trust and Holders of Beneficial Interests

Upon the Effective Date, the Litigation Trust will be established for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule. Pursuant to the Plan, distributions from the Litigation Trust in excess of the amount receivable thereunder by holders of Allowed General Unsecured Claims will be applied to pay down certain continuing obligations of Reorganized SVCMC.

***Classification as Litigation Trust***. The Litigation Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity), such that the holders of its beneficial interests are treated as owning an undivided interest in the underlying assets of the trust.

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes, particularly given the fact that Reorganized SVCMC will, among other things, have an obligation to make additional contributions to the Litigation Trust depending upon the occurrence of certain events (including, in part, the extent to which the holders of the GUC Litigation Trust Interests are still entitled to distributions from the Litigation Trust). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, Reorganized SVCMC, the Litigation Trustee and the holders of Allowed General Unsecured Claims against SVCMC) are required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule are the owners and grantors.

*The following discussion assumes that the Litigation Trust will be respected as a grantor trust of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule are the owners and grantors for federal income tax purposes.*

However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge the trust classification, the federal income tax consequences to the Litigation Trust, the holders of Claims and Reorganized SVCMC may vary from those discussed herein, including the potential for an entity level tax on any income of the Litigation Trust, or, alternatively, the possible treatment of the Litigation Obligation as a financial obligation of Reorganized SVCMC collateralized by the Litigation Trust Assets. *Holders of Allowed General Unsecured Claims against SVCMC are urged to consult with their tax advisors regarding potential alternative characterizations.*

*General Tax Reporting by the Litigation Trust Trustee and Beneficiaries*. For all federal income tax purposes, all parties (including, without limitation, Reorganized SVCMC, the Litigation Trustee, and the holders of Allowed General Unsecured Claims against SVCMC) must treat the transfer of assets to the Litigation Trust, and any amounts or other assets subsequently transferred to the Litigation Trust in accordance with the terms of the Plan (but only at such time as actually transferred), as a transfer of an undivided interest in the Litigation Trust Assets to the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule, followed by the transfer of the entire interest in the Litigation Trust Assets by the beneficiaries of the Litigation Trust to the Litigation Trust (absent being notified by the Litigation Trustee, as discussed below, or the IRS that an alternative treatment is required). Consistent therewith, all parties must treat the Litigation Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule are the owners and grantors. Thus, the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule will be treated as the direct owners of an undivided interest in the assets of the Litigation Trust for all federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Litigation Trust).

Pursuant to the Plan, the Litigation Trustee shall make a good faith valuation of the value of the Litigation Trust Assets and shall provide such valuation to the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule. Under the Plan, such holders (and all other parties, including Reorganized SVCMC) are required to report the value of such assets in a manner consistent with the valuations provided by the Litigation Trustee for federal income tax purposes. There can be no assurance that the IRS will agree with the valuations provided by the Litigation Trustee, and a different valuation of the assets transferred to the Litigation Trust could subject the holders of Allowed General Unsecured Claims against SVCMC to additional income taxes.

Subject to the treatment of the LT Disputed Claims Reserve (discussed in the next section), the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule will be required to report on their federal income tax return their allocable

share of any taxable income, gain, loss, deduction or credit recognized or incurred by the Litigation Trust. The Litigation Trust may have taxable income in the event and to the extent that the Litigation Trust Loan is not repaid in full. Allocations of taxable income and gain will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Litigation Trust Agreement, up to the tax book value of the Litigation Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The character of items of income, gain, loss and credit to any holder, and the ability of such holder to benefit from any deduction or losses, may depend on the particular situation of each holder.

The federal income tax obligations of a holder of an Allowed General Unsecured Claim against SVCMC that will result from holding an interest in the Litigation Trust are not dependent upon the Litigation Trust distributing any Cash or other proceeds. Therefore, any such holder may incur a federal income tax liability with respect to its allocable share of the income of the Litigation Trust regardless of the fact that the Litigation Trust has not made any concurrent distribution to the holder. In general, other than in respect of assets treated as held in the LT Disputed Claims Reserve and distributions resulting from unclaimed distributions, a distribution of Cash or property by the Litigation Trust will not be taxable to the holder as such holder would already be regarded for federal income tax purposes as owning the underlying assets (and would already have realized associated income, if any).

Subject to definitive guidance that an alternative treatment of the Litigation Trust is required, the Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct each holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.

Pursuant to the Plan, all parties are required to treat the Litigation Trust as a "grantor trust" subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee). In the event an alternative treatment of the Litigation Trust is required for federal income tax purposes, the Litigation Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the Litigation Trust, and anyone who subsequently becomes a holder, of such alternative treatment.

(e)        Tax Treatment of LT Disputed Claims Reserve

Pursuant to the Plan, the Litigation Trustee will hold the assets of the Litigation Trust allocable to, or retained on account of, Disputed General Unsecured Claims against SVCMC, as determined from time to time, separately from other assets of the Litigation Trust in the LT Disputed Claims Reserve.  Such assets shall be subject to an allocable share of all expenses and obligations of the Litigation Trust.  Distributions from the LT Disputed Claims Reserve will be made, in accordance with the Plan, as Disputed General Unsecured Claims against SVCMC are subsequently resolved.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are subject to tax on a current basis, as the amounts are earned. The Plan provides that the Litigation Trustee will, to the extent permitted under applicable law, make an election to treat the LT Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9, and report consistently for state and local income tax purposes.  In addition, pursuant to the Plan, all parties must report consistently with such treatment.

A disputed ownership fund is subject to a separate entity level tax, in a manner similar to either a corporation or a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.,* depending upon the nature of the assets transferred to the fund.  In the present case, it is expected that the LT Disputed Claims Reserve will be taxable similar to a corporation.  So treated, the LT Disputed Claims Reserve will be subject to a separate entity tax (maximum federal income tax rate, currently 35%).

In determining the taxable income of the LT Disputed Claims Reserve, (a) any amounts transferred by SVCMC to the reserve will be excluded from the reserve's income; (b) any sale or exchanges of property by the LT Disputed Claims Reserve (including recoveries on litigation assets, to the extent allocable to the LT Disputed Claims Reserve) will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis that the LT Disputed Claims Reserve has in such property; (c) any interest income or other earnings with respect to the LT Disputed Claims Reserve's assets will be included in the LT Disputed Claims Reserve's income; and (d) any administrative costs (including state and local taxes) incurred by the LT Disputed Claims Reserve will be deductible by the LT Disputed Claims Reserve.

Pursuant to the Plan, the Litigation Trustee will take into account in determining the taxable income or loss of the LT Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Litigation Trust that would have been allocated to the holders of Disputed General Unsecured Claims against SVCMC had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), and as a distribution from the LT Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims against SVCMC as and when, and to the extent, such Claims are subsequently resolved (following which time such assets shall no longer be held in the LT Disputed Claims Reserve).

Although not entirely certain, it appears that distributions from the LT Disputed Claims Reserve to holders of Allowed General Unsecured Claims against SVCMC should be taxed to such holders in the same manner as if such amounts were received directly from the Debtors. Although not expected, if upon the termination of the LT Disputed Claims Reserve, the reserve has any unused tax loss or credit carryforwards, the Treasury Regulations would allocate the carryforwards among all or part of the holders of the Allowed General Unsecured Claims against SVCMC.

2.    *Holders of General Unsecured Claims Against Other Debtors*

Pursuant to the Plan, holders of Allowed General Unsecured Claims against Other Debtors will receive, in satisfaction of their Claims, their Pro Rata share of the assets of Other Debtors in an amount not to exceed the Allowed amount of such Claims. The following discussion assumes that, with respect to each of the Other Debtors, the Plan will be treated as a plan of liquidation of each such Debtor for federal income tax purposes and that any distributions received by holders of Allowed General Unsecured Claims against the Other Debtors will be treated consistent therewith for federal income tax purposes.

In general, a holder of an Allowed General Unsecured Claim against an Other Debtor will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any assets received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest) and (ii) such holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). For a discussion of the federal income tax consequences to holders of any Claim for accrued but unpaid interest, *see* above.

It is possible that a holder may receive distributions subsequent to the Effective Date. Under the Tax Code, a portion of such later distributions to such holder may be treated as imputed interest. In addition, it is possible that any loss, and a portion of any gain realized by such holder, may be deferred until such holder has received its final distribution. *All holders of General Unsecured Claims against Other Debtors should consult their tax advisors as to tax consequences of the receipt of additional distributions subsequent to the Effective Date.*

The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was purchased at a discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

3.    *Holders of MedMal Claims*

Each Allowed MedMal Claim will be liquidated and satisfied in Cash solely from the assets of the respective MedMal Trust, in accordance with the Plan. The federal income tax treatment of a receipt of payments by a holder of such Claim generally will depend upon the nature of the Claim. Because the amounts received by a holder of an Allowed MedMal Claim generally will be attributable to, and compensation for, such holder's personal injuries or

sickness, within the meaning of section 104 of the Tax Code, any such amounts received by the holder should be nontaxable.  To the extent that an Allowed MedMal Claim receives payment over time, it is possible that a portion of the latter payments may be treated as imputed interest.  *Holders of MedMal Claims are urged to consult their tax advisors regarding the tax implications of the Plan to them.*

### C.    Holders of Equity Interests in the Other Debtors

In general, holders of Allowed Equity Interests in the Other Debtors should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of Cash and the fair market value of other property, if any, received in respect of their Equity Interest pursuant to the Plan (whether on or after the Effective Date), and (y) their adjusted tax basis in their Equity Interest.  Such gain or loss generally will be capital gain or loss, and will be long-term if their Equity Interest shall have been held for at least one year at the Effective Date.

### D.    Information Reporting and Withholding

All distributions to holders of Allowed Claims or Equity Interests under the Plan are subject to any applicable withholding obligations (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%).  Backup withholding generally applies if the holder:  (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' federal income tax returns.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims and Equity Interests are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## VII.    RISK FACTORS

HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE

STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE
FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY
RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION
OR INVESTING IN ASSETS OF THE DEBTORS.

### A.    Certain Bankruptcy Considerations

Although the Debtors believe that the Plan will satisfy all requirements necessary
for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court
will reach the same conclusion.  Moreover, there can be no assurance that modifications of the
Plan will not be required for confirmation or that such modifications would not necessitate a
resolicitation of votes.  Finally, there can be no assurance that any or all of the conditions to the
Effective Date of the Plan will be met (or waived).  Accordingly, even if the Plan is confirmed
by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

### B.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL
INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH
CONSUMMATION OF THE PLAN.  INTERESTED PARTIES SHOULD READ
CAREFULLY THE DISCUSSION SET FORTH IN <u>SECTION VI</u> OF THE DISCLOSURE
STATEMENT, ENTITLED "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN" FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL
INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS
OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT
OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN
CONNECTION WITH THE PLAN.

### C.    Risk that Claims Will be Higher than Estimated

The projected distributions and recoveries set forth in this Disclosure Statement
and the preliminary liquidation analysis attached as Exhibit 3 are based on the Debtors' initial
estimate of Allowed Claims and Equity Interests, without having undertaken a substantive
review of all filed Claims and Equity Interests.  The Debtors project that the Claims and Equity
Interests asserted against them will be resolved in and reduced to an amount that approximates
their estimates.  There can be no assurance, however, that the Debtors' estimates will prove
accurate.  If the estimate is low, for example, the Debtors may not be able to reach the 80% or
75% threshold, each as is applicable, for SVCMC's Effective Date Cash Distribution, and the
Plan will not go effective unless that condition is waived by the Creditors' Committee and the
Ad Hoc Committee.  If the condition is waived, on the Effective Date, the estimated distributions
and recoveries may be less than estimated on the Effective Date and the amount of the Secured
Obligation would increase.  Reorganized SVCMC's ability to pay the Secured Obligation then
due would be subject to increased pressure for the reasons set forth in the other risk factors
discussed herein.

For example, on March 24, 2006, the State of New York ("<u>New York</u>" or the "<u>State</u>"), by and through the New York State Comptroller's Office of Unclaimed Funds (the "<u>Comptroller</u>"), filed a proof of claim (Claim No. 2152) (the "<u>Escheat Claim</u>") asserting an unliquidated, unsecured non-priority claim against the Debtors in the amount of $14,816,233.95 for certain presumably "Abandoned Property," as such term is defined in New York's Abandoned Property Law, N.Y. Aband. Prop. Law §§ 101-1502 et seq. (McKinney 2006) (the "<u>NYAPL</u>").  The Debtors are currently in the process of investigating the Escheat Claim to determine what portion of the claim, if any, is legitimate.  The Debtors anticipate that, after concluding this investigation, they will likely either or both object to the Escheat Claim (in whole or in part) or seek to resolve the Escheat Claim consensually with the Comptroller.  If the Debtors object, they likely will do so contending that (i) the State lacks the authority to assert the Escheat Claim to the extent it failed to take the steps necessary to have the property at issue become deemed abandoned under the NYAPL or (ii) in the alternative, in the event that the State establishes a legal basis for its claim, the claim should be estimated in an amount that is significantly less than what the State claims.  If the Debtors are not successful in substantially reducing or eliminating the Escheat Claim on the Effective Date, the recovery to other General Unsecured Creditors could be negatively impacted by as much as approximately 5%.

**D.    Risk that MedMal Trusts Will be Insufficient to Pay All Allowed MedMal Claims**

The aggregate annual contributions to each MedMal Trust, as set forth on the MedMal Trust Funding Schedules in the Plan, should be sufficient to pay all holders of applicable MedMal Claims that become Allowed 100% of the Allowed Amount of their Claims. There is no certainty that the actual amount of Allowed MedMal Claims will equal the amount estimated by the Caronia Report, and in fact, the final amount of Allowed MedMal Claims could differ significantly from the Caronia Report's estimates and be higher or lower than those estimates.  There also is no absolute correlation between the expected time a MedMal Claim will become Allowed and a MedMal Trust Funding Schedule, although the Debtors hope to be able to pay Claims as soon as they become Allowed, or shortly thereafter, from the payments under the MedMal Trust Funding Schedules and, to the extend required, Shortfall Payments.  In the event that the aggregate amount of Claims to become Allowed by a given year exceeds the Debtors' estimates thereof with respect to any Class of MedMal Claims, the holders of the last Claims to be Allowed in that Class in the year may have to wait until the following year or thereafter to receive distributions an account of their Allowed MedMal Claims.  In the event that the aggregate amount of Claims to become Allowed in any Class of MedMal Claims exceeds the Debtors' estimates of the total Allowed amount of MedMal Claims in that Class, the Debtors will seek payment from the respective MedMal Trust Policy, or through payments under the Additional Funding Schedules.  However, given that each of the MedMal Trust Policies will have a ceiling, or, if applicable, payments under the Additional Funding Schedule are limited, there is a possibility that even with the MedMal Trust Policies (or Additional Funding Schedule), a MedMal Trust will not have sufficient assets to pay all holders of Allowed Claims associated with it the full Allowed amount of such Claims.  In addition, the risk that the holder of MedMal Claim may not be paid in full may well increase the longer it takes to fix the amount that MedMal Claim by litigation or otherwise.  On the Effective Date, the Debtors expect that in the aggregate there will be approximately $50 million available and funded for the payment of Allowed MedMal Claims, which the Debtors do not expect will exceed $50 million on the

Effective Date.  The Debtors cannot estimate how quickly this initial fund will be exhausted, but once exhausted, the funds available will be augmented on a yearly basis in an amount between $10 million and $18 million, plus any unused portion of the Shortfall Payments, if needed.  Reorganized SVCMC's ability to make Shortfall Payments are, in part, dependent on future financial performance, which cannot be guaranteed.

### E.     Risks Associated with Treatment of Funds in Litigation Trust and MedMal Trusts

Under the Plan, neither the Litigation Trustee nor a MedMal Trustee shall be required to post a bond with respect to moneys within their respective control.  If a bond were posted, then a third-party effectively would be providing some insurance against fraud or defalcation with respect to those funds by those trustees.  The Debtors, the Creditors' Committee and the Tort Claimants' Committee do not believe that the cost of any such bond necessarily should be incurred on the facts of these cases.  It is likely that the role of MedMal Trustee will be filled by a large, experienced and reputable financial institution.  The Litigation Trustee may likely be an individual.  In either case, there is a risk that if a trustee does commit defalcation with respect to funds within its control, there will no effective means of recovery.

### F.     Litigation Risks

The Plan provides, among other things, for the holders of Claims in Classes 3, 4, 5, and 6 to recover, in part, from the Litigation Claims Proceeds.  Although the Debtors anticipate that the Litigation Claims will, in time, be resolved in a manner that provides a net benefit to the Debtors' estates, there can be no guarantee that the result will be favorable.  At the very least, the Debtors anticipate that the Litigation Parties will vigorously oppose any Litigation Claims asserted against them.

### G.     Liquidity Risks

Although the Debtors project that they will have sufficient liquidity to operate their businesses until consummation of the Plan, there is no assurance that the revenues generated in the next several months will be adequate to cover all expenditures incurred prior to consummation.  In addition, there is no assurance that vendors will be willing to extend Reorganized SVCMC trade credit at an adequate level.

In addition, after the Effective Date, Reorganized SVCMC will have substantial indebtedness, including under the Exit Facility, the obligations owed to the Pension Plan, the payment obligations to holders of Allowed General Unsecured Claims against SVCMC, and the payments due to the MedMal Trusts pursuant to the MedMal Trust Funding Schedules and Shortfall Payment obligations.  Significant cash flows will be necessary to make payments of interest, where applicable, and repay the principal amount of this indebtedness.

### H.     Business Risks (Inherent Uncertainty of Financial Projections)

Although the financial projections set forth in Exhibit 4 suggest that Reorganized SVCMC will be able to meet all of its financial obligations following confirmation of the Plan,

those projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.

Moreover, those projections are dependent on certain assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms, the adequacy of the Exit Financing, and the continued improvement of Reorganized SVCMC's operating performance results. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of Reorganized SVCMC's operations. Factors that could cause actual results to differ materially include, but are not limited to, the ability to operate the hospitals consistent with the projections, comply with the Exit Facility covenants, attract and retain new executives and respond to adverse regulatory actions and accreditation determinations. Other unanticipated events that could negatively impact the financial results of Reorganized SVCMC include potential and unforeseen changes in reimbursement rates from the federal or state government, the cost and future availability of insurance, reductions in the amount of various state and federal grants, changes in reimbursement rates by private payors, or an increase in the volume of uninsured patients at their hospitals. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

## I.     Risks Associated with the Exit Facility

Reorganized SVCMC's operations are dependent on the availability and cost of working capital financing and may be adversely affected by any shortage or increased cost of such financing. SVCMC anticipates entering into the Exit Facility, the terms of which will provide a credit availability, secured with liens on substantially all of Reorganized SVCMC's assets. SVCMC anticipates that the Exit Facility will be used to (i) fund repayment of amounts outstanding under the DIP Agreement, (ii) make Effective Date and ongoing payments to the MedMal Trusts, pension fund obligations and holders of Claims, and (iii) provide short-term working capital needs.

SVCMC believes that substantially all of its needs for funds necessary for post-Effective Date working capital financing will be met by projected operating cash flow or the Exit Facility. The proposed Exit Facility, however, may contain certain conditions and covenants that Reorganized SVCMC may not be able to meet. In addition, the Exit Facility provides for "floating" interest rates, which will introduce some uncertainty into SVCMC's ability to project the amount of cash needed to service its debt. Moreover, if Reorganized SVCMC requires working capital greater than that provided by the Exit Facility, it may be required either to (i) seek to increase the availability under the Exit Facility, (ii) obtain other sources of financing, or (iii) curtail their operations. Some of the factors which may affect the amount of financing required to consummate the Plan include, without limitation, a delay in consummating the Plan, and whether SVCMC's cash flow prior to the Effective Date is more or less than budgeted. SVCMC believes that the recapitalization to be accomplished through the Plan will facilitate SVCMC's ability to obtain additional or replacement working capital financing. No assurance can be given, however, that any additional replacement financing will be available on terms that

are favorable or acceptable to SVCMC.  Moreover, there can be no assurance that Reorganized SVCMC will be able to obtain an acceptable credit facility upon expiration of the Exit Facility.

**J.      Risk Associated with Payment of Secured Obligation, Unsecured Obligation, and GUC Litigation Trust Interest and Amounts Due under the MedMal Trust Funding Schedules**

The right of a holder of an Allowed General Unsecured Claim against SVCMC to receive the payments from the Secured Obligation, the Unsecured Obligation, and the GUC Litigation Trust Interest under the Plan will not be transferable, except by the laws of descent or distribution or otherwise by operation of law or as part of a sale of substantially all assets of the holder.  Accordingly, there will be no trading market for such receivable.  As such, the holders of the Allowed General Unsecured Claims against SVCMC will not be able to sell such receivable or obtain accurate quotations as to the market value of the receivable.  The holders of such Claims will receive the rights to the payment obligations without registration under the Securities Act and without qualification or registration under any state securities laws and such rights will not subsequently be registered under the Exchange Act.  Accordingly, SVCMC will not be required to disclose the information relating to the receivable that would be made available for publicly held securities.

Because the obligations under the Unsecured Payment Obligation and the MedMal Trust Funding Schedules will be junior to the Exit Facility and other existing senior lending, if Reorganized SVCMC becomes insolvent, it may not have sufficient assets to make payments on amounts due on any or all of those obligations.  If Reorganized SVCMC subsequently becomes bankrupt, liquidates, dissolves, reorganizes or undergoes a similar proceeding, Reorganized SVCMC's assets will be available to satisfy those obligations only after all outstanding Exit Facility debt has been paid in full.  In addition, an event of default under the Exit Facility may prohibit Reorganized SVCMC from paying other obligations.

The obligations associated with the Plan increase the financial risk of Reorganized SVCMC, post-emergence.  To the extent that a default in payment obligations under the Plan is a default under the Exit Facility or any other post-Effective financing obtained by SVCMC, a failure to make such a payment could have a substantial impact on SVCMC's operations.  While SVCMC believes that the amount of debt in the capital structure is supportable according to its business plan, there can be no assurance that Reorganized SVCMC's actual financial performance will be sufficient to enable Reorganized SVCMC to meet its debt service requirements.

**K.      Regulatory and Other Governmental Considerations**

The Debtors are subject to numerous regulatory restrictions in the State of New York.  SVCMC requires a license from the DOH to operate a hospital, as well as to provide particular services.  These licenses are generally subject to periodic renewal, and are renewed only upon the successful completion by SVCMC of a survey of its operations by the DOH.  The DOH also monitors SVCMC on an ongoing basis to ensure compliance with regulatory requirement.  Maintenance of licenses is dependent upon generally favorable results during these periodic inspections or reviewed.  Although SVCMC has received a license from DOH for

having substantially complied with all requirements, there is no assurance that it will continue to maintain its license, either until the conclusion of the cases or after confirmation of the Plan. The loss of SVCMC's license likely would lead to closing of the Debtors' operations, subject to the availability of appellate review, if any.

Each of SVCMC's hospitals is accredited by Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), which is an independent, non-profit organization governed by a board that includes physicians, nurses and consumers.  JCAHO, like state licensing authorities, periodically surveys health care organizations to determine whether they are in compliance with the standards of practices and procedures enunciated by JCAHO with respect to the operation of healthcare organizations.  Third-party payors and federal and New York state payors rely on the accreditation of SVCMC's hospitals by JCAHO as a condition to their continued relationship with those hospitals.  Accreditation, in many but not all instances, enables a hospital to accept and bill Medicare and Medicaid patients, and is relied upon as a condition to service agreements with many, if not all, third-party payors for medical services. For SVCMC, maintenance of its JCAHO accreditation is vital because a substantial portion of its census population consists of Medicare and Medicaid patients.  There is no assurance, however, that SVCMC's Manhattan and Westchester hospitals will continue to maintain their JCAHO accreditation.

## L.      Changes in the Medicare or Medicaid Programs

SVCMC relies on payments from the Medicare and Medicaid programs for a substantial portion of its revenues.  These programs are subject to statutory and regulatory modifications, administrative rulings, interpretations and determinations, requirements for utilization review, and federal and state funding restrictions, all of which could materially impair SVCMC's revenues.  Any reduction in the scope of services covered by governmental payors or the rates paid by such entities, could lead to a materially adverse effect on SVCMC's business. There is no way to predict possible future adverse policy changes, and accordingly there can be no assurance that SVCMC will continue to receive governmental reimbursements in amounts comparable to those received in prior years.

## M.      Changes in Reimbursement from Managed Care Payors

SVCMC also relies on payments under its numerous contracts with managed care companies.  These firms routinely pressure SVCMC for lower reimbursement rates, and SVCMC's ability to collect from these entities is dependent on their own financial condition which cannot be assured.  SVCMC cannot predict the future course of the managed care industry, or the terms of the contracts it will be able to negotiate, and accordingly there can be no assurance that SVCMC will be able to maintain the level of reimbursement it currently receives for its services.

## N.      Reliance on Key Personnel

One of SVCMC's primary assets is its highly skilled personnel, including physicians and other employees, who have the ability to leave SVCMC and deprive SVCMC of the skill and knowledge essential for providing high quality health care in all of its businesses.

Deterioration of SVCMC's business, or loss of a significant number of key personnel, will have a material adverse effect on Reorganized SVCMC and may threaten its ability to survive as a going concern.

SVCMC's successful transition through the restructuring process is dependent in part on its ability to retain and motivate its officers and key employees. There can be no assurance that Reorganized SVCMC will be able to retain or employ qualified management and technical personnel. Should any of these persons be unable or unwilling to continue their employment with Reorganized SVCMC, the business prospects of Reorganized SVCMC could be materially and adversely affected.

### O.    Relationship with New York Medical College

Many of the medical personnel currently providing services at SVCMC come to SVCMC through its status as the academic medical center of New York Medical College. Should this relationship weaken or dissolve, SVCMC might lose many of its residents and fellows, with corresponding harm to SVCMC's reputation, quality of care, and ability to recruit other qualified medical personnel.

### P.    Closure of St. Vincent's Midtown

As noted above, one of the Berger Commission's recommendations was that St. Vincent's Midtown be closed. As a statistical matter, many of SVCMC's patients are initially treated at St. Vincent's Midtown's emergency department. The impact of the closure of St. Vincent's Midtown cannot be accurately predicted and it could have a negative impact on Reorganized SVCMC. As previously described, St. Vincent's Midtown is not a debtor in these cases or an entity of which SVCMC is directly or indirectly a member.

### Q.    Potential Reduction to New York State's Health Care Budget

New York State Governor Eliot Spitzer recently proposed to cut New York State's health care expenditures by over $1.2 billion, including over $1 billion from the Medicaid program. The Debtors currently are analyzing whether and to what extent (if any) the proposed budget cuts would impact SVCMC's ability to consummate the Plan and thereafter make the payment contemplated by it. Because the Debtors rely heavily on reimbursement from New York State, the proposed cuts, depending on how implemented, could adversely affect Reorganized SVCMC and could jeopardize its ability to make the payments contemplated by the Plan.

### R.    Collection of Deferred Consideration or Other Amounts Due from Caritas

As part of the purchase price for the Queens Hospitals, SVCMC accepted secured promissory notes from Caritas in the aggregate principal amount of $10 million. Also, as noted above, SVCMC has provided services to Caritas as part of the sales transaction. Caritas is reported to be having financial difficulties and it has not made all required payments to SVCMC. Whether Caritas will be able to make all required payments is unclear, and if it does not, the impact on SVCMC's ability to emerge from Chapter 11 or perform after emerging from Chapter 11 may be negatively impacted. SVCMC previously initiated an adversary proceeding in the

Chapter 11 Case against Caritas, and has since entered into the Caritas Settlement Agreement. Whether Caritas will be able to perform its obligations in connection with its purchase of the Queens Hospitals and as provided under the Caritas Settlement Agreement cannot be predicted.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization or liquidation.

### A.    Liquidation Under Chapter 7

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) and (b) of the Bankruptcy Code, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee(s) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee(s) is appointed or elected and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed General Unsecured Claims likely would receive distributions of a lesser value on account of their Allowed Claims and would have to wait a longer period of time to receive such distributions than they would under the Plan.

Further, if these chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors will experience excessive operating losses due to the costs of shutdown. The Worker Adjustment and Retraining Notification Act (the "WARN Act") requires the Debtors, if planning a plant closing or a mass layoff, to give affected employees at least 60 days notice of this employment action. If at least 60 days notice is not given, the Debtors are required under the WARN Act to make severance payments to those affected employees. In addition to the costs associated with compliance with the WARN Act, a liquidation plan would require the Debtors to incur costs in evaluating and securing key resources, establishing access to alternate care providers, and preparing to support employees, medical staff, and house staff. The Debtors would incur costs in their management of the winding down process, which would entail communicating proactively with all constituencies, establishing a transition management team, ensuring ongoing access to critical patient care resources, managing public relations, terminating employees and contracted services, and transferring remaining patients on the day of closure at each respective hospital. The Debtors would also incur substantial losses during the regulatory process associated with the closure of health care facilities. In order to support post-closure activities, the Debtors would incur costs in disposing of equipment and supplies, maintaining access to medical records and other key records, processing remaining financials, maintaining security and necessary utilities, and disposing of hazardous materials and normal wastes. These windup or shut down costs would all be entitled to priority treatment as chapter 7 administrative expenses.

The total cost of a liquidation of SV Manhattan, including severance payments and legal expenses, is estimated to be $280 million.  The amount of time necessary for closure of each hospital is dependent upon the nature of the patient base of each facility.

Attached as Exhibit 3 is a liquidation analysis of the Debtors on a consolidated and individual facility basis.  This analysis contains detail, for each operating Debtor, of the costs that would be incurred in its shutdown.

From this analysis, it appears that, on liquidation, creditors, particularly unsecured creditors would receive distributions as follows:

- Unsecured creditors of SVCMC would receive between 0% and 23.8% of their Allowed Claims.

- Unsecured creditors of SSSV would receive 0% of their Allowed Claims.

- Unsecured creditors of MS-SVH would receive between 89.4% and 91.3% of their Allowed Claims.

- Unsecured creditors of CMC-CS would receive 100% of their Allowed Claims.

- Unsecured creditors of CMC-RS would receive between 1% and 1.8% of their Allowed Claims.

- Unsecured creditors of CMC-PS would receive between 0.2% and 0.4% of their Allowed Claims.

**B.    Alternative Chapter 11 Plan**

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of the Debtors' remaining assets other than as provided by the Plan.  Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed General Unsecured Claims, MedMal Claims, and Equity Interests than are currently provided for under the Plan.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## IX.   CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Equity Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Debtors urge holders of impaired Claims and Equity Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 4:00 p.m., New York City Time, on July 18, 2007.

Dated: New York, New York
June 5, 2007

> SAINT VINCENTS CATHOLIC MEDICAL
> CENTERS OF NEW YORK d/b/a SAINT
> VINCENT CATHOLIC MEDICAL CENTERS
> (for itself and on behalf of each of the Debtors)
>
>
> By: _____
> Name: Guy Sansone
> Title:   Chief Executive Officer/
>           Chief Restructuring Officer