**EXHIBIT 1**
The Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

## FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION FOR MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.

**Cadwalader, Wickersham & Taft LLP**
**One World Financial Center**
**New York, NY 10281**
**(212) 504-6000**

**Attorneys for the Debtors and**
**Debtors in Possession**

**Dated:  New York, New York**
**June 5, 2007**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SAINT VINCENTS CATHOLIC MEDICAL<br>CENTERS OF NEW YORK d/b/a SAINT<br>VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

## FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION FOR MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.

### Introduction

Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, Medical Service of St. Vincent's Hospital and Medical Center, P.C., Surgical Service of St. Vincent's, P.C., CMC Cardiology Services P.C., CMC Physician Services, P.C., and CMC Radiological Services P.C., as debtors and debtors in possession, propose the following chapter 11 plans of reorganization and liquidation, pursuant to section 1121(a) of the United States Bankruptcy Code. All capitalized terms used in the Plan are defined in either section 101 of the Bankruptcy Code or Article I below.

Briefly stated, but subject to more specific details provided herein, the Plan provides for the reorganization of SVCMC and the liquidation of SVCMC's five affiliated Debtors (the operating assets of three of which were sold or will be sold during the Chapter 11 Cases). The Plan also provides for the preservation of SVCMC's mission, which is reflecting God's love by advancing Christ's healing ministry, with respect, integrity, compassion, and excellence to all who come to its system in need, especially the poor. Although the Debtors' cases have been jointly administered, the Debtors and their estates have not been substantively consolidated. Accordingly, the Plan is really six distinct plans, one for each of the Debtors. The sections of the Plan generally apply to all of the Debtors, except where otherwise indicated.

## Article I.

## DEFINITIONS

Definitions. As used in the Plan, the following terms shall have the respective meanings specified below:

1.1    50% Milestone means the date upon which, after a 50% Milestone Triggering Event has occurred, and Reorganized SVCMC has elected to cause an additional estimation of the Claims remaining to be paid by each of the remaining MedMal Trusts, it has been determined in such additional estimation that the funds remaining in the MedMal Trust exceed 115% of all then remaining MedMal Claims subject to each such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time.

1.2    50% Milestone Triggering Event means the occurrence of either of the following (a) 50% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 50% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.

1.3    75% Milestone means the date upon which, after a 75% Milestone Triggering Event has occurred, and Reorganized SVCMC has elected to cause an additional estimation of the Claims remaining to by paid by each of the remaining MedMal Trusts, it has been determined in such additional estimation that the funds remaining in the MedMal Trust exceed 125% of all then remaining MedMal Claims subject to each such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time.

1.4    75% Milestone Triggering Event means the occurrence of either of the following (a) 75% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 75% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.

1.5    Acceleration Event means a sale of all or substantially all of the assets of Reorganized SVCMC which is not also a Manhattan Real Estate Liquidity Event.

1.6    Additional Funding Schedule means payments, that may be required to be made pursuant to Section 6.6(n) of the Plan under certain circumstances, to each MedMal Trust of its Pro Rata Share of an amount equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate, to be paid in five (5) equal annual installments commencing on the tenth (10th) Effective Date Anniversary and continuing through and including the fourteenth (14th) Effective Date Anniversary.

1.7    Ad Hoc Committee means the unofficial committee formed by Stonehill Capital Management LLC, CarVal Investors, LLC, and Davidson Kempner Capital

Management LLC or entities affiliated with such parties, as assignees of General Unsecured Claims against SVCMC.

    1.8    <u>Administrative Expense Claim</u> means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, other than the DIP Claim, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 328, 330 and/or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date.

    1.9    <u>Allocation Method</u> means the method of allocating certain costs among the Debtors or Post-Effective Date Debtors and reimbursing SVCMC or Reorganized SVCMC for payments made by SVCMC or Reorganized SVCMC under the Plan on behalf of another Debtor or Post-Effective Date Debtor, pursuant to Section 6.12 of the Plan.

    1.10    <u>Allowed</u> means, with reference to any Claim, (a) any Claim allowed pursuant to the Plan, (b) any Claim that is not Disputed, (c) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order, (d) any Claim that, if Disputed, has been allowed by a Final Order, and (e) any timely filed proof of Claim as to which no objection has been or is interposed in accordance with Section 7.2 of the Plan or such applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bankruptcy Court and as to which any such applicable period of limitation has expired; <u>provided, however,</u> that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder; <u>provided further, however,</u> that a MedMal Claim shall only become an Allowed Claim after the MedMal Claim has been determined by Final Order of a court of competent jurisdiction or by settlement; <u>provided further, however,</u> that if a MedMal Claim was liquidated prior to the Effective Date and SVCMC has a structured payment obligation pursuant to the order or settlement agreement fixing the amount of that MedMal Claim, then such MedMal Claim shall be allowed by reinstating such MedMal Claim and the payment schedule under the applicable structured settlement or order and (i) treating as Allowed as of the Effective Date any unpaid payments that became due on or prior to the Effective Date under the structured settlement or order and (ii) treating each subsequent payment under the payment schedule as becoming Allowed on the date it otherwise would become due. In determining the Allowed amount of any MedMal Claim, nothing contained in the Plan or in any of the supporting documentation, shall be deemed to limit, modify or otherwise impair the rights of the parties under applicable state law with respect to the prosecution and/or defense of such MedMal Claim. Unless otherwise specified herein or pursuant to a Final Order, an "Allowed Administrative Expense Claim" or "Allowed Claim" shall

not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

      1.11    <u>Aptium</u> means Aptium W. New York, Inc. f/k/a Comprehensive Cancer Centers of New York.

      1.12    <u>Aptium Agreement</u> means that certain Second Amended and Restated Consulting and Administrative Services Agreement, dated as of April 11, 1996, between SVCMC and Aptium and any amendments thereto, as modified by the Stipulation and Order Confirming the Validity of Pre-Petition Liens and Security Interests Held by Aptium W. New York, Inc. f/k/a Comprehensive Cancer Corporation of New York, entered August 28, 2006.

      1.13    <u>Aptium Secured Claim</u> means all Secured Claims of Aptium for obligations of SVCMC arising out of the Aptium Agreement.

      1.14    <u>Available Cash</u> means all Cash (other than Restricted Assets) of Reorganized SVCMC available on the Effective Date, including, without limitation, in SVCMC's sole discretion, amounts drawn or that can be drawn by Reorganized SVCMC under the revolving credit portion of the Exit Facility, provided that no party shall be entitled to seek to compel Reorganized SVCMC to utilize any such funds under the Exit Facility as Available Cash, minus:  (i) fifteen million dollars ($15 million) for operations, (ii) payments required to be made under the Plan on the Effective Date (including, without limitation, $1 million to be given to the Litigation Trust and the Litigation Trust Loan) other than (a) payments to holders of General Unsecured Claims against SVCMC (including based upon the GUC Estimate), and (b) payments to the MedMal Trusts in the aggregate in excess of $5 million, and (iii) professional or other administrative costs and expenses accrued as of the Effective Date; <u>provided</u>, <u>however</u>, in the event that, prior to the Effective Date, (x) the aggregate amount of fees and expenses Allowed by Final Order for a Non-Litigation Party Professional is less than the amount accrued by SVCMC or Reorganized SVCMC on account of the amount requested by such Non-Litigation Party Professional, (y) SVCMC or Reorganized SVCMC is otherwise released of an obligation to pay any portion of the aggregate amount of fees and expenses requested by a Non-Litigation Party Professional, or (z) any Non-Litigation Party Professional is required to disgorge any amounts previously paid to such Non-Litigation Party Professional by SVCMC or Reorganized SVCMC, the amount so reduced, released, or disgorged, as applicable, shall be considered Available Cash.

      1.15    <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, as in effect on the Commencement Date, as modified by the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) that apply to cases pending as of its effective date but filed before its effective date.

      1.16    <u>Bankruptcy Court</u> means the bankruptcy court of the District Court under section 151 of title 28 of the United States Code.

1.17    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as
promulgated by the United States Supreme Court under section 2075 of title 28 of the
United States Code and any Local Rules of the Bankruptcy Court.

1.18    Bayley Seton means SVCMC's Bayley Seton Campus located at 75
Vanderbilt Avenue in Staten Island, New York, which has frontage on at least one side
on Vanderbilt Avenue.  For the avoidance of doubt, this shall include all parcels into
which the campus may be subdivided.

1.19    Brooklyn/Queens Hospitals means the hospitals and other assets formerly
owned and operated by SVCMC in Brooklyn, New York and Queens, New York as more
fully described in the May 6, 2006 Asset Purchase Agreement between SVCMC and
Caritas.

1.20    Brooklyn/Queens Seller Notes means that certain note entitled "Form of
Seller Financing Note" and that certain note entitled "Additional Note," each issued by
Caritas to SVCMC as part of the consideration paid pursuant to that certain Asset
Purchase Agreement dated May 9, 2006, by and among certain of the Debtors and
Caritas, which notes (i) were approved by the Order Approving Two Amendments to the
Queens Purchase Agreement, entered December 20, 2006 (Docket Number 2557 in the
Chapter 11 Cases), and (ii) are secured by the real property at Mary Immaculate Hospital,
Queens and St. John's Queens Hospital.

1.21    Business Day means any day other than (a) a Saturday, (b) a Sunday, (c)
any day on which commercial banks in New York, New York are required or authorized
to close by law or executive order, and (d) the Friday after Thanksgiving Day.

1.22    Business Plan means through fiscal year 2010, the financial projections for
Reorganized SVCMC as filed with the Bankruptcy Court as Exhibit 4 to the Disclosure
Statement.  Thereafter, Business Plan shall mean the financial projections prepared by
Reorganized SVCMC and approved by the Board of Reorganized SVCMC, which will be
submitted to the Trade Claims Monitor and MedMal Monitor no later than March 31 of
the current year, provided, however, that if Reorganized SVCMC fails to submit such
business plan by such deadline, the projected ending Cash balance and the projected
capital expenditures for such year as used in the definition of Excess Cash and Deferred
Capital Expenditures, respectively, shall equal $0.

1.23    Caritas means Caritas Health Care, Inc. f/k/a Caritas Health Care
Planning, Inc.

1.24    Caritas Settlement Agreement means that certain Settlement dated as of
May 4, 2007 and approved by the Bankruptcy Court on such date, by and among
SVCMC, Caritas Health Care, Inc. f/k/a Caritas Health Care Planning, Inc., and
Healthcare Finance Group, HFG Healthco-4 and HFG Healthco-5.

1.25    Caronia Estimate means the estimate of the likely amount of Allowed MedMal Claims before giving effect to MedMal Self-Insurance Trust Funds, as set forth in that certain report prepared by Caronia Corporation and dated March 15, 2007.

1.26    Cash means legal tender of the United States of America.

1.27    Change of Control means any moment in time in which the selection of at least fifty percent (50%) of the Board of Directors of Reorganized SVCMC is not within the control of one or more of the following: (a) any holder of a Membership Interest in Reorganized SVCMC as of the Effective Date, and (b) any other New York based Catholic (i) not-for-profit institution or (ii) for-profit institution.

1.28    Chapter 11 Cases means the following cases commenced by the Debtors pursuant to chapter 11 of the Bankruptcy Code, and jointly administered under the caption In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., Chapter 11 Case No. 05-14945 (ASH) (jointly administered): (i) In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, Chapter 11 Case No. 05-14945; (ii) In re CMC Physician Services, P.C., Chapter 11 Case No. 05-14951; (iii) In re CMC Radiological Services P.C., Chapter 11 Case No. 05-14949; (iv) In re CMC Cardiology Services P.C., Chapter 11 Case No. 05-14948; (v) In re Medical Service of St. Vincent's Hospital and Medical Center, P.C., Chapter 11 Case No. 05-14947; and (vi) In re Surgical Service of St. Vincent's, P.C., Chapter 11 Case No. 05-14946.

1.29    Claim has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.30    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan, classified by the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

1.31    CMC-CS means CMC Cardiology Services P.C.

1.32    CMC-PS means CMC Physician Services, P.C.

1.33    CMC-RS means CMC Radiological Services P.C.

1.34    Collateral means any property or interest in property of the estate of the Debtors, other than the MedMal Collateral, subject to a lien to secure the payment or performance of a Claim, which lien is valid, perfected and enforceable under applicable law, and is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.35    Commencement Date means July 5, 2005, the date on which the Debtors commenced the Chapter 11 Cases.

1.36    Commerce Loan Agreement means the Loan and Security Agreement by and between SVCMC and Commerce Bank, the entry into which by SVCMC was

approved by order of the Bankruptcy Court entered November 7, 2005, and which Loan and Security Agreement was executed by SVCMC and Commerce Bank on December 15, 2005, and any subsequent amendment thereto approved by the Bankruptcy Court.

1.37    Commerce Secured Claim means the Secured Claim of Commerce Bank arising out of the Commerce Loan Agreement.

1.38    Committees means the Creditors' Committee and the Tort Claimants' Committee.

1.39    Confirmation Date means the date upon which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Debtors' chapter 11 cases.

1.40    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.41    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.42    Covered Person means any physician or employee of SVCMC to the extent that such physician or employee has a right of indemnification against or from SVCMC with respect to claims of alleged medical malpractice.

1.43    Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases on July 18, 2005 pursuant to section 1102 of the Bankruptcy Code.

1.44    Cure Amount means all amounts required to be paid to a counterparty to an executory contract or unexpired lease to assume such contract or lease pursuant to section 365 of the Bankruptcy Code.

1.45    DASNY means the Dormitory Authority for the State of New York.

1.46    DASNY Arbitrage Rebate Account means that certain investment account held by DASNY for the purpose of making any arbitrage rebate payments that may be required to be made by SVCMC to the Internal Revenue Service in order to preserve the tax-exempt status of bonds issued by DASNY or the New York State Medical Care Facilities Finance Agency on behalf of SVCMC.

1.47    DASNY Subordinated Claims means the Claims to which DASNY is entitled pursuant to that certain stipulation between DASNY, the Debtors and the Creditors' Committee, so ordered by the Bankruptcy Court on December 29, 2005.

1.48    Debtors mean, collectively, SVCMC, CMC-CS, CMC-PS, CMC-RS, MS-SVH, and SSSV, including, where applicable, such entities in their capacity as debtors in

possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.49    Deferred Capital Expenditures means for each fiscal year, without reference to Deferred Capital Expenditures from the prior fiscal year, the amount (if positive) equal to (i) projected capital expenditures for the respective fiscal year, as projected in the Business Plan, minus (ii) actual capital expenditures made in such fiscal year, based upon the audited financial statements, plus (iii) the positive amount, if any, by which (x) capital expenditures relating to emergent items included in the capital expenditures reported in the audited financial statements for such year but not included in the Business Plan, exceed (y) the Restricted Assets used to pay for such emergent capital expenditures.

1.50    Deferred Effective Date Payment means a portion of the Secured Obligation, the principal amount of which shall be equal to the amount, if any, by which the Effective Date Cash Distribution is less than 80% of the Total Trade Claims, and which shall have the terms set forth in Section 6.3(l) of the Plan.

1.51    DIP Agent means General Electric Capital Corporation, in its capacity as agent under the DIP Agreement, or any successor in interest thereto.

1.52    DIP Agreement means the Credit Agreement dated as of December 30, 2005 among the Debtors, General Electric Capital Corporation, as agent, and the persons from time to time becoming lenders thereunder, together with any other documents defined therein as "Loan Documents" and the terms of the order of the Bankruptcy Court, dated December 23, 2005, approving such agreement.

1.53    DIP Claim means all Claims of the DIP Lender or any additional lenders arising under the DIP Agreement.

1.54    DIP Lender means General Electric Capital Corporation, in its capacity as a lender under the DIP Agreement, and any other person becoming a lender thereunder prior to the Effective Date.

1.55    Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.56    Disputed means, with reference to any Claim, (i) any Claim, proof of which was timely and properly filed, which is disputed under the Plan, or as to which the Debtors, the Post-Effective Date Debtors, or either of the Committees have interposed, will interpose or have determined to interpose a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (ii) any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was filed but was not timely or properly filed, (iii) any Claim that is disallowed pursuant to section 502(d) of

the Bankruptcy Code, and (iv) any MedMal Claim to the extent set forth in Section 7.2(b) of the Plan. A Claim that is Disputed as to its amount shall not be Allowed in any amount until it is no longer a Disputed Claim.

1.57    Distributable Cash means the Cash available in a particular MedMal Trust for distribution to holders of MedMal Claims after the MedMal Trustee has reserved sufficient Cash to pay all accrued and unpaid Reimbursable Costs.

1.58    District Court means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.59    Divested Facilities means the following facilities closed or sold, as applicable, by SVCMC subsequent to the commencement of the Chapter 11 Cases: Mary Immaculate Hospital, Queens; St. John's Hospital, Queens; St. Mary's Hospital, Brooklyn; and St. Vincent's Hospital, Staten Island.

1.60    Effective Date means the first Business Day on which the conditions specified in Section 9.1 of the Plan have been satisfied or waived.

1.61    Effective Date Anniversary means an annual anniversary of the Effective Date; provided, however, that if the anniversary of the Effective Date in any year is not a Business Day, then the Effective Date Anniversary shall be the first Business Day after the anniversary of the Effective Date in such year.

1.62    Effective Date Cash Distribution means (i) Available Cash in an aggregate amount equal to not less than (a) 80% of the Total Trade Claims if the Effective Date is on or before August 29, 2007 or (b) 75% of the Total Trade Claims if the Effective Date is after August 29, 2007, minus (ii) 50% of any Available Cash in excess of the amount equal to 85% of the Total Trade Claims; provided, however, that the Effective Date Cash Distribution shall not exceed the amount equal to 93% of the Total Trade Claims.

1.63    Equity Interest means any share of common or preferred stock or other instrument evidencing an ownership interest in the Other Debtors, whether or not transferable, and any option warrant or right, contractual or otherwise, to acquire any such interest. Solely for the sake of clarity, SVCMC has no Equity Interests; only the Other Debtors have Equity Interests.

1.64    ERISA means Title IV of the Employee Retirement Income Security Act of 1974, as amended, codified as 29 U.S.C. §§ 1301-1461.

1.65    Excess Cash means any Cash (net of Deferred Capital Expenditures, payments required to be made under the Plan but not made, unfunded projected pension payments, and amounts outstanding under Reorganized SVCMC's revolving credit or similar working capital line) of Reorganized SVCMC during a given year in excess of the sum of (i) the amount of projected Cash in the Business Plan filed with the Disclosure Statement, as of December 31 of any such year based upon Reorganized SVCMC's audited financial statements for such fiscal year, plus (ii) $15 million; provided, however,

that if the amount owing to the post-petition exit lender (or any subsequent senior lender) is not less than four times Reorganized SVCMC's EBIDA as reflected in the audited financial statements for the fiscal year, Excess Cash will equal $0.

1.66     Excess Insurance means in a given insurance policy coverage period, third-party commercial insurance available to cover the Debtors' Manhattan Hospital, Westchester Hospital, or Staten Island Hospitals in excess of either the per occurrence or aggregate limit of both (i) the third-party commercial primary insurance coverage provided by Medical Liability Mutual Insurance Company for the Manhattan Hospital and Staten Island Hospitals or Healthcare Underwriters Mutual for the Westchester Hospital, and (ii) where applicable, any self-insurance program supported in whole or in part by either the MedMal-MW Self-Insurance Trust Funds or the MedMal-SI Self-Insurance Trust Funds.

1.67     Excess Monitor Fees means the aggregate of all reasonable fees and expenses of the MedMal Trust Monitor, including the reasonable fees and expenses of counsel to the MedMal Trust Monitor, in excess of $75,000 a year.

1.68     Exit Facility means a credit facility determined by SVCMC to be sufficient to meet its Plan obligations and working capital needs as of the Effective Date.

1.69     Final Order means an order of the Bankruptcy Court or District Court (or, in the case of MedMal Claims only, another court of competent jurisdiction) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, or move to reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or District Court (or, in the case of the MedMal Claims only, other court of competent jurisdiction) shall have been upheld by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, the possibility that a timely motion under Bankruptcy Rule 9024 or any applicable analogous rule may be filed with respect to such order shall not prevent such order from being a Final Order.

1.70     General Unsecured Claim means any Claim that is not a Secured Claim, Administrative Expense Claim (including fees and costs for professional compensation and reimbursement), Priority Non-Tax Claim, Priority Tax Claim, MedMal Claim, PBGC Claim, DASNY Subordinated Claim, or Intercompany Claim.

1.71     GUC Estimate means SVCMC's estimate, for distribution purposes, as of the Effective Date, of the aggregate dollar amount at which Disputed General Unsecured Claims against SVCMC will ultimately be Allowed, which estimate must be either (i)

approved by Final Order or (ii) reasonably acceptable to the Creditors' Committee and the Ad Hoc Committee.

1.72    GUC Litigation Trust Interest means a beneficial interest in the Litigation Trust entitling the holders of such interest to receive up to seven percent (7%) of the Allowed amount of their General Unsecured Claims against SVCMC plus an annual accretion on any unpaid portion thereof at a rate of eight percent (8%) compounding annually, from Litigation Trust Assets paid in accordance with the Litigation Distribution Schedule; provided, however, holders of the GUC Litigation Trust Interest shall not have recourse against Reorganized SVCMC on account of the GUC Litigation Trust Interest.

1.73    Intercompany Claim means any Claim against SVCMC by an entity of which SVCMC is a direct or indirect member or shareholder.

1.74    Liquidity Event Distribution Schedule means,

(a)    In the event that and to the extent that, at the time a Manhattan Real Estate Liquidity Event or an Acceleration Event occurs, any portion of the Unsecured Obligation remains outstanding and/or any portion of the GUC Litigation Trust Interest remains outstanding, then such excess proceeds (in the event of a Manhattan Real Estate Liquidity Event) or net proceeds (in the event of an Acceleration Event) shall be distributed in the following manner, in each case within three (3) business days of the receipt by Reorganized SVCMC thereof:

- first, to the MedMal Trusts until such time as (i) the aggregate amount contributed to the MedMal Trusts (including the MedMal Trust Initial Assets, amounts funded pursuant to the MedMal Funding Schedule and Shortfall Payments, but not including any amounts funded on account of Reimbursable Costs) divided by the aggregate estimated amount at which Disputed MedMal Claims will be Allowed (as and to the extent modified based on a new estimate performed after a 50% Milestone Triggering Event or a 75% Milestone Triggering Event) plus without duplication the actual amount of Allowed MedMal Claims (without regard to whether such Allowed MedMal Claims have been paid in whole or in part) equals or exceeds (ii) the aggregate amount distributed in Cash to holders of General Unsecured Claims against SVCMC divided by the aggregate estimated amount of Allowed General Unsecured Claims against SVCMC;

- thereafter, (x) 45% to the MedMal Trusts in accordance with their respective Pro Rata Shares, (y) 27.5% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 27.5% to holders of Allowed General Unsecured Claims against SVCMC or to the Litigation Trust.

Amounts distributed on account of (z) in the preceding sentence shall be distributed as follows: (A) upon a Manhattan Real Estate Liquidity Event, these amounts will be applied first, to amounts due, if any, to the Litigation Trust on account of the

GUC Litigation Trust Interest, but in no event shall the contribution to the Litigation Trust on account of a Manhattan Real Estate Liquidity Event exceed 1/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions thereon, second, to the remaining balance (if any) of the Secured Obligation (principal first and then interest), and third to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest); provided, however, that Reorganized SVCMC's obligations to make any payments on account of a Manhattan Real Estate Liquidity Event shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full and either (i) the GUC Litigation Trust Interest has been paid in full or (ii) 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 shall have been realized by the Litigation Trust as a result of the occurrence of a Litigation Trust Contribution Event; and (B) upon an Acceleration Event these amounts will be applied first to the remaining balance (if any) of the Secured Obligation (principal first and then interest), and second to the remaining balance (if any) of the Unsecured Obligation (principal first and then interest); provided, however, that Reorganized SVCMC's obligations to make any payments on account of an Acceleration Event shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full.

(b)     In the event that and to the extent that the Unsecured Obligation remains outstanding, if there is Excess Cash, it will be distributed (w) 50% to the lenders for Reorganized SVCMC's Exit Facility or any successor thereof as a prepayment thereunder, (x) 22.5% to the MedMal Trusts in accordance with their respective Pro Rata Shares, (y) 13.75% to the Pension Plan and applied to payments due or estimated to become due in the current year and then to later years, and (z) 13.75% to holders of Allowed General Unsecured Claims against SVCMC and applied first to the Secured Obligation (principal first and then interest) and then to the Unsecured Obligation (principal first and then interest) until paid in full; provided, however, that Reorganized SVCMC shall not be obligated to distribute Excess Cash in accordance with the Liquidity Event Distribution Schedule if Reorganized SVCMC has not received the consent of the lenders for Reorganized SVCMC's Exit Facility or any successor thereof to distribute such Excess Cash; provided further, however, that Reorganized SVCMC's obligation to make any payments on account of Excess Cash shall cease when the Secured Obligation and the Unsecured Obligation have been paid in full.

1.75   Litigation Claims means all claims, rights (including rights of setoff and/or recoupment) and causes of action, including claims, rights, or causes of action arising out of or under chapter 5 of the Bankruptcy Code, that could have been brought or raised by or on behalf of the Debtors arising before, on, or after the Commencement Date, whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law, against any of the Litigation Parties (excluding claims against McDermott Will & Emery LLP relating to services provided after the Commencement Date to the extent that they have been resolved by Final Order on or prior to the Effective Date).

1.76   Litigation Claims Costs means any and all costs, including reasonable professionals' fees, including any contingent portions, if any, incurred by the Litigation

Trust, of prosecuting the Litigation Claims, enforcing any judgment on the Litigation Claims, and recovering proceeds on account of the Litigation Claims.

1.77    Litigation Claims Proceeds means the actual consideration, if any, received by the Litigation Trust as a result of any judgment, settlement, or compromise of any of the Litigation Claims.

1.78    Litigation Distribution Schedule means the distribution of Litigation Claims Proceeds and other Litigation Trust Assets by the Litigation Trust in the following manner and order:

- first, to pay Litigation Claims Costs;

- second, to Reorganized SVCMC to pay back the Litigation Trust Loan (principal first and then interest);

- third, to pay down the remaining principal portion of the GUC Litigation Trust Interest;

- fourth, to pay down the accreted portion of the GUC Litigation Trust Interest;

- fifth, after the GUC Litigation Trust Interest is satisfied in full and until the Secured Obligation is paid in full, fifty percent (50%) to pay down the Secured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Shares, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- sixth, after the Secured Obligation (both interest and principal) is paid in full and until the Unsecured Obligation is paid in full, fifty percent (50%) to pay down the Unsecured Obligation (principal first and then interest) and fifty percent (50%) to the MedMal Trusts, allocated among the MedMal Trusts in accordance with their respective Pro Rata Shares, and applied to obligations under the MedMal Trust Funding Schedule in inverse order of maturity;

- seventh, to the MedMal Trusts until Reorganized SVCMC's payments under the MedMal Trust Funding Schedule shall have been fully paid or the obligation to make such payments shall have ceased and all required Shortfall Payments due, outstanding, and unpaid at the time of distribution shall have been paid in full;

- eighth, any remaining balance to the Pension Plan.

1.79    Litigation Parties means McDermott Will & Emery LLP; Speltz & Weis LLC, Huron Consulting Services LLC, Huron Consulting Group LLC, and Huron Consulting Group Inc.; affiliates and successors of the foregoing Persons; any individual

who is or was a member of, a managing director of, or a partner in, or held a similar
position in, any of the foregoing Persons, including in such individual's capacity as an
officer or director of the foregoing Persons; and David Speltz and Tim Weis in any
capacity; provided, however, the Debtors are not Litigation Parties.

1.80    Litigation Party Fee Recoveries means (i) net proceeds, if any, received by
Reorganized SVCMC from any Litigation Party after the Effective Date as a result of a
Final Order having been entered on account of a Litigation Party seeking compensation
for services rendered or reimbursement for expenses incurred through and including the
Effective Date under section 503(b) of the Bankruptcy Code, (ii) the amount, if any, by
which the amount that SVCMC or Reorganized SVCMC had accrued as of the Effective
Date on account of a request or an anticipated request for payment by a Litigation Party
retained in the Chapter 11 Cases on account of postpetition fees and expenses exceeds the
amount SVCMC or Reorganized SVCMC is required to pay such Litigation Party by
Final Order or pursuant to a release or other arrangement between such Litigation Party
and SVCMC or Reorganized SVCMC and (iii) Cash equal to the amount, if any, paid by
SVCMC or Reorganized SVCMC to a Litigation Party retained in the Chapter 11 Cases
that is disgorged by such Litigation Party to SVCMC or Reorganized SVCMC.

1.81    Litigation Trust means the liquidating trust as established under Section
6.5 of the Plan and the Litigation Trust Agreement.

1.82    Litigation Trust Agreement  means the agreement establishing and
delineating the terms and conditions of the Litigation Trust, substantially in the form set
forth in the Plan Supplement.

1.83    Litigation Trust Assets means (i) the Litigation Trust Initial Assets, (ii)
payments made to the Litigation Trust as a result of a Litigation Trust Contribution Event
having occurred, (iii) Litigation Party Fee Recoveries to be contributed in Cash by
Reorganized SVCMC to the Litigation Trust, (iv) Litigation Claim Proceeds, and (v) any
proceeds, including interest, of the foregoing assets.

1.84    Litigation Trust Contribution Event means the occurrence of one of the
following conditions, in which case Reorganized SVCMC shall have additional payment
obligations to the Litigation Trust to the extent of, but only to the extent of, in the
aggregate, an amount no greater than 2/7 of the GUC Litigation Trust Interest as of the
Effective Date plus accrued accretions on such amount.

(a)    In the event, either (i) (x) all holders of Allowed MedMal Claims
have received the full Allowed amount of their Claims (including MedMal Interest,
where applicable), (y) there remain five or fewer Disputed MedMal Claims, and (z) there
is sufficient Distributable Cash in each of the MedMal Trusts to pay at least one hundred
and fifty percent (150%) of the aggregate amount in which the Disputed MedMal Claims
are estimated to be Allowed for each MedMal Trust, respectively, pursuant to a formal
estimate performed at the request of Reorganized SVCMC made at any time (at its sole
expense), or at the reasonable request of the Trade Claims Monitor (but at Reorganized

SVCMC's expense), provided that the Trade Claims Monitor may not cause such an estimation more than twice and no such estimate shall be performed within three months of another, or as otherwise agreed to by the MedMal Trust Monitor, or (ii) (y) all holders of Allowed MedMal Claims have received the full Allowed amount of their Allowed MedMal Claims and (z) there do not remain any Disputed MedMal Claims, then Reorganized SVCMC shall make payments to the Litigation Trust in twelve (12) equal monthly installments of principal plus the accrued accretions on each installment of principal paid, up to (but in no event exceeding), in the aggregate, the lesser of (i) an amount equal to (z) 2/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 2/7 minus (y) amounts (if any) received on account of the GUC Litigation Trust Interest as a result of the condition set forth in Section 1.84 of the Plan having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid under the Litigation Distribution Schedule.  The amount of each monthly installment shall be recalculated in the event distributions are made on account of Section 1.84(b) of the Plan after the first distribution is made on account of this Section 1.84(a).

(b)    In the event that Reorganized SVCMC is required to make a payment to the Litigation Trust under the Liquidity Event Distribution Schedule, Reorganized SVCMC shall make that payment in an amount not to exceed the lesser of (i) an amount equal to (y) 1/7 of the GUC Litigation Trust Interest as of the Effective Date plus accrued accretions on such 1/7 minus (z) amounts in excess of 1/7 of the GUC Litigation Trust Interest plus accrued accretions received by the Litigation Trust as a result of the condition set forth in Section 1.84(a) hereof having occurred, or (ii) the amount of the GUC Litigation Trust Interest that has not been paid out under the Litigation Distribution Schedule.

1.85    Litigation Trust Initial Assets means (i) the Litigation Claims; (ii) $1 million in Cash; (iii) the proceeds of the Litigation Trust Loan; and (iv) the right to Litigation Party Fee Recoveries.

1.86    Litigation Trust Loan means Cash in the amount of $250,000 to be loaned to the Litigation Trust by Reorganized SVCMC to fund the fees, expenses, and costs of the Litigation Trust.

1.87    Litigation Trustee means the Person or Persons appointed in accordance with the Litigation Trust Agreement, and identified in the Plan Supplement, to administer the Litigation Trust.  The Litigation Trustee shall also serve as the Trade Claims Monitor.

1.88    LT Disputed Claims Reserve means the assets of the Litigation Trust allocable to, or retained on account of, Disputed General Unsecured Claims against SVCMC, as determined from time to time, which assets shall (to the extent possible) be held separately from other assets of the Litigation Trust, but shall be subject to an allocable share of all expenses and obligations of the Litigation Trust.

1.89    Manhattan Hospital means St. Vincent's Hospital and Medical Center of New York and other related facilities in Manhattan, New York.

1.90    Manhattan Hospital Real Estate means the real estate currently occupied
by St. Vincent's Hospital and Medical Center of New York, located on 12th Street east of
Seventh Avenue in New York, New York, other than the Martin Payne Building located
at 130 West 12th Street.

1.91    Manhattan Real Estate Liquidity Event means the occurrence of either of
the following events:  (i) if Reorganized SVCMC shall receive aggregate gross proceeds
greater than $400 million from the sale or other disposition of the Manhattan Hospital
Real Estate or (ii) if Reorganized SVCMC shall receive aggregate gross proceeds greater
than $175 million from the sale or other disposition of the O'Toole Real Estate and the
Triangle, together with any and all rights of Reorganized SVCMC to the extent
transferred in connection with any such sale or other disposition of the O'Toole Real
Estate and the Triangle.

1.92    Manhattan Real Estate Process means the proposal for
development/renovation of the Manhattan Hospital, described in more detail in the
Disclosure Statement.

1.93    MedMal Claim means any prepetition Claim relating to medical
malpractice (i) asserted or which can be asserted against SVCMC and/or SVCMC's
insurers on account of or related to SVCMC's purported liability for an alleged act of
medical malpractice or (ii) asserted or which can be asserted against any Covered Person
with respect to or related to claims of alleged medical malpractice, in each case net of the
proceeds of SVCMC's third party insurance available to pay the holder of such Claim.

1.94    MedMal Collateral means Staff House and the Westchester Land.

1.95    MedMal Defense Costs means all costs, fees, and expenses incurred by
Reorganized SVCMC associated with resolving (including defending, settling or
otherwise compromising) the respective MedMal Claims.

1.96    MedMal Interest means interest on the unpaid portion of any MedMal
Claim from the date that the MedMal Claim becomes Allowed until it is paid in full,
which interest shall accrue at the judgment rate prevailing in New York State on the
Effective Date.

1.97    MedMal Lien means the liens granted by SVCMC to each MedMal Trust
on the MedMal Collateral to secure all obligations of Reorganized SVCMC to such
MedMal Trust under the Plan.

1.98    MedMal Loan means a loan from one MedMal Trust to another MedMal
Trust made under the terms, conditions, and circumstances described in Section 6.6(u) of
the Plan.

1.99    MedMal Self-Insurance Trust Funds means the MedMal-BQ Self-
Insurance Trust Funds, the MedMal-MW Self-Insurance Trust Funds, and the MedMal-SI
Self Insurance Trust Funds.

1.100    MedMal Trust Agreements means the MedMal-MW Trust Agreement, the MedMal-SI Trust Agreement, and the MedMal-BQ Trust Agreement.

1.101    MedMal Trust Assets means the MedMal-MW Trust Assets, the MedMal-SI Trust Assets, and the MedMal-BQ Trust Assets.

1.102    MedMal Trust Funding Schedule means, for each MedMal Trust, its Pro Rata Share of the amounts set forth below:

| Effective Date Anniversary | Funding Amount |
|---|---|
| First (1st) | $10 million |
| Second (2nd) | $10 million |
| Third (3rd) | $10 million |
| Fourth (4th) | $15 million |
| Fifth (5th) | $15 million |
| Sixth (6th) | $15 million |
| Seventh (7th) | $15 million |
| Eighth (8th) | $15 million |
| Ninth (9th) | $18 million |

1.103    MedMal Trust Initial Assets means the MedMal-MW Trust Initial Assets, the MedMal-SI Trust Initial Assets, and the MedMal-BQ Trust Initial Assets.

1.104    MedMal Trust Monitor means the Person or Persons selected by the Tort Claimants' Committee, and reasonably acceptable to SVCMC, to monitor the operations of the MedMal Trusts and contributions from Reorganized SVCMC, answer questions from holders of MedMal Claims, enforce the payment obligations of Reorganized SVCMC to the MedMal Trusts, enforce the MedMal Lien, oversee the refinancing or other disposition of the MedMal Collateral, enforce the cap on MedMal Defense Costs to be paid by the MedMal Trusts, and perform other duties as set forth in the Plan, the Plan Supplement or any other related documents.

1.105    MedMal Trust Policies means the MedMal-BQ Trust Policy, the MedMal-MW Trust Policy, and the MedMal-SI Trust Policy.

1.106    MedMal Trustees means the MedMal-MW Trustee, the MedMal-SI Trustee, and the MedMal-BQ Trustee.

1.107    MedMal Trusts means the MedMal-MW Trust, the MedMal-SI Trust, and the MedMal-BQ Trust.

1.108    MedMal-BQ Claim means a MedMal Claim other than a MedMal-MW Claim and a MedMal-SI Claim.

1.109   MedMal-BQ Self-Insurance Trust Funds means all funds in the
consolidated trust established pursuant to section 2162.7B of the Medicare Provider
Reimbursement Manual to (i) support a program of risk management and self-insurance
against malpractice claims and losses arising in connection with the charitable operations
of SVCMC at the Brooklyn/Queens Hospitals (above and beyond the coverage afforded
SVCMC by its third-party commercial primary insurance providers (if any)), and (ii) be
used exclusively for the payment of all or part of claims, settlements, judgments and
judicial or administrative awards asserted against, entered into on behalf of, or entered
against SVCMC as a result of alleged acts of medical or nursing malpractice at the
Brooklyn/Queens Hospitals, or any person or entity at the Brooklyn/Queens Hospitals for
which SVCMC is legally responsible or obligated to indemnify.

1.110   MedMal-BQ Trust means the trust described in Section 6.6 of the Plan and
the MedMal-BQ Trust Agreement.

1.111   MedMal-BQ Trust Agreement means the agreement establishing and
delineating the terms and conditions of the MedMal-BQ Trust, substantially in the form
set forth in the Plan Supplement.

1.112   MedMal-BQ Trust Assets means (i) the MedMal-BQ Trust Initial Assets,
(ii) all amounts required to be paid by Reorganized SVCMC to the MedMal-BQ Trust
after the Effective Date, and (iii) any proceeds, including interest, of the assets described
in (i) and (ii) above.

1.113   MedMal-BQ Trust Initial Assets means (i) the MedMal-BQ Self-Insurance
Trust Funds, (ii) the MedMal-BQ Trust's Pro Rata Share of the sum of (x) $5 million,
plus (y) all Available Cash on the Effective Date other than the Effective Date Cash
Distribution, (iii) the rights, titles and interests afforded to the MedMal-BQ Trust
pursuant to the MedMal-BQ Trust Agreement and the Plan, (iv) the MedMal-BQ Trust
Policy, and (v) proceeds of the foregoing.

1.114   MedMal-BQ Trust Policy means an insurance policy or other financial
instrument established or purchased on behalf of the MedMal-BQ Trust by Reorganized
SVCMC and/or the MedMal-BQ Trustee, substantially in the form set forth in the Plan
Supplement, underwriting a portion of amounts due on MedMal-BQ Claims in excess of
funds in the MedMal-BQ Trust.

1.115   MedMal-BQ Trustee means the Person or Persons appointed in
accordance with the MedMal-BQ Trust Agreement, and identified in the Plan
Supplement, to administer the MedMal-BQ Trust.

1.116   MedMal-MW Claim means a MedMal Claim relating to an incident that
allegedly occurred at the Manhattan Hospital or the Westchester Hospital.

1.117   MedMal-MW Self-Insurance Trust Funds means all funds in the trust
established by SVCMC pursuant to section 2162.7B of the Medicare Provider
Reimbursement Manual to (i) support a program of risk management and self-insurance

against malpractice, claims and losses arising in connection with the charitable operations of SVCMC at the Manhattan Hospital or the Westchester Hospital (above and beyond the coverage afforded SVCMC by its third-party commercial primary insurance providers) and (ii) pay for claims, settlements, judgments and judicial or administrative awards asserted against, entered into on behalf of or entered against SVCMC as a result of alleged acts of medical or nursing malpractice at the Manhattan Hospital or the Westchester Hospital, or any person or entity at the Manhattan Hospital for which SVCMC is legally responsible or obligated to indemnify.

1.118   MedMal-MW Trust means the trust described in Section 6.6 of the Plan and the MedMal-MW Trust Agreement.

1.119   MedMal-MW Trust Agreement means the agreement establishing and delineating the terms and conditions of the MedMal-MW Trust, substantially in the form set forth in the Plan Supplement.

1.120   MedMal-MW Trust Assets means (i) the MedMal-MW Trust Initial Assets, (ii) all amounts required to be paid by Reorganized SVCMC to the MedMal-MW Trust after the Effective Date, and (iii) any proceeds, including interest, of the assets described in (i) and (ii) above.

1.121   MedMal-MW Trust Initial Assets means (i) the MedMal-MW Self-Insurance Trust Funds, (ii) the MedMal-MW Trust's Pro Rata Share of the sum of (x) $5 million, plus (y) all Available Cash on the Effective Date other than the Effective Date Cash Distribution, (iii) the rights, titles and interests afforded to the MedMal-MW Trust pursuant to the MedMal-MW Trust Agreement and the Plan, (iv) the MedMal-MW Trust Policy, and (v) proceeds of the foregoing.

1.122   MedMal-MW Trust Policy means an insurance policy or other financial instrument established or purchased on behalf of the MedMal-MW Trust by Reorganized SVCMC and/or the MedMal-MW Trustee, substantially in the form set forth in the Plan Supplement, underwriting a portion of amounts due on MedMal-MW Claims in excess of funds in the MedMal-MW Trust.

1.123   MedMal-MW Trustee means the Person or Persons appointed in accordance with the MedMal-MW Trust Agreement, and identified in the Plan Supplement, to administer the MedMal-MW Trust.

1.124   MedMal-SI Claim means a MedMal Claim relating to an incident that allegedly occurred at one of the Staten Island Hospitals.

1.125   MedMal-SI Self-Insurance Trust Funds means all funds in the consolidated trust established pursuant to section 2162.7B of the Medicare Provider Reimbursement Manual to (i) support a program of risk management and self-insurance against malpractice, claims and losses arising in connection with the charitable operations of SVCMC at the Staten Island Hospitals (above and beyond the coverage afforded SVCMC by its third-party commercial primary insurance providers) and (ii) be used

exclusively for the payment of all or part of claims, settlements, judgments and judicial or administrative awards asserted against, entered into on behalf of, or entered against SVCMC as a result of alleged acts of medical or nursing malpractice at the Staten Island Hospitals, or any person or entity at the Staten Island Hospitals for which SVCMC is legally responsible or obligated to indemnify.

1.126   MedMal-SI Trust means the trust described in Section 6.6 of the Plan and the MedMal-SI Trust Agreement.

1.127   MedMal-SI Trust Agreement means the agreement establishing and delineating the terms and conditions of the MedMal-SI Trust, substantially in the form set forth in the Plan Supplement.

1.128   MedMal-SI Trust Assets means (i) the MedMal-SI Trust Initial Assets, (ii) the amounts required to be paid by Reorganized SVCMC to the MedMal-SI Trust after the Effective Date, and (iii) any proceeds, including interest, of the assets described in (i) and (ii) above.

1.129   MedMal-SI Trust Initial Assets means (i) the MedMal-SI Self-Insurance Trust Funds, (ii) the MedMal-SI Trust's Pro Rata Share of the sum of (x) $5 million, plus (y) all Available Cash on the Effective Date other than the Effective Date Cash Distribution, (iii) the rights, titles and interests afforded to the MedMal-SI Trust pursuant to the MedMal-SI Trust Agreement and the Plan, (iv) the MedMal-SI Trust Policy, and (v) proceeds of the foregoing.

1.130   MedMal-SI Trust Policy means an insurance policy or other financial instrument established or purchased on behalf of the MedMal-SI Trust by Reorganized SVCMC and/or the MedMal-SI Trustee, substantially in the form set forth in the Plan Supplement, underwriting a portion of amounts due on MedMal-SI Claims in excess of funds in the MedMal-SI Trust.

1.131   MedMal-SI Trustee means the Person or Persons appointed in accordance with the MedMal-SI Trust Agreement, and identified in the Plan Supplement, to administer the MedMal-SI Trust.

1.132   Membership Interests means the interests in SVCMC held as of the Commencement Date by the President of the religious congregation of The Sisters of Charity of St. Vincent de Paul of New York (or her designee who is a member of such congregation) in her individual ex officio capacity and the Most Reverend Bishop of the Diocese of Brooklyn, New York (or his designee who is a member of such Diocese) in his individual ex officio capacity.

1.133   Mercer Estimate means the estimate of the likely amount of Allowed MedMal Claims before giving effect to MedMal Self-Insurance Trust Funds, as set forth in that certain actuarial report prepared by Mercer Oliver Wyman and dated March 27, 2007.

1.134    Miscellaneous Non-Operating Real Property shall mean the following
parcels of real property: 690 Castleton Avenue (Staten Island, New York); 731 Castleton
Avenue (Staten Island, New York); 360 Bard Avenue (Staten Island, New York); 154 St.
Austin Place (Staten Island, New York); 155 Vanderbilt Avenue (Staten Island, New
York); 427 Forest Avenue (Staten Island, New York); 376 Jersey Street (Staten Island,
New York);  90 Hill Street (Brooklyn, New York); and Bayley Seton.

1.135    MS-SVH means Medical Service of St. Vincent's Hospital and Medical
Center, P.C.

1.136    Non-Litigation Party Professional means any Person, other than a
Litigation Party, retained by the Debtors or the Committees in the Chapter 11 Cases.

1.137    O'Toole Real Estate means the real estate currently occupied by the
O'Toole building at 36 7th Avenue in New York, New York.

1.138    Other Debtors means all Debtors other than SVCMC.

1.139    Other Secured Claim means any Secured Claim other than a DIP Claim,
the Aptium Secured Claim, the Commerce Secured Claim, the RCG Secured Claim, and
the Sun Life Secured Claims.

1.140    PBGC means the Pension Benefit Guaranty Corporation, a wholly owned
United States Corporation that administers the defined benefit pension plan termination
insurance under ERISA.

1.141    PBGC Claim means any Claim of the PBGC arising out of the Pension
Plan and the PBGC Penalties Claim.

1.142    PBGC Penalties Claim means the claims, fines or assessments, if any, of
the PBGC or Internal Revenue Service arising out of SVCMC's alleged failure to make
timely the filings required under section 4010 of ERISA for Pension Plan years 2001,
2002, 2003, 2004, and 2005.

1.143    Pension Plan means the Saint Vincents Catholic Medical Centers
Retirement Plan, the tax qualified defined benefit pension plans covered by ERISA,
sponsored and maintained by SVCMC.

1.144    Person means an individual, partnership, corporation, limited liability
company, business trust, joint stock company trust, unincorporated association, joint
venture, governmental authority, governmental unit or other entity of whatever nature.

1.145    Plan means this chapter 11 plan, including all exhibits and schedules
annexed hereto, either in its present form or as it may be altered, amended or modified
from time to time, and the Plan Supplement.

1.146   Plan Administration Account means a separate bank account established in the name of each Other Debtor to pay all expenses of administration of such Other Debtor's Plan and to make all distributions required by each Other Debtor under the Plan.

1.147   Plan Supplement means the compilation of documents and forms of documents specified in the Plan that will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan, and will be a part of the Plan.

1.148   Post-Effective Date Debtors means Reorganized SVCMC and the Other Debtors after the Effective Date.

1.149   Post-Effective Date Available Cash Reconciliation Account means a segregated account, to be established by Reorganized SVCMC with a domestic bank on or as soon as practicable after the Effective Date, into which the following amounts, if any, will be deposited as and when received by Reorganized SVCMC, and which amounts will be subject to a first priority security interest in favor of the potential recipients of such proceeds as if such amount was Available Cash on the Effective Date, to secure SVCMC's obligation to distribute on the first Effective Date Anniversary the contents of the Post-Effective Date Available Cash Reconciliation Account as if it had been Available Cash on the Effective Date:

     i.      An amount, if any, equal to the Effective Date Cash Distribution reserved based on the GUC Estimate, less the actual Effective Date Cash Distribution made on the Disputed Claims included in the GUC Estimate based on the amount at which they are ultimately Allowed, at such time as any such Disputed Claims are Allowed in the year following the Effective Date;

     ii.      After the Effective Date, the amount, if any, (a) by which the aggregate amount of fees and expenses awarded by the Bankruptcy Court to the Non-Litigation Party Professionals is less than the amount accrued by SVCMC, as of the Effective Date, in respect of the amount of fees and expenses requested by the Non-Litigation Party Professionals, due to (i) the Bankruptcy Court entering an order allowing the fees and expenses of a Non-Litigation Party Professional in an amount less than requested by such Non-Litigation Party Professional, (ii) SVCMC or Reorganized SVCMC having been released of an obligation to pay any portion of the aggregate amount of fees and expenses requested by a Non-Litigation Party Professionals, or (b) that SVCMC or Reorganized SVCMC previously paid to a Non-Litigation Party Professional that such Non-Litigation Party Professional disgorges to Reorganized SVCMC.

     iii.      The Cash proceeds received by Reorganized SVCMC on account of the Equity Interests of the Other Debtors; and

     iv.      Undeliverable or unclaimed Effective Date Cash Distributions.

1.150   <u>Priority Non-Tax Claim</u> means any Claim entitled to priority in payment, as specified in sections 507(a)(2)-(7) and (9) of the Bankruptcy Code, other than a Priority Tax Claim.

1.151   <u>Priority Tax Claim</u> means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.152   <u>Pro Rata</u> means the proportion that the amount of any Claim in a particular Class bears to the aggregate amount of all Claims in such Class, including the estimated Allowed amount of any Disputed Claims in such Class.

1.153   <u>Pro Rata Share</u> means, with respect to the MedMal Trusts, an allocation among the MedMal Trusts equal to the proportion to the total estimated Allowed MedMal Claims, as of the Effective Date, based upon the Caronia Estimate, for which a particular MedMal Trust is responsible, after giving effect to the distribution of the MedMal Self-Insurance Trust Funds; <u>provided</u>, <u>however</u>, that if a further official estimation of the MedMal Claims is performed, subsequent to the 50% Milestone, subsequent to the 75% Milestone, or otherwise, then the Pro Rata Share shall mean an allocation among the MedMal Trusts in proportion to the total unpaid Allowed MedMal Claims quantified in such estimation, as of the date of such estimation, for which a particular MedMal Trust is responsible, after giving effect to any funds remaining in the MedMal Trusts as of the date of such estimation.

1.154   <u>RCG</u> means RCG Longview II, L.P. or its successors and assigns.

1.155   <u>RCG Secured Claim</u> means the Secured Claim of RCG, which is Allowed in the amount of $3 million, that arises out of the Subordinate Promissory Note, dated May 18, 2005, in the principal amount of $10 million, made by SVCMC to the order of RCG and the Subordinate Promissory Note, dated June 27, 2005, in the principal amount of $6 million, made by SVCMC to the order of RCG.

1.156   <u>Record Date</u> means the date of the order approving the Disclosure Statement.

1.157   <u>Reimbursable Costs</u> means MedMal Defense Costs (other than the MedMal Defense Costs in excess of $3 million per year payable by Reorganized SVCMC), premiums on the MedMal Trust Policies, Excess Monitor Fees, MedMal Interest accrued or paid by any MedMal Trust, all reasonable fees and expenses of the MedMal Trustees, taxes (if any), and all other reasonable fees and expenses of the MedMal Trust (other than the aggregate of up to $75,000 per year payable by Reorganized SVCMC for reasonable fees and expenses incurred by the MedMal Trust Monitor) other than payments made to holders of Allowed MedMal Claims on account of those Claims exclusive of MedMal Interest.

1.158   <u>Released Parties</u> means any current or former agent, representative, director, officer, member, sponsor, manager, attorney, accountant, financial advisor, or

other professional of the Debtors, the Committees, the Ad Hoc Committee, the DIP
Agent, or the DIP Lender, but only to the extent, in each case, such party served in such
capacity on or after the Commencement Date; provided, however, notwithstanding
anything herein to the contrary, none of the Litigation Parties shall be Released Parties.

1.159    Reorganized Articles of Incorporation means the articles of incorporation
or similar corporate organizational document of Reorganized SVCMC, as amended and
restated, substantially in the forms to be filed with the Plan Supplement.  The
Reorganized Articles of Incorporation of Reorganized SVCMC shall, among other things,
prohibit the issuance of nonvoting equity securities, subject to further amendment of such
Reorganized Articles of Incorporation as permitted by applicable law.

1.160    Reorganized By-laws means the by-laws or similar corporate
organizational document, to the extent applicable, of Reorganized SVCMC, as amended
and restated, substantially in the forms to be filed with the Plan Supplement.

1.161    Reorganized SVCMC means SVCMC on and after the Effective Date.

1.162    Restricted Assets means all cash, cash equivalents, or other assets of the
Debtors as of the Effective Date, the use of which is restricted by New York Not-For-
Profit Law or other applicable nonbankruptcy law to the furtherance of a particular
purpose or purposes in accordance with the expressed or implied intent of the party that
transferred or donated the asset to the Debtors.

1.163    Schedules means the schedules of assets and liabilities and the statements
of financial affairs filed by each of the Debtors on October 3, 2005 as required by section
521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or
amendments thereto through the Confirmation Date.

1.164    Secured Claim means, pursuant to section 506 of the Bankruptcy Code,
that portion of a Claim, other than a MedMal Claim, that is (a) secured by a valid,
perfected and enforceable security interest, lien, mortgage or other encumbrance, that is
not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon
any right, title or interest of a Debtor in and to property of the relevant estate, to the
extent of the value of the holder's interest in such property as of the relevant
determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the
Confirmation Order becoming a Final Order).  The defined term Secured Claim includes
any Claim that is: (i) subject to an offset right under applicable law, and (ii) a secured
claim against a Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.165    Secured Obligation means a debt payment obligation by Reorganized
SVCMC to each holder of an Allowed General Unsecured Claim against SVCMC,
secured by the Secured Obligations Liens, the principal amount of which obligation shall
be equal to an amount, if greater than zero, which shall provide each holder of an
Allowed General Unsecured Claim against SVCMC a recovery equal to 85% of the
Allowed Amount of its General Unsecured Claim against SVCMC after accounting for

payment of the Effective Date Cash Distribution, but prior to payment of the Unsecured Obligation or the distribution of the GUC Litigation Trust Interest, as set forth in Section 6.3 of the Plan. The Secured Obligation shall include the Deferred Effective Date Payment, if any.

1.166  Secured Obligation Collateral means (i) the Miscellaneous Non-Operating Real Property, (ii) the Brooklyn/Queens Seller Notes, (iii) any security interest granted to SVCMC by Caritas, pursuant to the Caritas Settlement Agreement, (iv) the amount, if any, contained in the DASNY Arbitrage Rebate Account subject to the prior claims of DASNY, if any, to such amount, (v) any cash reimbursements owing to the Debtors from Bishop Mugavero Center for Geriatric Care, Holy Family Home and St. Elizabeth Ann's Health Care & Rehabilitation Center as of the Effective Date, and (vi) accounts receivable relating to services provided by the Divested Facilities, to the extent collected after the Effective Date; and (vii) the pool of bad debt receivables sold pursuant to a transaction approved during the Chapter 11 Cases that may be reversed pending a secondary sale, but only to the extent reversed prior to the Effective Date, and not re-consummated prior to the Effective Date; provided, however, that the Secured Obligation Liens shall not attach to any proceeds of the foregoing collateral, to the extent such proceeds, if any, are realized by the Debtors prior to the Effective Date.

1.167  Secured Obligation Liens means a first priority lien in the Secured Obligation Collateral.

1.168  Shortfall Payment means a payment made in respect of the obligation of Reorganized SVCMC to make payments to each of the MedMal Trusts under certain circumstances as specifically set forth in the Plan in the event funds in such MedMal Trust are insufficient to pay (i) all Allowed MedMal Claims to which such MedMal Trust is subject and (ii) accrued, unpaid Reimbursable Costs.

1.169  SSSV means Surgical Service of St. Vincent's, P.C.

1.170  Staff House means the Debtors' real property located at 555 6th Avenue, New York, New York 10011 (mailing address) / 101 W 15th Street, New York, New York 10011 (deed).

1.171  Staten Island Hospitals means SVCMC's Bayley Seton Hospital and St. Vincent's Medical Center of Richmond and other related facilities located in Staten Island, New York.

1.172  Sun Life Manhattan Notes means (i) the Sun Life O'Toole Note, (ii) the Sun Life Staff House Note, and (iii) the Sun Life Martin Payne Note.

1.173  Sun Life Manhattan Secured Claim means the Secured Claim of Sun Life Assurance Company of Canada or any of its affiliates, arising out of the Sun Life Manhattan Notes.

1.174   Sun Life Martin Payne Note means the Promissory Note, dated October 18, 2004, in the principal amount of $16 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Martin Payne property.

1.175   Sun Life O'Toole Note means the Promissory Note, dated October 18, 2004, in the principal amount of $5 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's O'Toole building.

1.176   Sun Life Secured Claims means the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim.

1.177   Sun Life Staff House Note means the Promissory Note, dated October 18, 2004, in the principal amount of $28 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Staff House property.

1.178   Sun Life Staff House Secured Claim means the Secured Claim of Sun Life U.S. or any of its affiliates arising out of the Sun Life Staff House Note.

1.179   Sun Life Westchester Notes means (i) the Promissory Note, dated February 11, 2005, in the principal amount of $22.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate and (ii) the Promissory Note, dated February 11, 2005, in the principal amount of $7.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate.

1.180   Sun Life Westchester Secured Claim means the Secured Claim of Sun Life Assurance Company of Canada or any of its affiliates, arising out of the Sun Life Westchester Notes.

1.181   SVCMC means Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers.

1.182   Tort Claimants' Committee means the statutory committee of tort claimants appointed in the Chapter 11 Cases on May 17, 2006 pursuant to section 1102 of the Bankruptcy Code.

1.183   Total Trade Claims means an amount equal to the sum of (x) the amount of General Unsecured Claims against SVCMC that have been Allowed (or for which proofs of claim have been filed to which the Debtors do not object) and (y) the GUC Estimate.

1.184   Trade Claims Monitor means the Person selected to monitor and enforce the payment obligations of Reorganized SVCMC with respect to and on behalf of all holders of the Secured Obligation (including the Deferred Effective Date Payment, if any) and the Unsecured Obligation which shall include but not be limited to monitoring and enforcing the determination of Excess Cash, Change in Control, Litigation Trust Contribution Events, the Liquidity Event Distribution Schedule and the Manhattan Real

Estate Liquidity Event. The Trade Claims Monitor shall be the Person serving as the Litigation Trustee, and the professionals retained by the Litigation Trustee may also provide services to the Trade Claims Monitor. SVCMC shall pay up to $30,000 per year in the aggregate to individuals serving as the Trade Claims Monitor and any professionals engaged by the Trade Claims Monitor, and any portion of the $30,000 not used in a given year will carry forward and may be applied in future years, provided, however, that the aggregate amount to be paid to the Trade Claims Monitor and any professional(s) engaged by the Trade Claims Monitor shall not exceed $90,000 in any year.

1.185   Triangle means that certain triangular parcel of real property located in Manhattan, New York, that is bounded by Seventh Avenue, Greenwich Avenue and West 12th Street.

1.186   Unsecured Obligation means an unsecured debt payment obligation by Reorganized SVCMC to each holder of an Allowed General Unsecured Claim against SVCMC, the principal amount of which obligation shall be equal to the amount, if greater than zero, which shall provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 93% of the Allowed amount of its General Unsecured Claim against SVCMC after accounting for payment of the Effective Date Cash Distribution and the Secured Obligation, but prior to the distribution of the GUC Litigation Trust Interest, as described in Section 6.4 of the Plan. For the avoidance of doubt, the principal amount of the Unsecured Obligation shall not exceed an amount sufficient to provide each holder of an Allowed General Unsecured Claim a recovery greater than 8% of the Allowed amount of its Claim on account of the Unsecured Obligation.

1.187   Westchester Hospital means Saint Vincent's Hospital, Westchester, other related facilities in and around Westchester, New York, and the land on which those facilities sit.

1.188   Westchester Land means the land owned by SVCMC adjacent to Westchester Hospital.

## Construction of Certain Terms

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

If a Claim is to be "reinstated" under the terms of the Plan, it shall mean that such claim shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding that the holder of such Claim shall not have any right to enforce, with regard to any default occurring prior to the Effective Date, any contractual provision

or applicable non-bankruptcy law that entitles the holder of such Claim to demand or receive payment of such Claim prior to its stated maturity date from and after the occurrence of a default, and (i) the holder of the Claim shall retain all of its legal rights respecting the Claim, (ii) Reorganized SVCMC shall remain liable for the Claim, and (iii) Reorganized SVCMC shall retain any and all defenses respecting the Claim.

Any term used in the Plan that is not defined shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

## Article II.

## TREATMENT AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1   Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided in Section 2.2 or 2.3 below, SVCMC or the applicable Post-Effective Date Debtor, as appropriate, shall pay to each holder of an Allowed Administrative Expense Claim against such Debtor an amount in Cash equal to the Allowed amount of such Claim on the later to occur of (a) the Effective Date or (b) the date such Administrative Expense Claim otherwise would become due in the ordinary course of business.

2.2   Professional Compensation and Reimbursement Claims.

(a)   All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses incurred through and including the Effective Date under section 503(b) of the Bankruptcy Code shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed from Reorganized SVCMC (with the Other Debtors reimbursing Reorganized SVCMC pursuant to the Allocation Method), (i) on the date the order granting such award is a Final Order, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon by the relevant professional and Reorganized SVCMC.

(b)   SVCMC shall support any application, pursuant to section 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for "substantial contribution" to the Chapter 11 Cases filed by (i) the Ad Hoc Committee for up to $350,000 in actual and reasonable fees and expenses incurred by the Ad Hoc Committee and (ii) holders of MedMal Claims for up to $150,000 in actual and reasonable legal fees and expenses of Kronish Lieb Weiner & Hellman LLP, now known as Cooley Godward Kronish LLP, incurred by holders of MedMal Claims.  The payment of any such fees and expenses shall be subject to the independent approval of the Bankruptcy Court and shall not be deemed approved merely by entry of the Confirmation Order.

(c)    Notwithstanding any of the foregoing, Reorganized SVCMC shall assume all postpetition liabilities, fees and expenses for and make payment in the ordinary course to those professionals retained by SVCMC as ordinary course professionals pursuant to that certain order of the Bankruptcy Court, entered September 9, 2005.

2.3    <u>United States Trustee Quarterly Fees and Other Statutory Fees</u>.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Reorganized SVCMC.  Any such fees accruing after the Confirmation Date also shall be paid by Reorganized SVCMC.

2.4    <u>DIP Claims</u>.  Except to the extent that a holder of a DIP Claim agrees to a different treatment, SVCMC and the Other Debtors shall pay each holder of a DIP Claim, on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim.

2.5    <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Debtor, from such Debtor (i) on the Effective Date, Cash equal to the Allowed amount of such Claim or (ii) equal annual Cash payments on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at a fixed annual rate equal to 7% or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the applicable Debtor as such obligations become due.

**Article III.**

**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

3.1    <u>Classification under SVCMC Plan</u>.  Claims against SVCMC, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting (unless otherwise specified), confirmation, and distribution pursuant to the Plan, as follows:

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 1 – Priority Non-Tax Claims against SVCMC | Unimpaired | No (deemed to accept) |
| Class 2-1 – Other Secured Claims against SVCMC | Unimpaired | No (deemed to accept) |

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 2-2 – Aptium Secured Claim | Impaired | Yes |
| Class 2-3 – Commerce Secured Claim | Unimpaired | No (deemed to accept) |
| Class 2-4 – RCG Secured Claim | Unimpaired | No (deemed to accept) |
| Class 2-5(a) – Sun Life Westchester Secured Claim | Unimpaired | No (deemed to accept) |
| Class 2-5(b) – Sun Life Manhattan Secured Claim | Unimpaired | No (deemed to accept) |
| Class 3 – General Unsecured Claims against SVCMC | Impaired | Yes |
| Class 4 – MedMal-BQ Claims | Impaired | Yes |
| Class 5 – MedMal-MW Claims | Impaired | Yes |
| Class 6 – MedMal-SI Claims | Impaired | Yes |
| Class 7 – PBGC Claim | Unimpaired | No (deemed to accept) |
| Class 8 – Intercompany Claims | Impaired | Yes |
| Class 9 – DASNY Subordinated Claims | Unimpaired | No (deemed to accept) |

3.2    Classification under Other Debtors' Plans.  Claims against and Interests in
the Other Debtors, other than Administrative Expense Claims and Priority Tax Claims,
are classified for all purposes, including voting (unless otherwise specified),
confirmation, and distribution pursuant to the Plan, as follows:

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class A1 – Priority Non-Tax Claims against MS-SVH | Unimpaired | No (deemed to accept) |
| Class A2 – Other Secured Claims against MS-SVH | Unimpaired | No (deemed to accept) |
| Class A3 – General Unsecured Claims against MS-SVH | Impaired | Yes |

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class A4 – Equity Interest in MS-SVH | Impaired | Yes |
| Class B1 – Priority Non-Tax Claims against SSSV | Unimpaired | No (deemed to accept) |
| Class B2 – Other Secured Claims against SSSV | Unimpaired | No (deemed to accept) |
| Class B3 – General Unsecured Claims against SSSV | Impaired | Yes |
| Class B4 – Equity Interest in SSSV | Impaired | Yes |
| Class C1 – Priority Non-Tax Claims against CMC-CS | Unimpaired | No (deemed to accept) |
| Class C2 – Other Secured Claims against CMC-CS | Unimpaired | No (deemed to accept) |
| Class C3 – General Unsecured Claims against CMC-CS | Impaired | Yes |
| Class C4 – Equity Interest in CMC-CS | Impaired | Yes |
| Class D1 – Priority Non-Tax Claims against CMC-PS | Unimpaired | No (deemed to accept) |
| Class D2 – Other Secured Claims against CMC-PS | Unimpaired | No (deemed to accept) |
| Class D3 – General Unsecured Claims against CMC-PS | Impaired | Yes |
| Class D4 – Equity Interest in CMC-PS | Impaired | Yes |
| Class E1 – Priority Non-Tax Claims against CMC-RS | Unimpaired | No (deemed to accept) |
| Class E2 – Other Secured Claims against CMC-RS | Unimpaired | No (deemed to accept) |
| Class E3 – General Unsecured Claims against CMC-RS | Impaired | Yes |
| Class E4 – Equity Interest in CMC-RS | Impaired | Yes |

## Article IV.

## <u>TREATMENT OF CLAIMS AND EQUITY INTERESTS</u>

4.1     <u>Class 1 - Priority Non-Tax Claims against SVCMC.</u>

(a)     <u>Impairment and Voting</u>. Class 1 consists of Priority Non-Tax
Claims against SVCMC. Class 1 is unimpaired by the Plan. Each holder of an Allowed
Priority Non-Tax Claim against SVCMC conclusively is presumed to have accepted the
Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions</u>. In full and complete satisfaction, settlement and
release of and in exchange for the Priority Non-Tax Claims against SVCMC, each holder
of an Allowed Priority Non-Tax Claim against SVCMC shall receive, except to the extent
that such holder of an Allowed Priority Non-Tax Claim has been paid by SVCMC prior
to the Effective Date and except to the extent such holder agrees to less favorable
treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later
of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed
Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.2     <u>Class 2-1 - Other Secured Claims against SVCMC.</u>

(a)     <u>Impairment and Voting</u>. Class 2-1 consists of the Other Secured
Claims against SVCMC. Each Allowed Other Secured Claim in Class 2-1 shall be
considered to be a separate subclass within Class 2-1, and each such subclass shall be
deemed to be a separate class for purposes of the Plan. To the extent an Other Secured
Claim is undersecured, the undersecured portion of such Claim shall be classified as a
General Unsecured Claim. Class 2-1 is unimpaired by the Plan. Each holder of an
Allowed Other Secured Claim conclusively is presumed to have accepted the Plan and is
not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions</u>. On the Effective Date, except to the extent that the
holder of an Other Secured Claim agrees to less favorable treatment, each Other Secured
Claim against SVCMC shall be reinstated or rendered unimpaired in accordance with
section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or
applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to
demand or receive payment of such Claim prior to its stated maturity from and after the
occurrence of a default. All Other Secured Claims against SVCMC that are not due and
payable on or before the Effective Date shall, at SVCMC's option, be paid (i) in the
ordinary course of business in accordance with the course of practice between SVCMC
and such holder with respect to such Claim, or (ii) by transfer of the Collateral securing
such Claim to the holder of such Claim, each in full and complete satisfaction, settlement
and release of and in exchange for such Claim.

4.3     Class 2-2 – Aptium Secured Claim.

(a)     Impairment and Voting.  Class 2-2 consists of the Aptium Secured Claim.  Class 2-2 is impaired by the Plan.  The holder of the Aptium Secured Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, the holder of the Aptium Secured Claim shall be treated in accordance with a settlement agreement filed with the Bankruptcy Court on May 11, 2007 (Docket No. 3104) which, among other things, provides for the payment of the Aptium Secured Claim by the first Effective Date Anniversary.  In the event that the agreement is not approved by the Bankruptcy Court prior to the Confirmation Date, it will be deemed approved upon entry of the Confirmation Order.  An estimate of the amount of this claim is set forth in Exhibit 2.  By agreement with the Creditors' Committee, and notwithstanding anything to the contrary contained in the settlement agreement with Aptium or any order entered approving the settlement agreement with Aptium, SVCMC will not fund or pay more than 50% of the Aptium Secured Claim on the Effective Date.

4.4     Class 2-3 – Commerce Secured Claim.

(a)     Impairment and Voting.  Class 2-3 consists of the Commerce Secured Claim.  Class 2-3 is unimpaired by the Plan.  The holder of the Commerce Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, SVCMC shall reinstate the Commerce Secured Claim.

4.5     Class 2-4 – RCG Secured Claim.

(a)     Impairment and Voting.  Class 2-4 consists of the RCG Secured Claim.  Class 2-4 is unimpaired by the Plan.  The holder of the RCG Secured Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date, at SVCMC's sole and absolute discretion, either (i) SVCMC shall reinstate the RCG Secured Claim, or (ii) the holder of the RCG Secured Claim shall receive Cash equal to the Allowed amount of the RCG Secured Claim in full and complete satisfaction, settlement and release of and in exchange for the RCG Secured Claim.

4.6     Class 2-5 – Sun Life Secured Claims.

(a)     Impairment and Voting.  Class 2-5 consists of two separate subclasses: Subclass 2-5(a), comprised of the Sun Life Westchester Secured Claim and Subclass 2-5(b), comprised of the Sun Life Manhattan Secured Claim.  Subclasses 2-5(a) and 2-5(b) are unimpaired by the Plan.  The holder of the Sun Life Secured Claims

conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or
reject the Plan.

(b)    Distributions.  On the Effective Date, in full and complete
satisfaction, settlement and release of and in exchange for the Sun Life Secured Claims,
Reorganized SVCMC and Sun Life will enter into a refinancing agreement for each of
the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim, on
substantially the terms set forth in the term sheets attached collectively as Exhibit
"4.6(b)."  Reorganized SVCMC shall not, without the consent of the MedMal Trust
Monitor, increase the principal amount owed to Sun Life secured by the collateral for the
Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim.

4.7    Class 3 – General Unsecured Claims against SVCMC.

(a)    Impairment and Voting.  Class 3 consists of General Unsecured
Claims against SVCMC.  Class 3 is impaired by the Plan.  Each holder of an Allowed
General Unsecured Claim against SVCMC is entitled to vote to accept or reject the Plan.

(b)    Distributions.  In full and complete satisfaction, settlement and
release of and in exchange for the Allowed General Unsecured Claims against SVCMC,
each holder of an Allowed General Unsecured Claim against SVCMC, except to the
extent such holder agrees to less favorable treatment, shall receive the following
distributions on the Effective Date or as soon thereafter as is reasonably practicable:

(i)    a Pro Rata share of the Effective Date Cash Distribution
after SVCMC has deducted and reserved a portion of the Effective Date
Cash Distribution sufficient to provide the same Pro Rata recovery being
received by holders of Allowed General Unsecured Claims against
SVCMC to holders of Disputed General Unsecured Claims against
SVCMC based on the GUC Estimate, provided, however, that in the event
a Disputed General Unsecured Claim against SVCMC is Allowed in an
amount greater than the GUC Estimate, distributions on such Allowed
Claim will be made based on the Allowed amount, not the estimated
amount, and Reorganized SVCMC shall fund the additional Cash
necessary to make such distributions;

(ii)    a Pro Rata share of the Secured Obligation;

(iii)    a Pro Rata share of the Unsecured Obligation; and

(iv)    a Pro Rata share of the GUC Litigation Trust Interest;
provided, however, that the GUC Litigation Trust Interest shall be
satisfied solely out of Litigation Trust Assets, and holders of Allowed
General Unsecured Claims against SVCMC shall not have recourse to
Reorganized SVCMC for unpaid portions of the GUC Litigation Trust
Interest, except as specifically set forth in the Plan.

4.8    Class 4 – <u>MedMal-BQ Claims</u>.

(a)    <u>Impairment and Voting</u>. Class 4 consists of MedMal-BQ Claims. Class 4 is impaired by the Plan. Each holder of an Allowed MedMal-BQ Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>. Each holder of an Allowed MedMal-BQ Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for its Allowed MedMal-BQ Claim, except to the extent such holder agrees to less favorable treatment, (i) (A) if such MedMal-BQ Claim is Allowed on the Effective Date, as soon as practicable after the Effective Date, or (B) if such MedMal-BQ Claim is not Allowed on the Effective Date, as soon as practicable after the date such MedMal-BQ Claim becomes Allowed, Cash up to the amount of its Allowed MedMal-BQ Claim to the extent there remains Distributable Cash in the MedMal-BQ Trust on such date, such Cash to be distributed to all Allowed MedMal-BQ Claims in proportion to the unpaid portion of each Allowed MedMal-BQ Claim (including accrued MedMal Interest, if any), and (ii) within 30 days after each date that the MedMal-BQ Trust receives a payment from Reorganized SVCMC, the Litigation Trust or the MedMal-BQ Trust Policy, to the extent that there is Distributable Cash in the MedMal-BQ Trust, Cash equal to such holder's proportionate share of the available Distributable Cash based on the amount of the unpaid portion of its Allowed MedMal-BQ Claim (including accrued MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-BQ Claims (including accrued MedMal Interest, if any) existing on that date, until it receives the full Allowed amount of its Claim (including accrued MedMal Interest, if any); <u>provided</u>, <u>however</u>, that in no event shall the holder of a MedMal-BQ Claim be entitled to recover on such Claim from any assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the MedMal-BQ Trust (which, for the avoidance of doubt, shall not preclude any holder of an Allowed MedMal-BQ Claim from recovering proceeds from any of SVCMC's third party insurance policies otherwise available for MedMal-BQ Claims)[1]. Holders of MedMal-BQ Claims that did not timely file proofs of claim (other than those whose MedMal-BQ Claims are deemed to be Allowed MedMal-BQ Claims pursuant to a Final Order) shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. Holders of MedMal-BQ Claims shall not have recourse against Reorganized SVCMC on account of their MedMal-BQ Claims.

4.9    Class 5 – <u>MedMal-MW Claims</u>.

(a)    <u>Impairment and Voting</u>. Class 5 consists of MedMal-MW Claims. Class 5 is impaired by the Plan. Each holder of an Allowed MedMal- MW Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>. Each holder of an Allowed MedMal-MW Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange

---

[1] SVCMC notes that it has no third party insurance for MedMal-BQ Claims

for its Allowed MedMal-MW Claim, except to the extent such holder agrees to less
favorable treatment, (i) (A) if such MedMal-MW Claim is Allowed on the Effective
Date, as soon as practicable after the Effective Date, or (B) if such MedMal-MW Claim
is not Allowed on the Effective Date, as soon as practicable after the date such MedMal-
MW Claim Allowed, Cash up to the amount of its Allowed MedMal-MW Claim to the
extent there remains Distributable Cash in the MedMal-MW Trust on such date, such
Cash to be distributed to all Allowed MedMal-MW Claims in proportion to the unpaid
portion of each Allowed MedMal-MW Claim (including accrued MedMal Interest, if
any), and (ii) within 30 days after each date that the MedMal-MW Trust receives a
payment from Reorganized SVCMC, the Litigation Trust or the MedMal-MW Trust
Policy, to the extent that there is Distributable Cash in the MedMal-MW Trust, Cash
equal to such holder's proportionate share of the available Distributable Cash based on
the amount of the unpaid portion of its Allowed MedMal-MW Claim (including accrued
MedMal Interest, if any) relative to the unpaid portions of all other Allowed MedMal-
MW Claims (including accrued MedMal Interest, if any) existing on that date, until it
receives the full Allowed amount of its Claim (including accrued MedMal Interest, if
any); provided, however, that in no event shall the holder of a MedMal-MW Claim be
entitled to recover on such Claim from any assets of the Debtors or the Post-Effective
Date Debtors other than from the assets of the MedMal-MW Trust (which, for the
avoidance of doubt, shall not preclude any holder of an Allowed MedMal-MW Claim
from recovering proceeds from any of SVCMC's third party insurance policies otherwise
available for MedMal-MW Claims).  Holders of MedMal-MW Claims that did not timely
file proofs of claim (other than those whose MedMal-MW Claims are deemed to be
Allowed MedMal-MW Claims pursuant to a Final Order) shall not be entitled to any
recovery under the Plan or from any of the Debtors' insurers.  Holders of MedMal-MW
Claims shall not have recourse against Reorganized SVCMC on account of their
MedMal-MW Claims.

    4.10   Class 6 – MedMal-SI Claims.

     (a)   Impairment and Voting.  Class 6 consists of MedMal-SI Claims.
Class 6 is impaired by the Plan.  Each holder of an Allowed MedMal-SI Claim is entitled
to vote to accept or reject the Plan.

     (b)   Distributions.  Each holder of an Allowed MedMal-SI Claim shall
receive, in full and complete satisfaction, settlement and release of and in exchange for its
Allowed MedMal-SI Claim, except to the extent such holder agrees to less favorable
treatment, (i) (A) if such MedMal-SI Claim is Allowed on the Effective Date, as soon as
practicable after the Effective Date, or (B) if such MedMal-SI Claim is not Allowed on
the Effective Date, as soon as practicable after the date such MedMal-SI Claim becomes
Allowed, Cash up to the amount of its Allowed MedMal-SI Claim to the extent there
remains Distributable Cash in the MedMal-SI Trust on such date, such Cash being
distributed to all Allowed MedMal-SI Claims in proportion to the unpaid portion of each
Allowed MedMal-SI Claim (including accrued MedMal Interest, if any), and (ii) within
30 days after each date that the MedMal-SI Trust receives a payment from Reorganized
SVCMC, the Litigation Trust or the MedMal-SI Trust Policy, to the extent that there is

Distributable Cash in the MedMal-SI Trust, Cash equal to such holder's proportionate
share of the available Distributable Cash based on the amount of the unpaid portion of its
Allowed MedMal-SI Claim (including accrued MedMal Interest, if any) relative to the
unpaid portions of all other Allowed MedMal-SI Claims (including accrued MedMal
Interest, if any) existing on that date, until it receives the full Allowed amount of its
Claim (including accrued MedMal Interest, if any); provided, however, that in no event
shall the holder of a MedMal-SI Claim be entitled to recover on such Claim from any
assets of the Debtors or the Post-Effective Date Debtors other than from the assets of the
MedMal-SI Trust (which, for the avoidance of doubt, shall not preclude any holder of an
Allowed MedMal-SI Claim from recovering proceeds from any of SVCMC's third party
insurance policies otherwise available for MedMal-SI Claims).  Holders of MedMal-SI
Claims that did not timely file proofs of claim (other than those whose MedMal-SI
Claims are deemed to be Allowed MedMal-SI Claims pursuant to a Final Order) shall not
be entitled to any recovery under the Plan or from any of the Debtors' insurers.  Holders
of MedMal-SI Claims shall not have recourse against Reorganized SVCMC on account
of their MedMal-SI Claims.

     4.11   Class 7 – PBGC Claim.

     (a)   Impairment and Voting.  Class 7 consists of the PBGC Claim.
Class 7 is unimpaired by the Plan.  The PBGC, on account of its Allowed PBGC Claim,
is not entitled to vote to accept or reject the Plan.

     (b)   Distributions.  In full and complete satisfaction, settlement and
release of and in exchange for the PBGC's Allowed PBGC Claim, SVCMC shall make
the payments to the Pension Plan set forth herein.

     4.12   Class 8 – Intercompany Claims.

     (a)   Impairment and Voting.  Class 8 consists of Intercompany Claims.
Class 8 is impaired by the Plan.  Each holder of an Allowed Intercompany Claim is
entitled to vote to accept or reject the Plan.

     (b)   Distributions.  After (i) all General Unsecured Claims against
SVCMC and MedMal Claims have been either Allowed, disallowed, or withdrawn and
(ii) all holders of Allowed General Unsecured Claims against SVCMC, Allowed MedMal
Claims and the Allowed PBGC Claim have received (unless they have agreed otherwise,
provided, however, that the treatments provided pursuant to this Plan shall not be
considered such agreement) a cash recovery of 100% of the Allowed amount of their
Claims in Cash plus interest (including all accrued MedMal Interest), each holder of an
Intercompany Claim shall be entitled to receive payment from Reorganized SVCMC
pursuant to terms to be mutually agreed upon between Reorganized SVCMC and that
holder of an Intercompany Claim, in full and complete satisfaction, settlement and release
of and in exchange for such Intercompany Claim.

4.13    Class 9 – DASNY Subordinated Claims.

(a)    Impairment and Voting. Class 9 consists of the DASNY
Subordinated Claims. Class 9 is unimpaired by the Plan. Each holder of an Allowed
DASNY Subordinated Claim is conclusively presumed to have accepted the Plan, and is
not entitled to vote to accept or reject the Plan.

(b)    Distributions. Unless SVCMC and DASNY shall reach an
alternative agreement with respect to the treatment of the DASNY Subordinated Claims
that shall be separately approved by the Bankruptcy Court, which alternative agreement
shall be subject to the reasonable satisfaction of the Tort Claimants' Committee, after (i)
all General Unsecured Claims and MedMal Claims have been either Allowed,
disallowed, or withdrawn and (ii) all holders of Allowed General Unsecured Claims,
Allowed Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim
have received 100% of the distributions to which they are entitled under the Plan in Cash,
each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro Rata
share of $2,865,721.47. The payment of such amount shall not be considered a payment
required to be made under the Plan as contemplated in the definition of Available Cash
and shall not reduce the amount of the Effective Date Cash Distribution. After (i) all
General Unsecured Claims and MedMal Claims have been either Allowed, disallowed, or
withdrawn and (ii) the holders of all Allowed General Unsecured Claim, Allowed
Intercompany Claims, Allowed MedMal Claims and the Allowed PBGC Claim have
been paid in full (i.e., received 100% of the Allowed amount of their Claims plus interest)
in Cash, each holder of a DASNY Subordinated Claim shall be entitled to receive its Pro
Rata share of $3.9 million. If, at any time, it becomes evident that the holders of all
Allowed General Unsecured Claims, Allowed Intercompany Claims, Allowed MedMal
Claims and the Allowed PBGC Claim shall not be paid in full (i.e., shall not receive
100% of the Allowed amount of their Claims plus interest), then the right of each holder
of a DASNY Subordinated Claim to receive its Pro Rata share of $3.9 million as set forth
in the immediately preceding sentence shall cease, and DASNY's claim for such amount
automatically shall be disallowed and expunged and any security therefore shall be
avoided and released without further action of the Bankruptcy Court or any other court.

4.14    Class A1 - Priority Non-Tax Claims against MS-SVH.

(a)    Impairment and Voting. Class A1 consists of Priority Non-Tax
Claims against MS-SVH. Class A1 is unimpaired by the Plan. Each holder of an
Allowed Priority Non-Tax Claim against MS-SVH conclusively is presumed to have
accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Priority Non-Tax Claims against MS-SVH, each holder
of an Allowed Priority Non-Tax Claim against MS-SVH shall receive, except to the
extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the
Debtors prior to the Effective Date and except to the extent such holder agrees to less
favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim

on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an
Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

    4.15    Class A2 - Other Secured Claims against MS-SVH.

        (a)    Impairment and Voting. Class A2 consists of the Other Secured
Claims against MS-SVH. Class A2 is unimpaired by the Plan. Each holder of an
Allowed Other Secured Claim against MS-SVH conclusively is presumed to have
accepted the Plan and is not entitled to vote to accept or reject the Plan.

        (b)    Distributions. On the Effective Date, except to the extent that the
holder of an Other Secured Claim against MS-SVH agrees to less favorable treatment,
each holder of an Other Secured Claim against MS-SVH shall receive, at MS-SVH's
option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or
(ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement
and release of and in exchange for such Claim.

    4.16    Class A3 – General Unsecured Claims against MS-SVH.

        (a)    Impairment and Voting. Class A3 consists of General Unsecured
Claims against MS-SVH. Class A3 is impaired by the Plan. Each holder of an Allowed
General Unsecured Claim against MS-SVH is entitled to vote to accept or reject the Plan.

        (b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Allowed General Unsecured Claims against MS-SVH,
each holder of an Allowed General Unsecured Claim against MS-SVH shall receive,
except to the extent such holder agrees to less favorable treatment, on the later of the
Effective Date and the date such Claim becomes an Allowed General Unsecured Claim,
or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of MS-
SVH (net of the distributions to which Priority Non-Tax Claims against MS-SVH and
Other Secured Claims against MS-SVH are entitled under the Plan, and the costs of
administering the Plan of MS-SVH); provided, however, that no holder of an Allowed
General Unsecured Claim against MS-SVH shall receive a distribution greater than the
Allowed amount of its General Unsecured Claim against MS-SVH.

    4.17    Class A4 – Equity Interest in MS-SVH.

        (a)    Impairment and Voting. Class A4 consists of the Equity Interest in
MS-SVH. Class A4 is impaired by the Plan. The holder of the Allowed Equity Interest
in MS-SVH is entitled to vote to accept or reject the Plan.

        (b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Equity Interest in MS-SVH, the holder of the Allowed
Equity Interest in MS-SVH shall receive the remaining assets of MS-SVH (net of the
costs of administering the Plan of MS-SVH), as soon as reasonably practicable after all
assets of MS-SVH have been liquidated and all Claims against MS-SVH have been paid
in full. On account of the contractual obligation of the holder of the Equity Interest in

MS-SVH to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in MS-SVH under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution.

4.18    Class B1 - Priority Non-Tax Claims against SSSV.

(a)    Impairment and Voting. Class B1 consists of Priority Non-Tax Claims against SSSV. Class B1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against SSSV conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against SSSV, each holder of an Allowed Priority Non-Tax Claim against SSSV shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.19    Class B2 - Other Secured Claims against SSSV.

(a)    Impairment and Voting. Class B2 consists of the Other Secured Claims against SSSV. Class B2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against SSSV conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the holder of an Other Secured Claim against SSSV agrees to less favorable treatment, each holder of an Other Secured Claim against SSSV shall receive, at SSSV's option, (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.20    Class B3 – General Unsecured Claims against SSSV.

(a)    Impairment and Voting. Class B3 consists of General Unsecured Claims against SSSV. Class B3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim against SSSV is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Allowed General Unsecured Claims against SSSV, each holder of an Allowed General Unsecured Claim against SSSV shall receive, except to the extent such holder agrees to less favorable treatment, on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, or as soon

thereafter as is reasonably practicable, its Pro Rata portion of the assets of SSSV (net of the distribution to which Priority Non-Tax Claims against SSSV and Other Secured Claims against SSSV are entitled under the Plan, and the costs of administering the Plan of SSSV); provided, however, that no holder of an Allowed General Unsecured Claim against SSSV shall receive a distribution greater than the Allowed amount of its General Unsecured Claim against SSSV.

4.21    Class B4 – Equity Interest in SSSV.

(a)    Impairment and Voting. Class B4 consists of the Equity Interest in SSSV. Class B4 is impaired by the Plan. The holder of the Allowed Equity Interest in SSSV is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in SSSV, the holder of the Allowed Equity Interest in SSSV shall receive the remaining assets of SSSV (net of the costs of administering the Plan of SSSV), as soon as reasonably practicable after all assets of SSSV have been liquidated and all Claims against SSSV have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in SSSV to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in SSSV under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution.

4.22    Class C1 - Priority Non-Tax Claims against CMC-CS.

(a)    Impairment and Voting. Class C1 consists of Priority Non-Tax Claims against CMC-CS. Class C1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against CMC-CS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-CS, each holder of an Allowed Priority Non-Tax Claim against CMC-CS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.23    Class C2 - Other Secured Claims against CMC-CS.

(a)    Impairment and Voting. Class C2 consists of the Other Secured Claims against CMC-CS. Class C2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against CMC-CS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  On the Effective Date, except to the extent that the
holder of an Other Secured Claim against CMC-CS agrees to less favorable treatment,
each Other Secured Claim against CMC-CS shall receive, at CMC-CS's option, (i) Cash,
on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral
securing such Claim, each in full and complete satisfaction, settlement and release of and
in exchange for such Claim.

4.24   Class C3 – General Unsecured Claims against CMC-CS.

(a)   Impairment and Voting.  Class C3 consists of General Unsecured
Claims against CMC-CS.  Class C3 is impaired by the Plan.  Each holder of an Allowed
General Unsecured Claim against SVCMC is entitled to vote to accept or reject the Plan.

(b)   Distributions.  In full and complete satisfaction, settlement and
release of and in exchange for the Allowed General Unsecured Claims against CMC-CS,
each holder of an Allowed General Unsecured Claim against CMC-CS shall receive,
except to the extent such holder agrees to less favorable treatment, on the later of the
Effective Date and the date such Claim becomes an Allowed General Unsecured Claim,
or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of
CMC-CS (net of the distribution to which Priority Non-Tax Claims against CMC-CS and
Other Secured Claims against CMC-CS are entitled under the Plan, and the costs of
administering the Plan of CMC-CS); provided, however, that no holder of an Allowed
General Unsecured Claim against CMC-CS shall receive a distribution greater than the
Allowed amount of its General Unsecured Claim against CMC-CS.

4.25   Class C4 – Equity Interest in CMC-CS.

(a)   Impairment and Voting.  Class C4 consists of the Equity Interest in
CMC-CS.  Class C4 is impaired by the Plan.  The holder of the Allowed Equity Interest
in CMC-CS is entitled to vote to accept or reject the Plan.

(b)   Distributions.  In full and complete satisfaction, settlement and
release of and in exchange for the Equity Interest in CMC-CS, the holder of the Allowed
Equity Interest in CMC-CS shall receive the remaining assets of CMC-CS (net of the
costs of administering the Plan of CMC-CS), as soon as reasonably practicable after all
assets of CMC-CS have been liquidated and all Claims against CMC-CS have been paid
in full.  On account of the contractual obligation of the holder of the Equity Interest in
CMC-CS to remit such payment to SVCMC, Reorganized SVCMC shall retain any
payments that would otherwise be payable to the holder of the Equity Interest in CMC-
CS under the Plan and to the extent such payments are remitted to SVCMC on the
Effective Date such payments will be included in Available Cash for the purposes of
determining the Effective Date Cash Distribution.

4.26   Class D1 - Priority Non-Tax Claims against CMC-PS.

(a)    Impairment and Voting. Class D1 consists of Priority Non-Tax
Claims against CMC-PS. Class D1 is unimpaired by the Plan. Each holder of an
Allowed Priority Non-Tax Claim against CMC-PS conclusively is presumed to have
accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Priority Non-Tax Claims against CMC-PS, each holder
of an Allowed Priority Non-Tax Claim against CMC-PS shall receive, except to the
extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the
Debtors prior to the Effective Date and except to the extent such holder agrees to less
favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim
on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an
Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.27    Class D2 - Other Secured Claims against CMC-PS.

(a)    Impairment and Voting. Class D2 consists of the Other Secured
Claims against CMC-PS. Class D2 is unimpaired by the Plan. Each holder of an
Allowed Other Secured Claim against CMC-PS conclusively is presumed to have
accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the
holder of an Other Secured Claim against CMC-PS agrees to less favorable treatment,
each Other Secured Claim against CMC-PS shall receive, at CMC-PS's option, (i) Cash,
on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral
securing such Claim, each in full and complete satisfaction, settlement and release of and
in exchange for such Claim.

4.28    Class D3 – General Unsecured Claims against CMC-PS.

(a)    Impairment and Voting. Class D3 consists of General Unsecured
Claims against CMC-PS. Class D3 is impaired by the Plan. Each holder of an Allowed
General Unsecured Claim against CMC-PS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Allowed General Unsecured Claims against CMC-PS,
each holder of an Allowed General Unsecured Claim against CMC-PS shall receive,
except to the extent such holder agrees to less favorable treatment, on the later of the
Effective Date and the date such Claim becomes an Allowed General Unsecured Claim,
or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets of
CMC-PS (net of the distribution to which Priority Non-Tax Claims against CMC-PS and
Other Secured Claims against CMC-PS are entitled under the Plan, and the costs of
administering the Plan of CMC-PS); provided, however, that no holder of an Allowed
General Unsecured Claim against CMC-PS shall receive a distribution greater than the
Allowed amount of its General Unsecured Claim against CMC-PS.

4.29    Class D4 – Equity Interest in CMC-PS.

(a)    Impairment and Voting. Class D4 consists of the Equity Interest in CMC-PS. Class D4 is impaired by the Plan. Each holder of the Allowed Equity Interest in CMC-PS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Equity Interest in CMC-PS, the holder of the Allowed Equity Interest in CMC-PS shall receive the remaining assets of CMC-PS (net of the costs of administering the Plan of CMC-PS) as soon as reasonably practicable after all assets of CMC-PS have been liquidated and all Claims against CMC-PS have been paid in full. On account of the contractual obligation of the holder of the Equity Interest in CMC-PS to remit such payment to SVCMC, Reorganized SVCMC shall retain any payments that would otherwise be payable to the holder of the Equity Interest in CMC-PS under the Plan and to the extent such payments are remitted to SVCMC on the Effective Date such payments will be included in Available Cash for the purposes of determining the Effective Date Cash Distribution.

4.30    Class E1 - Priority Non-Tax Claims against CMC-RS.

(a)    Impairment and Voting. Class E1 consists of Priority Non-Tax Claims against CMC-RS. Class E1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim against CMC-RS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims against CMC-RS, each holder of an Allowed Priority Non-Tax Claim against CMC-RS shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.31    Class E2 - Other Secured Claims against CMC-RS.

(a)    Impairment and Voting. Class E2 consists of the Other Secured Claims against CMC-RS. Class E2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against CMC-RS conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, except to the extent that the holder of an Other Secured Claim against CMC-RS agrees to less favorable treatment, each Other Secured Claim against CMC-RS shall at CMC-RS's option, receive (i) Cash, on the Effective Date, equal to the Allowed amount of such Claim, or (ii) the Collateral securing such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

4.32    Class E3 – General Unsecured Claims against CMC-RS.

(a)    Impairment and Voting. Class E3 consists of General Unsecured
Claims against CMC-RS. Class E3 is impaired by the Plan. Each holder of an Allowed
General Unsecured Claim against CMC-RS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Allowed General Unsecured Claims against CMC-RS,
each holder of an Allowed General Unsecured Claim against CMC-RS shall receive,
except to the extent such holder agrees to less favorable treatment, on the later of the
Effective Date and the date that such Claim becomes an Allowed General Unsecured
Claim, or as soon thereafter as is reasonably practicable, its Pro Rata portion of the assets
of CMC-RS (net of the distribution to which Priority Non-Tax Claims against CMC-RS
and Other Secured Claims against CMC-RS are entitled under the Plan, and the costs of
administering the Plan of CMC-RS); provided, however, that no holder of an Allowed
General Unsecured Claim against CMC-RS shall receive a distribution greater than the
Allowed amount of its General Unsecured Claim against CMC-RS.

4.33    Class E4 – Equity Interest in CMC-RS.

(a)    Impairment and Voting. Class E4 consists of the Equity Interest in
CMC-RS. Class E4 is impaired by the Plan. The holder of the Allowed Equity Interest
in CMC-RS is entitled to vote to accept or reject the Plan.

(b)    Distributions. In full and complete satisfaction, settlement and
release of and in exchange for the Equity Interest in CMC-RS, the holder of the Allowed
Equity Interest in CMC-RS shall receive the remaining assets of CMC-RS (net of the
costs of administering the Plan of CMC-RS) as soon as reasonably practicable after all
assets of CMC-RS have been liquidated and all Claims against CMC-RS have been paid
in full. On account of the contractual obligation of the holder of the Equity Interest in
CMC-RS to remit such payment to SVCMC, Reorganized SVCMC shall retain any
payments that would otherwise be payable to the holder of the Equity Interest in CMC-
RS under the Plan and to the extent such payments are remitted to SVCMC on the
Effective Date such payments will be included in Available Cash for the purposes of
determining the Effective Date Cash Distribution.

**Article V.**

**PROVISIONS REGARDING VOTING AND
DISTRIBUTIONS UNDER THE PLAN**

5.1    Voting of Claims. Each holder of an Allowed Claim in an impaired Class
of Claims that is entitled to vote on the Plan pursuant to Article IV of the Plan, or the
holder of a Claim that has been temporarily Allowed for voting purposes only under
Bankruptcy Rule 3018(a), shall be entitled to vote separately to accept or reject the Plan.

5.2    <u>Nonconsensual Confirmation</u>.  If any impaired Class of Claims or Equity
Interests entitled to vote shall not accept the Plan by the requisite statutory majorities
provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtors shall request
that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the
Bankruptcy Code.

5.3    <u>Method of Distributions Under the Plan</u>.

(a)    <u>Distributions Generally—SVCMC</u>.

(i)    Reorganized SVCMC shall make all distributions required
by the Plan other than those to be made by the MedMal Trustees or the
Litigation Trustee.

(ii)    Reorganized SVCMC shall make the $1 million
contribution and the Litigation Trust Loan described in the Plan to the
Litigation Trust on the Effective Date.  The Litigation Trustee shall make
distributions in accordance with the Litigation Distribution Schedule.

(iii)    Reorganized SVCMC shall make the distributions
described in the Plan to the respective MedMal Trusts on and after the
Effective Date.  The respective MedMal Trustees, when and as directed by
Reorganized SVCMC, shall make all distributions to holders of Allowed
MedMal Claims in accordance with the Plan and the respective MedMal
Trust Agreements.

(b)    <u>Distribution Generally—Other Debtors</u>.

(i)    On the Effective Date, Reorganized SVCMC shall place all
Cash of each of the Other Debtors into a Plan Administration Account.
Reorganized SVCMC shall deposit the proceeds of any assets of an Other
Debtor liquidated after the Effective Date into the applicable Plan
Administration Account.  Reorganized SVCMC shall pay all costs of
administering the Other Debtors' Plans and make all distributions required
to be made by the Other Debtors out of their respective Plan
Administration Accounts.

(ii)    Reorganized SVCMC shall make periodic payments Pro
Rata to holders of General Unsecured Claims against each of the Other
Debtors out of their respective Plan Administration Accounts; <u>provided,
however</u>, from the funds deposited in the Plan Administration Account
pursuant to Section 5.3(b)(i) above, Reorganized SVCMC shall reserve, in
each Plan Administration Account, sufficient Cash (and/or appropriate
assets) as reasonably necessary for each Other Debtor to (A) meet the
reasonable necessary administrative expenses of the Other Debtor after the
Effective Date, including contingent liabilities, (B) pay reasonable
administrative expenses of the Other Debtor's estate that have not been

paid (including the Other Debtor's professional fees and expenses) or have
not been Allowed as of the Effective Date but which are subsequently
Allowed, (C) pay holders of Disputed General Unsecured Claims against
the Other Debtor the amount such holders would be entitled to receive
under the Plan if all such Claims were to become Allowed Claims, (D)
satisfy other liabilities incurred by the Other Debtor permitted in
accordance with the Plan, and (E) otherwise perform the functions and
take the actions provided for or permitted herein.

(iii)    If (A) all holders of Allowed General Unsecured Claims
against an Other Debtor have not received payment in full on account of
their Claims after the resolution of all Disputed Claims against the Other
Debtor, (B) the Other Debtor's Plan Administration Account does not hold
sufficient Cash or other assets to pay all holders of General Unsecured
Claims against the Other Debtor the full Allowed amount of their Claims,
and (C) all assets of the Other Debtor have been liquidated, then (Y)
Reorganized SVCMC shall make a final Pro Rata distribution of all
remaining Cash in the Other Debtor's Plan Administration Account (other
than the amount of Cash necessary to wind up the Other Debtor) to
holders of Allowed General Unsecured Claims against the Other Debtor
and (Z) the holders of Equity Interests in the Other Debtor shall not
receive a distribution on account of their Equity Interests.

(iv)    As soon as reasonably practical after (A) the payment in
full of all Allowed Claims against an Other Debtor, (B) the resolution of
all Disputed Claims against the Other Debtor, and (C) the liquidation of all
the assets of the Other Debtor, Reorganized SVCMC shall be deemed to
have made a final Pro Rata distribution of all remaining Cash in the Other
Debtor's Plan Administration Account (other than the amount of Cash
necessary to complete all requirements for and wind up the Other Debtor)
to the holder of the Equity Interest in the Other Debtor;  provided,
however, that the final Pro Rata distribution shall in fact be retained by,
transferred to, and/or otherwise deemed transferred to, Reorganized
SVCMC in accordance with Section 4.17(b), 4.21(b), 4.25(b), 4.29(b) or
4.33(b) of the Plan, as applicable.

(v)    Reorganized SVCMC shall close each Other Debtor's Plan
Administration Account after there remains no Cash in such Plan
Administration Account, all the assets of the Other Debtor have been
liquidated, and all payments required to be made under the Other Debtor's
Plan have been made.

(c)    Distributions of Cash.  Any payment of Cash made by
Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee pursuant to the Plan
may be made at the option of such party either by check drawn on a domestic bank or by
wire transfer from a domestic bank.

(d) .   <u>Distributions Free and Clear</u>. Except as otherwise provided herein, any distributions or transfers by or on behalf of any Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

(e)   <u>Timing of Distributions</u>. Unless otherwise provided herein, any distribution to be made by Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be made to the extent and at the time provided in Article IV of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(f)   <u>Delivery of Distributions</u>. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents. The holder must notify Reorganized SVCMC in writing of a change of address pursuant to the notice requirements set forth in Section 12.18 of the Plan or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. None of Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee shall be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein.

(g)   <u>Distributions to Holders as of Record Date</u>. As of the close of business on the Record Date, the claims register, for each Debtor, shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim. Neither Reorganized SVCMC, the Other Debtors, the Litigation Trustee nor the MedMal Trustees shall have any obligation to recognize any transfer of any Claim occurring after the Record Date, <u>provided, however</u>, that Reorganized SVCMC, the Other Debtors, the Litigation Trustee and the MedMal Trustees will recognize transfers of Claims made after the entry of an order approving the Disclosure Statement but before the Confirmation Date for distribution purposes. Except as set forth in the prior sentence, Reorganized SVCMC, the Other Debtors, the Litigation Trustee, and the MedMal Trustees shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

(h)   <u>Undeliverable and Unclaimed Distributions</u>. If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall, subject to the final sentence of this paragraph,

be made as soon as is practicable to such holder, without interest. Checks issued by
Reorganized SVCMC, the Litigation Trustee, or a MedMal Trustee in respect of Allowed
Claims shall be null and void if not negotiated within one hundred and twenty (120) days
after the date of issuance thereof. Requests for re-issuance of any check shall be made in
accordance with the notice provisions of Section 12.18 of the Plan to Reorganized
SVCMC, the Litigation Trustee, or a MedMal Trustee, as appropriate, by the holder of
the Allowed Claim to whom such check originally was issued. All claims for
undeliverable distributions or voided checks shall be made on or before one hundred and
twenty (120) days after the date such undeliverable distribution was initially made. After
such dates, all such distributions shall be deemed unclaimed property under
section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of
Reorganized SVCMC (provided, however, that prior to the first Effective Date
Anniversary, any such undeliverable or unclaimed distribution shall be deposited by
Reorganized SVCMC into the Post-Effective Date Available Cash Reconciliation
Account), the Litigation Trust or the appropriate MedMal Trust, as the case may be. The
holder of any Claim for which any undeliverable distribution has been deemed unclaimed
property under section 347(b) of the Bankruptcy Code shall not be entitled to any other or
further distribution under the Plan on account of such Claim.

       (i)    Setoffs. To the extent permitted under applicable law,
Reorganized SVCMC may set off against or recoup from any Allowed Claim and the
distributions to be made pursuant to the Plan on account of such Allowed Claim (before
any distribution is made on account of such Allowed Claim), the claims, rights and
causes of action of any nature that the Debtors have asserted in writing against the holder
of such Allowed Claim, including, without limitation, any rights under section 502(d) of
the Bankruptcy Code and in the absence of a written objection by such holder of an
Allowed Claim within thirty (30) days of the delivery of such a writing from the Debtors,
it will be conclusively presumed that the requirements for disallowance of a Claim under
section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have
been satisfied. If the holder of such Allowed Claim does timely respond to the written
assertion by the Debtors that setoff or recoupment against such holder of an Allowed
Claim is appropriate, the party asserting such right to setoff or recoupment must seek an
order of the Bankruptcy Court allowing for such setoff or recoupment; provided,
however, that neither the failure to effect such a setoff nor the allowance of any Claim
hereunder shall constitute a waiver or release by the Debtors of any such claims, rights
and causes of action that the Debtors may possess against such holder.

       (j)    Application of Distributions. Distributions to any holder of an
Allowed Claim shall be applied first to the satisfaction of the principal portion (as
determined for federal income tax purposes) of any such Allowed Claim and thereafter to
the remaining portion of such Allowed Claim, if any.

       (k)    Withholding and Reporting Requirements. In connection with the
Plan and all instruments issued in connection therewith and distributed thereon, the
Debtors, the Other Debtors, the Litigation Trustee, the MedMal Trustees, or any other
paying agent, as applicable, shall comply with all applicable withholding and reporting

requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions. Any party issuing any instrument or making an in-kind (non-Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**Article VI.**

**MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLANS**

6.1     Reorganized SVCMC.

(a)     Reorganized Articles of Incorporation and Reorganized By-laws. Reorganized SVCMC shall adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which shall be included in the Plan Supplement. The Reorganized Articles of Incorporation and Reorganized By-laws of Reorganized SVCMC shall preserve the power of the holders of the Membership Interests to appoint and remove members of Reorganized SVCMC's Board of Directors and approve substantial asset sales and substantial capital projects. Prior to the closing of SVCMC's Chapter 11 case, any amendments to Reorganized SVCMC's Articles of Incorporation and Reorganized By-laws shall be filed with the Bankruptcy Court.

(b)     Boards of Directors and Officers. The initial Board of Directors and officers of Reorganized SVCMC shall be disclosed in the Plan Supplement and shall be in effect as of the Effective Date.

(c)     SVCMC Membership Interests. The prepetition Membership Interests in SVCMC shall remain unchanged.

(d)     Restructuring Transactions. On or after the Effective Date, and in SVCMC's discretion, certain transactions that will be listed in a schedule to the Plan Supplement shall be effectuated, provided, however, that these transactions shall in no way disadvantage the MedMal Trusts, payments to the Pension Plan or distributions or payments to holders of Allowed General Unsecured Claims pursuant to the Plan. These transactions may include the creation of non-profit or for-profit entities.

(e)     Change of Control. Until the Secured Obligation and the Unsecured Obligation have been paid in full, Reorganized SVCMC shall promptly provide notice to the Trade Claims Monitor and the MedMal Trust Monitor of any Change of Control.

(f)     _Liability of Affiliates_.  Any entity created by Reorganized SVCMC on or after the Effective Date as described in Section 6.1(d) above (other than any entity created for the purpose of a sale or financing of the Martin Payne building located at 130 West 12th Street in New York New York) into which assets of SVCMC immediately prior to the Effective Date are transferred or contributed, but not affiliates of Reorganized SVCMC existing prior to the Effective Date, shall be co-liable with Reorganized SVCMC on all of Reorganized SVCMC's obligations under the Plan.

    6.2     _Other Debtors_.

        (a)     _Reorganized SVCMC as Plan Administrator_.  Reorganized SVCMC shall be the administrator for the Plans of each of the Other Debtors.  In such capacity, the powers of Reorganized SVCMC shall include any and all powers necessary to implement the Plan with respect to the Other Debtors and to administer and liquidate the assets and wind up the business and affairs of the Other Debtors, including, but not limited to resolving claims, liquidating assets, abandoning assets, pursuing causes of action, retaining professionals, maintaining books and records, entering into agreements, investing cash, administering and paying taxes, and paying any and all reasonable fees and expenses of the Other Debtors.

        (b)     _Liquidation of Assets of SSSV and MS-SVH_.  SSSV and/or MS-SVH may, on or around the Effective Date, sell any of their assets and/or assume and assign their contracts to a new entity created by SVCMC to carry on a similar or expanded function to SSSV or MS-SVH.

        (c)     _Expenses of Liquidation_.  Reorganized SVCMC shall pay the expenses of liquidation of each Other Debtor out of such Other Debtor's Plan Administration Account; _provided_, _however_, that Reorganized SVCMC shall be entitled to reimbursement from each Other Debtor for all fees and expenses incurred and paid by Reorganized SVCMC on or after the Effective Date in connection with administering the Plan for such Other Debtor.

        (d)     _Termination_.  Each Other Debtor will terminate after the conclusion of the liquidation, administration, and distribution of its assets in accordance with the Plan and its material completion of all duties and functions set forth in the Plan, but in no event later than three (3) years after the Effective Date, unless extended by Court order upon the request of Reorganized SVCMC.  Upon such termination, the Equity Interests in the Other Debtor shall be extinguished and the legal existence of the Other Debtors shall terminate without further action of the Bankruptcy Court or any other Court, administrative body or other agency.  Reorganized SVCMC may cause to be filed with the State of New York and any other governmental authority such certificate of dissolution or cancellation and other certificates and documents as may be or become necessary to reflect the termination of the legal existence of each Other Debtor.  No further or other court order or regulatory approval shall be necessary to effectuate the termination of the legal existence of each Other Debtor.

6.3    <u>Secured Obligation</u>.  The terms of the Secured Obligation, if any, shall be
as follows:

(a)    The Secured Obligation and accrued and unpaid interest thereon
shall be paid in full on or before the earlier of (i) the fifth (5th) Effective Date
Anniversary and (ii) a Change of Control.

(b)    Interest shall accrue on the Secured Obligation at the rate
calculated from time to time using the interest rate formula for the term loan portion of
the Exit Facility, compounding annually; <u>provided, however,</u> that with respect to any
default by Reorganized SVCMC under the Secured Obligation that is not cured by
Reorganized SVCMC upon receipt by Reorganized SVCMC of 90 days' written notice of
such default from the Trade Claims Monitor, interest shall accrue on such defaulted
payment obligation for such time as such default continues at the above-referenced rate
plus 2.00%.  Interest shall be paid in full on or before the fifth (5th) Effective Date
Anniversary.

(c)    The Secured Obligation shall be secured by the Secured Obligation
Liens.  On and after the Effective Date, the Secured Obligation Liens shall be valid, fully
perfected first priority liens on, and security interests in, the Secured Obligation
Collateral, without the necessity of the execution, delivery and/or filing of any security
agreement, pledge agreement, financing statement or other document; <u>provided, however,</u>
that the Secured Obligation Liens shall not attach to any proceeds of the foregoing
collateral, to the extent such proceeds, if any, are realized by the Debtors prior to the
Effective Date.  The Plan is and shall be binding upon and govern the acts of all entities,
including, without limitation, all filing agents, filing officers, title agents, title companies,
recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents,
trademarks or other intellectual property, administrative agencies, governmental
departments, secretaries of state, federal, state, and local officials, and all other persons
and entities who may be required by operation of law, the duties of their office, or
contract, to accept, file, register or otherwise record or release any documents or
instruments, or who may be required to report or insure any title or state of title in or to
any and all of the collateral subject to the Secured Obligation Liens.  Each and every
federal, state, and local governmental agency or department is hereby directed to accept
any and all documents and instruments Reorganized SVCMC deems necessary and
appropriate to file, including without limitation a copy of the Confirmation Order, so as
to provide notice of the Secured Obligation Liens to third parties.

(d)    Reorganized SVCMC shall reasonably cooperate with the Trade
Claims Monitor to provide such reasonable documentation, make such reasonable public
filings, in the real estate records and otherwise, and do such other acts as reasonably
requested by the Trade Claims Monitor to (i) evidence the security interest of each holder
of the Secured Obligation in the Secured Obligation Collateral, (ii) perfect the Secured
Obligation Liens of the holders of the Secured Obligation, and (iii) delineate the events of
default, remedies of the holders of the Secured Obligation and the opportunities for
Reorganized SVCMC to cure with respect to the Secured Obligation Liens and the

obligations they secure. Without limiting the generality of the foregoing, Reorganized
SVCMC and the Trade Claims Monitor shall cooperate in causing the execution and
delivery of such loan, security and intercreditor agreements as the Trade Claims Monitor
shall reasonably request to accomplish the objective specified in the immediately
preceding sentence.

(e)    There shall be no mandatory prepayments on the Secured
Obligation and accrued and unpaid interest thereon other than immediately (i) upon the
sale or collection of proceeds from the Secured Obligation Collateral, provided, however,
that in the event Caritas elects to effectuate an offset against its payment obligations
under the Brooklyn/Queens Seller Notes in accordance with paragraph 25 of the Caritas
Settlement Agreement, the amount so offset shall be considered proceeds of the
Brooklyn/Queens Seller Notes received by Reorganized SVCMC, (ii) in accordance with
the Liquidity Event Distribution Schedule, or (iii) upon disbursement of the proceeds of
the Post-Effective Date Cash Reconciliation Account. Mandatory prepayments on the
Secured Obligation will be distributed as and when proceeds are received, provided,
however, that with respect to the collection of accounts receivable relating to the
Divested Facilities, such mandatory prepayments on the Secured Obligation will be made
on December 31, 2007 and provided further, however, that after December 31, 2007 all
mandatory prepayments relating to the collection of accounts receivable related to the
Divested Facilities shall be made on the last business day of each calendar quarter
thereafter. Notwithstanding the foregoing, Reorganized SVCMC shall not be required to
distribute any mandatory prepayments on the Secured Obligation pursuant to this Section
6.3(e) unless the aggregate amount to be distributed on the basis of any of the foregoing
is equal to or greater than $500,000. In addition, (i) the Litigation Trust shall make
payments on the Secured Obligation in accordance with the Litigation Distribution
Schedule, and (ii) Reorganized SVCMC shall make the payments on the Secured
Obligation otherwise provided for in this Section 6.3.

(f)    There shall be no penalty for prepayment of the Secured
Obligation.

(g)    Any payments on the Secured Obligation shall be applied first to
principal and then to interest due thereunder; provided, however, that amounts disbursed
from the Post-Effective Date Cash Reconciliation Account shall be applied solely to
outstanding principal under the Secured Obligation, and not to interest.

(h)    In the event that, as of the first Effective Date Anniversary, the
Secured Obligation has not been paid in full by Reorganized SVCMC, the aggregate
amount, if any, contained at such time in the Post-Effective Date Available Cash
Reconciliation Account shall be distributed by Reorganized SVCMC as if such amounts
had been Available Cash on the Effective Date.

(i)    With respect to any alleged default under the Secured Obligation
that is not cured by Reorganized SVCMC within 90 days following receipt by
Reorganized SVCMC of written notice of any such alleged default from the Trade

Claims Monitor, provided that if, as of the expiration of such 90-day notice period, all Allowed MedMal Claims have been paid in full as provided in the Plan and no Disputed MedMal Claims remain outstanding, the Trade Claims Monitor may elect to accelerate the balance due under the Secured Obligation on behalf of all holders of Allowed General Unsecured Claims against SVCMC and may commence litigation in the Bankruptcy Court to seek to recover any and all amounts then due from Reorganized SVCMC under the Secured Obligation. In the event that the Chapter 11 Cases are closed as of such time that the Trade Claims Monitor seeks to initiate any such litigation, the Trade Claims Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such lawsuit before the Bankruptcy Court, and Reorganized SVCMC and the MedMal Trust Monitor shall not be, and are hereby deemed to have agreed that they shall not be, entitled to object to any such motion.

(j)      Upon payment in full by Reorganized SVCMC of all Allowed MedMal Claims, provided that no Disputed MedMal Claims remain outstanding, 50% of the two subsequent payments to be made by Reorganized SVCMC to the MedMal Trusts pursuant to the MedMal Trust Funding Schedule will instead be payable by Reorganized SVCMC against the then-outstanding amount, if any, of the Secured Obligation; provided, however, that if the Secured Obligation is then paid in full, the remaining balance of such payments shall be applied against the then-outstanding amount, if any, of the Unsecured Obligation.

(k)      The Brooklyn/Queens Seller Notes may not be modified by Reorganized SVCMC subsequent to the Effective Date without the prior consent of the Trade Claims Monitor; provided, however, that in the event the Trade Claims Monitor refuses or otherwise fails to consent to any such proposed modification, Reorganized SVCMC shall have the right to request that the Bankruptcy Court approve any such modification, notwithstanding the refusal or failure of the Trade Claims Monitor to consent.

(l)      Notwithstanding anything to the contrary herein, if the Secured Obligation includes a Deferred Effective Date Payment, the following provisions shall apply:

(i)      Reorganized SVCMC shall pay the Deferred Effective Date Payment on or before December 15, 2007. Such payment shall be solely from (a) the net proceeds collected by Reorganized SVCMC from the sale of Bayley Seton and as necessary at such time (b) Reorganized SVCMC's operating cash flow.

(ii)      If the Deferred Effective Date Payment is paid by Reorganized SVCMC from the net proceeds collected by Reorganized SVCMC from the sale of Bayley Seton, the provisions of Section 6.3(e) regarding mandatory prepayments of the Secured Obligation relating to Bayley Seton proceeds only shall apply only to the net proceeds of Bayley

Seton, if any, remaining after payment of the Deferred Effective Date
Payment.

        (iii)    If the Deferred Effective Date Payment is paid by
Reorganized SVCMC out of operating cash flow, then, upon any
subsequent sale of Bayley Seton, Reorganized SVCMC shall be entitled to
retain from the proceeds thereof the amount paid on account of the
Deferred Effective Date Payment, and the provisions of Section 6.3(e)
regarding mandatory prepayments of the Secured Obligation shall apply
only to the net proceeds of Bayley Seton, if any, remaining after such
amount is retained by Reorganized SVCMC.

        (iv)    The Deferred Effective Date Payment shall accrue interest
as with the Secured Obligation generally. If the Deferred Effective Date
Payment is not paid on or before December 15, 2007, Reorganized
SVCMC shall have fourteen (14) days after December 15, 2007 to make
such payment. If the Deferred Effective Date Payment has not been paid
on or before January 14, 2008, then (a) on January 15, 2008, the interest
rate on the Deferred Effective Date Payment shall increase by 1.00% and
(b) every 60 (sixty) days thereafter, the interest rate on the Deferred
Effective Date Payment shall increase by an additional 1.00%, until the
Deferred Effective Date Payment and interest accrued thereon is paid in
full.

     6.4    <u>Unsecured Obligation</u>. The terms of the Unsecured Obligation, if any,
shall be as follows:

        (a)    The Unsecured Obligation and accrued and unpaid interest thereon
shall be paid in full on or before the earlier of (i) the seventh (7th) Effective Date
Anniversary and (ii) a Change of Control.

        (b)    Interest shall accrue on the Unsecured Obligation at the rate of 8%
annually, non-compounding; <u>provided</u>, <u>however</u>, that with respect to any default by
Reorganized SVCMC under the Unsecured Obligation that is not cured by Reorganized
SVCMC upon receipt by Reorganized SVCMC of 90 days' written notice of such default
from the Trade Claims Monitor, interest shall accrue on such defaulted obligation for
such time as such default continues at the above-referenced rate plus 2.00%. Interest
shall be paid in full on or before the seventh (7th) Effective Date Anniversary.

        (c)    There shall be no mandatory prepayments on the Unsecured
Obligation and accrued and unpaid interest thereon other than in accordance with the
Liquidity Event Distribution Schedule or as otherwise set forth herein. Other than the
mandatory prepayments and prior to the time that at least one of the conditions described
in the second sentence of Section 6.6(q) of the Plan shall be satisfied, Reorganized
SVCMC shall not, without the written consent of the MedMal Trust Monitor which shall
not be unreasonably withheld or delayed, make any payments on account of the

Unsecured Obligation before the seventh (7th) Effective Date Anniversary. Mandatory prepayments on the Unsecured Obligation will be distributed on a quarterly basis, commencing December 31, 2007; provided, however, Reorganized SVCMC shall not be required to distribute any mandatory prepayments on the Unsecured Obligation pursuant to this Section 6.4(c) unless the aggregate amount to be distributed on the basis of any of the foregoing is equal to or greater than $500,000, and if the available amount to be distributed at any point in time when a mandatory prepayment would otherwise be required is less than $500,000, Reorganized SVCMC will distribute such amounts as and when the aggregate value thereof is equal to at least $500,000. In addition, (i) the Litigation Trust shall make payments on the Unsecured Obligation in accordance with the Litigation Distribution Schedule, and (ii) Reorganized SVCMC shall make the payments on the Unsecured Obligation otherwise provided for in this Section 6.4.

(d)    There shall be no penalty for prepayment of the Unsecured Obligation.

(e)    Any payments on the Unsecured Obligation shall be applied first to principal and then to interest due thereunder.

(f)    In the event that, as of the first Effective Date Anniversary, the Unsecured Obligation has not been paid in full by Reorganized SVCMC, the aggregate amount, if any, contained at such time in the Post-Effective Date Available Cash Reconciliation Account shall be distributed by Reorganized SVCMC as if such amounts had been Available Cash on the Effective Date. For the avoidance of doubt, the distribution of the Post-Effective Date Available Cash Reconciliation Account may result in a mandatory pre-payment of the Unsecured Obligation if the distribution results in the complete reduction of the outstanding principal amount of the Secured Obligation.

(g)    With respect to any alleged default under the Unsecured Obligation that is not cured by Reorganized SVCMC within 90 days following receipt by Reorganized SVCMC of written notice of any such alleged default from the Trade Claims Monitor, provided that if, as of the expiration of such 90-day notice period, all Allowed MedMal Claims have been paid in full as provided in the Plan and no Disputed MedMal Claims remain outstanding, the Trade Claims Monitor may elect to accelerate the balance due under the Unsecured Obligation on behalf of all holders of Allowed General Unsecured Claims against SVCMC and may commence litigation to recover any and all amounts then due from Reorganized SVCMC under the Unsecured Obligation. In the event that the Chapter 11 Cases are closed as of such time that the Trade Claims Monitor seeks to initiate any such litigation, the Trade Claims Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such lawsuit before the Bankruptcy Court, and Reorganized SVCMC and the MedMal Trust Monitor shall not be, and are hereby deemed to have agreed that they shall not be, entitled to object to any such motion.

6.5    <u>Litigation Trust</u>.

(a)    <u>General</u>.  On or before the Effective Date, the Litigation Trust
Agreement, in a form reasonably acceptable to SVCMC, the Creditors' Committee and
the Ad Hoc Committee, shall be executed, and all other necessary steps shall be taken to
establish the Litigation Trust and the beneficial interests therein, which shall be for the
benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether
Allowed on or after the Effective Date, and such other beneficiaries as described in the
Litigation Distribution Schedule.  In the event of any conflict between the terms of the
Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust
Agreement shall govern.  Such Litigation Trust Agreement may provide powers, duties,
and authorities in addition to those explicitly stated herein, but only to the extent that
such powers, duties, and authorities do not affect the status of the Litigation Trust as a
liquidating trust for United States federal income tax purposes, or otherwise have
material adverse effect on the recovery of holders of Allowed General Unsecured Claims
and MedMal Claims against SVCMC.

(b)    <u>Purpose of Litigation Trust</u>.  The Litigation Trust shall be
established for the sole purpose of liquidating and distributing its assets, in accordance
with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage
in the conduct of a trade or business.

(c)    <u>Fees and Expenses of Litigation Trust</u>.  Other than the $1 million
grant on the Effective Date, all fees, expenses, and costs of the Litigation Trust (including
interest on the Litigation Trust Loan) shall be paid by the Litigation Trust, and
Reorganized SVCMC shall not be responsible for any fees, expenses and costs of the
Litigation Trust.

(d)    <u>Litigation Trust Loan</u>.

(i)    On the Effective Date, SVCMC shall make the Litigation
Trust Loan to the Litigation Trust.

(ii)    The Litigation Trust Loan shall be evidenced by a note
payable by the Litigation Trust to Reorganized SVCMC and such other
appropriate documentation to evidence the Litigation Trust Loan, the
forms of which shall be included in the Plan Supplement and reasonably
acceptable in form and substance to SVCMC, the Creditors' Committee,
and the Ad Hoc Committee.  In the event of any inconsistency between the
terms of the Plan and the terms of such documentation, the terms of such
documentation shall control.

(iii)    The Litigation Trust Loan shall accrue simple interest at the
rate of 8% annually.  The Litigation Trust Loan and accrued interest on
that loan shall be paid in accordance with the Litigation Distribution
Schedule.

57

(e)    <u>Litigation Trust Initial Assets</u>. As of the Effective Date, SVCMC
and the Creditors' Committee shall assign and transfer to the Litigation Trust all of their
rights, title and interest in and to the Litigation Trust Initial Assets for the benefit of the
holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or
after the Effective Date, and such other beneficiaries as described in the Litigation
Distribution Schedule. Such transfer shall be exempt from any stamp, real estate transfer,
mortgage reporting, sales, use or other similar tax, and shall be free and clear of any liens,
claims and encumbrances, and no other entity, including the Debtors or Reorganized
SVCMC (other than Reorganized SVCMC with respect to the Litigation Trust Loan),
shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the
Litigation Trust Assets upon their assignment and transfer to the Litigation Trust (other
than as provided herein or in the Litigation Trust Agreement); <u>provided</u>, <u>however</u>, that
such assets shall be transferred to the Litigation Trust subject only to the obligation of the
Litigation Trust to make distributions under the Litigation Distribution Schedule pursuant
to Section 6.5(o) hereof.

(f)    <u>Governance of Litigation Trust</u>. The Litigation Trust shall be
governed by the Litigation Trust Agreement and administered by the Litigation Trustee.

(g)    <u>Appointment of the Litigation Trustee</u>. Prior to the Effective Date,
the Creditors' Committee and the Ad Hoc Committee shall jointly select the Litigation
Trustee; <u>provided</u>, <u>however</u>, if the Creditors' Committee and the Ad Hoc Committee
cannot agree on the Litigation Trustee, the Litigation Trustee will be proposed by the
U.S. Trustee and confirmed by the Bankruptcy Court at the Confirmation Hearing. The
identity of and contact information for the Litigation Trustee (or proposed Litigation
Trustee, if applicable) shall be set forth in the Plan Supplement. In the event the
Litigation Trustee dies, is terminated, or resigns for any reason, the Trust Governing
Board shall designate a successor.

(h)    <u>The Trust Governing Board</u>.

(i)    The Litigation Trustee shall take direction from a "Trust
Governing Board" that shall initially consist of three (3) directors jointly
selected by the Creditors' Committee and the Ad Hoc Committee;
<u>provided</u>, <u>however</u>, that if the Creditors' Committee and the Ad Hoc
Committee cannot agree on three (3) directors, then these directors will be
nominated by the United States Trustee and confirmed by the Bankruptcy
Court at the Confirmation Hearing; <u>provided</u> <u>further</u>, <u>however</u>, the
Litigation Trustee cannot settle any Litigation Claims unless the
Bankruptcy Court enters an order approving such settlement pursuant to
Rule 9019 of the Bankruptcy Rules. The identity of the individuals
serving (or if applicable to be nominated to serve) on the Trust Governing
Board shall be set forth in the Plan Supplement. In the event one of the
Trust Governing Board directors dies, is terminated, or resigns for any
reason, the remaining Trust Governing Board directors shall designate a
successor.

           (ii)     Any fees and expenses of individuals serving on the Trust Governing Board shall be Litigation Claims Costs.

           (iii)    In all circumstances, the Trust Governing Board shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

           (i)     Role of the Litigation Trustee.  In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee shall (i) hold the Litigation Trust Assets for the benefit of the holders of Allowed General Unsecured Claims against SVCMC and such other beneficiaries as described in the Litigation Distribution Schedule, (ii) make distributions of Litigation Claim Proceeds pursuant to the Litigation Distribution Schedule as provided herein, (iii) have the power and authority to prosecute and resolve any Litigation Claims, and (iv) litigate objections to Litigation Parties' professional fees, including any appeals with respect thereto.  To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Claims prior to the Effective Date by the Debtors and/or the Creditors' Committee, the Litigation Trustee shall be substituted for the Debtors and/or the Creditors' Committee in connection therewith.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets.  In all circumstances, the Litigation Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.  In addition, the Litigation Trustee shall provide to the MedMal Trust Monitor such information and other data about the Litigation Trust as the MedMal Trust Monitor shall reasonably request.

           (j)     GUC Litigation Trust Interests.  The GUC Litigation Trust Interests shall not be certificated and are not transferable.

           (k)     Cash.  The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

           (l)     Retention of Professionals by the Litigation Trustee.  The Litigation Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate, without Bankruptcy Court approval, subject to the prior approval of the Trust Governing Board.

           (m)    Compensation of the Litigation Trustee.  The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation (which compensation shall be negotiated by the Litigation Trustee), to the extent not set forth in the Plan, shall be set forth in the Litigation Trust Agreement.  The

Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(n)    Cooperation of Reorganized SVCMC.    Reorganized SVCMC, upon reasonable notice, shall be required to provide information, to the extent Reorganized SVCMC has such information, to the Litigation Trustee sufficient to enable the Litigation Trustee to perform its duties hereunder.    Reorganized SVCMC shall cooperate with the Litigation Trustee in the administration of the Litigation Trust, including, without limitation, in providing documentation, witness testimony, and other evidence in support of the prosecution of the Litigation Claims, at no cost or expense of the Litigation Trust other than out of pocket expenses for copying or similar expenses.

(o)    Distribution of Litigation Trust Assets.

(i)    As soon as reasonably practicable in the reasonable discretion of the Litigation Trustee, the Litigation Trustee shall distribute all Cash on hand (including any Cash received from SVCMC on the Effective Date or any Cash received as a result of a Litigation Trust Contribution Event having occurred, and treating as Cash for purposes of this Section any permitted investments under Section 6.5(k) hereof), except such amounts (A) as would be distributable to a holder of a Disputed General Unsecured Claim against SVCMC (as of the time of such distribution) if such Disputed Claim had been Allowed in the full amount asserted by the holder of such Claim prior to the time of such distribution (but only until such Claim is resolved), which amounts shall be held in the LT Disputed Claims Reserve, (B) as are reasonably necessary, in the sole discretion of the Litigation Trustee, to meet contingent liabilities and to maintain the value of the Litigation Trust during liquidation, (C) to pay reasonable expenses in the sole discretion of the Litigation Trustee (including, but not limited to, any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets, including any taxes in respect of LT Disputed Claims Reserve), and (D) to satisfy other liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.    The Litigation Trustee shall distribute Cash in accordance with the Litigation Distribution Schedule.

(ii)    The Litigation Trustee shall remove funds from the LT Disputed Claims Reserve as the General Unsecured Claims against SVCMC are resolved, which funds shall be distributed in the manner provided for in Section 6.5(o)(i).

(p)    Federal Income Tax Treatment of Litigation Trust.

(i)    Litigation Trust Assets Treated as Owned by Creditors. For all federal income tax purposes, all parties (including, without limitation, SVCMC, Reorganized SVCMC, the Litigation Trustee, and the

holders of Allowed General Unsecured Claims against SVCMC) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) for the benefit of the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule as (A) a transfer of the Litigation Trust Assets, for all purposes of the Internal Revenue Code of 1986, as amended (including sections 61(a)(12), 483, 1001, 1012, and 1274) directly to the beneficiaries of the Litigation Trust, followed by (B) the transfer by such persons to the Litigation Trust of such Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

    (ii)    <u>Tax Reporting</u>.

        (A)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties shall treat the Litigation Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule are the grantors and beneficiaries. In the event an alternative treatment of the Litigation Trust is required for federal income tax purposes, the Litigation Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Litigation Trust, and anyone who subsequently becomes a holder, of such alternative treatment. The Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in

accordance with this Section 6.4(p). The Litigation
Trustee also shall annually send to each record
holder of a beneficial interest in the Litigation Trust
a separate statement setting forth such holder's
share of items of income, gain, loss, deduction, or
credit and shall instruct all such holders to report
such items on their federal income tax returns or to
forward the appropriate information to the
beneficial holders with instructions to report such
items on their federal income tax returns. The
Litigation Trustee shall also file (or cause to be
filed) any other statements, returns, or disclosures
relating to the Litigation Trust that are required by
any governmental unit. Subject to Section
6.5(p)(ii)(C), the Litigation Trust's taxable income,
gain, loss, deduction or credit shall be allocated by
reference to the manner in which an amount of Cash
equal to such taxable income would be distributed
(without regard to any restrictions on distribution
described in the Plan) if, immediately prior to the
deemed distribution, the Litigation Trust had
distributed all of its other assets (valued at their tax
book value) in accordance with the provisions of the
Plan and the Litigation Trust Agreement, up to the
tax book value of the Litigation Trust Assets treated
as contributed by the holders of Allowed General
Unsecured Claims against SVCMC, whether
Allowed on or after the Effective Date, and such
other beneficiaries as described in the Litigation
Distribution Schedule, adjusted for prior taxable
income and loss, and taking into account all prior
and concurrent distributions from the Litigation
Trust. Similarly, taxable loss of the Litigation Trust
shall be allocated by reference to the manner in
which an economic loss would be borne
immediately after a liquidating distribution of the
remaining assets.

(B)    As soon as possible after the Effective Date, the
Litigation Trustee shall make a good faith valuation
of the value of the Litigation Trust Assets. Such
valuation shall be made available from time to time,
to the extent relevant, and used consistently by all
parties for all federal income tax purposes.

(C) Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the LT Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Litigation Trust that would have been allocated to the holders of Disputed General Unsecured Claims against SVCMC had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the LT Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the LT Disputed Claims Reserve), and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). The holders of Allowed General Unsecured Claims against SVCMC, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Litigation Distribution Schedule shall report, for tax purposes, consistent with the foregoing.

(D) The Litigation Trustee shall be responsible for payments, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the LT Disputed Claims Reserve.

(E) The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including the LT Disputed Claims Reserve, under

section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust (including the LT Disputed Claims Reserve).

(q)    <u>Dissolution of Litigation Trust</u>.  The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Litigation Trustee determines that the pursuit of additional Litigation Claims is not likely to yield sufficient additional Litigation Claims Proceeds to justify further pursuit of such claims and (ii) all distributions of Litigation Claims Proceeds required to be made by the Litigation Trustee under the Plan have been made, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period prior to such fifth (5th) anniversary (and, in the event for further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets.  Upon dissolution of the Litigation Trust, any remaining Litigation Trust Proceeds shall be distributed to all holders of beneficial interests in the Litigation Trust in accordance with their relative beneficial interests and in accordance with the Litigation Trust Agreement (which shall include the Litigation Distribution Schedule).

6.6    <u>MedMal Trusts</u>.

(a)    <u>General</u>.  On or before the Effective Date, the MedMal Trust Agreements, in a form reasonably acceptable to SVCMC and the Tort Claimants' Committee, shall be executed, and all other necessary steps shall be taken to establish the MedMal Trusts.  This Section 6.6 sets forth certain of the rights, duties, and obligations of the MedMal Trustees.  In the event of any conflict between the terms of the Plan and the terms of the MedMal Trust Agreements, the terms of the MedMal Trust Agreements shall govern.  The MedMal Trust Agreements may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of each of the MedMal Trusts as a grantor trust for United States federal income tax purposes, or otherwise have a material adverse effect on the recovery of holders of Allowed MedMal Claims.

(b)    <u>Purpose of MedMal Trusts</u>.  Each MedMal Trust shall be established for the sole purpose of holding the MedMal Trust Assets, distributing such assets to holders of the applicable Allowed MedMal Claims, and otherwise acting in accordance with the provisions of this Plan, with no objective to continue or engage in the conduct of a trade or business.

64

(c)   MedMal Trust Assets. As of the Effective Date, SVCMC shall
assign and transfer to the MedMal-MW Trust, the MedMal-SI Trust and the MedMal-BQ
Trust all of SVCMC's right, title and interest in and to the MedMal-MW Trust Initial
Assets, the MedMal-SI Trust Initial Assets, and the MedMal-BQ Trust Initial Assets,
respectively. SVCMC or such other Persons that may have possession or control of such
MedMal Trust Initial Assets shall transfer possession or control of such property to the
respective MedMal Trusts prior to or as of the Effective Date and shall execute the
documents or instruments necessary to effectuate such transfers. Reorganized SVCMC
shall make additional contributions to the MedMal Trusts (i) in accordance with each
MedMal Trust's Pro Rata Share of the amounts set forth on the MedMal Trust Funding
Schedule, (ii) to the extent necessary, to satisfy all of Reorganized SVCMC's obligations
to make Shortfall Payments and payments under the Additional Funding Schedule, (iii)
on the first Effective Date Anniversary in an amount equal to the amount that would have
been paid to each MedMal Trust, if any, as if the amounts in the Post-Effective Date
Available Cash Reconciliation Account had been included in the calculation of Available
Cash on the Effective Date, provided, however, that Reorganized SVCMC shall be
obligated to contribute such amount to the MedMal Trusts only if the aggregate amount
of the Secured Obligation has been paid in full by Reorganized SVCMC as of such date
and net of any amounts to be split as prepayments of the Unsecured Obligation, and (iv)
as otherwise required under the Plan. Except as otherwise provided herein, all transfers
by or obligations of SVCMC or Reorganized SVCMC to the MedMal Trusts shall be in
accordance with each MedMal Trust's Pro Rata Share. All transfers to the MedMal
Trusts shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use
or other similar tax as discussed in Section 12.6 below, and shall be free and clear of any
liens, claims and encumbrances, and no other entity, including the Debtors or the Post-
Effective Date Debtors shall have any interest, legal, beneficial, or otherwise, in the
MedMal Trusts or the assets of the MedMal Trusts upon their assignment and transfer to
the MedMal Trusts; provided, however, that all such assets will be transferred to the
MedMal Trusts subject only to the obligation of the MedMal Trusts to pay their
respective (i) Allowed MedMal Claims, (ii) Reimbursable Costs, subject to the obligation
of Reorganized SVCMC to make Shortfall Payments under certain circumstances as
described herein, and (iii) final distributions pursuant to Section 6.6(t)(iv) of the Plan.

(d)   Governance of MedMal Trusts. The MedMal Trusts shall be
governed by the respective MedMal Trust Agreements and administered by the
respective MedMal Trustees.

(e)   Appointment of the MedMal Trustee. Prior to the Effective Date,
SVCMC, after consultation with the Tort Claimants' Committee, shall appoint the
MedMal Trustees for each of the MedMal Trusts. The same Person may serve as the
MedMal Trustee for two or more MedMal Trusts with the consent of the Tort Claimants'
Committee. The identity of and contact information for the MedMal Trustees shall be
described in the Plan Supplement. In the event a MedMal Trustee shall resign or
otherwise cease serving in such capacity, a successor MedMal Trustee shall be appointed
as provided for in the applicable MedMal Trust Agreement.

(f) . <u>Role of the MedMal Trustees</u>.  In furtherance of and consistent
with the purpose of the MedMal Trusts and the Plan, each of the MedMal Trustees shall,
as instructed by Reorganized SVCMC, (i) hold, manage, sell, or invest, as appropriate,
the MedMal Trust Assets, (ii) hold the MedMal Trust Assets for the benefit of the holders
of the Allowed MedMal Claims, (iii) hold, manage, sell, invest and distribute (in the
manner specified in Sections 4.8, 4.9, and 4.10, as applicable) Cash or non-Cash MedMal
Trust Assets, and (iv) perform such other functions as are provided in the Plan and the
applicable MedMal Trust Agreement.

(g)    <u>The MedMal Trust Monitor</u>.

(i)    Prior to the Effective Date, the Tort Claimants' Committee,
with the reasonable consent of SVCMC, shall appoint the MedMal Trust
Monitor.  The identity of and contact information for the MedMal Trust
Monitor shall be set forth in the Plan Supplement.  If the MedMal Trust
Monitor is terminated, resigns, or is unavailable to serve for any reason,
then (i) if any members of the Tort Claimants' Committee have not been
paid the full Allowed amount of their respective Claims or have not had
their Claims disallowed by Final Order, counsel to the MedMal Trust
Monitor shall contact such members and the successor MedMal Trust
Monitor shall be selected based on the majority vote of such members,
with the reasonable consent of Reorganized SVCMC (with any tie to be
broken by counsel to the MedMal Trust Monitor, with the reasonable
consent of Reorganized SVCMC), or (ii) if all members of the Tort
Claimants' Committee have been paid the full Allowed amount of their
respective Claims and/or have had their Claims disallowed by Final Order,
counsel to the MedMal Trust Monitor and Reorganized SVCMC shall
jointly select the MedMal Trust Monitor.

(ii)    Counsel to the MedMal Trust Monitor shall initially be
counsel to the Tort Claimants' Committee.  Any replacement counsel for
the MedMal Trust Monitor must be reasonably acceptable to Reorganized
SVCMC.

(iii)    Reorganized SVCMC shall be obligated under the Plan,
and shall promptly pay the reasonable fees and expenses of the MedMal
Trust Monitor (including the fees and expenses of its legal counsel) up to
$75,000 per year until the dissolution of all MedMal Trusts.  The Excess
Monitor Fees shall be paid by the respective MedMal Trusts in accordance
with their Pro Rata Share, subject to Reorganized SVCMC's obligations to
make Shortfall Payments

(iv)    Reorganized SVCMC shall provide to the MedMal Trust
Monitor and to the Trade Claims Monitor quarterly reports with respect
to the MedMal Trusts within 30 days after the close of each quarter.
These reports will include information on MedMal Trust

Assets; distributions out of the MedMal Trusts on account of MedMal
Claims or otherwise; and a summary of which Disputed MedMal Claims,
if any, have become Allowed MedMal Claims during the quarter that is
the subject of the report.

(v)    In addition to any other rights and duties of the MedMal
Trust Monitor under the Plan, the MedMal Trust Monitor shall respond to
inquiries from holders of MedMal Claims regarding the Plan and
treatment of their claims hereunder.

(h)    <u>Nontransferability of MedMal Trust Interests</u>.  The beneficial
interests in each of the MedMal Trusts shall not be certificated and are not transferable
(except as otherwise provided in the MedMal Trust Agreements).

(i)    <u>Cash</u>.  The MedMal Trustees may invest Cash (including any
earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy
Code.

(j)    <u>MedMal Defense Costs</u>.  The MedMal Defense Costs of each
MedMal Trust up to its Pro Rata Share of $3 million per year shall be paid by the
respective MedMal Trusts, subject to Reorganized SVCMC's obligations to make
Shortfall Payments.  The MedMal Trusts shall have no obligation to pay any MedMal
Defense Costs in excess of $3 million per year in the aggregate.  Any MedMal Defense
Costs incurred by a MedMal Trust in excess of its Pro Rata Share of $3 million per year
shall be an obligation of Reorganized SVCMC under the Plan and shall be timely paid
directly by Reorganized SVCMC.

(k)    <u>Other Costs and Expenses of the MedMal Trustees</u>.  All reasonable
fees, costs, and expenses of the MedMal Trusts, including the fees, expenses, bonding
and insurance of the respective MedMal Trustees and their retained professionals, shall
be paid out of the respective MedMal Trust Assets (including the proceeds, if any, of the
MedMal Trust Policies) and shall constitute Reimbursable Costs, subject to Reorganized
SVCMC's obligations to make Shortfall Payments, other than (i) the reasonable fees and
expenses of the MedMal Trust Monitor up to an aggregate of $75,000 a year and (ii) the
MedMal Defense Costs in excess of $3 million a year, each of which shall be paid
directly by Reorganized SVCMC as set forth herein; <u>provided</u>, <u>however</u>, that for the
avoidance of doubt, payments made to holders of Allowed MedMal Claims on account of
such Claims, other than payments on account of MedMal Interest, shall not constitute
Reimbursable Costs.

(l)    <u>Retention of Professionals by the MedMal Trustees</u>.  The MedMal
Trustees may retain and reasonably compensate counsel and other professionals to assist
in their duties as MedMal Trustees on such terms as the MedMal Trustees deem
appropriate, without Bankruptcy Court approval.

   (m) <u>Compensation of the MedMal Trustees</u>.  The MedMal Trustees shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

   (n) <u>MedMal Trust Policies</u>.  Prior to the Effective Date, SVCMC and the Tort Claimants' Committee, or after the Effective Date, Reorganized SVCMC and the MedMal Trust Monitor, may cooperate reasonably and in good faith to cause the procurement of MedMal Trust Policies reasonably acceptable to SVCMC and the Tort Claimants' Committee or Reorganized SVCMC and the MedMal Trust Monitor, as applicable. At SVCMC or Reorganized SVCMC's sole discretion, in consultation with the Tort Claimants' Committee or the MedMal Trust Monitor, as applicable, SVCMC or Reorganized SVCMC will (i) acquire MedMal Trust Policies for each of the MedMal-BQ Trust, the Med-Mal-MW Trust and the MedMal-SI Trust, each with a coverage limit equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate for the MedMal-BQ Trust, the MedMal-MW Trust or the MedMal-SI Trust, as applicable, (ii) acquire a single MedMal Policy in an amount equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate, or (iii) elect not to procure a MedMal Policy, in which case Reorganized SVCMC shall make payments pursuant to the Additional Funding Schedule; <u>provided however</u> that SVCMC or Reorganized SVCMC may only elect not to procure a MedMal Policy or MedMal Policies if procurement of such policy or policies is, in SVCMC's or Reorganized SVCMC's discretion, after consultation with the Tort Claimants' Committee, impossible or financially unreasonable. The premiums on the MedMal Trust Policies, if any, shall be paid by the respective MedMal Trusts and constitute Reimbursable Costs, subject to Reorganized SVCMC's obligations to make Shortfall Payments.

   (o) <u>Application of Certain Payments in Satisfaction of Obligations under the MedMal Trust Funding Schedule</u>.  All (i) payments, if any, made to the MedMal Trusts on account of Available Cash on the Effective Date or from the Post-Effective Date Available Cash Reconciliation Account on the first Effective Date Anniversary exceeding an amount equal to 85% of the Total Trade Claims, (ii) payments made to the MedMal Trusts pursuant to the Litigation Distribution Schedule, (iii) payments made to the MedMal Trusts pursuant to the Liquidity Event Distribution Schedule, (iv) payments made to the MedMal Trusts on account of monetization of the MedMal Collateral, and (v) Shortfall Payments made to the MedMal Trusts for amounts other than Reimbursable Costs shall be applied, in inverse order of maturity, to the payments called for in the MedMal Trust Funding Schedule and shall reduce, dollar-for-dollar, Reorganized SVCMC's obligations to make the payments called for in the MedMal Trust Funding Schedule. Until the aggregate of Shortfall Payments exceeds $25 million, Shortfall Payments shall be presumed to have been for other than Reimbursable Costs. Shortfall payments in excess of $25 million shall be allocated between Reimbursable Costs and an insufficiency to pay Allowed MedMal Claims to reflect the actual cause of the shortfall. Such payments shall reduce or satisfy the payments called for by the MedMal Trust Funding Schedule in inverse order of those payments maturity dates.

(p) .    Shortfall Payments; Reimbursable Costs; MedMal Interest.

(i)    Subject to Section 6.6(q), if at any point in time, the funds
in a MedMal Trust from any source, including proceeds recoverable on
account of the MedMal Trust Policies or a MedMal Loan, shall be
insufficient to pay all unpaid Allowed MedMal Claims and all unpaid
Reimbursable Costs, Reorganized SVCMC shall, within thirty (30) days
of receiving a written notice signed by the applicable MedMal Trustee,
remit to such MedMal Trust a Shortfall Payment as necessary to cure such
deficiency unless a MedMal Trustee shall have made a MedMal Loan to
cover such deficiency; provided, however, that Reorganized SVCMC's
obligations to make Shortfall Payments shall not, in the aggregate, exceed
the sum of (A) such MedMal Trust's Pro Rata Share of $25 million plus
(B) any accrued or paid Reimbursable Costs for such MedMal Trust; and
provided further, however that Reorganized SVCMC's obligations to
make Shortfall Payments for all MedMal Trusts shall not, in the aggregate,
exceed the sum of (Z) $25 million plus (Y) the aggregate of any accrued
or paid Reimbursable Costs for all MedMal Trusts.  For the avoidance of
doubt, nothing herein shall obligate any MedMal Trust to fund or obtain a
MedMal Loan at any time.

(ii)    The obligations of the MedMal Trusts to advance the
Reimbursable Costs on behalf of Reorganized SVCMC shall be a financial
accommodation as such term is used in section 365(c)(2) of the
Bankruptcy Code.  In the event of a subsequent bankruptcy or other
insolvency event of Reorganized SVCMC, (A) the MedMal Trusts shall
have no further obligation to fund any Reimbursable Cost, and neither
Reorganized SVCMC nor any party claiming to be a beneficiary of
Reorganized SVCMC, the MedMal Trusts and/or the transactions
contemplated hereby shall have any claim for or any interest in any
Reimbursable Costs, (B) all funds in the MedMal Trusts, shall be for the
exclusive benefit of the holders of the MedMal Claims, (C) Reorganized
SVCMC shall reimburse the MedMal Trusts for all costs and expenses,
including attorneys' fees, incurred in defending against claims for the
Reimbursable Costs, and (D) Reorganized SVCMC shall indemnify and
hold harmless the MedMal Trusts against any claims for Reimbursable
Costs.  For the avoidance of doubt, in the event of a subsequent
bankruptcy or other insolvency event of Reorganized SVCMC, nothing
herein shall preclude the MedMal Trusts from interposing one or more
claims against Reorganized SVCMC for reimbursement of Reimbursable
Costs.

(iii)    To the extent and only to the extent a holder of an Allowed
MedMal Claim is not paid in full within thirty (30) days of its MedMal
Claim becoming an Allowed Claim, then such holder shall be entitled to
receive MedMal Interest on the unpaid portion of its Allowed MedMal

Claim from the date the Claim is Allowed until the full principal amount of its Allowed MedMal Mal Claim is paid. The MedMal Trustee shall give notice to any holder of an Allowed MedMal Claim that is entitled to MedMal Interest that it is being provided with MedMal Interest until its Allowed MedMal Claim is paid in full.

(q)     Milestones. Following (i) the 50% Milestone Triggering Event and (ii) the 75% Milestone Triggering Event, Reorganized SVCMC may, at its sole discretion and expense, cause an additional estimation of the Claims remaining in all the MedMal Trusts. If (A) following the 50% Milestone Triggering Event, such additional estimation determines that the 50% Milestone has occurred or (B) following the 75% Milestone Triggering Event such additional estimation determines that the 75% Milestone has occurred, Reorganized SVCMC may, in its sole discretion, either suspend payment of such MedMal Trust's Pro Rata Share of the periodic payments it is obligated to make pursuant to the MedMal Trust Funding Schedule and/or Additional Funding Schedule (as applicable) or receive a payment from such MedMal Trust equal to the amount of such excess; provided, however, that prior to Reorganized SVCMC receiving payment from any MedMal Trust on account of such excess, the funds in the MedMal Trust shall be rebalanced in a manner that provides each MedMal Trust with sufficient funds to pay 125% upon the 50% Milestone and 115% upon the 75% Milestone of all remaining MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such Claims; and provided, further, however, that, if at any time, and from time to time prior to the termination or dissolution of a MedMal Trust, after the 50% Milestone or the 75% Milestone, a MedMal Trust shall have insufficient funds to pay all unpaid Allowed MedMal Claims and unpaid Reimbursable Costs of that MedMal Trust, Reorganized SVCMC shall, prior to making any Shortfall Payment on account of that deficiency, pay to that MedMal Trust (A) if Reorganized SVCMC elected to suspend making periodic payments to that MedMal Trust pursuant to the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable), an amount equal to the lesser of (i) the amount of such deficiency and (ii) the amount equal to that MedMal Trust's Pro Rata Share of the periodic payments under the MedMal Trust Funding Schedule and Additional Funding Schedule (if applicable) that in fact were suspended (and not contributed to another MedMal Trust) less all amounts previously paid to that MedMal Trust under this proviso; or (B) if Reorganized SVCMC elected to receive a payment of excess funding of a MedMal Trust as set forth above, an amount equal to the lesser of (i) the amount of such deficiency and (ii) the amount of excess funding actually paid over to Reorganized SVCMC from that MedMal Trust (and not used to rebalance the level of funding of a different MedMal Trust) less all amounts paid to that MedMal Trust under this proviso. For the avoidance of doubt, (x) no payment required to be made under any of the circumstances described in the last proviso of the immediately preceding sentence shall be treated as a Shortfall Payment or be subject to the limitations on Shortfall Payments; (y) to the extent that any portion of such deficiency remains following the payment made under any of the circumstances described in the last proviso of the immediately preceding sentence, Reorganized SVCMC shall make a Shortfall Payment to that MedMal Trust as and to the extent otherwise required under the Plan; and (z) nothing in this Section 6.6(q) shall relieve Reorganized SVCMC from paying to each MedMal

Trust (i) its Pro Rata Share of the full amount of the MedMal Trust Funding Schedule and
Additional Funding Schedule (if applicable) to the extent necessary to pay an Allowed
MedMal Claim for the appropriate MedMal Trust and (ii) all Shortfall Payments required
hereunder, provided that in no instance shall Reorganized SVCMC be required to pay
more than the aggregate of the MedMal Trust Funding Schedule and Additional Funding
Schedule (if applicable), plus any payment required to be made by Reorganized SVCMC
from the Post-Effective Date Available Cash Reconciliation Account on account of
Allowed MedMal Claims for all MedMal Trusts on a combined basis.

    (r)    <u>MedMal Collateral/MedMal Liens</u>.

        (i)    Each of the MedMal Trusts shall be granted the MedMal
Lien to secure all obligations of Reorganized SVCMC to the MedMal
Trusts under the Plan payable on or after the Effective Date, including,
without limitation:  (A) payments under the MedMal Trust Funding
Schedules, (B) payments under the Additional Funding Schedule in the
event SVCMC or Reorganized SVCMC does not obtain the MedMal Trust
Policies, and (C) Shortfall Payments.  The MedMal Liens on the MedMal
Collateral shall be junior only to the liens securing the Sun Life Staff
House Secured Claim and the Sun Life Westchester Secured Claim, and
shall otherwise be senior to any and all liens or encumbrances of any kind
whatsoever on the MedMal Collateral.  Without limiting the generality of
the immediately preceding sentence, the MedMal liens shall be senior to
any lien granted in the MedMal Collateral to secure the Exit Facility.  The
MedMal Trust Monitor shall be entitled to enforce on behalf of each
MedMal Trust its MedMal Lien if, after the MedMal Trust Monitor has
provided Reorganized SVCMC with one hundred and twenty (120) days'
written notice of the failure of Reorganized SVCMC to make a payment
required under the Plan, Reorganized SVCMC has failed to satisfy the
obligation.

        (ii)    Reorganized SVCMC may sell or refinance the MedMal
Collateral at any time provided that Reorganized SVCMC promptly pays
to the MedMal Trusts in accordance with each MedMal Trust's Pro Rata
Share all net proceeds (after satisfaction of the Sun Life Staff House
Secured Claim and the Sun Life Westchester Secured Claim and
transaction costs) from the MedMal Collateral, minus any Shortfall
Payments that were not made on account of Reimbursable Costs funded
by Reorganized SVCMC to the MedMal Trusts.  Notwithstanding
anything to the contrary contained in the Plan, the MedMal Trust Monitor
shall instruct the MedMal Trusts whether to consent to such same or
refinancing, if and to the extent consent is required, and such shall not be
unreasonably withheld.

        (iii)    On and after the Effective Date, each MedMal Lien shall be
a valid, fully perfected lien on, and security interest in, the MedMal

Collateral without the necessity of the execution, delivery and/or filing of
any security agreement, pledge agreement, financing statement or other
document. The Plan is and shall be binding upon and govern the acts of
all entities, including, without limitation, all filing agents, filing officers,
title agents, title companies, recorders of mortgages, recorders of deeds,
registrars of deeds, registrars of patents, trademarks or other intellectual
property, administrative agencies, governmental departments, secretaries
of state, federal, state, and local officials, and all other persons and entities
who may be required by operation of law, the duties of their office, or
contract, to accept, file, register or otherwise record or release any
documents or instruments, or who may be required to report or insure any
title or state of title in or to the MedMal Collateral. Each and every
federal, state, and local governmental agency or department is hereby
directed to accept any and all documents and instruments the MedMal
Trustees deems necessary and appropriate to file, including without
limitation a copy of the Confirmation Order, so as to provide notice of the
MedMal Lien to third parties.

      (iv)    Reorganized SVCMC shall reasonably cooperate with the
MedMal Trust Monitor to provide such reasonable documentation, make
such reasonable public filings, in the real estate records and otherwise, and
do such other acts as reasonably requested by the MedMal Trust Monitor
to (i) evidence the security interest of each MedMal Trust in the MedMal
Collateral, (ii) perfect the respective MedMal Liens of the MedMal Trusts
in the MedMal Collateral, and (iii) delineate the events of default,
remedies of the respective MedMal Trusts and the opportunities for
Reorganized SVCMC and the holder of the Sun Life Staff House Secured
Claim and the Sun Life Westchester Secured Claim to cure with respect to
the MedMal Liens and the obligations they secure. Without limiting the
generality of the foregoing, Reorganized SVCMC and the MedMal Trust
Monitor shall cooperate in causing the execution and delivery of such
loan, security and intercreditor agreements as the MedMal Trust Monitor
shall reasonably request to accomplish the objective specified in the
immediately preceding sentence.

      (s)    <u>Cooperation with Reorganized SVCMC</u>. Each MedMal Trustee
shall provide Reorganized SVCMC with reasonable access to its books and records and
be available during regular business hours, upon reasonable advance notice, to answer
Reorganized SVCMC's questions relating to MedMal Claims and the finances of the
MedMal Trusts. Reorganized SVCMC shall provide the MedMal Trustees with all
information reasonably requested by the MedMal Trustees or the MedMal Trust Monitor
to enable each to carry out their respective duties hereunder and under the respective
MedMal Trust Agreements and the Plan.

(t)  .  Distribution of MedMal Trust Assets; Proceeds of MedMal Trust Policies; Final Distributions; Excess Insurance.

(i)    MedMal Trust Assets shall be distributed to holders of Allowed MedMal Claims in accordance with Sections 4.8, 4.9, and 4.10 of the Plan.  Notwithstanding anything to the contrary herein, Reorganized SVCMC or the MedMal Trust Monitor shall reasonably cooperate to ensure that if the threshold trigger for receipt of payment from Excess Insurance is met at any point for any insurance year that the medical malpractice claims of holders of Allowed MedMal Claims shall be paid from proceeds of the Excess Insurance to the extent available rather than from MedMal Trust Assets.  Further distributions to holders of Allowed MedMal Claims in accordance with Sections 4.8, 4.9 and 4.10 of the Plan are and shall be deemed to be payments by SVCMC or Reorganized SVCMC, as appropriate, against any self-insured retention, inter-aggregate buffer, or similar payment with respect to, and as required by, any third-party insurance that might be available for an Allowed MedMal Claim, including Excess Insurance, as and to the extent made.

(ii)    If the MedMal Trust Policies have been obtained and at any time after the ninth (9th) Effective Date Anniversary, any MedMal Trust does not possess sufficient Distributable Cash to pay all holders of Allowed MedMal Claims the full Allowed amount of their Claim, the MedMal Trust Monitor or Reorganized SVCMC, acting on behalf of the applicable MedMal Trustee, shall exercise all of the powers available in its reasonable discretion, to collect from the respective MedMal Trust Policies and, as soon as reasonably practicable after receipt of proceeds from the MedMal Trust Policies, the applicable MedMal Trustee shall transfer to each holder of an unpaid Allowed MedMal Claims the lesser of (A) an amount of Cash sufficient to pay its Allowed MedMal Claim and any MedMal Claim Interest accrued thereon and (B) its Pro Rata portion of Distributable Cash remaining in the MedMal Trust.

(iii)    When all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved and all Allowed MedMal Claims relating to the MedMal Trust have been paid in full, (A) Reorganized SVCMC's obligations to make additional payments to the MedMal Trust shall cease and (B) the applicable MedMal Trustee shall make a final distribution of all remaining assets in the MedMal Trust as described in Section 6.6(t)(iv) of the Plan.

(iv)    When a MedMal Trust is making a final distribution of the assets of a MedMal Trust (pursuant to Section 6.6(t)(iii) of the Plan or upon dissolution), the MedMal Trustee shall, after causing the repayment of any outstanding MedMal Loans and reserving a sufficient amount of Cash to cover the wind-down expenses of such MedMal Trust (including

any taxes due thereon), make a distribution of all assets in the MedMal Trust to the remaining MedMal Trusts, if any, in proportion to the estimated unpaid Allowed MedMal Claims of each such MedMal Trust pursuant to the last estimate thereof. In the event there are no remaining MedMal Trusts, or if Reorganized SVCMC elects to cause an additional estimation, in its sole discretion and at its sole expense, of the Claims remaining in each of the remaining MedMal Trusts, and in such estimation, it is determined that the funds in each remaining MedMal Trust exceed 125%, if such estimation occurs prior to the 75% Milestone Triggering Event, or 115%, if such estimation occurs subsequent to the 50% Milestone Triggering Event, of all then remaining MedMal Claims subject to each such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time, then any excess funds in the dissolving MedMal Trust shall be remitted to Reorganized SVCMC.

(u)    MedMal Loans. Any MedMal Trust shall have the ability, but not the obligation, to make a MedMal Loan to another MedMal Trust up to the amount due from Reorganized SVCMC to the borrower MedMal Trust under the MedMal Trust Funding Schedule on the next Effective Date Anniversary if the lending MedMal Trustee, in it sole discretion, reasonably believes that it has sufficient funds in its MedMal Trust to pay all MedMal Claims of its MedMal Trust that it estimates will be Allowed prior to the next Effective Date Anniversary plus all accrued and unpaid MedMal Interest and any other costs for which such MedMal Trust will be responsible prior to the next Effective Date Anniversary. The borrower MedMal Trust shall repay, on or prior to the next Effective Date Anniversary, any amounts borrowed under a MedMal Loan. Additional terms of any MedMal Loan shall be negotiated between the respective MedMal Trustees.

(v)    Federal Income Tax Treatment of MedMal Trusts.

(i)    MedMal Trust Assets Treated as Owned by SVCMC.

(A)    Each of the MedMal Trusts is intended to constitute a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

(B)    SVCMC or Reorganized SVCMC shall timely prepare and execute a "grantor trust election" statement for each of the MedMal Trusts pursuant to Treasury Regulation section 1.468B-1(k) to treat each such trust as a trust all of which is owned by SVCMC for applicable federal income tax purposes, and shall, to the extent permitted by applicable law, report consistently therewith for state and local tax purposes (including making any appropriate elections). Each of the MedMal Trustees in respect of the MedMal Trusts or

Reorganized SVCMC, as applicable in accordance with the foregoing Treasury Regulation, shall attach such grantor trust election statement to its timely filed income tax return for the taxable year in which the trust is established.  If the election statement is required to be attached to the trust's tax return, Reorganized SVCMC shall timely deliver to the respective MedMal Trustee the original executed election statement with respect to such trust.

(ii)     <u>Tax Reporting</u>.

(A)     Each MedMal Trustee shall timely prepare and file all federal, state, local and foreign tax returns and other tax related statements for its respective MedMal Trust treating such trust as a grantor trust in accordance with Treasury Regulation section 1.468B-1(k) and this Section 6.6(v).  Before filing any MedMal Trust tax return or statement, the MedMal Trustee shall timely provide copies of such return or statement to Reorganized SVCMC for review and approval.

(B)     The MedMal Trustees shall cooperate with Reorganized SVCMC and any affiliate (including any successor in interest) with respect to the preparation and filing of any tax returns or statements of such person for which information relating to the MedMal Trusts is necessary or appropriate.

(C)     Each MedMal Trustee shall be responsible for payment, out of its respective MedMal Trust Assets, of any taxes imposed on such assets or its respective MedMal Trust.

(D)     Each MedMal Trustee may request an expedited determination of taxes in respect of its respective MedMal Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, such trust for all taxable periods through the dissolution of such trust.

(w)     <u>Litigation</u>.  In the event of an alleged default by Reorganized SVCMC with respect to any of its obligations under the Plan related to the treatment of Allowed MedMal Claims, any and all litigation arising out of or relating to such alleged

default shall be brought by the MedMal Trust Monitor before the Bankruptcy Court. In the event that the Chapter 11 Cases are closed as of such time that the MedMal Trust Monitor seeks to initiate any such litigation, the MedMal Trust Monitor may file a motion with the Bankruptcy Court seeking to re-open the Chapter 11 Cases for the purpose of pursuing any such litigation before the Bankruptcy Court, and Reorganized SVCMC and the Litigation Trustee shall not be, and hereby agree that they shall not be, entitled to object to any such motion.

(x)     Dissolution. The respective MedMal Trustees and the MedMal Trusts shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed MedMal Claims relating to a particular MedMal Trust have been resolved, and (ii) all distributions required to be made by the MedMal Trustee under the Plan have been made, provided, however, that if the foregoing conditions have not been met by the fourteenth (14th) Effective Date Anniversary, Reorganized SVCMC or the MedMal Trust Monitor shall, within the six (6) month period prior to the fourteenth (14th) Effective Date Anniversary, file a motion with the Bankruptcy Court for authorization to extend the duration of the applicable MedMal Trust for a fixed period so as to facilitate or complete the payments to holders of Allowed MedMal Claims. In the event the foregoing motion is not timely filed or if timely filed the motion is denied, the appropriate MedMal Trust shall be dissolved. Upon dissolution, any remaining assets in a MedMal Trust shall be distributed in accordance with Section 6.6(t)(v) of the Plan.

6.7     Non-Transferability of Rights of Holders of Allowed Claims. The rights of holders of Allowed Claims to receive payments under the Plan after the Effective Date, including but not limited to on account of the Secured Obligation, the Unsecured Obligation, the GUC Litigation Trust Interest, or from the MedMal Trusts shall not be certificated and are not transferable, except by the laws of descent or distribution or otherwise by operation of law or as part of the sale of substantially all the assets of the holder thereof.

6.8     Pension Plan/PBGC.

(a)     On the Effective Date, Reorganized SVCMC shall assume the Pension Plan and the obligations of contributing plan sponsor under ERISA.

(b)     On the Effective Date, Reorganized SVCMC shall make payments totaling $60 million into the Pension Plan, provided the Effective Date is on or before July 15, 2007. Regardless of when the Effective Date occurs and the Effective Date contribution amount is paid, SVCMC will contribute no less than $75 million to the Pension Plan in calendar year 2007. The Effective Date payment will be attributable to plan year ending December 31, 2006.

(c)     Reorganized SVCMC shall make aggregate Pension Plan payments of $13.5 million in each of calendar years 2008, 2009, 2010, 2011, and 2012, provided, however, that such payments shall be subject to adjustment in the event that, with respect to any particular calendar year identified above, (i) SVCMC is legally

required under ERISA funding rules, after taking into account any credit balance SVCMC is able to utilize, to contribute to the Pension Plan an amount in excess of $13.5 million to satisfy minimum funding requirements, or (ii) SVCMC is legally required under ERISA funding rules, without taking into account any credit balance SVCMC otherwise would be able to utilize, to contribute to the Pension Plan an amount less than $13.5 million to satisfy minimum funding requirements.

(d)     In the event that, with respect to any particular payment obligation of Reorganized SVCMC subject to Section 6.8(c) above, such payment obligation is not satisfied by Reorganized SVCMC in its entirety, the PBGC shall be entitled to seek to recover from Reorganized SVCMC the difference between the requisite payment obligation and the amount contributed to the Pension Plan by Reorganized SVCMC.

(e)     The PBGC Penalties Claim shall be unimpaired, and the PBGC and SVCMC (and Reorganized SVCMC) reserve all rights with respect to assessing and objecting to the PBGC Penalties Claim and raising any and all defenses in connection therewith. The PBGC and SVCMC (or Reorganized SVCMC) may enter into an agreement, which shall not be subject to Bankruptcy Court approval if such agreement occurs after the Effective Date, with respect to the PBGC Penalties Claim. SVCMC and Reorganized SVCMC reserve all rights to pursue claims against and/or seek a recovery from any and all third parties with respect to the PBGC Penalties Claim. "PBGC Penalties Claim" refers to a contingent claim (or claims) arising under ERISA Section 4071, 29 U.S.C. § 1371, retained by PBGC, but not yet asserted, for a failure (or failures) to provide any notice or other material information under Title IV of ERISA, including notices and information obligations under Sections 4010 and 4043 of ERISA, 29 U.S.C. §§ 1310 & 1343.

(f)     Except as it relates to the PBGC Penalties Claim, the PBGC Claim shall be deemed withdrawn on the Effective Date.

(g)     The Debtors and the PBGC have entered into a separate agreement, to be included within the Plan Supplement, which agreement shall reflect the terms and conditions of the agreement between the Debtors and the PBGC, as set forth in Sections 6.8(a) – 6.8(f), above.

6.9     Intercompany Claims. All Intercompany Claims are subordinated to payment in full of General Unsecured Claims, the MedMal Claims, and the PBGC Claim.

6.10    DASNY Subordinated Claims. All DASNY Subordinated Claims are subordinated to General Unsecured Claims, the MedMal Claims, Intercompany Claims and the PBGC Claim, as provided herein.

6.11    Exit Facility. On or before the Effective Date, SVCMC or Reorganized SVCMC shall enter into the Exit Facility. The Exit Facility shall be on terms and conditions substantially similar to the commitment letter that will be filed with the Plan Supplement and approved by the Bankruptcy Court.

6.12   <u>Allocation Method</u>.  On the Effective Date, each of the Other Debtors shall pay Reorganized SVCMC $1 as reimbursement for all costs incurred by SVCMC during the Chapter 11 Cases in respect of all the Other Debtors (including professionals' fees).

6.13   <u>Restricted Assets</u>.  Notwithstanding anything to the contrary herein, the Restricted Assets are not property of the Debtors' estates, shall not be applied to satisfy any Allowed Claim or distribution under the Plan, and shall only be used in furtherance of the use to which they are restricted.

6.14   <u>Closing of the Chapter 11 Cases</u>.  When all Disputed Claims, other than MedMal Claims, against any Debtor have become Allowed or have been disallowed by Final Order, and no controverted matter remains outstanding, Reorganized SVCMC shall seek authority from the Bankruptcy Court to close the applicable Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

6.15   <u>Early Payment</u>.  Nothing herein shall prevent any of the Debtors or Post-Effective Date Debtors from making any payments prior to the date provided for in the Plan, and neither the Debtors nor the Post-Effective Date Debtors shall suffer any penalty or prejudice from making any such payments; <u>provided</u>, <u>however</u>, that prepayments of the Unsecured Obligation shall only be made as provided for in Section 6.4.

6.16   <u>Section 1123(b)(3)</u>.  To the extent, but only to the extent, required, the Litigation Trustee, the Trade Claims Monitor, the MedMal Trust Monitor, and Reorganized SVCMC are each qualified as provided for in section 1123(b)(3) of the Bankruptcy Code.

**Article VII.**

**PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS**

7.1   <u>No Distributions Pending Allowance.</u>  Notwithstanding any other provision herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed.

7.2   <u>Resolution of Disputed Claims</u>.

(a)   <u>Resolution of Disputed Claims other than MedMal Claims</u>.

Subject to the more specific provisions of Section 7.2(b) relating to MedMal Claims, Reorganized SVCMC shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims.  Reorganized SVCMC shall serve a copy of each objection upon the holder of

the Claim to which the objection is made as soon as practicable (unless such Claim was
already the subject of a valid objection by the Debtors), but in no event shall the service
of such an objection be later than one (1) year after the Effective Date, unless such date is
extended by order of the Bankruptcy Court. The Bankruptcy Court, for cause, may
extend the deadline on the request of Reorganized SVCMC, on notice to the Trade
Claims Monitor. All objections shall be litigated to a Final Order except to the extent
that Reorganized SVCMC elects to withdraw such objection, or Reorganized SVCMC
and the holder of the Disputed Claim compromise, settle or otherwise resolve any such
objections, in which event they may settle, compromise or otherwise resolve any
Disputed Claim without further order of the Bankruptcy Court.

    (b)   Resolution of Disputed MedMal Claims. After the Effective Date,
Reorganized SVCMC shall have the right to the exclusion of all others to make, file, and
prosecute objections to MedMal Claims in a forum of appropriate jurisdiction; provided,
however, that the Bankruptcy Court shall only have jurisdiction to hear objections to
MedMal Claims based on timeliness of the proof of claim or other non-merit based
objections, but shall not have jurisdiction to determine the underlying merits of a
MedMal Claim. All costs of objecting to Disputed MedMal Claims before the
Bankruptcy Court shall be paid by SVCMC or Reorganized SVCMC, as appropriate and
shall not constitute MedMal Defense Costs. All MedMal Claims shall be litigated to a
Final Order except to the extent that Reorganized SVCMC and the holder of the Disputed
MedMal Claim compromise, settle or otherwise resolve the MedMal Claim, in which
event they may settle, compromise or otherwise resolve any Disputed Claim without
further order of the Bankruptcy Court.

    (c)   Reserve Accounts for Disputed Claims.

    (i)   None of the Post-Effective Date Debtors shall be required
to maintain segregated reserve accounts for Disputed Claims; provided,
however, that Reorganized SVCMC shall be required to reserve (but not in
a formal, segregated account) sufficient Cash for Disputed General
Unsecured Claims as set forth in the Plan and the Litigation Trustee shall
be required to establish the LT Disputed Claims Reserve.

    (ii)   None of the MedMal Trustees shall be required to maintain
segregated reserve accounts for Disputed MedMal Claims; however, such
MedMal Trustees must reserve Cash to the extent required in Sections 4.8,
4.9 and 4.10 of the Plan, as applicable.

    7.3   Estimation of Claims. The Debtors or the Post-Effective Date Debtors
may, at any time, request the Bankruptcy Court to estimate any Claim, other than
MedMal Claims, pursuant to section 502(c) of the Bankruptcy Code, regardless of
whether the Debtors previously have objected to such Claim, and the Bankruptcy Court
will retain jurisdiction to estimate any Claim, other than a MedMal Claim, at any time,
including during litigation concerning any objection to such Claim. For the avoidance of
doubt, in no event shall any MedMal Claim be subject to estimation by the Bankruptcy

Court or the District Court. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the applicable Post-Effective Date Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

7.4     Allowance of Disputed Claims. If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, Reorganized SVCMC, the applicable MedMal Trustee, or the Litigation Trustee shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided herein, distribute to the holder of such Allowed Claim an amount, without any interest thereon (other than MedMal Interest if, and to the extent, due), that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.

7.5     No Distribution in Respect of Disallowed Claims. To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed.

7.6     Late-Filed Claims. Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.

## Article VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1     Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtor that is the counterparty thereto, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date and is pending as of the Effective Date, (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.1(A) (executory contracts) or Schedule 8.1(B) (unexpired leases), which Schedules shall be contained in the Plan Supplement, or (iv) that is an executory contract or unexpired lease as to which an Other Debtor, but not SVCMC, is a party; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.1(A) and 8.1(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed

or rejected. The Debtors shall provide notice of any amendments to Schedules 8.1(A) and 8.1(B) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 8.1(A) or 8.1(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.2    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

8.3    Inclusiveness. Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

8.4    Cure of Defaults.

(a)    Schedule 8.4, which Schedule shall be contained in the Plan Supplement, lists certain executory contracts and unexpired leases the Debtors are intending to assume pursuant to section 365 of the Bankruptcy Code and the Debtors' proposed Cure Amounts for each such lease or contract; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.4 to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, or to amend the Cure Amount listed for any executory contract or unexpired lease. The Debtors shall provide notice of any amendments to Schedule 8.4 to the parties to the executory contracts and unexpired leases affected thereby.

(b)    With the exception of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, the Debtors are not required to make any payment or take any other action in order to satisfy the requirements of section 365(b) of the Bankruptcy Code with regard to all executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan. The Cure Amounts of any executory contracts or unexpired leases not listed on Schedule 8.1(A), 8.1(B), or 8.4 shall be deemed to be zero unless otherwise agreed by the Debtors and the applicable non-Debtor party to the

executory contract or unexpired lease or as determined by the Bankruptcy Court upon a motion by the applicable non-Debtor party to an executory contract or unexpired lease filed on or before the first Effective Date Anniversary, and the exclusion of an executory contract or unexpired lease from Schedule 8.4 shall not affect the status of such executory contract or unexpired lease under Section 8.1 of the Plan.

(c)     The Post-Effective Date Debtors shall pay all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the later to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

(d)     If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtors and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtors' sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

(e)     Notwithstanding the above, the Debtors may, in their sole and absolute discretion, determine to reject any executory contract or unexpired lease at any time prior to the later of (i) thirty (30) days after the Effective Date and (ii) thirty (30) days after the entry of a Final Order determining the proper Cure Amount for that contract or lease. The effective date of a rejection effected pursuant to the preceding sentence shall be the Confirmation Date regardless of the date on which the Debtors give notice of such rejection.

8.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Sections 8.1 or 8.4 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, Reorganized SVCMC, no later than thirty (30) days after the later of (i) the date notice of entry of an order is mailed approving the rejection of such executory contract or unexpired lease, (ii) the date notice of entry of the Confirmation Order is mailed, (iii) the date notice of an amendment to Schedule 8.1(A) or 8.1(B) that results in the rejection of such executory contract or unexpired lease is mailed, and (iv) the date notice of rejection of such executory contract or unexpired lease pursuant to Section 8.4(f) of the Plan is mailed. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Post-Effective Date Debtors and their property.

8.6    Insurance Policies. All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance. For the avoidance

of doubt, the Debtors' hospital professional liability (or medical malpractice) insurance policies and the proceeds thereof shall be available to holders of timely filed Claims alleging medical malpractice to the extent such insurance policies cover such Claims, and solely as necessary to make these insurance policies available to holders of timely filed claims alleging medical malpractice to the extent such insurance covers such claims, those insurance policies are hereby assumed.

    8.7    Compensation and Benefit Programs.  Except as provided in Section 8.1 of the Plan, all savings plans, retirement plans, health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, and other insurance plans are reinstated as of the Effective Date; provided, however, the Pension Plan shall be treated in accordance with the Plan.

    8.8    Retiree Benefits.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized SVCMC shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits.

## Article IX.

## EFFECTIVE DATE

    9.1    Conditions Precedent to the Effective Date.  The following are conditions precedent to the Effective Date of the Plan:

    (a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth herein, which shall be in form and substance satisfactory to the Debtors;

    (b)    No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in this Section 9.1 are satisfied or waived;

    (c)    All documents, instruments and agreements, in form and substance satisfactory to the Debtors, provided for under or necessary to implement the Plan, including but not limited to the MedMal Trust Agreements and the Litigation Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

    (d)    The Reorganized Articles of Incorporation and Reorganized By-laws shall have been adopted by SVCMC or Reorganized SVCMC;

    (e)    All of the payments to be made by SVCMC by or on the Effective Date shall have been made or will be made on the Effective Date;

(f)    .    SVCMC shall have sufficient Available Cash such that the Effective Date Cash Distribution is no less than (a) 80% multiplied by Total Trade Claims if the Effective Date is on or before August 29, 2007, or (b) 75% multiplied by Total Trade Claims if the Effective Date is after August 29, 2007;

(g)    SVCMC shall have entered into an Exit Facility providing for a term loan of at least $250 million and an accounts receivable credit line of at least $50 million, and all conditions precedent to funding under the Exit Facility shall have been satisfied; and

(h)    SVCMC shall have obtained all governmental and other regulatory approvals or rulings that SVCMC believes, in its reasonable discretion, are necessary for confirmation of the Plan.

(i)    The treatment of the Sun Life Secured Claims and the DASNY Subordinated Claim shall be reasonably satisfactory to the Tort Claimants' Committee in respect of the mortgages being granted to secure the MedMal Trusts.

(j)    SVCMC shall have received all amounts owed from its non-debtor affiliate, St. Elizabeth Ann's Health Care & Rehabilitation Center, totaling $9,523,263.00, on account of a certain deferred land note and a certain land acquisition user premium.

9.2    Waiver of Conditions.  The Debtors may waive one or more of the conditions precedent to the Effective Date of the Plan set forth in Section 9.1 of the Plan. The Debtors may only waive conditions 9.1(e), (f) and (j) with the consent of the Creditors' Committee and the Ad Hoc Committee, which consent may not be unreasonably withheld, and may only waive condition 9.1(i) with the consent of the Tort Claimants' Committee, which consent may not be unreasonably withheld.

9.3    Effect of Failure of Conditions.  In the event that one or more of the conditions specified in Section 9.1 of the Plan have not occurred and have not been waived pursuant to Section 9.2, on or before the date that is 180 days after the Confirmation Date, (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## Article X.

## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction over all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

      (a)    To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

      (b)    To determine any and all adversary proceedings, applications, and contested matters that have been or may be commenced, including, without limitation, any adversary proceeding, application, or contested matter requiring a determination of Excess Cash;

      (c)    Subject to Section 10(n) of the Plan, to hear and determine any objections to or requests to estimate any Claims (other than MedMal Claims);

      (d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

      (e)    To issue such orders in aid of implementation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

      (f)    To hear any request by Reorganized SVCMC to modify any of the terms of the Brooklyn/Queens Seller Notes, in the event that the Trade Claims Monitor has not consented to such modification or Bankruptcy Court approval is otherwise required;

      (g)    To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

      (h)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

      (i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

      (j)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(l)      To hear and determine any other matter consistent with the provisions of the Bankruptcy Code;

(m)      To hear and determine any matter concerning the Manhattan Real Estate Process;

(n)      Subject to Section 10(o) of the Plan below, to hear and determine any issues brought before the Bankruptcy Court concerning Litigation Claims and Disputed Claims (other than MedMal Claims);

(o)      To hear and determine any objection to a MedMal Claim based on a failure to have filed, or to have timely filed, a proof of claim or another objection to that claim other than an objection based on the underlying merits of that MedMal Claim; and

(p)      To enter a final decree closing these Chapter 11 Cases.

## Article XI.

## EFFECT OF CONFIRMATION OF PLAN

11.1    Vesting of Assets.

(a) As of the Effective Date, the property of each Debtor's estate, including all claims and causes of action against third parties that arose prior to or after the Commencement Date, shall vest in the applicable the Post-Effective Date Debtor or such other entity as provided in the Plan.

(b) From and after the Effective Date, each Post-Effective Date Debtor, each MedMal Trust, and the Litigation Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

(c) As of the Effective Date, all assets of the Post-Effective Debtors shall be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

11.2    Binding Effect.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Equity Interest in the Debtors and their respective successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any

heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

   11.3   Discharge. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors and the Post-Effective Date Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Equity Interest in any Debtor or the Post-Effective Date Debtor.

   **11.4   Exculpation. The Debtors, the Committees, the DIP Lender, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person for any act taken or omission, after the Commencement Date, in connection with or related to the Chapter 11 Cases or the operations of the Debtors' businesses during the Chapter 11 Cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

   11.5   **Releases.**

   **(a)    As of the Effective Date, the Released Parties shall be released by the Debtors and any successors-in-interest of the Debtors from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that any of the Debtors would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim, Equity Interest, Membership Interest, or other person or entity would have been legally entitled to assert on behalf of any of the Debtors or any of their estates, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Chapter 11 Cases and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Without limiting the generality of the foregoing, to the extent permitted by law, the Debtors and any**

successors-in-interest of the Debtors shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

(b)    Nothing herein shall be interpreted as in any way compromising the effect or scope of releases under applicable New York State law with respect to MedMal Claims, and all such releases shall be enforceable to the fullest extent of New York State law.

(c)    No provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will discharge, release, or relieve any other party, in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The PBGC shall not be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims.

11.6    **Injunction.**

(a)    Subject to 11.6(c), all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against and Equity Interests in the Debtors from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Effective Date Debtors, the Released Parties, or against the property or interests in property of the foregoing, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Post-Effective Date Debtors, the Released Parties, or any of their property, except as contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

(b)    All Persons are permanently enjoined, on and after the Effective Date, from asserting any Claim (x) which is released by such Person under the Plan or (y)

for which the party against whom the Claim is being asserted has received exculpation under the Plan, including: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of such Claim, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of such Claim, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of such Claim, (iv) asserting any right of setoff, directly or indirectly, against any obligation on account of such claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

(c)    The automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Sections 11.6(a) and (b) of the Plan shall not apply after the Effective Date to acts by holders of timely filed Claims alleging medical malpractice to seek payment from the Debtors' insurance companies for or to liquidate the amount of such Claims against the Debtors or a Covered Person in a court or administrative body of appropriate jurisdiction, except to the extent that it is determined by a Final Order either that such Claim was not timely filed or that the Claim shall not be Allowed.  Notwithstanding the forgoing sentence, holders of MedMal Claims may only be paid on account of their MedMal Claims as provided for, and from assets specifically designated for payment of such MedMal Claims, under the Plan.  Nothing in the Plan shall limit, modify or otherwise impair the rights of holders of timely filed Claims alleged to be for medical malpractice to seek payment for such Claims from the Debtors' insurance policies and/or from insurance policies for the benefit of a Covered Person which cover such Claims, it being the intent of the Plan to leave such timely filed Claims alleged to be for medical malpractice unimpaired except to the extent such Claims are MedMal Claims as defined by the Plan.

(d)    If, notwithstanding the injunction contained in this Section 11.6, any holder of a MedMal Claim shall assert such claim against a Covered Person, the injunction shall not preclude such Covered Person from asserting his or her right to indemnification against SVCMC (nor shall SVCMC be prevented from asserting all defenses, if any, to such asserted right to indemnification).  Any indemnification amount owed to a Covered Person by SVCMC on account of a MedMal Claim shall be paid from the appropriate MedMal Trust; however, nothing in this Section 11.6(d) shall be deemed to supersede an obligation, if any, of SVCMC to provide legal representation for a Covered Person in the defense of a MedMal Claim.

11.7   Term of Injunctions or Stays.  Unless otherwise herein, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing of these Chapter 11 Cases.

11.8   Compromise of Controversies.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

11.9   Retention of Causes of Action/Reservation of Rights.

(a)   Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Post-Effective Date Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code and (iii) the turnover of any property of the Debtors' estates.

(b)   Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Debtors and the Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such Claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Post-Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)   Except for the Litigation Claims, which are being assigned and transferred to the Litigation Trust pursuant to the Plan and will be prosecuted by the Litigation Trustee, each of the Post-Effective Date Debtors shall, after the Effective Date, retain the rights to bring any causes of action that could have been brought by the respective Debtors at any time.

11.10   <u>Section 506(c) Reservation</u>.  The Debtors and the Post-Effective Date
Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to
any and all Secured Claims.

11.11   <u>Chapter 5 Reservation</u>.  Without limiting Section 11.9 above, the Debtors
and the Post-Effective Date Debtors reserve all rights under chapter 5 of the Bankruptcy
Code.

11.12   <u>No Benefit to Litigation Parties</u>.  Notwithstanding anything to the contrary
contained in this Article XI, none of its exculpation, release or injunctive provisions shall
apply or provide any benefit to the Litigation Parties, and all Claims, causes of actions,
demands, charges or demands against any of the Litigation Parties are hereby expressly
reserved and preserved.

**Article XII.**

**<u>MISCELLANEOUS PROVISIONS</u>**

12.1   <u>Effectuating Documents and Further Transactions</u>.  Upon entry of the
Confirmation Order, each of the Debtors, the Post-Effective Date Debtors, and the
MedMal Trustees shall be authorized and are instructed to execute, deliver, file or record
such contracts, instruments, releases, indentures and other agreements or documents and
take such actions as may be reasonably necessary or appropriate to effectuate and further
evidence the terms and conditions of the Plan.

12.2   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to 28 U.S.C.
§ 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the
Confirmation Date, shall be paid on the Effective Date by Reorganized SVCMC.  Any
such fees accruing after the Confirmation Date also shall be paid by Reorganized
SVCMC.

12.3   <u>Modification of Plan</u>.  The Debtors reserve the right, in accordance with
the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time
prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order,
the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in
accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or
omission or reconcile any inconsistency in the Plan in such manner as may be necessary
to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that has
accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed
modification does not materially and adversely change the treatment of the Claim of such
holder.

12.4   <u>Withdrawal or Revocation</u>.  The Debtors may withdraw or revoke the Plan
as to any Debtor at any time prior to the Confirmation Date.  If the Debtors revoke or
withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not
occur, then the Plan shall be deemed null and void.  In such event, nothing contained

herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

12.5   <u>Dissolution of the Committees.</u>

(a)      Except as otherwise set forth in this Section 12.5 of the Plan, on the Effective Date, the Committees shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Committees' attorneys, accountants, and other agents shall terminate.

(b)      The Committees shall continue in existence after the Effective Date solely for the purpose of reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code. With respect only to the foregoing, Reorganized SVCMC shall pay the reasonable fees and expenses of counsel for the Committees.

(c)      The members of the Tort Claimants' Committee shall thereafter retain the right, in accordance with Section 6.6(g)(i), to select one or more successor MedMal Trust Monitors, and in the discharge of that function, the members of the Tort Claimants' Committee shall enjoy the full benefit of all applicable exculpation and indemnity provisions set forth herein, but shall not be entitled to any reimbursement or payment for costs and expenses in exercising the rights in Section 6.6(g)(i) of the Plan.

12.6   <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any disposition of assets contemplated by the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. Without limiting the generality of the foregoing, it is expressly the intent of this Plan that this Section 12.6 shall apply to any post-Effective Date assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the development of the Manhattan Hospital as generally described in the Disclosure Statement, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection therewith.

12.7   <u>Severability</u>. In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Committees, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision

held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

12.8    Governing Law. Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

12.9    Courts of Competent Jurisdiction. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

12.10    Plan Supplement. The documents comprising the Plan Supplement shall be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' bankruptcy counsel or on the website of the Debtors' claims agent (www.bsillc.com).

12.11    Headings. Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

12.12    Exhibits/Schedules. All Exhibits and Schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

12.13    Plan Controls Disclosure Statement; Confirmation Order Controls Plan. To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling. To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order shall be controlling.

12.14    Filing of Additional Documents. On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.15   Successors and Assigns.  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of the heirs, executors, administrators, successors, and/or assigns of such person.

12.16   Tax-Exempt Status.  Nothing in the Plan shall adversely affect, or be interpreted to be inconsistent with, the tax-exempt status of SVCMC or any other entity established pursuant to the Plan that is expressly intended to be tax-exempt.

12.17   Expedited Determination of Postpetition Taxes.  SVCMC and Reorganized SVCMC are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all tax returns filed for taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

12.18   Notices.  Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, (c) reputable overnight delivery service, all charges prepaid, or (d) via electronic mail, and shall be deemed to have been given when received by the following parties:

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK D/B/A
SAINT VINCENT CATHOLIC MEDICAL CENTERS
130 W. 12th Street
Martin Payne, 1G
New York, New York  10011
(212) 604-2300
Attn:   Chief Executive Officer and General Counsel

*with copies to the Debtors' bankruptcy counsel*:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
(212) 504-6000
Attn:   Deryck A. Palmer, Esq.,  John J. Rapisardi, Esq. and Andrew M. Troop, Esq.

*with copies to the MedMal Trustees:*

MedMal-BQ Trustee
(Name and Address
 to be included in
 Plan Supplement)

MedMal-MW Trustee
(Name and Address
 to be included in
 Plan Supplement)

MedMal-SI Trustee
(Name and Address
  to be included in
  Plan Supplement)

*with copies to the MedMal Trust Monitor:*

MedMal Trust Monitor
(Name and Address
  to be included in
  Plan Supplement)

-and-

COOLEY GODWARD KRONISH LLP
Attorneys for the MedMal Trust Monitor
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
Attn: Richard S. Kanowitz, Esq.

*with copies to the Litigation Trustee:*

Litigation Trustee and Trade Claims Monitor
(Name and Address
  to be included in
  Plan Supplement)

Dated: New York, New York
       June 5, 2007

                    SAINT VINCENTS CATHOLIC MEDICAL
                       CENTERS OF NEW YORK D/B/A SAINT
                       VINCENT CATHOLIC MEDICAL CENTERS
                    CMC PHYSICIAN SERVICES, P.C.
                    CMC RADIOLOGICAL SERVICES P.C.
                    CMC CARDIOLOGY SERVICES P.C.
                    MEDICAL SERVICE OF ST. VINCENTS
                       HOSPITAL AND MEDICAL CENTER, P.C.
                    SURGICAL SERVICE OF ST. VINCENTS, P.C.

                    By: _____
                        Guy Sansone
                        Chief Executive Officer

**EXHIBIT 4.6(b)**
Sun Life Commitment Letters

<u>COPY FOR SIGNATURE AND RETURN TO SUN LIFE</u>

**Sun Life Assurance
Company of Canada**
SC1307
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

UPS Overnight

May 17, 2007

Saint Vincent's Catholic Medical Center
Mr. Domenic Segalla
C/o Mr. Craig Bjornsund
NorthMarq Capital
One Penn Plaza, Suite 1421
New York, NY  10119

Re:    Sun Life Commitment #740440 - $42,500,000
       555 Sixth Avenue, New York, Manhattan County, New York

Dear Mr. Weis:

It is our pleasure to tell you that we have approved a refinance and paydown of mortgage loans
SL#740182, SL#740183 and SL#740184 to you upon the terms and conditions detailed on pages
1-6 and Exhibit A which are attached.  Please indicate your willingness to be bound by the terms
and conditions of this commitment by signing the cover letter and initialing each page of the
enclosed <u>yellow copy</u> and returning it to us by May 29, 2007.  The commitment will constitute a
binding obligation upon us to lend and you to accept our loan, all on the terms herein if you wire the
$2,327,808.11 of back principal to bring Sun Life current on the existing loans.

SUN LIFE ASSURANCE COMPANY
OF CANADA (U.S.)

Leo J. Barrett, Jr.
Managing Director
Eastern Mortgage Portfolio

SAINT VINCENT'S CATHOLIC MEDICAL CENTER

Domenic Segalla

Date  5/31/07

Sun Life Assurance Company of Canada
is a member of the Sun Life Financial group of companies.

**www.sunlife-usa.com**

<u>COMMITMENT CONDITIONS PAGE 1  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440</u>

1)  <u>LOAN AMOUNT, DISBURSEMENT SCHEDULE:</u>   A refinance and increase of
SL#740182 (current balance of $27,434,087.94) to $42,500,000.  A portion of the proceeds
will be used to partially pay off at par the outstanding balance of SL#740183
($15,676,621.65).  The new terms of the loan will be a 7 year term with an interest rate of
6.25% with monthly payments of $310,644.49 based on a 20 year amortization plan.  The
loan is to be disbursed no later than August 31st, 2007 however you may extend the
commitment through November 31, 2007 by paying one half of the fees due Sun Life and
Northmarq outlined in paragraph 25 (said payment to be credited against the amount due at
closing).

(2)  <u>LOAN YEAR:</u>  The first day of the first loan year will be the first day of the month after the
initial disbursement or September 30, 2007, whichever occurs first.

(3)  <u>CONTINGENCY:</u>  Notwithstanding the terms outlined in Conditions (1) and (2), this
commitment is issued with a contingency that all current Sun Life loans to Saint Vincent's
Catholic Medical Center be brought current, including all past due amount for amortization,
no later than May 28, 2007, or this commitment shall be null and void.  The estimated past
due amounts are estimated to be $2,327,808.11 and any interest payments due and payable up
to and including May 31, 2007.  Saint Vincent's Catholic Medical Center will represent and
warrant that all necessary approvals and authorization will have been received in connection
with said payments.  After Saint Vincent's Catholic Medical Center makes the back principal
payments they will begin making full principal and interest payments under the original loan
terms with the June 1st, 2007 payment.

(4)  <u>PAYOFF AND PAYDOWN OF EXISTING LOANS:</u>  After the partial pay down at par of
SL#740183 the loan balance of that loan will be $610,709.59.  Saint Vincent's Catholic
Medical Center will pay off the remaining balance of SL#740183 of $610,709.59, pay off the
outstanding balance of SL#740184 of $4,898,944.17, pay off the outstanding balance of
SL#715848 of $7,341,100.89 and pay down the balance of SL#715847 from $22,192,332.32
to $17,500,000.  All pay downs will be at par.  A portion of the pay downs by Saint Vincent's
Catholic Medical Centers will occur prior to funding as acceptance of this commitment. The
amount of the initial pay down will be equal to the above amount which brings Sun Life
current.

(5)  <u>PAYMENT:</u>  Notwithstanding the terms outlined in Conditions (1), (2), (3) and (4), Upon
Saint Vincent's Catholic Medical Center making a fully authorized, nonrefundable payment
to Sun Life of all amounts due as a condition precedent under the commitment and (ii) the
filing of the bankruptcy court of a modified plan of reorganization in a form agreeable to Sun
Life incorporating the terms of the commitment, whose agreement shall not be unreasonably
withheld, Sun Life shall promptly withdraw its objection to the disclosure statement and agree
to support the plan.

(6)  <u>EXCULPATION:</u>  Your financial responsibility respecting the loan contemplated herein will
be limited to the property itself and you will not be personally liable to us for any monetary

Approved

COMMITMENT CONDITIONS PAGE 2  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440

deficiency arising from a foreclosure or similar action should such occur.  Notwithstanding
the above, Saint Vincent's Catholic Medical Centers (SVCMC) will be liable for security
deposits received or held; rent received or held after an event of default; rents prepaid more
than one month in advance; any lease termination fees; condemnation awards and insurance
proceeds not applied as required by loan documents; property repair as a result of casualty not
reimbursed by insurance to the extent insurance is required by the loan documents; fraud,
material misrepresentation or bad faith; terms of the Environmental Indemnity Agreement;
waste of the property; delinquent real estate taxes or assessments and/or non-compliance of
Americans with Disabilities Act.

(7)    PREPAYMENT PRIVILEGE:  Open to prepayment in full at the beginning of the seventh
loan month of the loan term subject to a prepayment fee which shall be the greater of (a) 1%
of the then outstanding loan balance or (b) a Discounted Yield Maintenance Prepayment Fee
computed as follows: the proceeds of the prepayment will be assumed to be immediately
reinvested in a non-callable United States Treasury Security having a maturity most closely
equivalent to the maturity date of this loan, "the Treasury Yield." If there are more than one
non-callable United States Treasury Securities maturing in the same month as the loan, the
Security with a coupon interest rate closest to the loan interest rate will be used. If the yield on
that certain United States Treasury Security, as published in the "Wall Street Journal" on the
fifth business day prior to the date of prepayment, is;
   (1)    less than the interest rate of the note, you will take the positive difference between the
          two interest rates, divide by 12 and multiply by the then outstanding balance of the loan
          to arrive at the monthly payment differential.  Then calculate the present value of the
          series of the monthly payment differentials for the number of whole and partial months
          from the prepayment date to the maturity date using the Treasury Yield as the discount
          rate compounding monthly.  The resulting sum of the discounted monthly prepayment
          differentials will be the Discounted Yield Maintenance Prepayment Fee, or,
   (2)    greater than or equal to the interest rate on the note, then prepayment fee shall be 1% of
          the then outstanding loan balance.
Open to prepayment without a fee the last 180 days of the loan term.

(8)    PREPAYMENT OF EXISTING LOANS:  Notwithstanding the terms outlined in Condition
(6), there will be no prepayment charges in connection with the repayment of SL#740182,
SL#740183 and SL#740184 in connection with this contemplated financing, however the full
repayment of these loans will be a condition of funding (see condition 4).

(9)    DESCRIPTION:  The loan is to be secured by three non-contiguous parcels of land totaling
1.81 acres located in New York, Manhattan County, New York.  The property located at 555
Sixth Avenue has frontage consisting of approximately 206 feet along the west side of 6th
Avenue and 150 feet along the north side of West 15th Street.  The land improved with an
apartment building containing a total of 176,442 square feet.  The property located at 122-132
West 12th Street has with frontage consisting of approximately 112 feet along the south side of
West 12th Street. The land improved with an apartment and office building containing a total
of 94,000 square feet. The property located at 20-32 Seventh Avenue has frontage of 207 feet

Approved

COMMITMENT CONDITIONS PAGE 3  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440

along the west side of 7th Avenue, 200 feet along the north side of West 12th Street and 150 feet along the south side of West 13th Street. The land is is improved with a 188,876 square foot office building.

(11)  NET LEASE:  SVCMC will execute a net lease for the subject in form and substance reasonably satisfactory to Sun Life.  The Net Lease shall be co-terminus with the loan, at a triple net rent equal to 1.05 times actual debt service.  In addition, SVCMC will sign an occupancy lease, in form and substance reasonably satisfactory to Sun Life for the 25,000 square foot commercial space, at a net annual rental of $1,000,000.00.

(12)  APPROVAL OF LEASES:  The existing and future leases shall be subject to approval by Sun Life.  Sun Life's approval rights shall be subject to negotiated leasing parameters, reasonably acceptable to both parties.

(13)  ASSIGNMENT OF RENTS:  SVCMC is to give assignment of rents operative only in the event of a default.

(14)  NO SECONDARY FINANCING, ASSIGNMENT, TRANSFER:  There is to be no secondary financing in connection with this transaction or subsequently unless so approved by us in writing.  Further, this commitment may not be assigned or transferred.  Further, there may be no sale or transfer of any whole or partial interest in this property without our prior written consent.

Notwithstanding the above, Sun Life is aware of the possibility that there will be mezzanine debt and some secondary financing behind the Sun Life first mortgage.  All mezzanine and secondary debt will be totally subordinate to Sun Life's first mortgage and acceptable intercreditor agreements must be executed by all parties.

(15)  INSURANCE:  The property is to be insured to the extent of its full replacement value. Coverage is to be in an amount at all times sufficient to keep you from becoming a co-insurer as evidenced by an agreed amount endorsement or similar affirmative statement from the insurer. If the policy is subject to a deductible, the amount thereof is to be satisfactory to us. The policy contract and the company which issues it are to be subject to our initial and periodic review and approval. Further, we are to be furnished with evidence on an annual basis that the property is insured to our sole satisfaction. If the property is located within a "flood hazard area" as defined by the Federal Insurance Administration, flood insurance will be required.

(16)  CHATTEL MORTGAGE:  We are to receive a security interest in and chattel mortgage on all on-site fixtures and equipment owned by you necessary to the operation of the property as an apartment, office and retail buildings.

(17)  ANNUAL OPERATING STATEMENTS:  Within 120 days of the end of the property's fiscal year, we are to receive financial statements satisfactory to us reflecting the complete

COMMITMENT CONDITIONS PAGE 4  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440

results of the operation of the property for the prior fiscal year.  The statements are to be prepared by a Certified Public Accountant acceptable to us or by you and certified by you as being correct, and are to cover the operations of the subject property only.  In addition to and simultaneous with the financial statements, we are to receive a statement reflecting the complete rental status of the property showing the name of each tenant, the area in square feet occupied, the remaining term of the lease and the rental being paid.

(18)   REAL ESTATE TAX AND INSURANCE DEPOSITS:  The mortgage is to contain a provision to the effect that you are to deposit 1/12 of the estimated annual real estate tax and hazard insurance premium with us on each monthly installment date.  Initially, and until further notice, no such deposits for the hazard insurance premium will be required.

(19)   AFFIDAVIT OF SOLVENCY:  At the time of disbursement, you are to provide an affidavit satisfactory to us that Saint Vincent's Catholic Medical Centers are not the subject of or defendant in any voluntary or involuntary bankruptcy proceeding, either active or pending, of any type whatever including any arrangement for the benefit of creditors or any other similar activity.

(20)   GENERAL CONDITIONS OF CLOSING:  In addition to the conditions contained elsewhere herein, this commitment is subject to our counsel's approval of title, survey, zoning, legality, and the form and substance of all mortgage documents, partnership agreements, permits, licenses, easements, opinions of counsel (including your counsel's opinion that only 6 of the units are subject to rent stabilization), et cetera (see Exhibit A).  All closing costs, including a mortgagee's policy of title insurance and the fees and expenses of local counsel of our choosing are to be paid by you.  In the event that the loan should not be disbursed through no fault of Sun Life, and regardless of whether or not the Good Faith Deposit is returned in whole or in part, you are to be responsible for any legal expenses incurred by Sun Life in attempting in good faith to consummate this transaction.

(21)   ARCHITECT'S OR ENGINEER'S REPORT:  We are to be provided with a report and certification prepared by a licensed architect or engineer approved by us stating that the property is structurally sound, and is in good order and repair.  We are in receipt of a report by EBI Consulting, dated September 3, 2004.  The report is satisfactory to us provided that you enter into a side letter agreement whereby you agree to remedy to our reasonable satisfaction the items listed under "Action Required" in the Executive Summary.

(22)   HAZARDOUS SUBSTANCE:  We shall be furnished a report, commonly called a Level 1 site assessment, in form and substance satisfactory to us, from a registered engineer acceptable to us, certifying to us that the property and the immediate vicinity of the property are free from asbestos, polychlorinated biphenyls (PCB), hazardous wastes, toxic substances and any other pollutants or contaminants which are or could be detrimental to the Mortgaged Property, human health or the environment or in violation of any governmental laws or regulations.  At our option, such report shall be based upon a detailed physical evaluation of the property, including without limitations such test borings, soil analyses and other tests and

Approved

COMMITMENT CONDITIONS PAGE 5  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440

examinations as required by us.  Our obligation to fund this loan is specifically contingent upon our favorable review and final determination of the report.  We are in receipt of a report by EBI Consulting, dated September 2, 2004.

(23)  ACCELERATION PREMIUM: If an event of default occurs under the documents evidencing this loan, thereby causing us to accelerate the loan prior to the maturity date, Sun Life will sustain damages due to the loss of the investment.  Accordingly, the loan documents will provide that, in the event of any default and consequent acceleration of the loan, and in addition to any other sums due and payable under the Note, Deed of Trust or any other instruments given as further security for the loan, you will be required, to the extent permitted by law, to pay as liquidated damages an acceleration premium of the greater of 3% or a discounted reinvestment formula amount calculated as follows: the proceeds of the prepayment will be assumed to be immediately reinvested in a non-callable United States Treasury Security having a coupon interest rate and maturity most closely equivalent to the maturity date of the loan. If there are more than one non-callable United States Treasury Securities maturing in the same month as the loan, the Security with a coupon interest rate closest to the loan interest rate will be used.  If the yield on that certain United States Treasury Security, as published in the Wall Street Journal on the fifth business day prior to the date of prepayment, is;

   (1)  less than the interest rate of the note, you will take the positive difference between the two interest rates, divide by 12 and multiply by the then outstanding balance of the loan to arrive at the monthly payment differential.  Then calculate the present value of the series of monthly payment differentials for the number of whole and partial months from the prepayment date to the maturity date using the Treasury Yield as the discount rate compounding monthly.  The resulting sum of the discounted monthly payment differentials will be the Discounted Yield Maintenance Prepayment Fee.

   (2)  greater than or equal to the interest rate on the note, then the prepayment fee shall be 3% of the then outstanding loan balance.

(24)  TRANSFER OF LOAN; REGISTRATION:  We reserve the right to transfer, at any time, all or any portion of our interest in the loan.  We also reserve the right to elect to treat the principal and interest due under the loan as being in registered form.  The transfer or election may include all or any servicing rights with respect to the loan, involve the issuance of securities evidencing a beneficial interest in the loan or require the appointment of a registration or transfer agent.  You shall cooperate with us in connection with any transfer or election and shall perform any tasks reasonably requested by us.  The tasks may include delivering estoppels, opinions, tax certificates and any other documents each in form and substance reasonably acceptable to us or any rating agency, consenting to the release of information to potential transferees, participants or rating agencies or providing additional information or granting reasonable access in order to obtain such information, as may reasonably be required, including without limitation, updated environmental information, at our expense, and appraisals, at our expense.

Approved

COMMITMENT CONDITIONS PAGE 6  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 740440

(25)    FEES:  SVCMC will pay to Sun Life a processing fee of $425,000 that is considered earned
and payable upon the closing of the extended/increased loan.
      SVCMC will also pay to NorthMarq Capital a processing fee of $425,000 that is concerned
earned and payable upon the closing of the extended/increased loan.

In addition, SVCMC will responsible for all costs and fees associated with the loans including
the payment of Sun Life's Legal Fees including past legal fees connected with the existing Sun
Life loans to SVCMC.

(26)    LOAN DOCUMENTATION:  Wherever feasible, both parties will endeavor to use the
existing Sun Life loan documents including the exculpation language, master leases, currently
in place, and rights of transfer.

(27)    SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.) This transaction shall be
closed in the name of, and all funds advanced by Sun Life Assurance Company of Canada
(U.S.), with interest to accrue to Sun Life Assurance Company of Canada (U.S.) from the
date    funds are advanced to you.

(28)    TERMINATION, EXPIRATION:  Our obligations to perform under this commitment will
terminate and expire

Approved

Exhibit "A"

**SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.) AND RELATED COMPANIES**

*REQUIREMENTS FOR SURVEYS TO BE FURNISHED IN CONNECTION WITH MORTGAGE LOANS*

All surveys (a) shall be submitted to the appropriate Sun Life company ("Lender") making the mortgage loan, (b) shall conform to the latest applicable *Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys,* and (c) shall include both the items listed below and those on the attached Table A:

The survey:

1.    Shall be dated and delivered just before loan closing.

2.    Shall be certified to Lender, the borrower, and the applicable title company.

3.    Shall identify the square footage and number of stories of all structures and shall specify whether any improvements are under construction.

4.    Shall show all wetlands.

5.    Shall show all roof and surface drainage lines and their outfalls.

6.    Shall conform to additional requirements on the attached Table A and to any other requirements Lender may impose for the related mortgage loan.

Three copies of the survey conforming to these requirements shall be delivered to Lender's local mortgage loan counsel.

# TABLE A

## OPTIONAL SURVEY RESPONSIBILITIES AND SPECIFICATIONS

**NOTE:** *The items of Table A must be negotiated between the surveyor and client. It may be necessary for the surveyor to qualify or expand upon the description of these items, e.g., in reference to Item 6, there may be a need for an interpretation of a restriction. The surveyor cannot make a certification on the basis of an interpretation or opinion of another party. Items 16, 17 and 18 are only for use on projects for the U.S. Department of Housing and Urban Development (HUD).*

**If checked, the following optional items are to be included in the ALTA/ACSM LAND TITLE SURVEY, except as otherwise negotiated:**

1.  _____ Monuments placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

2.  _____ Vicinity map showing the property surveyed in reference to nearby highway(s) or major street intersection(s).

3.  __X__ Flood zone designation (with proper annotation based on federal Flood Insurance Rate Maps or the state or local equivalent, by scaled map location and graphic plotting only.)

4.  __X__ Gross land area (and other areas if specified by the client).

5.  _____ Contours and the datum of the elevations.

6.  __X__ List setback, height, and floor space area restrictions disclosed by applicable zoning or building codes (beyond those required under paragraph 5d of these standards). If none, so state. The source of such information must be disclosed. See "Note" above.

7.  __X__ (a) Exterior dimensions of all buildings at ground level

    (b) Square footage of:

    __X__ (1) exterior footprint of all buildings at ground level

    _____ (2) gross floor area of all buildings; or

    _____ (3) other areas to be defined by the client

    _____ (c) Measured height of all buildings above grade at a defined location. If no defined location is provided, the point of measurement shall be shown.

8.  __X__ Substantial, visible improvements (in addition to buildings) such as billboards, signs, parking structures, swimming pools, etc.

9.  __X__ Parking areas and, if striped, the striping and the type (e.g. handicapped, motorcycle, regular, etc.) and number of parking spaces.

10. __X__ Indication of access to a public way on land such as curb cuts and driveways, and to and from waters adjoining the surveyed tract, such as boat slips, launches, piers and docks..

11. Location of utilities (representative examples of which are shown below) existing on or serving the surveyed property as determined by:
    _____ (a) Observed evidence

    __X__ (b) Observed evidence together with evidence from plans obtained from utility companies or provided by client, and markings by utility companies and other appropriate sources (with reference as to the source of information)

- *railroad tracks and sidings;*
- *manholes, catch basins, valve vaults or other surface indications of subterranean uses;*
- *wires and cables (including their function, if readily identifiable) crossing the surveyed premises, all poles on or within ten feet of the surveyed premises, and the dimensions of all crossmembers or overhangs affecting the surveyed premises; and*
- *utility company installations on the surveyed premises.*

12. _____  *Governmental Agency survey-related requirements as specified by the client.*

13. _____  *Names of adjoining owners of platted lands.*

14. _____  *The distance to the nearest intersecting street as designated by the client*

15. _____  *Rectified orthophotography, photogrammetric mapping, laser scanning and other similar products, tools or technologies may be utilized as the basis for the location of certain features (excluding boundaries) where ground measurements are not otherwise necessary to locate those features to an appropriate and acceptable accuracy relative to a nearby boundary.  The surveyor shall (a) discuss the ramifications of such methodologies (e.g. the potential accuracy and completeness of the data gathered thereby) with the title company, lender and client prior to the performance of the survey and, (b) place a note on the face of the survey explaining the source, date, relative accuracy and other relevant qualifications of any such data.*

16. _____  *Observable evidence of earth moving work, building construction or building additions within recent months.*

17. _____  *Any changes in street right of way lines either completed or proposed, and available from the controlling jurisdiction.  Observable evidence of recent street or sidewalk construction or repairs.*

18. _____  *Observable evidence of site use as a solid waste dump, sump or sanitary landfill.*

19. _____

## SUN LIFE FINANCIAL GROUP OF COMPANIES

*Certification for Surveys*

The undersigned has surveyed real property known as _____ (the "Property").  With knowledge that *[applicable Sun Life company]* ("Lender") will rely on the attached survey in disbursing a loan, Surveyor hereby certifies to Lender, _____ ("Title Insurance Company") and _____("Borrower") that:

The survey:

1. Was made according to the latest applicable "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," adopted by ALTA, ACSM, and NSPS.

2. Complies with Lender's "Requirements for Surveys to be Furnished in Connection with Mortgage Loans" ("Requirements"), including those items checked on Table A, attached to the Requirements.

3. Is based upon the latest applicable accuracy standards adopted by ALTA and NSPS.

4. Accurately reflects that the property contains _____ acres.

5. Shows that the Property does not lie within any flood hazard areas reflected on the most recent FEMA (or its successor) flood maps.

In my professional opinion as a land surveyor registered in the State [Commonwealth] of _____, the relative positional accuracy of this survey does not exceed that specified on the survey.

Signature: _____

Name: _____

Title: _____

Date: _____

Registration Number: _____

[Seal of professional registered
engineer or registered land surveyor]

# Sun
# Life Financial®

<u>COPY FOR SIGNATURE AND RETURN TO SUN LIFE</u>

Sun Life Assurance
Company of Canada
SC1307
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

UPS Overnight

May 22, 2007

Saint Vincent's Catholic Medical Center
Mr. Domenic Segalla
C/o Mr. Craig Bjornsund
NorthMarq Capital
One Penn Plaza, Suite 1421
New York, NY  10119

Re:    Sun Life Commitment #716481 - $17,500,000
       275 North Street, Harrison, Westchester County, New York

Dear Mr. Segalla:

It is our pleasure to tell you that we have approved a refinance of mortgage loans SL#715847 and
SL#715848 upon the terms and conditions detailed on pages 1-6 and Exhibit A which are attached.
Please indicate your willingness to be bound by the terms and conditions of this commitment by
signing the cover letter and initialing each page of the enclosed <u>yellow copy</u> and returning it to us
by May 29, 2007.  The commitment will constitute a binding obligation upon us to lend and you to
accept our loan, all on the terms herein if you wire the $2,327,808.11 of back principal to bring Sun
Life current on the existing loans.

SUN LIFE ASSURANCE COMPANY
OF CANADA

Leo J. Barrett, Jr.
Managing Director
Eastern Mortgage Portfolio

SAINT VINCENT'S CATHOLIC MEDICAL CENTER

Domenic Segalla
Date   5/31/07

Sun Life Assurance Company of Canada
is a member of the Sun Life Financial group of companies.

www.sunlife-usa.com

COMMITMENT CONDITIONS PAGE 1  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481

1) **LOAN AMOUNT, DISBURSEMENT SCHEDULE:**  A refinance and decrease of
SL#715847 from $22,192,332.32 to $17,500,000.  The new loan will be for $17,500,000 for
7 years with monthly payments of $127,912.44 based on a 20 year amortization plan.  Saint
Vincent's Catholic Medical Center will pay down at par SL#715847 from $22,192,332.32
and pay off at par SL#715848 which currently has an outstanding balance of $7,341,100.89.
The loan is to be disbursed no later than August 31st, 2007 however you may extend the
commitment through November 31, 2007 by paying one half of the fees due Sun Life and
Northmarq outlined in paragraph 25 (said payment to be credited against the amount due at
closing).

(2) **LOAN YEAR:**  The first day of the first loan year will be the first day of the month after the
initial disbursement.

(3) **CONTINGENCY:**  Notwithstanding the terms outlined in Conditions (1) and (2), this
commitment is issued with a contingency that all current Sun Life loans to Saint Vincent's
Catholic Medical Center be brought current, including all past due amount for amortization,
no later than May 28, 2007, or this commitment shall be null and void.  The estimated past
due amounts are estimated to be $2,327,808.11 and any interest payments due and payable up
to and including May 31, 2007.  Saint Vincent's Catholic Medical Center will represent and
warrant that all necessary approvals and authorization will have been received in connection
with said payments.  After Saint Vincent's Catholic Medical Center makes the back principal
payments they will begin making full principal and interest payments under the original loan
terms with the June 1st, 2007 payment.

*(4)* **PAYDOWN AND PAYOFF OF EXISTING LOANS:** After the partial pay down at par of
SL#740183 the loan balance of that loan will be $610,709.59.  Saint Vincent's Catholic
Medical Center will pay off the remaining balance of SL#740183 of $610,709.59, pay off the
outstanding balance of SL#740184 of $4,898,944.17, pay off the outstanding balance of
SL#715848 of $7,341,100.89 and pay down the balance of SL#715847 from $22,192,332.32
to $17,500,000.  All pay downs will be at par.  A portion of the pay downs by Saint Vincent's
Catholic Medical Centers will occur prior to funding as acceptance of this commitment. The
amount of the initial pay down will be equal to the above amount which brings Sun Life
current.

(5) **PAYMENT:**  Notwithstanding the terms outlined in Conditions (1), (2), (3) and (4), Upon
Saint Vincent's Catholic Medical Center making a fully authorized, nonrefundable payment
to Sun Life of all amounts due as a condition precedent under the commitment and (ii) the
filing of the bankruptcy court of a modified plan of reorganization in a form agreeable to Sun
Life incorporating the terms of the commitment, whose agreement shall not be unreasonably
withheld, Sun Life shall promptly withdraw its objection to the disclosure statement and agree
to support the plan.

(6) **EXCULPATION:**  Your financial responsibility respecting the loan contemplated herein will
be limited to the property itself and you will not be personally liable to us for any monetary

Approved

COMMITMENT CONDITIONS PAGE 2 SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481

deficiency arising from a foreclosure or similar action should such occur. Notwithstanding the above, Saint Vincent's Catholic Medical Centers (SVCMC) will be liable for security deposits received or held; rent received or held after an event of default; rents prepaid more than one month in advance; any lease termination fees; condemnation awards and insurance proceeds not applied as required by loan documents; property repair as a result of casualty not reimbursed by insurance to the extent insurance is required by the loan documents; fraud, material misrepresentation or bad faith; terms of the Environmental Indemnity Agreement; waste of the property; delinquent real estate taxes or assessments and/or non-compliance of Americans with Disabilities Act.

(7)   PREPAYMENT PRIVILEGE:  Open to prepayment in full at the beginning of the seventh loan month of the loan term subject to a prepayment fee which shall be the greater of (a) 1% of the then outstanding loan balance or (b) a Discounted Yield Maintenance Prepayment Fee computed as follows: the proceeds of the prepayment will be assumed to be immediately reinvested in a non-callable United States Treasury Security having a maturity most closely equivalent to the maturity date of this loan, "the Treasury Yield." If there are more than one non-callable United States Treasury Securities maturing in the same month as the loan, the Security with a coupon interest rate closest to the loan interest rate will be used. If the yield on that certain United States Treasury Security, as published in the "Wall Street Journal" on the fifth business day prior to the date of prepayment, is;

   (1)   less than the interest rate of the note, you will take the positive difference between the two interest rates, divide by 12 and multiply by the then outstanding balance of the loan to arrive at the monthly payment differential.  Then calculate the present value of the series of the monthly payment differentials for the number of whole and partial months from the prepayment date to the maturity date using the Treasury Yield as the discount rate compounding monthly.  The resulting sum of the discounted monthly prepayment differentials will be the Discounted Yield Maintenance Prepayment Fee, or,

   (2)   greater than or equal to the interest rate on the note, then prepayment fee shall be 1% of the then outstanding loan balance.

   Open to prepayment without a fee the last 180 days of the loan term.

(8)   PREPAYMENT OF EXISTING LOANS:  Notwithstanding the terms outlined in Condition (6), there will be no prepayment charges in connection with the repayment of SL#715847, and SL#715848 only in connection with this contemplated financing, however the full repayment of these loans will be a condition of funding (see condition 4).

(9)   DESCRIPTION:  The loan is to be secured by a parcel of land totaling 66.85 acres located in Harrison, Westchester County, New York.  The subject is improved with the campus of St. Vincent's Hospital Westchester.  The campus includes various buildings containing a total of approximately 250,000 square feet.  The land and buildings have a street address of 275 North Street.

(11)  NET LEASE:  SVCMC will execute a net lease for the subject in form and substance reasonably satisfactory to Sun Life. The Net Lease shall be co-terminus with the loan, at a

Approved

<u>COMMITMENT CONDITIONS PAGE 2 SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481</u>

deficiency arising from a foreclosure or similar action should such occur. Notwithstanding the above, Saint Vincent's Catholic Medical Centers (SVCMC) will be liable for security deposits received or held; rent received or held after an event of default; rents prepaid more than one month in advance; any lease termination fees; condemnation awards and insurance proceeds not applied as required by loan documents; property repair as a result of casualty not reimbursed by insurance to the extent insurance is required by the loan documents; fraud, material misrepresentation or bad faith; terms of the Environmental Indemnity Agreement; waste of the property; delinquent real estate taxes or assessments and/or non-compliance of Americans with Disabilities Act.

(7)    <u>PREPAYMENT PRIVILEGE:</u>  Open to prepayment in full at the beginning of the seventh loan month of the loan term subject to a prepayment fee which shall be the greater of (a) 1% of the then outstanding loan balance or (b) a Discounted Yield Maintenance Prepayment Fee computed as follows: the proceeds of the prepayment will be assumed to be immediately reinvested in a non-callable United States Treasury Security having a maturity most closely equivalent to the maturity date of this loan, "the Treasury Yield." If there are more than one non-callable United States Treasury Securities maturing in the same month as the loan, the Security with a coupon interest rate closest to the loan interest rate will be used. If the yield on that certain United States Treasury Security, as published in the "Wall Street Journal" on the fifth business day prior to the date of prepayment, is;

(1)    less than the interest rate of the note, you will take the positive difference between the two interest rates, divide by 12 and multiply by the then outstanding balance of the loan to arrive at the monthly payment differential. Then calculate the present value of the series of the monthly payment differentials for the number of whole and partial months from the prepayment date to the maturity date using the Treasury Yield as the discount rate compounding monthly. The resulting sum of the discounted monthly prepayment differentials will be the Discounted Yield Maintenance Prepayment Fee or,

(2)    greater than or equal to the interest rate on the note, then prepayment fee shall be 1% of the then outstanding loan balance.

Open to prepayment without a fee the last 180 days of the loan term.

(8)    <u>PREPAYMENT OF EXISTING LOANS:</u>  Notwithstanding the terms outlined in Condition (6), there will be no prepayment charges in connection with the repayment of SL#715847, and SL#715848 only in connection with this contemplated financing, however the full repayment of these loans will be a condition of funding (see condition 4).

(9)    <u>DESCRIPTION:</u>  The loan is to be secured by a parcel of land totaling 66.85 acres located in Harrison, Westchester County, New York. The subject is improved with the campus of St. Vincent's Hospital Westchester. The campus includes various buildings containing a total of approximately 250,000 square feet. The land and buildings have a street address of 275 North Street.

(11)    <u>NET LEASE:</u>    SVCMC will execute a net lease for the subject in form and substance reasonably satisfactory to Sun Life. The Net Lease shall be co-terminus with the loan, at a

Approved

<u>COMMITMENT CONDITIONS PAGE 3  SAINT VINCENT'S CATHOLIC MEDICAL CENTER</u>
<u>SUN LIFE LOAN NUMBER 716481</u>

triple net rent equal to 1.05 times actual debt service.  This lease will be fully subordinate to the mortgage.

(12)  <u>APPROVAL OF LEASES:</u>  The existing and future leases shall be subject to approval by Sun Life.  Sun Life's approval rights shall be subject to negotiated leasing parameters, reasonably acceptable to both parties.

(13)  <u>ASSIGNMENT OF RENTS:</u>  SVCMC is to give assignment of rents operative only in the event of a default.

(14)  <u>NO SECONDARY FINANCING, ASSIGNMENT, TRANSFER:</u>  There is to be no secondary financing in connection with this transaction or subsequently unless so approved by us in writing.  Further, this commitment may not be assigned or transferred.  Further, there may be no sale or transfer of any whole or partial interest in this property without our prior written consent.

Notwithstanding the above, Sun Life is aware of the possibility that there will be mezzanine debt and some secondary financing behind the Sun Life first mortgage.  All mezzanine and secondary debt will be totally subordinate to Sun Life's first mortgage and acceptable intercreditor agreements must be executed by all parties.

(15)  <u>INSURANCE:</u>  The property is to be insured to the extent of its full replacement value. Coverage is to be in an amount at all times sufficient to keep you from becoming a co-insurer as evidenced by an agreed amount endorsement or similar affirmative statement from the insurer.  If the policy is subject to a deductible, the amount thereof is to be satisfactory to us. The policy contract and the company which issues it are to be subject to our <u>initial</u> and periodic review and approval.  Further, we are to be furnished with evidence on an annual basis that the property is insured to our sole satisfaction.  If the property is located within a "flood hazard area" as defined by the Federal Insurance Administration, flood insurance will be required.

(16)  <u>CHATTEL MORTGAGE:</u>  We are to receive a security interest in and chattel mortgage on all on-site fixtures and equipment owned by you necessary to the operation of the property as an office building.

(17)  <u>ANNUAL OPERATING STATEMENTS:</u>  Within 120 days of the end of the property's fiscal year, we are to receive financial statements satisfactory to us reflecting the complete results of the operation of the property for the prior fiscal year.  The statements are to be prepared by a Certified Public Accountant acceptable to us or by you and certified by you as being correct, and are to cover the operations of the subject property only.  In addition to and simultaneous with the financial statements, we are to receive a statement reflecting the complete rental status of the property showing the name of each tenant, the area in square feet occupied, the remaining term of the lease and the rental being paid.

Approved

COMMITMENT CONDITIONS PAGE 4  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481

(18)  REAL ESTATE TAX AND INSURANCE DEPOSITS:  The mortgage is to contain a provision to the effect that you are to deposit 1/12 of the estimated annual real estate tax and hazard insurance premium with us on each monthly installment date.  Initially, and until further notice, no such deposits for the hazard insurance premium will be required.

(19)  AFFIDAVIT OF SOLVENCY:  At the time of disbursement, you are to provide an affidavit satisfactory to us that Saint Vincent's Catholic Medical Centers are not the subject of or defendant in any voluntary or involuntary bankruptcy proceeding, either active or pending, of any type whatever including any arrangement for the benefit of creditors or any other similar activity.

(20)  GENERAL CONDITIONS OF CLOSING:  In addition to the conditions contained elsewhere herein, this commitment is subject to our counsel's approval of title, survey, zoning, legality, and the form and substance of all mortgage documents, partnership agreements, permits, licenses, easements, opinions of counsel (including your counsel's opinion that only 6 of the units are subject to rent stabilization), et cetera (see Exhibit A).  All closing costs, including a mortgagee's policy of title insurance and the fees and expenses of local counsel of our choosing are to be paid by you.  In the event that the loan should not be disbursed through no fault of Sun Life, and regardless of whether or not the Good Faith Deposit is returned in whole or in part, you are to be responsible for any legal expenses incurred by Sun Life in attempting in good faith to consummate this transaction.

(21)  ARCHITECT'S OR ENGINEER'S REPORT:  We are to be provided with a report and certification prepared by a licensed architect or engineer approved by us stating that the property is structurally sound, and is in good order and repair.  We are in receipt of a report by EBI Consulting, dated September 3, 2004.  The report is satisfactory to us provided that you enter into a side letter agreement whereby you agree to remedy to our reasonable satisfaction the items listed under "Action Required" in the Executive Summary.

(22)  HAZARDOUS SUBSTANCE:  We shall be furnished a report, commonly called a Level 1 site assessment, in form and substance satisfactory to us, from a registered engineer acceptable to us, certifying to us that the property and the immediate vicinity of the property are free from asbestos, polychlorinated biphenyls (PCB), hazardous wastes, toxic substances and any other pollutants or contaminants which are or could be detrimental to the Mortgaged Property, human health or the environment or in violation of any governmental laws or regulations.  At our option, such report shall be based upon a detailed physical evaluation of the property, including without limitations such test borings, soil analyses and other tests and examinations as required by us.  Our obligation to fund this loan is specifically contingent upon our favorable review and final determination of the report.  We are in receipt of a report by EBI Consulting, dated September 2, 2004.  The report is satisfactory to us provided that the majority of the items noted in the side letter agreement agreed by you were remedy to our reasonable satisfaction the items listed under "Concern Noted or Reported" in the Executive Summary.

Approved

COMMITMENT CONDITIONS PAGE 5  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481

(23)   ACCELERATION PREMIUM: If an event of default occurs under the documents evidencing
this loan, thereby causing us to accelerate the loan prior to the maturity date, Sun Life will
sustain damages due to the loss of the investment.  Accordingly, the loan documents will
provide that, in the event of any default and consequent acceleration of the loan, and in
addition to any other sums due and payable under the Note, Deed of Trust or any other
instruments given as further security for the loan, you will be required, to the extent permitted
by law, to pay as liquidated damages an acceleration premium of the greater of 3% or a
discounted reinvestment formula amount calculated as follows: the proceeds of the
prepayment will be assumed to be immediately reinvested in a non-callable United States
Treasury Security having a coupon interest rate and maturity most closely equivalent to the
maturity date of the loan. If there are more than one non-callable United States Treasury
Securities maturing in the same month as the loan, the Security with a coupon interest rate
closest to the loan interest rate will be used. If the yield on that certain United States Treasury
Security, as published in the Wall Street Journal on the fifth business day prior to the date of
prepayment, is;

(1)    less than the interest rate of the note, you will take the positive difference between the
two interest rates, divide by 12 and multiply by the then outstanding balance of the loan
to arrive at the monthly payment differential.  Then calculate the present value of the
series of monthly payment differentials for the number of whole and partial months
from the prepayment date to the maturity date using the Treasury Yield as the discount
rate compounding monthly.  The resulting sum of the discounted monthly payment
differentials will be the Discounted Yield Maintenance Prepayment Fee.

(2)    greater than or equal to the interest rate on the note, then the prepayment fee shall be
3% of the then outstanding loan balance.

(24)   TRANSFER OF LOAN; REGISTRATION:  We reserve the right to transfer, at any time, all
or any portion of our interest in the loan.   We also reserve the right to elect to treat the
principal and interest due under the loan as being in registered form.  The transfer or election
may include all or any servicing rights with respect to the loan, involve the issuance of
securities evidencing a beneficial interest in the loan or require the appointment of a
registration or transfer agent.  You shall cooperate with us in connection with any transfer or
election and shall perform any tasks reasonably requested by us.  The tasks may include
delivering estoppels, opinions, tax certificates and any other documents each in form and
substance reasonably acceptable to us or any rating agency, consenting to the release of
information to potential transferees, participants or rating agencies or providing additional
information or granting reasonable access in order to obtain such information, as may
reasonably be required, including without limitation, updated environmental information, at
our expense, and appraisals, at our expense.

(25)   FEES:  SVCMC will pay to Sun Life a processing fee of $175,000 that is considered earned
and payable upon the closing of the extended/increased loan.
    SVCMC will also pay to NorthMarq Capital a processing fee of $175,000 that is concerned
earned and payable upon the closing of the extended/increased loan.

COMMITMENT CONDITIONS PAGE 6  SAINT VINCENT'S CATHOLIC MEDICAL CENTER
SUN LIFE LOAN NUMBER 716481

In addition, SVCMC will responsible for all costs and fees associated with the loans including the payment of Sun Life's Legal Fees including past legal fees connected with the existing Sun Life loans to SVCMC.

(26)    LOAN DOCUMENTATION:    Wherever feasible, both parties will endeavor to use the existing Sun Life loan documents including the exculpation language, master leases, currently in place, and rights of transfer.

(27)    TERMINATION, EXPIRATION:    Our obligations to perform under this commitment will terminate and expire May 29, 2007.

Approved

Exhibit "A"

**SUN LIFE ASSURANCE COMPANY OF CANADA AND RELATED COMPANIES**

*REQUIREMENTS FOR SURVEYS TO BE FURNISHED IN CONNECTION
WITH MORTGAGE LOANS*

All surveys (a) shall be submitted to the appropriate Sun Life company ("Lender") making the mortgage loan, (b) shall conform to the latest applicable *Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys*, and (c) shall include both the items listed below and those on the attached Table A:

The survey:

1.    Shall be dated and delivered just before loan closing.

2.    Shall be certified to Lender, the borrower, and the applicable title company.

3.    Shall identify the square footage and number of stories of all structures and shall specify whether any improvements are under construction.

4.    Shall show all wetlands.

5.    Shall show all roof and surface drainage lines and their outfalls.

6.    Shall conform to additional requirements on the attached Table A and to any other requirements Lender may impose for the related mortgage loan.

Three copies of the survey conforming to these requirements shall be delivered to Lender's local mortgage loan counsel.

## TABLE A

## OPTIONAL SURVEY RESPONSIBILITIES AND SPECIFICATIONS

NOTE:  The items of Table A must be negotiated between the surveyor and client.  It may be necessary for the surveyor to
qualify or expand upon the description of these items, e.g., in reference to Item 6, there may be a need for an interpretation
of a restriction.  The surveyor cannot make a certification on the basis of an interpretation or opinion of another party.
Items 16, 17 and 18 are only for use on projects for the U.S. Department of Housing and Urban Development (HUD).

If checked, the following optional items are to be included in the ALTA/ACSM LAND TITLE SURVEY, except as otherwise
negotiated:

1. _____ Monuments placed (or a reference monument or witness to the corner) at all major corners of the boundary of
the property, unless already marked or referenced by an existing monument or witness to the corner.

2. _____ Vicinity map showing the property surveyed in reference to nearby highway(s) or major street intersection(s).

3. __X__ Flood zone designation (with proper annotation based on federal Flood Insurance Rate Maps or the state or
local equivalent, by scaled map location and graphic plotting only.)

4. __X__ Gross land area (and other areas if specified by the client).

5. _____ Contours and the datum of the elevations.

6. __X__ List setback, height, and floor space area restrictions disclosed by applicable zoning or building codes (beyond
those required under paragraph 5d of these standards). If none, so state. The source of such information must
be disclosed.  See "Note" above.

7. __X__ (a) Exterior dimensions of all buildings at ground level

(b) Square footage of:

__X__ (1) exterior footprint of all buildings at ground level

_____ (2) gross floor area of all buildings; or

_____ (3) other areas to be defined by the client

_____ (c) Measured height of all buildings above grade at a defined location. If no defined location is provided, the point
of measurement shall be shown.

8. __X__ Substantial, visible improvements (in addition to buildings) such as billboards, signs, parking structures,
swimming pools, etc.

9. __X__ Parking areas and, if striped, the striping and the type (e.g. handicapped, motorcycle, regular, etc.) and number
of parking spaces.

10. __X__ Indication of access to a public way on land such as curb cuts and driveways, and to and from waters adjoining
the surveyed tract, such as boat slips, launches, piers and docks..

11. Location of utilities (representative examples of which are shown below) existing on or serving the surveyed
property as determined by:
_____ (a) Observed evidence

__X__ (b) Observed evidence together with evidence from plans obtained from utility companies or provided by client,
and markings by utility companies and other appropriate sources (with reference as to the source of information)
•    railroad tracks and sidings;

- *manholes, catch basins, valve vaults or other surface indications of subterranean uses;*
- *wires and cables (including their function, if readily identifiable) crossing the surveyed premises, all poles on or within ten feet of the surveyed premises, and the dimensions of all crossmembers or overhangs affecting the surveyed premises; and*
- *utility company installations on the surveyed premises.*

12. _____ *Governmental Agency survey-related requirements as specified by the client.*

13. _____ *Names of adjoining owners of platted lands.*

14. _____ *The distance to the nearest intersecting street as designated by the client*

15. _____ *Rectified orthophotography, photogrammetric mapping, laser scanning and other similar products, tools or technologies may be utilized as the basis for the location of certain features (excluding boundaries) where ground measurements are not otherwise necessary to locate those features to an appropriate and acceptable accuracy relative to a nearby boundary. The surveyor shall (a) discuss the ramifications of such methodologies (e.g. the potential accuracy and completeness of the data gathered thereby) with the title company, lender and client prior to the performance of the survey and, (b) place a note on the face of the survey explaining the source, date, relative accuracy and other relevant qualifications of any such data.*

16. _____ *Observable evidence of earth moving work, building construction or building additions within recent months.*

17. _____ *Any changes in street right of way lines either completed or proposed, and available from the controlling jurisdiction. Observable evidence of recent street or sidewalk construction or repairs.*

18. _____ *Observable evidence of site use as a solid waste dump, sump or sanitary landfill.*

19. _____

## SUN LIFE FINANCIAL GROUP OF COMPANIES

*Certification for Surveys*

The undersigned has surveyed real property known as _____ (the "Property").  With knowledge that *[applicable Sun Life company]* ("Lender") will rely on the attached survey in disbursing a loan, Surveyor hereby certifies to Lender, _____ ("Title Insurance Company") and _____("Borrower") that:

The survey:

1.  Was made according to the latest applicable "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," adopted by ALTA, ACSM, and NSPS.

2.  Complies with Lender's "Requirements for Surveys to be Furnished in Connection with Mortgage Loans" ("Requirements"), including those items checked on Table A, attached to the Requirements.

3.  Is based upon the latest applicable accuracy standards adopted by ALTA and NSPS.

4.  Accurately reflects that the property contains _____ acres.

5.  Shows that the Property does not lie within any flood hazard areas reflected on the most recent FEMA (or its successor) flood maps.

In my professional opinion as a land surveyor registered in the State [Commonwealth] of _____, the relative positional accuracy of this survey does not exceed that specified on the survey.

Signature: _____

Name: _____

Title: _____

Date: _____

Registration Number: _____

[Seal of professional registered
engineer or registered land surveyor]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
                                                                         :
In re:                                                                   :
                                                                         :
SAINT VINCENT'S CATHOLIC MEDICAL                                         :    Chapter 11
CENTERS OF NEW YORK d/b/a SAINT VINCENT                                  :    Case No.  05-14945 (ASH)
CATHOLIC MEDICAL CENTERS, *et al.,*                                      :    (Jointly Administered)
                                                                         :
                                      Debtors.                           :
                                                                         :
                                                                         :
-------------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING PAYMENT OF AMORTIZATION PAYMENTS RELATED TO A SECURED LOAN BETWEEN THE DEBTORS AND SUN LIFE ASSURANCE COMPANY OF CANADA AND SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.)

Upon the emergency motion dated May 31, 2007 (the "Motion") of Saint

Vincent's Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers

("SVCMC") and certain of its affiliates and subsidiaries, debtors and debtors in possession

(collectively, the "Debtors") for entry of an order pursuant to sections 105(a) and 363(b) of title

11 of the United States Code (the "Bankruptcy Code"), authorizing payment in cash upon entry

of this order of a principal amortization payment related to certain secured loans with Sun Life

Assurance Company of Canada and Sun Life Assurance Company of Canada (U.S.)

(collectively, "Sun Life") that have accrued and not been paid during the course of this chapter

11 case and the hearing held on the Motion on June 4, 2007 (the "Hearing");  and it appearing

that notice of this Order and the Motion provided by the Debtors is good and sufficient and all

other and further notice is hereby waived and dispensed with;  and upon good and sufficient

cause appearing, it is

**ORDERED**, that the Motion is hereby granted;  and it is further

**ORDERED**, that the indefeasible payment of the past due principal amortization

payments owed to Sun Life by SVCMC in relation to the Sun Life Loans of $2,327,808.11 is

hereby approved and SVCMC has authority to make such payments by June 5, 2007; and it is

further

**ORDERED**, that, subject to and limited by the fourth and fifth decretal

paragraphs below, the Debtors shall include in its Plan[1] as the exclusive treatment of the Sun

Life Secured Claim a provision for the entry into the Sun Life Refinanced Loans (the "Treatment

Provision") on terms substantially similar to those contained in the Term Sheets and otherwise

comply with the conditions set forth in the Term Sheets; and it is further

**ORDERED**, that notwithstanding the property described as collateral for Sun

Life Loan #740440 for $42,500,000 in the term sheet (the "Refinanced Manhattan Loan"), and

by agreement between SVCMC and Sun Life as set forth at the Hearing, the only collateral for

the Refinanced Manhattan Loan shall be the property located at 555 Sixth Avenue, New York,

New York ("Staff House"); and it is further

**ORDERED**, that the Sun Life Objection is deemed withdrawn with prejudice

within two (2) days of receipt of the Principal Payment from SVCMC, provided, however, that in

the event the Plan does not incorporate the Treatment Provision as the exclusive treatment of the

Sun Life Secured Claim or the Plan as confirmed does not include the Treatment Provision as the

exclusive treatment of the Sun Life Secured Claim, Sun Life shall have all of its rights to object

to confirmation of the Plan, without limitation, based on the alternative treatment contained in

---

[1] Terms capitalized but not defined herein shall have the definitions ascribed to such terms in the Motion.

such a plan of reorganization and to prosecute the Sun Life Secured Claim for the full amounts asserted in its proofs of claim; and it is further

      **ORDERED**, that the Principal Payment shall be a final and indefeasible payment notwithstanding the ability of a party in interest from seeking to appeal the relief granted in this Order; and it is further

      **ORDERED**, that nothing in this Order or in the Term Sheets and related documents implementing the Term Sheets shall impair or prejudice any of the rights or protections granted to the official committee of unsecured creditors, the official committee of tort claimants, the med mal trusts, the med mal trust monitor or the trade claims monitor under the Debtors' Plan, provided however, the Principal Payment shall be final and indefeasible notwithstanding the reservation of rights contained in this Order.


Dated:    New York, New York
         June 5, 2007

                          **s/Adlai S. Hardin, Jr.**
                          Adlai S. Hardin, Jr.
                          United States Bankruptcy Judge

3

**EXHIBIT 2**
Claims Summary Based Upon Estimates as of January 31, 2007

## Unclassified Claims (all Debtors)

| Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|
| Administrative Claims | $22,093,336 | $22,093,336 | $10,700,000 |
| Professional Claims | | | $13,000,000 |
| DIP Claim | | | $60,400,000 |
| Priority Tax Claims | $2,275,387 | $2,275,387 | $0 |

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

USActive 8863827.2

## Claims Against SVCMC

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against SVCMC | $48,291,144 | $32,166,091 | $0 |
| 2-2 | Other Secured Claims against SVCMC | $70,340,791 | $64,372,700 | $2,804,067[4] |
| 2-2 | Aptium Secured Claim | $25,000,000 | $25,000,000 | $8,966,600 +Interest |
| 2-3 | Commerce Secured Claim | $49,100,000 | $49,100,000 | $7,000,000 |
| 2-4 | RCG Secured Claim | $16,176,000 | $16,176,000 | $3,000,000 |
| 2-5(a) | Sun Life Westchester Secured Claims | $30,012,150 | $30,012,150 | $29,533,432 |
| 2-5(b) | Sun Life Manhattan Secured Claim | $48,742,952 | $48,742,952 | $48,009,652 |
| 3 | General Unsecured Claims against SVCMC | $512,553,057 | $395,706,035 | $189,600,000 |
| 4-6 | MedMal-BQ Claims MedMal-MW Claims MedMal-SI Claims | $3,939,717,367 | $3,036,702,367 | $81,069,489[5] |
| 7 | PBGC Claim | $152,500,000 | $152,500,000 | $0 |
| 8 | Intercompany Claim | $75,951,545 | $75,951,545 | $37,975,772 |
| 9 | DASNY Subordinated Claims | $18,623,116 | $18,623,116 | $6,765,721 |

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

[4] Includes mechanics' liens with a filed proof of claim and for which no proof of claim was filed, many of which are covered by an escrow holding.

[5] The estimated Allowed amount of Claims in each class of MedMal Claims as set forth in the Caronia Estimate.

## Claims Against MS-SVH

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|-------|-------------|---------------------------|----------------------------------|---------------------------------------------|
| A1 | Priority Non-Tax Claims against MS-SVH | $0 | $0 | $0 |
| A2 | Other Secured Claims against MS-SVH | $72,824 | $0 | $0 |
| A3 | General Unsecured Claims against MS-SVH | $2,621,289 | $1,522,529 | $80,823[4] |

---

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

[4] Represents $0 in interdebtor debt and $80,823 in third-party Claims.

**Claims Against SSSV**

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|---|
| B1 | Priority Non-Tax Claims against MS-SVH | $0 | $0 | $0 |
| B2 | Other Secured Claims against SSSV | $72,824 | $0 | $0 |
| B3 | General Unsecured Claims against SSSV | $2,401,029 | $1,302,279 | $0 |

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

## Claims Against CMC-CS

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|---|
| C1 | Priority Non-Tax Claims against CMC-CS | $0 | $0 | $0 |
| C2 | Other Secured Claims against CMC-CS | $72,824 | $0 | $0 |
| C3 | General Unsecured Claims against CMC-CS | $2,387,987 | $1,289226 | $0 |

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

## Claims Against CMC-PS

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|---|
| D1 | Priority Non-Tax Claims against CMC-PS | $30,892 | $30,892 | $0 |
| D2 | Other Secured Claims against CMC-PS | $72,824 | $0 | $0 |
| D3 | General Unsecured Claims against CMC-PS | $7,396,392 | $6,316,019 | $12,300,000[4] |

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

[4] Represents $12,264,914 in interdebtor debt and $35,086 in third-party Claims.

## Claims Against CMC-RS

| Class | Description | Amount of Claims Filed[1] | Amount of Claims in Registry[2] | Estimated Amount of Claims to be Allowed[3] |
|---|---|---|---|---|
| E1 | Priority Non-Tax Claims against CMC-RS | $12,020 | $12,020 | $0 |
| E2 | Other Secured Claims against CMC-RS | $72,824 | $0 | $0 |
| E3 | General Unsecured Claims against CMC-RS | $8,737,980 | $7,639,220 | $8,224,376[4] |

---

[1] Represents the total dollar amount of Claims filed with the Debtors' Claims Agent as of January 30, 2007.

[2] Represents the total dollar amount of Claims in the claims registry maintained by the Debtors' Claims Agent as of January 30, 2007 that have not been expunged, disallowed, reduced, or reclassified by order of the Court. The Debtors reserve all rights to object to Claims as they continue the claims reconciliation process.

[3] Represents the total dollar amount of Claims the Debtors estimate will be Allowed following the completion of the Claims resolution process and the liquidation of all claims. As explained in the Disclosure Statement, these numbers are estimates only and the ultimate amount of total Allowed Claims may be higher or lower than the amounts set forth in this chart. The Debtors have made every effort to properly classify each claim based upon the documentation provided in the corresponding proof of claim, but reserve all rights to reclassify as appropriate.

[4] Represents $8,219,611 in interdebtor debt and $4,765 in third-party Claims.

**EXHIBIT 3**
Debtors' Liquidation Analysis

USActive 8863827.2

DRAFT - WILL CHANGE

**SVCMC**
**Notes to Liquidation Analysis**
**(in $000s)**

1. Cash is assumed liquidated at 100%.
2. Patient receivables are assumed to be liquidated at 80% and 60% for the high and low scenarios, respectively, due to projected increases in denials form the various payors.
3. Other receivables are assumed to be liquidated at 60% and 40% for the high and low scenarios, respectively.
4. Divested account receivable include receivables from the sale of the Staten Island Hospital as well as the Queens hospitals (MIH and St Johns).
5. Other current and non-current assets are detailed on Attachment D and have a liquidation rate 14.1% and 0%, respectively.
6. Self Insurance ("SI"), Debt Service Reserve Funds ("DSRF") and Other Restricted Assets are detailed on Attachment D. The SI has been netted against its corresponding liabilities, some of the DSRF can be liquidated and distributed to the creditors, however, the Restricted Marketable Security Assets can not be liquidated due to donor intent.
7. PPE for all operations was assumed to be the higher of the appraised value or fair market value ("FMV"), the latter is estimated at 5 times EBIDA.  Westchester and Home Health are assumed to be sold at FMV; Manhattan is assumed to be sold at appraised real estate value less wind down and severance.
8. Cash flow from operations includes six months of projected EBIDA (January 2007 through June 2007) for Home Health, while Westchester and DOD's transactions are projected to take ten months.  In addition, the cash burn would increase due to on-going work performed by professionals ($1.5M per month) and interest on secured debt ($1.5M per month), which is financed at 12%.
9. Liquidation costs are estimated at 3% and 5% of non-liquid assets for the high and low scenarios, respectively, which are in line with prior non-SVCMC transactions.  Given the size and complexities of this transaction, this estimate may be low.
10. There are three mortgages for supportive housing.  This debt is not part of the DASNY obligations that were defeased in December, 2005.
11. Manhattan's shut-down includes the following assumptions:
    - The decision to shut down Manhattan will be made by February 28, 2007.
    - It will take 22 months to receive governmental permission from DOH to shut down Manhattan and then fully wind down Manhattan, which includes 6 months for various wind down initiatives such as responding to issues, audit, patient records and medical malpractice matters.
    - Patient revenue (high scenario) will decrease 15% in March 2007, 5% in May 2007, and 5% per quarter for the remaining part of 2007.  Upon receiving permission to shut down the hospital, patient revenue is projected to initially decrease 20% in January 08 and then decrease 10% per month thereafter.
    - Patient revenue (low scenario) will decrease 20% in March 2007, 5% in May 2007, and 5% per quarter for the remaining part of 2007.  Upon receiving permission to shut down the hospital, patient revenue is projected to initially decrease 20% in January 08 and then decrease 10% per month thereafter.
    - Other revenue (high and low scenario) is projected to decrease 5% per quarter during 2007.  Starting in 2008, other revenue is projected to decrease initially 15% in January 2008 and then 10% per month thereafter.
    - All expenses (high and low scenarios) are projected to decrease 5% per quarter during 2007.  Expenses are projected to decrease initially 10% in January 2008; expenses are then projected to decrease 5% per every other month from February 2008 through May 2008; expenses are then projected to decrease 10% monthly from June 2008 through December 2008.
12. Annual salaries and wages are estimated to be paid out in severance and stay-on bonuses in the amount of 10% and 15% for the high and low scenarios, respectively.  350 people from shared services are projected to receive severance, which is estimated at a blended salary of $60K for 12 weeks.
13. Pension liability figure is from the most recent PBGC calculation, provided to SVCMC in February 2007, incorporating the latest interest rates and actuarial tables.

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**Debtor 945**
**(in $000s)**

Att A

| ASSETS: | DEBTORS' BOOK VALUE @ 1/31/2007 | HIGH SCENARIO ORDERLY RECOVERY BASIS % | HIGH SCENARIO ORDERLY LIQUIDATION VALUE ("OLV") | LOW SCENARIO ORDERLY RECOVERY BASIS % | LOW SCENARIO ORDERLY LIQUIDATION VALUE ("OLV") | NOTES |
|---|---|---|---|---|---|---|
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 13,276 | 100.0% | $ 13,276 | 100.0% | $ 13,276 | (1) |
| Patients accounts receivable, net | 104,510 | 80.0% | 83,608 | 60.0% | 50,165 | (2) |
| Accounts receivable, other | 11,589 | 60.0% | 6,953 | 40.0% | 2,781 | (3) |
| Divested accounts receivable | 20,181 | 70.0% | 14,127 | 50.0% | 10,091 | (4) |
| Litigation Trust | N/A | N/A | TBD | N/A | TBD | |
| Other current assets | 12,823 | 25.9% | 3,326 | 25.9% | 3,326 | (5) See Att D |
| Total current assets | 162,379 | 74.7% | 121,290 | 65.7% | 79,638 | |
| | | | | | | |
| Investments limited as to use, SI | 45,331 | 100.0% | 45,331 | 100.0% | 45,331 | (6) See Att D |
| Investments limited as to use, DSRFs | 5,703 | 100.0% | 5,703 | 100.0% | 5,703 | (6) See Att D |
| Investments limited as to use, Other | 59,347 | 0.0% | - | 0.0% | - | (6) See Att D |
| PPE, net | 114,832 | 522.5% | 600,000 | 457.5% | 525,300 | (7) See Att B & C |
| Other noncurrent assets | 8,772 | 0.0% | - | 0.0% | - | (5) See Att D |
| TOTAL ASSETS | 396,364 | 194.9% | 772,324 | 165.5% | 655,973 | |
| | | | | | | |
| Wind-Down Manhattan Costs | | | (205,327) | | (234,744) | (11) |
| Cash Flow From Operations | | | (26,816) | | (37,287) | (8) |
| Liquidation Analysis Estimation & Litigation Costs: | | | (21,240) | | (33,318) | (9) |
| Total Available for Distribution | | | $ 518,941 | | $ 350,624 | |
| | | | | | | |
| Secured Claims: | | | | | | |
| GE @ 3/26/2007 | $ 99,858 | 100.0% | $ 99,858 | 100.0% | $ 99,858 | |
| Sun Life | 77,543 | 100.0% | 77,543 | 100.0% | 77,543 | |
| Medical Malpractice | 45,331 | 100.0% | 45,331 | 100.0% | 45,331 | |
| Aptium | 10,325 | 100.0% | 10,325 | 100.0% | 10,325 | |
| Commerce | 7,743 | 100.0% | 7,743 | 100.0% | 7,743 | |
| RCG | 3,000 | 100.0% | 3,000 | 100.0% | 3,000 | |
| HUD/DASNY | 2,364 | 100.0% | 2,364 | 100.0% | 2,364 | (10) |
| Staten Island Savings Bank | 420 | 100.0% | 420 | 100.0% | 420 | |
| Sub-Total Secured Claims | 246,584 | 100.0% | 246,584 | 100.0% | 246,584 | |
| | | | | | | |
| Administrative Claims: | | | | | | |
| Severance - Manhattan Wind-Down | Variable | 100.0% | 30,936 | 83.8% | 43,618 | (12) |
| Third Party Liability | 40,000 | 100.0% | 40,000 | 83.8% | 33,502 | |
| Admin Expenses (post-petition trade and salaries) | 34,200 | 100.0% | 34,200 | 83.8% | 28,645 | |
| Professional Fees | 12,200 | 100.0% | 12,200 | 83.8% | 10,218 | |
| Lease Rejections | 11,700 | 100.0% | 11,700 | 83.8% | 9,799 | |
| Medical Malpractice | 10,000 | 100.0% | 10,000 | 83.8% | 8,376 | |
| DOD | 7,500 | 100.0% | 7,500 | 83.8% | 6,282 | |
| Commerce Lease | 5,000 | 100.0% | 5,000 | 83.8% | 4,188 | |
| Sub-Total Admin Claims | 120,600 | 100.0% | 151,536 | 83.8% | 144,627 | |
| | | | | | | |
| Amount Available for Unsecured Creditors | | | 120,821 | | - | |
| | | | | | | |
| Unsecured Claims: | | | | | | |
| Pension | 219,000 | 21.5% | 47,182 | 0.0% | - | (13) |
| Trade | 171,000 | 21.5% | 36,841 | 0.0% | - | |
| Third Party Liability | 61,957 | 21.5% | 13,348 | 0.0% | - | |
| Intercompany | 38,246 | 21.5% | 8,240 | 0.0% | - | |
| Medical Malpractice | 25,738 | 21.5% | 5,545 | 0.0% | - | |
| Aptium - Pre-Petition Receivables | 15,675 | 21.5% | 3,377 | 0.0% | - | |
| RCG | 13,000 | 21.5% | 2,801 | 0.0% | - | |
| Lease Rejections | 9,787 | 21.5% | 2,109 | 0.0% | - | |
| Unions | 6,400 | 21.5% | 1,379 | 0.0% | - | |
| Aptium - Rejection Damages | - | 21.5% | - | 0.0% | - | |
| Sub-Total Unsecured Claims | 560,803 | 21.5% | 120,821 | 0.0% | - | |
| | | | | | | |
| Subordinated Claims: | | | | | | |
| DASNY | 6,766 | 0.0% | - | 0.0% | - | |
| Sub-Total Subordinated Claims | 6,766 | 0.0% | - | 0.0% | - | |

Att B

DRAFT - WILL CHANGE

**SVCMC**
**Going Concern, Appraisal, FMV and OLV**
**(in $000s)**

**High Scenario**

| | Manhattan | Westchester | Martin Payne | Staff House | O'Toole | Home Health | DOD | Bayley Seton | Misc R/E | Assets to Liquidate |
|---|---|---|---|---|---|---|---|---|---|---|
| BV - PPE [1] | $ 99,102 | $ 14,747 | N/A | N/A | N/A | $ - | $ - | N/A | $ 15,699 | $129,548 |
| EBIDA [2] | $ (1,334) | $ 6,320 | N/A | N/A | N/A | $ 9,376 | $16,557 | $ - | $ - | $ 30,918 |
| Appraisal [3] | $ 319,400 | $ 11,700 | $ 49,400 | $ 73,100 | $39,500 | $ - | $ - | $ - | $ 22,500 | $515,600 |
| FMV [4] | N/A | $ 31,600 | $ 55,000 | N/A | N/A | $ 46,900 | $ - | $ 12,000 | $ - | $145,500 |
| OLV [5] | $ 319,400 | $ 31,600 | $ 55,000 | $ 73,100 | $39,500 | $ 46,900 | $ - | $ 12,000 | $ 22,500 | $600,000 |

**Low Scenario**

| | Manhattan | Westchester | Martin Payne | Staff House | O'Toole | Home Health | DOD | Bayley Seton | Misc R/E | Assets to Liquidate |
|---|---|---|---|---|---|---|---|---|---|---|
| BV - PPE [1] | $ 99,102 | $ 14,747 | N/A | N/A | N/A | $ - | $ - | N/A | $ 15,699 | $129,548 |
| EBIDA [2] | $ (1,334) | $ 6,320 | N/A | N/A | N/A | $ 9,376 | $16,557 | $ - | $ - | $ 30,918 |
| Appraisal [3] | $ 269,400 | $ 11,700 | $ 49,400 | $ 73,100 | $39,500 | $ - | $ - | $ - | $ 20,500 | $463,600 |
| FMV [4] | N/A | $ 25,300 | $ 55,000 | N/A | N/A | $ 37,500 | $ - | $ 5,000 | $ - | $122,800 |
| OLV [5] | $ 269,400 | $ 25,300 | $ 55,000 | $ 73,100 | $39,500 | $ 37,500 | $ - | $ 5,000 | $ 20,500 | $525,300 |

Notes:
(1) Book Value ("BV") is based on SVCMC's financial statements from 1/31/2007
(2) EBIDA was calculated using November YTD actual Financials, and then annualizing the YTD Financials.
(3) Appraisals were developed by Cushman and Wakefield for DIP financing purposes.
(4) Fair Market Value ("FMV") is developed using: offer letters or 5 times EBIDA for high scenario and 4 times EBIDA for low scenario.
(5) Orderly liquidation value ("OLV") includes the higher of the FMV or the appraised value for each property.

DRAFT - WILL CHANGE

Att C

**SVCMC**
**Wind Down and Severance**
**Manhattan and Shared Services**
**(in $000s)**

| | Manhattan - High | | | Manhattan - Low | | |
|---|---:|---:|---:|---:|---:|---:|
| | 2007 | 2008 | Total Wind Down Costs | 2007 | 2008 | Total Wind Down Costs |
| **Operating Revenue** | | | | | | |
| Inpatient | 268,552 | 44,010 | 312,561 | 254,542 | 35,413 | 289,955 |
| Outpatient | 108,401 | 17,732 | 126,133 | 102,766 | 14,281 | 117,047 |
| Patient Service Revenue | 376,953 | 61,742 | 438,694 | 357,308 | 49,694 | 407,001 |
| Less Provision for Bad Debt | 27,067 | 4,433 | 31,500 | 25,656 | 3,568 | 29,224 |
| Net Patient Service Revenue | 349,886 | 57,308 | 407,194 | 331,652 | 46,125 | 377,777 |
| Pool Revenue | 14,923 | 3,764 | 18,688 | 14,923 | 3,764 | 18,688 |
| Capitation | 2,319 | 585 | 2,904 | 2,319 | 585 | 2,904 |
| Other | 46,467 | 12,073 | 58,540 | 46,467 | 12,073 | 58,540 |
| **Total Operating Revenue** | 413,595 | 73,731 | 487,326 | 395,361 | 62,548 | 457,909 |
| **Operating Expenses** | | | | | | |
| Salaries and Wages | 190,700 | 99,520 | 290,220 | 190,700 | 99,520 | 290,220 |
| Fringe Benefits | 55,647 | 29,156 | 84,803 | 55,647 | 29,156 | 84,803 |
| Supplies and Other | 143,119 | 76,094 | 219,213 | 143,119 | 76,094 | 219,213 |
| Insurance | 18,084 | 9,565 | 27,649 | 18,084 | 9,565 | 27,649 |
| **Total Direct Operating Costs** | 407,551 | 214,335 | 621,886 | 407,551 | 214,335 | 621,886 |
| **Contribution to Shared Services** | 6,045 | (140,604) | (134,560) | (12,190) | (151,787) | (163,977) |
| **Shared Services** | | | | | | |
| Salaries and Wages | 10,837 | 5,732 | 16,569 | 10,837 | 5,732 | 16,569 |
| Fringe Benefits | 3,270 | 1,730 | 5,000 | 3,270 | 1,730 | 5,000 |
| Supplies and Other | 32,178 | 17,020 | 49,198 | 32,178 | 17,020 | 49,198 |
| **Total Shared Services** | 46,286 | 24,481 | 70,767 | 46,286 | 24,481 | 70,767 |
| **Total Operating Expenses** | 453,836 | 238,817 | 692,653 | 453,836 | 238,817 | 692,653 |
| **EBIDA** | (40,241) | (165,086) | (205,327) | (58,476) | (176,269) | (234,744) |

DRAFT

Att D

## SVCMC
### Restricted Assets, Other Current and Non-Current Assets
### as of 1/31/2007
### ($000s Omitted)

| Restricted Assets: | BOOK VALUE @ 1/31/2007 | ADJUSTMENTS | ADJUSTED VALUE | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
|---|---|---|---|---|---|
| Investments Limited as to Use, Other | $  55,347 | $  - | $  55,347 | 0.0% | $  - |
| Self Insurance Funds | 45,331 | - | 45,331 | 100.0% | 45,331 |
| Irrevocable Grant or Trust - Deferred Compensation | 3,572 | - | 3,572 | 0.0% | - |
| Security Deposit - 33rd Street | 779 | - | 779 | 100.0% | 779 |
| Escrowed and/or DSRF Funds | 1,200 | - | 1,200 | 100.0% | 1,200 |
| Escrowed Funds - Utilities and Taxes | 2,865 | - | 2,865 | 100.0% | 2,865 |
| Other DSRF | 860 | - | 860 | 100.0% | 860 |
| Sub-Total DSRF | 5,703 | - | 5,703 | | 5,703 |
| Other | 428 | - | 428 | 0.0% | - |
| Total | $  110,382 | $  - | $  110,382 | 46.2% | $  51,034 |

| Other Current Assets: | BOOK VALUE @ 1/31/2007 | ADJUSTMENTS | ADJUSTED VALUE | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
|---|---|---|---|---|---|
| Inventory | $  7,714 | $  - | $  7,714 | 10.0% | $  771 |
| Prepaid | 5,109 | - | 5,109 | 50.0% | 2,555 |
| Sub-Total Other Current Assets | $  12,823 | $  - | $  12,823 | 25.9% | $  3,326 |

| Other Non-Current Assets: | BOOK VALUE @ 1/31/2007 | ADJUSTMENTS | ADJUSTED VALUE | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
|---|---|---|---|---|---|
| Deferred Finance Charges | $  5,795 | $  - | $  5,795 | 0.0% | $  - |
| Intangible Pension Asset | 2,660 | - | 2,660 | 0.0% | - |
| Other | 317 | - | 317 | 0.0% | - |
| Sub-Total Other Non-Current Assets | $  8,772 | $  - | $  8,772 | 0.0% | $  - |

Attorney Work Product - Tentative and Preliminary

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**(in $000s)**
**Case# 946**

946

| | DEBTORS' BV @ 1/31/2007 | HIGH SCENARIO | | LOW SCENARIO | |
|---|---|---|---|---|---|
| | | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
| **ASSETS:** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ - | 100.0% | $ - | 100.0% | $ - |
| Patients accounts receivable, net | - | 80.0% | - | 60.0% | - |
| Other current assets | - | 0.0% | - | 0.0% | - |
| Total current assets | - | N/A | - | N/A | - |
| PPE, net | - | 0.0% | - | 0.0% | - |
| Due From SVCMC | - | 0.0% | - | 0.0% | - |
| **TOTAL ASSETS** | - | N/A | - | N/A | - |
| Liquidation Analysis Estimation & Litigation Costs: | | | - | | - |
| **Total Available for Distribution** | | | $ - | | $ - |
| **Unsecured Claims:** | | | | | |
| Trade | 0 | 0.0% | - | 0.0% | - |
| Intercompany | - | 0.0% | - | 0.0% | - |
| Total Unsecured Claims | 0 | 0.0% | - | 0.0% | - |

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**(in $000s)**
**Case# 947**

947

| ASSETS: | DEBTORS' BV @ 1/31/2007 | HIGH SCENARIO | | LOW SCENARIO | |
|---|---|---|---|---|---|
| | | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 77 | 100.0% | $ 77 | 100.0% | $ 77 |
| Patients accounts receivable, net | - | 80.0% | - | 60.0% | - |
| Other current assets | 26 | 0.0% | - | 0.0% | - |
| Total current assets | 103 | 74.5% | 77 | 100.0% | 77 |
| | | | | | |
| PPE, net | - | 0.0% | - | 0.0% | - |
| Due From SVCMC | - | 0.0% | - | 0.0% | - |
| TOTAL ASSETS | 103 | 74.5% | 77 | 100.0% | 77 |
| | | | | | |
| Liquidation Analysis Estimation & Litigation Costs: | | | 2 | | 4 |
| Total Available for Distribution | | | $ 74 | | $ 73 |
| | | | | | |
| Unsecured Claims: | | | | | |
| Trade | 81 | 91.3% | 74 | 89.4% | 73 |
| Total Unsecured Claims | 81 | 91.3% | 74 | 89.4% | 73 |

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**(in $000s)**
**Case# 948**

948

| ASSETS: | DEBTORS' BV @ 1/31/2007 | HIGH SCENARIO | | LOW SCENARIO | |
|---|---|---|---|---|---|
| | | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
| Current assets: | | | | | |
| Cash and cash equivalents | $ - | 100.0% | $ - | 100.0% | $ - |
| Patients accounts receivable, net | 45 | 80.0% | 36 | 60.0% | 22 |
| Other current assets | - | 0.0% | - | 0.0% | - |
| Total current assets | 45 | 80.0% | 36 | 60.0% | 22 |
| | | | | | |
| PPE, net | - | 0.0% | - | 0.0% | - |
| Due From SVCMC | 362 | 0.0% | - | 0.0% | - |
| TOTAL ASSETS | 407 | 8.8% | 36 | 60.0% | 22 |
| | | | | | |
| Liquidation Analysis Estimation & Litigation Costs: | | | 1 | | 1 |
| Total Available for Distribution | | | $ 35 | | $ 21 |
| | | | | | |
| Unsecured Claims: | | | | | |
| Trade | 0 | 100.0% | 0 | 100.0% | 0 |
| Intercompany | - | 100.0% | - | 100.0% | - |
| Total Unsecured Claims | 0 | 100.0% | 0 | 100.0% | 0 |

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**(in $000s)**
**Case# 949**

949

| ASSETS: | DEBTORS' BV @ 1/31/2007 | HIGH SCENARIO | | LOW SCENARIO | |
|---|---|---|---|---|---|
| | | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
| Current assets: | | | | | |
| Cash and cash equivalents | $ - | 100.0% | $ - | 100.0% | $ - |
| Patients accounts receivable, net | 186 | 80.0% | 149 | 60.0% | 89 |
| Other current assets | - | 0.0% | - | 0.0% | |
| Total current assets | 186 | 80.0% | 149 | 60.0% | 89 |
| PPE, net | - | 0.0% | - | 0.0% | - |
| Due From SVCMC | - | 0.0% | - | 0.0% | - |
| TOTAL ASSETS | 186 | 80.0% | 149 | 60.0% | 89 |
| Liquidation Analysis Estimation & Litigation Costs: | | | 4 | | 4 |
| Total Available for Distribution | | | $ 144 | | $ 85 |
| Unsecured Claims: | | | | | |
| Trade | 17 | 1.8% | 0 | 1.0% | 0 |
| Intercompany | 8,220 | 1.8% | 144 | 1.0% | 85 |
| Total Unsecured Claims | 8,237 | 1.8% | 144 | 1.0% | 85 |

DRAFT - WILL CHANGE

**SVCMC**
**Liquidation Analysis**
**(in $000s)**
**Case# 951**

951

| ASSETS: | DEBTORS' BV @ 1/31/2007 | HIGH SCENARIO | | LOW SCENARIO | |
|---|---|---|---|---|---|
| | | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") | ORDERLY RECOVERY BASIS % | ORDERLY LIQUIDATION VALUE ("OLV") |
| Current assets: | | | | | |
| Cash and cash equivalents | $        - | 100.0% | $        - | 100.0% | $        - |
| Patients accounts receivable, net | 65 | 80.0% | 52 | 60.0% | 31 |
| Other current assets | - | 0.0% | - | 0.0% | |
| Total current assets | 65 | 80.0% | 52 | 60.0% | 31 |
| PPE, net | - | 0.0% | - | 0.0% | - |
| Due From SVCMC | - | 0.0% | - | 0.0% | - |
| TOTAL ASSETS | 65 | 80.0% | 52 | 60.0% | 31 |
| Liquidation Analysis Estimation & Litigation Costs: | | | 2 | | 2 |
| Total Available for Distribution | | | $        50 | | $        30 |
| Unsecured Claims: | | | | | |
| Trade | 35 | 0.4% | 0 | 0.2% | 0 |
| Intercompany | 12,265 | 0.4% | 50 | 0.2% | 30 |
| Total Unsecured Claims | 12,300 | 0.4% | 50 | 0.2% | 30 |

**EXHIBIT 4**
Debtors' Projected Financial Information

1.    **Pro Forma Financial Projections**

SVCMC believes that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of SVCMC or any successor under the Plan.

In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility requirement, SVCMC analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. In this regard, the management of SVCMC developed and refined its business plan and prepared financial projections for the calendar years ending December 31, 2007 through 2014 (collectively, the "Projections"). SVCMC does not, as a matter of course, publish its business plans and strategies or projections or its anticipated financial position or results of operations. Accordingly, SVCMC does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to holders of claims or interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by SVCMC to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. Though considered reasonable by SVCMC as of the date hereof, the Projections are subject to significant business, economic and competitive uncertainties. These uncertainties include, but are not limited to:

1)  the highly competitive nature of the healthcare business,

2)  the efforts of insurers and other payors, health care providers, and others to contain health care costs,

3)  possible changes to Medicare, Medicaid and other governmental programs that may further limit reimbursements to healthcare providers,

4)  changes in Federal, state or local regulations affecting the health care industry,

5)  the possible enactment of Federal or state healthcare reform,

6)  the ability to attract  and retain qualified management and personnel, including physicians and nurses,

7)  claims and legal actions relating to professional liabilities or other matters,

8)  changes in accounting standards,

9) changes in general economic conditions,

10) the ability to enter into managed care provider arrangements on
acceptable terms,

11) changes in revenue mix,

12) changes in business strategy or development plans,

13) the ability to obtain adequate levels of general and professional
liability insurance,

14) potential adverse impact of known and unknown government
investigations,

15) timeliness of reimbursement payments received under government
programs,

16) the ability to maintain and increase patient volumes and control the
cost of providing services, and

17) other risk factors, including those set forth in section VIII of the
Disclosure Statement.

Accordingly, such projections, estimates and assumptions are not
necessarily indicative of current values or future performance, which may be significantly
less favorable or more favorable than as set forth.  The Projections were substantially
completed in April, 2007.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE
PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY
CONSIDERABLY FROM THE PROJECTIONS.  IN ADDITION, THE
UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE
FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED
DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC
ACTIVITY AND SVCMC PERFORMANCE AT MORE DISTANT POINTS IN THE
FUTURE.  CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED
HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY SVCMC,
SVCMC'S ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED
RESULTS WILL BE ACHIEVED.  THE PROJECTIONS WERE NOT PREPARED
WITH A VIEW TOWARDS PUBLIC DISCLOSURE OR COMPLIANCE WITH
GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PUBLISHED
GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION OR THE
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING
PROJECTIONS OR FORECASTS.  THE PROJECTIONS HAVE NOT BEEN
AUDITED OR REVIEWED BY SVCMC'S INDEPENDENT CERTIFIED

ACCOUNTANTS. IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

The Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized SVCMC, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of Reorganized SVCMC, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to Reorganized SVCMC. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by SVCMC when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of Reorganized SVCMC. Accordingly, the Projections are only an estimate and, therefore, necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by SVCMC or any other person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections

The Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Projections include the intent, belief or current expectations of SVCMC and members of its management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and SVCMC's future liquidity, as well as the assumptions upon which such statements are based. While SVCMC believes that the expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projections include, but are not limited to, further adverse developments with respect to SVCMC's liquidity position or operations of SVCMC's business, adverse developments in SVCMC's efforts to renegotiate its funding and adverse developments in the bank financing or public or private markets for debt or equity securities, or adverse developments in the timing or results of SVCMC's strategic business plan (including the time line to emerge from

chapter 11), the difficulty in controlling industry costs and the ability of SVCMC to realize the anticipated general and administrative expense savings and overhead reductions presently contemplated, the ability of SVCMC to return SVCMC's operations to profitability, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations, and the possible negative effects of a change in applicable legislation.

## 2.    **Summary of Significant Assumptions**

SVCMC's management developed the Projections based on: (i) current and projected market conditions in each of SVCMC's respective markets, (ii) strategic initiatives being implemented at various locations, (iii) cost savings opportunities at various business units and administrative departments, (iv) the ability to maintain sufficient working capital to self-fund operations or access to financing sources to fund any deficiencies, and (v) confirmation of the Plan.

For presentation purposes, it is assumed that SVCMC emerges from chapter 11 on September 1, 2007, thus completing the financial restructuring of SVCMC. SVCMC intends to emerge in September, 2007, which management believes will not materially change the Projections. All costs presented in the restructuring columns of the statements are assumed to be incurred and paid if applicable at September 1, 2007. However, not all of the costs presented in that column will be paid immediately and may be paid when approved by the Bankruptcy Court, when negotiated, or in the ordinary course of business of SVCMC.

Reorganized SVCMC expects to enter into an Exit Facility, consisting of two (2) separate sub-facilities of up to $320 million upon emergence from its chapter 11 case. The two (2) separate sub-facilities of the Exit Facility will likely consist of the following: (i) a $50 million Revolving Line of Credit secured by accounts receivable and inventory, of which $0.0 million will be drawn on emergence and $0.0 million of undrawn letters of credit are projected to be issued under this facility; (ii) a $270 Term Loan.

For purposes of preparing the Projections, a blended interest rate at emergence of 8.5% has been assumed and applied to the estimated outstanding balance of the Exit Facility. The Projections assume the following amortization schedule: the Revolving Line of Credit will be paid down with surplus cash; the Term Loan will amortize at 25 years, beginning 30 months after the effective date. The Exit Facility is projected to have a term of nine (9) years. The actual amount of proceeds required could differ materially from this estimate, as could the actual blended interest rate, amortization schedule and term ultimately obtained. The final terms of the Exit Facility are subject to further negotiation with SVCMC's potential exit lenders and future market conditions.

The Projections contemplate the payment of certain cash amounts to the holders of General Unsecured Claims against SVCMC, the PBGC, and the MedMal

Trust.  It is assumed that the holders of Allowed General Unsecured Claims will receive
$143 million of cash on the Effective Date, and that Reorganized SVCMC's obligations
to holders of General Unsecured Claims on account of the Intermediate Claims
Distribution Amount and the Final Claims Distribution Amount (i.e., after payment of
estimated Net Litigation Proceeds) will approximate $32 million.

"Fresh Start Reporting" principles, which SVCMC will be required to
adopt upon emergence from chapter 11 have been reflected in the Projections.  Fresh
Start Reporting requires, among other things, that SVCMC's assets and liabilities be
recorded at fair value on the Effective Date.  As a result, SVCMC's Projections reflect
reductions in the fixed assets, intangibles, and deferred tax accounts to reflect Fresh Start
Reporting.

3.   **Business Strategy of Reorganized SVCMC**

During SVCMC's chapter 11 case, its new senior management conducted
an extensive review of SVCMC's operations and competitive situation.  Management
focused its strategy on the following broad areas:

- Portfolio (or four wall) analysis, including but not limited to the
  following:

    o  Contribution margin analysis

    o  Viability analysis

- Revenue Intiatives, including but not limited to the following:

    o  Payor rates

    o  Volume drivers (e.g., discharges)

    o  Profitability factors (e.g., average length of stay)

- Expense reductions, including but not limited to the following:

    o  Employee and benefit analysis

    o  Expense rationalization

    o  Vendor contract negotiation

    o  Pension analysis

    o  Medical malpractice analysis

    o  Overhead rationalization

4.        **Balance Sheet Assumptions**

a.        *Cash*:  At emergence, there is forecasted cash of $15.0 million.  Any excess cash generated over the projection period is used to pay down any short-term debt borrowed to operate the business, with the balance accumulated in the cash accounts of SVCMC.  The Projections do reflect estimated amounts paid as a result of implementing the Plan, including but not limited to, payment of certain administrative, priority, and miscellaneous secured claims, cure costs, and amounts owed in respect of the PBGC Agreement and the MedMal Trusts.

b.        *Patient Accounts Receivable and Other Accounts Receivable ("AR")*:  Consists primarily of patient receivables owed to SVCMC for services provided in the ordinary course of business.  SVCMC provides services to its customers on standard terms of credit.  Consistent with a range of recent historical activity, AR is projected at 50-60 days sales outstanding throughout the Projections.

c.        *Other Current Assets*:  Primarily include inventory and prepaid expenses such as insurance and is expected to remain consistent with historical levels.

d.        *Investments limited as to use:*  Represent assets whose use is restricted for specific purposes, under internal designation or terms of agreements.  Primarily include Self Insurance Fund, Sinking Fund, Depreciation Fund, Escrow and Collateral Fund, and debt reserves.  The balance of the Self Insurance Fund for both the retained and the divested entities is utilized in full to reduce the Professional Liabilities (defined below) upon emergence and the remaining funds remain consistent with historical levels.

e.        *Land, Buildings & Equipment*:  Projected Land, Building & Equipment is presented net of accumulated depreciation on the balance sheet.  Value has been updated to reflect appraisal values of Manhattan and Westchester properties.  Increases that occur throughout the projection period represent annual capital expenditures reduced by annual depreciation.  Projected capital expenditures include replacement of worn equipment, spending for compliance with regulatory requirements, including environmental, and new equipment to support growth.

f.        *Other Non-Current Assets*:  Other Assets include notes receivable, deferred finance charges, and intangible pension assets.

g.        *Exit Financing Revolver*:  Short-term debt will consist of a $50 million Revolving Line of Credit secured by accounts receivable which will replace the DIP Agreement revolver currently in place.

h.    *Accounts Payable and Accrued Expenses*:  Projected accounts payable and accrued expenses are based on maintaining historical credit terms provided by SVCMC's vendors and are projected to be inline with industry standards.

i.    *Pre-petition Claims*: Represents General Unsecured Claims, general,cure costs, USFHP cure costs, and the Aptium claim.  The reduction of this liability represents the payments from SVCMC to their creditors as detailed in the Plan.

j.    *Accrued Salaries and Payroll Taxes Withheld*: Represents amounts due for salary and payroll taxes to be paid in arrears based on historical payment patterns and accruals.

k.    *Other Current Liabilities*:  Primarily includes due to third party liabilities including Medicaid and Medicare which will be paid in the normal course.

l.    *Long Term Debt*:  Upon emergence, Long Term Debt will consist of the Exit Facility term loan of $270.0 million, $42.5 million in mortgage debt on Staff House, $17.5 million of mortgage debt on Westchester, $22.6 million of mortgage debt on Bishop Mugavero, $1.1 million of mortgage debt on Holy Family Home, and $11.0 million secured by the pool revenue.  Additionally, the Secured Obligation to the Unsecured Creditors for $14.9 million is reflected as Long Term Debt.  This debt will be paid in accordance to their respective loan documents.

m.    *Professional Liabilities:* Represents the Medical Malpractice liability for the retained businesses only.  Balance will be reduced by a cash payment upon emergence, the balance of the self insurance fund related to the retained entities, and scheduled payments going forward.

n.    *Other Non-Current Liabilities:* Represents the pension liability for retained entities.  A one-time payment of $57.7 million will be made upon emergence.  In addition, the following payments will be made:

| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Payment | $17.3 | $13.5 | $13.5 | $13.5 | $18.2 | $24.7 | $8.0 | $6.2 |

o.    *Carry Forward Pre-Petition Professional Liabilities:* Represents the Medical Malpractice liability for the divested businesses only.  Balance will be reduced by a cash payment upon emergence, the balance of the self insurance fund related to the retained entities, and scheduled payments going forward.

      p.     *Carry Forward Pre-Petition Other Non-Current
Liabilities:* Represents the pension liability for divested businesses.  A one-time payment
of $57.7 million will be made upon emergence.  See item 4n above for payment schedule.

      q.     *Additional Minimum Liability for Pension*: Represents the
impact on Net Assets to adjust the pension liability to the projected balance for each year
as well as the reduction to due item 4o above.

      r.     *Unrestricted Net Assets*: All of the impact of the change in
Net Assets from the Income Statement is reflected in this line.

      s.     *Temporarily and Permanently Restricted Net Assets*: Do
not change over time because all of the change in Net Assets from the Income Statement
is reflected in the Unrestricted Net Assets line.

### 5.     Income Statement Assumptions

      a.     *Net Patient Service Revenues*:  Net patient service revenue
is the sum of the gross patient service revenue and any adjustments.  Gross patient service
revenue is driven by projected patient discharges or outpatient visits.  Deductions from
revenue include denials and are the difference between the hospital's charge for patient
services and the amount the hospital anticipates receiving from third party payors under
contractual agreements.  Deductions from revenue also include adjustments for charity,
bad debt, and administrative allowances.  The hospital has entered into agreements with
third party payors, including government programs such as Medicaid and Medicare, and
managed care health plans, under which the hospital is paid based upon different
contractual agreements including payment agreements based upon percentages of
established charges, predetermined rates per diagnosis, fixed per diem rates, and rates
based on the cost of providing services.

      b.     *Pool Revenue:* SVCMC currently receives and is projected
to receive additional payments from Federal Programs because it serves a
disproportionate share of low-income patients.

      c.     *Capitation Revenue*: SVCMC has entered into a payment
agreement with the United States Department of Defense, known as the Uniform Services
Family Health Plan.  Under the plan, SVCMC is paid on a fixed capitation basis.
SVCMC also has agreements with prepaid health services plans to provide medical
services to subscribing participants.  Under these agreements, SVCMC receives monthly
capitation payments based on the number of participants, regardless of services provided.

      d.     *Other Revenue*:  Includes grants, rents, contributions,
physician billings and other miscellaneous activities not related to patient service.

e.    *Operating Expenses*: Operating expenses include employee salaries and benefits, medical supplies and pharmaceutical expenses, insurance, utilities, rents and leases, professional fees, purchases services, repair and maintenance expenses and other expenses.  Projected operating expenses are based on factors such as projected full time equivalent employees, contractual or anticipated changes in wages and benefits per full time equivalent, expense changes due to volume increases or decreases, estimated inflationary increases in historical support costs, anticipated or negotiated changes in supply costs or other expenses, and the variable and fixed cost per discharge for medical supplies and pharmaceutical expenses.

f.    *Shared Services*:  Shared Services expenses include employee salaries and benefits, supplies, professional fees, purchases services, rents and leases and other costs related to the corporate shared overhead division of the organization.  The largest supply and other costs include IT services and supplies, fees related to the collection of revenue, and rent.

g.    *Interest Expense*:  Includes payments on the Exit Facility, Revolver and Mortgage Debt and an unused line fee.

h.    *Reorganization Items*:  Reorganization Items are comprised of Exit Facility fees and professional fees related to SVCMC's chapter 11 filing as well as the wind-down costs associated with the sale or closure of hospitals that will no longer be part of the system.

*( $'s in Millions)*

| Sources of Funds | | |
|---|---|---|
| New Debt, net | $ | 265.7 |
| Net Equity from Martin Payne/Staff House | | 35.0 |
| **Total Sources of Funds** | **$** | **300.6** |

| Uses of Funds | | |
|---|---|---|
| **Secured Claims:** | | |
| General Electric DIP | $ | 65.4 |
| Aptium & Litigation Trust | | 5.8 |
| Total Secured Claims | | 71.2 |
| | | |
| **Admin Claims:** | | |
| Get Out Costs | | 14.6 |
| Cure Costs | | 9.0 |
| Sub-Total for Admin Claims | | 23.6 |
| | | |
| **Unsecured Claims:** | | |
| Medical Malpractice Claims | | 5.0 |
| Pension Liabilities | 85 | 57.7 |
| Trade | 189 | 143.2 |
| Total Unsecured Claims | | 205.9 |
| | | |
| **Total Uses of Funds** | **$** | **300.6** |

# Saint Vincent Catholic Medical Centers of New York

## Projected Pro Forma Balance Sheet

| | Projection [3] Dec-06 | Projection Dec-07 | Projection Dec-08 | Projection Dec-09 | Projection Dec-10 | Projection Dec-11 | Projection Dec-12 | Projection Dec-13 | Projection Dec-14 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| Cash and other cash equivalents | 12,396 | 14,692 | 11,586 | 15,183 | 12,974 | 14,429 | 17,858 | 49,459 | 63,810 |
| Investments | - | - | - | - | - | - | - | - | - |
| Investments limited as to use | - | - | - | - | - | - | - | - | - |
| Patient accounts receivable, net | 104,849 | 93,645 | 91,765 | 94,730 | 97,800 | 99,756 | 101,752 | 103,787 | 105,862 |
| Accounts receivable, other | 8,689 | 7,761 | 7,605 | 7,851 | 8,105 | 8,267 | 8,432 | 8,601 | 8,773 |
| Other Current Assets | 13,201 | 13,201 | 13,201 | 13,201 | 13,201 | 13,201 | 13,201 | 13,201 | 13,201 |
| **Total Current Assets** | 139,135 | 129,299 | 124,157 | 130,965 | 132,081 | 135,654 | 141,243 | 175,048 | 191,647 |
| Investments limited as to use, less current | 125,503 | 80,380 | 80,380 | 80,380 | 80,380 | 80,380 | 80,380 | 80,380 | 80,380 |
| Land, buildings and equipment, net of | | | | | | | | | |
| accumulated depreciation [4] | 582,699 | 522,745 | 509,699 | 493,162 | 481,925 | 462,230 | 436,859 | 402,848 | 367,836 |
| Other non-current assets | 10,999 | 10,999 | 10,999 | 10,999 | 10,999 | 10,999 | 10,999 | 10,999 | 10,999 |
| **TOTAL ASSETS** | 858,335 | 743,422 | 725,235 | 715,506 | 705,385 | 689,263 | 669,481 | 669,274 | 650,861 |
| **LIABILITIES AND NET ASSETS** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| Current installments of long term debt | 91,526 | - | - | - | - | - | - | - | - |
| DIP/Exit Financing Revolver | - | - | - | - | - | - | - | - | - |
| AP and accrued expenses [1] | 24,465 | 38,906 | 40,462 | 41,777 | 43,135 | 43,998 | 44,878 | 45,776 | 46,691 |
| Pre-petition Claims | 206,377 | 25,503 | 9,300 | | | | | | |
| Accrued salaries and payroll taxes withheld | 26,567 | 28,995 | 29,721 | 30,582 | 31,468 | 32,097 | 32,739 | 33,394 | 34,062 |
| Other current liabilities | 61,455 | 61,455 | 61,455 | 61,455 | 61,455 | 61,455 | 61,455 | 61,455 | 61,455 |
| **Total Current Liabilities** | 410,390 | 154,859 | 140,938 | 133,813 | 136,058 | 137,550 | 139,072 | 140,625 | 142,208 |
| **Non-Current Liabilities** | | | | | | | | | |
| Long-term debt, excluding current installments | 170,117 | 378,737 | 375,065 | 371,344 | 354,073 | 336,823 | 319,573 | 302,323 | 270,193 |
| Professional liabilities (Medical Malpractice) | 39,956 | 26,083 | 27,136 | 28,190 | 29,243 | 29,323 | 29,403 | 29,484 | 29,564 |
| Other non-current liabilities (Pension) | 54,765 | 23,086 | 25,701 | 26,454 | 15,530 | 4,647 | (6,373) | (7,455) | (7,930) |
| **Total Non-Current Liabilities** | 264,838 | 427,905 | 427,901 | 425,988 | 398,846 | 370,793 | 342,603 | 324,351 | 291,826 |
| **Carry Forward Pre-Petition Liabilities [2]** | | | | | | | | | |
| Professional liabilities (Medical malpractice) | 165,311 | 132,061 | 124,008 | 115,954 | 107,901 | 95,821 | 83,741 | 71,660 | 59,580 |
| Other non-current liabilities (Pension) | 45,333 | 19,110 | 21,274 | 21,898 | 12,856 | 3,847 | (5,275) | (6,171) | (6,565) |
| **Total Carry Forward Pre-Petition Liabilities** | 210,644 | 151,172 | 145,282 | 137,852 | 120,757 | 99,667 | 78,465 | 65,490 | 53,016 |
| **TOTAL LIABILITES** | 885,872 | 733,936 | 714,121 | 697,653 | 655,661 | 608,010 | 560,141 | 530,466 | 487,050 |
| **NET ASSETS** | | | | | | | | | |
| Additional minimum liability for pension/security | | (10,415) | (21,810) | (29,595) | (15,826) | (6,612) | (3,422) | (1,464) | 1,425 |
| Unrestricted | (87,979) | (40,541) | (27,520) | (12,994) | 5,108 | 27,421 | 52,320 | 79,830 | 101,943 |
| Temporarily Restricted | 36,922 | 36,922 | 36,922 | 36,922 | 36,922 | 36,922 | 36,922 | 36,922 | 36,922 |
| Permanently Restricted | 23,521 | 23,521 | 23,521 | 23,521 | 23,521 | 23,521 | 23,521 | 23,521 | 23,521 |
| **TOTAL NET ASSETS** | (27,536) | 9,486 | 11,114 | 17,853 | 49,724 | 81,252 | 109,340 | 138,809 | 163,812 |
| **TOTAL LIABILITIES AND NET ASSETS** | 858,335 | 743,423 | 725,235 | 715,506 | 705,385 | 689,263 | 669,481 | 669,274 | 650,861 |
| | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |

[1] Reduced YE 2006 to 30 days of annualized Supply & Other expense for first 6 mos 2006 to remove impact of pre-petition liabilities.
[2] Includes the liabilities for medical malpractice or pension for the divested entities, as of 6/2006.
[3] Excludes St. Elizabeth Ann's and Queensbrook Insurance Ltd., which will be stand-alone entities going forward.
[4] Includes $385.1 million in additional asset value to record the Manhattan and Westchester properties at their appraised values.

# Saint Vincent Catholic Medical Centers of New York

## Projected Pro Forma Consolidated Income Statement

| | Projection 2006 | Projection 2007 | Projection 2008 | Projection 2009 | Projection 2010 | Projection 2011 | Projection 2012 | Projection 2013 | Projection 2014 |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Revenue** | | | | | | | | | |
| Inpatient | 406,441 | 431,696 | 449,896 | 465,416 | 481,041 | 490,662 | 500,475 | 510,484 | 520,694 |
| Outpatient | 224,405 | 245,593 | 253,668 | 260,904 | 268,868 | 274,245 | 279,730 | 285,325 | 291,031 |
| Patient Service Revenue | 630,846 | 677,289 | 703,564 | 726,321 | 749,909 | 764,907 | 780,205 | 795,809 | 811,725 |
| Less Provision for Bad Debt | 34,736 | 32,377 | 33,679 | 34,792 | 35,965 | 36,685 | 37,418 | 38,167 | 38,930 |
| Net Patient Service Revenue | 596,110 | 644,912 | 669,885 | 691,528 | 713,944 | 728,222 | 742,787 | 757,643 | 772,795 |
| Pool Revenue | 22,588 | 17,984 | 20,077 | 20,211 | 20,336 | 20,743 | 21,158 | 21,581 | 22,012 |
| Capitation | 87,022 | 94,872 | 97,718 | 100,650 | 103,669 | 105,742 | 107,857 | 110,014 | 112,215 |
| Other | 57,938 | 87,410 | 99,749 | 104,187 | 109,317 | 111,504 | 113,734 | 116,008 | 118,329 |
| **Total Operating Revenue** | 763,658 | 845,177 | 887,429 | 916,576 | 947,266 | 966,211 | 985,536 | 1,005,246 | 1,025,351 |
| **Operating Expenses** | | | | | | | | | |
| Salaries and Wages | 282,660 | 310,420 | 317,736 | 326,311 | 335,768 | 342,484 | 349,333 | 356,320 | 363,446 |
| Fringe Benefits | 79,309 | 87,267 | 90,136 | 92,586 | 95,283 | 97,189 | 99,133 | 101,115 | 103,138 |
| Supplies and Other | 289,507 | 315,573 | 328,193 | 338,854 | 349,875 | 356,873 | 364,010 | 371,291 | 378,716 |
| Insurance | 20,628 | 22,035 | 22,688 | 23,360 | 24,052 | 24,533 | 25,024 | 25,525 | 26,035 |
| **Total Direct Operating Costs** | 672,104 | 735,296 | 758,754 | 781,111 | 804,980 | 821,079 | 837,501 | 854,251 | 871,336 |
| **Contribution to Shared Services** | 91,555 | 109,881 | 128,675 | 135,464 | 142,287 | 145,132 | 148,035 | 150,996 | 154,015 |
| **Shared Services** | | | | | | | | | |
| Salaries and Wages | 3,664 | 17,162 | 17,676 | 18,207 | 18,753 | 19,128 | 19,510 | 19,901 | 20,299 |
| Fringe Benefits | 1,119 | 5,148 | 5,303 | 5,462 | 5,626 | 5,738 | 5,853 | 5,970 | 6,090 |
| Supplies and Other | 59,217 | 32,823 | 33,807 | 34,822 | 35,866 | 36,584 | 37,315 | 38,061 | 38,823 |
| **Total Shared Services** | 64,000 | 55,133 | 56,787 | 58,490 | 60,245 | 61,450 | 62,679 | 63,932 | 65,211 |
| Current and Prior Year Adjustments | - | - | - | - | - | - | - | - | - |
| **Total Operating Expenses** | 736,104 | 790,429 | 815,540 | 839,602 | 865,224 | 882,529 | 900,179 | 918,183 | 936,547 |
| **EBIDA** | 27,555 | 54,748 | 71,888 | 76,974 | 82,042 | 83,682 | 85,356 | 87,063 | 88,804 |
| Interest | 19,381 | 24,585 | 32,446 | 32,212 | 29,702 | 26,664 | 25,277 | 23,889 | 30,537 |
| Depreciation | 18,637 | 20,554 | 23,420 | 27,237 | 31,237 | 31,705 | 32,181 | 32,664 | 33,154 |
| **CINA** | (10,463) | 9,610 | 16,022 | 17,525 | 21,102 | 25,313 | 27,899 | 30,510 | 25,113 |
| Bankruptcy Professional Fees | - | 25,989 | - | - | - | - | - | - | - |
| Bankruptcy/Restructuring Costs | - | 8,932 | - | - | - | - | - | - | - |
| Gain / (Loss) on Sale of Facilities | - | - | - | - | - | - | - | - | - |
| **Adjusted CINA** | (10,463) | (25,311) | 16,022 | 17,525 | 21,102 | 25,313 | 27,899 | 30,510 | 25,113 |

# Saint Vincent Catholic Medical Centers of New York

## Projected Pro Forma Cash Flows

| | Projection 2007 | Projection 2008 | Projection 2009 | Projection 2010 | Projection 2011 | Projection 2012 | Projection 2013 | Projection 2014 |
|---|---|---|---|---|---|---|---|---|
| **Cash flow from operating activities** | | | | | | | | |
| Changes in net assets | (18,627) | 22,906 | 24,616 | 28,406 | 32,836 | 35,647 | 38,491 | 33,333 |
| Adjustments | - | - | - | - | - | - | - | - |
| Depreciation and amortization | 20,554 | 23,420 | 27,237 | 31,237 | 34,695 | 37,370 | 39,012 | 40,012 |
| Changes in: | | | | | | | | |
| Patients account receivable | 11,204 | 1,880 | (2,965) | (3,071) | (1,956) | (1,995) | (2,035) | (2,076) |
| Accounts receivables, other | 929 | 156 | (246) | (254) | (162) | (165) | (169) | (172) |
| Other non-current assets | - | - | - | - | - | - | - | - |
| AP and accrued expenses | 14,441 | 1,556 | 1,314 | 1,359 | 863 | 880 | 898 | 916 |
| Accrued salaries and payroll taxes | 2,428 | 726 | 861 | 886 | 629 | 642 | 655 | 668 |
| Other non-current liabilities | (221,908) | (23,589) | (16,686) | (7,386) | (9,957) | (13,514) | (4,377) | (3,392) |
| Other non-current liabilities (carry forward) | (33,966) | (6,114) | (6,114) | (6,114) | (8,243) | (11,186) | (3,623) | (2,808) |
| Payment to MedMal Trusts | (50,123) | (10,000) | (10,000) | (10,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| One-time payment from SNF for pre-petition | 6,500 | | | | | | | |
| **Net cash provided by operating activities** | **(268,569)** | **10,940** | **18,018** | **35,063** | **33,705** | **32,678** | **53,851** | **51,481** |
| | | | | | | | | |
| **Cash flow from investing activities:** | | | | | | | | |
| Sale / (purchase) of investments, net | - | - | - | - | - | - | - | - |
| Sale / (purchase) of assets whose use is limited | 45,123 | - | - | - | - | - | - | - |
| (Acquisition) of land, building, and equipment | 43,600 | (10,374) | (10,700) | (20,000) | (15,000) | (12,000) | (5,000) | (5,000) |
| Changes in Temporary / Permanently Restricted Net | - | - | - | - | - | - | - | - |
| **Net cash provided by investing activities** | **88,723** | **(10,374)** | **(10,700)** | **(20,000)** | **(15,000)** | **(12,000)** | **(5,000)** | **(5,000)** |
| | | | | | | | | |
| **Cash flow from financing activities** | | | | | | | | |
| Proceeds/(Repayment) of Revolver | - | - | - | - | - | - | - | - |
| Proceeds/(Repayment) of long term debt | 182,142 | (3,672) | (3,720) | (17,272) | (17,250) | (17,250) | (17,250) | (32,130) |
| Liabilities Subject to Compromise | - | - | - | - | - | - | - | - |
| **Net cash provided by financing activities** | **182,142** | **(3,672)** | **(3,720)** | **(17,272)** | **(17,250)** | **(17,250)** | **(17,250)** | **(32,130)** |
| | | | | | | | | |
| **Net increase / (decrease) in cash** | 2,296 | (3,106) | 3,598 | (2,209) | 1,455 | 3,428 | 31,601 | 14,351 |
| | | | | | | | | |
| Beginning cash balance | 12,396 | 14,692 | 11,586 | 15,183 | 12,974 | 14,429 | 17,858 | 49,459 |
| **Ending cash balance** | **14,692** | **11,586** | **15,183** | **12,974** | **14,429** | **17,858** | **49,459** | **63,810** |

**EXHIBIT 5**
The GE Commitment Letter

GE
Healthcare Financial Services

2 Bethesda Metro Center, Suite 600
Bethesda, Maryland 20814
U.S.A

T +1 301 961 1640

## CONFIDENTIAL

February 15, 2007

Mr. Martin McGahan
Chief Financial Officer
Saint Vincents Catholic Medical Centers of New York
130 West 12th Street, Suite 6-J
New York, NY  10011

Re:    Commitment for $300.0 Million Senior Secured Exit Financing Credit Facility

Dear Martin:

Saint Vincents Catholic Medical Centers of New York ("SVCMC" or "Hospital" or "you") and certain of its subsidiaries (collectively, the "Debtors") have filed Chapter 11 petitions for relief under the U.S. Bankruptcy Code (collectively the "Chapter 11 Cases"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  You have advised us that SVCMC, who is currently a borrower as defined in the Debtor In Possession Credit Agreement dated as of December 30, 2005 (the "DIP Facility"), is seeking up to $300.0 million of senior secured exit financing (the "Exit Facility"), consisting of a $50.0 million revolving credit facility and a $250.0 million term loan, to allow certain of the Debtors to emerge from their Chapter 11 Cases pursuant to a joint plan of reorganization confirmed by the Bankruptcy Court and to continue operating after the Effective Date of such plan.

Based on the above understanding and the information you have provided us to date, including but not limited to the Plan of Reorganization, General Electric Capital Corporation ("GE Capital"; the term "GE Capital" shall include any affiliate of General Electric Capital Corporation designated by General Electric Capital Corporation to provide all or any portion of the proposed Exit Facility), is pleased to offer its commitment to provide the Exit Facility, on the terms and subject to the conditions set forth in this letter (together with the Summary of Terms and Conditions attached hereto as Exhibit A and incorporated herein by reference the "Term Sheet" and together with this letter, the "Commitment Letter") and the fee letter dated of even date herewith between you and GE Capital (the "Fee Letter").  Capitalized terms used in the Summary of Terms and Conditions and not defined therein shall have the meaning ascribed to such terms in this letter.

You acknowledge and agree that, with the cooperation and assistance of you and your representatives, the Exit Facility may be partially syndicated by GECC Capital Markets, Inc.

Page 1 of 14

("GECM"), an affiliate of GE Capital, to other financial institutions identified by GECM so that GE Capital's exposure and loan commitment under the Exit Facility may be reduced to not less than 51% of the aggregate Exit Facility.  Upon your acceptance of this Commitment Letter, GECM will be authorized to initiate discussions with potential lenders relating to such syndication.  This Commitment Letter is not contingent upon completion of a syndication.  When and if a syndication occurs, GE Capital would act as the administrative agent with respect to the Exit Facility and GECM shall act as the sole lead arranger and sole bookrunner with respect to the Exit Facility.

You agree that, without the prior written consent of GE Capital (i) no additional agents, co-agents, co-arrangers or co-bookrunners shall be appointed, or other titles conferred to any person or entity, in respect of the Exit Facility, and (ii) no other lender under the Exit Facility shall receive any compensation of any kind for its participation in the Exit Facility.

If GE Capital decides to pursue a syndication of the Exit Facility on a post-closing basis, you agree to reasonably assist and cooperate (and use commercially reasonable efforts to cause your advisors and all necessary parties to reasonably assist and cooperate) with GE Capital and GECM in effecting and completing the syndication, including participating in bank and other relevant meetings upon reasonable notice, preparing and providing to GECM all information relating to the Exit Facility concerning you and cooperating with GECM in the preparation of a confidential information memorandum and other offering materials and confirming the completeness and accuracy of representations contained in such materials.  GE Capital and GECM shall not charge you for the costs and expenses incurred in syndicating the Exit Facility.

You agree that, so long as this commitment remains outstanding, you shall not, without the prior written consent of GECM, offer, issue, place, syndicate or arrange any debt securities or debt facilities that are intended to or would have the effect of being used in place of the Exit Facility contemplated herein, attempt or agree to do any of the foregoing, announce or authorize the announcement of any of the foregoing, or engage in discussions concerning any of the foregoing.

This Commitment Letter and the Fee Letter are being provided to you on the condition that except as required by law, (a) neither they nor their contents will be disclosed publicly or privately except to those individuals who are your officers, directors, employees or advisors who have a need to know such information as a result of being specifically involved in the Exit Financing and then only on the condition that such matters may not, except as required by law or for Bankruptcy Court approval of this Commitment Letter, be further disclosed and (b) neither you nor any of such persons shall use the name of, or refer to, GE Capital or its affiliates (including GECM), in any press release, advertisements or disclosure in connection with the Exit Facility without the prior written consent of GE Capital.  (GE Capital understands that SVCMC may issue a press release and GE Capital will consent to such a press release so long as the form thereof has been approved by GE Capital, such consent not to be unreasonably withheld.)  This Commitment Letter and the Fee Letter supersede all prior discussions, writings, indications of interest and proposals with respect to the Exit Facility previously delivered to you by GE Capital or any of its affiliates.

Regardless of whether the Exit Facility is approved by the Bankruptcy Court or whether the Exit Facility closes, Hospital agrees to (i) pay to GE Capital and GECM all reasonable, documented out-of-pocket expenses (including all reasonable legal, environmental, appraisal, and other consultant costs and fees incurred in connection with this letter and the Exit Facility and the transactions contemplated hereby and a field examination fee of $925 per person per diem plus actual

reasonable, documented out-of-pocket expenses in connection with the conduct of GE Capital's field audit, but excluding syndication costs and expenses), and (ii) indemnify and hold GE Capital, its affiliates (including GECM), and the directors, officers, employees, and representatives of any of them, harmless from and against, as and when incurred, all claims, expenses (including, but not limited to, reasonable attorneys' fees), damages, and liabilities of any kind which may be incurred by, or asserted against (by a third party or you), any such person in connection with, or arising out of, this letter, the Exit Facility, any financing related thereto and any investigation, litigation, or proceeding related to any such matters; provided, however, that no indemnified person shall be entitled to indemnity hereunder in respect of any claim or expense to the extent that the same is found by a final judgment of a court of competent jurisdiction to have resulted directly from the gross negligence, willful misconduct, or fraud of any indemnified person.  Under no circumstances shall either GE Capital or any of its affiliates (including GECM) or SVCMC or its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the Exit Facility or any other financing.  You hereby acknowledge and agree that the amounts payable under this paragraph shall be payable regardless of whether the Exit Facility is ever approved or closes.

So that we may continue our due diligence and other processes, you will need to provide us with an underwriting deposit of $50,000 (the "Underwriting Deposit").  GE Capital will charge the Underwriting Deposit for fees and expenses to be reimbursed as outlined above.  If the closing occurs, your remaining Underwriting Deposit (net of fees and expenses incurred) will be applied toward fees due at closing.  If the closing does not occur, then the balance of the Underwriting Deposit (net of fees and expenses to be reimbursed as outlined above) will be promptly returned.  The provisions of this Commitment Letter relating to the payment of fees and expenses, indemnification and confidentiality are intended to bind the parties and will survive the expiration or termination of this Commitment Letter (including any extensions hereof).

To become effective and create a binding commitment by GE Capital to provide the Exit Facility on the terms and subject to conditions set forth in this Commitment Letter, this Commitment Letter and the Fee Letter must be accepted by you and a signed copy of an original returned to us, along with the Underwriting Deposit referred to above, on or before 5:00 p.m. (Eastern Time) on February 15, 2007 in accordance with the instructions set forth in Schedule I attached hereto. If you do so, the commitment provided in this Commitment Letter shall remain in effect until 5:00 p.m. (Eastern Time) on February 28, 2007, at which time it shall immediately and automatically expire, and GE Capital shall be relieved of any obligation to provide the financing, unless by such time you have delivered to GE Capital (a) evidence that the Bankruptcy Court has entered the Commitment Approval Order (defined below), (b) an additional $150,000 Underwriting Deposit, and (c) a Commitment Fee of $450,000, in accordance with the instructions set forth in Schedule I attached hereto.  The Commitment Fee shall be considered fully earned and non-refundable upon its receipt by GE Capital so long as GE Capital does not breach its commitment as set forth hereunder.  The Commitment shall thereafter remain in effect until June 30, 2007.

SF:150697.7

GE Capital hereby consents to the delivery of this Commitment Letter and the Fee Letter to the Bankruptcy Court and the official committee of unsecured creditors in the Chapter 11 Case (the "Committee") and its advisors solely for the purpose of evaluating this Commitment Letter and obtaining the Commitment Approval Order. By executing this Commitment Letter, you agree to proceed in good faith and expeditiously to obtain, as soon as possible but in any event by no later than February 28, 2007, an order of the Bankruptcy Court approving of your execution and delivery of this letter, the terms of which order shall be subject to the reasonable approval of GE Capital (the "Commitment Approval Order"), and your payment of the additional Underwriting Deposit.

The parties hereto agree to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York in connection with any dispute related to this Commitment Letter or any matters contemplated hereby; provided that such exclusive jurisdiction shall terminate at such time as the Exit Facility has been funded.

Thank you for this opportunity. We look forward to continuing to work with you towards completing this transaction.

Sincerely,

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Name:  Scott R. Towers
Its:  Duly Authorized Signatory

Agreed and accepted this _____ day of February, 2007.

SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

By: _____
Its:  CFO

## EXHIBIT A

### SUMMARY OF PROPOSED TERMS AND CONDITIONS

**$300.0 Million Senior Secured Credit Facility
for Saint Vincents Catholic Medical Centers of New York**

TRANSACTION:

A senior secured credit facility in the maximum amount of $300.0 million (the "Exit Facility"). The Exit Facility will be comprised of a $50.0 million seven year revolving credit facility and a $250.0 million term loan facility. The Exit Facility will be fully underwritten by GE Healthcare Financial Services, Inc. ("GE-HFS") and partially syndicated by GE Capital Markets, Inc. ("GECM"), an affiliate of GE-HFS, to other financial institutions identified by GECM in order to reduce GE-HFS' exposure to its desired hold level, subject to the limitations set forth in this Commitment Letter.

BANKRUPTCY PROCEEDING:

Voluntary Chapter 11 bankruptcy proceedings filed by Saint Vincents Catholic Medical Centers of New York and certain of its affiliates on July 5, 2005, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") that are being jointly administered under Case No. 0514945. All such entities are debtors in possession and no trustee appointed.

BORROWER:

Saint Vincents Catholic Medical Centers of New York ("SVCMC") shall be the "Borrower." Borrower shall not include subsidiaries or affiliates of SVCMC so long as Agent is satisfied that all significant business operations of SVCMC, including the home health business, are divisions of SVCMC and not separate legal entities; provided that (a) Bishop Francis J. Mugavero Center for Geriatric Care, St. Jerome's Health Services Corporation, and Pax Christi Hospice shall nonetheless be borrowers at the option of Agent, and (b) St. Elizabeth Ann's Health Care & Rehabilitation Center shall not be a borrower.

ADMINISTRATIVE AGENT:

GE Healthcare Financial Services, Inc. or one of its affiliates (in such capacity, "Agent").

SOLE LEAD ARRANGER
AND SOLE BOOKRUNNER:

GE Capital Markets, Inc.

LENDERS:

A syndicate of financial institutions (including GE-HFS individually) assembled by GECM to provide the Exit Facility (the "Lenders").

AMOUNT:

A senior secured credit facility in the maximum amount of $300.0 million (the "Maximum Commitment Amount") consisting of a $50.0 million Revolving Credit Facility and a $250.0 million Term Loan Facility as further described below.

ANTICIPATED CLOSING DATE:

No later than June 30, 2007.

| | |
|---|---|
| USE OF PROCEEDS: | To refinance Borrower's existing DIP Facility, fund obligations under the Plan of Reorganization, fund transaction costs and provide liquidity for working capital and other general corporate needs. |

## DESCRIPTION OF THE EXIT FACILITY:

| | |
|---|---|
| ***REVOLVING CREDIT FACILITY:*** | A revolving credit facility in a maximum aggregate committed principal amount of $50.0 million (the "Maximum Revolver Commitment Amount"), subject to Revolver Availability as defined below (the "Revolving Credit Facility" or "Revolver"). At Borrower's request, Lenders may agree to make a portion of the Revolving Credit Facility available for the issuance of letters of credit ("Letters of Credit") on terms and conditions to be determined (the "Letter of Credit Subfacility"). |
| REVOLVER AVAILABILITY: | Not to exceed the lesser of (x) the Maximum Revolver Commitment Amount under the Revolving Credit Facility, and (y) eighty-five percent (85%) of Borrower's net eligible accounts receivable, less self-pay and any applicable reserves reasonably applied by Lender in the exercise of its reasonable credit judgment. Lender would retain the right from time to time to establish and/or modify standards of eligibility and reserves against availability based on actual collection experience, historical performance, and other factually based credit criteria. The face amount of any and all Letters of Credit will reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis. |
| REVOLVER TERM: | Seven (7) years from the closing date. |
| AMORTIZATION: | Subject to compliance with the Exit Facility documents, Borrower may borrow, repay and re-borrow under the Revolving Credit Facility. All principal amounts outstanding under the Revolving Credit Facility will be payable at maturity, whether at the stated maturity, on acceleration or otherwise. |
| ***TERM LOAN:*** | A term loan facility in an aggregate principal amount of $250.0 million, subject to Term Loan Availability as defined below (the "Term Loan"). |
| TERM LOAN AVAILABILITY: | The Term Loan will be available in a single draw on the Closing.<br><br>The maximum principal amount of the Term Loan will be limited to the lesser of (x) $250.0 million and (y) an advance rate of seventy percent (70%) of the appraised value (based on the lesser of current fair market value or best alternative use in the case of hospital properties) of Borrower's real properties listed on attached Schedule II and pledged to Agent as Collateral with Agent having a first lien thereon, with such values and appraisal methodologies to be reasonably acceptable to Agent and with appropriate deduction for any senior liens approved by Agent. |

Page 6 of 14

SF:150697.7

TERM LOAN TERM:

Seven (7) years from the closing date..

AMORTIZATION:

Twenty-five (25) year amortization schedule comprised of thirty (30) months interest only payments followed by monthly principal and interest payments and a final balloon payment due at maturity. All principal amounts outstanding under the Term Loan will be payable at maturity, whether at the stated maturity, on acceleration or otherwise.

INTEREST:

For all loans, at Borrower's option, (i) absent a default or event of default, 1, 2 or 3 month reserve-adjusted LIBOR plus the Applicable Margin or (ii) floating at the Index Rate (higher of Prime or 50 basis points over the Federal Funds Rate) plus the Applicable Margin.

Interest would be payable monthly in arrears (except for LIBOR-based loans which would be payable at the end of the applicable LIBOR period) and calculated on the basis of a 360-day year and actual days elapsed. For purposes of calculating interest, good funds will be credited to the Exit Facility one (1) business day after receipt. LIBOR mechanics and breakage fees will be set forth in the final Exit Facility documents.

APPLICABLE MARGINS:

The following applicable margins will apply commencing on the Closing Date:

| Applicable Margins | LIBOR + | Index Rate + |
|---|---|---|
| Revolver | 2.00% | 1.00% |
| Term Loan | 3.00% | 2.00% |

The applicable margin for the Term Loan shall be subject to adjustment based on Borrower's total leverage. The adjustment shall be quarterly based on Borrower's total leverage for the immediately preceding four quarters. The first such adjustment may occur after Borrower has delivered financial statements covering four full calendar quarters after Closing Date. Total leverage shall be the ratio of certain fixed liabilities of Borrower to EBITDA as more fully specified in the Loan Documents. The adjusted applicable margins shall be as follows:.

| Total Leverage | LIBOR + | Index Rate + |
|---|---|---|
| $\geq$5.0 | 3.00% | 2.00% |
| $\geq$4.0 – <5.0 | 2.75% | 1.75% |
| <4.0 | 2.50% | 1.50% |

FEES:

Borrower shall pay to GE-HFS and Agent such fees as are set forth in the Fee Letter. In addition, the following fees shall be payable in connection with the Exit Facility:

SF:150697.7

Page 7 of 14

*Unused Facility Fee:* Borrower shall pay an unused facility fee equal to one-half of one percent (0.50%) per annum on the average unused daily balance of the Revolver, which shall be payable monthly in arrears.

*Letter of Credit Fee*: If applicable, Borrower shall pay a letter of credit fee equal to two percent (2.00%) per annum on the undrawn face amount of all Letters of Credit issued under the Exit Facility, which shall be payable monthly in arrears, plus any charges assessed by the issuing bank thereof.

DEFAULT RATES:

Default interest and the Letter of Credit Fee shall be increased by two percent (2%) above the rate or Letter of Credit Fee otherwise applicable.

SECURITY AND
PRIORITY:

To secure all obligations of Borrower under the Exit Facility, Agent, on behalf of itself and Lenders, will receive a fully perfected first priority lien and security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrower, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, investment property (including  stock of subsidiaries), supporting obligations, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively, the "Collateral"); provided that the Collateral will not include reimbursements or accounts received by SVCMC pursuant to the Indigent Care Pool and the GME Pool and Excluded Deposit Accounts as such terms are defined in the DIP Facility and certain restricted funds. All Collateral will be free and clear of other liens, claims, and encumbrances, except for (a) currently existing liens in favor of Commerce Bank, Sun Life, RCG, Aptium, DASNY, and Staten Island Savings Bank currently covering certain property of SVCMC for existing obligations, (b) a second lien in favor of a medical malpractice trust to be created under the Plan of Reorganization covering the Staff House and Westchester properties not listed on Schedule II, (c) a senior lien created under the Plan of Reorganization in favor of general unsecured creditors covering property identified in Schedule III, (d) and other encumbrances reasonably acceptable to Agent. If Agent has approved SVCMC's disposition of an asset under the DIP Facility, the Exit Facility shall likewise provide for approval of such disposition.

OPTIONAL PREPAYMENTS.

Subject to compliance with the terms of the Exit Facility documents, the payment of any LIBOR breakage fees and, if applicable, prepayment premium described below, Borrower may borrow, repay and re-borrow under the Revolving Credit Facility in its discretion. The Exit Facility documents will provide for payment of a prepayment premium on certain optional prepayments or reductions in the

SF:150697.7

Maximum Revolver Commitment Amount. The prepayment premium equal to a percentage of the sum of the Revolver Commitment Amount being reduced or terminated plus the amount of prepayment of the Term Loan. The percentage shall be 2% for prepayments during the first year after the closing date, 1% during the period between one and two years after the closing date, and 0% thereafter.

MANDATORY PREPAYMENTS:    Mandatory prepayments to include: (a) a prepayment in an amount equal to the amount by which the outstanding balance under the Exit Facility exceeds availability and/or the maximum aggregate commitment amount of such facility, and (b) following a disposition of assets, receipt of insurance or condemnation proceeds and the issuance of any debt securities, a prepayment in such amounts (and subject to such baskets, if any, and prepayment premiums) as shall be agreed upon.

FINANCIAL COVENANTS:    Financial covenants to be mutually agreed upon may include some or all of the following or such other financial covenants as may be agreed to:

- Maximum Days Sales Outstanding (DSO)
- Minimum Fixed Charge Coverage (EBITDA – Cash Taxes – Cap-Ex) / (Principal + Interest)
- Maximum Total Debt to EBITDA
- Maximum Capital Expenditures
- Minimum Days Cash on Hand

DOCUMENTATION:    The final Exit Facility documents will be mutually acceptable to all parties and will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default, including cross-default provisions, and remedies customary for transactions of this type as reasonably required by Agent. Relevant documents, such as transaction documents, lockbox and bank account control agreements, insurance policy endorsements and assignments, subordination agreements, intercreditor agreements, incentive and employment agreements, tax agreements, and other material agreements, to be reasonably acceptable to Agent. Covenants will include (i) full cash dominion, (ii) Agent's right of inspection and access to facilities, management, and auditors, (iii) adequate insurance coverage with endorsements in favor of Agent providing for notice prior to cancellation, (iv) limitations on transactions with employees and affiliates, management fees to affiliates, payment of subordinated debt, and capital expenditures, and (v) requirement that interim management and permanent management be acceptable to Agent in its reasonable credit judgment. Documents will provide Lenders with assignment/syndication rights subject to: (i) in the case of a transferee other than a financial institution, Borrower's written consent, which shall not be unreasonably withheld and (ii) GE's or its affiliates retention of not less than 51% of the aggregate Exit Facility; provided however, if an event of default has occurred and is continuing, such Lender syndication/assignment rights shall no longer be subject to the

foregoing restrictions. Governing law will be New York law. The terms of Borrower's chapter 11 Plan of Reorganization (the "Plan") shall be generally consistent with the projections provided to Agent and shall otherwise be reasonably acceptable to Agent as shall be the order confirming the Plan. All orders of the Bankruptcy Court approving or authorizing the Exit Facility and all motions relating thereto, shall be in form and substance reasonably acceptable to Agent.

**FINANCIAL AND OTHER REPORTING:**

The final Exit Facility documents will require Borrower, on a monthly basis, to provide to Agent internally prepared financial statements. Annually, Borrower will be required to provide audited financial statements and a board approved operating plan for the subsequent year. Borrower will provide, on an as requested basis, borrowing base certificates and other information reasonably requested by Agent. All financial statements shall be prepared on a consolidated and consolidating basis. So long as the Chapter 11 Cases remain pending, Borrower will provide copies of all pleadings and other documents filed with the Bankruptcy Court or the U.S. Trustee, or distributed by or on behalf of Borrower to any official committee in the Chapter 11 Cases. Borrower shall also provided such other reports and information respecting Borrower's business or financial condition as Agent may, from time to time, reasonably request shall be provided to Agent.

**CONDITIONS TO FUNDING:**

The terms of all loan documents shall be satisfactory to Agent. Agent must be satisfied (i) with Borrower's corporate, capital, and debt structure after implementation of the Plan, and (ii) that the term of the Plan and the confirmation order provide for payment in full of the DIP Facility and that the rights of the agent and the lenders thereunder are not subject to challenge. The confirmation and all related orders shall be final and non-appealable unless otherwise approved by Agent and Lenders.

Commitments for title insurance policies in amount, form, and from an issuer satisfactory to Agent covering all real property Collateral.

Receipt of all necessary or appropriate third party and governmental waivers and consents.

Updated appraisals satisfactory to Agent reflecting asset values at levels satisfactory to Agent from appraisers retained by Borrower and satisfactory to Agent (Cushman & Wakefield having been approved by Agent).

If requested by Agent, updated environmental surveys or reviews indicating no adverse conditions other than those previously disclosed to Agent.

As of the closing date, there will have been no material adverse change, individually or in the aggregate, in the business, financial or other condition of Borrower or the Collateral since the date of the last financial statements delivered to Agent or to Borrower's projections since the date of delivery of such projections to Agent, and no litigation presenting a material adverse risk or challenging the transactions under consideration.

**Schedule 1**

GE Healthcare Financial Services, Inc., Wire Instructions

Bank:              Deutsche Bank/Banker's Trust
                   New York, NY
ABA:               021-001-033
Account Name:      GECC / Healthcare RTS Collections
Account # :        50-269-534
Re:                SVCMC Due Diligence Deposit.

SF:150697.7

**Schedule II**

List of Appraised Real Property

**<u>Manhattan Properties</u>**
Coleman Pavilion
Cronin Building
Spellman Pavilion
Reiss Pavilion
Link Pavilion
Nurses Residence
Raskob/Smith Building
O'Toole Building
O'Toole Building Air Rights

**<u>Brooklyn Properties</u>**
St Mary's Hospital MMTP II (221 Powell)
St. Martin de Porres SATC (480 Alabama)

**<u>Staten Island Properties</u>**
Tompkins Residence (1150 Castleton)
Sister Mary Assissuim (382 Westervelt)
49 Clinton Avenue
700 Bay Street SRC

**Schedule III**

List of Property Subject to First Lien in Favor of General Unsecured Creditors

Brooklyn/Queens Seller Notes (notes due from Wyckoff) and certain Miscellaneous Non-Operating Real
Property (1496-1540 & 1482 Prospect Place (Brooklyn, New York); 690 Castleton Avenue (Staten Island, New
York); 731 Castleton Avenue (Staten Island, New York); 360 Bard Avenue (Staten Island, New York); 154 St.
Austin (Staten Island, New York); 155 Vanderbilt (Staten Island, New York); 427 Forest Avenue (Staten Island,
New York); 376 Jersey Street (Staten Island, New York); and 90 Hill Street (Brooklyn, New York)).

**EXHIBIT 6**

Fees and Expenses Incurred by the Professionals Employed by the Debtors and the Committees

### Professional Fees and Expenses Incurred through March 31, 2007[27]

|  | Total Fees | Total Expenses | Total Fees & Expenses |
|---|---|---|---|
| Alvarez and Marsal LLC | $10,263,537 | $358,035 | $10,621,572 |
| Bankruptcy Services, LLC, Claims and Noticing Agent to the Debtors | $1,127,927 | $425,502 | $1,553,430 |
| Cadwalader, Wickersham & Taft LLC[28] | N/A | N/A | N/A |
| Cain Brothers & Company, Investment Bankers to the Debtors | $1,405,645 | $21,158 | $1,426,803 |
| Caronia Corporation, Estimation Consultant to the Debtors, Tort Committee and Creditors' Committee | $302,656 | $27,917 | $330,573 |
| CIT Capital USA, Inc., Real Estate Financial Advisors to the Debtors | $440,322 | $27,004 | $467,326 |
| Garfunkel, Wild & Travis, P.C., Special Health Care Corporate and Financing Counsel to the Debtors | $3,076,858 | $67,640 | $3,144,498 |
| Gilbert Heintz & Randolph LLP, Special Insurance Consultant to the Official Committee of Tort Claimants | $136,290 | $4,150 | $140,440 |
| Houlihan Lokey Howard & Zukin Capital, Inc., Financial Advisors to the Official Committee of Unsecured Creditors | $3,217,742 | $200,256 | $3,417,998 |
| Huron Consulting Services LLC, Restructuring and Management Consultants to the Debtors[29] | $14,387,627 | $2,028,117 | $16,415,743 |
| Cooley Godward Kronish LLP, as Counsel for the Official Committee of Tort Claimants | $1,224,879 | $18,351 | $1,243,230 |

[27] Fees and expenses for BSI, Inc., Garfunkel, Wild & Travis, P.C., Houlihan Lokey Howard & Zukin Capital Inc. and Cooley Godward Kronish LLP are through April 31, 2007.

[28] As discussed in the Disclosure Statement, on April 19, 2007, the Debtors filed a motion to substitute CWT for WG&M as their general chapter 11 counsel. The Court entered a final order approving this substitution of counsel on April 25, 2007. WG&M continues to be retained as "special counsel" under section 327(e) of the Bankruptcy Code for limited transition matters. CWT has not yet submitted an invoice in these cases, but expects that fees and expenses through March 31, 2007 will be approximately $130,000.

[29] As discussed in the Disclosure Statement, Huron Inc. acquired Speltz & Weis on May 5, 2005. Accordingly, these fees and expenses represent charges for both Huron LLC and Speltz & Weis. In addition, also as more fully discussed in the Disclosure Statement, Huron LLC, Huron Inc. and Speltz & Weis are identified as Litigation Parties in the Debtors' Plan and Litigation Claims will be transferred to the Litigation Trust.

| | Total Fees | Total Expenses | Total Fees & Expenses |
|---|---|---|---|
| McDermott, Will and Emery, Chapter 11 counsel to the Debtors[30] | $2,231,765 | $88,813 | $2,320,578 |
| Novare Inc., Preference and Claims Administrators to the Debtors | $978,048 | $3,528 | $981,576 |
| Proskauer Rose LLP, Special Labor Counsel for the Debtors | $154,594 | $2,739 | $157,333 |
| Thelen Reid & Priest LLP and Alston & Bird LLP, Counsel for the Official Committee of Unsecured Creditors[31] | $2,812,234 | $77,681 | $2,889,915 |
| Togut, Segal & Segal LLP, Conflicts Counsel to the Debtors | $1,928,385 | $46,324 | $1,974,708 |
| Weil Gotshal & Manges LLP, Counsel to the Debtors | $15,219,630 | $535,620 | $15,755,251 |
| Total[32] | $60,927,061 | $3,958,016 | $64,885,077 |

---

[30] As discussed in the Disclosure Statement, MWE is identified as a Litigation Party. In addition, and as discussed in the Disclosure Statement, the Debtors, the Creditors Committee and the US Trustee each have objected to MWE's final request for compensation filed in these Chapter 11 Cases. The Bankruptcy Court has not yet ruled on the MWE Fee Application or the objections to that Fee Application. Depending upon the Bankruptcy Court's ruling, the MWE Fee Application may be allowed in whole or in part, disallowed in whole or in part, additional amounts may need to be paid to MWE or MWE may be required to repay amounts previously paid to it.

[31] In connection with these cases, the Creditors' Committee retained Thelen Reid & Priest LLP as its legal counsel. On June 21, 2006, the Court authorized the retention of Alston & Bird LLP as substitute counsel to the Creditors' Committee, effective as of March 16, 2006.

[32] The inclusion of this chart is for informational purposes only, subject to the rights of all parties referenced herein with respect to interim and final fee applications and orders.