UNITED STATES BANKRUPTCY COURT                    **NOT FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:

                               Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT    Case No. 05 B 14945 (ASH)
CATHOLIC MEDICAL CENTERS, *et al.*,         (Jointly Administered)

                     Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**SCHULTE ROTH & ZABEL LLP**
**Attorneys for McDermott Will & Emery LLP**
**By: Michael L. Cook, Esq.**
    **David M. Hillman, Esq.**
**919 Third Avenue**
**New York, NY 10022**

**McDERMOTT WILL & EMERY LLP**
**By:  William P. Smith, Esq.**
**227 West Monroe Street**
**Chicago, IL 60606**

**McDERMOTT WILL & EMERY LLP**
**By: Stephen B. Selbst, Esq.**
    **James M. Sullivan, Esq.**
**340 Madison Avenue**
**New York, NY 10017-4613**

**TOGUT, SEGAL & SEGAL LLP**
**Conflicts Counsel for the Debtors**
  **and Debtors in Possession**
**By: Frank A. Oswald, Esq.**
    **Howard P. Magaliff, Esq.**
**One Penn Plaza, Suite 3335**
**New York, NY 10119**

**ALSTON & BIRD LLP**
**Attorneys for the Creditors' Committee**
**By: Martin G. Bunin, Esq.**
    **Michael E. Johnson, Esq.**
**90 Park Avenue**
**New York, NY 10016**

**DIANA G. ADAMS**
**United States Trustee for Region 2**
**By: Tracy Hope Davis, Esq.**
    **Alicia M. Leonhard, Esq.**
**33 Whitehall Street, 21st Floor**
**New York, NY 10004**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### DECISION ON OBJECTIONS
### TO APPLICATION FOR FEES AND EXPENSES

Before the Court is the application for legal fees of $2,227,779 and expenses of $104,314

of the law firm of McDermott Will & Emery ("McDermott"). The legal fees and expenses cover the

period from July 5, 2005 (the "Petition Date") through September 13, 2005, during which McDermott

served as the debtors' bankruptcy counsel.[1]   Objections to the application were filed by the Office of the

United States Trustee, the Official Committee of Unsecured Creditors and the debtors.

The Court conducted a trial of the objections, and the parties exchanged post-trial briefs,

replies and supplemental submissions as requested by the Court.   The following constitute the Court's

findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b) and

157(a) and the standing order of referral to bankruptcy judges dated July 10, 1984, signed by Acting

Chief Judge Robert J. Ward.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### Background

The Court's findings of fact are based on the parties' joint statement of "Undisputed and

Admissible Facts,"[2] the documentary exhibits admitted in evidence including deposition transcripts,

transcripts of Court proceedings, and the testimony of the witnesses.   I have included in this Background

section only those facts necessary to understand the two objections which I have sustained to the extent

set forth in this Decision.

---

[1]    Effective September 13, 2005, McDermott was discharged and replaced by Weil Gotshal &
Manges as debtors' counsel.

[2]    Quotations, unless otherwise attributed, are from the statement of "Undisputed and Admissible
Facts."

**The Debtors**

The debtors, collectively referred to as Saint Vincent Catholic Medical Centers ("SVCMC"), own and operate a New York metropolitan area comprehensive health care system. SVCMC serves as the academic medical center of New York Medical College in New York City.  As of the Petition Date, SVCMC owned and operated seven hospitals: Saint Vincent's Hospital, Manhattan; Bayley Seton Hospital, Staten Island; Mary Immaculate Hospital, Queens; Saint John's Hospital, Queens; Saint Mary's Hospital, Brooklyn; Saint Vincent's Hospital, Staten Island; and Saint Vincent's Hospital, Westchester.   As of the Petition Date, SVCMC also operated numerous debtor and non-debtor affiliates, including four skilled nursing facilities, a hospice, a system-wide home health care agency, and more than sixty off-site ambulatory care centers, providing a broad array of medical, psychiatric and substance abuse services.

**McDermott**

McDermott is a large American law firm with more than 1,000 attorneys and offices in nine American cities and five foreign cities.  The Court authorized McDermott's retention in the bankruptcy case by final order dated August 8, 2005.  McDermott staffed the debtors' cases with attorneys from its Chicago, New York, Washington, DC and Los Angeles offices.  William P. Smith ("Smith"), a partner in McDermott's Chicago office, was the partner in charge of the debtors' bankruptcy cases.

**The Speltz & Weis, Huron and McDermott pre-petition retentions by SVCMC**

On April 13, 2004 SVCMC engaged Speltz & Weis LLC ("SW") to provide management advisory services to SVCMC pursuant to the terms of a management agreement (the "Management Agreement") for a period of one year.  On May 5, 2005, the SVCMC Board of Directors (the "Board") voted to renew the Management Agreement through October 31, 2005.

David Speltz ("Speltz") and Timothy Weis ("Weis"), principals of SW, were the senior SW personnel acting under the Management Agreement with SVCMC.  On September 17, 2004, the

Board appointed Speltz and Weis as the Chief Executive Officer ("CEO") and Chief Financial Officer

("CFO"), respectively, of SVCMC.  They served in these capacities until August 24, 2005.

In September 2004, the same month in which the Board appointed Speltz and Weis as

CEO and CFO, respectively, the Board retained McDermott to provide SVCMC with advice regarding a

possible debt restructuring.  The Board retained McDermott upon the advice and recommendation of

Speltz.   On September 22, 2004 McDermott presented to the Board various restructuring alternatives,

including Chapter 11 protection.

The following month, on October 4, 2004, the Board authorized the retention of Huron

Consulting Services LLC ("Huron") as financial advisors to SVCMC upon on the advice and

recommendation of McDermott, specifically Smith.

Weis and McDermott were responsible for supervising and directing Huron's work for

and billings to SVCMC.

**SW's undisclosed retention of Huron as subcontractor**

In addition to Huron's disclosed engagement by SVCMC as financial advisor concerning

insolvency issues, Huron was also engaged in late 2004 as a subcontractor to SW in connection with

management reporting and claims denials.  Huron's subcontractor relationship with SW was not disclosed

to SVCMC's Board.  As set forth in the Crowley report, discussed below:

> Huron suggested [to SW] that SVCMC needed improvements in the areas of management
> reporting and claims denials.  SWLLC then engaged Huron as a subcontractor to it and
> sought and obtained from the Chairman [of SVCMC's Board] authorization to add
> individuals to its management services team to perform such services but did not disclose
> that such individuals were Huron employees or that Huron — which at that point was
> already a significant vendor to SVCMC — had become a subcontractor to SWLLC with
> respect to these services.

**The secret SW/Huron Group acquisition negotiations**

Prior to January 2005, the chairman of Huron Consulting Group, Inc. ("Huron Group"),

the parent of Huron, approached Speltz to discuss a potential business combination between SW and

Huron Group.  As a condition of negotiations with Huron Group, Messrs. Speltz and Weis entered into a

confidentiality agreement with Huron in January 2005 which prohibited them from disclosing their discussions with Huron Group.

Despite this confidentiality agreement, Smith first learned no later than February 2005 that Speltz and Weis might sell SW and were in discussions with a number of potential purchasers, including Huron. Smith did not disclose the existence of the negotiations between Speltz and Weis and the Huron Group to his client, the Board of SVCMC.

SW and Huron Group entered into a term sheet for the sale of SW to Huron Group in April 2005. Smith learned from Messrs. Speltz and Weis in an April 26, 2005 telephone conversation that the negotiations regarding Huron Group's potential acquisition of SW were "becoming 'serious.'" Once again, Smith did not disclose the fact of the negotiations to the SVCMC Board.

The parties have stipulated that "[a]fter learning that discussions of a Huron acquisition of SW were becoming serious, Smith commissioned a research memorandum from McDermott attorneys regarding the issues that could arise from such an acquisition in the event of a SVCMC bankruptcy filing." But it would appear that Smith must have given consideration to the "issues that could arise" before April 26, because in the April 26 telephone conversation Weis, Speltz and Smith discussed whether Huron's potential acquisition of SW would have any implications in the event SVCMC filed for bankruptcy and sought to retain SW and Huron on a post-petition basis. On April 26 Smith advised Speltz and Weis "that the issues were disinterestedness, the Jay Alix Protocol and conflicts."[3]

---

[3]     The Jay Alix Protocol is the name given to an agreement between the United States Trustee for the District of Delaware and Jay Alix & Associates in the *Safety-Kleen Corp.* bankruptcy case which concerns the role of financial advisors acting as both financial advisors and crisis managers in the same case. The Protocol recognizes that there is an inherent conflict between an advisor's duty to a debtor and its own business interests where the advisory firm serves as both a financial advisor retained under Section 327 of the Bankruptcy Code and as a crisis manager and where the advisory firm's staff serve as officers of the debtor corporation. The Jay Alix Protocol precludes an advisory firm from acting in both capacities in a single bankruptcy case because of this conflict. The Jay Alix Protocol is applicable in the Southern District of New York, and as noted in the text, Smith advised Speltz and Weis in the April 26 telephone conversation that the Jay Alix Protocol would be an issue in any applications to retain both SW and Huron in the bankruptcy case.

Elizabeth St. Clair ("St. Clair") was SVCMC's Chief Legal Officer.    In mid-April St. Clair approached Speltz to discuss a rumor that SW was to be acquired by Huron Group.   Speltz falsely denied the rumor and did not disclose the ongoing negotiations between SW and Huron.

On May 5, 2005, the Huron Group, SW, Speltz and Weis entered into an agreement for Huron Group to acquire SW (the "Acquisition Agreement").  The acquisition of SW by Huron Group closed on May 9, 2005, and Speltz and Weis personally entered into employment contracts with Huron.

Prior to May 6, 2005, neither Speltz nor Weis had disclosed to the SVCMC Board their discussions with Huron Group.  Neither Smith nor anyone else at McDermott disclosed the existence of the SW/Huron negotiations before May 6, 2005.  Speltz finally disclosed Huron's acquisition of SW to Richard Boyle ("Boyle"), Chairman of the SVCMC Board, on or shortly after May 6, 2005, and Speltz disclosed the acquisition to St. Clair one or two days later.

Upon learning of Huron Group's acquisition of SW, and on the initiative St. Clair, the Board retained as special counsel Leo Crowley ("Crowley") of Pillsbury Winthrop Shaw Pittman LLP to investigate the Huron Group's acquisition of SW.  Crowley had been with Pillsbury Winthrop Shaw Pittman LLP for twenty-six years and was the leader of the firm's insolvency and restructuring practice. Crowley was advised by St. Clair and other members of the Executive Committee to treat the investigation as a confidential matter, which would be subject to "attorney-client privilege."

On July 6, 2005 Crowley sent a draft report dated June 29, 2005 to SVCMC's Board Chairman Richard Boyle and Edward Lahey, another member of the Board.  Crowley's final report, labeled "**DRAFT**," was dated and delivered to the SVCMC Board Chairman on July 18, 2005.   The discussion below is based on the July 18 report.

**Breaches of fiduciary duty and conflicts arising from the SW/Huron acquisition**

Under the Acquisition Agreement SW was not merged or dissolved.  It continued to exist as a subsidiary of Huron Group.  Speltz and Weis, as former principals and owners of SW, received two types of compensation or "earn-outs."  One was based on the post-acquisition revenues of SW.  The other earn-out provision (the "percentage of SVCMC earnings" provision) was based on revenues derived by

Huron from SW clients, specifically SVCMC.  Under this percentage of SVCMC earnings provision, Speltz and Weis would personally receive payments from Huron based on a percentage of what SVCMC would pay to Huron for the insolvency services for which Huron had been previously engaged and which Speltz and Weis were responsible for supervising and controlling on behalf of SVCMC.   As a consequence of the acquisition, Speltz and Weis became employees of Huron under written employment contracts.

The negotiations between Speltz and Weis and Huron Group and the contractual relationships resulting from Huron Group's acquisition of SW gave rise to serious breaches of the Management Agreement between SW and SVCMC, breaches of fiduciary duty and conflicts of interest on the part of Speltz and Weis.   These breaches and conflicts are self-evident, but they are aptly summarized in the Crowley report, from which I shall quote:

> [T]he present arrangement [referring to the SW/Huron Group Acquisition Agreement and the Speltz and Weis employment contracts], and the manner in which it was entered into, breached several aspects of the management agreement between SWLLC and SVCMC. . . .
>
> 1.    By signing the confidentiality agreements with Huron in January 2005, their outside activities in negotiating with Huron interfered with the performance of their duties [to] SVCMC because Speltz and Weis undertook contractual obligations to Huron that were inconsistent with their duty of disclosure to SVCMC.  . . .
>
> 2.    Speltz's and Weis' duties to SVCMC include supervising the work of Huron as SVCMS's [sic] financial advisor, a matter of importance to SVCMC.   They have effectively rendered themselves unable to fulfill that responsibility because they (now being both SVCMC officers and Huron employees) are conflicted from doing so.  The complex arrangements among SWLLC, Speltz and Weis personally and Huron have injected complications into the ability of SVCMC to engage Huron as an estate professional under section 327 of the Bankruptcy Code.  At a minimum all of these matters would have to be disclosed to the US Trustee, and to the bankruptcy court in a public filing, and subject to challenge and criticism by creditors and others.  . . .
>
> 3.    SWLLC's responsibilities under the management agreement cannot be assigned or delegated, without the prior approval of the SVCMC board (see clause 11j of the management agreement).   However, because Speltz and Weis and apparently Fanning are no longer employees of SWLLC but instead are employees of Huron, they have in effect delegated responsibility to Huron without the Board's permission.  . . .

Regarding conflicts of interest, the Crowley report states:

> SVCMC's conflict of interest policy requires that "covered persons" (which includes Speltz and Weis because they are officers) must fully disclose any "potential or actual conflict of interest," and "must refrain from participating in any consideration of any transaction with a vendor until the matter has been reviewed and resolved."

This provision of the conflict of interest policy was obviously violated. The Crowley report notes that Huron was a major vendor of SVCMC as its financial advisor on insolvency matters, that Speltz and Weis negotiated with Huron from January 2005 through the date of their written agreement on May 6, 2005, and that "Speltz and Weis did not disclose their proposed transaction with Huron until Friday, May 6th." The report notes: "[a]lso during the first part of 2005, SWLLC engaged Huron as a subcontractor to perform services under the umbrella of the existing SWLLC management agreement," and that Speltz and Weis "did not disclose . . . that Huron . . . had become a subcontractor to SWLLC. . . ."[4] The report notes also that "there is no exception in the conflict of interest policy that permitted Speltz & Weis to voluntarily place themselves in a position where they apparently had conflicting contractual obligations to Huron and conflicting fiduciary obligations to SVCMC." The Crowley report concludes as follows:

1. They [Speltz and Weis] failed to disclose the potential conflict of interest created by their discussions with Huron. Because Huron was a significant and important vendor to SVCMC which they were personally responsible for supervising and because of the size of their personal financial interests, this failure was serious. . . . Huron, which was a relative newcomer to SVCMC having been engaged only in the fall of 2004, was seemingly locking in its position by procuring the favor of SVCMC's CEO and CFO. . . .

2. They subcontracted Huron to SWLLC at a time when Huron was already a vendor and presumably marked up Huron's rates (SWLLC bought services from Huron wholesale and resold them at a higher price to SVCMC). . . . [T]he conflict of interest policy prohibited Speltz and Weis from having an undisclosed interest in a vendor as to which they were in a position to influence any substantive business decision between SVCMC and the vendor. An "interest" for this purpose includes a contractual relationship, and Speltz and Weis had management responsibility for Huron's work for SVCMC, and were responsible for reviewing and approving Huron's bills.

---

[4] The secret subcontractor relationship under which SW utilized Huron employees to perform services for SVCMC and charged SVCMC a mark-up on the Huron employees' costs was a particularly repugnant breach of fiduciary duty on the part of Speltz and Weis. Board Chairman Richard Boyle testified that, upon discovery of this subcontractor relationship, the Board required SW to reimburse SVCMC $183,000 on account of the mark-up. (Tr. Oct. 24, 2006 p. 93)

3.      They entered into a contract with an "earn-out" that pays them a percentage of what SVCMC pays Huron.  While the preexisting management agreement gave SWLLC some financial interest in services rendered by their personnel, the Huron insolvency engagement is one that is not within SWLLC's line of business.   Moreover, since Huron was willing to in effect cede to Speltz and Weis a portion of the revenues from its engagement with SVCMC, circumstances have the appearance of Speltz and Weis negotiating a discount from Huron for services rendered to SVCMC, and then appropriating for themselves the value of that discount.   . . .

Finally, the Crowley report noted that Speltz and Weis violated their fiduciary duty under New York law.

As officers of a New York not for profit corporation Speltz and Weis individually had inherent fiduciary duties to SVCMC, which included, among other things, complying with the conflict of interest policy, and not acquiring interests adverse to the interests of SVCMC unless such interests had been approved by the board after disclosure of all relevant facts.

## Bankruptcy retention of SW and Huron

One of the two critical issues in these fee objections concerns McDermott's handling of SVCMC's prolonged, divisive and ultimately futile attempt to seek Bankruptcy Court approval of the proposed professional retentions of SW and Huron.  The process commenced with the filing of retention applications with the "first day orders" on July 5, 2005, the petition date, and was marked by ever-increasing contention, animosity, and most devastating in a Chapter 11 case, lack of trust between the debtors and their counsel, McDermott, and the Creditors' Committee and the United States Trustee's office.  The process culminated disastrously with the forced resignations of Speltz and Weis as CEO and CFO of SVCMC on August 24, 2005 and, three weeks later, the termination of McDermott as debtors' counsel on September 13, 2005.

SW and Huron each wanted to be approved for retention by the Bankruptcy Court for public relations purposes.  McDermott determined initially to seek Court approval of the SW Management Agreement under Bankruptcy Code 363 and of Huron's retention under Section 327.   McDermott reported to Speltz and Weiss, who were obviously conflicted, issues concerning approval of the SW Management Agreement and the retention of Huron and possible alternative strategies.  But McDermott apparently did not report these issues adequately to the SVCMC Board.  Smith was aware that Crowley

was investigating the propriety of the Huron Group acquisition of SW (Smith was interviewed by Crowley on June 23, 2005). McDermott attorneys responsible for the SVCMC bankruptcy case had studied the Acquisition Agreement and the Speltz and Weis employment contracts with Huron and were therefore aware of the multiple conflicts and breaches of fiduciary duty on the part of Speltz and Weis. Smith instructed another McDermott attorney to include disclosures about the Huron Group's acquisition of SW, the Speltz and Weis employment contracts and the earn-out arrangements between SW and the Huron Group in the retention motions to be filed with the Court.

In fact, McDermott never made full and candid disclosure respecting the Huron acquisition of SW and the consequent conflicts and breaches of fiduciary duty by Speltz and Weis.

On July 5, 2005 McDermott filed separate motions (the "July 5 Motions") to retain Huron under Section 327 of the Bankruptcy Code and to approve the SW Management Agreement under Section 363 of the Code. McDermott was responsible for determining the disclosure to be made in the July 5 Motions and thereafter. Although the Motions did disclose the bare fact of the Huron Group acquisition of SW, the July 5 Motions did not disclose any details of the acquisition, the Speltz and Weis Employment Agreements or the earn-out provisions. Nor was there any disclosure of the conflicts or breaches of fiduciary duty resulting from the acquisition and related agreements or their implications for the Huron and SW retentions, which were the object of the July 5 Motions. Indeed, the July 5 Motions represented that SW was a "materially disinterested person," despite the fact that Speltz and Weis were grossly conflicted as a consequence of the Huron Group acquisition of SW and the percentage of SVCMC earnings provision.

Smith acknowledged in testimony that the July 5 Motions were careless, incomplete and inappropriate. Both Motions were withdrawn shortly after July 5.

On July 13, 2005 McDermott filed an amended motion to approve the SW Management Agreement. The disclosures in the July 13 motion were also woefully deficient, and two days later McDermott filed a notice of adjournment without date of the July 13 motion. Between July 5 and August 24, 2005, McDermott circulated numerous drafts of the retention motions for SW and Huron

among parties including the U.S. Trustee's office, the Creditors' Committee, the debtors' senior manage-

ment, Huron's counsel, SW's counsel and Crowley (although Crowley had no responsibility with respect

to the retentions of Huron and SW or any other bankruptcy matters, which were solely the responsibility

of McDermott).

It is unnecessary to this ruling to present a detailed recapitulation of the evidence con-

cerning the increasingly contentious intercourse among the parties between July 5 and August 24 when

the Board finally called for the resignations of Speltz and Weis.   Suffice it to say that, as the weeks

passed after the soon-aborted July 5 Motions and the adjourned-without-date July 13 motion, McDermott

continued to press for the SW and Huron retentions despite the increasing resistance of both the

Creditors' Committee and the U.S. Trustee.  As the parties have stipulated:

> Smith understood, based on a July 21, 2005 conversation with Martin Bunin, acting as
> counsel to the Committee, that the Committee objected to the Debtors' attempt to
> approve the Management Agreement or retain Huron but gave no reasons for the
> Committee's opposition other than "Speltz & Weis were really bad guys and they had to
> go;" they were "paid a lot of money"; and "their turnaround plan didn't work."  Smith
> understood, based on Bunin's comments, that "there were no circumstances under which
> [the Committee] would agree to the retention of Speltz & Weis."

Nevertheless, McDermott continued to press for Court approval of the SW Management

Agreement and Section 327 retention of Huron, until August 1.  The parties have stipulated that

"McDermott withdrew the Huron application on August 1, 2005," but problems with the SW approval

continued and "on August 12, 2005 the UST informed McDermott by letter that UST's 'concerns have

not been resolved by the amendments to' the July 28 draft motion to approve the [SW] Management

Agreement."

By early August the Creditors' Committee and the U.S. Trustee had grave doubts about

the competence and efficacy of Speltz and Weis as the senior management of SVCMC.  Both the Com-

mittee and the Trustee had lost confidence in Speltz and Weis.   McDermott, the U.S. Trustee and the

Creditors' Committee counsel met on August 19, 2005.  At the August 19 meeting, the U.S. Trustee

stated that she would not consent to SW's retention, and the U.S. Trustee and the Committee proposed the

appointment of a "Chief Restructuring Officer" ("CRO").

The U.S. Trustee's CRO proposal obviously had very serious implications for SVCMC and its management.  Responding to this impetus, the debtors' Executive Committee of the Board convened a "special" meeting on August 24, 2005 to discuss the August 19 meeting and its implications.  At the August 24 meeting Smith relayed to the Executive Committee the concerns articulated by the Creditors' Committee and the U.S. Trustee regarding Speltz and Weis.   After thorough and comprehensive discussion at the August 24 meeting, it was decided that the Executive Committee would ask Speltz and Weis to resign from their positions as CEO and CFO, respectively, and the Executive Committee appointed Richard Boyle as interim President and CEO and Thomas Allison as interim CFO of SVCMC.

**The closure of St. Mary's Hospital**

The other objection to McDermott's fee application which I have found meritorious relates to the firm's handling of the closure of St. Mary's Hospital.   Closure of this Hospital was from the beginning a high priority for SVCMC because operation of the Hospital was costing SVCMC an average loss which the debtors put at $78,000 a day.[5]  The background facts relating to this objection are concisely summarized in the parties' agreed statement of Undisputed and Admissible Facts, as follows:

D.    CLOSURE OF SAINT MARY'S HOSPITAL

105.  On June 1, 2005, prior to the Petition Date, the Debtors' Board of Directors (the "Board") resolved to close St. Mary's Hospital.

106.  Smith attended the June 1, 2005 Board meeting.

107.  On June 1, 2005, the Board instructed management and counsel, including McDermott, to take the necessary and appropriate action for the closure of St. Mary's Hospital.

108.  McDermott knew that the Debtors wanted to close St. Mary's as promptly as applicable regulatory approvals could be obtained.

109.  The closure of St. Mary's was subject to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

---

[5]    *See* objecting parties' Post-Trial Statement of Economic Consequences page 2 at footnote 1.  In its August 18 motion seeking Bankruptcy Court approval to close St. Mary's Hospital, McDermott referred in paragraph 47 to "[t]he continued expense of more than $100,000 per day to fund the losses of St. Mary's Hospital operations. . . ."   In the Debtors' Omnibus Response to Objections to the SVCMC motion to close St. Mary's Hospital dated September 2, 2005, McDermott asserted that "St. Mary's Hospital is currently losing more than $500,000 per week," which would average approximately $71,428 per day.

110. McDermott was primarily responsible for obtaining Court approval of the closure of St. Mary's, while the Debtors' internal management, including Bernadette Kingham-Bez and Elizabeth St. Clair, Esq., was primarily responsible for the steps required to obtain canonical and regulatory approval of the closure.

111. In late June 2005, prior to the Petition Date, the Debtors had already obtained canonical authority to close St. Mary's.

112. The Debtors' management, not McDermott, had primary responsibility for obtaining DoH [New York Department of Health] approval to close St. Mary's Hospital.

113. In June 2005, prior to the Petition Date, the Debtors made the application to the DoH to close St. Mary's Hospital.

114. McDermott did not review, and was not asked by SVCMC to review, the application to close St. Mary's that was made to the DoH prior its filing.

115. At a June 17, 2005 meeting of the Executive Committee of the Board, the Executive Committee discussed the progress of the closure of St. Mary's Hospital setting as the target date for closure September 1, 2005.

116. Smith attended the June 17 meeting of the Executive Committee at which the Executive Committee set September 1, 2005, as the target date for the closure of St. Mary's Hospital.

117. In connection with the St. Mary's Hospital closure, McDermott provided certain services, including: (I) representing the Debtors in state court litigation (the "State Court Litigation") regarding the approval by the New York Department of Health of the closure plan; (ii) commencing an action in the Debtors' chapter 11 cases seeking, among other things, a declaration that the plaintiff in the State Court Litigation had violated the automatic stay; (iii) preparing and filing a motion, dated August 18, 2005, seeking authority to close St. Mary's Hospital (the "St. Mary's Motion"); (iv) responding to objections filed in opposition to the St. Mary's Motion; (v) appearing at a hearing on August 23, 2005, on issues relating to the closure of St. Mary's Hospital; and (vii) [sic] appearing at a hearing on the St. Mary's Motion on September 7, 2005.

118. Certain members of the St. Mary's community and employees contested the closure.

119. McDermott caused a series of motions to be filed on behalf of Debtors on the Petition Date (the "First Day Motions").

120. McDermott did not file a motion seeking permission to close St. Mary's Hospital with the First Day Motions.

121. McDermott disclosed the Debtors' intention to close St. Mary's Hospital on the Petition Date in an affidavit (i.e., Weis's affidavit under Local Bankruptcy Rule 1007-1) filed with the First Day Motions and in colloquy with the Court.

122.   On July 22, 2005, the Debtors issued notices of the St. Mary's closure to employees under the WARN ACT.

123.   Between the Petition Date and July 22, 2005, McDermott took no steps to seek Bankruptcy Court permission to close St. Mary's Hospital.

124.   In the state court litigation, where the Debtors were not named as parties, Harriett [sic] McCloud, a former patient of St. Mary's Hospital, obtained an ex-parte temporary restraining order in Kings County Supreme Court on July 22, 2005, restraining the DoH from approving a closure plan for St. Mary's Hospital (the "State Court Litigation").

125.   On July 29, 2005, McDermott filed a complaint with the Bankruptcy Court, seeking a preliminary and permanent injunction to enjoin Ms. McCloud from prosecuting the State Court Litigation.

126.   On August 4, 2005, [McDermott attorney] Selbst appeared on behalf of the Debtors at a hearing in the Bankruptcy Court on the Debtors' application for a preliminary and permanent injunction.

127.   After the August 4, 2005 hearing, Selbst and St. Clair both "felt that someone else had to handle the [August 5] hearing and neither of them wanted to go back into Court the next day."

128.   McDermott first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005.

129.   McDermott filed the St. Mary's Motion on August 18, 2005.

130.   By August 18, 2005, the Debtors were close to obtaining, but had not obtained, DoH approval to close St. Mary's Hospital.

131.   The DoH approved the closure of St. Mary's Hospital on August 31, 2005.

132.   Objections to the closure of St. Mary's Hospital were filed by the following objectors: (I) Brooklyn Safety Net, LLC ("BSN") on August 30, 2005; (ii) Harriet M. McCloud on August 31, 2005; (iii) the Medical Staff (Physicians) Committee of St. Mary's, Mary Immaculate, and St. John's Hospitals on August 31, 2005; and (iv) the Bedford Stuyvesant Family Health Center, Inc. and Brownsville Multi Service Family Health Center on September 7, 2005.

133.   BSN purported to be an entity formed by certain employees to purchase St. Mary's to avoid its closure.

134.   The UST took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

135.   McDermott prepared and filed on September 2, 2005, the Debtors' omnibus reply to the objections to the St. Mary's Motion.

136.  As part of the Debtors' reply, McDermott filed no affidavits or declarations in response to any of the objectors' objections.

137.  The Committee filed a short response in support of McDermott's motion to close St. Mary's Hospital on September 2, 2005.

138.  The Court held a hearing on the St. Mary's Motion on September 7, 2005.

139.  Selbst represented the Debtors at the September 7 hearing.

140.  McDermott offered no testimony from any witnesses at the September 7, 2005 hearing.

141.  At the September 7, 2005 hearing, the Committee's counsel made statements supporting the closure of St. Mary's Hospital.

142.  The Court did not grant the St. Mary's Closure Motion on September 7, 2005, and the hearing was adjourned.

143.  On September 19, 2005, Weil, on behalf of the Debtors, filed the declarations of:  Linda Brady, M.D., Kingsbrook HealthCare System LLC's president; Thomas M. Barry, Managing Director of Cain Brothers & Company, LLC (as supplemented on September 19, 2005); Dawn Gideon, the Debtors' then-Interim Chief Restructuring Officer; and Sister Jane Iannucelli, a member of the Board, in support of the St. Mary's Motion.

144.  The Court resumed the hearing on the St. Mary's Motion on September 20, 2005.

145.  Weil appeared on behalf of the Debtors at the September 20, 2005 hearing.

146.  At the September 20, 2005 hearing, Weil presented testimony from Sister Jane Iannucelli, vice chairman of the Board.

147.  The Court approved the closure of St. Mary's Hospital at the September 20, 2005 hearing.

**Termination of McDermott as debtors' counsel**

By the close of business on September 7, 2005, some progress had been made in the

SVCMC reorganization proceedings.   But two important objectives had not been accomplished, the

Huron retention and closure of St. Mary's Hospital.

Professional retentions are generally presented to the Court as "first day orders" in major

Chapter 11 cases.  But after more than two months Huron had not been retained under Section 327 despite

the fact that scores of its employees were devoting their full time to the debtors' affairs in essential

positions.  As a quite predictable consequence of the Huron Group acquisition of SW and the insistence

of Speltz and Weis that both Huron and SW be retained for public relations reasons, the Huron retention

became intractably mired in the attempt, relentlessly pressed by the SVCMC management (*i.e.*, Speltz and

Weis) and McDermott, both to retain Huron and to approve the SW Management Agreement.  This

attempt was doomed from the outset because of the Huron Group/SW conflict prohibited by the Jay Alix

Protocol, and the conflicts of interest and breaches of fiduciary duty on the part of Speltz and Weis.   But

the exercise in futility did not end until the SVCMC Board fired Speltz and Weis on August 24.

       The closing of St. Mary's Hospital was critical triage to staunch the ongoing hemorrhage

averaging $71,000 to $100,000 every day.  Before the bankruptcy filing, the Board charged its profes-

sionals to accomplish this objective by September 1.   All approvals necessary to achieve closing by

September 1 had been obtained, except one — Court approval.   Indeed, the Court did not have a

sufficient record to approve the closing over the vociferous objections of various local groups at the

hearing on September 7.

       Both the Huron/SW retentions and Court authorization to close St. Mary's Hospital by

the September 1 deadline set by the Board were the responsibility of McDermott.   The disastrous out-

come of the Huron/SW approval process undermined the debtors' and McDermott's credibility and

relationship with the Creditors' Committee and the U.S. Trustee's office.  The belated and unsuccessful

proceedings relating to St. Mary's Hospital undermined the debtors' and McDermott's credibility with the

Court as well as the debtors and the Creditors' Committee.

       Following the September 7 hearing on St. Mary's, the Board made the decision to dis-

charge McDermott and retain Weil, Gotshal & Manges as debtors' counsel.  Boyle, then Chairman of the

Board and Interim CEO of SVCMC, made the decision.  Boyle made this statement in his trial declara-

tion:  "It became readily apparent to me that the restructuring of SVCMC was in a quagmire, and that the

bankruptcy process could not go forward with MWE continuing as counsel to SVCMC, given the frayed

relationships between MWE, on the one hand, and the U.S. Trustee and Committee, on the other.   . . .

[B]ecause the Board had lost confidence in MWE's ability to guide SVCMC through the bankruptcy

process, we needed to replace MWE as counsel to the Debtors." Boyle also gave this testimony as to the

reasons for the change in counsel:

> it became increasingly obvious to me that the debtor and myself in this position was
> facing a significant credibility crisis with the [UST] and people on the [UST]'s staff,
> certain members of the creditors committee and certain of the creditors committee
> financial advisors and representatives. They were being increasingly demanding of the
> immediate appointment of a chief restructuring officer and demanding among other
> things the formation of a committee that would have been tantamount to the board giving
> up its responsibilities and threatening to appoint a receiver. It was clear to me as I went
> through these different deliberations that we could not replace the [UST], we certainly
> didn't have the power to replace the judge, there was no way we had any influence to
> replace the chair of the creditors committee or any of the advisors to the creditor [sic]
> committee. I thought long and hard over the weekend just prior to around the 10th of
> September, what we could do to remedy this quagmire we were in in terms of having all
> this lack of credibility. And I felt the only reasonable thing to do from a business point
> of view was to have a change in counsel.

Smith acknowledged in his testimony that if McDermott had not been terminated as

counsel the firm probably would have resigned because the firm's effectiveness was at an end. Smith

said: "It was apparent that the trustee and the committee were not willing to work with McDermott as

counsel at St. Vincent's."

## Discussion

### I.    The Bankruptcy Code and retrospective review

Compensation of professionals is covered in Section 330 of the Bankruptcy Code.

Section 330, as it existed prior to October 17, 2005, provided as follows, in pertinent part:

**11 USC § 330.  Compensation of officers**

(a) (1)    After notice to the parties in interest and the United States Trustee and a
hearing, and subject to sections 326, 328, and 329, the court may award to a
trustee, an examiner, or a professional person employed under section 327 or
1103 —

(A)    reasonable compensation for actual, necessary services rendered by
the trustee, examiner, professional person, or attorney and by any
paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

(2)    The court may, on its own motion or on the motion of the United States
Trustee, the United States Trustee for the District or Region, the trustee for the
estate, or any other party in interest, award compensation that is less than the
amount of compensation that is requested.

(3)    In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including —

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)    (A)    Except as provided in subparagraph (b), the court shall not allow compensation for —

(I)    unnecessary duplication of services; or

(ii)    services that were not —

(I)    reasonably likely to benefit the debtors' estate; or

(II)    necessary to the administration of the case.

This statute requires the Court to make a retrospective review of the services rendered by counsel to determine whether the services were "necessary . . . or beneficial at the time at which the service was rendered" and whether the services "were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or tax addressed."   The Court must determine long after the fact whether the services were or were not "reasonably likely to benefit the debtor's estate" or "necessary to the administration of the case."

It is an inevitable fact of life that events and conduct are judged after the fact, with the proverbial benefit of 20-20 hindsight.   What may have been difficult for some to assess at the time may appear self-evident to others in hindsight.   But experienced counsel in major Chapter 11 cases are paid to investigate the facts, to know the applicable principles of law, practice and ethics, to act timely to accomplish their clients' objectives, and to guide their clients with a firm hand to the course of action

which is most beneficial to the debtor's estate.   Counsel charge and are paid high compensation in the fair expectation that their foresight and judgment will assess today's facts as the facts will be perceived and judged tomorrow under the searching gaze of 20-20 hindsight.  McDermott failed in this, at great cost to the client.

## II.      Retention of Huron and SW

It is not inappropriate to be reminded that McDermott was retained by SVCMC in September 2004 on the recommendation of Speltz, and that Huron was retained by SVCMC in October 2004 on the recommendation of McDermott.

McDermott manifested an insensitivity to the interests of its client, SVCMC, and the pitfalls inherent in the Huron Group/SW negotiations and acquisition from the outset.  Smith learned not later than February 2005 that Speltz and Weis were negotiating with Huron Group concerning a possible acquisition.  He learned in April 2005 that the negotiations with Huron Group were nearing finality. Speltz and Weis, as the senior executives of SVCMC, were responsible for oversight of the activities of and billings by Huron.  The secret negotiations obviously gave rise to a clear and present conflict of interest and a breach of fiduciary duty on the part of Messrs. Speltz and Weis.   As counsel to SVCMC and ultimately its Board of Directors (not Speltz and Weis), Smith should have disclosed his knowledge of the Huron Group/SW negotiations to Boyle, as Chairman of the Board, and advised Boyle of the potential issues which he advised the conflicted Messrs. Speltz and Weis, namely, "disinterestedness, the Jay Alix Protocol and conflicts."  Smith's reason for not disclosing his knowledge to the Board — that Speltz told him he had already informed Boyle (denied by Speltz and concededly not true) — is no reason at all.  If Speltz, who is not a lawyer and was conflicted, had discussed the negotiations with Boyle, what possible objection could there be to Smith's discussing the topic with Boyle in order to give Boyle legal advice concerning the serious pitfalls from SVCMC's perspective.

As noted above, "SW and Huron each wanted to be approved for retention by the Bankruptcy Court for public relation purposes," and this was the objective which the SVCMC senior management (*i.e.*, Messrs. Speltz and Weis) instructed McDermott to pursue.  Competent counsel, acting in the interests of the client, SVCMC, as distinguished from the interests of senior management Speltz

and Weis and their new employer Huron, should have recognized from the outset that the dual retention

of Huron under Section 327 and approval of the SW Management Agreement under Section 363 would

be a practical impossibility if full disclosure were made concerning all relevant terms of the Huron Group

acquisition of SW, the employment agreements between Huron Group and Speltz and Weis, the earn-out

provisions (especially the percentage of SVCMC earnings provision) and the breaches of fiduciary duty

and conflicts of interest on the part of Speltz and Weis.

      The Jay Alix Protocol precluded the dual retention of Huron and SW.  The Jay Alix

Protocol is posted on the website of the Office of the U.S. Trustee for the Southern District of New York

at http://www.usdoj.gov/ust/r02/manhattan/chapter11.htm and is applicable in the Southern District of

New York.   Smith was aware of the Jay Alix Protocol prior to July 5, 2005, and he advised Speltz and

Weis in the April 26 telephone conversation concerning the prospective consequences of the Huron

Group acquisition of SW on the dual retention of Huron and SW "that the issues were disinterestedness,

the Jay Alix Protocol and conflicts."  In pertinent part the Jay Alix Protocol states:

> JA&A and its affiliates [footnote omitted] will not act in more than one of the following
> capacities in any single bankruptcy case: (I) crisis manager retained under Sec. 363, (ii)
> financial advisor retained under Sec. 327, (iii) claims agent/claims administrator
> appointed pursuant to 28 U.S.C. § 156(c) and any applicable local rules or (iv)
> investor/acquirer; and upon confirmation of a Plan may only continue to serve in a
> similar capacity.   Further, once JA&A or one of its affiliates is retained under one of the
> foregoing categories it may not switch to a different retention capacity in the same case.

* * *

> A.     Pursuant to the "one hat" policy as stated above, after accepting an engagement
> in one capacity, JA&A and affiliates shall not accept another engagement for the
> same or affiliated debtors in another capacity.

      McDermott was aware within a day after the July 5 Motions were filed that the U.S.

Trustee's office would oppose the Huron retention based on the Jay Alix Protocol.   Thus, Crowley's

email dated July 6, 2005 to Richard Boyle stated: "Another point which I learned from Bill Smith, which

may have already reached your attention, is that the US Trustee would not approve of Huron as an estate

professional so Bill is trying an alternative approach which would have Huron function as in effect a sub-

- 20 -

contractor to Speltz & Weis LLC."[6]   The conflict of interest between Huron and SW resulting from the

acquisition of SW by Huron Group was self-evident and lay at the core of the Jay Alix Protocol.   Smith

knew of the Jay Alix Protocol, as he advised Speltz and Weis on April 26, and the Protocol appears on the

website of the Office of the U.S. Trustee for the Southern District of New York.   Smith's subsequent

disclaimer that he thought the Jay Alix Protocol might not be applied in the Southern District because of

other examples where the Protocol was not applied is unsupported and, in any event, was belied from the

outset by the U.S. Trustee's firm position, as reflected in the July 6 email reporting that "the U.S. Trustee

would not approve of Huron as an estate professional."

       The Huron/SW conflict was immeasurably compounded by the personal conflicts and

fiduciary breaches of Messrs. Speltz and Weis.  Smith's advice to Speltz and Weis in the April 26

telephone conversation that the prospective Huron Group acquisition would raise issues of

"disinterestedness" and "conflicts" was prescient.  What Smith did not know on April 26, but what the

McDermott lawyers certainly did know or should have known after reviewing the Acquisition and

Employment Agreements and interrogating Speltz and Weis, was that the problems of lack of

disinterestedness, conflicts of interest and breaches of fiduciary duty by Speltz and Weis were of such

gravity that those matters (and, of course, the Crowley report itself) *could not be disclosed* without

virtually annihilating any likelihood of approval of the Speltz and Weis retention and undermining public

confidence in the management of SVCMC.

       The seriousness of the Speltz and Weis conflicts and breaches and the need to prevent

disclosure is clearly reflected in the trial evidence.  For example, in a June 23, 2005 email to his associate

Cleary concerning the SW and Huron retentions, Smith said:

1.  Both Speltz and Weis have personal employment contracts with Huron; and

2.  Both Speltz and Weis have earnout arrangements predicated on future business to
Huron from legacy S&W clients and insolvency business referred to Huron based on
S&W engagements.   Crowley (who is a bankruptcy lawyer) suggested that at a minimum
these were disclosure items for any retention applications involving Huron or S&W.

---

[6]   Putting aside the questionable viability of this suggested palliative to avoid Section 327
disinterestedness scrutiny, it should be recalled that, unbeknownst to and unapproved by the
SVCMC Board, Huron already was a subcontractor to SW by means of which SW was charging
SVCMC a markup on the cost of Huron employees.

- 21 -

Better have whomever is doing these (Augsperger?) read, analyze, and tell us if we're saying what we need to say and doing it the way we should.  Also, be aware that my conversation with Crowley was privileged, his report when rendered may never be public, and he is trying to find a way from a corporate/NFP perspective to make this work, as should we, but his solution may involve some board member taking over supervision of Huron's engagement, since it certainly smells like David and Tim have a personal financial interest in pumping up the Huron revenues.

Smith's June 23 email clearly focused on the "earn-out arrangements predicated on future business to Huron from legacy S&W clients and insolvency business referred to Huron based on S&W engagements" and observed, correctly, that "it certainly smells like David [Speltz] and Tim [Weis] have a personal financial interest in pumping up the Huron revenues."   Smith's June 23 email also reflects Smith's comprehension of the seriousness of the Speltz and Weis conflicts and breaches of fiduciary duty and the consequent need to curtail disclosure of these matters.  He warns Cleary to "be aware that my conversation with Crowley was privileged, his report when rendered may never be public, and he is trying to find a way from a corporate/NFP [not for profit] perspective to make this work, *as should we*" (emphasis supplied).   Concerning his June 23, 2005 interview with Crowley, Smith said in his direct testimony trial affidavit (¶ 57):   "I also told Cleary that Crowley expressed concern about the reactions of external constituencies, such as Elliott Spitzer, examiners, the Committee, and disgruntled employees, if the Debtors' cases became a meltdown."

As noted above, the disclosure in the July 5 Motions was grossly and concededly inadequate, and none of McDermott's subsequent draft retention motions contained complete or appropriate disclosures concerning the terms of the Huron Group/SW acquisition and the Speltz and Weis conflicts and fiduciary breaches.

Smith well understood McDermott's obligation as debtors' counsel to make disclosure of these matters, but McDermott did not do so. In his direct testimony by affidavit, Smith stated "I told St. Clair that if she gave me a copy of the Crowley report, I would have to give it to the UST and the Committee."   Speltz, Weis and even Crowley were aware of and concerned about the impact of complete disclosure.  As noted in McDermott's post-trial memorandum (¶ 50): "But Weis complained about Smith's complete disclosure (*see* Oct. 23, 2006 Tr., 283, 17-21), and even Crowley echoed Weis' concerns about too much disclosure.  *See* July 27, 2005 email from Crowley to Smith . . . ('[Speltz] and

[Weis] have a legitimate concern (which affects not just them but also the Hospital) about opening the door and the possibility of the Committee and the US Trustee rushing in.')."  The "possibility of the Committee and the US Trustee rushing in" — *i.e.*, seeking to replace management with a CRO or Chapter 11 trustee — was very real as it turned out, even without full disclosure.

Complete and timely disclosure of all relevant and material information and documents lies at the heart of the bankruptcy process.   This is particularly so in a Chapter 11 case, where the Creditors' Committee and the U.S. Trustee's office, each with fiduciary duties of their own, must have confidence and trust in the debtor and its professionals.  *See*, *In re Mercury*, 280 B.R. 55-56 (Bankr. S.D.N.Y. 2002) *aff'd and reinstated, Fellows & Hymowitz, P.C. v. Mercury* (*In re Mercury*), 122 Fed. Appx. 528 LEXIS 25481 (2d Cir. 2004).  For disclosure requriements in other contexts, *see also*, *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (in the context of Chapter 11, "'Full and fair' disclosure is required during the entire reorganization process; it begins 'on day one, with the filing of the Chapter 11 petition.'" (quoting *In re v. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)); *see also*, *Texaco Inc., v. Bd. of Commissioners for the LaFourche Basin Levee District, et al.* (*In re Texaco Inc.*), 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000) (Chapter 11).  "The courts have uniformly recognized that full and accurate disclosure of all material information is vital to the bankruptcy process."  *In re Riccardo*, 248 B.R. 717, 723-24 (Bankr. S.D.N.Y. 2000) (Chapter 7).  *See also*, *In re Wincek*, 202 B.R. 161, 166 (Bankr. M.D. Fla. 1996), *aff'd*, 208 B.R. 238 (M.D. Fla. 1996) (Chapter 13) ("'[F]ull disclosure of all relevant information has always been an important policy of the bankruptcy laws.'"); *Cohen v. McElroy* (*In re McElroy* ), 229 B.R. 483, 488 (Bankr. M.D. Fla. 1998) (Chapter 7) ("A debtor's complete disclosure is essential to the proper administration of the bankruptcy estate."); *in accord*, *In re Sharp*, 244 B.R. 889, 891-92 (Bankr. E.D. Mich. 2000) (Chapter 7).   The Jay Alix Protocol itself contains comprehensive disclosure requirements in Article I paragraph (e) and subparagraphs thereof, which provides:

> E.    The application to retain JAS shall make all appropriate disclosures of any and all facts that may have a bearing on whether JAS, its affiliates, and/or the individuals working on the engagement have any conflict of interest or material adverse interest, including but not necessarily limited to the following:
>
> [subparagraphs 1 through 8]

Consistent with the failure to make adequate disclosure concerning the SW and Huron retention applications, McDermott and, under McDermott's direction, SVCMC were not always forthcoming with documents and information.  Two examples are illustrative.   One is that McDermott did not provide the U.S. Trustee with a copy of the May 6, 2005 Huron Group Acquisition Agreement and related Employment Agreements for Speltz and Weis until July 22 (the U.S. Trustee testified that she never received these documents from McDermott), despite the fact that disclosure of these documents was obviously essential for the Trustee to assess the propriety of the July 5 Motions to retain Huron and approve the SW Management Agreement.  A second example is the extraordinary shutdown of information, or "radio silence" instruction, issued by McDermott.   On August 11, 2005 the Creditors' Committee informed Smith that it intended to object to the debtors' motion to retain SW.  The same day Smith sent an email to the debtors' management directing that it cease all communications and information transmittal to the Creditors' Committee, cancel all meetings with the Committee's representatives and "maintain radio silence."  Acting on the McDermott "radio silence" instruction, the debtors' management thereafter ceased to provide any information about the debtors' business and operations to the Committee and its professionals.   At the same time Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Creditors' Committee had begun to interview candidates to replace the debtors' senior management.  The investigation lasted four days, after which McDermott determined that there was insufficient credible evidence of any "wrongdoing."  Only then did Smith instruct the debtors' management to reopen communications with the Creditors' Committee.

The excuses for the failure to timely provide the Huron Acquisition documents — that the documents were never requested (denied by the U.S. Trustee), or that the U.S. Trustee could have obtained the documents from the Huron Group's Form 8-K SEC filing — speak volumes as to McDermott's uncooperative or even adversarial approach to the U.S. Trustee's office and the Creditors' Committee, and the firm's apparent failure to understand the necessity of a forthcoming approach in the conduct of a Chapter 11 reorganization, where the achievement of trust, confidence and consensus is the key to success.   The "radio silence" incident reflects fundamental misconceptions concerning the stewardship of a Chapter 11 case as debtors' counsel.  Open communications and the prompt furnishing of all data and

information necessary for other parties to fulfill their fiduciary responsibilities are absolutely essential to

the conduct of a Chapter 11 case.  Moreover, if the Committee had, in fact, begun to interview candidates

to replace Speltz and Weis, there was nothing improper in the Committee doing so.  McDermott's

imposition of "radio silence" on the debtors' management while the firm undertook an investigation of

whether the Committee had begun to interview candidates was emblematic of McDermott's adversarial

and counterproductive representation of the debtors.

McDermott argues that in pursuing the dual retention of Huron and approval of the SW

Management Agreement it was simply acting pursuant to the instructions of the SVCMC Board.  Thus,

McDermott asserts:

> Even after McDermott and St. Clair learned of the UST's concerns about the SW/Huron
> retentions, and after they discussed those concerns with Richard Boyle ("Boyle"), the
> Chairman of the Debtors' Board (see Oct. 23, 2006 Tr., 286: 8-11), SVCMC still directed
> McDermott to get Court approval of the Board/Crowley strategy while the Board and
> Crowley negotiated with SW and Huron.  See July 25, 2005 email from Smith to Boyle,
> cc: Crowley [Tab 40]; July 25, 2005 email from Boyle to Smith responding to Smith's
> email [Tab 41] ("Please proceed for Speltz and Weis.  The Executive Committee will
> meet on Friday and, I expect, will approve the actions being taken by Huron and waive
> the conflict  issue.").  As Boyle put it. [sic] "I did not realize that new management was
> needed until mid-August of 2005."  Boyle Aff. [Vol. 4, Exhibit C], ¶ 11.

> 30.  McDermott cannot be held liable for following the instruction of its client to
> seek the retentions of the critical SW personnel in these cases — an instruction that was
> supported by the Debtors' sound business judgment and reached with the Debtors' full
> knowledge of the conflicts presented by the SW/Huron relationship.  It is unjust to fault
> McDermott now for merely following the reasoned and informed direction of the
> Debtors' Board.

But the evidence does not support the conclusion that McDermott's failure in the

Huron/SW retention debacle was "merely following the reasoned and informed direction of the Debtors'

Board," or that the debtors' persistent pursuit of dual retention in the face of obvious conflicts and

derelictions of Speltz and Weis reflected "sound business judgment."   In the Debtors' Reply dated

October 19, 2006 to McDermott's response to the debtors' objection, the debtors argued their position as

follows:

> Rather, the Debtors assert that the relevant questions are what advice and counsel was
> provided by MWE and to whom was it provided as to the substantive issues raised in the
> Debtors' Objection, and in particular, MWE's handling of the S&W retention issues,
> including its failure to disclose those issues to the Court.   . . .   MWE's purported
> defense that it was simply taking direction from the "client" (i.e., senior management) is
> alarming given that the Debtors' senior management was comprised of Messrs. Speltz

and Weis, the conflicted parties, (acting as the Debtors' CEO and CFO, respectively), and is borderline absurd. The record is also clear that the Debtors' Board and Elizabeth St. Clair . . ., who were not and are not bankruptcy experts, were wholly relying on MWE in these matters and MWE failed to make them completely aware of the seriousness of the issues and the positions of the United States Trustee until very late in the process.

The trial evidence fully supports the debtors' October 19, 2006 argument. The Executive Committee's August 24 decision to fire Speltz and Weis certainly demonstrates that Boyle's July 25 "proceed for Speltz and Weis" email to Smith was neither reasoned nor informed. The evidence compels the conclusion that McDermott did not inform and advise Boyle of the legal and practical realities of the dual retention and Speltz and Weis conflicts until mid-August.

Smith's direct testimony by affidavit reflects numerous occasions where he gave reports, advice and counsel to Speltz and Weis. But the very first recitation in Smith's affidavit of any advice given to Boyle or the rest of the SVCMC Board appears in paragraph 113 concerning advice given *on July 29*. In paragraphs 114 and 115 Smith states "I conveyed to Speltz, Weis and to St. Clair the concerns expressed by the UST and Committee at the July 21, 2005 meeting" and "I recommended to Speltz and Weis *on July 21, 2005* that the debtors adopt the UST's requests made to me on July 21, 2005. . . ." In paragraph 113 Smith stated "McDermott advised the Board *on or about July 29, 2005*, that McDermott met on July 21, 2005 with the UST and counsel for the Committee" (emphasis supplied). It was not until August that Smith advised Boyle that Speltz and Weis were at the heart of the retention problem.[7] In

---

[7]    *See*, for example, Smith's trial testimony on October 23, 2006 at page 230:

> Q.    The fight over Speltz and Weiss [sic], as you said, was a sideshow?
>
> A.    It began as a sideshow. It became to dominate the reorganization by the end of the summer.
>
> Q.    Is it fair to say that uncertainty surrounding the Speltz and Weiss [sic] retention in senior management at St. Vincent's had become a distraction to the entire reorganization process, isn't it?
>
> A.    The threats that the committee and the trustee were leveled at St. Vincent's and its advisors make it very difficult about anything approximating the goal of reorganization. The direct threat for me to go tell Huron that they're never going to be paid for any of the services that they rendered, that the trustee's office under no circumstances will ever agree, not for a time and as long as I'm at it, go tell the Speltz and Weiss [sic] people they're never going to be paid for the work they've done and, by the way, Mr. Smith, I don't think your fee application is going to be treated particularly well either. Yes, that was deeply stabilizing [sic, should read destabilizing] to a reorganization neither with

(continued...)

paragraph 130 Smith states "By the second week of August 2005, I shared with Boyle, the Chairman of

the Debtors' Board, my belief that the tenure of Speltz as CEO had become unsupportable."[8]  Then came

the August 19, 2005 meeting with the UST and the Committee's counsel at which both demanded the

appointment of a Chief Restructuring Officer.  Following that seismic event, Smith finally called for a

meeting of the Executive Committee of the Board which was held on August 24, at which the Executive

Committee fired Speltz and Weis.

What is clear from the evidence is that McDermott never advised Boyle or the Executive

Committee or the full Board until mid-August 2005 that the dual retention of Huron and SW was *from the*

*outset* a dead letter by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code and the

serious conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the

Huron Group acquisition of SW in early May.  This is clear from Boyle's trial affidavit:

> 10.    I am not aware of ever being advised by MWE prior to the July
> bankruptcy filing of the impact that the Huron acquisition would have on SVCMC's
> ability to retain SW LLC in the bankruptcy action.  I was not informed by MWE prior to
> the bankruptcy of the "disinterestedness" requirement in the Bankruptcy Code as it
> related to the retention of SW LLC as bankruptcy professionals.
>
> 11.    While my confidence in David Speltz and Tim Weis was shaken in May
> of 2005 because of the Huron acquisition, I did not realize that new management was
> needed until mid-August of 2005.  Neither I nor the Board became aware of the substan-

---

[7](...continued)
> them.

[8]    Smith's August 11 "radio silence" email to Speltz, Weis and others (but not Boyle) raises a
question as to when in the second week of August Smith came to the belief that the tenure of
Speltz as CEO had become unsupportable.  The August 11 email, set forth in full below, states
"our intent" to bring on an application for retention of SW promptly.

> "In conversation this afternoon, I was advised by Comtee counsel that the
> Comtee will oppose retention of S+W.  Marty declined to be more specific, but
> said that nothing would change his or the Comtee's mind.
>
> "I have notified the UST of this, as well as our intent to bring the application on
> for hearing promptly.  Will liase with Ron Barliant on strategy.
>
> "Effective immediately, please stop ALL communication or information
> transmittal to the Comtee, cancel ALL meetings with their representatives, and
> maintain radio silence.  If asked, refer inquiries to me.  We will attend the
> meeting next Friday, but it is an open question who, if anyone, other than Tom
> Allison and me will go.  This does not apply to OCB contacts with Comtee
> members, such as 1199.
>
> "Lots more will follow, and positions may change, but for now, shut it down."

tial issues related to the retention of SW LLC until shortly before the August 24, 2005
Board meeting where it was determined that David Speltz and Tim Weis would be asked
to resign from SVCMC.

Boyle and other members of the Board undoubtedly saw the Crowley report, but they

obviously did not comprehend the significance of the Jay Alix Protocol and the Speltz and Weis taint

from the perspective of bankruptcy retention and the disinterestedness requirement under Section 327.

This is painfully evident from the July 25, 2005 email from Boyle to Smith (relied on to support

McDermott's "merely following orders" argument) where Boyle said "Please proceed for Speltz and

Weis.  The Executive Committee will meet on Friday and, I expect, will approve the actions being taken

by Huron and waive the conflict issue."  The fact that the Executive Committee or the Board might be

willing to waive the Huron/SW conflict, and the Speltz and Weis conflicts and breaches of fiduciary duty,

was completely irrelevant from a bankruptcy perspective, because no waiver could be expected from the

Creditors' Committee, or the U.S. Trustee's office, or the Court which is charged by law to enforce the

law as written in Section 327(a).[9]   Indeed, the Board's waiver had the predictable result of undermining

the Committee's and the U.S. Trustee's confidence in the Board itself, leading to the August 19 proposal

for a CRO.

Boyle's trial affidavit and testimony that he was not advised of the gravity of the Huron

and Speltz and Weis retention issues or the U.S. Trustee's position relating thereto was confirmed in the

testimony of Deirdre Martini, the U.S. Trustee.  Martini testified in her deposition (Tab 115 p. 78):

> Q.      You said that you had conversations with Dick Boyle that also led to you
> concluding that McDermott had not adequately communicated your positions.  Do you
> recall any of those conversations?
>
> A.      Yes.
>
> Q.      Can you tell me about any of them?
>
> A.      Dick Boyle had no idea about my — the level of my concern in the
> beginning of the case.  He had no idea that I was looking to possibly move for a trustee.

---

[9]      Section 327 permits retention of professional persons "that do not hold or represent an interest
adverse to the estate, and that are disinterested persons."  Implementing this provision, the Jay
Alix Protocol clearly precluded the dual retention of both Huron and SW after the Huron Group
acquisition of SW.  For the same reason, the Huron Group/SW acquisition and their employment
agreements (not to mention their breaches of fiduciary duty) disqualified Speltz and Weis
personally from their positions as senior management of the debtors.

He had no idea that the Speltz & Weis issue had risen to such a crescendo.  And he just said: "Deirdre, I just didn't know."

> Q.      Were those discussions after August 24, 2005 when he became the CEO?
>
> A.      Yes.  This was when Weil Gotshal came in.

Boyle's and Martin's testimony was also corroborated by the trial declaration of St. Clair.

SVCMC's Chief Legal Officer testified in her declaration:

> 12.      At no time prior to the bankruptcy filing was I informed by MWE of the "disinterestedness" requirement in the Bankruptcy Code as it relates to the retention of professionals.  To the best of my knowledge, at no time prior to August 24, 2005 did MWE advise SVCMC's Board of the substantial issues that SVCMC faced in getting Speltz & Weis retained by the Court, including the specific concerns that had been raised by the U.S. Trustee.

> 13.      In hindsight, it is clear to me that MWE's single-minded pursuit of the Speltz & Weis retention in the bankruptcy case was extraordinarily destructive to SVCMC's credibility with the constituents in the bankruptcy process, including the Court, the U.S. Trustee and the Creditors' Committee.  This is particularly true now, as I have experienced the scrutiny under which such retention is examined by the non-debtor constituents in the bankruptcy process.

> 14.      Additionally, it is now clear to me that that [sic] MWE's decision to take a strong adversarial position against the U.S. Trustee and the Creditors' Committee did not benefit SVCMC, and resulted in delaying SVCMC's restructuring process.  For example, MWE consistently took the position that SVCMC did not need to comply with the "J. Alix Protocol" and that the "J. Alix Protocol" was simply a pretext for the Creditors' Committee to muscle its way into management.

Precisely because Speltz and Weis were conflicted in pursuing the dual Huron/SW retentions for public relations purposes, McDermott had no alternative but to take the matter to the SVCMC Board at the earliest stage possible, preferably even before the July 5, 2005 filing date, to preclude the ultimately disastrous confrontation with the Creditors' Committee and the U.S. Trustee's office.  That was not done.  As Boyle put it, "I did not realize that new management was needed until mid-August 2005."

I unequivocally reject McDermott's attempt to place responsibility on Crowley and St. Clair with respect to advising the SVCMC Board concerning the dual retention applications and the conflict issues.  St. Clair was not a bankruptcy lawyer.  Crowley was retained for a limited purpose which did not include acting as bankruptcy counsel for SVCMC or advising on bankruptcy issues arising in connection with professional retention applications or otherwise.  The evidence makes unambiguously

clear that everyone, including McDermott, understood that McDermott was responsible for representing the debtors on all matters relating to the bankruptcy proceedings and advising on all bankruptcy matters including bankruptcy retention issues.

**III.     St. Mary's Hospital closing**

Little need be said regarding McDermott's performance on the closing of St. Mary's Hospital.

On June 1, 2005 the SVCMC Board instructed McDermott to work with management to close St. Mary's Hospital as soon as possible.   As of June 17, 2005, McDermott knew that the debtors had set September 1, 2005 as the target for closure of St. Mary's Hospital.  McDermott was charged with the responsibility of obtaining Bankruptcy Court approval.   St. Clair and other SVCMC staff were responsible for obtaining Department of Health and canonical authority to close the Hospital.

Canonical authority was granted prior to the bankruptcy filing on July 5.  Department of Health approval was granted on August 31.   Bankruptcy Court approval was not obtained until the September 20, 2005 hearing at which SVCMC was represented by Weil, Gotshal & Manges.

The closing of any medical facility in a big city is almost certain to generate intense and emotional opposition from doctors, other hospital staff and affected local community groups.  The Court must be sensitive to such pressures and must grant time and attention to the objecting community voices. Most important, the debtors must provide the Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, politicians and the public the economic or other facts of life requiring closure.

In order to meet the September 1 deadline set by the Board, it was absolutely essential for McDermott to prepare and file with the Bankruptcy Court a comprehensive, well-supported motion by the second or third week in July *at the very latest* to have any chance of holding a hearing in August and getting a favorable ruling by the September 1 deadline set by the Board.   As shown in the recitation from paragraphs 104-147 of the parties' agreed statement of Undisputed and Admissible Facts, quoted above, McDermott simply did not get the job done.

From June 17 until after July 22, no McDermott attorney was assigned to begin work on a motion for Bankruptcy Court authority to close St. Mary's Hospital.  On July 22 Harriet McCloud filed a State Court litigation in Kings County Supreme Court seeking to restrain the Department of Health from approving the St. Mary's Hospital closure plan.  The McCloud suit seems to have been the catalyst for McDermott to focus on St. Mary's.  A week later, on July 29, McDermott filed a complaint with the Bankruptcy Court to enjoin Ms. McCloud from prosecuting the State Court litigation.  The August 4 hearing in the Bankruptcy Court seeking a preliminary injunction concededly was not handled well by McDermott on behalf of the debtors, but the motion was granted.  It was not until August 5 that McDermott attorneys first began work on a motion for Bankruptcy Court approval to close St. Mary's Hospital, and the motion was not filed until August 18.  The motion papers were not supported by a single affidavit and did not attach any financial analysis to support the summary and conclusory lawyer assertions in the motion concerning the financial need to close the Hospital.   As the chronology shows, this was too little, too late.  At the September 7 hearing on the motion to close, the Bankruptcy Court, unsupported by a sufficient record, adjourned the hearing without ruling on the motion.

At the resumed hearing on September 20, with the benefit of four supporting affidavits, prepared under the supervision of Weil as new counsel for the debtors, the Court finally granted the motion.

I reject McDermott's contention that it did not file the St. Mary's Hospital closure motion on July 5, or on July 22 "because the Debtors . . . were not far along enough in the process of obtaining regulatory approval from the Department of Health."  No witness at the trial (other than McDermott) supported such a rationale.   Nor do the facts and circumstances.   SVCMC publicly announced in June its intent to close St. Mary's Hospital.  The debtors' local Rule 1007-2 Statement filed on July 5 expressly stated the debtors' intention to close the Hospital.   On July 22 the debtors, on their own, with no participation by McDermott, issued notices to St. Mary's Hospital employees pursuant to the WARN Act.  The Selbst trial affidavit to the effect that St. Clair told him to delay the motion because  the Department of Health had a strong preference for keeping details relating to the closure confidential until it had finally approved the closure is unsupported by any document, or by St. Clair, or by any witness from the Depart-

ment of Health.  The argument makes no sense, because by mid-July it was widely known public

knowledge that SVCMC was seeking to close St. Mary's Hospital.   In response to a question by the

Court, St. Clair denied ever having a conversation with any lawyer from McDermott in which she asked

McDermott, in words or substance, to hold up or refrain from filing a motion in the Bankruptcy Court (Tr.

Oct. 24, 2006 p. 64).   Nor was Selbst convincing in asserting that the Bankruptcy Court closure motion

could not have been completed and filed before August 18 because McDermott "struggled mightily with

the client to verify these . . . numbers . . .  the losses, to figure out which contract[s] [would have] to be

rejected and to try to address some of the concerns that Judge Beatty had expressed."   If work on the

motion had been commenced soon after the June 17 Board meeting which set the September 1 deadline,

instead of August 5, the motion would have been timely filed.  It was the Board that set the September 1

deadline, and it was McDermott's job to do what had to be done to comply with the Board's mandate.

      The undisputed fact is that no McDermott lawyers began working on the Bankruptcy

Court motion to approve the St. Mary's Hospital closure until August 5, following the impetus of the

McCloud State Court litigation.[10]  By that time a successful resolution of the motion by September 1 was

impossible.  Moreover, the motion was unaccompanied by any supporting affidavits or financial analysis

to document the economic exigency requiring prompt closure.   McDermott's delay in preparing and

filing the motion was not the consequence of strategy, but inattention.   The failure to support the motion

when finally made with affidavits and financial analysis was not the consequence of strategy or the un-

availability of data, but inadequate and untimely preparation.

**IV.    Consequences for the McDermott fee application**

      At the conclusion of the trial hearing I requested the objecting parties to submit a concise

post-trial submission explaining with particularity the dollar consequences for the McDermott fee applic-

ation which should result from the deficiencies in performance by the McDermott firm with respect to the

---

[10]     Paragraph 128 of the parties' statement of Undisputed and Admissible Facts states:

      128.  McDermott first began work on a motion seeking
    permission from the Bankruptcy Court to close St. Mary's Hospital (the
    "St. Mary's Motion") no earlier than August 5, 2005.

Huron/SW retention proceedings (including the radio silence instruction) and the delay in filing the debtors' motion to close St. Mary's Hospital.  I have carefully considered the objecting parties' Post-Trial Statement of Economic Consequences to Debtors' Estates resulting from McDermott's services, McDermott's Reply, McDermott's submission dated July 19, the objectants' response dated July 30, and McDermott's reply dated August 3.   The following are my conclusions on these issues.

A.    **SW and Huron retentions**

The parties have stipulated in their July 19 and July 30, 2007 submissions that the total of McDermott's fees incurred in connection with the SW and Huron retentions was $98,382.25.  I conclude that McDermott should receive no compensation in respect of the firm's work in connection with these retentions.  These efforts, including the grossly misleading and inadequate July 5 Motions, the improvident July 13 motion, the August 1 withdrawal of the application to retain Huron, and the events leading to the August 24 Executive Committee meeting at which Speltz and Weis were fired were predictably futile from the outset.  McDermott should have realized, and advised the Board early in July if not before the filing, that (as Smith advised Speltz and Weis on April 26) "the issues were disinterestedness, the Jay Alix Protocol and conflicts" and that dual retention of both Huron and SW could never receive support from the Creditors' Committee or the U.S. Trustee's office and could never be approved by the Court because of the patent conflict between Huron and SW after the Huron Group acquisition of SW and the very serious conflicts and breaches of fiduciary duty of Speltz and Weis.  The entire retention process from the July 5 Motions to the August 24 Executive Committee meeting resulted in escalating friction and mistrust between the Committee and the U.S. Trustee, on the one hand, and the debtors and McDermott on the other.  As Smith testified, the retention issues "[came] to dominate the reorganization by the end of the summer."

In short, the McDermott services relating to retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates — they were affirmatively detrimental to the debtors' estates.  Compensation of $98,382.25 in respect of retention services is denied.

**B.**     <u>The tortious interference investigation</u>

The investigation conducted by McDermott during the radio silence instruction was unnecessary and inappropriate and conferred no benefit on the debtors' estates.  Compensation for the stipulated $44,523 cost of the investigation is denied.

**C.**     <u>Change of management and CRO retention</u>

The parties have stipulated that $74,180 of McDermott's fee application represent time charges in connection with the change in management and CRO retention matters resulting from the firing of Speltz and Weis on August 24, 2005.  These matters are inextricably related to the disastrous SW and Huron retention proceedings and events described at length in this Decision.  The debtors should not be required to bear this expense and, accordingly, compensation for this $74,180 in fees is denied.

**D.**     <u>Transition of counsel from McDermott to Weil</u>

The parties have stipulated that McDermott's application for legal fees includes $43,458 in connection with the transition of counsel from McDermott to Weil.  As shown in the discussion above, McDermott was terminated by the Board because of the shortcomings in the firm's performance which resulted in a crisis of confidence in SVCMC's management and Board and McDermott on the part of the Creditors' Committee, the U.S. Trustee and the Court.  The debtors should not bear that cost.  McDermott's billed transition fees of $43,457.50 will be deducted from McDermott's fee application.

**E.**     <u>Fees incurred for St. Mary's Hospital closing</u>

On June 1, 2005 the Board instructed McDermott to take the necessary and appropriate action to close St. Mary's Hospital.  On June 17 the Executive Committee set September 1 as the target date for closure of the Hospital.  Smith attended the June 1 Board meeting and the June 17 Executive Committee meeting.   Despite these unambiguous instructions from the Board and the Executive Committee, McDermott did not even begin to prepare a motion for Court approval of the Hospital closing until August 5, and the motion was not filed until August 18.   The motion as filed was defective because it was not supported by any affidavits or financial data to document the necessity for closing the Hospital.  As a direct consequence of this delay, Court approval was not obtained until September 20.

Since canonical authority for the closure had been obtained in late June, and Department of Health approval of the closure was obtained on August 31, McDermott's failure to get the job done in accordance with its instructions from the client resulted in a twenty-day delay in closure of the Hospital.

The parties have stipulated that McDermott's fee application includes $248,704 in connection with the closure of St. Mary's Hospital.  For the reasons elaborated in point III and summarized just above, I conclude that McDermott's compensation in respect of the St. Mary's Hospital closure should be reduced by $200,000.  These services were grossly tardy and the work product was plainly inadequate because it did not provide the Court with a documented, factual predicate necessary for an order to close the Hospital.

To summarize, I conclude that McDermott's services in connection with the St. Mary's Hospital closure were not "performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed" within the meaning of Section 330(a)(3)(D) and that McDermott's delay in rendering those services was not "beneficial at the time at which the service was rendered" within the meaning of Section 330(a)(3)(C).  I further conclude that $200,000 is an appropriate amount to deduct from McDermott's $248,704 billings for the Hospital closing.

F.    **Consequential damage claims**

The debtors seek a reduction of McDermott fees to offset the damages sustained by SVCMC as a consequence of McDermott's default.   The debtors assert that St. Mary's Hospital was losing approximately $78,000 per day resulting in a total loss of $1,560,000 for the twenty-day delay.  I reject McDermott's argument that "there is no proof linking these purported losses to McDermott's services.   This claim is pure speculation" (Reply at 8-9).  The fact that St. Mary's Hospital was operated at a loss is neither speculative nor disputed.  The precise quantum of loss sustained during this specific twenty-day period may be impossible to quantify with dollar and cents precision on the trial record.  But there can be no doubt that the debtors suffered a large loss as a consequence of McDermott's delay in filing the motion.   It must be noted that McDermott's position now contrasts sharply with McDermott's representations to the Court in its contemporaneous submissions in August and September 2005.  As

noted in footnote 5, above, McDermott represented in the August 18, 2005 motion (¶ 47) that "The continued expense of more than $100,000 per day to fund the losses of St. Mary's Hospital operations is simply not justified and threatens the entire SVCMC reorganization."   In the Debtors' Omnibus Response dated September 2, 2005 (¶ 5) McDermott represented to the Court that "St. Mary's Hospital is currently losing more than $500,000 per week," which equates to $71,428 per day or $1,428,560 for a twenty-day delay.

However, the debtors' claim for consequential damages in connection with the St. Mary's Hospital closing delay is, in substance, a tort claim for professional malpractice.  The contested matter before the Court is McDermott's application for legal fees and the objections to McDermott's fees filed by the objecting parties.   In my view it is inappropriate to litigate a tort claim for malpractice in the guise of an objection to legal fees.   The standards for determining the merits of a malpractice claim and the quantum of damages to be awarded, if any, are not necessarily the same as the standards for determining the appropriateness of legal fees under the Bankruptcy Code.

Accordingly, I deny the debtors' request to reduce McDermott's legal fee application by reason of consequential damages resulting from delay in the St. Mary's Hospital closing, without pre-judice to the debtors' right to assert such damages in an appropriate malpractice action or proceeding.

Similarly, the debtors seek to recover (by deduction from McDermott's fee application) $230,000 in legal fees payable to Weil to obtain Bankruptcy Court approval to close St. Mary's Hospital and $120,000 of Weil legal fees for the transition.  These costs also represent putative consequential damages.  They may, or may not, be awarded as damages in a malpractice action, but they may not be recovered in an objection to McDermott's legal fees.  Accordingly, these claims also are denied, without prejudice.

## Conclusion

Upon the foregoing, the objections to McDermott's fee application are sustained to the extent of $460,543, consisting of $98,382 in respect of the SW and Huron retentions, $44,523 for the tortious interference investigation, $74,180 for change of management and CRO retention, $43,458 for

McDermott's fees for transition of counsel, and $200,000 of McDermott's fees relating to the St. Mary's Hospital closing.   The objections are sustained to the extent set forth herein and overruled to the extent

that the objectants sought a greater reduction in McDermott's legal fees.   Debtors' counsel will submit an order consistent with this Decision, approved as to form by all parties but without prejudice to any party's right to appeal.

Dated:  White Plains, NY
       August 29, 2007

                                               /s/Adlai S. Hardin, Jr.                                       
                                                             U.S.B.J.